1  Chad S. Hummel, SBN 139055
   chummel@sidley.com
2  Clayton S. Friedman, SBN 245513
   cfriedman@sidley.com
3  Mark D. Campbell, SBN 180528
   mcampbell@sidley.com
4  Michael Yaghi, SBN 202720
   myaghi@sidley.com
5  **SIDLEY AUSTIN LLP**
   1999 Avenue of the Stars, 17th Floor
6  Los Angeles, CA  90067
   Telephone:  (310) 595-2600
7  Facsimile:    (310) 595-2601

8  Ryan M. Sandrock, SBN 251781
   rsandrock@sidley.com
9  **SIDLEY AUSTIN LLP**
   555 California Street, Suite 2000
10 San Francisco, CA 94104
   Telephone:  (415) 722-1200
11 Facsimile:    (415)772-7400

12 Attorneys for Defendants
   DIRECTV and DIRECTV, LLC

13

14                   UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                        SAN FRANCISCO DIVISION

17 | FEDERAL TRADE COMMISSION, | Case No. 3:15-cv-01129 HSG |
   | --- | --- |
18 | Plaintiff, | Assigned to the Hon. Haywood S. Gilliam, Jr. |
19 | v. | **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
20 | DIRECTV, a corporation, | |
21 | and | |
22 | DIRECTV, LLC, a limited liability company, | Date:          November 19, 2015 |
23 | | Time:          2:00 p.m. |
   | | Courtroom:  15 – 18th Floor |
24 | Defendants. | Complaint Filed:   March 11, 2015 |
   | | Trial Date:          December 5, 2016 |

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II. UNDISPUTED MATERIAL FACTS .................................................................. 4

    A.  The Allegations in the Complaint .......................................................... 4

    B.  The FTC Has Produced No Evidence to Support Its ROSCA Contentions ........... 5

    C.  DIRECTV's 2013 Web Flow Makes Clear and Conspicuous Disclosures
        Related to the Premium Channel Packages Prior to Obtaining Consumers'
        Financial Information............................................................................ 6

    D.  DIRECTV's Current Webflow Makes Clear and Conspicuous Disclosures
        Related to the Premium Channel Packages Prior to Obtaining Consumers'
        Financial Information............................................................................ 10

    E.  DIRECTV Requires Consumers to Give Their Express Consent to The
        Premium Package Prior to Charging the Consumers................................... 14

III. LEGAL STANDARD...................................................................................... 15

IV. ARGUMENT ................................................................................................ 16

    A.  ROSCA's Requirements ......................................................................... 17

    B.  The Undisputed Evidence Conclusively Establishes that DIRECTV Complies
        with the Requirements of ROSCA............................................................ 18

        1.  Under the FTC's .com Guidelines, DIRECTV's Disclosures Comply
            with ROSCA ............................................................................. 18

        2.  A Transactional Webpage Is Not Deceptive If It Discloses All of the
            Material Terms and Requires the Consumer to Take Affirmative Steps
            to Accept the Offer.................................................................... 21

V.  CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)...................................................................................................16

*Baxter v. Intelius, Inc.*,
2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) ...................................................22, 23

*Berry v. Webloyalty.com, Inc.*,
2011 WL 1375665 (S.D. Cal. 2011), vacated on other grounds, 517 Fed. Appx.
581 (9th Cir. 2013)...............................................................................................23, 24

*Bott v. Vistaprint USA Inc.*,
392 F. App'x 327 (5th Cir. 2010) ........................................................................21, 22

*Burcham v. Expedia, Inc.*,
2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ..............................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1987).............................................................................................15, 16

*Fairbank v. Wunderman Cato Johnson*,
212 F.3d 528 (9th Cir. 2000) ....................................................................................16

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) ......................................................................................23

*FTC v. Health Formulas, LLC, et al.*,
2015 WL 2130504 (D. Nev. 2015) ...........................................................................17

*Hager v. Vertrue*,
2011 WL 4501046 (D. Mass. 2011) ...................................................................23, 25

*Hook v. Intelius, Inc.*,
2011 WL 1196305 (M.D. Ga. Mar. 28, 2011) ..........................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).............................................................................................15, 16

*Riensche v. Cingular Wireless, LLC*,
2006 WL 3827477 (W.D. Wash. Dec. 27, 2006) ......................................................23

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ....................................................................................15

*U.S. v. Helms*,
2010 WL 3384997 .......................................................................................................... 16

*In re Vistaprint Corp. Mktg. & Sales Practices Litig.*,
2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) (Atlas, J.) .................................... 21, 22, 23, 24, 25

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,
860 F.Supp. 1448 (C.D. Cal. 1993) ............................................................................ 16

**Statutes**

15 U.S.C. § 8403 ....................................................................................................... 1, 17, 18

15 U.S.C. § 8403 (1) ...................................................................................................... 18, 19

15 U.S.C. §8403 (2) ............................................................................................................. 24

**Other Authorities**

.Com Disclosures: How to Make Effective Disclosures in Digital Advertising,
*available at* https://www.ftc.gov/tips-advice/business-center/guidance/com-
disclosures-how-make-effective-disclosures-digital (last accessed October 1,
2015) ................................................................................................................ 17, 18, 19, 20

At FTC's Request, Court Stops Supplement Marketers From Deceptive Advertising
and Illegally Debiting Consumers' Accounts, *available at*
https://www.ftc.gov/news-events/press-releases/2014/10/ftcs-request-court-stops-
supplement-marketers-deceptive (last accessed October 1, 2015) .............................. 17

Dot Com Disclosures: Information About Online Advertising, *available at*
https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-issues-
guidelines-internet-advertising/0005dotcomstaffreport.pdf (last accessed October
1, 2015) ............................................................................................................................. 17

16 C.F.R. § 310.2(u) ............................................................................................................ 1

Fed. R. Civ. P. 56(a) ........................................................................................................... 16

Fed. R. Civ. P. 56(c) ........................................................................................................... 15

Fed. R. Civ. P. 56(e) ..................................................................................................... 15, 16

Rule 26 ................................................................................................................................. 3

Rule 26(a) ........................................................................................................................... 16

Rule 30(b)(6) ............................................................................................................... 3, 5, 9

Rule 34 .................................................................................................................................. 5

ii

Rule 37(c)(1) ............................................................................................................... 16

Rule 56 ............................................................................................................... 1, 16

1

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

2        TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE

3 THAT on November 19, 2015, at 2:00 p.m. or as soon thereafter as this matter may be heard before

4 the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, California 94102,

5 defendants, DirecTV and DirecTV, LLC (collectively, "DIRECTV") will, and hereby do, move this

6 Court for an order granting partial summary judgment, pursuant to Federal Rule of Civil Procedure

7 56, on counts three and four asserted in the Complaint of plaintiff, the Federal Trade Commission

