1   Eric D. Edmondson, D.C. Bar No. 450294
    Erika Wodinsky, Cal. Bar No. 091700
2   Boris Yankilovich, Cal. Bar No. 257887
    Jacob A. Snow, Cal. Bar No. 270988
3   901 Market Street, Suite 570, San Francisco, CA 94103
    (415) 848-5100/(415) 848-5184 (fax)
4   *eedmondson@ftc.gov*; *ewodinsky@ftc.gov*;
    *byankilovich@ftc.gov*; *jsnow@ftc.gov*
5
    Raymond E. McKown, Cal. Bar No. 150975
6   Stacy Procter, Cal. Bar No. 221078
    Kenneth H. Abbe, Cal. Bar No. 172416
7   10877 Wilshire Blvd., Suite 700, Los Angeles, CA 90024
    (310) 824-4343/(310) 824-4380 (fax)
8   *rmckown@ftc.gov*; *sprocter@ftc.gov; kabbe@ftc.gov*
9   Attorneys for Plaintiff
    Federal Trade Commission
10
11                  **UNITED STATES DISTRICT COURT**
12                **NORTHERN DISTRICT OF CALIFORNIA**
13                   **SAN FRANCISCO DIVISION**

14  FEDERAL TRADE COMMISSION,          CASE NO. 15-cv-01129-HSG
15              Plaintiff,
                                       **FEDERAL TRADE COMMISSION'S**
16      v.                             **OPPOSITION TO DEFENDANTS'**
                                       **MOTION FOR PARTIAL SUMMARY**
17  DIRECTV, a corporation, and        **JUDGMENT**
18  DIRECTV, LLC, a limited liability company,
                                       Date:       January 14, 2016
19          Defendants.                Time:       2:00 p.m.
                                       Judge:      Hon. Haywood S. Gilliam, Jr.
20                                     Location:   San Francisco Courthouse
                                                    Courtroom 15—18th Floor
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.     **INTRODUCTION**................................................................................................ 1

II.    **STATEMENT OF ISSUES TO BE DECIDED**.......................................... 2

III.   **PROCEDURAL HISTORY** .......................................................................... 2

IV.    **FACTUAL BACKGROUND** ........................................................................ 3

    A.     Overview of DIRECTV's negative-option offer ................................... 3

    B.     DIRECTV's description of the August 2013 version of its website is not
           accurate ................................................................................................... 3

    C.     DIRECTV mischaracterizes the disclosures in its August 2015 website .............. 7

V.     **ARGUMENT** .................................................................................................. 10

    A.     Legal Standard ..................................................................................... 10

    B.     ROSCA's Requirements ...................................................................... 10

    C.     A reasonable finder of fact could conclude that DIRECTV has not clearly and
           conspicuously disclosed material terms of its premium-channel offer ................. 11

          1.     FTC Act cases define when disclosures are not clear and conspicuous ....... 11

          2.     DIRECTV's websites do not clearly and conspicuously disclose the
               premium-channel terms ..................................................................... 13

          3.     The *Dot Com Disclosures* unambiguously condemn DIRECTV's website
               practices ............................................................................................ 15

          4.     Documents from DIRECTV show that the disclosures are not clear and
               conspicuous ...................................................................................... 17

    D.     A reasonable finder of fact could conclude that DIRECTV failed to obtain
           consumers' express informed consent prior to charging them for access to the
           premium channels ................................................................................ 17

    E.     DIRECTV's reliance on *Vistaprint* is misplaced ................................ 19

    F.     The purpose of ROSCA is to forbid negative option disclosures made solely
           through info-hovers and hyperlinks ..................................................... 20

    G.     The multistate settlement is not relevant to DIRECTV's liability under ROSCA 21

VI.    **THE COURT SHOULD DENY DIRECTV's MOTION UNDER RULE 56(d)**....... 22

    A.     The FTC has been diligent in pursuing discovery ............................... 22

    B.     Discovery from DIRECTV will provide additional bases to deny DIRECTV's
           motion for summary judgment............................................................ 23

VII.   **CONCLUSION** .............................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Allied–Bruce Terminix Companies, Inc. v. Dobson*
4
    513 U.S. 265 (1995)................................................................................. 19

*Anderson v. Liberty Lobby, Inc.*
5
    477 U.S. 242 (1986)................................................................................. 10

6

*Baxter v. Intelius, Inc*
    2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) ...................................... 19
7

*Berry v. Webloyalty.com, Inc.*
8
    2011 WL 1375665 (S.D. Cal. Apr. 11, 2011) ....................................... 19

9

*Bott v. Vistaprint USA Inc.*
    392 F. App'x 327 (5th Cir. 2010) .......................................................... 19
10

*Bravo v. City of Santa Maria*
11
    665 F.3d 1076, 1083 (9th Cir. 2011) ..................................................... 10

12

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*
    323 F.3d 767, 773–74 (9th Cir.2003) ................................................... 22
13

*Doe v. Successfulmatch.com*
14
    70 F. Supp. 3d 1066, 1078–79 (N.D. Cal. 2014) .................................. 20

15

*Ferrington v. McAfee, Inc.*
    2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010)..................... 20
16

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*
17
    771 F.3d 1119, 1125 (9th Cir. 2014) ..................................................... 10

18

*FTC v. AMG Servs.*
    29 F. Supp. 3d 1338 (D. Nev. 2014)...................................................... 12
19

*FTC v. Commerce Planet, Inc.*
20
    878 F. Supp. 2d 1048 (C.D. Cal. 2012) .................................. 12, 13, 19

21

*FTC v. Cyberspace.com*
    453 F.3d 1196  (9th Cir. 2006) .............................................................. 11
22

*FTC v. EDebitPay, LLC*
23
    695 F.3d 938 (9th Cir. 2012) ................................................................. 12

24

*FTC v. Health Formulas, LLC*
    2015 U.S. Dist. LEXIS 59387 (D. Nev. May 6, 2015)......................... 12
25

*FTC v. Johnson*
26
    96 F. Supp. 3d 1110 (D. Nev. 2015)....................................... 11, 12, 20

27

*FTC v. Medlab, Inc.*
    615 F. Supp. 2d 1068 (N.D. Cal. 2009) ................................................ 11
28

*Garret v. City & Cnty. of S.F.*
  818 F.2d 1515 (9th Cir. 1987) ................................................................................ 22

*In re Easysaver Rewards Litig.*
  737 F. Supp. 2d 1159 (S.D. Cal. 2010) ................................................................. 20

*In re Vistaprint Corp. Mktg. & Sales Practices Litig.*
  2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ................................................. 19, 20

*JJCO, Inc. v. Isuzu Motors Am., Inc.*
  2009 WL 1444103 (D. Haw. May 22, 2009) ........................................................ 10

*Keithly v. Intelius Inc.*
  764 F. Supp. 2d 1257 (W.D. Wash. 2011) ............................................................ 20

*Kremen v. Cohen*
  2012 WL 2919332 (N.D. Cal. July 17, 2012) ........................................................ 22

*Music Group Macao Commercial Offshore Ltd v. Foote*
  2015 WL 3882448 (N.D. Cal. June 23, 2015) ....................................................... 22

*Netbula, LLC v. BindView Dev. Corp.*
  516 F. Supp. 2d 1137 (N.D. Cal. 2007) ............................................................... 19

**STATUTES**

15 U.S.C. § 57a ........................................................................................................ 11

15 U.S.C. § 8403 ...................................................................................................... 10

15 U.S.C. § 8404 ...................................................................................................... 11

**REGULATIONS**

16 C.F.R. § 310.2(u) ................................................................................................. 10

21 C.F.R. § 50.27 ..................................................................................................... 18

38 C.F.R. § 17.32(c) ................................................................................................. 18

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants DirecTV and DirecTV, LLC's (collectively, "DIRECTV") Motion for Partial Summary Judgment (Dkt. No. 53) ("MSJ") is based on misleading factual assertions and inapposite legal authority.  It should be denied.

