1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3         Before The Honorable Haywood S. Gilliam Jr., Judge

4

5   FEDERAL TRADE COMMISSION,       )
                                    )
6            Plaintiff,             )
                                    )
7   vs.                             )   No. C 15-01129-HSG
                                    )
8   DIRECTV, INC., et al.,          )
                                    )
9            Defendants.            )
    _____)

10
                                 San Francisco, California
11                               Friday, March 4, 2016

12

13    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 10:02 - 10:45 = 43 MINUTES

14  APPEARANCES:

15  For Plaintiff:

                                 Federal Trade Commission
16                               901 Market Street
                                 Suite 570
17                               San Francisco, California
                                   94103
18                       BY:  ERIC DAVID EDMONDSON, ESQ.
                             JACOB ADAM SNOW, ESQ.
19                           ERIKA WODINSKY, ESQ.
                             BORIS YANKILOVICH, ESQ.
20
    For Defendants:
21                               Sidley Austin, LLP
                                 695 Town Center Drive
22                               Suite 530
                                 Costa Mesa, California 92626
23                       BY:  CLAYTON S. FRIEDMAN, ESQ.

24
                    (APPEARANCES CONTINUED ON NEXT PAGE)
25

*Echo Reporting, Inc.*

2

APPEARANCES:   (Cont'd.)

For Defendants:
                              Sidley Austin, LLP
                              555 California Street
                              Suite 2000
                              San Francisco, California
                                  94104
                         BY:  RYAN M. SANDROCK, ESQ.

                              Sidley Austin, LLP
                              1999 Avenue of the Stars
                              17th Floor
                              Los Angeles, California 90067
                         BY:  CHAD SAMUEL HUMMEL, ESQ.


Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

3

<u>Friday, March 4, 2016</u>                                        <u>10:02 a.m.</u>

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

          THE CLERK:  We're calling C 15-1129, Federal Trade
Commission versus DirecTV, Inc., et al.

      Please step forward and state your appearances for the
record, please.

          MR. HUMMEL:  Good morning, your Honor.  Chad
Hummel, Clay Friedman, Ryan Sandrock, and Chris Murphy for
DirecTV.

          THE COURT:  All right.  Good morning, Mr. Hummel.

          MR. EDMONDSON:  Eric Edmondson for the Federal
Trade Commission, and with me at counsel table are Erika
Wodinsky, Jacob Snow, and Boris Yankilovich.

          THE COURT:  All right.  Good afternoon, Mr. --
good morning, Mr. Edmondson.

      All right.  We're here for -- for two purposes.  One is
a hearing on Defendants' motion for partial summary judgment
and also a case management conference, especially in light
of the stipulation that the parties submitted regarding the
trial schedule which we can talk about at the end.

      In terms of timing and plan, what's the -- what's the
proposal?  I saw that there's a -- there was a request for
some audiovisual equipment, and I'm fine using that as a --
as a guide for a discussion, but I don't really need a

4

1 tutorial or a walk-through, and I hope that's not what was

2 planned.

3          MR. HUMMEL:  No, not for today, your Honor.  I

4 just plan to argue.

5          MR. EDMONDSON:  Your Honor, the FTC requested

6 access to the AV equipment, and that is so if your Honor

7 would like, we could walk you through the interactive

8 version of DirecTV's website.

9          THE COURT:  You know, I -- what I suspect will be

10 the most useful is to use that as a mechanism for answering

11 particular questions that I have.  I do have a few.  So why

12 don't we plan on approaching it that way.

13     All right.  So with regard to the -- to the -- the

14 motion, something -- an interesting scenario in that there's

15 no dispute about what the facts are, I think the issue in

16 dispute here will be the inferences to be drawn from the

17 undisputed facts, and it seems to me that that's the core of

18 the issue that will be presented at a trial.

19     So, as I understand it, there are two components to

20 Defendants' motion.  One is that express informed consent is

21 established as a matter of law, and the second is that the

22 clarity and conspicuousness of the disclosures is

23 established as a matter of law based on the undisputed

24 record.

25     Do I have that right?

5

1          MR. HUMMEL:  Not quite, your Honor.  Given the

2 posture of the motion for summary judgment, as you know, the

3 -- there are two components of ROSCA which you got exactly

4 right.  The first component is that all the material terms

5 of the negative option offer relating to the premium terms,

6 HBO, Showtime, et cetera, are clearly and conspicuously

7 disclosed before DirecTV obtains billing information.

8          The second component is that DirecTV obtains express

9 informed consent to the material terms before the consumer

10 is charged.  So those are the components of ROSCA.

