Eric D. Edmondson, D.C. Bar No. 450294
Erika Wodinsky, Cal. Bar No. 091700
Boris Yankilovich, Cal. Bar No. 257887
Jacob A. Snow, Cal. Bar No. 270988
901 Market Street, Suite 570, San Francisco, CA  94103
(415) 848-5100/(415) 848-5184 (fax)
*eedmondson@ftc.gov*; *ewodinsky@ftc.gov*; *byankilovich@ftc.gov*; *jsnow@ftc.gov*

Raymond E. McKown, Cal. Bar No. 150975
Stacy Procter, Cal. Bar No. 221078
Kenneth H. Abbe, Cal. Bar No. 172416
10877 Wilshire Blvd., Suite 700, Los Angeles, CA 90024
(310) 824-4343/(310) 824-4380 (fax)
*rmckown@ftc.gov*; *sprocter@ftc.gov; kabbe@ftc.gov*

Attorneys for Plaintiff
Federal Trade Commission

Jeff Tillotson, SBN 139372
jtillotson@TillotsonLaw.com
Tillotson Law
750 North Saint Paul, Suite 610
Dallas, TX  75201
Telephone:  (214) 382-3040

Pete Marketos, *Pro Hac Vice*
pete.marketos@rgmfirm.com
Reese Gordon Marketos LLP
750 North Saint Paul
Suite 610
Dallas, TX  75201
Telephone: (214) 382-9810

Chad S. Hummel, SBN 139055
chummel@sidley.com
Mark D. Campbell, SBN 180528
mcampbell@sidley.com
Bridget S. Johnsen, SBN 210778
bjohnsen@sidley.com
Ryan M. Sandrock, SBN 251781
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  (415) 722-1200
Facsimile:  (415) 772-7400

Attorneys for Defendants
DIRECTV and DIRECTV, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DIRECTV, a corporation, and<br><br>DIRECTV, LLC, a limited liability company,<br><br>　　　　Defendants. | Case No. 15-cv-01129-HSG<br><br>**JOINT PRETRIAL STATEMENT** |

JOINT PRETRIAL STATEMENT

Plaintiff Federal Trade Commission ("FTC") and Defendants DIRECTV and DIRECTV, LLC (collectively, "DIRECTV") submit the following Joint Pretrial Conference Statement pursuant to the Court's Civil Pretrial and Trial Standing Order.

## I.   SUBSTANCE OF THE ACTION

### A.  FTC's Statement

This case concerns deceptive advertising by an omnipresent marketer of television subscription services with a long history of deceptive marketing.  DIRECTV (now part of AT&T) has for years offered its satellite-television subscription service by advertising low "teaser" rates for 12 months and three months of "free" premium channels (such as HBO or Showtime).  This offer comes with several conditions that materially alter the advertised terms: Consumers are (a) required to enter into a 24-month contract or pay an early termination fee, (b) required to pay substantially higher prices for the same package in the second year of their contract, and (c) automatically enrolled in a negative option continuity plan for the premium channels, with fees automatically charged to their financial accounts starting in the fourth month. Rather than include clear notice of these conditions in its ubiquitous advertisements, DIRECTV chose to shroud these disclosures, or not to disclose the conditions at all.  As a result, a substantial number of reasonable consumers viewing DIRECTV's print or electronic advertisements or television commercials were likely left with a false impression about the cost or terms of commitment for television programming from DIRECTV.

Tens of millions of consumers who viewed advertisements promoting DIRECTV's "lowball" offers purchased the company's services.  Those who stayed with DIRECTV in their second year were charged, on average, approximately $221 more than in the first year. Consumers who cancelled their contracts before the end of two years were charged $20 for each month remaining on their contracts – up to a total of $480. And any consumer who did not cancel his or her "free" premium channel subscription before the end of the third month was charged approximately $47 per month for those channels.  The aggregate injury to consumers – conservatively estimated – is approximately $3.95 billion.

**1.    Violations of Section 5 of the FTC Act**

The FTC's complaint contains four counts. Counts one and two allege that DIRECTV has violated Section 5 of the FTC Act, 15 U.S.C. § 45, by failing to adequately disclose the following material terms: (1) consumers must enroll in a two-year contract or pay an early cancellation fee of up to $480; (2) consumers must pay a significantly higher price for the same package in the second year; (3) consumers are automatically enrolled in a premium channel subscription, for which they will be charged unless they cancel within three months; and (4) the costs associated with the premium channel subscription.

The Court may determine whether advertisements are deceptive under Section 5 of the FTC Act based solely on a facial review of the ads. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1064-68 (C.D. Cal. 2012), *aff'd* 815 F.3d 593 (9th Cir. 2016) (holding, based solely on a facial analysis, that several purported website disclosures about a negative option plan were inadequate because the disclosures were ambiguous or consumers were unlikely to see them). When evaluating whether disclosures in an ad are clear and conspicuous, courts typically consider the following key factors, such as (1) a disclosure's **proximity** to the claim it is qualifying, (2) its **placement** in the ad, (3) its **prominence** in the ad, (4) whether other items in the ad **distract attention** from the disclosure, and (5) whether the language of the disclosure is **understandable**. *See, e.g., FTC v. Cyberspace.com*, 453 F.3d 1196, 1200–01 (9th Cir. 2006) (disclosures found inadequate when placed in small print on the back of a check); *FTC v. Johnson,* 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (disclosures found inadequate when placed at the very top of the page or under the "submit" button); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009) (disclosures found inadequate when placed at the bottom of a page).

The most compelling evidence that DIRECTV advertisements are deceptive is the ads themselves. To the extent that DIRECTV discloses material terms of its lowball 12-month price and free premium channel offers, the disclosures are inconspicuous, hard to comprehend, or both. DIRECTV advertises widely through a variety of media, including print, internet and television, but the company's ads are developed from a common template and consistently hide disclosures in small, hard-to-read print, or behind hyperlinks or ambiguously labeled infohovers

JOINT PRETRIAL STATEMENT

3

or mouseovers.  None of the advertisements adequately disclose the significantly higher amount advertised programming packages will cost consumers in the second year of a contract.  As a result, DIRECTV's advertisements consistently create an overall "net impression" that the company's service may be obtained for substantially less than consumers ultimately must pay over the course of their mandatory 24-month contract.[1]

Although a facial review of DIRECTV's print ads and website alone is sufficient to prove that DIRECTV ads are deceptive, the FTC commissioned marketing expert Dr. Tülin Erdem to conduct a "copy test" of DIRECTV's advertisements.  Her test survey shows that only a tiny percent of survey respondents who viewed a typical DIRECTV print advertisement or navigated the company's website were likely to understand the material terms of DIRECTV's television programming and "free" premium channel offer.  Her survey also shows that even modest improvements in disclosures markedly improves comprehension of material terms of DIRECTV's offer.

The FTC also retained Dr. Anthony Pratkanis, who is an expert in consumer behavior and social influence, to study how a reasonable consumer would respond to the low-ball pricing and free premium channel offer that is the hallmark of DIRECTV's advertisements.  Dr. Pratkanis will explain why subsequent disclosures such as those made by DIRECTV telemarketers or in contracts provided by DIRECTV installation personnel are insufficient to overcome the net impression created by DIRECTV's advertising.

In addition to expert testimony, the FTC plans to introduce at trial circumstantial evidence that DIRECTV executives made a conscious decision not improve their advertising disclosures, including:  (1) DIRECTV advertisements do not comply with its own internal guidance; (2) DIRECTV documents including internal surveys, usability tests, eye tracking studies and patterns of complaints that support the FTC's contention that DIRECTV's advertising is deceptive; (3) despite undertaking literally thousands of studies of the efficacy of its advertisements, DIRECTV avoided conducting copy tests, focus groups or other studies to

---

[1] *See FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009).

JOINT PRETRIAL STATEMENT

determine whether consumers were likely to see or understand disclosures in its advertisements. Although proof of actual deception is unnecessary, the FTC will also present evidence from DIRECTV's own files that many of its own customers felt deceived by DIRECTV's marketing and sales process.

### 2.    Violations of the Restore Online Competition Act

Counts three and four allege that DIRECTV violated the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq.*, by failing to provide clear and conspicuous (*i.e.*, unavoidable) notice that its "free" three-month premium channel offer automatically rolls to pay if customers do not cancel before the third month, and by failing to obtain consumers' express informed consent to its terms.

On its face, the website does not disclose material terms of its "free" premium channel negative option clearly and conspicuously, and fails to obtain consumers' express informed consent, as ROSCA requires.  Instead of disclosing those terms conspicuously, the company hid those terms behind generically labeled hyperlinks and symbols. Thus, consumers could, and did, proceed through the entire online purchase process without once seeing any of these disclosures. The FTC will present evidence at trial that DIRECTV employed these inadequate disclosure practices against legal advice, and despite the fact that its usability testing, performed in the ordinary course of business, showed that consumers miss DIRECTV's inconspicuous disclosures.

### 3.    DIRECTV's Meritless Affirmative Defenses

Rather than cleaning up its ads and dealing honestly with American consumers, DIRECTV wants to shift the blame for its deceptive conduct to the FTC.  DIRECTV's laches and estoppel defenses are based on the unsupportable theory that the FTC knowingly led DIRECTV to believe its 2010 entry into a multistate settlement agreement ("MSA") would inoculate it against future action by the FTC for the disclosures at issue in this case.  The FTC will show at trial that there is simply no truth to this claim.

The FTC will also show that any "delay" by the FTC in filing suit against DIRECTV for violations of the FTC Act and ROSCA was the result of DIRECTV's own actions:  Between

JOINT PRETRIAL STATEMENT

2013 and 2015, DIRECTV lawyers met with two different directors of the Bureau of Consumer Protection and all five members of the Commission.  In each of those meetings, DIRECTV asked that the Commission refrain from filing suit and direct FTC staff to continue settlement negotiations.  The FTC acceded to DIRECTV's request and spent over two years attempting to resolve this matter before initiating this action.  Accordingly, DIRECTV has no basis to claim that it is unfairly prejudiced by the timing of the FTC's lawsuit.

### B.    DIRECTV's Statement

On March 11, 2015, after a five year delay, the FTC sued DIRECTV under Section 5 of the FTC Act ("FTCA") for advertising dating back to 2007 and under the Restore Online Shopper's Confidence Act ("ROSCA"), a statute that became effective in 2011.

With respect to the FTC's Section 5 claims, the FTC alleges that DIRECTV failed to make adequate disclosures in its advertising regarding certain conditions of purchase for its satellite television service.  The FTC does not allege that DIRECTV made any false statements or that it failed to provide any of the services that it advertises.  Nor does the FTC allege that DIRECTV does not actually make the disclosures at issue—only that DIRECTV's disclosures in its advertising (on TV, in print, on the web, and in phone sales) are made in a way that the FTC asserts is inadequate.  In order to show liability, the FTC must show not only that the disclosures at issue are less than what the FTC might like, but that the inadequate disclosures relate to material terms and are likely to deceive DIRECTV customers acting reasonably under the circumstances about the terms of their subscriptions.