8 ("FTC"), for purported violations of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15

9 U.S.C. §8403.

10

**MEMORANDUM OF POINTS AND AUTHORITIES**

11 **I.**        **INTRODUCTION AND SUMMARY OF ARGUMENT**

12        DIRECTV is entitled to partial summary judgment on the FTC's Third and Fourth causes of

13 action for alleged violations of ROSCA.  ROSCA requires that an online seller using a so-called

14 negative option feature[1] (a) clearly and conspicuously disclose all material terms of the transaction

15 before obtaining the consumer's billing information, (b) obtain the consumer's express informed

16 consent to the feature before charging the consumer's financial account, and (c) provide a simple

17 mechanism for a consumer to stop recurring charges.  15 U.S.C. § 8403.  In this case, the FTC

18 challenges the adequacy of DIRECTV's disclosures regarding its premium channel negative option

19 program and asserts that DIRECTV does not obtain consumers' express informed consent to the

20 terms of its free premium channel offer in its online subscription process.[2]

21        These claims are refuted by the undisputed evidence submitted with this Motion. During the

22 relevant time period, DIRECTV has offered new subscribers to its satellite television services free

23 premium movie channels (*e.g.*, HBO, Showtime, and Cinemax) generally for a period of three

24 months.  At the end of the free trial period, consumers have to call DIRECTV either to cancel or to

25

---

26 [1]     A "negative option feature" is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(u).

27 [2]     The FTC does not allege that DIRECTV failed to provide a simple mechanism for consumers to stop recurring charges.

28

change the premium channels they receive, or they are charged going forward.  These terms are disclosed in several ways on multiple occasions on DIRECTV's website when a consumer subscribes online and are done in a clear and conspicuous manner.  Those disclosures comply with both the requirements of the 2010 multi-State settlement agreement with DIRECTV[3] and the FTC's own "dot-com" disclosure guidelines.

As set forth herein and as is clear from the evidence submitted with this Motion, DIRECTV's detailed disclosures are contained in website info-hovers and hyperlinks that are invariably positioned in close proximity to the locations in the web flow promoting the free premium channel feature of a new programming subscription. The hyperlinks consistently are in the same font color and use the same icon to signal to the consumer that additional information is available.  When the hyperlinks are clicked, clear and conspicuous disclosures appear in the subscription web flow which plainly disclose the length of the free promotional pricing for the premium channels and the price that the consumer will pay for these channels after the expiration of the trial period.  The disclosures are easily understandable to the consumer.

DIRECTV also complies with ROSCA's requirement that it obtain the consumer's express informed consent to the premium channel negative option feature prior to charging the consumer for the premium channels.  In its current online subscription web flow, for example, DIRECTV makes disclosures about the negative option feature on every single page of the signup process, including in its Terms and Conditions to which a consumer must consent prior to placing an order.  Only after a consumer provides consent to the Terms and Conditions (which is one of but many instances where the negative option feature is disclosed) can that consumer take affirmative steps to complete the order.  Only then does DIRECTV receive the consumer's financial information.  Since DIRECTV does not receive a consumer's financial information until _after_ the consumer consents to the negative option feature, there is no ROSCA violation.

There is no contrary evidence.  In fact, the FTC's allegations in the Complaint are premised on screen shots from a single version of DIRECTV's website from 2013 (Complaint, Ex. 4) which is

---

[3] _See_ Declaration of Clayton Friedman, submitted concurrently herewith.

materially incomplete.  The FTC-concocted exhibit omits entirely the website's info-hovers and hyperlinked text that contain the very disclosures the FTC claims were not adequately made to consumers.  What's worse, nowhere in the Complaint does the FTC even mention the multi-state settlement agreement which covers the manner in which DIRECTV was required to disclose the terms of negative option features or explain why 50 States and the District of Columbia got it wrong in settling their investigation in the way they did.  There is no dispute that DIRECTV has never been the subject of any subsequent state enforcement action on this issue.

Finally, as the last straw, when DIRECTV sought through discovery in this case to elicit any facts the FTC relied upon in alleging that the terms of DIRECTV's premium channel offer are not clear and conspicuous or that consumers do not give express informed consent to the deal, the FTC completely refused to produce any consumer surveys, research, studies, or tests supporting its ROSCA claims -- or even disclose whether any such evidence exists.[4]  Nor did the FTC disclose any such information in its Rule 26 Initial Disclosures.  Most recently, during the duly noticed Rule 30(b)(6) deposition on this subject, the FTC's witness refused to answer all questions regarding whether the FTC has any consumer surveys, research, studies, or tests which support its ROSCA allegations.  Instead, the FTC's witness merely parroted allegations in the Complaint as its sole evidence purportedly supporting its ROSCA claims.  Of course, as noted above and described below, the Complaint's allegations in this regard are premised on website screen captures that omit all of the relevant web pages and disclosures.[5]

Regardless of the FTC's conduct here, the facts prove that DIRECTV has made the required disclosures for all relevant times in a manner that satisfies both the multi-state agreement and FTC guidelines.  Moreover, to the extent any such consumer surveys, research, studies, or tests exist, the FTC should be barred from relying upon such evidence in opposing this Motion.  Therefore, as more fully set forth below, DIRECTV is entitled to an order granting this Motion for Partial Summary Judgment as to the Third and Fourth Counts in the Complaint.

---

[4] *See* Declaration of Chad S. Hummel, filed concurrently herewith.
[5] Tellingly, when asked in the Rule 30(b)(6) deposition if the omissions were deliberate or whether they were intended to deceive the Court, the FTC's witness refused to answer.

## II.   UNDISPUTED MATERIAL FACTS

### A.   The Allegations in the Complaint

The barebones allegations in the FTC's Complaint highlight the deficiencies of the Third and Fourth Counts for violations of ROSCA.  The FTC selectively cites to a single excerpt from an exhibit in its Complaint, which is a copy of portions of DIRECTV's web flow from August 2013, and makes the allegation that "Defendants' webpages typically contain statements concerning an offer of free premium channels that are identical or similar to the following: "Free for 3 months. HBO + Starz + Showtime + Cinemax."  (Compl., ¶ 23) (citing to Ex. 4, p. 1).  The Complaint never again references any statement from DIRECTV's website.

Rather than addressing the multiple disclosures that DIRECTV makes in its web flows about its offer of three free months of premium channels (*see* Section II (C) & (D) below), the FTC makes the unsupportable conclusion that, "[t]o the extent that Defendants' webpages contain any qualifying disclosures concerning the offer of free premium channels, any such disclosures are inadequate in terms of their content, presentation, proximity, prominence, or placement such that consumers are unlikely to see or understand such disclosures."  (Compl., ¶ 24).  Noticeably absent from the Complaint are any allegations about the specific disclosures that DIRECTV makes to its consumers during the signup process or images of those disclosures that appear in DIRECTV's web flow, much less any explanation of why such disclosures are "inadequate."