The Restore Online Shoppers' Confidence Act ("ROSCA") requires DIRECTV to clearly and conspicuously disclose all material terms of its "free" premium-channel negative option and to obtain the consumer's express informed consent to those terms. [1]  DIRECTV's own evidence shows that its online purchase process meets neither of these requirements.  The material terms of the negative option, including its very existence, are buried behind inconspicuous and nondescript hyperlinks or info-hovers on DIRECTV's website.  A consumer can proceed through the entire online purchase process without ever seeing that they must cancel the "free" premium channels before the end of the trial period to avoid a substantial charge.  A rational trier of fact could, and almost certainly would, resolve this dispute in the FTC's favor.

DIRECTV's reliance on inapposite legal authority further undercuts its request for summary judgment.  The cases that DIRECTV invokes do not address ROSCA or the FTC Act, and assess disclosures that are more conspicuous than DIRECTV's.  Moreover, DIRECTV ignores a long line of FTC Act cases holding that advertisements including hard-to-read disclosures—such as those placed at the bottom of a webpage or behind hyperlinks—did not comply with the FTC Act.

Finally, although the Court can determine that DIRECTV violated ROSCA solely upon a facial review of DIRECTV's website, because the Court may benefit from a more fully developed record, it may also deny DIRECTV's motion under Fed. R. Civ. P. 56(d) to permit the FTC to complete its discovery of materials that DIRECTV has not yet produced.

---

[1] The FTC alleged in its complaint that DIRECTV violated Section 5 of the FTC Act as well as ROSCA in its failure to disclose clearly and conspicuously the material terms of the premium-channel negative option offer.  DIRECTV does *not* seek summary judgment on the Section 5 aspect of the negative option offer, and thus, regardless of the Court's decision here, the issue of whether the premium-channel offer was clearly and conspicuously disclosed to purchasers will remain in this case.

1

## II.  STATEMENT OF ISSUES TO BE DECIDED

**Issue No. 1**: Could a reasonable finder of fact conclude that DIRECTV failed to clearly and conspicuously disclose all material terms of the premium-channel negative-option offer, as required by ROSCA?

**Issue No. 2**: Could a reasonable finder of fact conclude that DIRECTV failed to obtain consumers' express informed consent via those websites before charging their credit card, debit card, bank account, or other financial account for those premium channels, as required by ROSCA?

## III.  PROCEDURAL HISTORY

The FTC filed this suit on March 11, 2015, alleging that DIRECTV has violated Section 5 of the FTC Act and Section 4 of ROSCA by failing to adequately disclose: 1) the pricing and mandatory contract length of its satellite television subscription service; and 2) material terms of its negative option premium-channel offer.  (*See* Counts I to III.) (Dkt. No. 1.)  The complaint further alleges that DIRECTV failed to obtain consumers' express informed consent before charging them for premium-channel subscriptions.  (*See* Count IV.) (Dkt. No. 1.)  The FTC attached screen shots of a DIRECTV website taken in August 2013 to the complaint.  (Complaint Ex. 4.) (Dkt. No. 1-4.)  In support of this opposition, the FTC has filed a declaration that authenticates that exhibit.  (Declaration of Ann Stahl ("Stahl Dec.") ¶ 7 & Exs. E, F.)  The FTC has also submitted an interactive version of DIRECTV's website intended to simulate a user's experience visiting the site.  (Declaration of Nicole Davis ("Davis Dec.") ¶¶ 6–13.)

On July 1, 2015, the Court issued a scheduling order directing that fact discovery ends on April 22, 2016, expert discovery closes on July 26, 2016, and dispositive motions are due no later than August 25, 2016.  (Dkt. No. 40.)  On October 13, 2015, DIRECTV filed the current MSJ seeking summary judgment as to Counts III and IV of the complaint, which relate to DIRECTV's violations of ROSCA.  (Dkt. No. 53.)

1  **IV.    FACTUAL BACKGROUND**

2       **A.      Overview of DIRECTV's negative-option offer**

3       At all times since ROSCA became effective, DIRECTV has offered direct-to-home

4  digital television service to consumers by subscription through its website.  (Dkt. No. 2 ¶¶ 11,

5  20.)  DIRECTV's subscription service consists of programming, hardware, and installation and

6  support services.  (*Id* ¶ 11.)  As an inducement to subscribe, DIRECTV offers new subscribers

7  time-limited "free" access to premium channels, such as HBO, Cinemax, and Showtime,

8  typically for three months.  (MSJ at 1.)  However, unless a consumer *affirmatively* cancels this

9  premium-channel package before the end of the "free" period, the consumer will incur a

10  substantial monthly charge.  (*Id.* at 1–2; Declaration of Karen Leever ("Leever Dec.") Ex. A

11  (Dkt. No.53-4) at 46 ($47 in August 2013); Leever Dec. Ex. B (Dkt. No.53-6) at 37 ($59.96 in

12  August 2015).)  Until recently, consumers who signed up online for DIRECTV's television

13  subscription service were automatically enrolled in the "free" premium-channel subscription and

14  not allowed to opt out of the free trial.  (*Compare* Leever Dec. ¶¶ 5-11 *with* ¶¶ 12, 19, 21.)

15       While the appearance of DIRECTV's website has varied over time, DIRECTV has

16  chosen to focus its MSJ on how the website appears at two points in time: August 2013 and

17  August 2015.  DIRECTV therefore presumably concedes that the website's presentation of

18  material terms has not diverged in relevant ways for the entire time period covered by the FTC's

19  ROSCA claims.[2]

20       **B.      DIRECTV's description of the August 2013 version of its website is not**

21            **accurate**

22       DIRECTV's submission of its website purchase flow as of August 2013 in a series of

23  enlarged, static screenshots is not an accurate simulation of what a consumer sees when

24

25  _____

[2] Despite being on notice of the FTC's investigation of its marketing practices since at least
2010, DIRECTV has not modified its data retention practices in any way as a result of the FTC's

26  investigation.  (Poling-Hiraldo Tr. 144:10–146:11)(Edmondson Decl. Ex E.)  As a result of a
purported software defect that DIRECTV has long been aware of, it is possible that assets

27  associated with past versions of the website have been deleted.  (*Id.* at 93:3–94:25 ("The problem
is that if you try to revert [an asset] back [to a previous version], it doesn't always work . . . And

28  this is a historical issue . . . We've just always known.").)

1   navigating the website.  (*See* Exhibit A to Leever Declaration (Dkt. No. 53-4 & 53-5).)  By

2   presenting screenshots of its website taken with all material behind hyperlinks and info-hovers

3   visible, DIRECTV's presentation suggests that all consumers were likely to see all material

4   disclosures as they navigated through the subscription process.  In fact, unless consumers clicked

5   on certain hyperlinks or activated info-hovers, the critical premium-channel terms would *never*

6   *be displayed to the user*.  (*See* Stahl Dec. Exs. A, C; Davis Dec. Ex. A.)

7        DIRECTV also claims that "detailed disclosures are contained in website info-hovers that

8   are *invariably positioned in close proximity* to the locations in the web flow promoting the free

9   premium channel of a new programming subscription."  (MSJ at 2 (emphasis added).)  This

10   claim—and specifically the emphasized language—is flatly inaccurate.  Info-hovers *do not*

11   accompany every mention of the premium-channel promotion.

12        For example, the Home page (the website's first, or opening, page) of the August 2013

13   version of www.directv.com prominently features the "free" premium-channel package offer.

14   (*See* Complaint Ex. 4 at 1; Davis Dec. Ex. A; Stahl Dec. Ex. C at 0:01–0:05; Leever Dec. Ex. A

15   at 1.)  But the Home page does not disclose—anywhere—that the consumer will be charged if

16   she fails to affirmatively cancel the package before the end of the "free" period.  (*Id.*)  Nor does

17   the page disclose the amount of this charge, when it will be imposed, or that it will continue for

18   the duration of the subscription.  (*Id.*)

19        Next, on the Package Selection page, DIRECTV reiterates the "free" premium-channel

20   offer beneath most of its programming packages.  (*See* Complaint Ex. 4 at 2–3 ; MSJ at 7; Stahl

21   Dec. Ex. C at 0:12–0:20; Davis Dec. Ex. A (navigate to "View All Packages" from the Home

22   page); Leever Dec. Ex. A at 4–5.)  As with the Home page, the Package Selection page does not

23   include any conspicuous notice in close proximity to the premium-channel promotion.  (*Id.*)

24   Instead, DIRECTV placed a minuscule, light-colored hyperlink, non-descriptively labeled

25   "Additional Offer Details," well below the web fold and far from the premium-channel

26   promotion—at the very bottom of the page, following a paragraph of fine-print disclosures.