11          In the summary judgment context, your Honor, in our

12 view, once DirecTV comes forward with undisputed evidence

13 that the disclosures are made, that there's no dispute about

14 the content of the disclosures, they are in part contained

15 in hyperlinks and rollovers -- there's no dispute about that

16 -- but once we come forward with evidence that they are made

17 in both flows that are at issue in this case, what we call

18 the old flow, Exhibit A to the Lieber (phonetic)

19 declaration, and Exhibit B, then the burden shifts, and the

20 burden shifts to the FTC to come forward with admissible

21 evidence showing that there is a genuine issue of material

22 fact that the disclosures are not clear and conspicuous,

23 which is their burden at trial, as you know.

24          What that means is that there has to be evidence that a

25 significant percentage of consumers don't see or understand

6

1 the disclosures.

2          THE COURT:  Where is that from?  What case sets

3 out that standard at the summary judgment stage?

4          MR. HUMMEL:  Your Honor, your -- at the summary

5 judgment stage, your own decision I think in --

6          THE COURT:  Well --

7          MR. HUMMEL:  -- Gaddy v. Adams (phonetic).

8          THE COURT:  It was an incredibly different case.

9          MR. HUMMEL:  No, no.  I understand.  But the point

10 is here that clearly ROSCA requires clear and conspicuous

11 disclosures, right, and clear and conspicuous means that

12 it's -- to be not clear and conspicuous, which is the FTC's

13 burden to show liability -- we don't have the burden here in

14 the case or in summary judgment.  We just need to establish

15 that -- that the disclosures are made.  There's no falsity.

16 There's no material omission.  There's the -- the undisputed

17 facts are that the key terms that you get these premium

18 channels free for three months, and if you don't call to

19 cancel, it rolls to automatic pay.  There's no question

20 that's disclosed.

21          THE COURT:  Right.  But isn't the whole point the

22 manner of disclosure?  That's --

23          MR. HUMMEL:  Exactly.

24          THE COURT:  That's the question.  So, wait, so

25 just -- because your argument was the disclosures are made

1  undisputedly in some form, ergo, now at this stage the FTC

2  has to come forward with particular types of evidence like

3  surveys or other -- other evidence of -- in essence, that

4  consumers didn't see the disclosure.  I'm just not sure

5  that's right.  It seems to me that the point is on balance

6  the overall question is whether the manner in which the

7  disclosures are made satisfies ROSCA or not.

8          MR. HUMMEL:  Correct.  The test is whether

9  consumers see and understand the disclosures.  To violate a

10 clear and conspicuous standard, the FTC will have to show

11 that a significant percentage of consumers don't see and

12 understand them.  Our view -- and this is a very important

13 jurisprudential point here, your Honor, on summary judgment,

14 and I would suggest that the Court would -- well, I don't

15 want to suggest that yet, but let's see where we go.  The --

16 our view is that once we come forward with the fact that the

17 disclosures are unquestionably made, then there has to be

18 some evidence that consumers don't see and understand them.

19     The only evidence in front of your Honor is the website

20 itself.

21          THE COURT:  Right.  And, again, what is -- it's in

22 your papers somewhere I'm sure, but what is the case that

23 you say directly establishes that standard you just

24 articulated?

25          MR. HUMMEL:  On summary judgment?

8

1          THE COURT:  Yes.

2          MR. HUMMEL:  I would say it's the general summary

3   judgment standard.  There is no case on ROSCA establishing

4   the burden on summary judgment, and there's no case on

5   summary judgment that we've found, your Honor, with respect

6   to the summary judgment standard.

7        But just as a matter of logic, our position is that a

8   facial review of the website, without a clearly literally

9   false statement or the type of evidence that existed in a

10  case that is much cited by the FTC in which we're happy to

11  discuss the, Commerce Planet (phonetic) case, which is that

12  a -- a facial review would reveal something literally false

13  or misleading.

14       This is a prominence case.  Your Honor is quite right.

15  That's all it is.  It's a manner of disclosure, and they

16  could have and our view is should have and had to have

17  submitted some evidence that a consumer was confused, that a

18  significant percentage of consumers didn't see or understand

19  the website or, your Honor, given the baseline that exists

20  here, which is that 50 states approved in the multi-state

21  settlement the notion that the way we disclose the premium

22  channel offer is clear and conspicuous.  We entered into a

23  settlement agreement, as you know, the multi-state agreement

24  which your Honor has considered back in 2011.  Since that

25  time -- and that agreement required that the terms of the

9

1 premium offered channel deal be clear and conspicuously

2 disclosed.  We have done it this way since that time.  No

3 state has complained.  No state has brought an action about

4 the premium channel offers, none.  The FTC has said in its

5 complaint itself that there are tens of thousands of

6 complaints relating to the marketing practices at issue

7 here.  They don't submit a single consumer complaint in

8 connection with this particular issue.