The five conditions of purchase that allegedly are not adequately disclosed are:  (i) obtaining an introductory discounted programming package price requires a 24-month commitment to maintain a minimum level of service with DIRECTV, (ii) the introductory discount price lasts 12 months, (iii) consumers pay the regular price for their programming package in the second year of the commitment which is higher than the introductory discounted price,  (iv) cancelling before the end of the commitment period triggers the assessment of an early cancellation fee of $20 per month for the remaining months, and (v) a three-month free premium channel programming (such as HBO and Showtime) package automatically rolls to pay

JOINT PRETRIAL STATEMENT

at the regular price if the customer does not call to cancel after the third month of service (collectively, the "Conditions of Purchase"). With respect to ROSCA, the FTC alleges that DIRECTV does not clearly and conspicuously disclose the material terms of its premium channel negative option offer on its website.

The FTC brings this case without any consumer testimony of actual deception, without any competent survey evidence that consumers are likely to be deceived by DIRECTV's advertising,[2] without any empirical evidence that consumers who subscribe on *directv.com* do not see and understand DIRECTV's disclosures, without any evidence of the typical indicia of deceptive advertising that courts in this Circuit have considered in Section 5 cases, and without a legally justifiable study or expert opinion of harm to consumers flowing from the allegedly deceptive practices. The FTC has also failed to adduce any evidence—survey or otherwise—as to what consumers "expected to pay" for DIRECTV's programming throughout the 24-month commitment or for premium channels. On this barren record, the FTC seeks nearly $4 billion in "benefit of the bargain" expectancy damages, which the FTC merely labels "restitution."

On the other hand, in its defense, DIRECTV has extensive evidence (a) that the overwhelming majority of DIRECTV's subscribers actually know the terms of purchase when they sign up – having engaged in the purchase process of a high involvement product by phone or website that is designed to convey all material terms of its subscriptions multiple times, (b) virtually no one is actually deceived about DIRECTV's pricing structure when they subscribe, (c) even when assessed in isolation, DIRECTV's ads are not "deceptive door openers," (d) DIRECTV's subscribers are among the most satisfied in the paid TV industry and stay on the platform for an average of over 5 years, (e) consumer complaints about these issues are virtually non-existent, and, (f) DIRECTV's advertising of the terms at issue in this case has been

---

[2] The only empirical survey evidence that the FTC has is of a single 2013 print ad and a 2013 version of its website. That evidence is subject to a motion *in limine* under Daubert. Even if admitted, however, the survey of a single one-page print ad did not measure potential deception and is not projectable to tens of thousands of differing advertisements across many forms of media over a nearly a decade.

JOINT PRETRIAL STATEMENT

7

consistent with the terms of a 50-state settlement agreement in 2010 that covered the way that DIRECTV must disclose the identical terms.

### 1. Background On DIRECTV

DIRECTV is a leading provider of satellite television services with more than 20 million customers. It offers unparalleled content and services and is an industry leader in customer satisfaction. Customers display their satisfaction by staying with DIRECTV for an average of 5.5 years, long after their two-year contract commitment ends.

DIRECTV changed the paid-television industry by increasing competition and offering first of its kind programming. DIRECTV's entry into the market brought the first meaningful competition to entrenched television monopolies and brought multichannel video programming distribution throughout the United States when cable was unable to do so. DIRECTV also offers cutting edge digital recording, mobile device technology, hundreds of high-definition channels, premium channels like HBO, Starz, Cinemax, and Showtime, and is the only provider of NFL Sunday Ticket -- which provides every out-of-market Sunday NFL football game to subscribers.

### 2. The FTC's Case Is Based On A Fatally Flawed Legal Theory

The FTC's case is founded on a false legal premise – that each DIRECTV advertisement (on TV, in print, on the web, and in phone sales) must be analyzed in isolation to determine deception, and the Court should ignore all of DIRECTV's repeated disclosures throughout the lengthy web and phone sign up process. The FTC lacks any objective, empirical evidence that so much as a single ad is likely to deceive consumers in any event. Moreover, its legal position is flatly contradicted by the FTC's own policy statement on deception which has been in effect since 1983. The FTC's Deception Policy Statement specifies that, in considering the question of deception, the decision maker should consider "the entire advertisement, transaction, or course of dealing" and "examine the entire mosaic, rather than each tile separately." FTC Policy Statement on Deception, at p. 182. This approach is also consistent with current marketing literature, advertising practice, and common sense. The Court should not artificially analyze a single ad in isolation, but—just as consumers do—analyze the entire transaction (including dozens of disclosures on DIRECTV's web and phone sign-up process).

JOINT PRETRIAL STATEMENT

8

### 3. **The FTC Has No Competent Evidence To Support Its Case**

Beyond its legal infirmities, the FTC's case also fails on the facts. The FTC cannot present any evidence of deception in this case:

• Unlike virtually every other case the FTC has prosecuted, the FTC has no evidence (and has not even alleged) that any DIRECTV advertising has been literally false; there is no fraud or lie in the advertising at issue;

• The FTC cannot show that DIRECTV failed to make necessary disclosures concerning the conditions of purchase, as they were made repeatedly during the subscription process;

• The FTC does not have a single complaining consumer to testify that they were deceived;

• The indicia of deceptive advertising that the FTC offered in *F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012)), are not present – no bait and switch on the product being sold, no significant level of consumer complaints, no refund or credit card charge back data, and no precipitous drop in consumer demand when the conditions of purchase at issue are more prominently disclosed.

With no traditional evidence of consumer deception, the FTC faces a very high bar. Courts have made clear that the FTC must show actual evidence of deception and not rely on its own *ipse dixit*. *See United States v. Bayer Corp.*, 2015 WL 5822595, at *13 (D.N.J. Sept. 24, 2015) (rejecting FTC's deception claim because the FTC "offered no consumer survey data, no consumer testimony, no expert opinion on consumer understanding of the PCH ads, no marketing data, and no copy tests of any PCH advertisement."). Moreover, the evidence the FTC will present at trial is wholly insufficient to prove liability.

First, the only survey evidence offered by the FTC is limited to a single non-representative print ad and a prototype of the 2013 website. Both of these surveys, performed by Dr. Tulin Erdem, are fatally flawed for a number of reasons:

a. They do not test the relevant issue in this Section 5 case (likelihood of deception on material terms). They test—at best—whether more prominent disclosures can

JOINT PRETRIAL STATEMENT

9

improve recall of certain terms.  By Dr. Erdem's express admission, her surveys were not even designed to test whether consumers were deceived or whether additional disclosures affected a decision to purchase (materiality).

b.      The surveys tested the wrong universe—2/3 of participants would not consider buying satellite television (like DIRECTV).  After controlling for this error, the sample size is not large enough to provide statistically significant results.

c.      The web survey design was impermissibly biased to skew results to show that consumers who viewed so-called enhanced disclosures could recall more of the terms. The disclosures at issue were visible in the static images in the control stimulus but were not visible at all in the test that was available as survey respondents proceeded through the questions.

d.      For print, the FTC tested only a single ad that was not representative (and the ad was displayed in an unreadable manner which fatally skewed the results).

Second, the remainder of the FTC's evidence is not in any way "empirical," and it is not probative of deception.  A so-called web usability expert, Theo Mandel, conducted an improperly narrow and self-serving "heuristic" web usability analysis to opine that some of the design elements on DIRECTV's website could be more user friendly or effective based only on an analysis of some advisory guidelines promulgated by the U.S. Health and Human Services. He offered no opinion on deception and conducted no actual consumer usability study on DIRECTV's website.  And, a social psychologist hired by the FTC, Anthony Pratkanis, offers his personal views that customers were not likely to pay attention to DIRECTV's disclosures and become committed to a purchase once they see a discounted price in an ad.  While recognizing that every single learned treatise on consumer perception of advertising that he cites requires actual empirical study and consumer testing to confirm hypotheses about consumer deception and attendant behavior, he did none.

### 4. DIRECTV's Evidence Shows That Customers Are Not Deceived

Even though DIRECTV bears no burden in this case, it conducted a number of separate and independent empirical studies to defend against the FTC's allegations.  Each of these studies

JOINT PRETRIAL STATEMENT

10

demonstrates from different perspectives that DIRECTV's advertisements are not likely to deceive reasonable consumers.

First, a leading marketing expert, Professor Yoram Wind from the Wharton School at the University of Pennsylvania, conducted a large-scale study of actual DIRECTV customers immediately after they subscribed to DIRECTV by phone or online.  This study demonstrates that the overwhelming majority of subscribers (80%) understand the relevant conditions of purchase at the time they subscribe.  It also shows that any purported deception is, at best, minuscule and thus not actionable under the applicable legal precedents.  These results were consistent regardless of the manner through which customers subscribed (phone, web, or a combination of the two), whether disclosures of the conditions at issue were modified in ways suggested by the FTC, and whether customers are price sensitive. There was virtually no change in the results when modified disclosures (of the type the FTC had suggested) were used.  This evidence conclusively demonstrates that DIRECTV customers are not deceived, and, in any event, that the allegedly inadequately disclosed terms do not impact consumer purchase behavior.

Dr. Wind confirmed his conclusion of no deceptive conduct with further empirical evidence: (1) a recorded call analysis of 1,800 sales calls shows DIRECTV's required call components ("RCCs") related to the conditions of purchase were stated on 92% of the recorded calls; (2) customers do not complain about these issues to DIRECTV or the FTC in significant numbers (during the relevant time period, only 0.02% complained about the 24-month commitment, 0.01% complained about pricing, 0.01% complained about the ECF, and 0% complained about the premium negative option), and a portion of the complaints are demonstrably invalid; (3) less than 0.50% of discussions about DIRECTV on the internet by potential and actual customers of DIRECTV are negative discussions concerning the conditions of purchase; (4) customers on average stay on the platform for 63-68 months, far past the initial commitment period (and would have left earlier if deceived); (5) at any given time, 50%-60% of DIRECTV's customers are outside of their initial commitment; (6) there are no spikes in churn in the fourth, thirteenth, or twenty-fifth months (when you would expect to see customers leave

JOINT PRETRIAL STATEMENT

11

the platform if deceived); and (7) since 2007, DIRECTV has grown or maintained its market share in the highly competitive market for paid television. These data prove DIRECTV's customers are highly satisfied, not deceived.

This is just a sampling of the multifaceted evidence that DIRECTV will present at trial. It confirms from a number of different perspectives that DIRECTV's advertising has not been and is not likely to deceive consumers about material terms of DIRECTV's programming offers.

### 5.  FTC's Claims Are Equitably Barred

The FTC's case is also barred by laches and estoppel.  In 2010, DIRECTV resolved a dispute about the identical disclosures at issue in this case in a multistate settlement agreement ("MSA") with all 50 states and the District of Columbia.  After participating in the investigation with the states and having full knowledge of the terms of this agreement and the enhanced disclosures that DIRECTV agreed to, the FTC waited five years before filing suit.   Worse, even though the FTC affirmatively told DIRECTV that it had "other issues" and was not concerned with those disclosures at issue in the MSA, the FTC brought suit on the identical issues previously resolved by all of the states.