The Complaint then alleges that DIRECTV's web flow "do[es] not convey to consumers:
A.   That Defendants automatically enroll consumers in a negative option continuity plan under which Defendants charge consumers for access to premium channels after an initial free period, typically three months, unless consumers contact Defendants and cancel their access to the premium channels;
B.   That consumers must affirmatively cancel the negative option continuity plan before the end of the initial free period to avoid charges;
C.   That Defendants use consumers' credit or debit card information to charge consumers for the negative option continuity plan; and
D.   The costs associated with the negative option continuity plan."
(Compl., ¶24 (A) – (D)).

Based upon these allegations, the FTC alleges in support of its third purported cause of action that "Defendants have charged or attempted to charge consumers for access to premium channels . . .

---

4

through a negative option feature while failing to clearly and conspicuously disclose all material terms of the transaction before obtaining consumers' billing information." (Compl., ¶39).   The FTC also alleges in support of its fourth purported cause of action that "Defendants have charged or attempted to charge consumers for access to premium channels . . . through a negative option feature while failing to obtain consumers' express informed consent before charging their credit card, debit card, bank account, or other financial account for those premium channels." (Comp., ¶ 41).

As explained below, each of the FTC's claims is refuted by the undisputed evidence which demonstrates that (1) DIRECTV provides clear and conspicuous disclosures that the negative option feature is free for the first three months and that the consumer will then be charged regular prices when the promotional period ends (unless cancelled) and (2) DIRECTV obtains the consumer's express informed consent to the premium channel offer prior to charging a consumer's account.

**B.**     **The FTC Has Produced No Evidence to Support Its ROSCA Contentions**

The FTC designated Kerry O'Brien, its Assistant Regional Director in San Francisco, as its Rule 30(b)(6) deponent on topics related to, among others "[t]he results of any and all research, surveys, or tests conducted by the FTC concerning DIRECTV's advertising that the FTC contends has been or is deceptive." (Hummel Decl., ¶ 8; Ex. F). During her August 28, 2015, deposition, Ms. O'Brien was instructed not to answer whether the FTC conducted any research, surveys, or tests:

1.  to ascertain whether consumers who subscribed online viewed or were likely to see or view, understand, or appreciate the disclosures related to the premium channel package on the website  (*Id.* Ex. G, 84:14-25; 87:14-88:13; 190:12-23);

2.  that support the FTC's contention that the disclosures for the three free months of premium channels were inadequate  (*Id.*, Ex. G, 131:5-17); and

3.  to ascertain whether consumers give express informed consent to the premium channel offer.  (*Id.*, Ex. G, 149:23-150:8).

Moreover, the FTC has failed to produce and identify any such information in its Initial Disclosures and in response to DIRECTV's Rule 34 document requests.  The FTC served its Initial Disclosures on June 9, 2015.  (Hummel Decl., ¶ 2; Ex. A).  Nowhere does the FTC identify any consumer research, surveys, or tests.  (*Id.*). Moreover, Request Numbers 8, 15, 17 & 18 of

5

DIRECTV's First Set of Requests for Production of Documents to Plaintiff Federal Trade Commission seek documents related to the ROSCA allegations.  (Hummel Decl., Ex. B, 4:7 – 6:13).  To date, the FTC has produced no consumer surveys, studies, research, or tests responsive to these requests  (*id.*, ¶ 10), therefore confirming that it has no evidence to support its ROSCA claims.

Finally, Ms. O'Brien was asked during her deposition to explain the factual basis for the FTC's contentions in its Complaint, including those allegations supporting its ROSCA allegations.  Instead of providing any detailed information, she merely referred back to the Complaint.  For example, when asked the basic question "[w]hat factual basis did the FTC have when it filed its lawsuit contending that . . . DIRECTV's advertising has been deceptive," she merely responded "[t]he factual basis is laid out in the complaint." (*Id.*, Ex. G, 24:4-9).  She further stated "the complaint explains why consumers are unlikely to understand the terms of the offer that DIRECTV is making.  And it explains that in pretty good detail in the complaint." (*Id.*, Ex. G, 66:9-12).  When asked if the FTC had any facts to support its contention in the Complaint that consumers do not see or understand the disclosures for the premium channel offers on DIRECTV's online web flow, Ms. O'Brien merely referred back to the allegations in the Complaint and its attachments.  (*Id.*, Ex. G, 131:18 – 133:4).  Thus, not only has the FTC failed to produce any consumer surveys, research, or tests in support of its claims, it likewise has failed to cite any facts to support those claims either.

### C.   DIRECTV's 2013 Web Flow Makes Clear and Conspicuous Disclosures Related to the Premium Channel Packages Prior to Obtaining Consumers' Financial Information

Exhibit 4 to the Complaint is a misleadingly selective print out of DIRECTV's subscription web flow from August 2013, and is the only "evidence" the FTC cites in its Complaint to support its ROSCA claims.  (Compl., ¶ 21).  During the discovery process, the FTC has only produced innocuous print advertisements, newspaper ads, video clips, and webpage photos in support of its ROSCA claims.  (Hummel Decl., ¶ 7). None of these documents explains how the subscription webflow violates ROSCA.  Moreover, during her deposition, when Ms. O'Brien was asked about the disclosures on the webflow, she merely stated that "the complaint explains why consumers are unlikely to understand the term of the offer that DIRECTV is making.  And it explains that in pretty

good detail in the complaint."  (*Id.*, Ex. G, 66:9-12).  Therefore, this Motion, by necessity, focuses on DIRECTV's entire subscription web flow from 2013 to demonstrate why the allegations about DIRECTV's alleged violation of ROSCA fail as a matter of law.

DIRECTV's 2013 web flow includes on multiple pages during the signup process clear and conspicuous disclosures of material terms related to premium packages.   (Leever Decl., ¶4).  Tellingly, Ms. O'Brien refused to answer during her deposition why the FTC did not include any of DIRECTV's online disclosures as exhibits to its Complaint.  (Hummel Decl., Ex. G, 69:21 – 70:5; 133:5-17).  Starting with the "Package Selection" page, DIRECTV advises consumers as to which packages (*e.g.*, Entertainment, Choice and Ultimate) include three free months of the premium movie channels HBO, STARZ, SHOWTIME and Cinemax:



(Leever Decl., ¶5; Ex. A, p. 4)

At the bottom of the Package Selection page, the words "Additional Offer Details" appear in blue lettering against a white background, clearly signaling a hyperlink to more information:

ALL OFFERS REQUIRE 24-MONTH AGREEMENT. Offers end 10/2/13 and are based on approved credit; credit card required, except in MA & PA. New customers only (lease required). Applicable use tax adjustment may apply to the retail value of the installation. Programming, pricing and offers are subject to change and may vary in certain markets. Customers activating the CHOICE Package or above or the MAS ULTRA Package will be automatically enrolled in the 2013 season of NFL SUNDAY TICKET at no additional cost and will receive a free upgrade to NFL SUNDAY TICKET MAX for the 2013 season.
Additional Offer Details

(*Id.*, ¶ 6; Ex. A, p. 7).