27   (MSJ at 7; Leever Dec. Ex. A at 7; *see also* Complaint Ex. 4 at 3; Stahl Dec. Ex. D at 0:17-057;

28   Davis Dec. Ex. A.)  Although DIRECTV's motion highlights this "Additional Offer Details" link

FTC'S OPP. TO DIRECTV'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 15-cv-01129-HSG

1    (MSJ at 7), it never explains why a reasonable consumer would click on and read such a

2    generically labeled hyperlink, or how a *hyperlink that sends the consumer to another webpage*

3    constitutes a clear and conspicuous disclosure.

4        Clicking on that hyperlink opens a separate page containing densely packed legal

5    disclosures, all in small print.  That popup page is reproduced below.

6    **Additional Information**

7    *BILL CREDIT/PROGRAMMING OFFER: IF BY THE END OF PROMOTIONAL PRICE PERIOD(S) CUSTOMER DOES NOT CONTACT
     DIRECTV TO CHANGE SERVICE THEN ALL SERVICES WILL AUTOMATICALLY CONTINUE AT THE THEN-PREVAILING RATES.
8    Free HBO, STARZ, SHOWTIME and Cinemax for three months, a value of $141. LIMIT ONE PROGRAMMING OFFER PER
     ACCOUNT. Featured package/service names and current prices: ENTERTAINMENT $54.99/mo.; CHOICE $64.99/mo.; XTRA
9    $70.99/mo. ULTIMATE $77.99/mo., PREMIER $124.99/mo. Advanced Receiver fee $25/mo. In certain markets, a $3/mo.
     Regional Sports fee will be assessed with CHOICE Package or above and MAS ULTRA Package or above. **Prices include the**
10   **following instant bill credits for 12 months: $30 for ENTERTAINMENT Package, $35 for CHOICE Package, $36 for XTRA and**
     **$38 for ULTIMATE Package or above. †$10 CREDIT OFFER**: To receive the $10 bill credit for 24 months on your Advanced
11   Receiver fee (required for Genie HD DVR or HD DVR lease), customer must, at point of sale: provide a valid email address
     and activate and maintain the ENTERTAINMENT or ÓPTIMO MÁS Package or above, Auto Bill Pay and Paperless Billing. o2013
12   NFL SUNDAY TICKET OFFER: Package consists of all out-of-market NFL games (based on customer's service address)
     broadcast on FOX and CBS.  Games available via remote viewing based on device location. Local broadcasts are subject to
13   blackout rules. Other conditions apply. 2013 NFL SUNDAY TICKET regular full-season retail price is $224.95.  2013 NFL
     SUNDAY TICKET MAX regular full-season retail price is $299.95. **Customers activating the CHOICE Package or above or the**
14   **MÁS ULTRA Package or above will be automatically enrolled in the 2013 season of NFL SUNDAY TICKET at no additional**
     **cost and will receive a free upgrade to NFL SUNDAY TICKET MAX for the 2013 season.  NFL SUNDAY TICKET subscription**
15   **will automatically continue each season at special renewal rate unless customer calls to cancel prior to start of season.**
     **To renew to NFL SUNDAY TICKET MAX, customer must call to upgrade after the 2013 season.**  Subscription cannot be
16   **cancelled (in part or in whole) after the start of the season and subscription fee cannot be refunded. Only one game may be**
     **accessed remotely at any given time.**  Online access is only available on certain operating systems. Computer hardware,
17   software, and Internet connection not included. Mobile access only available on certain devices. Additional data charges may
     apply. Please check with your service provider.  Visit directv.com/NFL for a list of system requirements and compatible mobile
18   devices. Short Cuts are available from midnight Sunday ET through midnight Tuesday ET.  Account must be in "good standing"
     as determined by DIRECTV in its sole discretion to remain eligible for all offers.

19   (*See* Stahl Dec. Ex. D at 0:58-1:50)

20        On this separate page of detailed legal disclosures, buried in the above paragraph,

21   DIRECTV discloses for the first time—with confusing language—that consumers must cancel

22   the premium-channel plan to avoid being charged.  But even here, there is no mention of the

23   monthly fee for the premium channels, other than an oblique reference to the free trial having a

24   value of $141.

25        Moving forward through the online purchase flow to the Cart page, on

26   the right side of that page is a box, like that depicted on the right, which

27   contains the cost for the first month of the DIRECTV subscription chosen by

28   the consumer, and the amount due at "checkout."  (*See* MSJ at 8; Complaint Ex.

1    4 at 5; Leever Ex. A at 46–48; Stahl Dec. Ex. C at 0:33–0:44; Davis Dec. Ex. A.)  This

2    "checkout box" contains an orange call-to-action button labeled "Check Out," which,

3    incidentally, DIRECTV has omitted from the partial screen shot appearing on page 8 of its

4    Motion.  There is no disclosure of the negative option terms in close proximity to this checkout

5    box.  (*Id.*)

6         In its MSJ, DIRECTV includes an enlarged picture of an info-hover that can be activated

7    by hovering over the "[?]" adjacent to the offer "FREE for 3 months:  HBO, SHOWTIME,

8    STARZ and Cinemax," which appears in small, green font not anywhere near this checkout box,

9    but instead below the heading "Premium Channels" partway down the Cart page.  (*See* MSJ at

10   8–9; Leever Dec. Ex. A at 58; Stahl Dec. Ex. C. at 0:33–0:44; Davis Dec. Ex. A.)  The "[?]" next

11   to the free premium-channel offer is one of approximately 30 light-colored hovers and

12   hyperlinks on the Cart page, each containing distinct messages.  (*See* Leever Dec. Ex. A at 49–

13   76; *see also* Complaint Ex. 4 at 5; Stahl Dec. Ex. C at 0:33-0:44, Ex. D. at 2:12-3:06; Davis Dec.

14   Ex. A)  Although DIRECTV claims that its "[?]" hovers are designed to impart material

15   information, many of them provide promotional messages completely unrelated to the material

16   terms of the negative option.  (*See, e.g.*, Leever Dec. Ex. A at 54 ("See blockbuster movies, bold

17   original series and exclusive sports on 11 channels, 9 in HD."); *id.* at 57 ("Enjoy a massive

18   movie lineup and hits you can't find anywhere else on 8 channels—all in HD."); *see also* Stahl

19   Dec. Ex. D at 2:12–3:06)  Consumers are neither required nor actively prompted to view material

20   behind this panoply of info-hovers as part of the purchase process.  And DIRECTV does not

21   explain why a reasonable consumer would expect to find important service terms behind any

22   particular question mark.  DIRECTV does not provide click-through data to support its

23   conclusory contention that consumers are likely to see the disclosures behind the info-hovers.

24        DIRECTV's assertion that it "discloses in an easy-to-follow chart the prices a consumer

25   will pay throughout the term of the agreement" (MSJ at 9) is misleading.  In order to access that

26   chart, a consumer would have to locate and click on the  [← VIEW MONTHLY COST]  tab located

27   inconspicuously—with small gray font on a gray background—above the "Packaging and

28   Programming" section of the Cart page.  (*See* MSJ at 9; Complaint Ex. 4 at 5; Stahl Dec. Ex. C at

1   0:32-0:42, Ex. D. at 3:52; Davis Dec. Ex. A.)  The purchase process does not require or actively

2   prompt consumers to click on this "View Monthly Cost" hyperlink before proceeding to check

3   out.  DIRECTV presents no evidence supporting the conclusion that a reasonable consumer

4   would notice—much less click on—this hyperlink.

5           The remainder of the sign-up process provides no additional information about the

6   premium-channel negative option's material terms.  After clicking the "Check Out" button on the

7   Cart page, the website takes consumers to a series of Payment pages, which direct consumers to

8   provide their installation address, social security number, account information, and payment and

9   billing information.  (*See* Complaint Ex. 4 at 7–9; Leever Dec. Ex. A at 106–119; Stahl Dec. Ex.