9       Your Honor, the other thing I would mention is we had a

10 situation where in the complaint itself -- this is where

11 this started -- and the issue for summary judgment is framed

12 by the complaint -- the FTC attached as Exhibit 4 what it

13 purported to be the website, and it omitted all the ROSCA

14 disclosures, all the disclosures relating to the website.

15       So we asked them "What evidence do you have that

16 consumers are misled or that they don't see or understand

17 the disclosures?"  They produced nothing.  They won't even

18 tell us if any evidence exists.  The dot com closures, dot

19 com disclosure guides that the FTC publishes don't require

20 that disclosures be made and managed other than hyperlinks

21 or -- or rollovers.  That --

22            THE COURT:  Well, (a), the dot com guidance isn't

23 binding on me, is it?

24            MR. HUMMEL:  It's not binding.  Neither is -- what

25 is binding on you, your Honor, I would suggest respectfully

1   is ROSCA, and ROSCA nowhere either prescribes or prohibits

2   disclosures by rollovers or hyperlinks.  And, in fact, your

3   Honor, there is nothing in the statute that mandates the

4   manner in which affirmative consent can be obtained.

5        So absent evidence other than a facial review of the

6   website, which is all the FTC is coming forward with --

7   that's all -- they say it's undisputed and inferences can be

8   drawn from this website, absent any evidence whatsoever, you

9   can deny summary judgment, and we suggest that is a complete

10  failure of proof at the summary judgment stage.  So, no, the

11  dot com guidelines aren't binding.  The MSA is not binding.

12  This is a separate action we agree.  However, it is highly

13  probative that our disclosures, at least to meet an initial

14  burden, satisfy the 50 states.

15          THE COURT:  What about the -- the portion of the

16  dot com guidelines that says that a hyperlink should not be

17  used to communicate an integral part of a claim, and isn't

18  -- isn't that a question here, whether the information

19  contained in these hyperlinks was or was not an integral

20  part of the claim?

21          MR. HUMMEL:  So significant -- I would argue, your

22  Honor, that the significant disclosure is not contained in

23  hyperlink, and it's repeated throughout the website, and you

24  can see that for yourself.  Point one is the free for three

25  months appears throughout.  The only component of a material

11

term that does not appear in anything other than a hyperlink
or a rollover is the fact that you have to call to cancel.
However, if you look at the card page on both of the flows,
it is very clear, your Honor, that the -- that the price
shows up for the consumer for the first three months as a
credit and then it begins to pay in the fourth month, and
that's unavoidable.

     So there is one component that I would concede, which
is the call to cancel component of this offer that is not
disclosed except in a hyperlink or a rollover, which is
where you take your mouse and roll over a question mark.

     So I guess the point is -- and it's important, your
Honor, and I think it is somewhat first impression, that you
cannot -- if this were -- let me -- let me now say what I
was going to say.  I think that if this were a private
plaintiff and not the government, there would be no question
that summary judgment is appropriate, and I would suggest
that the FTC stands in the shoes of a private plaintiff
absent an administrative finding, which there is none, of
deception.  And there is no dispute this, unlike Commerce
Planet, which your Honor has probably read and is familiar
with, that was really a bait and switch.  That was an offer
on two versions of a website that said, you know, get a free
starter kit, and in lieu of the free starter kit, the
consumer was unknowingly signed up for something completely

12

different, which was an online continuity program, totally
different circumstance.  There was a facially deceptive
website.  That does not exist here, and the -- I don't think
the FTC is even arguing that it is.  All they're arguing is
that consumers -- a significant percentage of consumers
don't see and understand the disclosures, but they don't
have any evidence of that, and, therefore, the summary
judgment, partial summary judgment is appropriate.

THE COURT:  Let me ask this.  Are -- and this may
be a place where you can use your demo.  What wasn't clear
to me is whether the key disclosures in this web flow are
something that the consumer is required to click.  In over
words, I get that there are hover overs, frankly, some of
them about important matters, some of them about promotional
matters or other -- other insignificant non-disclosure
issues.

MR. HUMMEL:  Right.

THE COURT:  But what wasn't clear is whether at
any point you're -- the consumer would be required to click
a particular hyperlink or mouse over before being able to
proceed.  And so, for example, with regard to the -- the
last page where we have the orange button that says by --
proceed or purchase and then next to it by clicking orange
button I'm agreeing to all the terms and conditions in --
behind this link, does the consumer have to click that link

13

1 before being able to proceed with the orange button?