## II.    RELIEF SOUGHT

### B.  FTC's Proposed Relief

DIRECTV sales data show that approximately 33 million new subscribers joined its platform since 2007. Under longstanding precedent, the FTC is entitled to seek redress for all of these consumers in an amount equivalent to DIRECTV's total revenues for the advertised product, minus refunds. *FTC v. Commerce Planet*, 815 F.3d at 603; *FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993).  In this case, the FTC seeks a small fraction of that amount.  Dr. Daniel Rascher, an expert economist hired by the FTC, calculated that DIRECTV collected approximately $3.95 billion in unjust gains from consumers.  The FTC also seeks a permanent injunction against DIRECTV.  The FTC's proposed Order for Permanent Injunction and Monetary Judgment is attached as Exhibit A.

### C.  DIRECTV's Position Re FTC's Request for Relief

The FTC is not entitled to any relief.  Even if liability is found, the FTC is not entitled to

JOINT PRETRIAL STATEMENT

an injunction or "restitution" because it cannot satisfy its burden to establish liability and its case is barred by DIRECTV's affirmative defenses. Moreover, the FTC made the deliberate decision to proceed with this case under Section 13(b) of the FTC Act, which permits injunctive and ancillary equitable relief only. The vast majority of the legal and evidentiary flaws in the FTC's demand for nearly $4 billion in compensatory damages stem from that choice.

Section 13(b) was always intended to provide the FTC an efficient means to enjoin "garden variety fraud" without requiring delay for an administrative hearing while the public was being harmed. The FTC has used this section over the years to unwind sham transactions and recoup the money paid by consumers duped by fraudulent advertising. Here, though, the FTC confronts a legitimate satellite television services provider that counts over 20 million annual subscribers who wanted, continue to want, and have actually received DIRECTV's programming. The FTC cannot credibly seek to unwind millions of customers' television programming subscriptions over the last 9 years. Instead, its theory presumes the consumers' subscription agreements with DIRECTV went forward and attempts to recoup "benefit-of-the-bargain" damages measured as incremental cost. The FTC simply assumes, *without evidence*, that DIRECTV's customers expected to pay a lower amount for programming and premium channels and then demands the difference. That is *damages*, not restitution, and it is not available in a Section 13(b) injunction proceeding.

Had the agency wanted to pursue such relief and challenge DIRECTV's advertising and marketing, second-year pricing, or premium-channel practices, it could have initiated an administrative proceeding and, potentially, obtained a cease and desist order—suing for (and attempting to prove) legal "expectation" damages under Section 19 in the event of a subsequent violation. That path, however, would have entitled DIRECTV to the protections inherent in Section 19 and, thereafter, required the FTC to prove its claims. Instead, the FTC elected the path of least resistance by proceeding under Section 13(b) in "equity." The result is a liability theory that does not match the FTC's request for damages repackaged as "restitution."

JOINT PRETRIAL STATEMENT

**1.    The FTC Lacks Standing to Pursue Legal Damages in an Equitable Proceeding**

Because a case brought under Section 13(b) is an equitable proceeding, the FTC has characterized its request for monetary relief at all times as equitable "restitution" and not compensatory legal damages—which are not recoverable in a Section 13(b) case. The FTC's recently unveiled damages theory, however, has revealed that it seeks precisely the opposite: it asks this Court to award, for the first time ever, consumers' *expectancy damages*—measured as a "benefit-of-the-bargain" differential for millions of DIRECTV customers—which the FTC pegs at almost $4 billion. It is fundamental that expectation damages, as distinct from restitution, are legal damages intended to compensate a plaintiff for its expected benefits in a transaction that actually went forward. They do not restore the *status quo ante* and are not a proper measure of a defendant's alleged unjust gains.

The principle of standing requires a litigant's case or controversy to be justiciable. To invoke federal subject matter jurisdiction, the FTC must demonstrate standing not merely for the underlying controversy itself but, separately, for *each form of relief sought*. A "proper case" under Section 13(b) of the FTC Act permits equitable relief only. Determining the nature of that relief turns on the relief itself, not the label ascribed to it. Because the FTC's requested "restitution" in this case is in fact a demand for compensatory legal damages, it lacks standing to recover, and its claims for monetary relief must be dismissed.

**2.    Restitution and "Benefit of the Bargain" Damages are Competing Remedies; the Election of One is a Bar to the Other**

Regardless of the FTC's lack of standing under Section 13(b), it cannot seek benefit-of-the-bargain damages by labeling them "restitution." It is fundamental to remedies law that an injured party can seek rescission of a contract and restitution—restoring him to the *status quo ante*—or affirm the contract and recover damages. But affirmation of the contract, on the one hand, and rescission and restitution on the other, are *alternative remedies*. Election to pursue one is a bar to invoking the other.

Here, the FTC seeks benefit-of-the-bargain damages *as* restitution—no doubt because it chose to proceed under Section 13(b), which does not permit legal damages, while at the same

JOINT PRETRIAL STATEMENT

time affirming DIRECTV's contracts with its consumers and seeking incremental benefits. Restitution, which is backward looking, restores the parties to the *status quo ante* as if the transaction had never transpired. Expectation damages, which are forward looking, compensate a plaintiff incrementally under a transaction that actually occurred. The benefit-of-the-bargain remedy that the FTC seeks is antithetical to restitution.

**3.      The FTC has Failed to "Reasonably Approximate" DIRECTV's Alleged Unjust Gains**

Under the Ninth Circuit's *Commerce Planet* decision, the FTC first "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains" before the burden shifts to the defendant to disprove that amount. *Id*., 815 F.3d at 603. Here, the FTC instructed its damages expert to calculate restitution through an "'expectation' injury framework" measuring consumers' total losses, which *Commerce Planet* prohibits.

Even if the FTC's request for monetary relief were proper under Section 13(b), it would nonetheless be incumbent on the FTC to prove that the monetary amount it seeks "reasonably approximates" DIRECTV's unjust gains before shifting the burden to DIRECTV to show the figures are inaccurate. Because the FTC alleges, through Dr. Rascher's opinion testimony, that restitution is "based on the difference between what [DIRECTV's customers] paid and *what they thought they would pay*" under their purported bargain with DIRECTV, the burden cannot shift to DIRECTV until and unless the FTC proves, through a reasonable approximation, what DIRECTV's millions of customers "thought they would pay" for programming and premium channel packages under Counts I-IV.

The FTC did not attempt to measure consumers' expectations as to what they would pay under their contracts with DIRECTV, whether in response to advertising or at the time of contract.  Its testifying expert neither adduced nor considered any such evidence himself. There is no allegation, nor can there be, that every consumer who viewed the same ad (let alone hundreds or thousands of different ads in various channels over almost a decade) formed the same expectation as to what they would pay for DIRECTV's programming. But the FTC's approximation of DIRECTV's "unjust gains" has neither accounted for nor excluded any

JOINT PRETRIAL STATEMENT

DIRECTV customers who expected to pay a higher price in the second year of programming than the first or to pay for premium channels after the end of the promotional period. Instead, Dr. Rascher was instructed to assume that all consumers, across all DIRECTV advertising, formed the same impressions as to pricing and, therefore, had the same expectations to serve as the basis of a "benefit of the bargain" restitution measure.

Moreover, while Dr. Rascher concedes that consumers might have a mistaken expectation based on an advertisement and then learn the correct terms before subscribing to DIRECTV, he was not even certain as to when in the consumer subscription process he was measuring expectation—after exposure to advertising, at sign-up (the time of the "bargain"), or somewhere in between. But "benefit-of-the-bargain", as opposed to the traditional "reliance" measure in Section 13(b) cases, must be calculated based on consumer expectations at the time of the *bargain*, not at the time the consumer views an advertisement. Indeed, the FTC's corporate representative conceded that consumers who understand the terms of the bargain at the time of sign-up have not been *harmed*. Not only did Dr. Rascher's "step one" restitution estimate not take any measurement of consumer expectation into account (because the FTC failed to measure expectation)—he presumed expectation at the wrong point in time. Dr. Rascher's theory also suffers from additional flaws in his framework and calculations that render the FTC's approximation of unjust gains unreasonable.

The FTC's attempt to shift the burden to DIRECTV to disprove an expectation measure of restitution where expectation has never been measured or accounted for is exactly the type of improper burden-shifting that the Second Circuit identified as error in *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68-69 (2d Cir. 2006). Here, with fact and expert discovery closed, the FTC has yet to prove a reasonable approximation for DIRECTV's alleged unjust gains. There is, therefore, nothing for DIRECTV to rebut.

**4.        The FTC should not be Permitted to Alter its Flawed Theory of "restitution" at Trial**

The FTC has presented its "restitutionary" theory of monetary relief in initial disclosures, interrogatory responses, and expert disclosures, reports, and deposition testimony. The result, as stated above, is a legally invalid request for expectation damages in an equitable proceeding that

JOINT PRETRIAL STATEMENT

is not supported by any evidence of "expectation." The FTC cannot meet its burden under *Commerce Planet*, in any disclosed theory or testimony, to reasonably approximate DIRECTV's unjust gains.

DIRECTV's testifying expert, Dr. Michael Baye, specifically pointed out that the FTC's testifying expert had not properly accounted for "restitution" of unjust gains. But the FTC chose to double down on its "expectation" theory and has never presented or disclosed any alternative. Under controlling law in this Circuit and the Federal Rules of Civil Procedure, the FTC should not be permitted to alter its theory at trial or to offer undisclosed theories of relief. *See Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011); *Werdebaugh v. Blue Diamond Growers*, Case No. 12–CV–02724–LHK, 2014 WL 7148923 at *6 (N.D. Cal. 2014) (Rule 37 "gives teeth" to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed.).