This hyperlink to "Additional Offer Details" appears on page 4 of Exhibit 4 to the Complaint. However, the FTC misleadingly failed to include the text of the "Additional Offer Details" as an exhibit.  (*See* Compl., Ex. 4, p. 4).  During the FTC's deposition, Ms. O'Brien refused to answer why the FTC did not include this disclosure in Exhibit 4.  (Hummel Decl., Ex. G, 72:16 – 73:3). When that clear and conspicuous hyperlink is clicked, a white box labeled "Additional Information" appears against a dark background and includes the following disclosure for the premium packages:



(Leever Decl., ¶6; Ex. A, p. 23).

Additional disclosures about the negative option feature appear in the "Cart" page after the consumer selects his or her package, as depicted below.  (*Id.*, ¶ 7).  There is a prominent blue banner which spans across the entire page and states in black letters the words "Package and Programming." (*Id.*).  Under that heading is a light grey box which has a prominent orange check-mark next to the wording "Premium Channels."  (*Id.*). The premium channel selections and their prices are all in black font.  (*Id.*).  In contrast <u>and for prominence</u>, green font is used to highlight the three free months of premium channels and the three month total discount (*id.*, ¶7; Ex. A, p. 46):

As can also be seen above, there is another blue hyperlink with a "[?]" icon immediately next

to the "FREE for 3 months" language.  (*Id.*, ¶8).  Hovering on that [?] brings up a prominent light blue box with a darker blue border, with the following additional disclosure about the negative option feature in prominent black lettering:

For a limited time, you get every premium move channel FREE for 3 months as part of our new customer offer. After promotional period ends, you will be charged the price in effect unless you call to cancel.

(*Id.*, ¶8; Ex. A, p. 58).  Notably, the FTC included a printout of the Cart page in Exhibit 4 of its Complaint, but again misleadingly failed to include the necessary disclosure as an exhibit or explain its terms in the allegations.  (Compl., Ex. 4, p. 5).  And during its 30(b)(6) deposition, the FTC refused to answer whether or not the FTC has any tests or surveys which would demonstrate that a consumer is unlikely to see or understand the disclosures listed on the Package & Programming page of the webflow.  (Hummel Decl., Ex. G, 135:12-20).

DIRECTV also discloses in an easy-to-follow chart the prices a consumer will pay throughout the term of the agreement. (Leever Decl., ¶9). More specifically, as can be seen on P. 5 of Exhibit 4 to the Complaint, DIRECTV includes a hyperlink that states "View Monthly Cost" in its Cart page.  While Ms. O'Brien refused to answer whether the FTC performed any analysis as to whether consumers see or understand this page of the web flow, (Hummel Decl., Ex. G, 146:9-17), it is undisputed that clicking this link allows the consumer to view precisely how much will be billed for each individual month of service for the premium channels: (Leever Decl., Ex. A, p. 77):

*zip code: 92108 change*

| Package & Programming | | | | | | |
|---|---|---|---|---|---|---|
| ✓ TV Package    Change | | | | | | NEXT ▶ |
| XTRA \| What is my agreement? | $70.99 | $70.99 | $70.99 | $70.99 | $70.99 | $70.99 |
| $31 Bill Credit for Months 1-12 [?] \| instant rebate | -$31.00 | -$31.00 | -$31.00 | -$31.00 | -$31.00 | -$31.00 |
| ✓ Premium Channels    Change | | | | | | NEXT ▶ |
| HBO [?] | $17.99 | $17.99 | $17.99 | $17.99 | $17.99 | $17.99 |
| SHOWTIME UNLIMITED [?] | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 |
| STARZ Super Pack [?] | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 |
| Cinemax [?] | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 | $12.99 |
| FREE for 3 months: HBO, SHOWTIME, STARZ, and Cine | -$47.00 | -$47.00 | -$47.00 | - | - | - |
| Watch More Save More [?] \| instant savings | -$9.96 | -$9.96 | -$9.96 | -$9.96 | -$9.96 | -$9.96 |
| AUDIENCE Network [?] | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

9

The above image depicts pricing for the first six months of service.  (*Id.*, ¶ 9).  DIRECTV continues to use black font for the cost for each premium channel, continues to use green font for the discount applied to that channel during the three month promotional period, and continues to use the same "[?]" icon with blue font to signal an additional disclosure.  (*Id.*, ¶10).  Notably, for months four through six of a subscription, the "View monthly cost" page clearly discloses that the promotional discount for the premium channels no longer applies.  (*Id.*). This is consistent with the disclosures listed above, which state the promotional period lasts only three months and that normal prices will be charged for these channels unless the consumer contacts DIRECTV.

Only after disclosing all material terms and conditions related to the premium channel offer is the consumer then asked to enter his or her contact and payment information and affirmatively consent to the purchase and conversion of the premium channels after three months.  (*Id.*, ¶11).

**D.      DIRECTV's Current Webflow Makes Clear and Conspicuous Disclosures Related to the Premium Channel Packages Prior to Obtaining Consumers' Financial Information**

To the extent the FTC's Complaint includes allegations relating to DIRECTV's current practices, the undisputed evidence establishes compliance with ROSCA.  Since about early 2014 and continuing to the present, DIRECTV, in its ongoing commitment to improve consumers' experience on the company subscription website, has included even more robust disclosures about the free premium channel offer to additional locations throughout the web flow.  (*Id.*, ¶13).  For instance, the above-referenced disclosure contained within the hyperlink labeled "Additional Offer Details" can now be accessed on *every page* of the current web flow. (*Id.*, ¶14).  The disclosures that appeared on the consumer's Cart page were added to the Package Selection pages as well. (*Id., ¶*15).

In the Package Selection pages, each package description has a box indicating that the premium channels are "FREE for 3 months," and includes a blue hyperlinked icon of an "i" enclosed in a circle immediately next to that language:



1    (*Id.*, ¶16; Ex. B, p. 4).

2        Clicking the hyperlinked icon displays another white box with a prominent black border

3    containing a disclosure about the negative option feature:



4
5
6
7
8
9

10   (*Id.*, ¶16; Ex. B, p. 6).  This disclosure can be accessed on every page as the consumer progresses

11   through the web flow.  (*Id.*, ¶17).