10   C at 0:43-2:42; .)  These pages do *not* contain any information about the premium-channel

11   negative option offer.  (*Id.*)  Even when the Payment page directs consumers to submit their

12   order by clicking an orange button (depicted below), it does not disclose the cancellation

13   requirement or the monthly cost of the negative option offer.  Nor does any Payment page

14   require the consumer to affirmatively accept the negative option terms:

15   By clicking "Submit Order" I agree to these Terms & Conditions    I Accept. Submit My Order.

16   (*See* Complaint Ex. 4 at 9; Leever Dec. Ex. A at 51; Stahl Dec. Ex. C at 2:41; Davis Dec. Ex. A.)

17   The blue text is a hyperlink to a separate Terms & Conditions webpage.  DIRECTV asserts that

18   clicking this orange "I Accept" button next to the Terms & Conditions link constitutes

19   consumers' "affirmative[] consent to the purchase and conversion of the premium channels after

20   three months."  (MSJ at 10.)  In fact, DIRECTV's own evidence establishes the exact opposite:

21   this Terms & Conditions page contains *no information* about the premium-channel negative

22   option offer.  (*Id.*)[3]

23   **C.     DIRECTV mischaracterizes the disclosures in its August 2015 website**

24           A facial analysis of the August 2015 website submitted by DIRECTV in support of its

25   MSJ reveals that the August 2015 version of the company's online purchase flow has the same

26   _____

27   [3] Neither DIRECTV's motion nor the Leever Declaration includes a screen shot of this Terms &
     Conditions page from the August 2013 website.  The Court can find that page by going to
     Exhibit A of the Davis Declaration and following the process described in paragraph 15 until

28   sub-paragraph 15.i, and by reviewing Exhibits C and D to the Stahl Declaration.

1    inadequate disclosures as the 2013 version.  Both the 2013 and the 2015 versions prominently

2    advertise the "free" premium-channel offer, while burying the offer's material terms behind

3    inconspicuous info-hovers and hyperlinks.  Moreover, the 2015 website's disclosures still do not

4    disclose all the material terms of the offer, such as the actual price consumers must pay after the

5    "free" period.

6        The Home pages in both versions are remarkably similar.  As in August 2013, the Home

7    page of the August 2015 website continues to highlight the premium-channel offer in bold, red

8    letters directly above the orange button prompt.  (Leever Dec. Ex. B (Dkt. 53-6) at 1; Stahl Dec.

9    Ex. A at 0:01–0:05.)  However, no other information about the premium-channel offer appears

10   on the Home page or in the "Offer Details" info-hover at the bottom of the page.  (Leever Dec.

11   Ex. B at 1–2; Stahl Dec. Ex. A at 0:01–0:05, Ex. B at 0:01–0:21.)

12       Continuing through the purchase flow, DIRECTV's 2015 website continues to use the

13   same inconspicuous hyperlinks and info-hovers as the August 2013 version, but those links are

14   sprinkled in more locations on the site and use the generic symbol "[i]" instead of the "[?]".  (*See*

15   Stahl Dec. Ex. A at 0:22–1:01.)  Although DIRECTV argues that the 2015 version now places

16   the "Additional Offer Details" hyperlink on each page of the web flow (MSJ at 10), DIRECTV

17   has still done nothing to alert consumers that this hyperlink has anything to do with the premium-

18   channel offer, its price, or other material offer terms.[4]

19       DIRECTV also points out that the info-hovers that did not appear until getting to the Cart

20   page in the 2013 version now begin to appear a step earlier, on the Package Selection page.

21   (MSJ at 10–11; Leever Dec. ¶ 15, Ex. B at 4–16; Stahl Dec. Ex. A at 0:22–0:30.)  That, however,

22   does not make these disclosures any less inconspicuous.  DIRECTV continues to rely on a small,

23   generic icon—now "[i]" instead of the "[?]" in the 2013 version—as cover for stating material

24

25

---

26   [4] Exhibit B to the Leever Declaration shows this hyperlink only on the Cart page, not on any of
     the other pages.  (Leever Dec. Ex. B at 36.)  Notably, Exhibit B does not show what consumers
27   would see behind this hyperlink.  Exhibit B to the Stahl Declaration, however, does show that
     hidden text between the 2:02 and 3:08 marks.  As with the Terms & Conditions page, the
28   material price term is omitted from this disclosure.

1    terms, mixed in with immaterial minutiae. (*Compare* Leever Dec. Ex. B at 5, *with id.* at 6 *and*

2    *id.* at 15.)[5]

3         Although DIRECTV asserts that it has added a "Terms and Conditions" hyperlink to each

4    page of the website, its evidence shows this hyperlink only on the Payment page, as it appears in

5    the August 2013 site. (Leever Dec. ¶ 24, Ex. B at 52–53.)[6] As with the 2013 version, in 2015,

6    this generically labeled hyperlink provides no indication that consumers need to go behind it to

7    discover the material terms of the premium-channel negative option. (*See* Stahl Dec. Ex. B. at

8    2:02–4:14.)

9         Unlike the August 2013 website, the August 2015 version contains an "Add more great

10   programming (optional)" page. (Leever Ex. B at 17; Stahl Dec. Ex. A at 0:33–0:42 (now titled

11   "Choose add-on packages (optional)").) After consumers select their programming package,

12   which includes the "free" premium channels, consumers have the option on this page of

13   customizing their package "with premium channels, sports, and more." (*Id.*) The 2015 website

14   also allows consumers to remove the premium-channels "free" trial from their shopping cart.

15   (*Id.*) The page, however, does not explain to consumers that they will be enrolled in a negative

16   option plan, and does not provide its material terms. (*Id.*)

17        Regarding the content of the disclosures, DIRECTV states in its MSJ that the disclosures

18   beneath the "Additional Offer Details" hyperlink are the same in 2015 as they were in the 2013

19   version. (MSJ at 10.) Unlike the August 2013 version, however, in 2015, the information on the

20   "Terms & Conditions" page now contains information about the premium-channel offer.

21   Specifically, a lengthy series of legal disclosures is visible if the consumer scrolls to the top of

22   that "Terms & Conditions" page. (*See* Leever Dec. Ex. B at 57; Stahl Dec. Ex. B at 4:14–5:14)

23        In 2015, DIRECTV has included a mention of the negative option aspect of its "free"

24   premium-channel offer in a long "Terms and Conditions" document, hidden behind an

25   inconspicuous "Terms & Conditions" hyperlink that appears in the bottom footer of its website.

26

27   _____
     [5] The "i" icon appears more than 60 times throughout the site. (*See* Stahl Dec. Ex. B.)
     [6] Exhibit B to the Leever Declaration does not show a "Terms and Conditions" hyperlink on

28   every page of the site.

(*Id.*)  But even this disclosure fails to inform consumers of the actual price DIRECTV will charge them after three months; instead, DIRECTV states only that consumers will be charged the "full, in-effect price per network," and stops short of disclosing what that "price" is.  (*Id.*)

## V.   ARGUMENT

### A.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual issue is "material" when its resolution might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material factual issue is "genuine" when there is sufficient evidence that a reasonable trier of fact could resolve the issue in the non-movant's favor.  *Id.*

Summary judgment for the movant is improper "if a rational trier of fact *could* resolve a genuine issue of material fact in the nonmoving party's favor."  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011) (emphasis added).  This dictate applies even where the facts at issue are undisputed; after all, a moving party cannot win summary judgment by drawing improper inferences from undisputed facts.  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014); *see also JJCO, Inc. v. Isuzu Motors Am., Inc.*, No. 08-00419, 2009 WL 1444103, at *8 (D. Haw. May 22, 2009) (denying summary judgment where the undisputed facts could draw multiple inferences).

### B.   ROSCA's Requirements

Section 4(1) of ROSCA prohibits charging consumers for goods or services in Internet transactions through a negative option feature, unless the seller "provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information."  15 U.S.C. § 8403(1).  Section 4(2) requires sellers to obtain a "consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account."  15 U.S.C. § 8403(2).  A "negative option feature" is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel

1    the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(u).