2          MR. HUMMEL:  No.  At no time is -- are any of the

3 roll overs or the hyperlink what are called force clicks.

4 That does not exist.

5      I will say, your Honor, with respect to the terms and

6 conditions, however, those do not purport to be nor have

7 they ever purported to be a statement of all the material

8 terms of what the consumer is agreeing to when the consumer

9 clicks "I accept and submit my order."  For example, no

10 where is the price the consumer is paying in those terms and

11 conditions.  Nowhere is the package they're paying in those

12 terms.  Nowhere is the programming they're getting in those

13 terms.  What we submit, your Honor, is that as a consumer

14 proceeds through the web, all of the information is

15 available, and nothing in the law prevents -- nothing in the

16 law prevents DirecTV from disclosing the additional term of

17 the -- of the requirement to call to cancel in anything

18 other than a hyperlink or rollover which is not forced.

19 ROSCA doesn't say it.  The states obviously thought it was

20 sufficiently clear and conspicuous for five years before

21 this action was brought, and the dot com guidelines suggest

22 that in circumstances nothing prohibits those types of

23 disclosures.

24      So what I'm suggesting to you, your Honor, is this,

25 that the facial review does not allow the FTC in this

14

instance to survive summary judgment.  There is not a
permissible inference that consumers don't see and
understand it absent additional evidence, which was clearly
present in Commerce Planet and clearly present in each of
the other cases that discuss the clear and conspicuous
statement.

THE COURT:  All right.  But, again, just going
back to what you said, evidence that consumers don't see and
understand -- and you posit that survey could be that or
evidence of consumer confusion could be that, but all of
that seems to me to be types of evidence that the FTC could
present, but for purposes of summary judgment, what is your
best case for the idea that they have to present these
particular types of evidence to survive summary judgment?

MR. HUMMEL:  Because there is no question.  It is
undisputed that the disclosures are made.  You can view them
on the website.  It is undisputed that they're factually
accurate.  It is undisputed that there is no material
omission.  Absent that -- and there's no dispute that the
product disclosed is actually delivered.  The FTC is not
arguing that a consumer doesn't get three free months of
HBO, three free months of Showtime, and then it rolls to
pay.

ROSCA doesn't require anything else.  All it says is
clear and conspicuous, and I can repeat myself as much as I

1  can, but absent that additional fact, a facial review is

2  inadequate.  That is our position.

3        THE COURT:  Based on your interpretation of

4  general summary judgment principles as opposed to any court

5  having said what you just said?

6        MR. HUMMEL:  Because no court has reached the

7  issue.  We have not found a ROSCA case that says that, and

8  the cases that the FTC cites, for example, <u>Commerce Planet</u>,

9  Mr. Edmondson tried the case.  He knows far more about it

10  than I do, but that was a case where there was significant

11  consumer evidence.  There was significant consumer

12  complaint.  There was significant evidence that once the

13  disclosures were made, the company tanked.  There were three

14  versions of the website in advance, and then once my former

15  partner, Linda Goldstein, advised on the website, the -- the

16  entire program can't -- was wiped out.

17     All of the cases that they're citing are scans.  This

18  is not a scan.  And the -- and the terms are accurate, and

19  once the Court determines as a threshold matter, the burden

20  shifts.  And I -- regardless of -- obviously the case of

21  <u>Gaddy</u> is distinguishable on its facts, but it does set forth

22  the standard, which is that once we make a showing

23  sufficient to establish the existence of an essential

24  element or the absence of an essential element, namely, the

25  consumers don't see and understand this, the burden shifts

16

1  for them to do something other than point to what's

2  undisputedly at issue, and they could have done it if they

3  had any evidence, and they didn't.

4          THE COURT:  All right.  Mr. Edmondson?

5          MR. EDMONDSON:  Well, first of all, your Honor, I

6  want to point out that Mr. Hummel misstated the standard for

7  showing deception.  It's whether a significant minority of

8  consumers would be -- acting reasonably under the

9  circumstances would be likely to be deceived by the failure

10 to disclose, and with respect to -- let me step back and

11 just say that the FTC sued DirecTV for violating ROSCA

12 because it concluded based on a -- its analysis of the

13 website that the -- that DirecTV had buried the required

14 disclosures where most consumers were unlikely to ever see

15 them, and, your Honor, we're only part way through fact

16 discovery, but we've tried for months to find evidence that

17 even a single consumer has ever clicked on a hyperlink or

18 held their mouse over an info hover when they were

19 navigating through DirecTV's website, and there is none.