## III. UNDISPUTED FACTS

The Parties have agreed to the following undisputed facts for purposes of the trial of this matter:

| No. | UNDISPUTED FACTS |
| --- | --- |
| | DIRECTV was acquired by AT&T Corp. on July 24, 2015. |
| | The FTC is an independent agency of the United States Government created by statute. |
| | The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Restore Online Shopper's Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.* |
| | DIRECTV offers direct-to-home satellite television service to consumers by subscription, and consumers who subscribe receive programming, necessary equipment, installation, and support services.  (Answer ¶ 11) |
| | As of December 31, 2013, DIRECTV had approximately 20.3 million subscribers in the United States.  (Answer ¶ 10) |
| | DIRECTV has disseminated advertisements for its subscription services since |

JOINT PRETRIAL STATEMENT

| | |
|---|---|
| | 2007.  (Answer ¶ 16; Interrog. No. 4) |
| | DIRECTV maintains a website, www.directv.com, through which consumers may subscribe to its satellite television services.  DIRECTV's website contains a landing page, programming package selection page, receiver selection page, a shopping cart page, and an order confirmation page, among other pages.  (Answer ¶ 20) |
| | Consumers who call a toll-free telephone number can speak with a DIRECTV telephone customer service representative.  Consumers wishing to subscribe to DIRECTV's satellite television services may be given the opportunity to do so during the call.  (Answer ¶ 25) |
| | In 2009, the State of Washington filed an action in Washington State Court against DIRECTV relating to DIRECTV's advertising practices. |
| | In 2009, other States were also investigating DIRECTV relating to DIRECTV's advertising practices. |
| | Starting in 2009, DIRECTV was engaged in settlement negotiations with the States that were investigating DIRECTV. |
| | DIRECTV entered into a multistate settlement agreement with 50 states and the District of Columbia regarding its marketing practices, effective in January 2011. (Answer ¶ 15) |
| | On April 23, 2010, the FTC issued a civil investigative demand (the "First CID") to DIRECTV seeking documents and information relating to the advertising, marketing and sale by DIRECTV of television subscription packages. |
| | The FTC filed the Complaint against DIRECTV on March 11, 2015 (Dkt. #1). |

JOINT PRETRIAL STATEMENT

IV.   DISPUTED FACTS

### D.  Plaintiff's Statement of Disputed Facts

| No. | DISPUTED FACTS |
|---|---|
| | Whether the "two-year contract term" is "material,"—i.e., information that is important—to consumers. |
| | Whether the "second-year-price term" is "material" to consumers. |
| | Whether the "premium-channel cancellation term" is "material" to consumers. |
| | Whether the costs associated with the premium channels are "material" to consumers. |
| | Whether DIRECTV's advertisements conspicuously—e.g., in font large and bright enough for consumers to read and placed where consumers will look—disclosed the two-year contract term. |
| | Whether DIRECTV's advertisements clearly—e.g., in wording and format easy for consumers to understand—disclosed the two-year contract term. |
| | Whether the disclosure of the two-year contract term in DIRECTV's advertisements is proximate to—i.e., close to—DIRECTV's 12-month introductory offer. |
| | Whether DIRECTV's advertisements conspicuously disclosed the regular, i.e., undiscounted, monthly price of the advertised television programming packages. |
| | Whether DIRECTV's advertisements clearly disclosed the regular, i.e., undiscounted, monthly price of the advertised television programming packages. |
| | Whether the disclosure of the undiscounted, monthly price of the advertised television programming packages is proximate to DIRECTV's 12-month introductory offer(s). |
| | Whether DIRECTV's advertisements conspicuously disclosed that its "free" premium-channel offer included a negative option, e.g., the premium channels will automatically "roll to pay" if the consumer does not call to cancel their premium |

JOINT PRETRIAL STATEMENT

| | channel subscription before the end of the three month trial period. |
|---|---|
| | Whether DIRECTV's advertisements clearly disclosed that its "free" premium-channel offer included a negative option, e.g., the premium channels will automatically "roll to pay" if the consumer does not call to cancel their premium channel subscription before the end of the three month trial period. |
| | Whether the disclosure of the negative option component in DIRECTV's advertisements is proximate to DIRECTV's "free" premium channel offer. |
| | Whether DIRECTV's advertisements conspicuously disclosed charges consumers would incur if they do not cancel their "free" premium channel subscription before it rolls to pay. |
| | Whether DIRECTV's advertisements clearly disclosed charges consumers would incur if they do not cancel their "free" premium channel subscription before it rolls to pay. |
| | Whether any disclosure in DIRECTV's advertisements of charges consumers will incur if they do not cancel their "free" premium channel subscription before it rolls to pay is proximate to—i.e., close to—the offer of "free" premium channels. |
| | Regarding consumers who subscribed to DIRECTV's service via its website, whether DIRECTV failed to obtain their express informed consent to be charged for access to premium channels before charging or attempting to charge them for such access. |
| | Whether DIRECTV's television advertisements were widely disseminated. |
| | Whether DIRECTV's print advertisements were widely disseminated. |
| | Whether DIRECTV's internet advertisements were widely disseminated. |
| | Whether DIRECTV's website, www. directv.com, was widely disseminated. |
| | Whether DIRECTV's telephonic sales presentations were widely disseminated. |
| | With respect to DIRECTV's laches defense, whether the FTC inexcusably delayed filing the Complaint in this matter (Dkt. #1). |
| | With respect to DIRECTV's laches defense, whether DIRECTV suffered any |

JOINT PRETRIAL STATEMENT

| | |
|---|---|
| | prejudice from any delay by the FTC in filing the Complaint. |
| | With respect to DIRECTV's laches defense, whether the FTC has committed affirmative misconduct going beyond mere negligence in the course of allegedly inexcusably delaying filing the Complaint in this matter. |
| | With respect to DIRECTV's laches defense, whether DIRECTV caused the FTC to delay filing the Complaint in this matter. |
| | With respect to DIRECTV's estoppel defense, whether the FTC inexcusably delayed filing the Complaint in this matter (Dkt. # 1). |
| | With respect to DIRECTV's estoppel defense, whether DIRECTV suffered any prejudice from any delay by the FTC in filing the Complaint. |
| | With respect to DIRECTV's estoppel defense, whether the FTC committed affirmative misconduct going beyond mere negligence. |
| | With respect to DIRECTV's estoppel defense, whether the FTC's allegedly wrongful act would cause a serious injustice. |
| | With respect to DIRECTV's estoppel defense, whether the public interest would suffer undue damage if the FTC is barred from pursuing its claims against DIRECTV. |
| | With respect to DIRECTV's estoppel defense, whether the FTC knew the facts at issue. |
| | With respect to DIRECTV's estoppel defense, whether the FTC so acted such that DIRECTV had a right to believe the FTC intended that DIRECTV act upon its conduct. |
| | Whether DIRECTV was ignorant of the true facts at issue in DIRECTV's estoppel defense. |

### E.  Defendants' Statement of Disputed Facts

| No. | DISPUTED FACTS |
|---|---|
| | Whether a substantial percentage of consumers acting reasonably under the |

JOINT PRETRIAL STATEMENT

21

| circumstances take away false net impressions from DIRECTV's advertisements – from each and every ad, in each and every medium between 2007 and the present – about each of the conditions of purchase at issue in this case.  Specifically, whether subscribers who viewed a DIRECTV advertisement reasonably took some action with respect to their DIRECTV subscription based on a false belief arising from the advertisement -- for example, that (a) an introductory discount program package price lasts more than 12 months; (b) there is no 24 month commitment to maintain a minimum level of DIRECTV service; (c) the second year price for a package is not the then-existing regular price or that the package price does not increase in the second year; (d) that there is no early cancellation fee; or (e) that no action is required to avoid paying for premium channels commencing in month 4 of a subscription. |
| Whether DIRECTV's conditions of purchase alleged in the Complaint to have been "inadequately" disclosed in DIRECTV's advertising are material to consumers – that is, likely to influence the purchase decision. |
| Whether the single print ad from 2013 that was tested by the FTC's survey expert is sufficiently representative of all DIRECTV advertising to be projectable to literally tens of thousands of DIRECTV ads (on TV, in print, on the web, and in the telephone subscription process) over nearly 10 years. |
| Whether the 2013 website version of *directv.com* (a mock up of a 2013 web flow) is sufficiently representative of prior and subsequent web subscription flows such that the results of any empirical analysis can be projectable to past and current versions of the website? |
| Whether all subscribers to DIRECTV between 2007 and the present, based on DIRECTV's advertising, falsely expected to pay the introductory discount package price for the entire length of their 24 month commitment period. |
| Whether no subscribers to DIRECTV who received 3 months of premium channel programming, and who cancelled one or more premium channels before month 10 |

JOINT PRETRIAL STATEMENT

22

| | of their commitment, would ever have paid for premium channel content (HBO, Showtime, etc.) |
|---|---|
| | Whether DIRECTV's website discloses the material terms of the premium channel negative option offer in a manner that is likely to been seen and understood by reasonable consumers under the circumstances. |
| | Whether consumers who subscribed to DIRECTV on its website provided their express informed consent to be charged premium channels. |
| | Whether the advertisements which the FTC contends were deceptive were widely disseminated. |
| | Whether no consumers who were assessed an early cancellation fee (ECF) for terminating their subscription early were deceived into believing that no such ECF could be assessed. |
| | Whether all consumers who were assess an ECF paid it. |
| | Whether, in 2010, the FTC was informed of the material terms of the then-contemplated multi-state settlement agreement. |
| | Whether the FTC declined to comment upon, intervene in, or otherwise criticize in any way to any party the material terms of the multi-state settlement agreement (MSA). |
| | Whether the requirements of the (MSA) addressed the advertising disclosures of the conditions of purchase at issue in the case. |
| | Whether the FTC told DIRECTV that it was focused on "other issues" in connection with its investigation of DIRECTV in 2010 and 2011 such that DIRECTV reasonably relied on that representation by the FTC in entering into the MSA. |
| | Whether the FTC inexcusably delayed in filing this lawsuit. |
| | Whether DIRECTV was prejudiced as a result of the FTC's delay in the filing of this lawsuit. |
| | Whether the FTC committed affirmative misconduct in connection with its |

JOINT PRETRIAL STATEMENT

23

| | |
|---|---|
| | communications with DIRECTV regarding the MSA. |
| | Whether DIRECTV relied on the FTC's acquiescence in and/or silence regarding the MSA in designing and implementing a compliance program consistent with the requirements of the MSA. |
| | Whether the FTC knew the terms of the MSA and failed to provide any objection to them in 2010 prior to the implementation of the terms of the MSA. |
| | Whether the FTC acted in a manner such that DIRECTV had a right to believe that the FTC intended that DIRECTV would act upon its conduct with respect to the MSA. |
| | Whether DIRECTV was ignorant of the true facts relating to the FTC's conduct with respect to the MSA. |
| | Whether the FTC, in interacting with DIRECTV with respect to the MSA, engaged in affirmative misconduct going beyond mere negligence. |
| | Whether the FTC's wrongful acts in connection with the MSA, if any, would constitute a serious injustice. |
| | Whether the public's interests will suffer undue damage if the FTC is barred from pursuing these claims under the equitable doctrine of estoppel. |

## V.   AGREED STATEMENT

The parties do not agree that any part of the action may be presented upon an agreed statement of facts.

## VI.   STIPULATIONS

The parties have agreed to the following stipulations.

A.   The parties agree to use their best efforts to bring all designated percipient witnesses to appear live at trial subject to the one-time on the stand rule.  However, in the event that a non-party witness who resides outside the Northern District of California and is not employed and does not regularly transact business within the Northern District of California is unable to attend the trial, the parties agree that such person may testify remotely by contemporaneous video transmission.  This stipulation is not intended to preclude the parties

JOINT PRETRIAL STATEMENT

24

from calling to the stand more than once expert witnesses who have also been designated to provide rebuttal or reply testimony.