12       Moreover, as seen below on the "Add more great programming" page, DIRECTV indicates

13   that premium packages are "optional."  (*Id.*, ¶17).  Consistent with prior disclosures, DIRECTV

14   continues to use blue hyperlinks with the same "i" icon placed near the relevant information about

15   the negative option feature.  (*Id.*). When clicked, this hyperlinked icon displays another box

16   containing a disclosure about the terms of the negative option feature, which has a black border and

17   black font.  (*Id.*).  To the right of the page, there is also a blue hyperlink with the words "Remove"

18   which gives the consumer the option of removing the premium package:

19



20
21
22
23
24
25
26
27

28

(*Id.*, ¶¶18-19; Ex. B, p. 18).

Moreover, as seen on the Cart page below, DIRECTV continues to use green font to show the discounts on the premium channels, in contrast to the black font which has the regular monthly cost. (*Id.*, ¶20). DIRECTV again uses the same hyperlinked "i" icon with blue font which is placed immediately next to the relevant statement "FREE for 3 months: HBO, SHOWTIME, STARZ and Cinemax," signaling to the consumer that there is an additional disclosure for the premium package. (*Id.*). Clicking on the blue hyperlink brings up another white box with a prominent black border containing that disclosure. (*Id.*). Notably, there is even an additional blue hyperlink with the word "Remove" where the consumer *again* has the option of removing the premium package:



(*Id.*, ¶¶ 20-21, Ex. B, p. 31). As seen above, the current webflow also allows a consumer to view the monthly costs of the selected packages by clicking on the blue hyperlink in the Cart that states "View Monthly Cost." (*Id.*, ¶22).

The below image depicts the new page the consumer is taken to when that hyperlink is clicked. (*Id.*). As seen in that image, DIRECTV continues to use green font to signal discounts and black font to signal normal prices. (*Id.*). DIRECTV also continues to use the same blue hyperlinked "i" icon placed next to the premium package to signal that additional information is available to the consumer about the terms of the premium package. (*Id.*). When the icon is clicked, as depicted below, there is yet another disclosure that repeats the terms of the negative option feature. (*Id.*).

12

And the chart again shows that for months four through six, the promotional discount is no longer applicable to the premium channel (*id.*, ¶¶ 22-23):



(*Id.*, Ex. B, p. 38).

The "Terms and Conditions" hyperlink, also in blue font, can now also be accessed on *every page* of the web flow, including the Check Out page (as seen below).  (*Id.*, ¶24).  Clicking it causes additional disclosures about the premium channel offer to appear in a large white box with black font that takes up nearly the entire web page and blacks out the rest of the page (*id.*, Ex. B, p. 57):



Only after disclosing all material terms and conditions related to the premium channel offer is the consumer then asked to enter his or her contact and payment information and affirmatively consent to the purchase and conversion of the premium channels after three months.  (*Id.*, ¶25).

**E.     DIRECTV Requires Consumers to Give Their Express Consent to The Premium Package Prior to Charging the Consumers**

Express informed consent to the negative option feature has always been obtained before the consumer's financial information is provided to DIRECTV.  (*Id.*, ¶26).  As seen in the image below for the 2013 version of the website, at the bottom of the Checkout page where the consumer enters his or her financial information, there is a prominent hyperlink in blue lettering labeled "By clicking 'Submit Order' I agree to these Terms and Conditions."  (*Id.*).  Immediately adjacent to that hyperlink is a prominent orange box containing contrasting white lettering "I Accept.  Submit My Order" (*id.*, Ex. A; p. 118):

By clicking "Submit Order" I agree to these Terms & Conditions     I Accept. Submit My Order.

During Ms. O'Brien's deposition, she was asked whether it is the FTC's contention that a consumer clicking on the above orange box constitutes express informed consent to the premium package offer.   (Hummel Decl., Ex. G, 148:25 – 149:6).  Highlighting the FTC's lack of evidence, the entirety of Ms. O'Brien's answer was "I think given the whole purchase flow the Commission is alleging in its complaint that consumers didn't have informed consent."  (*Id.*, Ex. G, 149:20-22)  Ms. O'Brien also refused to answer whether the FTC performed any studies or analyses as to whether or not clicking on the above button constitutes express informed consent.  (*Id.*, Ex. G, 149:23 – 150:8).

In the current version of the web flow, at the bottom of the Checkout page after the consumer enters his or her financial information and views all the above referenced disclosures, there is a radio button which requires the consumer to give his or her express consent to the Terms and Conditions:

☐ I agree to the Terms and Conditions

**Place My Order**

(*Id.*, ¶27; Ex. B, pp. 52-53).

As can also be seen in the image above for the current web flow, there is again a prominent blue hyperlink which sends the consumer to the same Terms & Conditions referenced above and found on every other page in the web flow.  (*Id.*, ¶ 28).  The Terms and Conditions include, among other disclosures, the disclosure about the premium channels:

> If you agree to the **free premium networks for three months**, you will begin being charged the full, in-effect price per network after the promotional period ends unless you cancel them by calling Customer Service.

(*Id.*, ¶29; Ex. B, p. 57).

A consumer must take the affirmative step of acknowledging that he or she consents to the Terms and Conditions before he or she can press the "Place My Order" button, which then transmits the consumer's financial information to DIRECTV.  (*Id.*, ¶ 29).  In other words, it is only after DIRECTV discloses all material terms and conditions about the negative option feature, and the consumer affirmatively consents to the negative option feature, that it receives financial information. (*Id.*).  DIRECTV therefore does not have access to nor does it receive the consumer's payment information until after the consumer affirmatively consents to all the Terms and Conditions, including those required by ROSCA, by actively pressing the appropriate button to purchase his or her order.  (*Id.*, ¶30).  After placing the order, the consumer also receives an email confirming the details of the offer, which again discloses the terms of the premium movie channels offer, including the need to call to cancel.  (*Id.*, ¶31).

## III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that establish the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1987).  If the moving party meets its burden, the burden then shifts to the opposing party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987).

1  To establish the existence of a genuine issue of material fact, the non-moving party may not

2  rely upon mere allegations in its pleadings, but rather is required to tender evidence of specific facts

3  in the form of affidavits and/or discovery.  *Celotex Corp.*, 477 U.S. at 324; *Fairbank v. Wunderman*

4  *Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  Moreover, a party cannot defeat summary

5  judgment merely be showing "that there is some metaphysical doubt as to the material facts."

6  *Matsushita*, 475 U.S. at 587; *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986) ("mere

7  existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.").