2    DIRECTV does not dispute that ROSCA applies to the negative option offer associated with its

3    sale of the premium-channel package over the Internet.[7]

### C.    A reasonable finder of fact could conclude that DIRECTV has not clearly and conspicuously disclosed material terms of its premium-channel offer

6         DIRECTV claims that its 2013 and 2015 web flows make "clear and conspicuous

7    disclosures related to the premium channel packages prior to obtaining consumers' financial

8    information."  (MSJ at 6, 10.)  This assertion is contradicted by (1) a facial review of

9    DIRECTV's purchase process; and (2) reliable evidence showing that consumers are unlikely to

10   see the disclosures as they appear on DIRECTV's website.  This evidence includes guidance in

11   the FTC's .*com Disclosures* (the "*Dot Com Disclosures*") to prominently display material

12   conditions close the triggering claim, e.g., "FREE for three months."  *Dot Com Disclosures*

13   (Attached to the Stahl Dec. as Exhibit G) at 8.

### 1.    FTC Act cases define when disclosures are not clear and conspicuous

15        When evaluating whether a disclosure is clear and conspicuous, courts have considered

16   several factors, such as (1) its **proximity** to the claim it is qualifying, (2) its **placement** in the ad,

17   (3) its **prominence** in the ad, (4) whether other items in the website **distract attention** from the

18   disclosure, and (5) whether the language of the disclosure is **understandable**.  In considering

19   their placement and proximity, courts find disclosures inadequate when advertisers place them in

20   locations where consumers are unlikely to see them (such as the bottom of the webpage) or in a

21   context that is different than the claims they qualify (such as on a separate "Terms and

22   Conditions" webpage).  *See FTC v. Cyberspace.com*, 453 F.3d 1196, 1200–01 (9th Cir. 2006)

23   (disclosures found inadequate when placed in small-print on the back of a check); *FTC v.*

24   *Johnson,* 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (disclosures found inadequate when placed

25   at the very top of the page or under the submit button); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d

26   1068, 1077 (N.D. Cal. 2009) (disclosures found inadequate when placed at the bottom of a page).

---

[7] Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

1    When considering the prominence of a disclosure, courts look to the font size, color, and

2    style of the disclosure, as well as its prominence in comparison to other text or graphics in the

3    advertisement.  *See, e.g., FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (disclosure

4    found inadequate when "consumers would have had to look at a small footnote buried in the

5    middle of other dense footnotes"); *Johnson*, 96 F. Supp. 3d at 1140 n.19 (disclosure found

6    inadequate when size of font was smaller when compared to rest of webpage).  Moreover, courts

7    have found that consumers are unlikely to see a disclosure if other elements of the advertisement

8    may cause them to overlook the disclosure.  *See, e.g.*, *Johnson*, 96 F. Supp. 3d at 1140)

9    (disclosures found inadequate where statements about the "free" and "risk free" nature of the

10   program were more eye-catching); *FTC v. AMG Servs.*, 29 F. Supp. 3d 1338, 1353 (D. Nev.

11   2014) (hyperlink was inconspicuous where mandatory check boxes would "naturally draw a

12   borrower's attention" and where hyperlink was "buried in the fourth paragraph and

13   overshadowed by two all caps hyperlinks").  Finally, when considering whether a disclosure is

14   understandable, courts look to whether the disclosure is unambiguous.  *AMG Servs.*, 29 F. Supp.

15   3d at 1372–73.

16   More recently, in *FTC v. Health Formulas, LLC*, 2015 U.S. Dist. LEXIS 59387, at *48

17   (D. Nev. May 6, 2015), the court granted the FTC's motion for a preliminary injunction, finding

18   that the FTC was likely to succeed on the merits of its ROSCA claims because the defendant's

19   disclosures were not clear and conspicuous.  The disclosures at issue were "either buried in fine

20   print on the payment page of Defendants' websites or stated in separate Terms and Conditions

21   documents that consumers are not required to read."  *Id.* at *48.  DIRECTV's disclosures are

22   similarly inconspicuous.

23   Even before the enactment of ROSCA, courts used these factors to evaluate whether

24   disclosures of negative options were clear and conspicuous.  For example, in *FTC v. Commerce*

25   *Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012), the court held that, based solely on a facial

26   analysis, several purported website disclosures about a negative option plan were inadequate

27   because the disclosures were ambiguous or consumers were unlikely to see them.  The court

28   identified characteristics that rendered the "disclosures" in a hyperlinked "Terms of

Membership" page insufficient.  First, the hyperlink was "buried at the bottom" of the page, not "in close proximity" to the claim, and it was therefore "unlikely that consumers would notice or click on the link."  *Id.* at 1065–1067.  Second, the label "Terms of Membership" did not indicate that it had anything to do with a negative option plan.  *Id.*  Moreover, the hyperlink sent consumers to a separate pop-up page and, thus, appeared in a "different context" than the claims they were qualifying.  *Id.*  Finally, the disclosures on the separate "Terms of Membership" page in one version of the website were buried on that page "with other densely packed information and legalese, which makes it unlikely that the average consumer will wade through the material and understand that she is signing up for a negative option plan."  *Id*. at 1065.  The *Commerce Planet* court also found the other fine-print disclosures on the payment page to be inadequate on their face, given their size, color, and placement at the bottom of the page.  *Id*. at 1065–67.  In sum, the court held that the disclosures by their "placement, wording, colorization, spacing, and size of the text" were "designed not be clear and conspicuous, but rather to mask information about [the defendants'] continuity program without entirely omitting the information.  Such a method of disclosure is inadequate because it simultaneously conceals, obscures, and suppresses the very information it purports to convey."  *Id.* at 1068.

### 2.    DIRECTV's websites do not clearly and conspicuously disclose the premium-channel terms

Both the August 2013 and August 2015 websites prominently tout DIRECTV's "free" offer for its premium-channel package.  But the websites' disclosures are not clear and conspicuous for three primary reasons.  *First*, the relevant material terms are invisible by default, and only appear when the user clicks or hovers on particular links.  *Second*, those links and info-hovers have inconspicuous, non-descriptive names such as "[?]" or "Additional Offer Terms." *Third*,  the disclosures behind those hyperlinks and info-hovers, even if discovered, do not disclose the material terms in plain, concise language, instead burying terms in paragraphs of legal text and using unclear descriptions.  Using these techniques, DIRECTV has designed a purchase process that makes it unlikely that a reasonable consumer will see the material terms of the offer.  Indeed, DIRECTV's efforts urging consumers to move directly to the next stage of the

purchase process serve only to decrease the possibility that consumers will obtain additional information by hovering over ambiguous symbols or clicking on "Additional Offer Terms" hyperlinks.  (*See* Leever Dec. Ex. A, at 42–45 (prominent orange "Proceed to Cart" button), 47–60 (including prominent orange "Check Out" button); Ex. B at 17–21 (prominent orange "Continue to Next Step" button); 32–48 (prominent orange "Check Out" button).)

First, not a single page in the purchase process discloses the negative option term in a way that is visible without additional interaction by the user.  That is, if an extraordinarily diligent consumer were to painstakingly read every line of text on every page (but not click any hyperlink or display any info-hover), that consumer would never read that they would be automatically enrolled for a premium-channel subscription.  *See supra*, Section IV.B, IV.C.  And critically, the purchase process does *not* require consumers to display that information in order to complete their order.  *See supra*, Section IV.B, IV.C.  Thus, a consumer who completes every mandatory step of the purchase process is unlikely to see or be aware of the negative option term.

Second, the links and info-hovers that contain the negative option term are often inconspicuous and have non-descriptive names (e.g., "[?]", "[i]", or "Additional Offer Details") that tell the user nothing about what information they contain.  Further, these hyperlinks and info-hovers are easily overlooked, as they were small, lightly colored, and generically labeled.  In fact, as described above, the "[?]" and "[i]" hovers appeared many times on the websites and, if seen by consumers, often contain information of marginal relevance, such as generally describing a product or service or advertising some other aspect of DIRECTV's business.[8] (*See* Leever Dec. Ex. B at 15 ("Get every out-of-market game every Sunday on your TV, computer, tablet, and phone.").)  The inconspicuous "View Monthly Cost" hyperlink on the Cart page (approximately six pages into the signup process) is no better.  Similar to the other hyperlinks, the size, color, and placement of the "View Monthly Cost" hyperlink made it unlikely that consumers would see it.