20 DirecTV has come forward with none, and we would submit the

21 fact that DirecTV has no evidence that any of its customers

22 who signed up on this website ever even clicked on the

23 hyperlinks or viewed the info hovers is sufficient to deny

24 summary judgment right now.  I'd like to note --

25          THE COURT:  Well, why?  In other words, apply what

17

1  you just said to the standard and the burden allocation at

2  summary judgment, and explain to me why it is that in your

3  view they were required to come forward with that.

4          MR. EDMONDSON:  Okay.  For nearly two decades, the

5  FTC's advised internet marketing companies that if they're

6  going to disclose material information behind hyperlinks --

7  and info hovers are just another type of hyperlink -- that

8  they need to monitor whether consumers are actually seeing

9  the disclosures, and that's because the ultimate test here

10  is whether consumers actually see the disclosures that under

11  ROSCA they -- the company is required to clearly and

12  conspicuously present to them.

13      And what DirecTV has done here and we're prepared to

14  demonstrate it by walking -- walking through the website if

15  you'd like -- is they've taken the material disclosures,

16  including the fact of the negative option, the price, and

17  what consumers need to do to avoid being charged the price

18  for the premium channels, and they've buried it where

19  consumers are least likely to look.

20          THE COURT:  Well, and that -- and that I -- it's

21  sort of interesting.  I get that that's the ultimate issue

22  in the case, and that would be the point of the bench trial.

23  What I'm getting presented is something of a novel summary

24  judgment argument, and it seems to me that the resolution of

25  this summary judgment motion depends on what I find about

18

1  who has the burden of showing what at this stage to advance,

2  and so what you just said was that DirecTV was required to

3  come forward with some evidence that consumers actually look

4  at some of these hyperlinks, and what I'm grappling with is

5  what's your basis for assigning that burden to them at the

6  summary judgment stage?

7           MR. EDMONDSON:  Well, they've assigned -- well, we

8  could --

9           THE COURT:  Let me put it this way.  I have a very

10 clear framing and understanding what the ultimate issues

11 here will be.

12          MR. EDMONDSON:  Yes.

13          THE COURT:  What I'm not entirely clear on, and it

14 may be because there's no authority that the parties have

15 been able to cite in an analogous summary judgment

16 situation, is what impact the allocation of the summary

17 judgment burden has here and exactly what type of evidence

18 is required and by whom to prevail at this stage.

19          MR. EDMONDSON:  We maintain that it's common

20 sense.  That if material disclosure mandated by federal law

21 is completely avoidable in the sign-up process as it is here

22 on DirecTV's web flow, that it -- it -- it fails -- it's not

23 clear and conspicuous and for that reason violates ROSCA.

24 It violates --

25          THE COURT:  Well, I get that that's your theory

1  and that's -- that's what you'll ultimately be arguing at

2  the trial when we get there if we get there, but it's -- Mr.

3  Hummel is saying that you had the burden of coming forward

4  with some evidence, not argument, but evidence at this

5  stage.  I suppose you could respond to that in a couple of

6  ways.  One is you could say, "Well, no, they're undisputed

7  facts from which inferences could be drawn either way and

8  that's enough to get past summary judgment," or you could

9  say "We have come forward with evidence."

10      Which are you saying?  This is just an evidentiary

11  question that I need to be sure I understand so that I can

12  make the right decision at this stage.  I get what

13  everyone's long-term argument is, but I -- I don't know that

14  either party is clearly and directly engaging the

15  application of the summary judgment standard to a situation

16  like this, and that's what I would like some clarity on.

17          MR. EDMONDSON:  Okay.  Your Honor, well, I think

18  you articulated it when you said that viewing the undisputed

19  facts, that it's -- that a judgment could be made either way

20  and, therefore, the case is not ripe for summary judgment.

21  I think that would be our position at this stage because,

22  again, we're still early in fact discovery.  DirecTV has yet

23  to produce a single document from its cache of millions of

24  consumer complaints.  It has yet to produce any of the sales

25  and cancellation data we requested, has yet to produce

1  anything other than a few misleading -- what we argue are

2  misleading screen shots of historical versions of its

3  website where we've requested actual interactive copies of

4  the historical website.

5      So I guess our position would be that if -- if your

6  Honor finds that inferences could be drawn either way at

7  this stage, that the -- the motion is -- is not ripe for --

8  for a decision.

9          THE COURT:  All right.

10         MR. EDMONDSON:  And, therefore, we -- we went

11 through our portion of our brief where we argued that Rule

12 56(d) applies.

13         MR. HUMMEL:  Could I respond on the burden

14 question briefly, your Honor?