B.      The parties stipulate to the authenticity of any document produced by a party in this case (including website source code produced by DIRECTV). Both parties reserve the right to raise good faith objections to the authenticity or completeness of documents produced by either party. In that instance, the party challenging the authenticity has the burden to demonstrate that the document is not authentic or complete. This stipulation does not address the authenticity of website captures, whether by print, video or otherwise.  In addition, this stipulation shall not be deemed or interpreted to be a stipulation that any document is admissible.

C.      The parties stipulate to the authenticity of any document produced by a third party that has been represented by Manatt Phelps & Phillips LLP or Sidley Austin LLP in this litigation, if such document was produced in the course of discovery in this action.  For the purpose of this stipulation, the following is the list of third parties which have been so represented:  Media & Entertainment Strategies, Inc., BrainJuicer, Odyssey Ventures, Inc., The Kern Organization, Taylor Research and Consulting, ConvergeDirect, Alorica, Inc., S&P Data, RDI Marketing Services, Inc., Empereon Marketing, CFI Group USA, LLC, DirectStar TV, LLC, and McKinsey and Company.  This stipulation shall not be deemed or interpreted to be a stipulation that any document covered by this paragraph is admissible.

D.      **Dissemination Schedules and Related Documents**

The parties stipulate that any dissemination schedules produced by third-party agents of DIRECTV are authentic and accurate. (Dkt. 163.) Third-party agents of DIRECTV include ConvergeDirect, LLC (ConvergeDirect), and Deutsch LA, Inc. and Deutsch Inc. (collectively, "Deutsch").  Accordingly, the following dissemination schedules are accurate:

a.  FTC-CONVERGEDIRECT-000001 through FTC-CONVERGEDIRECT-000099;

b.  FTC-CONVERGEDIRECT-000169 through FTC-CONVERGEDIRECT-000180;

c.  FTC-CONVERGEDIRECT-000238 through FTC-CONVERGEDIRECT-000484; and

JOINT PRETRIAL STATEMENT

d.  DEUTSCH_000001 through DEUTSCH_010386.

e.  The index produced by counsel for DIRECTV and ConvergeDirect on or about May 19, 2016, which shows file names associated with Bates numbers for the documents produced by ConvergeDirect.

E.   **Television Advertisements**

DIRECTV will stipulate that all television commercials DIRECTV has produced are authentic nationally aired advertisements.  In addition, DIRECTV will stipulate that television commercials produced by the Grey Global Group ("Grey") with a slate with an Ad ID or ISCI code tied to a dissemination schedule are authentic, final DIRECTV television advertisements that aired nationally. (Dkt. 163.)

Specific dissemination information for DIRECTV's television advertisements can be determined by searching the Deutsch dissemination information (*see* Stipulation No. VI.A, above) for entries showing the date(s) and network or station on which a DIRECTV television advertisement with a particular ISCI code or AD Id (as shown on the slate of the advertisement) was broadcast or aired.  This stipulation does not apply to television advertisements produced by Grey that do not contain an ISCI code or AD Id.

F.   **Print Advertisements**

Any DIRECTV print advertisement within the Bates ranges DIRECTV-0383277 through DIRECTV-0383286, and FTC-KERN-000001 through FTC-KERN-077044, which contains a toll-free telephone number and appears on a dissemination schedule, is a final advertisement. DIRECTV's final disseminated print advertisements are authentic.

Specific dissemination information for DIRECTV's circular advertisements located at DIRECTV-0383277 through DIRECTV-0383286 can be determined by matching the phone number,  relevant descriptions of the ad, and drop date on the advertisement with the ConvergeDirect dissemination schedules located at FTC-CONVERGEDIRECT-000243, FTC-CONVERGEDIRECT-000259 through FTC-CONVERGEDIRECT-000262, FTC-CONVERGEDIRECT-000264, FTC-CONVERGEDIRECT-000362 through FTC-CONVERGEDIRECT-000366, FTC-CONVERGEDIRECT-000451 through FTC-

JOINT PRETRIAL STATEMENT

CONVERGEDIRECT-000454, FTC-CONVERGEDIRECT-000462 through FTC-CONVERGEDIRECT-000466, FTC-CONVERGEDIRECT-000474 through FTC-CONVERGEDIRECT-000477, FTC-CONVERGEDIRECT-000480, FTC-CONVERGEDIRECT-000482, and FTC-CONVERGEDIRECT-000484.

For 2009 through 2015, specific dissemination information for DIRECTV's print advertisements developed or created by The Kern Organization, including but not limited to final advertisements found within the Bates ranges FTC-KERN-000001 through FTC-KERN-077044, can be determined by matching the toll free phone number on the advertisement, relevant descriptions of the ad, and the drop date for the advertisement (as shown in the file name index provided by The Kern Organization in this litigation) with the information contained in the dissemination schedules provided by ConvergeDirect at FTC-CONVERGEDIRECT-000001 through FTC-CONVERGEDIRECT-000099, FTC-CONVERGEDIRECT-000169 through FTC-CONVERGEDIRECT-000180, FTC-CONVERGEDIRECT-000238 through FTC-CONVERGEDIRECT-000484, excluding duplicate spreadsheets.

The index produced by counsel for DIRECTV and The Kern Organization on or about April 18, 2016, which shows files names associated with Bates numbers for the documents produced by The Kern Organization, accurately identifies the files names of documents produced to the FTC.  This index has been identified as Trial Exhibit 435.

G.    **Digital Advertisements**

The digital advertisements identified in the following documents were disseminated on websites accessible to consumers during the time periods shown on those documents:

    a.  DIRECTV-0382685;

    b.  DIRECTV-0382686;

    c.  DIRECTV-0382687;

    d.  DIRECTV-0382688; and

    e.  DIRECTV-0382689

The digital advertisements that DIRECTV made accessible to the FTC through staging links (hyperlinks) on DIRECTV-0539828 and DIRECTV-0539638 are digital ads DIRECTV

JOINT PRETRIAL STATEMENT

27

disseminated or caused to be disseminated on websites accessible to consumers on the dates depicted on such documents.

H.       **Sales Scripts and the Telephone Sales Call Process**

The video captures of the agent dashboard produced by DIRECTV to the FTC, listed below, are authentic representations of scripts for DIRECTV's telephone sales call sign up process used during the time periods shown below:

a.   DTVFTCII-0000001 (2013);

b.   DIRECTV-0538962 (2015); and

c.   DIRECTV-0538963 (2015).

The following documents produced by DIRECTV to the FTC are portions of authentic copies of sales scripts used by DIRECTV or its sales agents during the telephonic sales call process during the time periods shown: DTVFTCII-0111360 through DTVFTCII-0111404 (March 2008 through March 2009).

I.       The following documents produced by DIRECTV to the FTC are authentic copies of sales call flows used by DIRECTV or its sales agents during the telephonic sales call process starting on or about the date shown:

a.   DTVFTCII-0017504 (January 17, 2008);

b.   DIRECTV-0539597 (March 26, 2009);

c.   DIRECTV-0539615 (February 3, 2010);

d.   DIRECTV-0539611 (October 6, 2011);

e.   DIRECTV-0539620 (April 1, 2012);

f.   DIRECTV-0539601 (March 14, 2013);

g.   DIRECTV-0539599 (February 6, 2014);

h.   DIRECTV-0539600 (March 12, 2015); and

i.   DIRECTV-0539606 (February 23, 2016).

JOINT PRETRIAL STATEMENT

28

J.    **RIO**

For all times during the period 2007 through 2015, RIO has been DIRECTV's customer relationship management system and DIRECTV's main system for DIRECTV agents to record communications between DIRECTV's customers and DIRECTV's customer service agents.

G.    **Further Stipulations:**

a.    The parties agree to identify Exhibits, Witnesses, and demonstratives to be used at trial (other then for purposes of impeachment only) by 5:00 p.m. the day before the parties plan to present such evidence in Court; this includes categories of documents that are voluminous – e.g., customer billing data (Rascher, Baye, and Wind), RIO Notes, RIO data dictionary and algorithm, Sentinel communications, OOP communications and associated notes, loose communications, recorded calls, dissemination schedules, print ads, web flows, etc.

b.    Demonstratives to be used in Opening Statements shall be exchanged 48 hours in advance of the commencement of trial.

**VII.    TREATMENT OF CONFIDENTIAL DOCUMENTS AT TRIAL**

DIRECTV will identify proposed exhibits that it will request to be filed under seal if admitted at trial.  DIRECTV will indentify such documents in a manner consistent with the categories of documents the Court has sealed in past orders.  Prior to the commencement of trial, the parties shall jointly identify the documents they agree may be filed under seal, provide to the Court in a joint submission any arguments concerning any dispute about documents requested to be filed under seal, and file all necessary administrative motions and other documents required by the Court when necessary.  In connection with any testimony concerning an admitted exhibit that the Court has ordered to be filed under seal, the parties shall promptly after such testimony request such testimony to be filed under seal and jointly submit any dispute regarding such a request.  The parties do not presently anticipate that there will be any evidence presented at trial that would require the Courtroom to be cleared during its presentation.

**VIII.    WITNESSES TO BE CALLED**

A list of the parties' witnesses to be called at trial are attached as Exhibits B and C.

JOINT PRETRIAL STATEMENT

## IX.   EXHIBITS, SCHEDULES, AND SUMMARIES

Lists of the parties' trial exhibits are attached as Exhibits D, E, F and G.  The parties have worked in good faith to resolve evidentiary issues, and intend to continue these efforts up to and through trial.  The parties will file amended joint exhibit list in advance of the Pre-Trial Conference.

## X.   DISPUTED LEGAL ISSUES

The parties have different positions about the legal standards pursuant to which this Court will decide this matter.  Those are set forth below:

### FTC's STATEMENT OF DISPUTED LEGAL ISSUES

**A.   Whether failure to disclose adequately material terms of service in disseminated advertising is likely to mislead consumers in violation of the FTC Act Section 5's deception provision.**

Section 5 of the FTC Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  The Commission and the federal courts, including the Ninth Circuit, have articulated and adhered to a three-pronged test for what constitutes deception in violation of Section 5(a): an act is deceptive if (1) the defendant disseminates in commerce a representation, makes an omission, or engages in a practice (2) that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission or practice is material. *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (adopting the Commission's deception standard articulated in *In re Cliffdale Assocs.*, Inc., 103 F.T.C. 110, 164–65 (1984))).  An advertiser's failure to disclose adequately material terms of the advertised offer constitutes a deceptive act or practice under Section 5.  *See FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).  Courts have found deception in a defendant's failure to disclose material terms clearly and conspicuously, including through an analysis of the disclosures' placement, proximity, prominence, and unavoidability in the underlying advertisements.  *See, e.g.*, *id.* at 1200-01 (disclosures found inadequate when placed in small print on the back of promotional mailer); *FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (disclosure found inadequate when "consumers would have had to look at a small footnote buried in the middle of other dense

JOINT PRETRIAL STATEMENT

footnotes"); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009) (disclosures found inadequate when placed at the bottom of a page of print advertisement); *FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1065-68 (C.D. Cal. 2012), *aff'd in relevant part*, 642 Fed.Appx. 680 (9th Cir. 2016) (finding deception violation where disclosures, by their "placement, wording, colorization, spacing, and size of the text" were "designed not be clear and conspicuous, but rather to mask information about [the defendants'] continuity program without entirely omitting the information"); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1140 (D. Nev. 2015) (disclosures found inadequate when placed at the very top of the webpage or under the submit button).