8  Nor can a party opposing summary judgment rely upon evidence not produced during the

9  discovery process or in the initial disclosures.  Rule 37(c)(1) provides, in pertinent part, "[i]f a party

10  fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

11  allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial,

12  unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1).  The Advisory

13  Committee Notes expressly state that this is applicable to Rule 56 motions for summary judgment.

14  *See* Advisory Committee Notes to 1993 Amendments to subdivision (c)(1) ("This automatic sanction

15  provides a strong inducement for disclosure of material that the disclosing party would expect to use

16  as evidence . . . on a motion, such as one under Rule 56."); *see also U.S. v. Helms*, 2010 WL

17  3384997 at *2-3 (S.D. Cal. Aug. 26, 2010 (striking evidence submitted by defendant in opposition to

18  motion for summary judgment because it was not disclosed during discovery).

19  Upon a showing that there is no genuine dispute of material fact as to particular claims or

20  defenses, the court may grant summary judgment in the party's favor on "each claim or defense—or

21  the part of each claim or defenses—on which summary judgment is sought."  Fed. R. Civ. P. 56(a);

22  *see Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 860 F.Supp. 1448, 1450 (C.D.

23  Cal. 1993).

24  ## IV.   **ARGUMENT**

25  As set forth above, the undisputed evidence conclusively demonstrates that there are no

26  material factual disputes as to Counts III and IV.  Moreover, as discussed below, this undisputed

27  evidence establishes that DIRECTV meets the requirements of ROSCA as well as guidelines

28  provided by the FTC to assist businesses in meeting those requirements.

A.     **ROSCA's Requirements**

Section 8403 of ROSCA, which took effect on December 29, 2010, provides that it is "unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature. . . unless the person--

(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;

(2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and

(3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."

FTC staff—the same government entity bringing this enforcement action—issued a document in March 2013 entitled ".com Disclosures: How to Make Effective Disclosures in Digital Advertising," (the ".com Guidelines") which "provides FTC staff guidance concerning the making of clear and conspicuous online disclosures that are necessary pursuant to the laws the FTC enforces." *See* ".com Disclosures, How to Make Effective Disclosures in Digital Advertising", *available at* https://www.ftc.gov/tips-advice/business-center/guidance/com-disclosures-how-make-effective-disclosures-digital (last accessed October 1, 2015).[6]

The first time the FTC brought a ROSCA enforcement action was nearly four years after ROSCA was enacted, on October 7, 2014. *See FTC v. Health Formulas, LLC, et al.,* 2015 WL 2130504 (D. Nev. 2015) (granting FTC's request for preliminary injunction against defendants who upsold products through negative option features without complying with ROSCA requirements).[7] Notwithstanding the lack of applicable legal precedent as to ROSCA's precise requirements,

---

[6]     The Commission's first guidance, released in May 2000, is available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-issues-guidelines-internet-advertising/0005dotcomstaffreport.pdf (last accessed October 1, 2015).

[7]     *See also* https://www.ftc.gov/news-events/press-releases/2014/10/ftcs-request-court-stops-supplement-marketers-deceptive (FTC press release describing case as first FTC action alleging violations of ROSCA) (last accessed October 1, 2015).

DIRECTV has carefully tailored its online advertising to satisfy the statutory language of Section 8403 and to adhere to the FTC's pronouncements regarding effective online disclosures.

**B.** **The Undisputed Evidence Conclusively Establishes that DIRECTV Complies with the Requirements of ROSCA**

As set forth in the concurrently filed Friedman Declaration, DIRECTV's disclosures are made pursuant to a multi-state settlement agreement. Tellingly, there has never been any enforcement action against DIRECTV related to the multi-state settlement agreement. This is not surprising because, as explained below, DIRECTV is in full compliance with that agreement and ROSCA because it (1) clearly and conspicuously discloses all material terms of the negative option feature prior to obtaining consumers' financial information and (2) obtains consumers' express informed consent before charging consumers' financial accounts for the negative option feature.

**1.** **Under the FTC's .com Guidelines, DIRECTV's Disclosures Comply with ROSCA**

The first prong of ROSCA requires that a seller, prior to charging or attempting to charge a consumer for goods or services sold online through a negative option feature, clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information. 15 U.S.C. § 8403 (1). In the overview to the .com Guidelines, the FTC staff advises:

> …In evaluating whether a disclosure is likely to be clear and conspicuous, advertisers should consider its placement in the ad and its proximity to the relevant claim. The closer the disclosure to the claim to which it relates, the better. Additional considerations include: the prominence of the disclosure; whether it is unavoidable, whether other parts of the ad distract attention from the disclosure, [and] whether the disclosure needs to be repeated at different places on the website…

(*See* .com Guidelines at pp. 1-2).

With regard to proximity, the FTC recommends placing the disclosure as close as possible to the triggering claim. "A disclosure is more effective if it is placed near the claim it qualifies or other relevant information. Proximity increases the likelihood that consumers will see the disclosure and relate it to the relevant claim or product." *Id.* at 8.

Recognizing that the details of some disclosures may be ***too complex*** to describe adjacent to the claim, the Commission expressly endorses the use of hyperlinks. *See id.* at 10. "The key

considerations for evaluating the effectiveness of all hyperlinks" include "the labeling or description of the hyperlink;" "consistency in the use of hyperlink styles;" "the placement and prominence of the hyperlink on the webpage or screen;" and "the handling of the disclosure on the click-through page or screen." *Id.* at 11.  It is important to reiterate that the FTC approves and favors the use of hyperlinks when the overall terms and transaction are complicated.

The FTC's .com Guidelines recommends that a hyperlink's label, whether text or graphic, should be obvious.  "Consumers should be able to tell that they can click on a link to get more information." *Id.*  Similarly, "[u]sing hyperlink styles consistently increases the likelihood that consumers will know when a link is available." *Id.* at 12.  In addition, the "hyperlink should be proximate to the claim that triggers the disclosure so consumers can notice it easily and relate it to the claim," which, typically, "means that the hyperlink is adjacent to the triggering claim." *Id.* at 13. "Format, color, or other graphics treatment also can help to ensure that consumers notice the link." *Id.*  And, once the hyperlink is accessed, "[g]etting to the disclosure on the click-through should be easy" and "take consumers directly to the disclosure," which "should be easy to understand." *Id.*

The .com Guidelines further advises that "disclosures are more likely to be effective if they are provided in the context of the ad, when the consumer is considering the purchase." *Id.* at 14.  It further advises "[w]here advertising and selling are combined on a website or mobile application…disclosures should be provided before the consumer makes the decision to buy, *e.g.*, before clicking an 'order now' button or a link that says 'add to shopping cart.'" *Id.*

Finally, the .com Guidelines notes that "[i]t may be necessary to disclose information more than once" since "[r]epeating a disclosure makes it more likely that a consumer will notice and understand it, and will also increase the likelihood that it will be seen by consumers who may be entering the website at different points." *Id.* at 19.