---

[8] Given that the "?" hover disclosure in the August 2013 website contained a spelling error, one might wonder how many people actually clicked on this hover.

Third, even if a consumer discovered DIRECTV's inconspicuous disclosures, they fail to disclose all the material terms of the offer or were ambiguous. The "Additional Offer Details" hyperlinks sent consumers to a separate page where the negative option disclosures were buried in other densely packed information and legal disclosures. *See supra*, Section IV.B, IV.C. And even the legal language behind the "Additional Offers Details" is not entirely clear. In particular, the words "BILL CREDIT/PROGRAMMING OFFER" are ambiguous as to whether it relates to the premium-channel offer. While the paragraph stated that the "BILL CREDIT/PROGRAMMING OFFER"—presumably referring to the premium-channel subscription—was "valued" at $141 in August 2013 and $152.97 in August 2015, that disclosure hardly informs consumers what the actual charges will be if they do not cancel the premium channels. In addition, both the August 2013 and 2015 info-hovers (labeled with "[?]" and "[i]" respectively) and the August 2015 Terms and Conditions state that the "price in effect" will be charged. That is, even the info-hovers do not state, in simple plain language, what the consumer will be charged. Again, a reasonable finder of fact could conclude that DIRECTV did not adequately disclose the amount it would charge consumers at the end of the promotional period.

### 3. The *Dot Com Disclosures* unambiguously condemn DIRECTV's website practices

DIRECTV asserts that its purchase process complies with the guidance in the FTC's *Dot Com Disclosures*. Quite the contrary. In fact, DIRECTV's purchase process ignores crucial guidance from the *Dot Com Disclosures* on how to make disclosures clear and conspicuous.

According to the *Dot Com Disclosures*, web disclosures are "more likely to be effective if consumers view the disclosure and the claim that raises the need for disclosure (often referred to as a "triggering claim") together on the same screen." (*Dot Com Disclosures* at 8.) DIRECTV has often decided, contrary to this guidance, to place material disclosures behind hyperlinks and info-hovers, moving the information off the screen where the promotional language appears. (*See*, *e.g.*, Leever Dec. Ex. B, at 31.)

Next, the *Dot Com Disclosures* direct that "[d]isclosures that are an integral part of a claim or inseparable from it should not be communicated through a hyperlink. Instead, they

1    should be placed on the same page and immediately next to the claim . . . ."  (*Dot Com*

2    *Disclosures* at 10.)  The negative option feature of the premium-channel offer is integral to its

3    claim that the channels are "FREE for 3 months."  Nevertheless, DIRECTV hides the negative

4    option disclosure behind hyperlinks and info-hovers.

5        The ultimate test of whether a disclosure is clear and conspicuous, according to the *Dot*

6    *Com Disclosures* is "whether the information intended to be disclosed is actually conveyed to

7    consumers." (*Id.* at 1.)  In fact, it recommends that advertisers monitor whether consumers are

8    actually seeing disclosures and hyperlinks that contain disclosures by obtaining relevant

9    empirical evidence such as (1) "click-through rates, *i.e.*, how often consumers click on a

10   hyperlink and view the click-through information" and (2) evaluating "the amount of time

11   visitors spend on a certain page, which may indicate whether consumers are reading the

12   disclosure."  (*Id.* at 13.)  It also recommends that advertisers consider "empirical research about

13   where consumers do and do not look on a screen."  (*Id.* at 8.)  Despite this clear guidance,

14   DIRECTV has not offered any evidence that it monitored click-through rates or used web

15   analytics data to show that consumers saw its disclosures.

16       Finally, the *Dot Com Disclosures* advise that "[e]lements like graphics, sound, text, links

17   that lead to other screens or sites, or "add to cart" buttons may result in consumers not noticing,

18   reading, or listening to the disclosure." (*Dot Com Disclosures* at 19.)  Moreover, the *Dot Com*

19   *Disclosures* advised that, when, as on DIRECTV's websites, consumers are "trying to complete a

20   task and obtain a specific product or service," consumers "may not pay adequate attention to a

21   disclosure that does not relate to the task at hand."  (*Id.* at 18.)  The document even highlights the

22   fact that "[t]his can be problematic if, for example, an advertiser is selling a product or service

23   together with a negative option trial for a different product or service."  (*Id.*)  Despite this

24   guidance governing the same product type and purchase process used by DIRECTV, the negative

25   option disclosure is buried behind "Additional Offer Details" and "Terms and Conditions" links.

26   And the text behind that link is a long paragraph of legal disclosures, which *Dot Com*

27   *Disclosures* advise against, stating that a "disclosure that is buried in a long paragraph of

28   unrelated text will not be effective."  (*Id.* at 18.)

**4.     Documents from DIRECTV show that the disclosures are not clear and conspicuous**

In addition to the *Dot Com Disclosures*, evidence from DIRECTV contradict DIRECTV's assertions that its free premium-channel disclosures are clear and conspicuous. This evidence includes:

• DIRECTV's own website usability consultant advised the company not to bury important information at the bottom of webpages, in small fonts, or behind hyperlinks. (Declaration of Eric Edmondson In Support Of FTC's Opp. to DIRECTV's MSJ, ("Edmondson Dec."), Ex. K (FTCDTVII-0227792 at 4, 7, 16, 20, 28))

• DIRECTV receives 50 million calls a year, partially because of "surprises;" 9 million of these calls relate to "[w]hy am I being charged [for] premium channels?" (Edmondson Dec. Ex I, DTVFTCII-0114578 at p. 4)

• DIRECTV is aware that consumers are pained by "no proactive notification of roll to pay offers," the inability to cancel free premiums online, and the inability to future date and refuse premiums at the point of sale. (Edmondson Dec. Ex. J, DTVFTCII-0047444 at pp. 4–5.)

• DIRECTV executives were concerned about the "negative impact . . . on revenue and churn" that providing advance notice to consumers that they would have to affirmatively cancel the premium-channel negative-option—suggesting that DIRECTV executives knew that this requirement was not sufficiently disclosed to consumers when they subscribed." (Edmondson Dec. Ex H, DTVFTCII-0081362-63)

**D.     A reasonable finder of fact could conclude that DIRECTV failed to obtain consumers' express informed consent prior to charging them for access to the premium channels**

ROSCA requires that DIRECTV obtain consumers' "express informed consent" to the terms of the premium-channel negative option offer before charging them.

DIRECTV argues that by including text containing the negative option's material terms interspersed throughout various places on its website in hover-overs and pop-ups, it put consumers on constructive notice that they were agreeing to those terms when they ultimately

1    clicked the purchase ("Submit My Order") button at the end of the purchase process.  DIRECTV

2    then argues that its addition of the generic statement "I agree to the Terms and Conditions" next

3    to the purchase button secured consumers' consent to the negative option's material terms.  (MSJ

4    at 14–15, 24.)  These arguments fail.  A reasonable fact finder could conclude that consumers did

5    not provide their express informed consent before DIRECTV charged them for the premium-

6    channel subscription.[9]

7            As explained above, DIRECTV's info-hovers and pop-ups, placed in inconspicuous

8    locations and displayed in tiny font, do not constitute clear and conspicuous disclosures of the

9    material terms.  As such, a reasonable fact finder could conclude—and would likely conclude—

10   that DIRECTV failed to secure consumers' express informed consent.  *See FTC v. Health*

11   *Formulas,* 2015 WL 2130504, at *16 (under ROSCA, "inadequate disclosures constitute

12   evidence that Defendants often do not obtain consumers' express informed consent before

13   charging their cards or accounts.")