15         THE COURT:  Sure.

16         MR. HUMMEL:  Thank you.  So I think the standard

17 is pretty -- is quite well known.  We came forward with

18 undisputed facts, and here are the following, what the

19 website, in fact, shows.  I didn't hear Mr. Edmondson once

20 say there's anything false or misleading or omitted in the

21 website.  It's a prominence case.

22     What he said was you can go through the website, and

23 it's possible to avoid the disclosures.  That's true.

24 Nothing in ROSCA prohibits disclosure by hyperlink or

25 rollover.  Nothing in the dot com guidelines prohibits that.

And, your Honor, we've come forward with probative evidence that the disclosures are clear and conspicuous.  That is, our conduct has complied with the multi-state agreement, which we've put in evidence, specifically that 50 states and the District of Columbia have already determined that this disclosure is adequate.

THE COURT:  But what -- so you're arguing what, that I'm bound by that?

MR. HUMMEL:  Evidence, it's a fact.

THE COURT:  But how -- how is it probative of anything?  In other words, the fact that in a negotiated resolution they said whatever they said, that's not evidence of any issue before me, is it?

MR. HUMMEL:  I think it is probative, your Honor, of the fact that you have law enforcement attorneys general throughout the country looking at -- their job is to protect the consumer, and they have said this is adequate.  Now what Mr. Edmondson actually said is his burden at trial will be to demonstrate that consumers do not actually see and understand.  That will be their burden at trial.

That then frames the summary judgment issue for you, your Honor, which is what evidence do they have that consumers don't see and understand these.  What he says is the only evidence they have is that the FTC has made a determination using its expertise, nothing else.  If -- and

22

1 that goes back to my point, your Honor.  If this weren't the

2 FTC, I think you would have little hesitance in saying

3 there's no evidence, and I think they would admit in a

4 private civil lawsuit this would be a different thing.

5     This is a private civil lawsuit.  They're not coming to

6 you with an administrative determination of -- of a

7 violation of the clear and conspicuous requirement.  They're

8 simply saying you can look at it yourself and determine

9 facially that there's a genuine issue, and our point is,

10 your Honor, absent some other evidence, that they haven't

11 met their burden.

12         THE COURT:  Well, let me ask -- let me circle back

13 to the point you started to make, which is the evidence that

14 you're contending meets your initial burden of presentation

15 or production.  You're citing the -- the settlement

16 agreement which you're arguing is evidence of whether the

17 website is actually -- actually contains clear and

18 conspicuous disclosures or not.  I'm not sure I agree with

19 that.

20     What else do you have?

21         MR. HUMMEL:  Not just the settlement agreement,

22 the fact that no attorney general since 2011 has brought any

23 action to enforce.  That is also a fact.

24         THE COURT:  But, again, they might make that

25 determination for any number of reasons that don't have

23

1  anything to do with factual accuracy.

2          MR. HUMMEL:  Fair enough.  Right.  There are a lot

3  of other considerations that would go into law enforcement

4  decisions.  I recognize that.  However, I would submit that

5  the evidence that shifts the burden is the website itself.

6  You need to in a complaint come forward with -- and what the

7  FTC brought forward was a -- in their -- Exhibit 4 to their

8  complaint was a version of the web flow that omitted all of

9  the disclosures.

10     Typically the complaint frames the issue for summary

11  judgment.  We then come forward with saying, well, no, the

12  complaint is factually inaccurate, and that's undisputed the

13  disclosures are made.  Our principal point, your Honor, is

14  that facial review of the website itself -- and I don't

15  think the FTC or DirecTV at this point have a factual

16  dispute about what the website is or what it does.  The

17  question is is that enough to survive summary judgment, and

18  our view is absent more, no.

19          THE COURT:  All right.  Well, I understand your

20  position.

21          MR. HUMMEL:  Thank you, your Honor.

22          MR. EDMONDSON:  If I may, your Honor, the FTC has

23  produced over 100,000 complaints, consumers to DirecTV.  We

24  -- we could have inundated the Court with tens of thousands

25  of complaints, but we chose not to because DirecTV

24

1    predicated their motion solely on the four corners of its

2    website which it presented to the Court in the form of

3    static screen shots with disclosures revealed but provided

4    no evidence that consumers ever actually revealed the

5    disclosures when they're navigating the website.

6          THE COURT:  Okay.  Like I said, I don't know that

7    either party has really given me a lot of help on the burden

8    and the evidentiary question.  I'll just have to figure it

9    out.

10          MR. HUMMEL:  Your Honor, one final point if I

11    might.