    **B.**    **Whether Section 5's "net impression" test applies to the advertisements that the FTC has alleged as deceptive, or to the entire course of dealing between DIRECTV and its customers.**

To determine what representation the advertisement conveys, courts look to the "net impression" of that advertisement. *See Cyberspace.Com*, 453 F.3d at 1200-01 (examining the four corners of the defendants' solicitation document). This "net impression" review applies to the disseminated advertisements that the FTC has alleged as deceptive, not to the entire course of dealing between the defendant and its consumers. *See id.* (reviewing the solicitation mailing under the net impression test); *Commerce Planet*, 878 F. Supp. 2d at 1063 (applying the net impression test to the specific webpages in defendant's online purchase flow that the FTC alleged as deceptive); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314-15 (7th Cir. 1992) (affirming the Commission's finding of deception based on the application of the net impression tests to the two sets of print and television advertisements "at issue in this case").

Applying the "net impression" review to the entire course of dealing between the defendant and consumers, including their post-advertising interactions, would contravene the well-established rule that the FTC Act "is violated if [the defendant] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975). Thus, an advertiser cannot overcome a Section 5 violation by first disseminating deceptive advertisements to consumers and then attempting to dispel the deception through the subsequent transaction consummation. *See FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd*, 265 F.3d

JOINT PRETRIAL STATEMENT

944 (9th Cir. 2001) (rejecting defendants' argument that the advertising deception was cured in subsequent contracting "because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information").

**C.    Whether the FTC must prove that defendant's failure to disclose adequately the material terms of the offer led to the creation of a false (i.e., affirmatively incorrect) impression among consumers about those terms.**

To establish deception through a failure to disclose adequately, the FTC need not prove that the advertising conveys a false message. Under a "failure to disclose theory," the FTC need only show that the defendant made an affirmative representation (a "triggering claim") without adequately disclosing material qualifying information. *See Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir. 1978) ("Failure to disclose material information may cause an advertisement to be false or deceptive within the meaning of the FTCA even though the advertisement does not state false facts"); *Southwest Sunsites v. FTC* , 785 F.2d 1431, 1437-1438 (9th Cir. 1986) (failure to disclose substantial development costs is deceptive in light of representations of lands' suitability for use); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1074 (C.D. Cal. 2012) (failure to disclose that consumers would be automatically enrolled in continuity programs upon purchase); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1224-30 (D. Nev. 2011) (in light of line of credit (LOC) offers, failure to disclose negative option upsells and terms of offers was deceptive); *FTC v. American Standard Credit Sys.*, 874 F. Supp. 1080, 1088 (C.D. Cal. 1994) (failure to disclose that consumers must meet certain minimum qualifying criteria to even apply for a VISA or Mastercard deceptive in light of representation that anyone could qualify for the advertised secured credit card).

By failing to disclose adequately material information, an advertisement can be deceptive even if it does not contain any false statements.  *See Simeon Management Corp.*, 579 F.2d at 1145; *John Beck Amazing Profits*, 865 F. Supp. 2d at 1066, 1072 (citing *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188 (1948)).  In addition, when an advertisement contains disclosures that may qualify the representation at issue, courts evaluate whether the disclosures were clear and conspicuous (*i.e.*, if consumers do not see or understand the disclosures, they cannot qualify the representation).  *See, e.g., Cyberspace.com*, 453 F.3d at 1200–01 (disclosures

JOINT PRETRIAL STATEMENT

found inadequate when placed in small-print on the back of a check); *Johnson*, 96 F. Supp. 3d at 1140 (disclosures found inadequate when placed at the very top of the page or under the submit button); *FTC v. Medlab, Inc.*, 615 F. Supp. 2d at 1077 (disclosures found inadequate when placed at the bottom of a page).

Because, in a failure to disclose case, the deception does not turn on literal falsity, the FTC need not demonstrate that reasonable consumers are likely to take away some false message about advertised offer. Instead, the question is whether reasonable consumers would not likely take away the truth. *See Commerce Planet*, 878 F. Supp. 2d at 1065 (explaining how inadequately placed disclosures on defendant's website make it "unlikely that the average consumer will . . . understand" the actual terms of the offer).

**D.      Whether the FTC must present extrinsic evidence to prove deception.**

Federal courts can, and do, adjudicate FTC Act deception cases based on a facial assessment of disclosures. *See Medlab, Inc.*, 615 F. Supp. 2d at 1077-78 (conducting a facial analysis to determine that defendants' disclaimers—presented in "minuscule type at the bottom of the advertisements"—were insufficient to cure the deception). In *Commerce Planet*, a case involving the adequacy of disclosures, the district court held that "[t]he most compelling evidence that the website marketing of OnlineSupplier was misleading are the sign-up pages themselves." 878 F. Supp. 2d at 1064. Additionally, in *Medlab*, this Court expressly rejected the argument that the FTC must present extrinsic evidence beyond what is plainly evident on a facial review. *Id.* at 1077-78.

To be sure, the Court can rely on extrinsic evidence, including "expert opinion, consumer testimony, copy tests, surveys, or any other reliable evidence of consumer interpretation." *Cliffdale Assocs.*, 103 F.T.C. at 172 & n.8. Thus, consumer copy test are not the only type of valid extrinsic evidence in FTC Act deception cases. For instance, courts also consider consumers' expressions of confusion about an advertised promotion as evidence that disclaimers were not clear and conspicuous, and thus likely to mislead. *See FTC v. Cyberspace.com, LLC*, No. C00-1806L, 2002 WL 32060289, at *3 n.5 (W.D. Wash. July 10, 2002), *aff'd*, 453 F.3d 1196 (9th Cir. 2006). The absence or low incidence of consumer complaints, however, does not

JOINT PRETRIAL STATEMENT

stand for the converse proposition that consumers were likely not deceived. *See FTC v. Wilcox*, 926 F. Supp. 1091, 1099 (S.D. Fla. 1995). Additionally, even though the FTC need not show intent to mislead to prove deception, evidence showing a business motive to mislead may support the finding of likely deception. *See Commerce Planet*, 642 F. Appx. at 683 ("That additional disclosures were a 'disaster' to sales suggests that, without those disclosures, consumers were not adequately informed.").

### E.      Whether the FTC must prove that consumers were actually deceived.

As explained above, the FTC need not present extrinsic evidence to prove deception. Nor is the FTC required to establish that consumers were actually deceived by the defendant's conduct. Instead, the FTC need only show that the allegedly deceptive representation, omission, or practice "'is *likely* to mislead consumers acting reasonably under the circumstances.'" *Gill*, 265 F.3d at 950. Thus, there is no need for the FTC to present evidence about actual  deception. *See Commerce Planet*, 878 F.Supp. 2d at 1073 (citing *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979) ("To establish a section 5 violation, proof of actual deception is unnecessary; it only requires a showing that misrepresentations 'possess a tendency to deceive.'"). More specifically, the claim that a consumer survey is indispensable evidence in an FTC Act deception case is wrong. *See Medlab*, 615 F. Supp. 2d. at 1078 (rejecting the demand for the FTC to "present consumer survey data in order to prove what is obvious to any rational reader"). Moreover, the FTC is not required to show that the deceptive advertising is likely to mislead *all* reasonable consumers. *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In fact, to be found deceptive, an ad need not mislead even "a majority of reasonable consumers." *In re Telebrands*, 140 F.T.C. 278, 291 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006). Instead, the Court need only conclude that at least a "significant minority" of reasonable consumers is likely to be misled. *Id.*; *accord POM Wonderful, LLC v. FTC*, 777 F.3d 478, 500 (D.C. Cir. 2015). Where court consider extrinsic data in making that determination, figures as low as 10% to 15% suffice for a significant minority. *In re ECM BioFilms*, Docket No. 9358, available at https://www.ftc.gov/system/files/documents /public_statements/819651/ 151019ecmbiofilmsopinioncomm.pdf, p.11 (Oct.15, 2015) ("we have found percentages ranging

JOINT PRETRIAL STATEMENT

from 10% to 22% to be sufficient to constitute a significant minority"); *see also Firestone Tire & Rubber Co. v. FTC*, 481 F.2d 246, 249 (6th Cir. 1973) (finding consumer survey showing 15.3% of respondents taking away misleading claim from the ad enough to uphold deception); *In re Benrus Watch Co., Inc.*, 64 F.T.C. 1018 (1964), *aff'd*, *Benrus Watch Co. v. FTC*, 352 F.2d 313, 319-20 (8th Cir. 1965) (reported rate of 86% of nondeception insufficient to defeat the FTC's deception claim).

F.    **Whether the presumption of materiality applies to advertising claims about cost.**

Under the FTC Act, "[a] 'material' misrepresentation is one that involves information important to consumers and that is therefore likely to affect the consumer's choice of, or conduct regarding, a product." *In re Novartis Corp.*, 127 F.T.C. at 127 F.T.C. 580, 685 (1999). Representations involving "express claims" or claims, implied or express, "pertaining to the central characteristic of the product" are presumptively material. *In re POM Wonderful LLC*, 2013 WL 268926, *1,*52 (F.T.C. Jan. 16, 2013) (citing *Novarti*, 127 F.T.C. at 686), *aff'd*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015); *Johnson*, 96 F. Supp. 3d at 1121.  The cost of an advertised product or service, including a "free" offer, is a central characteristic, and therefore presumptively material. *See Commerce Planet*, 878 F. Supp. 2d at 1068 (citing *Cyberspace.com*, 453 F.3d at 1200) ("This misrepresentation is undoubtedly material because the information about a free kit goes to the cost of the product, an important factor in a consumer's decision on whether or not to purchase a product); *see also Johnson*, 96 F. Supp. 3d at 1121 ("Generally speaking, information is material where it 'concerns the purpose, safety, efficacy, or cost, of the product or service.'" (internal citation omitted)).

Here, the deceptive advertising claims at issue pertain to cost: specifically, the price and fees that consumers are required to pay to DIRECTV, when, and for how long. (*See* Complaint (Dkt. 1).)  Therefore, these claims are presumptively material.  Consequently, because the presumption of materiality applies, the FTC need not prove it at trial. *See Pantron I*, 33 F.3d at 1095-96 & n.20.