While the .com Guidelines may not constitute a rule or regulation, DIRECTV's on-line presentation of these disclosures is consistent with FTC staff guidance set forth in the .com Guidelines.  DIRECTV's hyperlinked disclosures are positioned strategically for maximum impact. In the 2013 web flow, disclosures were made (1) in the Additional Offer Details hyperlink in the Package Selection Page, (2) in the Cart page immediately adjacent and tied directly to the premium

movie channel offer, where the consumer is most focused on the details of his or her selection before completing the purchase, and (3) in the View Monthly Cost hyperlink in the Cart page.  (Leever Decl., ¶¶6-10).  More recently, disclosures are immediately adjacent and tied directly to the premium movie channel offers in (1) the Package Selection page, (2) the Add more great programming page, (3) the Cart page, and (4) the View Monthly Cost page.  (*Id.*, ¶¶15-16, 18, 20, 22).

In addition, in the 2013 web flow, the contrasting green and blue lettering and the blue "[?]" icon highlighted for the consumer that additional important information was to be found by accessing those tactically placed hyperlinks.  (*Id.*, ¶¶ 7-10; Ex. A, pp. 4, , 46, 58, 77).  The current web flow also use similar graphics that prompt the consumer to click a hyperlinked icon of an "i" encircled in blue.  (*Id.*, ¶¶ 16, 18, 20-24; Ex. B, pp. 4, 6, 18, 30-31, 37).  Moreover, regardless which particular graphic DIRECTV historically has used to signal a hyperlink, the hyperlink icon remains consistent throughout each web flow, indicating to the consumer that additional information is to be found by accessing the hyperlinks.  Once the consumer clicks the icon, he or she is taken directly to the disclosure, which appears inside a prominent box with a white background and black lettering. (*See e.g. id.,* Ex. B, p. 57).

Further, the information contained on the webpage, combined with the click-through disclosures, details for the consumer in readily understandable language what the free premium movie channel offer entails, including the current cost of the premium channels, the savings, the limited time of the promotional period, and that the consumer must call to cancel to avoid additional charges.  Finally, DIRECTV ensures that disclosures are repeated on every page of the web flow by including them in the Additional Details and Terms and Conditions hyperlinks, thus making it more likely the consumer will notice and understand the disclosure.  (*Id.*, ¶¶ 14, 24).

These facts are indisputable and the FTC has no produced no facts to the contrary.  The FTC refused to answer during its deposition whether DIRECTV's online disclosures complied with the.Com Guidelines.  (Hummel Decl., Ex. G, 137:3 – 138:9).  The FTC also refused to answer whether it had performed any studies, analyses, or surveys that would demonstrate if a different presentation of DIRECTV's disclosures would render it more likely that a consumer would see or

view the disclosure of material terms, thus confirming the FTC's lack of evidentiary support for its allegations.  (*Id.*, Ex. G, 154:21 – 156:4; 161:18 – 163:22).

It is not until all these disclosures are made that the consumer then is asked to submit his or her financial information to DIRECTV (and as described below, affirmatively consent to the negative option feature prior to DIRECTV charging the consumer).  (Leever Decl., ¶¶11, 25, 26-30).  Therefore, not only does DIRECTV comply with the FTC's .com Guidelines by providing clear and conspicuous disclosures in accordance with those guidelines, but it also discloses all material terms of the negative option feature in compliance with ROSCA.

> **2.     A Transactional Webpage Is Not Deceptive If It Discloses All of the Material Terms and Requires the Consumer to Take Affirmative Steps to Accept the Offer**

As noted above, case law on the application of ROSCA is scant.  However, a number of district courts have looked at the question of consumer deception as it relates to online disclosures and have held that when the material terms of an online sales transaction are disclosed on the webpage where consumers are required to take affirmative steps to accept an offer, a plaintiff cannot state a claim based on deception.  The seminal case on this issue is *In re Vistaprint Corp. Mktg. & Sales Practices Litig.*, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) (Atlas, J.), aff'd *Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010) ("Vistaprint").

In *Vistaprint*, the plaintiffs claimed they were "tricked into enrolling in membership programs" that resulted in "unauthorized charges to their debit or credit cards for monthly fees." 2009 WL 2884727, at *1.  Specifically, after completing an online purchase of business cards, consumers were directed to a webpage that offered a $10 rebate on the purchase.  *Id.* at *4-5.  A boxed area on that webpage provided space for consumers to enter their email address, to answer three "survey" questions (in some versions of the webpage), and to click on a "Yes" button.  *Id.* at *5-6.  "Offer Details" located next to the boxed area disclosed that clicking "Yes" would enroll consumers in the "VistaPrint Rewards" program, which, after a 30-day free trial membership, would cost $14.95 per month and would be charged to the credit or debit card they had used for their original purchase.  *Id.*  The Offer Details stated in relevant part:

21

> Simply click "Yes" to activate your trial membership and take advantage of the great savings that *VistaPrint Rewards* has to offer plus claim your $10.00 Cash Back. The membership fee of $14.95 per month will be charged by *VistaPrint Rewards* to the credit card you used today with VistaPrint after the 30-day FREE trial and then automatically charged/debited each month at the then-current monthly membership fee so long as you remain a member. Of course, you can call toll-free at 1-888-243-6158 and speak to a *VistaPrint Rewards* member representative within the first 30 days to cancel – you will have paid nothing and owe nothing.

*Id.* at *6. Consumers enrolled in the program and incurred monthly charges simply by entering their email address and clicking the "Yes" button.

The district court dismissed the complaint, holding that "Plaintiffs' allegation regarding the deceptive nature of the webpages at issue is clearly and unequivocally refuted by the website pages themselves," whose language is "clear and easily understandable by anyone capable of making an online purchase of business cards." *Id.* at *4-*6; s*ee also id.* at *8 ("review of the webpages on which Plaintiffs base their claims convinces the Court *without reservation that, as a matter of law, the webpages are not deceptive*") (emphasis added). Given the plain language of the disclosures and their proximity to the "Yes" button, the court held that a "consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive." *Id.* at *6; *see also id.* at *7 (claim of deception refuted because consumers had to take affirmative steps to accept offer).[8]

Similarly, in *Baxter v. Intelius, Inc.,* 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010), the plaintiffs alleged that they had been "enrolled…in a negative option monthly membership program without their knowledge or permission." *Id.* at *1. The enrollment process in *Baxter* was similar to that at issue in *Vistaprint*: (i) consumers were given the option to enroll in a membership program after completing the purchase of a product; (ii) the enrollment page required consumers to enter their email address twice and click a button in order to enroll; (iii) offer details were disclosed adjacent to the email entry box; and (iv) the offer details explained that the cost of the membership would be

---

[8]     The Fifth Circuit affirmed the "well-reasoned, detailed" decision "essentially for the reasons stated by the district court." *Bott*, 392 F. App'x at 328.

automatically charged to the consumer's credit card.  *Id.* at *4.  In dismissing the complaint with

prejudice, Judge Guilford, citing *Vistaprint*, reasoned that the "website was not deceptive as a matter

of law" (*id.* at *4) because it required consumers "to take affirmative steps to accept and provide[d]

complete information about the results of those steps."  *Id.* at *5.  The court also noted that because

"the full disclosure and 'true facts' were located right next to the button" the plaintiff clicked to

enroll (*id.* at *6), her "failure to read the information provided does not constitute a fraudulent

business practice."  *Id.* at *1.