14           DIRECTV cannot rely on the generic "I agree to the Terms and Conditions" link near the

15   purchase button.  First, for the majority of the time since ROSCA's enactment, the pop-up page

16   behind that "Terms and Conditions" link did not even disclose the material terms of the

17   premium-channel negative option.  (*See* Stahl Dec. Ex. D at 5:22–6:06 and 7:37–8:22; Davis

18   Dec. Ex. A.)  Thus, even those consumers who visited the "Terms and Conditions" page to

19   investigate those material terms would not have found them.[10]

20   _____

21   [9] The statutory language—"express informed consent"—requires evidence that the offeror
     clearly and conspicuously disclosed all the material terms of the negative option offer and that
22   the consumer affirmatively consented to those terms.  The word "express" means "made known
     distinctly and explicitly."  BLACK'S LAW DICTIONARY (10th ed. 2014). Informed consent" is a
23   legal term that requires more than merely providing an opportunity to review the terms to which
     consent is sought.  Black's Law Dictionary defines "informed consent" as "[a] person's
24   agreement to allow something to happen, made with *full knowledge* of the risks involved and the
     alternatives."  *(Id.)*(emphasis added).  Federal regulations that employ and define "informed
25   consent" comport with the dictionary definitions by mandating a "careful explanation" and "the
     opportunity to . . . indicate comprehension," 38 C.F.R. § 17.32(c), as well as robust
26   documentation that demonstrates beyond doubt that the person understands the substance of that
     to which he or she is consenting, *see* 21 C.F.R. § 50.27.
27   [10] While DIRECTV highlights that its *current* Terms and Conditions include a disclosure about
     the negative option (MSJ at 15), it omits the fact that there was no such disclosure as late as
28   August 2013, two and a half years after ROSCA's enactment.  DIRECTV does not reveal when
     it added the disclosure that currently appears.  Nor does DIRECTV disclose when it added a

1       Second, even after DIRECTV began including a disclosure about the negative option in

2  the "Terms and Conditions" page, that disclosure remains inconspicuous and confusing.

3  Because it is displayed on an entirely different webpage from the offer purchase flow, it fails to

4  meet the clear and conspicuous prerequisite to obtaining express informed consent. *Commerce*

5  *Planet*, 878 F. Supp. 2d at 1058, 1065, 1067.  Moreover, this newly added disclosure omits

6  perhaps the most important material term of the negative option: the price that DIRECTV will

7  charge consumers for the premium channels after the "free" trial.  Instead of specifying the price,

8  the disclosure states that "you will begin being charged the full, in effect price per network after

9  the promotional period ends."  (MSJ at 15.)  Testimony from DIRECTV's own employees

10  confirms that DIRECTV omits the price term from the disclosure.  (Leever Dec. ¶ 28; Ex. B at

11  54.)  If DIRECTV does not tell consumers what the price term is, consumers are incapable of

12  giving *informed* consent to it and, consequently, to the negative option agreement. *See Netbula,*

13  *LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) ("Contract formation

14  . . . requires that the parties[] reach mutual assent or consent on definite or complete terms.");

15  *Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281 (1995) (listing "price"

16  among the few inherently "basic" terms in consumer contracts).  Consequently, for all these

17  reasons, a reasonable finder of fact could conclude that DIRECTV has not met ROSCA's

18  express informed consent requirement.

19     **E.    DIRECTV's reliance on *Vistaprint* is misplaced**

20       To justify its inadequate disclosures, DIRECTV relies primarily on *Vistaprint*.[11]

21  DIRECTV also relies upon two other cases that cite *Vistaprint*:  *Baxter v. Intelius, Inc.*, 2010 WL

22  3791487 (C.D. Cal. Sept. 16, 2010), and *Berry v. Webloyalty.com, Inc.*, 2011 WL 1375665 (S.D.

23  Cal. Apr. 11, 2011), *vacated on other grounds*, 517 Fed. App'x 581 (9th Cir. 2013).  DIRECTV

24  argues that these cases hold that so long as a consumer has to take some affirmative step to

25  accept the seller's offer, a web-based offer is—as a matter of law—not deceptive, even if the

---

26  check box next to the "I agree to the Terms and Conditions" language, although that too was
necessarily after August 2013.

27 [11] *In re Vistaprint Corp. Mktg. & Sales Practices Litig.*, 2009 WL 2884727 (S.D. Tex. Aug. 31,
2009), *aff'd Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010).

28

1  material terms are so buried that they are unlikely to be seen by a reasonable consumer.  (MSJ at

2  21.)

3         DIRECTV's reliance on these cases is flawed. First, district courts in this circuit have

4  repeatedly rejected this argument.  *See*, *e.g.*, *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1114 (D.

5  Nev. 2015) (finding *Visaprint* unpersuasive); *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1270

6  n.12 (W.D. Wash. 2011) (rejecting *Vistaprint* and *Intelius* analyses and conclusions); *Ferrington*

7  *v. McAfee, Inc.*, 2010 U.S. Dist. LEXIS 106600, at *30 (N.D. Cal. Oct. 5, 2010) ("[T]he Court is

8  not persuaded that [*Vistaprint*'s] determination of factually distinct claims under different laws

9  should determine the outcome of this case."); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d

10  1159, 1172 (S.D. Cal. 2010) (rejecting motion to dismiss complaint based on *Vistaprint*); *see*

11  *also Doe v. Successfulmatch.com*, 70 F. Supp. 3d 1066, 1078–79 (N.D. Cal. 2014)

12  (distinguishing *Vistaprint*, *Webloyalty*, and *Intelius*).

13         It is also notable that the disclosures in *Vistaprint* appeared on *the same web page*

14  adjacent to the button consumers clicked to accept the offer at issue.  *Vistaprint*, 2009 U.S. Dist.

15  LEXIS 77509, at *14–23.  DIRECTV has consistently failed to place on the material disclosures

16  for the premium-channel offer on pages in a manner that makes the disclosures unavoidable to

17  consumers.

18      **F.**    **The purpose of ROSCA is to forbid negative option disclosures made solely**

19            **through info-hovers and hyperlinks**

20         Congress enacted ROSCA in direct response to conduct of companies like Vistaprint and

21  the corresponding harm to consumers from deceptive online negative option marketing.  The

22  legislative history of ROSCA is replete with critical assessments of Vistaprint's failure to

23  adequately disclose its negative option contracts.  *See*, *e.g*., Sen. Comm. on Commerce, Science

24  and Technology, Aggressive Sales Tactics on the Internet and Their Impact on American

25  Consumers, S. Hrg. 11-513 14–23 (Statement of Prof. Robert G. Meyer, Wharton School, Univ.

26  of Pennsylvania) (Vistaprint as example of deceptive Web sales "architecture") (hereafter

27  "Senate Hearing") (Stahl. Dec. Ex. J, pp. 14–23).  Indeed, Vistaprint's "tiny fine print"

28  disclosures demonstrated the need for legislative reform.  *Id.* at 59 (colloquy between Prof.

1   Meyer and Sen. LeMieux).  A Senate Commerce Committee investigative report described how

2   Vistaprint lured consumers into continuity programs cancellable only through a consumer's

3   affirmative action, resulting in thousands of consumers getting enrolled in continuity programs

4   without their knowledge.  *See* Office of Oversight and Investigations, Supplemental Report on

5   Aggressive Sales Tactics on the Internet (May 19, 2010), Sen. Comm. on Commerce, Science

6   and Technology, Restore Online Shoppers' Confidence Act, S. Rep. No. 111-240, 61–62

7   (hereafter "Senate Report") (Over 20,000 Vistaprint consumers unwittingly enrolled in at least

8   two negative option programs) (Stahl Dec. Ex. I at 13–14).

9        Prior to ROSCA, consumers who were sold negative option contracts by Vistaprint and

10   other companies repeatedly complained that they felt "tricked into buying and or signing up for

11   something" and the nature of the negative option feature (including its real cost) were "hidden at

12   the bottom of the page, or not very clear."  Senate Report at 41 (Stahl Dec. Ex. H, at 28).

13        In sum, the plain language of this statute and the legislative history surrounding the

14   enactment of ROSCA make abundantly clear that Congress passed ROSCA in order to require

15   clear and conspicuous disclosure of all material terms for a sale involving a negative option.

16   DIRECTV's efforts to mischaracterize the Act's reach should be rejected.

17       **G.**    **The multistate settlement is not relevant to DIRECTV's liability under**

18            **ROSCA**

19        DIRECTV argues that the putative failure of state attorneys general to take further

20   enforcement action under their 2010 settlement with the States is dispositive evidence that the

21   company is complying with ROSCA.  (MSJ at 18.)  This is a curious argument when addressing

22   whether DIRECTV has violated (and continues to violate) a federal statute that had not even

23   been signed into law at the time the State settlements were entered.