12          THE COURT:  Sure.

13          MR. HUMMEL:  Mr. Edmondson said they had tens of

14    thousands of complaints.  They didn't submit one.  They

15    didn't submit a single survey and not a single document

16    that's probative of the lack of disclosure, nothing.  So

17    that's our -- that's our point.  And you're quite correct.

18    It's a question of burden, and it's a question of whether

19    facial review is sufficient to survive summary judgment.

20          THE COURT:  All right.  Fair enough.  So I'll take

21    the -- the summary judgment motion under submission.  Now

22    let's talk about the case management dimension of the case.

23      So I received the -- the stipulation that the parties

24    submitted requesting a three-month continuance, essentially,

25    of all dates, and my initial response was relatively

1 skeptical.  I hate moving trial dates.  I'll do it, but

2 generally when I do it, it's because there is a likelihood

3 of resolution short of trial.  This doesn't strike me as

4 that sort of case, and so I am reluctant to -- to move the

5 trial date at all, and I'm certainly not inclined to move it

6 by three months.

7      And so what I think I need to understand is what in

8 particular is happening in the discovery realm that the

9 parties think justifies the request they made.  I would note

10 that the current April 22nd fact discovery close date is

11 almost two months out, six weeks out at this point, and I

12 take the parties' efforts to resolve discovery disputes

13 without court intervention as a positive.  That's something

14 that I never would discourage, but what I always tell

15 parties is it's your obligation to quickly move through that

16 meet and confer, decide if it can be resolved without

17 intervention.  If intervention is needed, you need to build

18 in enough time to do that in light of the discovery deadline

19 that exists, and so I would say if there are issues that are

20 still potentially pending before Judge James or will be

21 things that you potentially need to bring to her attention,

22 I think you need to very quickly decide whether they can be

23 worked out informally or not and get those on her -- on her

24 docket.

25      And you can understand, there's always a Catch 22.  I

1 never like to encourage continuances because of discovery

2 disputes because that means that the parties have an

3 incentive to have lots of discovery disputes if they're

4 looking to move the deadlines.  So all that said, I think I

5 need a clear understanding of what needs to be done, why it

6 can't be done by April 22nd.  I saw a reference to some

7 depositions being in April, but it seems to me that an April

8 22nd discovery cutoff would accommodate that, and so just to

9 preview what I'm thinking, I -- my inclination would be to

10 either keep the current deadlines or if I'm persuaded that

11 there's a strong reason to give some extension, I don't

12 think the extension would be longer than a month.  So what I

13 need from you is some detailed explanation of what the

14 issues are that motivated the request for an extension.

15        MR. HUMMEL:  Do you want to start?  I'm happy to

16 address it.

17        MR. EDMONDSON:  Why don't you.

18        MR. HUMMEL:  So I think -- let me make a couple of

19 observations.  One is that there are significant disputes

20 between the parties as to discovery obligations in the case.

21 We are expeditiously working together to bring those to

22 resolution before Judge James.  The -- the scope of the

23 rulings will largely dictate what has to be done, and I will

24 tell you that in terms of the production from our side,

25 there is a significant amount of time required to produce

27

data from various databases including customer complaints from various things that the FTC has requested, including source code, including a number of other specific issues.

I will say, your Honor, that neither party has been dilatory. We have large teams of very fine lawyers working to get this thing done and resolved very quickly. The other thing I will tell you is that on the section five claims there is a significant amount of expert work that needs to be done, and the factual predicate for that work is -- has not yet been fully obtained by either party, and so when Mr. Edmondson and I were talking about this several months ago, neither of us wants to continue this case. However, we just simply have no idea how to get what's necessarily done in the time that was allotted by the Court. You may remember that when we initially proposed the case management conference, DirecTV's position was exactly what we're now suggesting, because we knew the volume.

The other thing that's happened -- and I know it's not an excuse, but the AT and T acquisition of DirecTV set us back several months in terms of a complete overhaul of personnel who are unfamiliar with the systems. The witnesses have largely -- who are significant to the case no longer work with the company. We're working with the FTC to get them deposed. We've had attempts to depose the FTC on certain issues and to gather evidence. There have been

1   disputes about that.

2       So, your Honor, what I will say is and represent to the

3   Court as an officer of the court, we have been working

4   diligently to get things done and to resolve things

5   informally, and where we can't, we've gone to the

6   magistrate, and the magistrate has issued some guidance, and

7   we're proceeding at pace.  Neither party has been dilatory

8   at all in the pursuit of discovery in the case, and I think

9   the four-month continuance -- well, actually through I guess

10  April 7th, 2017 for a trial is reasonable in light of the

11  amount of expert work that needs to be done which in part is

12  predicated on fact discovery that won't be done in time.