JOINT PRETRIAL STATEMENT

**G.      Whether the FTC must establish that individual consumers were injured in order to justify a restitutionary award.**

The FTC does not need to show that individual consumers were deceived by DIRECTV's advertisements, relied upon the misrepresentations in DIRECTV's advertisements, or that deceived customers did not use DIRECTV's service or derive any enjoyment from it.  *See Commerce Planet*, 878 F. Supp. 2d at 1091. Courts may order redress to compensate deceived consumers for the loss.  *Stefanchik*, 559 F.3d at 931.  Courts apply a burden-shifting framework to determine the amount of redress to award.  *Commerce Planet*, 878 F. Supp. 2d at 1088-89. "Under the first step, the FTC bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains, since the purpose of such an award is 'to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction.' If the FTC makes the required threshold showing, the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains." *Commerce Planet, Inc.,* 815 F.3d 593, 604 (9th Cir. 2016) (citations omitted).

**H.      Whether returning to consumers' a Defendants' unjust gains associated with inadequately disclosed charges is an appropriate award of monetary equitable relief under 15 U.S.C. 13(b).**

In *Commerce Planet*, the Ninth Circuit wrote that the Court's "equitable powers are comprehensive."  815 F.3d 593 at 599 (emphasis added).  Further, "[t]o ensure that 'complete rather than truncated justice' is done, a court sitting in equity may 'go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances." *Id*. (emphasis added).  And in cases brought by the government, the court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Id.* (emphasis added). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id*. (emphasis added).  Neither the language of the statute nor any case law provides "by a necessary and inescapable inference" that the Court's "broader and more flexible" equitable authority does not allow the FTC to return unjust gains to consumers associated with charges that were not adequately disclosed.

JOINT PRETRIAL STATEMENT

36

**DIRECTV'S STATEMENT OF DISPUTED LEGAL ISSUES**

**A.      Whether DIRECTV Has Violated Section 5 of the FTC Act.**

To prevail under Section 5 of the FTC Act, the FTC must prove: (1) there is a representation, omission or practice, (2) that is likely to mislead reasonable consumers, and (3) which is material. *F.T.C. v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir. 1994); *FTC Policy Statement on Deception* at 177 n.20, appended to *Cliffdale Assocs. Inc.,* 103 F.T.C. 174 (1984)). The legal issues are thus:

1.  Whether DIRECTV's advertisements for its subscription television service contain or constitute a representation, omission, or practice likely to deceive consumers acting reasonably under the circumstances about the following conditions of purchase of DIRECTV satellite television services ("the conditions of purchase"):

a.      obtaining an introductory discounted programming package price typically requires a 24 month commitment to maintain a minimum level of service with DIRECTV;

b.      the introductory discount package price typically lasts 12 months;

c.      the price for the same package in the second year of the commitment is higher than the introductory price (that is, it is the then-existing regular price for the package in effect at the end of month 12);

d.      if the consumer elects to cancel DIRECTV service within the commitment period, DIRECTV may assess an early cancellation fee of up to $20 per month for the remaining months; or

e.      for new subscribers who receive 3 months of premium channel programming (HBO, Showtime, Starz, Cinemax, etc.) at no charge, and the subscription automatically rolls to pay at the regular price for those services in month 4 if the customer does not call to cancel one or more of the premium channels.

2.  Is the net impression of DIRECTV's advertisements likely to mislead a substantial percentage of consumers acting reasonably under the circumstances about the conditions of

JOINT PRETRIAL STATEMENT

37

purchase when considering the entire advertisement, transaction, or course of dealing in subscribing;

3. Are a substantial percentage of consumers who are acting reasonably under the circumstances likely to reach false beliefs about the conditions of purchase of DIRECTV due to alleged inadequate disclosures in DIRECTV's advertisements; and

4. Whether the conditions of purchase are each material – that is, likely to affect a consumer's decision to subscribe to DIRECTV.

B. **Whether the FTC Can Prove Consumers Are Likely to be Deceived Without Presenting Any Extrinsic Evidence.**

The FTC's case is premised principally on the argument that the disclosures in DIRECTV's advertising are inadequate – that is, not clear and conspicuous -- and, therefore, that DIRECTV subscribers are deceived about the conditions of purchase. It is DIRECTV's position that the FTC cannot prove that consumers are likely to be deceived without reliable extrinsic evidence of deception. Facial review of the ads to ascertain false implied messages conveyed to consumers by the advertisements is insufficient. *See, e.g., United States v. Bayer Corp.*, 2015 WL 5822595, at *13 (D.N.J., Sept. 24, 2015) (*unpublished*) (government failed to show Bayer violated an FTC consent decree because "[t]he government presented no evidence that Bayer made any implied disease claims," having "offered no consumer survey data, no consumer testimony, no expert opinion on consumer understanding of the PCH ads, no marketing data, and no copy tests of any PCH advertisement"); *FTC v. National Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) (requiring extrinsic evidence when no express misstatement); *FTC v. QT*, Inc., 448 F. Supp.2d 908, 958 (N.D. Ill. 2006) ("conspicuous" claims do not require extrinsic evidence, while implied messages do).

C. **Whether DIRECTV has violated ROSCA.**

ROSCA requires companies that offer negative option features to (1) clearly and conspicuously disclose all material terms of the transaction before receiving the consumer's billing information (15 U.S.C. § 8403(1)) and (2) obtain the consumer's express informed consent to the feature before charging the consumer's financial account (15 U.S.C. § 8403(2)).

JOINT PRETRIAL STATEMENT

38

The FTC's own ".com Disclosures" guidelines explain that the ultimate test of whether a disclosure is clear and conspicuous is "whether the information intended to be disclosed is actually conveyed to consumers." *See* FTC.com Disclosures, How to Make Effective Disclosures in Digital Advertising (March 2013) (".com Guidelines") at 1*; see also FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963).

> D.       **Whether Laches and Estoppel Bar the FTC's Claims.**

The equitable defense of laches bars the FTC from bringing a claim based on facts of which it had "full knowledge" after "sleep[ing] upon [its] rights." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012). Unreasonable delay and prejudice are elements of this defense. *Grand Canyon Trust v. Tucson Elec. Power Co.,* 391 F.3d 979, 987 (9th Cir. 2004). The Court has held in this case that, for the defense of laches to apply to the government, DIRECTV must show affirmative misconduct. *See* Dkt. No. 88 at 4-5 (*FTC v. Directv, Inc.*, No. 15-CV-01129-HSG, 2015 WL 9268119, at *3 (N.D. Cal. Dec. 21, 2015)) (discussing *United States v. Ruby Co,* 588 F.2d 697, 705 n.10 (9th Cir. 1978); *FTC v. Hang-Ups Art Enterprises, Inc.*, No. 95-cv-0027-RMT-JGX, 1995 WL 914179, at *4 (C.D. Cal. Sept. 27, 1995)); *see also United States v. Becker*, No. 86 CIV. 3946 (JFK), 1989 WL 34048, at *4 (S.D.N.Y. Apr. 4, 1989).

With respect to estoppel, when pled against the government, the question is whether the government engaged in "affirmative misconduct going beyond mere negligence." *See Baccei v. United States*, 632 F.3d 1140, 1147 (9th Cir. 2011). "Affirmative misconduct on the part of the government requires an affirmative misrepresentation or affirmative concealment of a material fact, such as a deliberate lie or a pattern of false promises." *Id*. (citation omitted). Beyond affirmative misconduct, the second requirement of an estoppel claim against the government involves a balancing of interests in individual cases. *Watkins v. U.S. Army*, 875 F.2d 699, 708 (9th Cir. 1989).

JOINT PRETRIAL STATEMENT

**E.      With respect to the Section 5 claims, assuming liability, whether this Court should order injunctive relief against DIRECTV, and, if so, in what form.**

Section 13(b) of the FTC Act confers upon the Court, in a "proper case," the power to award preliminary and permanent injunctive relief. 15 U.S.C. § 53(b). A permanent injunction is only justified if there exists "some cognizable danger of recurrent violation," *United States v. W.T. Grant*, 345 U.S. 629, 633 (1953), or "some reasonable likelihood of future violations." *CFTC v. Co. Petro Marketing Group, Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1982).

**F.      With respect to the Section 5 claims, assuming liability, whether DIRECTV customers have been injured by the alleged deceptive conduct; if so, whether this Court should order any monetary or other redress to injured consumers, and, if so in what form and amount.**

To recover monetary relief under Section 5, the FTC must prove the defendant "engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). There "may be no redress without proof of injury caused by those practices." *FTC v. Figgie*, 994 F.2d 595, 605-06 (9th Cir. 1993).

If the Court finds consumer injury, a two-step framework for calculating monetary relief follows. First, "the FTC bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains, since the purpose of such an award is 'to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016) (quoting 1 Dobbs, Law of Remedies § 4.1(1), at 552 (2d ed. 1993)). Restitution of unjust gains in a Section 13(b) case cannot be measured by the consumers' total losses—to do so "would amount to an award of damages, a remedy available under § 19(b) but precluded under § 13(b)." *Id.* at 603. Before shifting the burden to the defendant, the Court must "assess the reasonableness of the FTC's approximation of unjust gain. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70 (2d Cir. 2006) (reversing district court's award because the FTC did not establish the reasonableness of its approximation of unjust gain). Only if the FTC makes the required threshold showing does the

JOINT PRETRIAL STATEMENT

burden then shift to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains." *Commerce Planet,* 815 F.3d at 603-04.

> **G.     With respect to the FTC's claim under Section 4(1) of ROSCA (Count III), whether DIRECTV charged consumers who subscribed to DIRECTV online on directv.com for access to premium channels through a negative option feature without having clearly and conspicuously disclosed the material terms of the transaction before obtaining the consumers' billing information.**

To prove a violation of Section 4(1) of ROSCA, the FTC must prove that the defendant did not clearly and conspicuously disclose on its website that customers would be enrolled in a negative option.  Neither the statute nor case law requires a particular method of disclosure.  No law, regulation, or policy documents prohibit sellers from placing these disclosures in hyperlinks or info hovers on their websites.  The test is whether the disclosures are likely to be "seen and understood."

> **H.     With respect to the FTC's claim under Section 4(2) of ROSCA (Count IV), whether DIRECTV charged or attempted to charge consumers who subscribed to DIRECTV online on directv.com for access to premium channels through a negative option feature without having obtained consumers' express informed consent before charging their credit card, debit card, or other financial account for those premium channels.**

To prove a violation of Section 4(2) of ROSCA, the FTC must prove that the defendant did not obtain express informed consent before charging the customers' credit card.  Neither statute nor case law requires that express informed consent be obtained in any particular method or manner.

JOINT PRETRIAL STATEMENT

**I.      With respect to the FTC's ROSCA claims, assuming liability, whether this Court should order injunctive relief against DIRECTV, and, if so, in what form.**

*See* Section E above.

**J.      With respect to the FTC's ROSCA claims, assuming liability, whether DIRECTV customers have been injured by the alleged deceptive conduct; if so, whether this Court should order any monetary or other redress to injured consumers, and, if so in what form and amount.**

*See* Section F above.