Other courts have adopted the reasoning in *Vistaprint* to reject similar claims.  In *Berry v.*

*Webloyalty.com, Inc*., 2011 WL 1375665 (S.D. Cal. 2011), vacated on other grounds, 517 Fed.

Appx. 581 (9th Cir. 2013), for example, the court dismissed misrepresentation claims regarding an

online membership program because the defendant's disclosures about the program were located

next to where consumers indicated their acceptance of the offer by entering their email address and

clicking on a "YES" button.  2011 WL 1375665 at *4; *id.* at *5 (plaintiff "took three affirmative

steps to accept the terms of the club membership—he entered his email twice and clicked the 'YES'

button").  The court also found the plaintiff's unfair competition and false advertising claims to be

baseless in light of the multiple times the disclosures were made on the website.  *Id.* at *6; *see also*

*Hager v. Vertrue*, 2011 WL 4501046, *6 (D. Mass. 2011) (granting summary judgment because the

"clear language on each landing page advising consumers *before* they enter their email addresses

[twice] and click 'Yes'" was "sufficient to place reasonable consumers on notice…they were

entering into new membership programs") (emphasis in original).

This self-evident proposition—that clearly displayed disclosures preclude a claim based on

deception—has been upheld in a variety of contexts.  *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285,

289-90 (9th Cir. 1995) (upholding dismissal of UCL and CLRA claims challenging mailer that

suggested plaintiff had won sweepstakes, where no reasonable consumer could be deceived by the

advertisement); *Hook v. Intelius, Inc.*, 2011 WL 1196305, at *8 (M.D. Ga. Mar. 28, 2011) (no EFTA

claim where plaintiff was informed before entering payment information and clicking on button that

he was signing up for service); *Riensche v. Cingular Wireless, LLC*, 2006 WL 3827477, at *2 (W.D.

Wash. Dec. 27, 2006) ("Mr. Riensche is incorrect that his decision not to read the Terms absolves

1   him from any obligation to be bound by those Terms."); *Burcham v. Expedia, Inc.*, 2009 WL

2   586513, at *2, *4 (E.D. Mo. Mar. 6, 2009) ("A customer on notice of contract terms available on the

3   internet is bound by those terms…  That [plaintiff] either didn't read the agreement or didn't see it

4   may be unfortunate for him, but it does not change the outcome.").

5           As a matter of law, DIRECTV's premium channel package is not deceptive and fully

6   complies with ROSCA's requirement that DIRECTV obtain a consumer's direct informed consent

7   prior to charging the consumer for products or services. 15 U.S.C. §8403 (2).  As described above,

8   DIRECTV abundantly discloses the material terms of the premium movie channel offered—

9   including the current cost of the premium channels, the savings, the limited time of the promotional

10  period, and that the consumer must call to avoid additional charges—all before the consumer enters

11  his or her personal contact and billing information.  (Leever Decl., ¶¶ 4-11, 14-25).  Only after all

12  these disclosures are made is the consumer able to take the affirmative step of consenting to the

13  Terms and Conditions (including the negative option feature).  (*Id.*, ¶¶25-30).  It is not until after the

14  consumer consents to the Terms and Conditions and then clicks the "Place My Order" button that

15  DIRECTV then receives the customer's financial information for the services selected.  (*Id.*, ¶¶ 28-

16  30).  Thus, contrary to Ms. O'Brien's testimony that "I think given the whole purchase flow, the

17  Commission is alleging in its complaint that consumers didn't have informed consent," (Hummel

18  Decl., Ex. G, 149:20-22), the undisputed facts establish that consumers provide their express

19  informed consent.

20          This case is thus substantially similar to *Vistaprint* and the other cases cited above.  Here,

21  DIRECTV discloses all material terms of the premium movie channels offer in language "clear and

22  easily understandable by anyone capable of making an online purchase" of satellite subscription

23  services.  *Vistaprint*, *supra*, 2009 WL 288427 at *6.  These disclosures, repeated at several locations

24  throughout the web flow, are "sufficient to place the consumer on notice of the conditions and

25  details" of the offer.  *Berry, supra,* 2011 WL 1375665 at *6.  Moreover, in the current version of the

26  website, the disclosures are again repeated in the interstitial "Terms and Conditions" pages which

27  are available on each page of the web flow, including the Checkout page right next to where the

28  consumer must take the affirmative step of clicking the "Place My Order" button to accept the offer.

1  (Leever Decl., ¶24).  "Given the plain language of the disclosures and their proximity to the

2  [acceptance] button," (*Vistaprint*, *supra,* 2009 WL 288427 at *6), consumers' express informed

3  consent is unmistakable and cannot be disputed.  Finally, the confirmation email consumers receive

4  prior to being charged—which again discloses the terms of the premium movie channels offer,

5  including the need to call to cancel (Leever Decl., ¶ 31)—provides yet additional assurance that the

6  online subscription "experience as [a]whole [is] adequate to put a reasonable consumer on notice" of

7  the material terms.  *Hager, supra,* 2011 WL 4501046 at *7.

8      In sum, it is undisputed that DIRECTV is in full compliance with ROSCA as it (1) discloses

9  all material terms of the negative option feature prior to obtaining consumers' financial information

10  and (2) obtains consumers' express informed consent before charging consumers' financial accounts

11  for the negative option feature.

12  **V.    CONCLUSION**

13      For the foregoing reasons, DIRECTV respectfully requests that the Court grant this Motion

14  for Partial Summary Judgment on the Third and Fourth counts in the Complaint.

15  Dated: October 13, 2015

16                          SIDLEY AUSTIN LLP

17

18                          By:   /s/ Chad S. Hummel
                                  Chad S. Hummel
19                                Attorneys for Defendants
                                  DIRECTV and DIRECTV, LLC
20

21

22

23

24

25

26

27

28

MOTION FOR PARTIAL SUMMARY JUDGMENT