24        Moreover, the State settlements for violations of state law have no preclusive effect on

25   enforcement of federal law by the FTC.  See FTC's Motion to Strike Defendants' Affirmative

26   Defenses (Dkt. No. 32).  And decisions by the state attorneys general not to enforce their own

27   orders is irrelevant to the question of whether DIRECTV has complied with the FTC Act,

28   ROSCA, or even its obligations under the settlements.  Declaration of Paula Selis, Assistant

1    Attorney General for the State of Washington, ¶ 8 ("Although Washington has not thus far

2    brought a formal enforcement action against DIRECTV for violating the State Settlement

3    Agreement, that fact should not be interpreted as establishing DIRECTV's compliance with

4    Washington' Consent Decree, let alone with federal law.").

5    **VI.    THE COURT SHOULD DENY DIRECTV'S MOTION UNDER RULE 56(d)**

6            DIRECTV's motion for partial summary judgment should be denied for the reasons set

7    forth above.  Alternatively, the Court may deny DIRECTV's motion under Rule 56(d).

8            Rule 56(d) states that if "for specified reasons" a party cannot present sufficient facts to

9    support its opposition to the motion for summary judgment, "the court may (1) defer considering

10   the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or

11   (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).  Generally, the party seeking a

12   continuance or denial must show that "(1) they have set forth in affidavit form the specific facts

13   that they hope to elicit from further discovery; (2) the facts sought exist, and (3) these sought

14   after facts are essential to resist the summary judgment motion."  *Kremen v. Cohen*, No. 5:11-

15   05411-LHK, 2012 WL 2919332 at *5 (N.D. Cal. July 17, 2012) (citing *Garret v. City & Cnty. of*

16   *S.F.*, 818 F.2d 1515, 15181 (9th Cir. 1987)).  However, "[w]hen a party moves for summary

17   judgment before a meaningful opportunity for discovery, district courts may 'fairly freely' grant

18   a Rule 56(d) motion." *Id.*

19           Courts generously grant Rule 56(d) motions "unless the non-moving party has not

20   diligently pursued discovery of the evidence." *Music Group Macao Commercial Offshore Ltd v.*

21   *Foote*, 2015 WL 3882448, *6 (N.D. Cal. June 23, 2015) (citing *Burlington N. Santa Fe R. Co. v.*

22   *Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773–74 (9th Cir.2003)).

23   "Summary denial [of a Rule 56(d) motion] is especially inappropriate where . . . the material

24   sought is also the subject of outstanding discovery requests."  *Id.*

25           **A.    The FTC has been diligent in pursuing discovery**

26           There can be no dispute that the FTC has diligently pursued discovery.  Since fact

27   discovery opened, FTC has served DIRECTV with 13 requests for production, 11

28   interrogatories, and 20 requests for admission.  (Edmondson Dec. ¶¶ 2–4.)  The FTC has taken

FTC's Opp. To DIRECTV's Motion For Partial Summary Judgment
Case No. 15-cv-01129-HSG

1    four depositions in this case, including a deposition of DIRECTV pursuant to Federal Rule of

2    Civil Procedure 30(b)(6).  (*Id.* ¶ 9.)  DIRECTV has yet to comply with the FTC's discovery, and

3    the FTC has filed one letter brief seeking an order compelling production of draft

4    advertisements.  (Dkt. No. 70.)  It appears likely that the FTC will need to file additional motions

5    to compel, but the FTC will continue to work with DIRECTV to resolve any discovery disputes

6    without seeking the Court's intervention.  (Edmondson Dec. ¶¶ 11–13.)

7         **B.    Discovery from DIRECTV will provide additional bases to deny DIRECTV's**

8              **motion for summary judgment**

9         At least three categories of discovery from DIRECTV will provide additional bases to

10   deny DIRECTV's summary-judgment motion: material from DIRECTV's customer-service

11   database, DIRECTV's website-related material, and DIRECTV's analytics data.

12       **DIRECTV's Customer-Service Database.**  DIRECTV's customer-support system

13   records system is known within DIRECTV as "RIO."  (Edmondson Dec. ¶ 10.)  According to

14   DIRECTV counsel, the RIO database includes many millions of records associated with

15   customer-service calls DIRECTV receives.  (*Id.*)

16       The FTC has requested that DIRECTV produce relevant consumer complaints from the

17   RIO system.  (Edmondson Dec. ¶ 2 (attaching the FTC's first set of Requests for Production as

18   Exhibit A).)  On November 16, 2015, the FTC and DIRECTV met and conferred regarding

19   DIRECTV's production of RIO-system records, and DIRECTV agreed to answer a set of

20   outstanding questions regarding how the RIO material is stored.  (Edmondson Dec. ¶ 10.)  The

21   FTC is also slated to take the deposition of a witness, who has knowledge of DIRECTV's RIO

22   system, on December 16.  (*Id.*)

23       The material in DIRECTV's RIO system is relevant and will likely contain information

24   relevant to DIRECTV's motion for partial summary judgment.  Customer-service calls inquiring

25   about unexpected charges on a bill shortly after the expiration of the three-month "free" period

26   would show that the disclosures were not clear and conspicuous.  Such calls would also show

27   that any consent was neither express nor informed.

28

FTC'S OPP. TO DIRECTV'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 15-cv-01129-HSG

**DIRECTV Website-Related Material.** The exhibits to DIRECTV's motion for partial summary judgment represent two versions of the website purchase flow, captured in August 2013 and August 2015, respectively. Those exhibits however, do not accurately replicate the experience of a customer browsing DIRECTV's website for two primary reasons. First, the exhibits are static images, not an interactive website. And second, the images in the exhibits are configured such that many disclosures are visible by default (instead of requiring user interaction to appear as they would on an interactive website). An interactive, web-based version of the site will allow the Court to see—and expert witnesses to test—whether consumers would have understood the disclosures in the form DIRECTV offered them. There is no reason to rule on DIRECTV's motion without the benefit of a website purchase flow that more accurately imitates a consumer's experience.

The FTC has sought the materials necessary to reconstruct an operable website since the outset of this case. The FTC took a 30(b)(6) deposition of two DIRECTV witnesses relating to the website on November 10, 2015, and an on-premises source-code inspection is scheduled for December 16, 2015. (Edmondson Dec. ¶ 8.) The Court should deny DIRECTV's motion for partial summary judgment to let that discovery go forward.

**DIRECTV's Analytics Data.** Since 2010, DIRECTV has used a tool called SiteCatalyst—later known as Adobe Omniture—to track user behavior on its website. (*Id.* ¶ 13.) The FTC has requested that DIRECTV produce analytics data as well as relevant DIRECTV studies, surveys, or tests relating to how users navigate its website. (*Id.* ¶ 2; Ex. A) The FTC has also noticed the deposition of DIRECTV under Federal Rule of Civil Procedure 30(b)(6) for a topic relating to those studies, surveys, or tests. (*Id.* ¶ 5.) The parties are continuing to negotiate the scope of that production. (*Id.* ¶ 6.) The FTC expects that the analytics data will show that when disclosures were more prominent, consumers were less likely to purchase DIRECTV services because they understood the relevant disclosures. Discovery on website analytics information held by DIRECTV—but not yet disclosed—should be allowed to go forward before ruling on DIRECTV's motion for summary judgment.

1

## VII.    CONCLUSION

2          For the foregoing reasons, the Commission requests that the Court deny DIRECTV's

3   motion for partial summary judgment.

4

5                                        Respectfully Submitted,

6   Dated:       November 24, 2015              /s/ Eric D. Edmondson

7                                        Eric D. Edmondson
                                         Jacob A. Snow
8                                        Erika Wodinsky
                                         Boris Yankilovich
9                                        Attorneys for Plaintiff
                                         Federal Trade Commission
10                                       901 Market Street, Suite 570
                                         San Francisco, CA 94103
11                                       (415) 848-5100 (phone)
                                         (415) 848-5184 (facsimile)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28