13      I don't know if Mr. Edmondson disagrees or wants to

14  augment or add to that.

15          MR. EDMONDSON:  I would just say that a central

16  evidentiary challenge that we have here is that DirecTV did

17  not maintain operating copies of its -- of its website.

18  It's been on notice since 2010 that the FTC is investigating

19  its internet marketing practices but didn't maintain the

20  website in a form that is viewable.  They have data, and

21  we've reached an agreement in principle now with DirecTV to

22  see if we can jointly employ a third party firm with

23  expertise in forensic internet website rebuilding to see if

24  they can reconstruct representative examples of the web flow

25  from three key points in time.  And that will take some

1 time.  We don't know how long, but it's important to have

2 those web flows up and running for our experts to be able to

3 complete their work.

4          MR. HUMMEL:  So I -- that's not the discovery

5 dispute I was thinking about.  I think that's --

6          THE COURT:  I figured it wasn't.

7          MR. HUMMEL:  I didn't want to argue that point.

8 So I won't get into it.  I'll just say, your Honor, that we

9 need the time, and -- and I would appreciate the Court's

10 indulgence in accepting the agreement of the parties that --

11 that both sides need the time for different reasons.

12          THE COURT:  All right.  Let me ask this, and maybe

13 this is one way to approach it.  Both sides are saying that

14 there are pending issues that may be impacted by the scope

15 of what Judge James will rule once she's presented with an

16 actual dispute, and my -- my inclination would be, if I can,

17 to have a sense of how that will play out before we reset

18 the schedule.  In other words, if the scope of production

19 that's ordered is broad, that may put us on one path.  If

20 there's a significant narrowing, that may in both parties'

21 view change that analysis.  And so one what I would -- what

22 I would propose is to have the parties continue on the path

23 that they're on, and I don't doubt that there's good faith

24 collaboration that's taking place, and I appreciate it, but

25 to see where we are in say a month and see what the actual

1 lay of the land is in terms of the -- these discovery issues

2 and analysis issues and then be able to calibrate the -- the

3 trial schedule and the rest of the schedule accordingly.

4      It may be, for example, that we could keep the trial

5 date close to where it is but extend some of the discovery

6 deadlines.  I just don't -- I just don't have a good enough

7 sense yet.

8           MR. HUMMEL:  I understand, your Honor.  The only

9 thing I'll say is -- and it's a personal thing.  I'm in

10 trial in Orange County right now, a jury trial, through the

11 end of March.  The expert discovery deadline is the one that

12 I'm most worried about.  We can work on fact discovery, but

13 we cannot have our experts ready by the 25th of April, and I

14 think Mr. Edmondson would agree.  That's the one date right

15 now that needs to move, and I would appreciate your Honor at

16 least giving us a couple of months extension on the expert

17 discovery.  We can work on the facts and then maybe come

18 back to you with an alternative schedule when we see where

19 we are.

20           THE COURT:  All right.  Why don't we do that.  Why

21 don't you two meet and confer and talk about what sort of

22 expert schedule would accommodate both sides' needs at this

23 point, for the time being, continuing to keep the rest of

24 the days, including the trial date, where they are.  In

25 other words, I understand the point.  If we need to push the

1 expert dates but could potentially accommodate that within

2 the currently existing trial schedule, that's something I

3 certainly would be willing to consider.

4          MR. HUMMEL:  Understood.  We will -- we'll work

5 with that, and if we -- you know, if we can't, we'll come

6 back to your Honor with some more specifics about the

7 reasons for the requested continuance of the trial date.

8          THE COURT:  All right.  And I think that makes

9 sense.

10          MR. HUMMEL:  Thank you, your Honor.

11          THE COURT:  All right.  Anything else we should

12 discuss today?

13          MR. HUMMEL:  No, your Honor.

14          THE COURT:  All right.

15          MR. HUMMEL:  Thanks for your time.

16          THE COURT:  You're welcome.  Thank you.

17     (Proceedings adjourned at 10:45 a.m.)

18

19

20

21

22

23

24

25

32

<u>CERTIFICATE OF TRANSCRIBER</u>

1
2
3      I certify that the foregoing is a true and correct
4  transcript, to the best of my ability, of the above pages of
5  the official electronic sound recording provided to me by
6  the U.S. District Court, Northern District of California, of
7  the proceedings taken on the date and time previously stated
8  in the above matter.
9      I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties to the action
11 in which this hearing was taken; and, further, that I am not
12 financially nor otherwise interested in the outcome of the
13 action.
14
15
16              Echo Reporting, Inc., Transcriber
17                Wednesday, March 9, 2016
18
19
20
21
22
23
24
25