**K.      Whether the FTC lacks Article III standing to recover legal damages through Section 13(b).**

Section 13(b) of the FTC Act confers upon the Court, in a "proper case," the power to award preliminary and permanent injunctive relief. 15 U.S.C. § 53(b). Section 13(b) does not mention monetary relief. Nevertheless, courts have held that the FTC Act endows district courts with broad authority to grant "any ancillary relief necessary to accomplish complete justice," including restitution of a defendant's unjust gains. *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (quoting *Pantron I Corp.*, 33 F.3d at 1102). The district court's power to fashion monetary relief is not without limit, however. When proceeding under Section 13(b) (as opposed to Section 19), the court's jurisdiction is limited to awarding relief that comports with both the common law principles of equity and the text and purpose of the FTC Act. As the Ninth Circuit recently held in *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 599 (9th Cir. 2016), courts do not have the power to award restitution measured by consumers' losses because such an award constitutes *legal damages*. *Id.* at 599 (holding that Section 19(b) precludes a court from awarding damages under Section 13(b)) (emphasis added).

Under Section 13(b), only awards of "restitutionary" monetary relief are permitted. *Commerce Planet*, 815 F.3d at 602. "Restitution" refers generally to a form of relief that grants recovery on the basis of unjust enrichment. Restatement (Third) of Restitution and Unjust Enrichment § 1 (2010) ("A person who is unjustly enriched at the expense of another is subject

JOINT PRETRIAL STATEMENT

to liability in restitution."). Restitution measures unjust enrichment by a defendant—*not* expectation damages by a plaintiff. "[T]he damages remedy and the restitution remedies are always conceptually distinct." 1 Dobbs, Law of Remedies § 4.2(3), 581 (2d ed. 1993). "To measure damages, the courts look at *the plaintiff's loss or injury*; to measure restitution, the courts look at the *defendant's gain or benefit*." (*Id.*) (emphasis added).

"Expectancy" or "benefit of the bargain" damages are legal damages measuring consumers' total losses—they are not restitution of unjust gains. "[T]he damages remedy and the restitution remedies are always conceptually distinct." 1 Dobbs, Law of Remedies § 4.2(3), 581 (2d ed. 1993). "Expectation damages" measure a plaintiff's total losses and attempt to make him whole. They restore the plaintiff's "benefit of the bargain" by putting him or her in as good a position as he or she would have been had the bargain been performed as represented. *See ALLTEL Information Services, Inc. v. F.D.I.C.*, 194 F.3d 1036, 1039 n. 3 (9th Cir. 1999); *DCD Programs Ltd. v. Leighton*, 90 F.3d 1441, 1447 (9th Cir. 1996). Because the expectation in a damages measure is that of the plaintiff and not the defendant, proof of expectation losses is untethered from and not a proxy for a defendant's unjust gains.

"It is a prerequisite of justiciability that judicial relief will prevent or redress the claimed injury, or that there is a significant likelihood of such redress." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (citations omitted). "[I]f the court is unable to grant the relief that relates to the harm, the plaintiff lacks standing." *Id.* Courts have consistently found a lack of Article III standing where a plaintiff seeks monetary damages under a statute that restricts remedies to equitable relief. *See, e.g.*, *Click v. Sunoco, Inc.*, No. 06-CV-0518-CVE-FHM, 2007 WL 593618, at *5-6 (N.D. Okla. Feb. 21, 2007) (granting Rule 12(b)(1) motion to dismiss because "[t]he relief plaintiff requests in this case should be classified as compensatory damages rather than restitution" and the statutory scheme at issue permitted only equitable relief); *Ochsner Health Plan v. N. La. Physician Hosp. Org., Inc.*, No. Civ.A. 01–2601, 2002 WL 31844903, at *8-9 (E.D. La. Dec. 16, 2002) (finding no subject matter jurisdiction where plaintiff styled its requested relief as equitable but in reality sought money damages in contravention of statutory scheme permitting only equitable relief); *Legal Aid Soc'y v. City of*

JOINT PRETRIAL STATEMENT

43

*New York*, 114 F. Supp. 2d 204, 213-14 (S.D.N.Y. 2000) (holding that plaintiff lacked Article III standing to pursue action for money damages where the law only permitted an association plaintiff to seek equitable relief).

L.   **Whether the FTC may recover "benefit-of-the-bargain" damages as restitution when the two remedies are mutually exclusive.**

It is fundamental to remedies law that an injured party can seek rescission of a contract and restitution—restoring him to the *status quo ante*—or affirm the contract and recover damages. But "[a]ffirmation of the contract, on the one hand, and rescission and restitution on the other, are *alternative remedies*. Election to pursue one *is a bar to invoking the other* ...." *Flagship West, LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1018 (E.D. Cal. 2010) (quoting *B.C. Richter Contracting Co. et al. v. Continental Casualty Co.*, 230 Cal. App.2d 491, 500-01 (Cal. Ct. App. 1964)) (emphasis added); *see Courtney v. Custer County Bank*, 198 F.2d 828, 830-31 (9th Cir. 1952) (rescission and restitution remedies are inconsistent with affirming contract and suing for damages); Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011); 1 Dobbs, Law of Remedies § 9.4, at 714-15 (2d ed. 1993) ("There appears little occasion to permit the plaintiff to recover both restitution and loss-of-bargain damages and such recoveries have been rejected not only by courts which recite the traditional election doctrine, but also by courts that allow both restitution and consequential damages.").

M.   **Whether the FTC may seek restitution where an express contract governs the relevant subject matter.**

The common law prohibits restitution by implied contract where the parties have bargained for and allocated risk in an express contract. *See, e.g.*, *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) (under New York and California law, restitution of unjust enrichment does not lie when "an enforceable, binding agreement exists defining the rights of the parties"); *U.S. for Use of Youngstown Welding and Engineering Co.*, 802 F.2d 1164, 1169 (9th Cir. 1986) (restitution may not be used to circumvent allocation of risks in express written contract) (Arizona law). Where parties have contracted "with reference to the same general subject matter, the contract itself … should control" and

JOINT PRETRIAL STATEMENT

restitution will not be permitted to undermine the contract. 1 Dobbs, Law of Remedies § 4.9(4), at 480 (2d ed. 1993).

      **N.**      **Whether the FTC has reasonably approximated DIRECTV's alleged unjust gains.**

Monetary relief must be that relief "flowing from" the allegedly deceptive conduct. Expert testimony as to monetary relief cannot be constructed in a vacuum independent from the liability facts in the case, as "any model supporting a 'plaintiff's damages cause must be consistent with its liability case….'" *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013) (citation omitted).

Calculating benefit of the bargain damages requires evidence of the individual expectations of consumers. *See, e.g., Montgomery v. Kraft Foods Global, Inc.*, No. 1:12–CV–00149, 2014 WL 1875022 at *3 (W.D. Michigan 2014) (denying class certification in consumer fraud action over Tassimo coffee maker seeking expectancy damages) ("Determining damages in this case would require inquiry into the expectations of each proposed class member to determine what amount would fulfill their individual expectations. Those individualized damages calculations would necessarily overwhelm any questions that are common to the proposed class.").

**XI.  Pending Motions or Matters:**

The parties have filed the following motions in limine:

**A.  DIRECTV:**

    a.   Motion in Limine No. 1 Re: Excluding Opinions of FTC Expert Anthony Pratkanis Regarding DIRECTV Advertising.

    b.   Motion in Limine No. 2 Re: Excluding Survey Evidence Proffered by FTC's Expert Dr. Tulin Erdem.

    c.   Motion in Limine No. 3 Re: Excluding Opinions of FTC's Expert Dr. Daniel A. Rascher.

    d.   Motion in Limine No. 4 Re: Precluding the FTC from Offering Evidence (A) Contradicting Rule 30(b)(6) Designee Testimony or (B) On Topics Where Privilege was Asserted to Block Discovery.

**B. FTC:**

    a.   First Motion in Limine Re MSA and Compliance.

    b.   Second Motion in Limine Re DIRECTV Expert Howard Beales.

    c.   Third Motion in Limine Re DIRECTV Expert Dr. Jerry Wind (Recorded Calls and Convergys Control).

    d.   Fourth Motion in Limine Re DIRECTV expert Dr. Michael Baye.

    e.   Fifth Motion in Limine Re DIRECTV expert Lori Wijntjes.

**XI.   BIFURCATION OR SEPARATE TRIAL OF ISSUES**

The parties do not propose that the trial be bifurcated or that any issues be tried separately.

**XII.   USE OF DISCOVERY RESPONSES**

Lists of the parties' designation of testimony to be presented through deposition transcripts and written discovery responses are attached as Exhibit H.  The parties have been meeting and conferring about the designations of discovery responses and will continue to do so to narrow the responses ultimately presented at trial and to resolve objections related thereto. The parties will submit a revised list of discovery responses in advance of the Pre-Trial Conference.

**XIII.   ESTIMATE OF TRIAL TIME**

The parties anticipate that the trial will take approximately 20 court days.

**XIV.   SETTLEMENT DISCUSSION**

The parties participated in a settlement conference with Chief Magistrate Judge Joseph Spero on November 28, 2016, but were unable to resolve the matter.  Dkt. No. 218.

JOINT PRETRIAL STATEMENT

*The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this case, unless modified by the Court to prevent manifest injustice.*

/s/ Eric D. Edmondson

Eric D. Edmondson, D.C. Bar No. 450294
Erika Wodinsky, Cal. Bar No. 091700
Boris Yankilovich, Cal. Bar No. 257887
Jacob A. Snow, Cal. Bar No. 270988
901 Market Street, Suite 570, San Francisco, CA  94103
(415) 848-5100/(415) 848-5184 (fax)
*eedmondson@ftc.gov*; *ewodinsky@ftc.gov*; *byankilovich@ftc.gov*; *jsnow@ftc.gov*

Raymond E. McKown, Cal. Bar No. 150975
Stacy Procter, Cal. Bar No. 221078
Kenneth H. Abbe, Cal. Bar No. 172416
10877 Wilshire Blvd., Suite 700, Los Angeles, CA 90024
(310) 824-4343/(310) 824-4380 (fax)
*rmckown@ftc.gov*; *sprocter@ftc.gov; kabbe@ftc.gov*

Attorneys for Plaintiff
Federal Trade Commission

/s/ Chad S. Hummel

Jeff Tillotson, SBN 139372
jtillotson@TillotsonLaw.com
Tillotson Law
750 North Saint Paul, Suite 610
Dallas, TX  75201
Telephone:  (214) 382-3040

Pete Marketos, *Pro Hac Vice*
pete.marketos@rgmfirm.com
Reese Gordon Marketos LLP
750 North Saint Paul
Suite 610
Dallas, TX  75201
Telephone: (214) 382-9810

Chad S. Hummel, SBN 139055
chummel@sidley.com
Mark D. Campbell, SBN 180528
mcampbell@sidley.com
Bridget S. Johnsen, SBN 210778
bjohnsen@sidley.com
Ryan M. Sandrock, SBN 251781
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  (415) 722-1200
Facsimile:  (415) 772-7400

Attorneys for Defendants
DIRECTV and DIRECTV, LLC

JOINT PRETRIAL STATEMENT