```
                                    VOLUME 4

                              PAGES 550 - 734

               UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA
```

**BEFORE THE HONORABLE HAYWOOD S. GILLIAM JR., JUDGE**

```
FEDERAL TRADE COMMISSION,    )
                             )
            PLAINTIFF,       )   NO. C-15-1129 HSG
                             )
   VS.                       )   THURSDAY, AUGUST 17, 2017
                             )
DIRECTV, A CORPORATION,      )   OAKLAND, CALIFORNIA
ET AL.                       )
                             )   COURT TRIAL
                             )
            DEFENDANTS.       )
_____)
```

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**FOR PLAINTIFF:**          U.S. FEDERAL TRADE COMMISSION
                            901 MARKET STREET, SUITE 570
                            SAN FRANCISCO, CALIFORNIA 94103
                        BY: ERIC D. EDMONDSON, ESQUIRE
                            JACOB A. SNOW, ESQUIRE
                            EVAN ROSE, ESQUIRE
                            ERIKA WODINSKY, ESQUIRE


                     (APPEARANCES CONTINUED)


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER


           TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1

2    **FOR DEFENDANTS:**              TILLOTSON LAW
                                      750 SAINT PAUL PLACE, SUITE 610
3                                     DALLAS, TEXAS 75201
                              BY:     JEFFREY M. TILLOTSON, ESQUIRE
4

5                                     SIDLEY AUSTIN LLP
                                      1999 AVENUE OF THE STARS
6                                     LOS ANGELES, CALIFORNIA 90067
                              BY:     CHAD S. HUMMEL, ESQUIRE
7                                     BRIDGET S. JOHNSEN,

8                                     REESE GORDON MARKETOS
                                      750 N. SAINT PAUL STREET, SUITE 610
9                                     DALLAS, TEXAS 75201
                              BY:     KATIE DOLAN-GALAVIZ, ESQUIRE
10                                    LESLIE CHAGGARIS, ESQUIRE
                                      PETER D. MARKETOS, ESQUIRE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2        **PLAINTIFF'S WITNESSES:**                        **PAGE**   **VOL.**

3        **POLING—HIRALDO, LIZ**

4        DIRECT EXAMINATION BY MR. SNOW (RESUMED)      557      4

5        CROSS-EXAMINATION BY MR. HUMMEL              672      4

6        REDIRECT EXAMINATION BY MR. SNOW             700      4

7        **GUYARDO, PAUL**

8        DIRECT EXAMINATION BY MR. EDMONDSON          590      4

9        CROSS-EXAMINATION BY MR. HUMMEL              633      4

10       REDIRECT EXAMINATION BY MR. EDMONDSON        663      4

11       RECROSS EXAMINATION BY MR. HUMMEL            670      4

12       **STAHL, ANN** (RECALLED)

13       DIRECT EXAMINATION BY MS. WODINSKY           716      4

14       CROSS-EXAMINATION BY MR. HUMMEL              727      4

15       REDIRECT EXAMINATION BY MS. WODINSKY         734      4

16

17

18

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

```
1                        I N D E X

2    TRIAL EXHIBITS:        WITHDRAWN    I.D.    EVD.    VOL.

3            1                                   721      4

4            7                                   721      4

5           14                                   721      4

6           19                                   653      4

7           22                                   721      4

8           36                                   721      4

9           40                                   721      4

10          52                                   721      4

11          54                                   721      4

12          58                                   721      4

13          62                                   721      4

14          76                                   721      4

15         103                                   601      4

16         238                                   611      4

17         438                                   734      4

18       442 - 448                               734      4

19       450 - 456                               734      4

20         472                                   721      4

21         587                                   631      4

22         767                                   574      4

23         768                                   587      4

24         770                                   566      4

25         983                                   607      4
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

| TRIAL EXHIBITS: | WITHDRAWN | I.D. | EVD. | VOL. |
|---|---|---|---|---|
| 984 | | | 613 | 4 |
| 986 | | | 659 | 4 |
| 987 | | | 637 | 4 |
| 988 | | | 621 | 4 |
| 990 | | | 617 | 4 |
| 991 | | | 645 | 4 |
| 995 | | | 627 | 4 |
| 1105 | | | 584 | 4 |
| 1128 | | | 570 | 4 |
| 1169 – 1183 | | | 726 | 4 |
| 1184 | | | 727 | 4 |
| 2013A | | | 613 | 4 |
| 2701 | | 698 | | 4 |

```
 1    THURSDAY, AUGUST 18, 2017                        8:33 A.M.

 2                      P R O C E E D I N G S

 3         THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

 4    COURT IS IN SESSION.  THE HONORABLE HAYWOOD S. GILLIAM, JR.,

 5    PRESIDING.

 6       WE ARE CALLING C-15-1129, FEDERAL TRADE COMMISSION VERSUS

 7    DIRECTV, INC., ET AL.  PLEASE STEP FORWARD AND STATE YOUR

 8    APPEARANCES FOR THE RECORD, PLEASE.

 9         MR. EDMONDSON:  GOOD MORNING, YOUR HONOR.  ERIC

10    EDMONDSON FOR THE FEDERAL TRADE COMMISSION.  AND APPEARING

11    TODAY FOR THE FTC WILL BE JACOB SNOW, EVAN ROSE, AND ERIKA

12    WODINSKY.

13         THE COURT:  GOOD MORNING, MR. EDMONDSON.

14         MR. TILLOTSON:  GOOD MORNING, YOUR HONOR.  JEFF

15    TILLOTSON HERE ON BEHALF OF THE DEFENDANTS DIRECTV.  AND

16    APPEARING TODAY WILL BE CHAD HUMMEL AND PETE MARKETOS.

17         THE COURT:  WHO IS ON THE AGENDA FOR TODAY?

18         MR. EDMONDSON:  YOUR HONOR, WE HAVE FOUR WITNESSES

19    LINED UP.  WE ARE IN THE MIDDLE OF THE FTC'S DIRECT

20    EXAMINATION OF MS. POLING-HIRALDO.  AND THEN IT SHOULD BE

21    FOLLOWED BY PAUL GUYARDO, AUDREY CHEN, AND IF THERE IS TIME,

22    ANN STAHL TO FINISH OFF SOME FOUNDATIONAL TESTIMONY.

23       THERE IS ONE -- WITH THE COURT'S INDULGENCE, WE WOULD LIKE

24    TO HANDLE MS. POLING-HIRALDO'S TESTIMONY IN TWO STAGES IN

25    ORDER TO ACCOMMODATE MR. GUYARDO'S TIGHT TRAVEL SCHEDULE.  AND
```

1    THIS IS ACCOMMODATING A REQUEST BY DIRECTV COUNSEL.

2              **MR. TILLOTSON:**  MR. GUYARDO IS IN FROM NEW YORK AND

3    HAS A PERSONAL ISSUE.  WE HAVE SCHEDULED HIM.  WE WOULD LIKE

4    TO HAVE THE FTC FINISH THEIR EXAM OF MS. POLING-HIRALDO.  WE

5    WILL THEN CALL MR. GUYARDO AND COMPLETE HIM.  WE WILL BRING

6    BACK MS. POLING-HIRALDO AND FINISH HER WITH -- MR. HUMMEL WILL

7    THEN START HIS EXAMINATION OF HER, WITH THE COURT'S

8    PERMISSION.

9              **THE COURT:**  I THINK THAT IS FINE.  WOULD WE BE

10   FINISHING HER DIRECT FIRST?

11             **MR. TILLOTSON:**  YES, YOUR HONOR.  FTC WILL FINISH.

12   WE'LL THEN HOLD HER OPEN, DO MR. GUYARDO, AND THEN FINISH UP

13   WITH MS. POLING-HIRALDO.

14             **THE COURT:**  THAT'S FINE WITH ME.

15      AND WHY IS MS. STAHL COMING BACK?

16             **MR. EDMONDSON:**  SOME ADDITIONAL FOUNDATIONAL

17   TESTIMONY THAT WAS UNRELATED TO THE SUBJECT THAT SHE

18   ORIGINALLY -- THAT SHE TESTIFIED ON INITIALLY.  MS. STAHL WAS

19   LAYING FOUNDATION FOR THE ADMISSION OF SEVERAL WEBSITE

20   CAPTURES WHEN SHE TESTIFIED ON MONDAY, YOUR HONOR, AND SHE HAS

21   SEVERAL SUMMARY EXHIBITS THAT SHE WOULD LIKE TO LAY FOUNDATION

22   FOR NOW.

23             **THE COURT:**  OKAY.  SETTING ASIDE SORT OF WITNESS

24   SCHEDULE ISSUES OF THE TYPE OF MR. GUYARDO, LET'S JUST HAVE

25   WITNESSES TESTIFY TO EVERYTHING THAT THEY'VE GOT, FOR THEIR

```
1    CONVENIENCE.  I DON'T KNOW THAT IT MAKES A LOT OF SENSE FOR

2    HER TO HAVE TO COME BACK.

3              MR. EDMONDSON:  YES, YOUR HONOR.

4              MR. TILLOTSON:  YES, YOUR HONOR.

5              THE COURT:  ARE WE READY TO START?

6              MR. TILLOTSON:  WE ARE, YOUR HONOR.

7              MR. EDMONDSON:  THANK YOU.

8              MR. SNOW:  THE FTC CALLS BACK TO THE STAND LIZ

9    POLING-HIRALDO.

10                  DIRECT EXAMINATION (RESUMED)

11   BY MR. SNOW:

12   Q.  GOOD MORNING --

13   A.  GOOD MORNING.

14   Q.  -- MS. POLING-HIRALDO.  I WOULD LIKE TO ASK YOU A FEW

15   QUESTIONS ABOUT THE USABILITY TESTS THAT DIRECTV HAS DONE.

16       YOU HAVE BEEN AT DIRECTV OR AT&T SINCE 2009, CORRECT?

17   A.  YES.

18   Q.  AND DURING THAT PERIOD FROM 2009 THROUGH 2016, YOU SAW

19   USABILITY TESTS PERFORMED ON DIRECTV'S WEB FLOW?

20   A.  YES, I HAVE.

21   Q.  AND DIRECTV USED THOSE USABILITY TESTS TO HELP DESIGN ITS

22   WEBSITE, RIGHT?

23   A.  YES.

24   Q.  AND WOULD YOU SAY THAT DIRECTV HAS MADE A SERIOUS

25   INVESTMENT OF TIME AND MONEY INTO USABILITY TESTING?
```

1    **A.**   THEY HAVE OVER TIME.

2    **Q.**   HAS THAT INVESTMENT INCREASED OVER TIME?

3    **A.**   YES, IT HAS.

4    **Q.**   AND DIRECTV PERFORMED A USABILITY TEST FOR ALMOST EVERY

5    MAJOR LAUNCH OF ITS SITE; ISN'T THAT CORRECT?

6    **A.**   NOT EXACTLY.  IT DEPENDS ON THE TIME PERIOD, BUT, YES, WE

7    INCREASED IN FREQUENCY.

8    **Q.**   SINCE WHEN HAS THERE BEEN USABILITY TESTS PERFORMED FOR

9    MAJOR LAUNCHES OF THE SITE?

10   **A.**   THERE HAS BEEN MORE SINCE 2012.

11   **Q.**   WITH RESPECT TO THAT 2012 WEBSITE REDESIGN, DIRECTV DID A

12   BIG USABILITY TEST FOR THAT REDESIGN; ISN'T THAT RIGHT?

13            **MR. HUMMEL:**  OBJECTION, VAGUE.

14            **THE COURT:**  OVERRULED.

15   **BY MR. SNOW:**

16   **Q.**   A BIG USABILITY TEST FOR THAT REDESIGN.

17   **A.**   IT WAS WITH REGARDS TO THE ENTERTAINMENT PORTION OF THE

18   SITE, AND WE HAD ONGOING -- INCREASING FREQUENCY OF USABILITY

19   TESTS.  DOES THAT ANSWER THE QUESTION?

20   **Q.**   I'M WONDERING WHETHER FOR THE 2012 REDESIGN THERE WAS A

21   LARGE USABILITY TEST PERFORMED FOR THAT PROJECT?

22   **A.**   THERE WAS -- THE REDESIGN FOR THE ACQUISITION FLOW IS

23   2014 -- 2013, 2014, SO THAT IS WHY I AM ASKING ABOUT THE DATE.

24   I AM SORRY.

25   **Q.**   SO THERE IS A 2012 REDESIGN, AND THAT REDESIGN

1    CORRESPONDED TO REDESIGNING WHAT PORTION OF THE WEBSITE?

2    **A.**   SO MORE ON THE ENTERTAINMENT SIDE OF THE HOUSE.

3    **Q.**   AND FOR THAT ENTERTAINMENT FOCUS REDESIGN, THERE WAS A

4    LARGE USABILITY TEST DONE; IS THAT CORRECT?

5    **A.**   YES, THAT IS CORRECT.

6    **Q.**   AND FOR USABILITY TESTS THAT HAVE BEEN DONE IN YOUR TENURE

7    AT THE COMPANY, HAVE THIRD-PARTY VENDORS BEEN USED TO PERFORM

8    THOSE TESTS IN SOME INSTANCES?

9    **A.**   SOME INSTANCES, YES.

10   **Q.**   AND IN OTHER INSTANCES INTERNAL DIRECTV USABILITY TESTERS

11   HAVE BEEN USED; IS THAT RIGHT?

12   **A.**   CORRECT.

13   **Q.**   STARTING AROUND 2014, YOU SET UP A USABILITY DISCIPLINE

14   THAT YOUR TEAM WOULD USE TO DO USABILITY TESTING QUITE

15   FREQUENTLY; ISN'T THAT RIGHT?

16   **A.**   CORRECT.

17   **Q.**   AND YOU HIRED THREE USABILITY TESTING TESTERS AND

18   USABILITY RESEARCHERS?

19   **A.**   YES, I DID.

20   **Q.**   AND WAS THAT PROJECT -- WOULD THAT PROJECT INVOLVE

21   RESEARCHERS BEING ASSIGNED TO A DIFFERENT PART OF THE WEBSITE?

22   **A.**   YES.

23   **Q.**   AND THEN THOSE INDIVIDUALS WOULD HAVE RESPONSIBILITY FOR

24   RUNNING TESTS ON THE WEBSITE EVERY COUPLE OF WEEKS OR SO?

25   **A.**   YES.  THE FREQUENCY VARIED.

POLING-HIRALDO - DIRECT / SNOW

1    **Q.**  ARE YOU FAMILIAR WITH THE TERM "SPRINT"?

2    **A.**  YES, I AM.

3    **Q.**  DOES A SPRINT REFER TO A PERIOD OF TIME OF TWO TO THREE

4    WEEKS WHERE THERE IS A SET OF DELIVERABLES THAT ARE DEVELOPED

5    FOR A PROJECT?

6    **A.**  YES.

7    **Q.**  AND IN THIS RECENT PERIOD WHERE USABILITY TESTING IS A

8    FOCUS, THE COMPANY TRIED DO A USABILITY TEST FOR EVERY SPRINT;

9    IS THAT RIGHT?

10   **A.**  FOR EVERY MAJOR DELIVERABLE, NOT EVERY SPRINT.

11   **Q.**  YOU DON'T TRY TO TEST THE USABILITY OF THE WEBSITE USING

12   USABILITY TESTS FOR EVERY SPRINT?

13   **A.**  IT DEPENDS UPON IF THERE ISN'T ANYTHING THAT'S -- AT TIMES

14   IN THE SPRINTS THERE ISN'T ENOUGH FUNCTIONALITY OR THERE ISN'T

15   SOMETHING THAT CAN BE SHOWN TO PEOPLE SO WE WOULDN'T TEST IT.

16   SO FOR THE MOST PART WE TRY TO TEST EVERY SPRINT BUT IT

17   DEPENDS UPON WHAT THE DELIVERABLE FOR THE SPRINT IS.

18   **Q.**  LET'S TALK A LITTLE BIT ABOUT HOW USABILITY TESTS WORKED

19   IN GENERAL.  GENERALLY THERE WAS A TEAM OF INDIVIDUALS WHO

20   WOULD START BY FIGURING OUT WHAT THEY WANTED TO TEST; IS THAT

21   RIGHT?

22   **A.**  CORRECT.

23   **Q.**  AND THEN A DEMO OR A CLICKABLE PROTOTYPE WOULD BE

24   DEVELOPED THAT WOULD BE USED AS THE SUBJECT MATTER OF THE

25   TEST; IS THAT RIGHT?

POLING-HIRALDO – DIRECT / SNOW

1    **A.**  FOR THE MOST PART, YES.

2    **Q.**  ARE YOU FAMILIAR WITH THE TERM "HIGH-FIDELITY PROTOTYPE"?

3    **A.**  YES.

4    **Q.**  WHAT DOES THAT REFER TO IN YOUR MIND?

5    **A.**  A HIGH-FIDELITY PROTOTYPE WOULD BE A FUNCTIONING FLOW, NOT

6    ALL OF THE COMPONENTS WOULD BE FUNCTIONING, BUT YOU WOULD BE

7    ABLE TO CLICK THROUGH TO ACCOMPLISH CERTAIN TASKS.  SO NOT

8    EVERY SINGLE ASPECT WOULD BE BUILT OUT BECAUSE IT IS NOT LIVE

9    OR PRODUCTION READY BUT IT IS MOSTLY THERE IN TERMS OF CONTENT

10   AND FUNCTIONALITY.

11   **Q.**  AND WHAT'S THE PURPOSE OF A HIGH-FIDELITY PROTOTYPE IN A

12   USABILITY TEST?

13   **A.**  IT'S TO GET A USER TO -- SO IN A USABILITY TEST WE WOULD

14   GET A USER TO TRY TO NAVIGATE THEIR WAY THROUGH THE FLOW AND

15   TO SEE IF THEY CAN ACCOMPLISH THEIR TASK.

16   **Q.**  AND A HIGH-FIDELITY PROTOTYPE IS USEFUL TOWARDS THAT GOAL?

17   **A.**  YES, IT IS.

18   **Q.**  ARE YOU FAMILIAR WITH THE TERM "CLICKABLE PROTOTYPE"?

19   **A.**  YES.

20   **Q.**  IS THAT DISTINCT, IN YOUR MIND, FROM A HIGH-FIDELITY

21   PROTOTYPE?

22   **A.**  NOT TO ME, NO.

23   **Q.**  SO GOING BACK TO HOW A USABILITY TEST WOULD WORK, THE NEXT

24   STEP AFTER HAVING THE DEMO OR PROTOTYPE PUT TOGETHER WOULD BE

25   FOR THE USABILITY RESEARCHER TO WRITE A SCRIPT; IS THAT RIGHT?

1    **A.**  YES.

2    **Q.**  AND THEN THE TEAM WOULD REVIEW THE SCRIPT AND THEN START

3    SOLICITING INDIVIDUALS TO PARTICIPATE IN THE USABILITY TEST?

4    **A.**  CORRECT.

5    **Q.**  AND IF IT'S AN IN-PERSON TEST, THOSE PARTICIPANTS MIGHT

6    COME INTO AN OFFICE OR A CONFERENCE ROOM OR SOMETHING TO

7    PARTICIPATE?

8    **A.**  CORRECT.

9    **Q.**  IS IT CORRECT THAT DIRECTV USUALLY HAD BETWEEN TEN AND

10   TWENTY PARTICIPANTS FOR USABILITY TESTS?

11   **A.**  ON AVERAGE, YES.

12   **Q.**  DURING THOSE TESTS THERE IS A FACILITATOR IN THE ROOM WITH

13   THE PARTICIPANTS; IS THAT RIGHT?

14   **A.**  CORRECT.

15   **Q.**  AND THEN THOSE USERS, THE PARTICIPANTS, WOULD GO THROUGH

16   THE DEMO OR THE CLICKABLE PROTOTYPE, THE HIGH-FIDELITY

17   PROTOTYPE, AND THEY COULD CLICK THROUGH IT AND USE THE TOOL;

18   IS THAT RIGHT?

19   **A.**  YES.

20   **Q.**  AND THEY WOULD BE ASKED TO COMPLETE CERTAIN TASKS ON THAT

21   PROTOTYPE?

22   **A.**  YES.

23   **Q.**  AND THEN THE FACILITATOR, WHO IS IN THE ROOM WITH THE

24   PARTICIPANTS, WOULD TAKE THE PARTICIPANTS THROUGH THE SCRIPT

25   AND HAVE THEM COMPLETE THE TEST INTERACTING WITH THE

1    PROTOTYPE; IS THAT RIGHT?

2    **A.**  CORRECT.

3    **Q.**  AND THEN THE FACILITATOR CAPTURES THE PARTICIPANTS'

4    RESPONSES AND THEN PREPARES A REPORT WITH THOSE RESPONSES THAT

5    IS THEN DELIVERED BACK TO THE COMPANY; IS THAT RIGHT?

6    **A.**  SOMETIMES THERE IS ANOTHER NOTE TAKER BUT, YES, IN GENERAL

7    THEY CAPTURE THE FEEDBACK AND IT TURNS INTO A REPORT.

8    **Q.**  AND THESE USABILITY TESTS WOULDN'T ALWAYS BE IN PERSON; IS

9    THAT RIGHT?

10   **A.**  WE HAVE DONE ONLINE TESTS AS WELL.

11   **Q.**  FOR THE ONLINE TESTS, THERE WOULD BE A SCRIPT THAT WOULD

12   BE PART OF THE PROTOTYPE THAT THE USERS WOULD SEE?

13   **A.**  YES.

14   **Q.**  AND IN YOUR EXPERIENCE, THE RESULTS OF THOSE ONLINE TESTS

15   ARE STILL VALUABLE TO THE COMPANY?

16   **A.**  YES.

17   **Q.**  AT SOME POINTS IS IT CORRECT THAT USABILITY TESTS WOULD BE

18   PERFORMED AS OFTEN AS ONCE A WEEK?

19   **A.**  DEPENDING ON THE FUNCTIONALITY THAT WAS AVAILABLE, YES.

20   **Q.**  AND THEN OTHER TIMES IF IT WAS LESS BUSY, IT MIGHT BE ONCE

21   A MONTH OR SOMETHING?

22   **A.**  CORRECT.

23   **Q.**  DID ANYONE AT DIRECTV EVER SAY, FORGET IT, THESE USABILITY

24   TESTS AREN'T VALUABLE, LET'S GET RID OF THEM?

25   **A.**  NO.

1   **Q.**  AND YOU PERSONALLY FEEL THE USABILITY TESTS ARE AN

2   IMPORTANT PART OF THE DESIGN PROCESS, RIGHT?

3   **A.**  YES.

4   **Q.**  BUT THE PURPOSE OF USABILITY TESTING AT DIRECTV INVARIABLY

5   WAS TO SEE IF USERS COULD COMPLETE THE TASK OF SELECTING A

6   PACKAGE, ADDING IT TO THEIR CART, AND CHECKING OUT AND MAKING

7   A PURCHASE; IS THAT RIGHT?

8   **A.**  FOR THE ACQUISITION FLOW, YES.

9   **Q.**  WELL THAT'S THE PURPOSE OF USABILITY TESTS AT THE COMPANY

10  INVARIABLY FOR THE WEBSITE, RIGHT?

11  **A.**  THERE ARE DIFFERENT FUNCTIONS ON THE WEBSITE.  SO

12  STREAMING, WE WOULD TEST STREAMING.  WE WOULD TEST HOW USERS

13  CAN PAY THEIR BILL.  SO IF WE ARE TALKING ABOUT SELECTING A

14  PACKAGE, THAT IS SPECIFIC TO THE ACQUISITION FLOW.

15  **Q.**  FOR THE ACQUISITION FLOW IT IS JUST TO SEE WHETHER THEY

16  CAN ADD SOMETHING TO THEIR CART AND CHECK OUT?

17  **A.**  IT'S WHETHER THEY CAN COMPLETE THE TASK THAT THEY HAVE

18  COME TO DO.

19  **Q.**  I SEE.

20     SO THERE'S THIS HIGH VALUE THAT DIRECTV PUTS ON USABILITY

21  TESTS AND AS YOU HAVE DESCRIBED THIS GROWING USABILITY

22  DISCIPLINE AT THE COMPANY, BUT TO YOUR KNOWLEDGE, DIRECTV HAS

23  NEVER USED INFORMATION FROM USABILITY TESTS TO IMPROVE OR

24  CHANGES ITS DISCLOSURES, RIGHT?

25  **A.**  CORRECT.

1              **MR. HUMMEL:**  OBJECTION, FOUNDATION.

2              **THE COURT:**  OVERRULED.

3              **THE WITNESS:**  DIRECTV HAS NOT USED FEEDBACK FROM THE

4    TEST TO CHANGE LANGUAGE ON DISCLOSURES OR MAKE CHANGES.

5    **BY MR. SNOW:**

6    **Q.**  SO YOU DON'T REMEMBER ANY INSTANCE WHERE DIRECTV HAS USED

7    INFORMATION FROM USABILITY TESTS TO IMPROVE OR CHANGE

8    DISCLOSURES, CORRECT?

9    **A.**  NO, THAT'S INCORRECT.

10   **Q.**  SO YOU DO REMEMBER AN INSTANCE WHERE THAT HAPPENED?

11   **A.**  WE HAVE TAKEN FEEDBACK FROM THE TESTS TO MAKE CHANGES AS

12   APPROPRIATE.

13   **Q.**  MS. POLING-HIRALDO, AT YOUR DEPOSITION YOU TESTIFIED THAT

14   DIRECTV HAD NEVER MADE A CHANGE TO THE DISCLOSURES ON ITS

15   WEBSITE TO IMPROVE THEM OR CHANGE THEM --

16   **A.**  I --

17   **Q.**  -- AS A RESULT OF INFORMATION FROM USABILITY TESTS.  DO

18   YOU RECALL THAT?

19   **A.**  YES.

20   **Q.**  AND WAS THAT TESTIMONY ACCURATE?

21   **A.**  YES.

22             **MR. SNOW:**  I WOULD LIKE TO PUT UP TRIAL EXHIBIT 770

23   ON THE SCREEN, PLEASE.

24                    (DISPLAYED ON SCREEN.)

25   **BY MR. SNOW:**

1    **Q.**  MS. POLING-HIRALDO, FOCUSING ON THE MIDDLE OF THIS

2    DOCUMENT, DO YOU SEE THIS IS AN EMAIL FROM WENDY JACKSON DATED

3    OCTOBER 16TH, 2009, AND YOU ARE ONE OF THE RECIPIENTS ON THE

4    EMAIL?

5    **A.**  YES, I SEE IT.

6            **MR. SNOW:**  YOUR HONOR, I WOULD LIKE TO OFFER

7    EXHIBIT 770 INTO EVIDENCE.

8            **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

9            **THE COURT:**  770 IS ADMITTED.

10           (TRIAL EXHIBIT 770 RECEIVED IN EVIDENCE)

11   **BY MR. SNOW:**

12   **Q.**  SO WENDY JACKSON WAS ONE OF DIRECTV'S INTERNAL USABILITY

13   TESTING TEAM MEMBERS; IS THAT RIGHT?

14   **A.**  YES.  CORRECT.

15   **Q.**  IN THIS EMAIL SHE SAYS:  ATTACHED YOU'LL FIND THE FINAL

16   REPORT FOR PEPOD USABILITY TESTING.  THE PURPOSE OF THIS

17   TESTING, WHICH CONSISTED OF 24 SESSIONS HELD OVER TWO DAYS IN

18   IRVINE AND CINCINNATI, WAS TO UNDERSTAND HOW WELL A NEW

19   APPROACH TO THE DIRECTV.COM ACQUISITION FLOW APPEALS TO

20   PROSPECTS.

21           DO YOU SEE THAT?

22   **A.**  I DO.

23   **Q.**  CAN YOU TELL US WHAT PEPOD STANDS FOR?

24   **A.**  IT'S PROSPECT EQUIPMENT PROGRAMMING ORDERING, AND I NEVER

25   REMEMBER WHAT THE D STANDS FOR.

1  **Q.**  SO STILL, SITTING HERE TODAY, YOU DON'T KNOW WHAT THE D

2  STANDS FOR?

3  **A.**  NO.

4  **Q.**  IT IS GOING TO REMAIN A MYSTERY.

5  **A.**  IT WILL.

6  **Q.**  DO YOU SEE THE REFERENCE IN THIS EMAIL TO 24 SESSIONS?

7  **A.**  YES, I DO.

8  **Q.**  AND THAT REFERS TO 24 SESSIONS OF ONE PERSON IN EACH

9  SESSION, RIGHT?

10  **A.**  CORRECT.

11  **Q.**  SO THIS USABILITY TESTING INCLUDED 24 SEPARATE INTERVIEWS

12  WITH A PARTICIPANT?

13  **A.**  CORRECT.

14  **Q.**  AND THEN MOVING DOWN IN THIS EMAIL UNDER KEY FINDING,

15  THERE'S A REFERENCE TO ACQUISITION FLOW PROTOTYPE.  DO YOU SEE

16  THAT?

17  **A.**  YES, I DO.

18  **Q.**  IS THAT AN INDICATION THAT THE USABILITY TEST WAS NOT RUN

19  ON A LIVE DIRECTV WEBSITE?

20  **A.**  THAT WOULD BE CORRECT.

21  **Q.**  AND IT USED A PROTOTYPE OF THE DIRECTV WEBSITE?

22  **A.**  YES.

23  **Q.**  DO YOU RECALL ANYTHING ABOUT THE DETAILS OF THAT

24  PROTOTYPE?

25  **A.**  I WAS NOT INVOLVED IN THAT PROTOTYPE.

1    **Q.**  DO YOU RECALL THAT THIS USABILITY TEST WAS DONE ON A

2    PROTOTYPE OF THE 2009 REDESIGN?

3    **A.**  YES.

4    **Q.**  AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE TOP OF

5    THE EMAIL WHERE IT INDICATES THAT THERE'S AN ATTACHMENT TO THE

6    EMAIL.  DO YOU SEE THAT?  IT'S ENTITLED DIRECTV.COM PEPOD PPT?

7    **A.**  YES.

8            **MR. SNOW:**  I WOULD LIKE TO GO TO PAGE 23 OF THAT

9    PRESENTATION.

10                   (DISPLAYED ON SCREEN.)

11   **BY MR. SNOW:**

12   **Q.**  DO YOU SEE THE IMAGE ON THE RIGHT OF PAGE 23 OF

13   EXHIBIT 770?

14   **A.**  YES, I DO.

15   **Q.**  AND THAT'S AN IMAGE OF THE SHOPPING CART PAGE, CORRECT?

16   **A.**  CORRECT.

17   **Q.**  AND DO YOU RECALL YESTERDAY WE TALKED ABOUT THE OLD FLOW,

18   THE LANGUAGE THE OLD FLOW?

19   **A.**  YES.

20   **Q.**  IS THIS AN IMAGE OF THE OLD FLOW?

21   **A.**  YES, THAT IS CORRECT.

22   **Q.**  DO YOU SEE IN THE FIRST BULLET HERE IT SAYS -- DO YOU SEE

23   WHERE IT SAYS:  PERHAPS ONE OF THE MOST TRULY UNFORTUNATE

24   OVERSIGHTS IS THE LINK TO VIEW SIX MONTHS AT A GLANCE.  ALL

25   RESPONDENTS PLACED HIGH VALUE ON THIS OPTION AND FEEL THE

1    CONTENT BEHIND THIS LINK IS VERY CLEARLY LAID OUT.

2       DO YOU SEE THAT?

3    **A.** YES, I DO.

4    **Q.** AND DIRECTV NEVER USED THIS INFORMATION TO IMPROVE OR

5    CHANGE ITS DISCLOSURE, DID IT?

6          **MR. HUMMEL:** OBJECTION, FOUNDATION.

7          **THE COURT:** TO YOUR KNOWLEDGE.

8          **THE WITNESS:** THE DESIGN STAYED AS IT IS.

9    **BY MR. SNOW:**

10    **Q.** IN THE NEXT BULLET ON THIS SLIDE IT STATES:  RESPONDENTS

11    UNIVERSALLY OVERLOOKED THE LINK, HOWEVER, DUE TO THE LIGHT

12    GRAY BACKGROUND, EXTREMELY SMALL FONT, AND ITS PLACEMENT ON

13    THE SCREEN, AND THE AMOUNT OF INFORMATION DISPLAYED ON THE

14    SCREEN.

15       DO YOU SEE THAT?

16    **A.** YES, I DO.

17    **Q.** AGAIN, TO YOUR KNOWLEDGE, THERE IS NO CHANGE TO THE

18    ADVERTISEMENTS TO IMPROVE OR CHANGE THE DISCLOSURE BASED ON

19    THIS INFORMATION?

20    **A.** TO MY KNOWLEDGE.

21          **MR. SNOW:** LET'S MOVE TO PAGE 47.

22             (DISPLAYED ON SCREEN.)

23    **BY MR. SNOW:**

24    **Q.** THIS IS A PAGE TITLED RECOMMENDATIONS.  DO YOU SEE THAT?

25    **A.** I DO.

1    **Q.** IN THE SIXTH BULLET -- FOURTH BULLET DOWN, EXCUSE ME, IT

2    SAYS: THE LINK TO VIEW SIX MONTHS AT A GLANCE NEEDS TO BE

3    MORE PROMINENT AS IT IS CLEARLY ONE OF THE TRUE PERCEIVED

4    BENEFITS OF THE SCREEN.

5        DO YOU SEE THAT?

6    **A.** YES, I DO.

7    **Q.** AGAIN, TO YOUR KNOWLEDGE, DIRECTV NEVER USED THIS

8    INFORMATION TO IMPROVE OR CHANGE ANY DISCLOSURES?

9    **A.** TO MY KNOWLEDGE.

10          **MR. SNOW:** I WOULD LIKE TO BRING UP TRIAL

11   EXHIBIT 1128.

12                          (DISPLAYED ON SCREEN.)

13   **BY MR. SNOW:**

14   **Q.** THIS IS AN EMAIL FROM KELLEY WALKER TO YOU DATED

15   OCTOBER 15TH, 2013. DO YOU SEE THAT?

16   **A.** YES, I DO.

17          **MR. SNOW:** YOUR HONOR, I WOULD LIKE TO OFFER

18   EXHIBIT 1128 INTO EVIDENCE.

19          **MR. HUMMEL:** NO OBJECTION, YOUR HONOR.

20          **THE COURT:** IT'S ADMITTED.

21          (TRIAL EXHIBIT 1128 RECEIVED IN EVIDENCE)

22   **BY MR. SNOW:**

23   **Q.** SO DO YOU RECALL THIS USABILITY TEST?

24   **A.** YES. THIS EMAIL HAS A SERIES OF DOCUMENTS IN IT, AND

25   THERE IS A FIRST ROUND OF RESEARCH FOR THE ACQUISITION FLOW

1    THAT WE USED TO TRY TO CREATE REQUIREMENTS.

2    **Q.**  AND THEN THERE WAS A SLIDE DECK WITH RESULTS FROM THE

3    USABILITY TEST AS WELL, CORRECT?

4    **A.**  CORRECT.

5    **Q.**  AND THIS STUDY, THIS USABILITY TEST WAS DONE IN

6    APPROXIMATELY MARCH OF 2013; IS THAT RIGHT?

7    **A.**  YEAH.

8        **MR. SNOW:**  I WOULD LIKE TO LOOK AT PAGE 17 OF THE

9    SLIDE DECK.

10                    (DISPLAYED ON SCREEN.)

11       SORRY, SLIDE 17 OF THE DECK, SO IT ENDS IN THE BATES

12   NUMBER 00017.

13                    (DISPLAYED ON SCREEN.)

14   **BY MR. SNOW:**

15   **Q.**  MS. POLING-HIRALDO, DIRECTING YOUR ATTENTION TO THE TOP OF

16   THIS SCREEN, DO YOU SEE WHERE IT SAYS:  NONE NOTICED THE COST

17   BREAKDOWN TAB?

18   **A.**  YES, I DO.

19   **Q.**  AND, AGAIN, TO YOUR KNOWLEDGE, DIRECTV NEVER USED THIS

20   INFORMATION TO IMPROVE OR CHANGE DISCLOSURE; ISN'T THAT RIGHT?

21   **A.**  THAT'S INCORRECT, BECAUSE WE WERE -- WE USED THE

22   INFORMATION TO HELP DEFINE THE REQUIREMENTS FOR THE NEW FLOW

23   AND HOW WE WOULD PRESENT IT.  SO IN TERMS OF DESIGN, IT HELPED

24   INFLUENCE HOW WE APPROACHED IT.

25   **Q.**  SO IS IT YOUR TESTIMONY THAT DIRECTV USED THIS INFORMATION

1   FROM THIS USABILITY TEST TO CHANGE THE DISCLOSURES ON THIS

2   WEBSITE?

3   **A.**  NO, WE DID NOT CHANGE DISCLOSURES.  WE CHANGED -- WE USED

4   IT TO INFORM DESIGN AND HOW WE APPROACHED IT.

5   **Q.**  HOW DID DIRECTV'S DESIGN CHANGE AS A RESULT OF THIS

6   INFORMATION?

7   **A.**  WE TOOK THAT INTO ACCOUNT WHEN WE WERE LOOKING INTO THE

8   NEW FLOW IN TERMS OF HOW WE PRESENTED MATERIAL.

9   **Q.**  SO YOU TOOK IT INTO ACCOUNT?

10  **A.**  YES.

11  **Q.**  HOW DID IT CHANGE?

12  **A.**  WHEN WE -- WE TOOK A LOOK AT -- INSTEAD OF MAKING IT A

13  SMALL LINK, WE TOOK A LOOK AT HOW THE LINK WAS PRESENTED.

14  **Q.**  HOW DID IT CHANGE?

15  **A.**  HOW DID IT CHANGE?  IT CHANGED TO A DIFFERENT LINK THAT

16  WAS ON THE PAGE.

17  **Q.**  AND THAT WAS BECAUSE OF THIS USABILITY TEST AND THIS

18  INFORMATION, THAT'S YOUR TESTIMONY?

19  **A.**  YES.

20  **Q.**  FURTHER DOWN IT SAYS:  FELT IT WAS DIFFICULT TO TRACK WHEN

21  PRICE INCREASES WERE HAPPENING AND WHY.

22      DO YOU SEE THAT?

23  **A.**  YES, I DO.

24  **Q.**  WAS THIS INFORMATION USED TO MODIFY THE DISCLOSURES OR THE

25  DESIGN OF THE DIRECTV WEBSITE?

1    **A.**  THE INFORMATION IN THE STUDY WAS USED TO DETERMINE THE

2    REQUIREMENTS AND TO INFORM THE DESIGN TEAM INTO CHANGES THAT

3    THEY SHOULD CONSIDER.

4    **Q.**  SO IT'S YOUR TESTIMONY THAT THIS INFORMATION WAS USED TO

5    CHANGE THE DESIGN OF THE DIRECTV WEBSITE?

6    **A.**  IT WAS USED TO INFORM.  SOME CHANGES MAY HAVE BEEN MADE.

7    THE PARTICULAR LAYOUT OF THIS GRID HAS CHANGED OVER TIME.

8    **Q.**  WERE THOSE CHANGES THE RESULTS OF USABILITY TEST FEEDBACK?

9    **A.**  THEY MAY HAVE BEEN.

10   **Q.**  BUT YOU DON'T KNOW?

11   **A.**  NO, I'M NOT THE DESIGNER.

12   **Q.**  SO YOU CAN'T SAY WHETHER OR NOT THIS FEEDBACK RESULTED IN

13   A CHANGE OR NOT?

14   **A.**  NO.

15             **MR. SNOW:**  I WOULD LIKE TO TAKE A LOOK AT

16   EXHIBIT 767.

17                     (DISPLAYED ON SCREEN.)

18   **BY MR. SNOW:**

19   **Q.**  MS. POLING-HIRALDO, THIS IS AN EMAIL FROM JASON LAU, DATED

20   JUNE 25TH, 2013.  DO YOU SEE YOU ARE ONE OF THE RECIPIENTS?

21   **A.**  YES, I DO.

22             **MR. SNOW:**  YOUR HONOR, I WOULD LIKE TO ADMIT

23   EXHIBIT 767 INTO EVIDENCE.

24             **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

25             **THE COURT:**  ADMITTED.

1                   (TRIAL EXHIBIT 767 RECEIVED IN EVIDENCE)

2      BY MR. SNOW:

3      Q.   JASON LAU WAS A MEMBER OF THE INTERNAL DIRECTV USABILITY

4      TESTING TEAM, RIGHT?

5      A.   YES, HE WAS.

6      Q.   LET'S TAKE A LOOK AT THE FIRST PAGE OF THE POWERPOINT

7      PRESENTATION THAT IS ATTACHED TO THIS EMAIL.  DO YOU SEE WHERE

8      IT SAYS IN THE SUBHEADING:  CONSUMER INSIGHTS JUNE 2013?

9      A.   YES, I DID.

10     Q.   WAS JUNE 2013 THE APPROXIMATE DATE OF THIS USABILITY TEST?

11     A.   THE TEST WOULD HAVE OCCURRED EARLIER.  THE FEEDBACK WOULD

12     HAVE BEEN DATED AS OF JUNE.  SO, YES, APPROXIMATELY THAT TIME.

13     Q.   SO MAYBE IN THE PREVIOUS MONTH?

14     A.   CORRECT.

15            MR. SNOW:  TAKE IT TO PAGE 4 OF THE SLIDES.

16                   (DISPLAYED ON SCREEN.)

17     BY MR. SNOW:

18     Q.   AT THE TOP IT SAYS:  IN JUNE OF 2013, A SERIES OF TEN

19     USABILITY INTERVIEWS WAS CONDUCTED AT DIRECTV OFFICES IN

20     NEW YORK CITY WITH NONCUSTOMERS WHO ARE CURRENTLY CONSIDERING

21     OR HAVE RECENTLY CONSIDERED SWITCHING TV PROVIDERS.

22         DO YOU SEE THAT?

23     A.   YES.

24     Q.   AND TO YOUR KNOWLEDGE, WOULD THIS USABILITY TEST HAVE BEEN

25     CONDUCTED IN A SIMILAR MANNER TO THE PREVIOUS ONE WE LOOKED AT

1    WHERE THERE WERE SEPARATE INTERVIEWS WITH EACH OF THE

2    PARTICIPANTS?

3    **A.**  YES.

4           **MR. SNOW:**  TAKE A LOOK AT PAGE 10.

5                   (DISPLAYED ON SCREEN.)

6    **BY MR. SNOW:**

7    **Q.**  DO YOU SEE THE TOP BULLET, IT SAYS:  QUESTIONS REGARDING

8    COST PROMPT ALL USERS TO SAY THEY WOULD CONTACT CUSTOMER

9    SERVICE FOR CLARIFICATION AND/OR REASSURANCE AT LEAST ONCE

10   DURING THE PURCHASE FLOW?

11   **A.**  YES, I SEE IT.

12   **Q.**  AND IT SAYS:  USERS REPORT HAVING ENCOUNTERED, QUOTE,

13   BAIT-AND-SWITCH TACTICS IN THE PAST AND RESPOND WITH A CERTAIN

14   AMOUNT OF SUSPICION AND NEGATIVITY TO WHAT THEY PERCEIVE AS

15   EXAMPLES THROUGHOUT THE ACQUISITION FLOW.

16       DO YOU SEE THAT?

17   **A.**  I DO SEE IT.

18   **Q.**  AND THEN FINALLY, THE SECOND BULLET SAYS:  EXAMPLES

19   INCLUDE THE FINE PRINT STATING THAT THE DISCOUNT PACKAGE PRICE

20   IS GOOD FOR 12 MONTHS BUT THAT NEW CUSTOMERS MUST SIGN A

21   24-MONTH AGREEMENT AS WELL AS HIDDEN MONTHLY RECEIVER FEES.

22       DO YOU SEE THAT?

23   **A.**  YES, I SEE THAT.

24   **Q.**  AND DIRECTV NEVER USED THIS INFORMATION TO CHANGE OR

25   IMPROVE ITS DISCLOSURES; ISN'T THAT RIGHT?

1    **A.**  WE USED THE DISCLOSURES THAT WERE PROVIDED TO US FROM

2    LEGAL, AND PEOPLE COULD OBVIOUSLY SEE THE FINE PRINT AS IS

3    STATED THERE.

4    **Q.**  MS. POLING-HIRALDO, YOU TESTIFIED AT YOUR DEPOSITION THAT

5    DIRECTV NEVER CHANGED OR IMPROVED DISCLOSURES BASED ON

6    USABILITY TESTING INFORMATION, DIDN'T YOU?

7    **A.**  YES.

8    **Q.**  AND NOW YOU ARE SAYING THAT THIS INFORMATION MIGHT HAVE

9    BEEN USED TO CHANGE OR IMPROVE DISCLOSURES?

10   **A.**  I DIDN'T SAY THAT.  I SAID THAT IT'S OBVIOUS FROM THIS

11   THAT PEOPLE COULD SEE THE DISCLOSURES.  THE LANGUAGE OF THE

12   DISCLOSURE WAS NOT UP TO US TO CHANGE.  THE LANGUAGE OF THE

13   DISCLOSURE CAME FROM LEGAL.  SO IF IMPROVING DISCLOSURE MEANS

14   THE LANGUAGE, NO, WE HAD NO CONTROL OVER THAT.  THE VISIBILITY

15   IS APPARENT HERE BECAUSE PEOPLE COULD SEE THE, QUOTE, "FINE

16   PRINT", UNQUOTE.

17          **MR. SNOW:**  I WOULD LIKE TO PLAY A CLIP FROM

18   MS. POLING-HIRALDO'S DEPOSITION, PAGE 193, LINES 8 THROUGH 12.

19              (DEPOSITION VIDEO PLAYED AS FOLLOWS:)

20          "QUESTION:  DID SUCH INFORMATION EVER -- WAS SUCH

21          INFORMATION BASED ON USABILITY TESTING EVER USED BY

22          DIRECTV, TO YOUR KNOWLEDGE, TO IMPROVE OR CHANGE

23          DISCLOSURES?

24          "ANSWER:  NO."

25          **MR. SNOW:**  COMING BACK TO PAGE 10 OF EXHIBIT 770 I

```
 1    BELIEVE -- 767, EXCUSE ME.
 2                        (DISPLAYED ON SCREEN.)
 3        GO TO PAGE 10 OF THE SLIDES, THE NUMBERED PAGE 10.  THANK
 4    YOU.
 5                        (DISPLAYED ON SCREEN.)
 6    BY MR. SNOW:
 7    Q.  SEE THE SECOND BULLET DOWN -- FIRST OF ALL, PAGE 10 IS
 8    TITLED RECOMMENDATIONS.  DO YOU SEE THAT?
 9    A.  I DO.
10    Q.  AND IN THE SECOND BULLET DOWN IT SAYS:  ON THE PACKAGING
11    SCREEN?
12        RIGHT?  IS THAT CORRECT?
13    A.  YES.  I AM SORRY.  YES.
14    Q.  AND THEN ON THE FOURTH BULLET UNDER THAT IT SAYS:
15    SIMILARLY, THE REGULAR PRICE OF THESE CHANNELS OR A LINK TO
16    THIS INFORMATION SHOULD BE INCLUDED.
17        DO YOU SEE THAT?
18    A.  YES.
19    Q.  AND YOU DON'T KNOW WHETHER THIS REFERENCE TO "THESE
20    CHANNELS" REFERRED TO THE PREVIOUS BULLET MENTIONING HBO AND
21    SHOWTIME, THAT IS THE PREMIUM CHANNELS, OR WHETHER IT REFERRED
22    TO THE PACKAGE PRICE; IS THAT RIGHT?
23    A.  CORRECT.
24            MR. SNOW:  LET'S GO TO NUMBERED PAGE 11 OF THIS SLIDE
25    DECK.
```

1          (DISPLAYED ON SCREEN.)

2    **BY MR. SNOW:**

3    **Q.**  DO YOU SEE THE IN CART, THIRD BULLET DOWN?

4    **A.**  YES.

5    **Q.**  AND THEN UNDER THAT THE BULLET SAYS:

6          CONSIDERATION SHOULD BE GIVEN TO RELOCATING THE 24-MONTH

7    COST LINK TOWARDS THE TOP OF THE SCREEN.

8          DO YOU SEE THAT?

9    **A.**  YES, I DO.

10   **Q.**  AND YOU DON'T REMEMBER WHETHER ANY CONSIDERATION WAS GIVEN

11   TO FOLLOWING THIS RECOMMENDATION, DO YOU?

12   **A.**  NO.

13   **Q.**  ON PAGE 17, NUMBERED PAGE 17 OF THIS DECK.

14          (DISPLAYED ON SCREEN.)

15          THE BOX AT THE BOTTOM OF THE SCREEN IT STATES:  SOME

16   REPORT THAT THE TEXT IN THE CENTER COLUMN IS DIFFICULT TO READ

17   DUE TO ITS SMALL SIZE AND THE COLOR SCHEME OF THE GRAY FONT

18   AGAINST A GRAY BACKGROUND.

19          DO YOU SEE THAT?

20   **A.**  I DO.

21   **Q.**  AND TO YOUR KNOWLEDGE, THAT -- TO BE CLEAR, THERE'S AN

22   ARROW ON SLIDE 17 POINTING TO SOME TEXT, AND DO YOU RECALL

23   THAT THAT TEXT READS, LEARN MORE?

24   **A.**  YES, IT DOES.

25   **Q.**  AND THE LEARN MORE TEXT WAS, IN FACT, MODIFIED IN THE

1    ULTIMATE VERSION OF THE DIRECTV WEBSITE, CORRECT?

2    **A.**   THERE WERE VARIOUS FONTS AND BACKGROUND CHANGES MADE.

3    **Q.**   AND, TO YOUR KNOWLEDGE, THAT TEXT WAS CHANGED FROM THE

4    CURRENT COLOR TO WHITE, RIGHT?

5    **A.**   NO, I DON'T RECALL.

6    **Q.**   AND THAT CHANGED, THOUGH --

7    **A.**   THE --

8    **Q.**   PLEASE FINISH YOUR ANSWER.  GO AHEAD.

9    **A.**   I AM SORRY.

10       THE BACKGROUND COLOR WAS GRAY FOR THE MAIN BLOCK OF TEXT

11   AND THAT WAS CHANGED TO WHITE.

12   **Q.**   SO THE BACKGROUND WAS CHANGED TO WHITE AND THE TEXT WAS

13   LEFT THE SAME?

14   **A.**   YES.

15   **Q.**   BUT THAT CHANGE WAS NOT A RESULT OF THE INFORMATION FROM

16   THIS USABILITY TEST, WAS IT?

17   **A.**   THERE WERE SOME DESIGN CHANGES THAT WERE MADE FOR -- TO

18   IMPROVE CLARITY.  THE USABILITY TEST WAS DIRECTIONAL TO HELP

19   PROVIDE THAT INFORMATION, BUT THE DECISION MAY NOT -- I DON'T

20   KNOW HOW THE DECISION WAS MADE.

21   **Q.**   ON NUMBERED PAGE 20 OF THIS SLIDE DECK.

22                       (DISPLAYED ON SCREEN.)

23       ON THE LEFT IT SAYS:

24       RESPONDENTS NOTE THAT THE PREMIUM CHANNELS ARE FREE FOR

25   THREE MONTHS BUT WANT TO SEE WHAT THE PRICE WOULD BE AFTER

1    THIS PERIOD.

2         DO YOU SEE THAT?

3    **A.**  YES, I DO.

4    **Q.**  AND THERE ON THE LEFT SIDE IT SAYS:  USERS NOTICE --

5    EXCUSE ME.  FOCUSING ON THAT DISCLOSURE ON THE LEFT?

6    **A.**  UH-HUH.

7    **Q.**  TO YOUR KNOWLEDGE, THERE WAS NO CHANGE IN THE DISCLOSURES

8    TO IMPROVE THEM AS A RESULT OF THAT INFORMATION FROM THE

9    USABILITY TEST, CORRECT?

10   **A.**  CORRECT.  THE PRICE APPEARS IN THE CART.

11   **Q.**  BUT THERE WAS NO CHANGE AS A RESULT OF THE FEEDBACK TO

12   THIS USABILITY TEST?

13   **A.**  NO.

14   **Q.**  IT'S CORRECT THAT THERE WAS NO CHANGE?

15   **A.**  IT IS CORRECT THAT THERE IS NO CHANGE.  THE PRICE APPEARS

16   IN THE CART AND IN THE INFORMATION.

17   **Q.**  ON PAGE 23 OF THIS SLIDE DECK.

18                    (DISPLAYED ON SCREEN.)

19        THERE'S A BOX, AGAIN, ON THE LEFT IT SAYS:

20        USERS NOTICE THE PREMIUM CHANNELS HAVE BEEN AUTOMATICALLY

21   ADDED TO THEIR CART AND, AGAIN, STATE THEY WOULD LIKE TO SEE

22   HOW MUCH THESE CHANNELS WILL COST AFTER THE FIRST THREE

23   MONTHS.

24        DO YOU SEE THAT?

25   **A.**  YES, I DO.

1   **Q.**  AGAIN, NO CHANGE AS A RESULT OF THAT FEEDBACK?

2   **A.**  NOT DURING THIS ITERATION.

3   **Q.**  DID YOU SAY NOT DURING THIS ITERATION?

4   **A.**  YES.

5   **Q.**  THANK YOU.

6        ON PAGE 30 OF THE SLIDE DECK.

7                    (DISPLAYED ON SCREEN.)

8        ON THE RIGHT SIDE THERE'S A BOX THAT SAYS:

9        RESPONDENTS UNDERSTAND WHAT IS MEANT BY FIRST MONTH TOTAL

10   AND DUE AT CHECKOUT, ALTHOUGH IT RAISES QUESTIONS REGARDING

11   THE AMOUNT THAT WILL BE DUE IN THE SECOND MONTH.  SOME WHO

12   HAVE READ THE FINE PRINT ON PREVIOUS SCREENS REITERATE THAT

13   THEY DO NOT KNOW WHAT THEIR COST WILL INCREASE TO AFTER THE

14   FIRST 12 MONTHS.  SOME USERS STILL OPERATE UNDER THE MISTAKEN

15   BELIEF THAT THE DISCOUNT PRICE APPLIES TO THEIR ENTIRE

16   24-MONTH AGREEMENT.

17        DO YOU SEE THAT?

18   **A.**  YES, I DO.

19   **Q.**  AND DIRECTV NEVER USED THIS INFORMATION TO CHANGE OR

20   MODIFY ITS DISCLOSURES, DID IT?

21   **A.**  NO.

22   **Q.**  THERE WAS NO CHANGE, CORRECT?

23   **A.**  THERE WAS NO CHANGE.

24        **MR. SNOW:**  I WOULD LIKE TO GO BACK TO SLIDE 18 OF

25   EXHIBIT 767.

1                    (DISPLAYED ON SCREEN.)

2    BY MR. SNOW:

3    Q.  SO THIS IS A SCREENSHOT, AND IT'S SHRUNK, OF PART OF THE

4    PAGE WHERE USERS COULD VIEW MORE INFORMATION ABOUT INDIVIDUAL

5    PACKAGES, CORRECT?

6    A.  CORRECT.

7          MR. SNOW:  AND, MR. DUNKIN, CALL OUT THAT CENTER

8    SCREENSHOT FOR A MOMENT.

9                    (DISPLAYED ON SCREEN.)

10   BY MR. SNOW:

11   Q.  SO THIS TEXT IS NOT CLEAR, BUT I AM INTERESTED IN WHAT THE

12   THIRD BULLET DOWN SAYS.  SITTING HERE TODAY, DO YOU KNOW WHAT

13   THAT SAYS?

14   A.  IT SAYS, REG PRICE, AND IT LOOKS LIKE IT SAYS 77.95 AND

15   THEN SOMETHING, OTHER FEES MAY APPLY.  SOMETHING LIKE THAT.

16   Q.  THANK YOU.

17      ON PAGE 28, NUMBERED PAGE 28 OF THESE SLIDES.

18                    (DISPLAYED ON SCREEN.)

19      AT THE TOP IT SAYS:  THE 24 MONTHS COST IS OF GREAT

20   INTEREST TO USERS.

21      DO YOU SEE THAT?

22   A.  YES, I DO.

23   Q.  AND THEN IT SAYS:

24      THIS IS UNSURPRISING GIVEN THE LEVEL OF UNCERTAINTY

25   SURROUNDING THEIR MONTHLY BILL AFTER THE INITIAL MONTH.

1    AND THEN IT SAYS:

2    HOWEVER, THE PLACEMENT OF THIS LINK AT THE BOTTOM OF THE

3    SCREEN MEANS IT CAN GO UNNOTICED.  USERS MAINTAIN THAT IT

4    SHOULD BE DISPLAYED AT THE TOP.

5    IS THAT RIGHT?

6  **A.**  THAT IS WHAT IT SAYS.

7  **Q.**  THAT IS WHAT IT SAYS.

8    AGAIN, DIRECTV NEVER USED THIS INFORMATION TO IMPROVE OR

9    CHANGE ITS DISCLOSURES, CORRECT?

10  **A.**  WE DIDN'T MAKE CHANGES BECAUSE WHEN YOU ADDED SOMETHING TO

11   THE CART, THE VERY FIRST TIME YOU -- THE VERY FIRST TIME YOU

12   ADDED SOMETHING, THE CART DROPPED DOWN, AND YOU WOULD SEE THAT

13   LINK, IT WAS ON THE PAGE.

14  **Q.**  BUT THEN THE COMPANY RECEIVED INFORMATION THROUGH THIS

15   REPORT THAT, USERS MAINTAIN THAT THAT INFORMATION SHOULD BE AT

16   THE TOP, AND NO CHANGE WAS MADE TO DISCLOSURES AS A RESULT OF

17   THAT FEEDBACK, CORRECT?

18  **A.**  NO -- SORRY, CORRECT.

19  **Q.**  THANK YOU.

20       **MR. SNOW:**  I WOULD LIKE TO BRING UP TRIAL

21   EXHIBIT 1105.

22       **THE CLERK:**  1105?

23       **MR. SNOW:**  YES.

24            (DISPLAYED ON SCREEN.)

25    MR. DUNKIN, CAN YOU HIGHLIGHT THE TOP PORTION OF THIS

1    EMAIL.

2    **BY MR. SNOW:**

3    **Q.**  THIS IS AN EMAIL FROM ALEKSANDRA POLOVINA TO YOU AND A

4    WHOLE BUNCH OF OTHER PEOPLE DATED SEPTEMBER 20TH, 2011; IS

5    THAT CORRECT?

6    **A.**  YES.

7        **MR. SNOW:**  YOUR HONOR, I WOULD LIKE TO ADMIT

8    EXHIBIT 1105 INTO EVIDENCE.

9        **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

10       **THE COURT:**  1105 IS ADMITTED.

11       (TRIAL EXHIBIT 1105 RECEIVED IN EVIDENCE)

12   **BY MR. SNOW:**

13   **Q.**  AND DO YOU SEE THE SUBJECT IT SAYS:  SEPTEMBER USABILITY

14   FINDINGS?

15   **A.**  YES, I DO.

16   **Q.**  AND THEN THERE ARE TWO ATTACHMENTS, A DIRECTV PURCHASE

17   FLOW BUNDLING USABILITY POWER POINT AND A DIRECTV STREAMING

18   USABILITY FINDINGS POWER POINT?

19   **A.**  YES.

20   **Q.**  OKAY.  LET'S LOOK AT PAGE 3 OF THE EXHIBIT, WHICH IS THE

21   FIRST SLIDE OF THE DECK.

22       (DISPLAYED ON SCREEN.)

23   WOULD THESE USABILITY TESTS HAVE BEEN PERFORMED AROUND

24   SEPTEMBER 2011?

25   **A.**  YES.

1    **Q.**  DO YOU RECALL WHAT THE DEMO OR PROTOTYPE WAS THAT THE

2    PARTICIPANTS IN THIS USABILITY TEST WOULD HAVE SEEN?

3    **A.**  I DON'T.  I DO NOT RECALL.

4    **Q.**  MOVING TO PAGE 7.

5                    (DISPLAYED ON SCREEN.)

6        THIS IS THE RIGHT PAGE -- SORRY.  IT IS PAGE 5 OF THE

7    DECK, NUMBERED PAGE 5.

8        DO YOU SEE WHERE IT SAYS:

9        THE CARTS SHOULD BE STREAMLINED IN TERMS OF NUMBERS AND

10   REFERENCES.  IN ADDITION, USERS ARE VERY INTERESTED IN THE

11   MONTHLY COST OVER TIME AND SHOULD BE -- EXCUSE ME, IT SAYS,

12   MONTHLY COST OVERTIME, BUT I THINK THAT MEANS MONTHLY COST

13   OVER, SPACE, TIME -- AND SHOULD BE ABLE TO ACCESS THESE TOTALS

14   EASILY.

15       IS THAT CORRECT?

16   **A.**  YES, I SEE THAT.

17   **Q.**  THEN ON PAGE 15 THERE IS A BULLET REFERRING TO THE

18   SHOPPING CART PAGE SAYING:

19       THE 24-MONTH BREAKDOWN IS CONCEPTUALLY APPRECIATED BUT IT

20   IS TOO DETAILED AND NOT READILY NOTICED.

21       DO YOU SEE THAT?

22   **A.**  YES, I DO.

23   **Q.**  AND, AGAIN, DIRECTV NEVER USED THIS INFORMATION TO IMPROVE

24   OR CHANGE ITS DISCLOSURES; ISN'T THAT CORRECT?

25   **A.**  YES, IT'S CORRECT.

1           **MR. SNOW:**  BRING UP TRIAL EXHIBIT 768.

2                        (DISPLAYED ON SCREEN.)

3        MR. DUNKIN, CAN YOU MOVE TO THE FIRST SLIDE OF THIS SLIDE

4    DECK?

5                        (DISPLAYED ON SCREEN.)

6    **BY MR. SNOW:**

7    **Q.**  MS. POLING-HIRALDO, DO YOU RECOGNIZE THIS SLIDE DECK?

8    **A.**  YES, I DO.

9    **Q.**  WHAT IS IT?

10   **A.**  THIS IS A USABILITY FINDING STUDY THAT KELLEY WALKER, ON

11   MY TEAM, PRODUCED.

12   **Q.**  AND DO YOU SEE IN THE -- AT THE BOTTOM NEXT TO THE PAGE

13   NUMBER THERE'S A DATE, IT SAYS MARCH 19TH, 2013?

14   **A.**  YES.

15   **Q.**  SO WOULD THESE USABILITY STUDIES HAVE BEEN PERFORMED IN

16   MARCH 2013?

17   **A.**  YES, THAT'S CORRECT.

18   **Q.**  DO YOU RECALL WHAT THE PARTICIPANTS IN THE STUDY LOOKED AT

19   AS THEY WERE GOING THROUGH THE USABILITY STUDY?

20   **A.**  I BELIEVE THEY LOOKED AT COMPS.

21   **Q.**  WHAT DO YOU MEAN BY "COMPS"?

22   **A.**  OF DESIGN LAYOUTS.

23   **Q.**  WOULD THOSE HAVE BEEN STATIC SCREENSHOTS?

24   **A.**  I BELIEVE SO.

25   **Q.**  IN WHAT FORM WOULD THEY HAVE LOOKED AT THEM?

1    **A.**   THEY WOULD HAVE LOOKED AT THEM ONLINE.

2    **Q.**   WOULD THEY HAVE BEEN ABLE TO CLICK ON THE COMPS AT ALL?

3    **A.**   YES.

4            **MR. SNOW:**  I WOULD LIKE TO ADMIT EXHIBIT 768 INTO

5    EVIDENCE.

6            **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

7            **THE COURT:**  768 IS ADMITTED.

8            (TRIAL EXHIBIT 768 RECEIVED IN EVIDENCE)

9    **BY MR. SNOW:**

10   **Q.**   SO, MS. POLING-HIRALDO, IN YOUR EXPERIENCE DIRECTV VALUES

11   USABILITY STUDIES IN DESIGNING AND IMPLEMENTING ITS WEBSITE,

12   CORRECT?

13   **A.**   CORRECT.

14   **Q.**   AND DIRECTV RELIES ON THE RESULTS OF THOSE USABILITY

15   STUDIES IN REFINING ITS DESIGN AND BUILDING ITS WEBSITE,

16   DOESN'T IT?

17   **A.**   YES, IT DOES.

18   **Q.**   AND DIRECTV NEVER EVER USES USABILITY TESTING TO DETERMINE

19   WHETHER CONSUMERS UNDERSTAND THE TERMS AND CONDITIONS OF

20   PARTICULAR OFFERS, DOES IT?

21   **A.**   THAT IS CORRECT.

22   **Q.**   DIRECTV NEVER USES USABILITY STUDIES TO DETERMINE WHETHER

23   CONSUMERS UNDERSTAND?

24   **A.**   THAT IS CORRECT.

25   **Q.**   AND, IN FACT, IN YOUR VIEW, A USER'S UNDERSTANDING OF THE

1   TERMS OF THE WEBSITE IS NOT RELATED TO USABILITY AT ALL, IS

2   IT?

3   **A.**  CORRECT.

4   **Q.**  AND YOU DON'T CONSIDER IT TO BE A USABILITY PROBLEM AT ALL

5   IF A WEBSITE DOESN'T ADEQUATELY DISCLOSE IMPORTANT INFORMATION

6   TO A CONSUMER, DO YOU?

7   **A.**  I AM SORRY, RESTATE.

8   **Q.**  YOU DON'T CONSIDER IT TO BE A USABILITY PROBLEM AT ALL IF

9   A WEBSITE DOESN'T ADEQUATELY DISCLOSE IMPORTANT INFORMATION TO

10  A CONSUMER, DO YOU?

11  **A.**  THAT IS INCORRECT.

12         **MR. SNOW:**  I WOULD LIKE TO PLAY A CLIP FROM

13  MS. POLING-HIRALDO'S DEPOSITION, PAGES 196, LINES 22, THROUGH

14  197, LINE 6.

15         **MR. HUMMEL:**  YOUR HONOR, CAN I HAVE A MOMENT TO

16  REVIEW THIS TRANSCRIPT?  I DIDN'T GET THE PAGE AND LINE

17  NUMBER?

18         **THE COURT:**  YES.

19         **MR. HUMMEL:**  CAN I HAVE IT AGAIN, COUNSEL?

20         **MR. SNOW:**  196 --

21         **MR. HUMMEL:**  WHAT DEPOSITION DATE?

22         **MR. SNOW:**  IT'S THE SECOND ONE.

23         **MR. HUMMEL:**  MAY 11.  WHAT IS THE PAGE?

24         **MR. SNOW:**  THE DATE IS MAY 11, 2016.  THE PAGE NUMBER

25  AND LINE NUMBER IS 196:22 THROUGH 197:6.

1        **MR. HUMMEL:**  ONE MOMENT, YOUR HONOR, PLEASE.

2               (PAUSE IN THE PROCEEDINGS.)

3        **MR. HUMMEL:**  THROUGH WHAT LINE, COUNSEL?

4        **MR. SNOW:**  197:6.

5        **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

6        **THE COURT:**  ALL RIGHT.

7           (DEPOSITION VIDEO PLAYED AS FOLLOWS:)

8        "QUESTION:  WELL, MS. POLING-HIRALDO, YOU TESTIFIED

9        THAT A CONSUMER'S UNDERSTANDING OF THE SITE WAS NOT

10       RELATED TO USABILITY, AND MY QUESTION IS, IF A SITE

11       DOES NOT ADEQUATELY DISCLOSE IMPORTANT FACTS TO A

12       CONSUMER, WOULD YOU CONSIDER THAT A USABILITY

13       PROBLEM?

14       "ANSWER:  IT'S NOT A USABILITY PROBLEM.  I MEAN, IT'S

15       A CONTENT PROBLEM, BUT IT'S NOT A USABILITY PROBLEM.

16       I MEAN, HOW WOULD THE -- HOW WOULD THE USER EVEN KNOW

17       THAT IT WAS MISSING IF THEY DON'T KNOW, RIGHT?"

18       **MR. SNOW:**  NO FURTHER QUESTIONS.

19       **THE COURT:**  ALL RIGHT.  CROSS-EXAMINATION?

20     OH, THAT'S RIGHT, WE ARE TAKING OUT OF ORDER.

21       **MR. TILLOTSON:**  WE ARE GOING TO RESERVE HER UNTIL

22     AFTER MR. GUYARDO.

23       **THE COURT:**  THAT'S FINE.

24       **MR. EDMONDSON:**  FEDERAL TRADE COMMISSION CALLS PAUL

25     GUYARDO TO THE STAND.

```
 1              THE CLERK:  GO UP TO THE WITNESS STAND AND RAISE YOUR

 2    RIGHT HAND, PLEASE.

 3         (PAUL GUYARDO, CALLED AS A WITNESS FOR THE PLAINTIFF,

 4    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

 5              THE WITNESS:  I DO.

 6              THE CLERK:  YOU MAY BE SEATED, AND ONCE SEATED I AM

 7    GOING TO ASK THAT YOU PLEASE STATE AND SPELL YOUR FIRST AND

 8    LAST NAME FOR THE RECORD, PLEASE.

 9              THE WITNESS:  SURE.  MY NAME IS PAUL GUYARDO.

10    P-A-U-L, G-U-Y-A-R-D-O.

11              THE CLERK:  THANK YOU.

12                      DIRECT EXAMINATION

13    BY MR. EDMONDSON:

14    Q.  GOOD MORNING, MR. GUYARDO.

15    A.  GOOD MORNING.

16    Q.  WE MET ONCE BEFORE WHEN I DEPOSED YOU, I THINK IT WAS LAST

17    JUNE, A YEAR AGO LAST JUNE; IS THAT RIGHT?

18    A.  TIMES FLY.  YEAH, SURE.

19    Q.  AND I WANT TO CONFIRM THAT YOU ARE REPRESENTED HERE TODAY

20    BY DIRECTV COUNSEL?

21    A.  I AM.

22    Q.  AND YOU WERE REPRESENTED BY DIRECTV COUNSEL AT YOUR

23    DEPOSITION; IS THAT ACCURATE?

24    A.  I WAS.

25    Q.  BUT YOU'RE CURRENTLY EMPLOYED BY DISCOVERY COMMUNICATIONS?
```

GUYARDO – DIRECT / EDMONDSON

1    **A.**  I AM.

2    **Q.**  AND YOUR TITLE AT DISCOVERY COMMUNICATIONS IS WHAT?

3    **A.**  CHIEF COMMERCIAL OFFICER.

4    **Q.**  NOW, PRIOR TO WORKING FOR DISCOVERY COMMUNICATIONS, YOU

5    WERE EMPLOYED BY DIRECTV; IS THAT ACCURATE?

6    **A.**  YES, I WAS.

7    **Q.**  AND YOU WORKED AT DIRECTV FROM 2005 UNTIL AT&T ACQUIRED

8    DIRECTV IN DECEMBER OF 2015; IS THAT RIGHT?

9    **A.**  THAT'S CORRECT.

10   **Q.**  I WOULD LIKE TO WALK YOU THROUGH YOUR POSITIONS AT DIRECTV

11   FROM 2005 TO 2015 SO WE CAN GIVE THE COURT AN IDEA OF YOUR

12   RESPONSIBILITIES THERE DURING THAT TIME.  OKAY?

13   **A.**  SURE.

14   **Q.**  SO YOU STARTED AT DIRECTV AS THE CHIEF MARKETING OFFICER;

15   IS THAT RIGHT?

16   **A.**  YES, SIR.

17   **Q.**  AND WHAT WERE YOUR RESPONSIBILITIES IN THAT FIRST

18   POSITION?

19   **A.**  I OVERSAW ALL OF THE MARKETING FOR DIRECTV.

20   **Q.**  AND AFTER 13 MONTHS IN THAT POSITION YOU WERE GIVEN A

21   PROMOTION?

22   **A.**  YES, SIR.

23   **Q.**  AND WHAT WERE YOU PROMOTED TO?

24   **A.**  I OVERSAW ALL SALES AND MARKETING, I BECAME THE CHIEF

25   SALES AND MARKETING OFFICER.

GUYARDO – DIRECT / EDMONDSON

1    **Q.**  AND IN 2012 YOU WERE PROMOTED AGAIN, WEREN'T YOU?

2    **A.**  YES, SIR.

3    **Q.**  WHAT WAS YOUR TITLE AS OF 2012?

4    **A.**  I HELD TWO TITLES.

5    **Q.**  WHAT WERE THOSE TITLES?

6    **A.**  CHIEF REVENUE OFFICER AND CHIEF MARKETING OFFICER.

7    **Q.**  WHAT WERE YOUR RESPONSIBILITIES AS CHIEF REVENUE OFFICER

8    AND CHIEF MARKETING OFFICER?

9    **A.**  ESSENTIALLY I OVERSAW ALL ASPECTS OF SALES REVENUE AND

10   MARKETING.

11   **Q.**  AND YOU REPORTED DIRECTLY TO THE CEO?

12   **A.**  YES, SIR.

13   **Q.**  AND THE CEO IN 2012 WAS --

14   **A.**  MIKE WHITE.

15   **Q.**  WAS MIKE WHITE.  AND MR. WHITE WAS CEO DURING WHAT TIME

16   PERIOD?

17   **A.**  I BELIEVE HE JOINED JANUARY OF 2010, AND HE WAS THERE

18   UNTIL AT&T ACQUIRED THE COMPANY.

19   **Q.**  NOW, AT YOUR DEPOSITION YOU TESTIFIED THAT YOU STRUCTURED

20   MARKETING AT DIRECTV INTO THREE AREAS, ACQUISITION MARKETING,

21   RETENTION MARKETING, AND UPGRADE MARKETING.  DO YOU RECALL?

22   **A.**  YES, SIR.

23   **Q.**  AND YOU TESTIFIED THAT ACQUISITION MARKETING WAS FOCUSED

24   ON ATTRACTING AND ACQUIRING NEW CUSTOMERS; IS THAT ACCURATE?

25   **A.**  YES.

GUYARDO – DIRECT / EDMONDSON

1   **Q.**  RETENTION MARKETING WAS FOCUSED ON IMPROVING CUSTOMER

2   LOYALTY AND MAINTAINING EXISTING CUSTOMERS?

3   **A.**  YES.

4   **Q.**  AND UPGRADE MARKETING WAS FOCUSED ON SELLING AND MARKETING

5   ADDITIONAL SERVICES TO EXISTING CUSTOMERS?

6   **A.**   THAT'S CORRECT.

7   **Q.**  ADVERTISING FELL UNDER ACQUISITION MARKETING, DIDN'T IT?

8   **A.**  YES, IT DID.  IT WAS A SEPARATE DEPARTMENT THAT REPORTED

9   DIRECTLY TO ME BUT I WOULD CONSIDER IT TO BE A FORM OF

10  ACQUISITION MARKETING, YES.

11  **Q.**  THANK YOU.

12      YOU HAD SEVERAL EXECUTIVES REPORTING TO YOU WITH

13  RESPONSIBILITY FOR DIFFERENT ASPECTS OF ADVERTISING AND

14  ACQUISITION MARKETING; IS THAT ACCURATE?

15  **A.**  YES.

16  **Q.**  ONE OF THOSE EXECUTIVES WAS BRAD BENTLEY?

17  **A.**  YES.

18  **Q.**  MR. BENTLEY ALREADY TESTIFIED HERE.

19      MR. BENTLEY WAS RESPONSIBLE FOR DIRECT MARKETING FOR AT

20  LEAST PART OF YOUR TENURE AT DIRECTV?

21  **A.**  THAT'S RIGHT.

22  **Q.**  WHAT ELSE WAS MR. BENTLEY RESPONSIBLE FOR?

23  **A.**  HE HAD SEVERAL ROLES THROUGHOUT THE TEN YEARS THAT HE AND

24  I WORKED TOGETHER.

25  **Q.**  OKAY.  ANOTHER DIRECT REPORT WAS MR. GIESELMAN, WHO WILL

1    TESTIFY LATER IN THIS TRIAL.  WHAT WAS MR. GIESELMAN

2    RESPONSIBLE FOR?

3    **A.**  HE WAS PRIMARILY RESPONSIBLE FOR ALL OF THE NATIONAL

4    ADVERTISING CAMPAIGNS, BOTH THE CREATIVE AND THE MEDIA

5    PLANNING AND VOLUME.

6    **Q.**  KAREN LEEVER ALSO REPORTED TO YOU, DIDN'T SHE?

7    **A.**  YES, SHE DID.

8    **Q.**  WHAT WERE MS. LEEVER'S RESPONSIBILITIES?

9    **A.**  SHE OVERSAW ALL OF DIRECTV.COM AND THE DIGITAL MARKETING

10   ASPECTS, BOTH FOR ACQUISITION AND RETENTION AND FOR UPGRADE.

11   **Q.**  MS. LEEVER WILL TESTIFY LATER IN THIS TRIAL.

12       AND SHANNON CAMPAIN ALSO REPORTED TO YOU; IS THAT

13   ACCURATE?

14   **A.**  YES, SHE DID.

15   **Q.**  WHAT WAS MS. CAMPAIN RESPONSIBLE FOR?

16   **A.**  SHE WAS PRIMARILY RESPONSIBLE FOR OVERSEEING RETENTION

17   MARKETING, AND SHE ALSO OVERSAW OUR SALES CENTERS.

18   **Q.**  OKAY.  SHE DIDN'T HAVE ANY RESPONSIBILITY FOR ADVERTISING,

19   DID SHE?

20   **A.**  NOT -- NO.

21   **Q.**  NOW, YOU ARE FAMILIAR WITH THE FTC'S LAWSUIT AGAINST

22   DIRECTV; IS THAT CORRECT?

23   **A.**  YES, I AM.

24   **Q.**  YOU UNDERSTAND THE FTC HAS ALLEGED THAT DIRECTV HAS MISLED

25   CONSUMERS BY NOT CLEARLY AND CONSPICUOUSLY DISCLOSING THE

```
1    TOTAL COST OF ITS DIRECT-TO-HOME DIGITAL TELEVISION SERVICE IN

2    ITS ADVERTISING, CORRECT?

3    A.  YES, I UNDERSTAND THAT ALLEGATION.

4    Q.  AND LOOKING ONLY AT DIRECTV'S INTERNET SALES, YOU

5    UNDERSTAND THAT THE FTC HAS ALSO ALLEGED THAT DIRECTV FAILED

6    TO OBTAIN CONSUMER'S EXPRESS INFORMED CONSENT TO BE BILLED FOR

7    PREMIUM CHANNELS THAT ROLL FROM A FREE TRIAL TO PAY?

8    A.  REPEAT THAT ONE MORE TIME, PLEASE.

9    Q.  WITH RESPECT TO THE INTERNET SALES, THE FTC HAS ALSO

10   ALLEGED THAT DIRECTV FAILED TO OBTAIN CONSUMER'S EXPRESS

11   INFORMED CONSENT TO BE BILLED FOR PREMIUM CHANNELS AT THE

12   CONCLUSION OF THE THREE-MONTH PREMIUM -- FREE TRIAL PERIOD?

13   A.  YES, SIR, I UNDERSTAND THAT ALLEGATION.

14   Q.  SO I'M GOING TO BE ASKING YOU QUESTIONS TODAY ABOUT

15   DIRECTV'S ADVERTISING AND MARKETING AS IT RELATES TO THE FTC'S

16   ALLEGATIONS.  FIRST I WOULD LIKE TO DISCUSS YOUR WORK WITH

17   DIRECTV ADVERTISEMENTS.

18   A.  OKAY.

19   Q.  YOU HAVE A BINDER OF EXHIBITS UP THERE?

20   A.  I DO.

21        MR. EDMONDSON:  OKAY.  MAY I APPROACH THE WITNESS,

22   YOUR HONOR?

23        THE COURT:  YOU MAY.

24             (BINDER HANDED TO WITNESS.)

25        MR. EDMONDSON:  THIS IS A COPY FOR THE COURT.
```

```
 1                   (BINDER HANDED TO THE COURT.)

 2            THE CLERK:  YOU GUYS GAVE ME FIVE, SIX BINDERS THIS

 3   MORNING.  I THOUGHT YOU GAVE ME EVERYTHING.

 4            THE COURT:  WHAT IS THE DIFFERENCE BETWEEN THIS AND

 5   THIS (INDICATING)?

 6            MR. EDMONDSON:  THE BINDER IN YOUR RIGHT HAND, YOUR

 7   HONOR, IS THE WITNESS BINDER FOR MR. GUYARDO.

 8            THE COURT:  I'VE GOT ONE THAT SAYS, GUYARDO

 9   EXAMINATION DIRECTV AND FTC.  IS THERE SOMETHING THAT IS IN

10   THIS IN MY RIGHT HAND THAT IS NOT IN THIS IN MY LEFT HAND?

11            MR. EDMONDSON:  I AM NOT SURE.  I THINK THE BINDER IN

12   YOUR LEFT HAND, YOUR HONOR, IS DEFENDANTS' BINDER.

13            MR. HUMMEL:  CORRECT.  AND IT HAS ALL OF THE EXHIBITS

14   IN THERE.

15            THE COURT:  SO I CAN USE THIS AS THE OMNIBUS?

16            MR. HUMMEL:  YES.

17            THE COURT:  ALL RIGHT.

18            MR. EDMONDSON:  I WOULD LIKE TO PULL UP TRIAL

19   EXHIBIT 103, PLEASE.

20                   (DISPLAYED ON SCREEN.)

21            THE WITNESS:  IS IT IN THE BINDER, TOO?

22   BY MR. EDMONDSON:

23   Q.  IT IS.  I DON'T KNOW IF IT IS MARKED --

24   A.  IT IS HARD TO READ IT ON THE SCREEN.  I AM SORRY.

25   Q.  IF YOU HAVE DIFFICULTY LOCATING THE EXHIBIT, LET ME KNOW,
```

```
 1    AND WE WILL PROVIDE ASSISTANCE.
 2                    (PAUSE IN THE PROCEEDINGS.)
 3            THE WITNESS:  THANK YOU.  GOT IT.
 4    BY MR. EDMONDSON:
 5    Q.  NOW, EXHIBIT 103 IS A PRINT ADVERTISEMENT; IS THAT
 6    ACCURATE?
 7    A.  IT IS.
 8    Q.  AND THE YEAR THE PRINT ADVERTISEMENT WAS CIRCULATED WAS
 9    2009.  CAN YOU SEE THAT?
10    A.  I CAN.
11    Q.  AND IS IT FAIR TO SAY THE PURPOSE OF THIS ADVERTISEMENT
12    WAS TO HELP DIRECTV ACQUIRE NEW CUSTOMERS?
13    A.  YES, IT WAS.
14    Q.  WOULD YOU DESCRIBE FOR THE COURT HOW -- WHERE THIS
15    ADVERTISEMENT MIGHT TYPICALLY APPEAR.
16    A.  THIS PARTICULAR AD MIGHT HAVE APPEARED IN A SUNDAY
17    CIRCULAR IN A NEWSPAPER.  THAT'S PROBABLY WHAT IT WAS.
18    Q.  NOW, AS WE LOOK AT THE ADVERTISEMENT, WE CAN SEE IN THE
19    UPPER RIGHT-HAND CORNER SURROUNDED BY A RED BOX THE PRICE OF
20    29.99 A MONTH FOR 12 MONTHS.  DO YOU SEE THAT?
21    A.  I DO.
22    Q.  NOW, WOULD YOU CONSIDER THAT PRICE TO BE A PROMOTIONAL
23    PRICE?
24    A.  THE 29.99?
25    Q.  YES.
```

1    **A.**  YES, THAT WOULD BE AN INTRODUCTORY PRICE FOR 12 MONTHS.

2    **Q.**  PROMOTIONAL PRICE, INTRODUCTORY PRICE, ARE THOSE TERMS

3    SYNONYMOUS?

4    **A.**  ABSOLUTELY.

5    **Q.**  IS IT FAIR TO SAY THAT INTRODUCTORY PRICES OR PROMOTIONAL

6    PRICES APPEARED IN MOST DIRECTV PRINT ADVERTISEMENTS DURING

7    YOUR TENURE?

8    **A.**  YES.

9    **Q.**  THERE'S ANOTHER TERM I WOULD LIKE TO DEFINE FOR THE COURT

10   AND THAT IS CALL TO ACTION.  WHAT IS A CALL TO ACTION?

11   **A.**  GET THE CUSTOMER TO CALL 1800 DIRECTV OR WHATEVER PHONE

12   NUMBER OR TO GO ONLINE.

13   **Q.**  SO --

14   **A.**  THAT'S A TERM OF ART.

15   **Q.**  THAT'S A TERM OF ART.

16      WOULD YOU DEFINE -- COULD YOU IDENTIFY A CALL TO ACTION IN

17   THIS ADVERTISING?

18   **A.**  YES, SIR.

19   **Q.**  AND COULD YOU POINT OUT TO THE COURT WHAT PHRASE OR

20   PHRASES YOU CONSIDER TO BE CALL TO ACTIONS ON EXHIBIT 103.

21   **A.**  PROMOTE THE TELEVISION MONITOR, ACT NOW AND TAKE ADVANTAGE

22   OF THESE GREAT OFFERS.  ACT NOW.

23   **Q.**  ACT NOW IS THE CALL TO ACTION?

24   **A.**  YES, SIR.

25   **Q.**  IS THE PHRASE "LOCK IN YOUR LOW PRICE FOR A YEAR" A CALL

```
1    TO ACTION?
2    A.   IT COULD BE.  I WOULD DIRECT YOU TO THE -- THE ACT NOW IS,
3    I THINK, CLEARLY A CALL TO ACTION.  BUT, YES, "LOCK IN YOUR
4    LOW PRICE" COULD BE A CALL TO ACTION AS WELL.
5             MR. EDMONDSON:  I WOULD LIKE TO TURN NOW TO
6    EXHIBIT 238.
7                    (DISPLAYED ON SCREEN.)
8    BY MR. EDMONDSON:
9    Q.   YOU CAN SEE IN THE UPPER RIGHT-HAND CORNER OF THIS
10   ADVERTISEMENT THERE'S A RED BUBBLE WITH THE WORDS "ACT NOW,
11   24.99 A MONTH."
12        "ACT NOW," IS THAT THE CALL TO ACTION IN THIS
13   ADVERTISEMENT?
14   A.   YES, IT IS.
15   Q.   AND 24.99 A MONTH IS PROMOTIONAL -- IS THE PROMOTIONAL
16   PRICE; IS THAT ACCURATE?
17   A.   YES, IT IS.
18   Q.   NOW, THIS -- THIS IS A PRINT AD FROM 2013.  WHERE WOULD
19   THIS TYPE OF ADVERTISEMENT TYPICALLY BE DISSEMINATED TO
20   CONSUMERS?
21   A.   I DON'T KNOW EXACTLY.  BUT IF I HAD TO GUESS, AGAIN, IT
22   LOOKS LIKE IT COULD BE IN A SUNDAY CIRCULAR, OR IT COULD BE IN
23   SOME TYPE OF WHAT WE WOULD CALL A SHARED MAIL PIECE WHERE IT
24   IS INCLUDED WITH OTHER PROMOTIONAL OFFERS FROM OTHER
25   COMPANIES.
```

GUYARDO – DIRECT / EDMONDSON

```
1    Q.   WOULD THAT BE A PIECE LIKE CLIPPER MAGAZINE?

2    A.   YES.

3    Q.   SO IF YOU WOULDN'T MIND TAKING A LOOK IN THE BINDER WITH

4    SEVERAL ADVERTISEMENTS IN PLASTIC SLEEVES, IT SHOULD BE RIGHT

5    UP THERE WITH YOU.

6    A.   GOT IT.

7    Q.   THERE'S AN ADVERTISEMENT.  IT'S ACTUALLY A CLIPPER

8    MAGAZINE AT EXHIBIT 2013.

9    A.   YES, I HAVE IT.

10   Q.   IF YOU GO TO THE MIDDLE OF THIS CLIPPER MAGAZINE, YOU CAN

11   SEE A DIRECTV AD?

12                      (DISPLAYED ON SCREEN.)

13   A.   I SEE IT, SIR.

14   Q.   IS THIS AN EXAMPLE OF SHARED ADVERTISEMENT?

15   A.   SURE.

16        MR. EDMONDSON:  I WOULD LIKE TO GO BACK TO LOOKING AT

17   EXHIBIT 238.

18                      (DISPLAYED ON SCREEN.)

19        THE COURT:  ARE WE ENTERING 2013 INTO EVIDENCE?

20        MR. EDMONDSON:  YES, YOUR HONOR, BY STIPULATION.

21   THANK YOU.

22        THE CLERK:  2013 HAS PREVIOUSLY BEEN ADMITTED.

23        MR. EDMONDSON:  I WOULD LIKE TO ALSO AT THIS TIME

24   OFFER EXHIBIT 103 INTO EVIDENCE.  I THINK IT WAS THE FIRST

25   EXHIBIT WE LOOKED AT.  I FAILED TO MOVE IT IN, YOUR HONOR.
```

GUYARDO – DIRECT / EDMONDSON

```
 1            MR. HUMMEL:  NO OBJECTION.

 2            THE COURT:  103 IS ADMITTED.

 3            (TRIAL EXHIBIT 103 RECEIVED IN EVIDENCE)

 4            MR. EDMONDSON:  THIS WHOLE PREADMISSION ROUTINE HAS

 5    ME CONFUSED.  I APOLOGIZE, YOUR HONOR.

 6            THE WITNESS:  CAN I JUST ASK YOU WHICH ONE WAS 103?

 7            MR. EDMONDSON:  I AM SORRY.  103 WAS THE FIRST

 8    ADVERTISEMENT THAT WE LOOKED AT, BUT WE AREN'T GOING TO LOOK

 9    AT IT ANYMORE.

10            THE WITNESS:  I AM SORRY.

11    BY MR. EDMONDSON:

12    Q.  WE ARE NOW LOOKING AT EXHIBIT 238.

13    A.  GOT IT.

14    Q.  WHICH IS CURRENTLY ON THE SCREEN.

15                     (DISPLAYED ON SCREEN.)

16        I WANTED TO ASK YOU A COUPLE OF QUESTIONS ABOUT IT.  IF

17    YOU LOOK JUST BELOW THE RED BUBBLE WITH THE PROMOTIONAL PRICE

18    OF 24.99, YOU SEE THE PRICE 29.99 A MONTH FOR 12 MONTHS

19    SLASHED THROUGH.  NOW, IS THAT A -- IS THAT THE REGULAR PRICE

20    FOR THIS PACKAGE?

21    A.  NO, IT ISN'T.

22    Q.  AND THE PACKAGE BEING ADVERTISED IS THE ENTERTAINMENT

23    PACKAGE; IS THAT ACCURATE?

24    A.  YES.

25    Q.  SO WHAT PRICE HAS BEEN SLASHED THROUGH IN THIS AD?
```

1    **A.**  IT WAS THE PREVIOUS PROMOTIONAL PRICE.  WE MADE THE DEAL

2    BETTER.

3    **Q.**  OKAY.  NOW, WHEN WE LOOK BACK AT EXHIBIT 103 --

4    **A.**  YOU SAID WE WEREN'T GOING TO GO THERE.  I AM SORRY.

5    **Q.**  I AM CONTRADICTING MYSELF.  WE ARE GOING TO GO BACK TO

6    103.

7    **A.**  ALL RIGHT.

8    **Q.**  YOU CAN SEE --

9    **A.**  CAN I JUST SEE IT IN PRINT?  I DON'T MEAN TO BE DIFFICULT

10   I AM SORRY.

11   **Q.**  THAT'S FINE.  IF YOU CALL OUT THE PROMOTIONAL PRICE --

12   **A.**  GOT IT.

13   **Q.**  AND RIGHT NEXT TO THE PROMOTIONAL PRICE WE SEE A PRICE OF

14   52.99 SLASHED THROUGH?

15   **A.**  YES.

16   **Q.**  NOW, THE 52.99 THAT IS SLASHED THROUGH IS THE REGULAR

17   PRICE FOR THE CHOICE PACKAGE THAT IS BEING ADVERTISED HERE; IS

18   THAT ACCURATE?

19   **A.**  YES, THAT'S CORRECT.

20   **Q.**  BUT FOUR YEARS LATER IN 2013, THE COMPANY IS ADVERTISING A

21   PROMOTIONAL PRICE WITH A SLASH THROUGH IT.  DO YOU SEE THAT?

22   **A.**  YES.

23   **Q.**  ISN'T IT REASONABLE TO ASSUME THAT A PROSPECTIVE CUSTOMER

24   WOULD LOOK AT THE SLASHED OUT PROMOTIONAL PRICE AND ASSUME

25   THAT THAT IS THE REGULAR PRICE?

1    **A.**  NO, IT'S NOT REASONABLE.

2    **Q.**  WHY NOT?

3    **A.**  WELL, IT CLEARLY STATES IN BOLD BLACK PRINT UNDERNEATH,

4    "FOR 12 MONTHS."

5    **Q.**  BUT YOU CAN SEE THAT THE "FOR 12 MONTHS" IS RIGHT NEXT TO

6    THE SLASH.  DON'T YOU BELIEVE THAT CONSUMERS WOULD SEE THAT

7    AND ASSUME THAT THE "FOR 12 MONTHS" WAS ALSO SLASHED OUT?

8    **A.**  NO, I DON'T.

9    **Q.**  AND WHY NOT?

10   **A.**  WELL, I BELIEVE YOUR QUESTION TO ME WAS WOULD CONSUMERS

11   THINK THAT THAT IS THE REGULAR PRICE, AND I ANSWERED NO.

12   **Q.**  WHERE IS THE REGULAR PRICE DISCLOSED ON EXHIBIT 238?

13   **A.**  I WOULD BELIEVE THAT IT IS PART OF THE COPY BLOCK AT THE

14   BOTTOM.  IT'S IN THE FIRST PARAGRAPH OF THE COPY BLOCK AT THE

15   BOTTOM.

16        **MR. EDMONDSON:**  CAN WE CALL THAT OUT.

17            (DISPLAYED ON SCREEN.)

18   **BY MR. EDMONDSON:**

19   **Q.**  SO IN ORDER FOR A CONSUMER TO LEARN WHAT THE REGULAR PRICE

20   IS FOR THE PRODUCT, THE ENTERTAINMENT PACKAGE THAT IS BEING

21   PROMOTED AT 24.99 A MONTH, THEY WOULD HAVE TO LOOK DOWN IN THE

22   COPY BLOCK TO FIND THAT?

23   **A.**  THIS WOULD BE ONE OF THE MANY PLACES WHERE THEY WOULD FIND

24   OUT WHAT THE REGULAR PRICE IS.

25        **MR. EDMONDSON:**  OKAY.  IF WE CAN PULL BACK TO THE

1   FULL AD AGAIN.

2                      (DISPLAYED ON SCREEN.)

3   **BY MR. EDMONDSON:**

4   **Q.**  WE SEE IN THE MIDDLE OF THIS ADVERTISEMENT IS THE OFFER OF

5   FREE FOR THREE MONTHS HBO, STARZ, SHOWTIME, AND CINEMAX.

6       DO YOU SEE THAT?

7   **A.**  I DO.

8   **Q.**  AND IN THIS LITIGATION WE ARE REFERRING TO THAT OFFER AS

9   THE FREE PREMIUM CHANNEL OFFER.

10      DO YOU UNDERSTAND?

11  **A.**  YES, I DO.

12  **Q.**  IS THE REGULAR PRICE FOR THOSE PREMIUM CHANNELS DISCLOSED

13  ANYWHERE ON THIS ADVERTISEMENT?

14  **A.**  I DON'T KNOW FOR SURE BUT IF IT IS, IT WOULD BE AGAIN IN

15  THE COPY BLOCK AT THE BOTTOM OF THE AD.

16                   (PAUSE IN THE PROCEEDINGS.)

17  **Q.**  I WANT TO GO BACK TO DISCUSSING YOUR WORK AS CHIEF

18  MARKETING OFFICER FOR DIRECTV.  YOUR PERFORMANCE WAS EVALUATED

19  BASED ON, AMONG OTHER THINGS, CUSTOMER ACQUISITION; ISN'T THAT

20  CORRECT?

21  **A.**  YES, SIR.

22  **Q.**  AND YOU WERE VERY GOOD AT ACQUIRING NEW CUSTOMERS, WEREN'T

23  YOU?

24  **A.**  THANK YOU.

25  **Q.**  DURING YOUR TENURE AT DIRECTV THE COMPANY'S ANNUAL REVENUE

GUYARDO – DIRECT / EDMONDSON

1    FROM ITS SUBSCRIPTIONS INCREASED FROM 12.2 BILLION TO

2    26 BILLION; IS THAT CORRECT?

3    **A.**  YES.

4    **Q.**  AND YOU WERE RESPONSIBLE FOR DRIVING THAT ANNUAL REVENUE

5    INCREASE, RIGHT?

6    **A.**  YES, I WAS.

7    **Q.**  AND ONE OF THE WAYS YOU INCREASE DIRECTV'S REVENUE IS BY

8    GROWING ITS SUBSCRIBER BASE; IS THAT CORRECT?

9    **A.**  YES, SIR.

10   **Q.**  IN OTHER WORDS, BRINGING ON NEW CUSTOMERS?

11   **A.**  GROWING A SUBSCRIBER BASE IS MUCH MORE THAN BRINGING ON

12   NEW CUSTOMERS.

13   **Q.**  WELL, YOU DID SUCCEED IN BRINGING ON NEW CUSTOMERS BECAUSE

14   DIRECTV'S SUBSCRIBER BASE INCREASED FROM 15 TO 20 MILLION

15   SUBSCRIBERS DURING YOUR TENURE; ISN'T THAT CORRECT?

16   **A.**  THAT IS CORRECT, BUT GROWING NEW SUBSCRIBERS IS A

17   COMBINATION OF ACQUISITION AND RETENTION.

18   **Q.**  OKAY.  WE DISCUSSED EARLIER YOU HAD SEVERAL DIRECT REPORTS

19   JUST IN THE ADVERTISING AND MARKETING REALM.  AND YOU HAD MANY

20   OTHER DIRECT REPORTS FOR YOUR OTHER AREAS OF RESPONSIBILITY;

21   IS THAT CORRECT?

22   **A.**  YES, SIR.

23   **Q.**  ISN'T IT FAIR TO SAY YOU WERE A HANDS-ON MANAGER?

24   **A.**  SURE.

25   **Q.**  I WOULD LIKE YOU TO TURN TO TRIAL EXHIBIT 983, PLEASE.

GUYARDO – DIRECT / EDMONDSON

1    **A.**  IS THAT IN A BINDER, SIR?

2    **Q.**  YES, THAT'S IN A BINDER THAT MY COLLEAGUE HANDED YOU.

3                    (DISPLAYED ON SCREEN.)

4    **A.**  I CAN READ IT OFF THE SCREEN.  NO PROBLEM.

5    **Q.**  MR. GUYARDO, EXHIBIT 983 IS AN EMAIL FROM YOU TO EVELYN KO

6    OF DIRECTV DATED AUGUST 18, 2008, ISN'T IT?

7    **A.**  YES, SIR.

8    **Q.**  YOU WROTE THIS EMAIL, CORRECT?

9    **A.**  I DID.

10   **Q.**  DID EVELYN KO WORK IN YOUR GROUP?

11   **A.**  YES, SHE DID.

12   **Q.**  WAS SHE A DIRECT REPORT?

13   **A.**  NO, SHE WAS NOT.

14   **Q.**  DO YOU KNOW WHO SHE REPORTED TO?

15   **A.**  SHE WAS PART OF THE DIRECT SALES ORGANIZATION.  I DON'T

16   REMEMBER FOR SURE, BUT SHE MAY HAVE REPORTED TO BRAD BENTLEY

17   OR SARAH LYONS.  THEY ARE BOTH CC'D ON THE EMAIL.

18   **Q.**  IS IT FAIR TO SAY THE PURPOSE OF THIS EMAIL IS TO TELL

19   MS. KO THAT YOU HAD REVIEWED AN AD THAT YOU FOUND IN CLIPPER

20   MAGAZINE?

21   **A.**  YES, SIR.

22   **Q.**  AND YOU WERE GIVING HER FEEDBACK IN THIS EMAIL ON SOME

23   CHANGES IN DIRECTV'S AD THAT YOU WOULD LIKE TO SEE; IS THAT

24   ACCURATE?

25   **A.**  IN THE FUTURE, YES.

GUYARDO – DIRECT / EDMONDSON

```
1    Q.  LET'S FOCUS ON THE CHANGES THAT YOU REQUESTED.

2            MR. EDMONDSON:  STOP RIGHT NOW, YOUR HONOR, I FAILED

3    TO MOVE EXHIBIT 983 INTO EVIDENCE.  MAY I DO SO AT THIS TIME?

4            MR. HUMMEL:  NO OBJECTION, YOUR HONOR.

5            THE COURT:  983 IS ADMITTED.

6               (TRIAL EXHIBIT 983 RECEIVED IN EVIDENCE)

7    BY MR. EDMONDSON:

8    Q.  I WOULD LIKE TO FOCUS ON THE CHANGES THAT YOU REQUESTED

9    THAT MS. KO MAKE IN FUTURE DIRECTV ADS.  LOOKING AT THE

10   PARAGRAPH LABELED NO. 1.  DO YOU SEE THAT?

11   A.  UH-HUH.

12           MR. EDMONDSON:  IF YOU CAN EXPAND THAT ON THE SCREEN,

13   PLEASE.

14               (DISPLAYED ON SCREEN.)

15   BY MR. EDMONDSON:

16   Q.  NOW, WHEN YOU WERE WRITING THIS EMAIL, YOU WERE REFERRING

17   TO THE ADVERTISEMENT THAT APPEARS ON PAGE 3 OF THIS EXHIBIT;

18   IS THAT ACCURATE?

19   A.  COULD YOU SHOW ME THAT, PLEASE?

20           MR. EDMONDSON:  WHY DON'T WE PULL UP PAGE 3 OF

21   EXHIBIT 983, PLEASE.

22               (DISPLAYED ON SCREEN.)

23           THE WITNESS:  I REMEMBER.  THANK YOU.

24   BY MR. EDMONDSON:

25   Q.  THAT AD IS VERY SIMILAR TO THE AD WE LOOKED AT IN
```

1   EXHIBIT 2013, WHICH IS THIS CLIPPER MAGAZINE I AM HOLDING IN

2   MY HAND; IS THAT ACCURATE?

3   **A.**  IT IS SIMILAR.

4   **Q.**  GOING BACK TO YOUR EMAIL, YOU WROTE THAT:  IN EACH FREE

5   BOX, YOU HAVE TWO SMALLER BOXES THAT LOOK LIKE CIGARETTE

6   WARNING LABELS.  ONE SPEAKS TO OFFER ENDS.  THE OTHER TALKS OF

7   NEW CUSTOMERS ONLY/LEASE REQUIRED.  I DON'T LIKE OFFERS ENDS

8   10/31 BECAUSE IT IS TOO FAR OUT.

9       WHAT DO YOU MEAN BY 10/31 BEING TOO FAR OUT?

10  **A.**  THE END DATE WAS TOO FAR OUT FROM WHENEVER WE RAN THE AD.

11  **Q.**  SO THERE WAS -- BY PUTTING THE WORDS "OFFER ENDS 10/31"

12  UP, YOU -- BECAUSE 10/31 WAS A DATE SO FAR IN THE FUTURE YOU

13  WERE CONCERNED THERE WAS A LACK OF URGENCY IN THAT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  YOU THEN WROTE:  I WOULD LIKE IT IF IT WERE MORE OF A CALL

16  TO ACTION.  WHEN IT'S THIS FAR AWAY FROM THE END DATE, DON'T

17  MAKE IT SO PROMINENT.

18      WHAT DID YOU MEAN BY PROMINENT?

19  **A.**  PROBABLY RELATED TO ITS SIZE.

20          **MR. EDMONDSON:**  LET'S GO BACK TO PAGE 3, IF WE COULD.

21          **THE WITNESS:**  SIZE OR PROXIMITY.

22              (DISPLAYED ON SCREEN.)

23          **MR. EDMONDSON:**  IF WE CAN JUST CALL OUT THE THREE

24  BOXES IN THE MIDDLE.

25  **BY MR. EDMONDSON:**

GUYARDO – DIRECT / EDMONDSON

```
 1    Q.   THOSE THREE BOXES ARE THE CIGARETTE BOXES?

 2    A.   THE THREE BOXES ARE NOT THE CIGARETTE BOXES.

 3    Q.   CIGARETTE WARNING LABELS?

 4    A.   THEY ARE NOT THE CIGARETTE WARNING LABELS.

 5    Q.   WHAT ARE THEY?

 6    A.   WHAT I WAS REFERRING TO AS THE CIGARETTE WARNING LABELS

 7    WERE THE RECTANGULAR BOXES THAT SIT ABOVE THE FREE FREE, JUST

 8    THOSE PIECES.

 9              MR. EDMONDSON:  IF WE COULD CALL OUT THOSE.  THANK

10    YOU.

11              THE WITNESS:  YES.

12    BY MR. EDMONDSON:

13    Q.   I APOLOGIZE THAT WE ONLY HAVE A BLACK-AND-WHITE COPY OF

14    THIS AD BUT THAT'S THE FORM THAT IT WAS PRODUCED TO THE FTC

15    IN.

16         SIR, YOU WERE WORRIED THAT THOSE CIGARETTE WARNING LABELS

17    WERE TOO PROMINENT.  IS THAT WHAT YOU WERE EXPRESSING IN YOUR

18    EMAIL?

19    A.   YES.

20              MR. EDMONDSON:  IF WE CAN GO BACK TO PAGE 1.

21                   (DISPLAYED ON SCREEN.)

22    BY MR. EDMONDSON:

23    Q.   THE PARAGRAPH CONTINUES:  WHEN YOU'RE USING OFFER ENDS TO

24    DRIVE EXCITEMENT, THAT'S OKAY -- LET ME STEP BACK.

25         YOU WROTE:  AND I DON'T LIKE LEASE REQUIRED SO PROMINENT.
```

1   PUT ALL OF THAT IN THE LEGAL BOX AT THE BOTTOM.

2       THAT'S THE LEGAL TEXT AT THE BOTTOM OF THE PAGE?

3   **A.**  YES, SIR.

4   **Q.**  AND YOU CONTINUED:  WHEN YOU'RE USING OFFER ENDS TO DRIVE

5   EXCITEMENT, THAT'S OKAY.  I KNOW WHAT YOU'RE GOING TO SAY, AND

6   YOU KNOW WHAT I AM GOING TO SAY, SO JUST DO IT.

7   **A.**  OKAY.

8   **Q.**  IT WASN'T UNUSUAL FOR YOU TO GIVE DIRECTIONS LIKE YOU GAVE

9   TO MS. KO TO OTHER REPORTS; IS THAT ACCURATE?

10  **A.**  THAT'S ACCURATE.

11  **Q.**  EVEN IF THE EMPLOYEES WEREN'T DIRECT REPORTS; IS THAT

12  ACCURATE?

13  **A.**  YES, SIR.

14  **Q.**  AND YOU WERE RESPONSIBLE FOR ALL THE ADVERTISING THAT

15  DIRECTV DISSEMINATED DURING YOUR TENURE; IS THAT ACCURATE?

16  **A.**  ULTIMATELY I WAS.

17  **Q.**  I WOULD LIKE TO LOOK AT TRIAL EXHIBIT 2013.

18          **MR. EDMONDSON:**  I WOULD LIKE TO MOVE TRIAL

19  EXHIBIT 2013 INTO EVIDENCE, YOUR HONOR.

20          **THE CLERK:**  AS PREVIOUSLY STATED, 2013 WAS PREVIOUSLY

21  ADMITTED.

22          **THE COURT:**  YEAH, IT DOES RAISE THE POINT, I THINK WE

23  HAVE A NUMBERING PROBLEM.  2013 IS THIS AD BUT I THINK THE

24  CLIPPER MAGAZINE WE LOOKED AT WAS ALSO LABELED 2013.

25          **MR. EDMONDSON:**  I AM SORRY, YOUR HONOR.  I'LL MOVE

```
1    ON.  I AM --

2              THE CLERK:  238, YOU DIDN'T ASK THAT TO BE ADMITTED.

3    I DON'T KNOW IF YOU WANTED THAT --

4              THE COURT:  ON THE BREAK WHY DON'T YOU WORK IT OUT.

5    THE CLIPPER MAGAZINE AND THIS THING WE ARE LOOKING AT ARE BOTH

6    NUMBERED 2013.  SO WORK OUT AN ALTERNATIVE NUMBERING AND

7    FIGURE OUT IF YOU WANT THEM ADMITTED.

8              MR. HUMMEL:  WE WILL, YOUR HONOR.

9              MR. EDMONDSON:  MAY I MOVE EXHIBIT 238 INTO EVIDENCE

10   AT THIS POINT, YOUR HONOR?

11             MR. HUMMEL:  NO OBJECTION.

12             THE COURT:  IT'S ADMITTED.

13                 (TRIAL EXHIBIT 238 RECEIVED IN EVIDENCE)

14             MR. EDMONDSON:  LET'S LOOK AT EXHIBIT 984, PLEASE.

15             THE WITNESS:  ARE WE NOT -- WE ARE NOT LOOKING AT

16   2013 ANYMORE?

17             THE COURT:  LET'S DO THIS.  IT IS BREAK TIME.  WHY

18   DON'T WE BREAK UNTIL 10:10.

19             MR. EDMONDSON:  THANK YOU.

20      (RECESS TAKEN AT 9:55 A.M.; RESUMED AT 10:12 A.M.)

21             THE CLERK:  REMAIN SEATED.  COME TO ORDER.  THIS

22   COURT IS BACK IN SESSION.

23             THE COURT:  YOU MAY PROCEED.

24             MR. EDMONDSON:  THANK YOU, YOUR HONOR.

25      IF I MAY, I'VE IDENTIFIED THE SOURCE OF CONFUSION OVER
```

1    EXHIBIT 2013, AND THE PARTIES WILL SUBMIT A STIPULATION TO THE

2    COURT TO TRY TO RESOLVE THIS CONFUSION SHORTLY.

3        I'LL JUST EXPLAIN THAT RIGHT NOW THERE ARE EFFECTIVELY TWO

4    VERSIONS OF EXHIBIT 2013; ONE IS THE ELECTRONIC PRINTED

5    VERSION WHICH YOUR HONOR HAS IN HIS BINDER OF PRINT EXHIBITS,

6    AND THEN THERE IS THE -- WHAT I WILL CALL THE DEMONSTRATIVE

7    VERSION WHERE DIRECTV HAD TAKEN THIS ADVERTISEMENT

8    (INDICATING) THAT I'M DISPLAYING TO YOU AND HAD IT PRINTED OUT

9    IN A FORMAT THAT CONSUMERS WOULD HAVE -- WOULD HAVE RECEIVED

10   THE AD.

11       SO IN THE CASE OF EXHIBIT 2013, DIRECTV HAD THIS

12   ADVERTISEMENT PRINTED INTO A CLIPPER MAGAZINE.  SO WE'LL

13   SUBMIT A SCHEME FOR RENUMBERING WHERE WE HAVE A 2013 AND

14   2013A.

15           **THE COURT:**  THAT SOUNDS FINE.  WHICH IS GOING TO BE

16   2013A?

17           **MR. EDMONDSON:**  2013A WILL BE -- WOULD BE THIS

18   VERSION -- WE CAN DO THE CLIPPER VERSION, IF YOUR HONOR

19   PREFERS.

20           **THE COURT:**  WHY DON'T WE MAKE THE CLIPPER HARD-COPY

21   MAGAZINE 2013A.

22           **MR. EDMONDSON:**  OKAY.  THANK YOU, YOUR HONOR.

23       I WOULD LIKE TO TURN TO EXHIBIT 984.

24           **THE CLERK:**  I AM SORRY, JUST FOR CLARIFICATION, IS

25   2013A ALSO ADMITTED INTO EVIDENCE, YOUR HONOR?

GUYARDO – DIRECT / EDMONDSON

1     **THE COURT:**  ANY OBJECTION TO THE ADMISSION OF 2013A?

2     **MR. HUMMEL:**  NO, YOUR HONOR.

3     **THE COURT:**  IT'S ADMITTED.

4     **THE CLERK:**  THANK YOU.

5          (TRIAL EXHIBIT 2013A RECEIVED IN EVIDENCE)

6     **THE CLERK:**  I AM SORRY.

7     **MR. EDMONDSON:**  THANK YOU.

8  **BY MR. EDMONDSON:**

9  **Q.**  SO, MR. GUYARDO, EXHIBIT 984 IS IN THE BINDER OF DOCUMENTS

10  THAT MY COLLEAGUE HANDED YOU THIS MORNING.  DO YOU SEE IT?

11  **A.**  I AM SORRY, SIR?

12  **Q.**  EXHIBIT -- I AM SORRY, EXHIBIT 984.

13  **A.**  YES, SIR, I HAVE IT.

14  **Q.**  OKAY.  AND DO YOU SEE THAT IT'S AN EMAIL FROM YOU TO

15  SEVERAL OF YOUR DIRECT REPORTS DATED FEBRUARY 27TH, 2009?

16  **A.**  YES, SIR.

17     **MR. EDMONDSON:**  YOUR HONOR, I WOULD LIKE TO OFFER

18  TRIAL EXHIBIT 984 INTO EVIDENCE.

19     **MR. HUMMEL:**  NO OBJECTION.

20     **THE COURT:**  984 IS ADMITTED.

21          (TRIAL EXHIBIT 984 RECEIVED IN EVIDENCE)

22               (DISPLAYED ON SCREEN.)

23  **BY MR. EDMONDSON:**

24  **Q.**  NOW, JUST TO CONFIRM, IN 2009, WHEN YOU WROTE THIS EMAIL,

25  YOU WERE CHIEF MARKETING OFFICER AT DIRECTV; IS THAT CORRECT?

GUYARDO – DIRECT / EDMONDSON

1    **A.**  CHIEF SALES AND MARKETING OFFICER AT THAT TIME.

2    **Q.**  SO YOU HAD TWO TITLES?

3    **A.**  IT WAS ONE TITLE, IT HAD SALES AND MARKETING IN THE TITLE.

4    **Q.**  OKAY.  AND YOU WROTE:  YESTERDAY'S DIRECT SALES CREATIVE

5    REVIEW MEETING WAS VERY, VERY ALARMING.  SPECIFICALLY, THE

6    POSITIONING OF THE NEW Q2 OFFER IN THE CREATIVE I SAW WAS

7    EXTREMELY WEAK.  THERE WAS NO MENTION OF $29 INTRODUCTORY

8    PRICE POINT.

9        IS THAT ACCURATE?

10   **A.**  YES, SIR.

11   **Q.**  AND THAT'S WHAT YOU WROTE?

12   **A.**  YES, SIR.

13   **Q.**  SO JUST TO BE CLEAR, Q2 REFERS TO THE SECOND QUARTER?

14   **A.**  YES, IT DOES.

15   **Q.**  SECOND QUARTER OF 2009?

16   **A.**  YES.

17   **Q.**  AND THE $29 INTRODUCTORY PRICE POINT IS PROMOTIONAL

18   PRICING?

19   **A.**  YES, SIR.

20   **Q.**  YOU WERE ALARMED BECAUSE YOU SAW AN AD WITHOUT PROMOTIONAL

21   PRICING; IS THAT ACCURATE?

22   **A.**  BASED ON THIS EMAIL.

23   **Q.**  AND THEN YOU WROTE:  FURTHERMORE, THERE WAS NO EMPHASIS ON

24   THE SAVE $21 FOR 12 MONTHS, WHICH BRAD HAS SAID FOR MONTHS IS

25   A STRONG MESSAGE DESPITE THE FACT THAT THE ABSOLUTE PRICE IS

1  GOING UP TO $35 ON CHOICE –– $34 ON CHOICE.

2      DO YOU SEE THAT?

3  **A.**  I DO.

4  **Q.**  "BRAD" REFERS TO BRAD BENTLEY, RIGHT?

5  **A.**  THAT'S CORRECT.

6  **Q.**  DO YOU HAVE ANY IDEA WHAT BASIS BRAD BENTLEY HAD FOR

7  SAYING THE PHRASE "SAVE $21 FOR 12 MONTHS" WAS VERY, VERY

8  STRONG?

9  **A.**  WHY HE WOULD HAVE SAID THAT?

10  **Q.**  WHAT HIS BASIS WAS FOR BELIEVING THAT THAT PHRASE WAS

11  STRONG?

12  **A.**  HE RAN OUR DIRECT SALES ORGANIZATION FOR QUITE SOME TIME,

13  AND SO HE WAS VERY FAMILIAR WITH THE LANGUAGE THAT WOULD DRIVE

14  PROSPECTIVE CUSTOMERS TO CALL OR GO ONLINE.

15  **Q.**  HE WOULD HAVE BEEN FAMILIAR WITH LANGUAGE THAT WOULD

16  DISSUADE CUSTOMERS FROM CALLING DIRECTV OR GOING ONLINE, TOO;

17  IS THAT ACCURATE?

18  **A.**  I DON'T KNOW IF I WOULD SAY "DISSUADE."

19  **Q.**  WELL, YOU WERE CERTAINLY FAMILIAR WITH LANGUAGE THAT WOULD

20  DISSUADE CUSTOMERS FROM CALLING DIRECTV, WEREN'T YOU?

21  **A.**  THE PURPOSE OF THE AD WAS TO GET CUSTOMERS TO CALL.

22  **Q.**  TURNING TO THE SECOND PARAGRAPH OF THIS EMAIL, YOU WROTE

23  THAT YOU WOULD LIKE TO MEET THAT AFTERNOON, THE AFTERNOON OF

24  THE EMAIL, TO GO THROUGH EVERYTHING INCLUDING DIRECT

25  MARKETING, THE MAJOR PIECES THAT WILL DRIVE VOLUME, I.E., SOLO

1    MAIL CONTROL PIECE, ALT MEDIA CONTROL PIECE, ET CETERA.

2        SO WHAT IS A SOLO MAIL CONTROL PIECE?

3    **A.**  A SOLO MAIL PIECE WOULD BE PRINTED MAIL THAT IS IN A

4    TRADITIONAL NO. 10 ENVELOPE, AND THAT THE ONLY THING IN THAT

5    ENVELOPE IS A PROMOTION OR ADVERTISEMENT FOR DIRECTV.  THERE'S

6    NOTHING ELSE IN IT; HENCE, THE NAME SOLO MAIL.

7    **Q.**  WHAT DO YOU MEAN BY CONTROL IN THIS CONTEXT?  YOU WROTE

8    SOLO MAIL CONTROL PIECE?

9    **A.**  OH.  IN ANY FORM OF DIRECT MARKETING THERE'S ALWAYS A TEST

10   AND A CONTROL WHERE YOU HAVE YOUR CONTROL PIECE, WHICH IS WHAT

11   YOU RELY ON DAY IN AND DAY OUT TO ACQUIRE NEW CUSTOMERS, BUT

12   THEN YOU ARE ALWAYS TRYING TO PERFORM BETTER, AND SO YOU WILL

13   TYPICALLY PUT OUT TEST PIECES THAT TEST DIFFERENT OTHER OFFERS

14   PERHAPS OR LANGUAGE TO TRY TO SEE IF YOU CAN FIND A TEST PIECE

15   THAT OUTPERFORMS THE CONTROL PIECE.

16   **Q.**  IS IT FAIR TO SAY DIRECTV WAS CONSTANTLY TESTING THE

17   EFFECTIVENESS OF POSSIBLE NEW MESSAGES?

18   **A.**  YES, SIR.

19   **Q.**  FOR THE RECORD, WOULD YOU TELL THE COURT WHAT YOU MEANT

20   BY -- WHEN YOU WROTE, ALT MEDIA CONTROL PIECE.

21   **A.**  ALT MEDIA WOULD HAVE BEEN A TERM I WOULD HAVE USED TO

22   DESCRIBE SOME OF THE OTHER ADS THAT WE'VE LOOKED AT EARLIER

23   THIS MORNING.

24        **MR. EDMONDSON:**  I WOULD LIKE TO TAKE A LOOK AT TRIAL

25   EXHIBIT 990.

1    **BY MR. EDMONDSON:**

2    **Q.**  DID YOU FIND THAT EXHIBIT IN YOUR BINDER, MR. GUYARDO?

3    **A.**  YES, SIR.

4    **Q.**  I WOULD LIKE YOU TO TAKE A LOOK AT THE SECOND PAGE OF THIS

5    EXHIBIT.  IT IS AN EMAIL FROM YOU TO JON GIESELMAN DATED

6    JULY 17TH, 2013?

7    **A.**  YES, SIR.

8    **Q.**  DO YOU RECOGNIZE THAT EMAIL?

9    **A.**  YES, I RECOGNIZE IT.

10   **Q.**  AND YOU WROTE IT?

11   **A.**  YES, I WROTE IT.

12          **MR. EDMONDSON:**  YOUR HONOR, I WOULD LIKE TO MOVE

13   EXHIBIT 990 INTO EVIDENCE AT THIS TIME.

14          **MR. HUMMEL:**  NO OBJECTION.

15          **THE COURT:**  ADMITTED.

16          (TRIAL EXHIBIT 990 RECEIVED IN EVIDENCE)

17                (DISPLAYED ON SCREEN.)

18   **BY MR. EDMONDSON:**

19   **Q.**  NOW, BEFORE I START TO ASK YOU QUESTIONS ABOUT WHAT YOU

20   WROTE IN THE EMAIL, I JUST WANT TO GET SOME CONTEXT HERE.  YOU

21   WERE -- WHEN YOU REFER TO A TV SPOT THAT YOU VIEWED, YOU

22   WEREN'T TALKING ABOUT THE ENTIRE TV AD.  YOU WERE TALKING

23   ABOUT THE END CARD ON THE TV AD; IS THAT ACCURATE?

24   **A.**  NO, SIR.

25   **Q.**  YOU WROTE:  I SAW THE SPOT ON TV YESTERDAY.  $24 POPS

1    NICELY BUT LIMITED TIME FEELS LIKE IT SHOULD BE THICKER.  RED

2    WAS HARD TO READ AGAINST THE BLACK.

3    **A.**  THE REASON I ANSWERED THE WAY I DID IS THE FIRST SENTENCE:

4    I SAW THE SPOT ON TV YESTERDAY.  I WAS REFERRING TO THE ENTIRE

5    SPOT.  BUT THEN, YES, THE SECOND SENTENCE IN THE PARAGRAPH WAS

6    SPECIFIC TO THE END CARD.

7    **Q.**  SO THAT IS WHAT I WANT TO DISCUSS IS WHAT YOU -- WHAT YOU

8    ARE RAISING HERE WITH RESPECT TO THE END CARD.

9             **MR. EDMONDSON:**  JUST FOR CONTEXT, IF WE COULD TAKE A

10   LOOK AT PAGE 1 OF EXHIBIT 990.

11                      (DISPLAYED ON SCREEN.)

12       AND CALL OUT THE TWO IMAGES IN THE MIDDLE.

13   **BY MR. EDMONDSON:**

14   **Q.**  THOSE ARE STILL IMAGES OF AN END CARD, RIGHT?

15   **A.**  YES, THEY ARE.

16   **Q.**  AND THE END CARD IS THE TEXT THAT APPEARS AT THE END OF A

17   DIRECTV AD; IS THAT ACCURATE?

18   **A.**  THAT USED TO APPEAR AT THE END.  YES.  UH-HUH.

19   **Q.**  OKAY.  AND, AGAIN, I APOLOGIZE THAT THIS IS A

20   BLACK-AND-WHITE IMAGE AND NOT A COLOR IMAGE BUT IT IS THE ONLY

21   COPY WE HAVE.  THAT'S THE WAY WE RECEIVED IT FROM DIRECTV.

22       SO YOU WROTE:  THE $24 POPS NICELY.

23       SO THE $24 YOU ARE REFERRING TO IS THE FIGURE IN LARGE

24   WHITE FONT IN THE MIDDLE OF THE PAGE THERE; IS THAT ACCURATE?

25   **A.**  YES, SIR.

1    **Q.** AND YOU WROTE: BUT LIMITED TIME FEELS LIKE IT SHOULD BE

2    THICKER.

3            **MR. EDMONDSON:** CAN YOU SEE IF WE CAN CALL OUT

4    LIMITED TIME OR PUT A BOX AROUND THAT, MR. DUNKIN.

5    **BY MR. EDMONDSON:**

6    **Q.** SO I GUESS COMPARING THE TWO END CARDS, THE TOP END CARD

7    "LIMITED TIME" IS THINNER AND THE BOTTOM END CARD HERE THE

8    PHRASE "LIMITED TIME OFFER," IS THAT THICKER?

9    **A.** YES. THIS WAS A LONG TIME AGO. BUT IF I HAD TO GUESS, MY

10   EMAIL PERTAINED TO THE END CARD AT THE TOP WHERE THE LIMITED

11   TIME IS TO THE RIGHT OF THE 24.99, AND THEN HE MUST HAVE COME

12   BACK AND SAID CURRENT PROPOSED. AND SO THIS WAS JON'S WAY OF

13   ADDRESSING MY COMMENTS.

14   **Q.** SO YOU WERE CONCERNED THAT THE PRICE BE CLEARLY VISIBLE TO

15   CONSUMERS?

16   **A.** I WAS CONCERNED THAT THE LIMITED TIME OFFER WAS NOT

17   VISIBLE ENOUGH.

18   **Q.** NOW, IF YOU LOOK DOWN -- LOOK AT THE TOP END CARD, IF YOU

19   LOOK DOWN AT THE BOTTOM, JUST BELOW THE FIGURE 24.99.

20           **MR. EDMONDSON:** IF WE CAN CALL OUT THAT PHRASE, I

21   THINK IT SAYS FOR 12 MONTHS.

22                   (DISPLAYED ON SCREEN.)

23   **BY MR. EDMONDSON:**

24   **Q.** DO YOU SEE BELOW THE 24.99, IT'S A DISCLOSURE, FOR 12

25   MONTHS AFTER INSTANT SAVINGS, 24-MONTH AGREEMENT REQUIRED.

1      DO YOU SEE THAT?

2  **A.**  I DO.

3  **Q.**  YOU WEREN'T CONCERNED THAT THAT DISCLOSURE WAS NOT

4  PROMINENT, WERE YOU?

5  **A.**  NOT ON THIS PARTICULAR AD I WAS NOT.

6  **Q.**  WELL, ULTIMATELY YOUR JOB WAS TO MAKE SURE THAT DIRECTV

7  DISSEMINATED ADS THAT SUCCESSFULLY PUSHED -- GOT CONSUMERS TO

8  CALL THE 1800 NUMBER OR OTHER TOLL-FREE NUMBER OR GO TO

9  DIRECTV'S WEBSITE, CORRECT, SIR?

10  **A.**  YES, SIR.

11  **Q.**  DIRECTV GAVE YOU HUNDREDS OF MILLIONS OF DOLLARS ANNUALLY

12  TO SPEND ON ADVERTISING TO ACQUIRE NEW CONSUMERS; IS THAT

13  ACCURATE?

14  **A.**  BILLIONS.

15  **Q.**  BILLIONS.  BILLIONS OF DOLLARS.

16      AND YOU VIEWED IT AS YOUR JOB TO ENSURE THAT DIRECTV GOT A

17  RETURN ON THAT MULTIBILLION DOLLAR INVESTMENT?

18  **A.**  YES, SIR.

19  **Q.**  LET'S TAKE A LOOK AT EXHIBIT 988 NOW.

20      DID YOU FIND THE EXHIBIT 988, MR. GUYARDO?

21  **A.**  YES, SIR.  I AM SORRY, I HAVE IT.  YES.

22  **Q.**  THIS IS AN EMAIL FROM YOU TO MIKE WHITE, ISN'T IT?

23  **A.**  YES, SIR.

24  **Q.**  DATED AUGUST 24TH, 2012?

25  **A.**  YES, SIR.

1    **Q.**  AND YOU WROTE THIS EMAIL?

2    **A.**  I DID.

3            **MR. EDMONDSON:**  YOUR HONOR, I WOULD LIKE TO MOVE

4    EXHIBIT 988 INTO EVIDENCE AT THIS TIME.

5            **MR. HUMMEL:**  NO OBJECTION.

6            **THE COURT:**  ADMITTED.

7            (TRIAL EXHIBIT 988 RECEIVED IN EVIDENCE)

8                    (DISPLAYED ON SCREEN.)

9    **BY MR. EDMONDSON:**

10   **Q.**  LOOKING AT THE FIRST PARAGRAPH, MR. GUYARDO, YOU WROTE:

11       I WANTED TO BRING THE FOLLOWING MATTER TO YOUR ATTENTION

12   PRIOR TO THE NEXT TUESDAY'S CUSTOMER EXPERIENCE CX MEETING.

13   AS YOU KNOW, I WAS IN L.A. THIS WEEK, SO I HAD THE OPPORTUNITY

14   TO SPEAK WITH MIKE PALKOVIC AND PAT DOYLE ABOUT THIS ISSUE AS

15   WELL IN PERSON.  THE ISSUE PERTAINS TO A CX PROJECT LABELED

16   ADVANCED WARNING OR ADVANCED NOTIFICATION.

17       DO YOU SEE THAT?

18   **A.**  YES.

19   **Q.**  PAT DOYLE WAS THE CFO AT THAT TIME?

20   **A.**  YES.

21   **Q.**  AND MIKE PALKOVIC WAS THE HEAD OF OPERATIONS AT THAT TIME?

22   **A.**  THAT IS CORRECT.

23   **Q.**  AND MR. PALKOVIC WAS RESPONSIBLE FOR THE CALL CENTERS THAT

24   HANDLED CALLS FROM EXISTING DIRECTV CUSTOMERS; IS THAT RIGHT?

25   **A.**  YES, SIR.

GUYARDO – DIRECT / EDMONDSON

1  **Q.**  SO IF AN EXISTING DIRECTV CUSTOMER HAD A QUESTION ABOUT

2  THEIR BILL, THEY WOULD GO TO MR. PALKOVIC'S ORGANIZATION; IS

3  THAT RIGHT?

4  **A.**  YES, THEY WOULD.

5  **Q.**  AND IF AN EXISTING CUSTOMER HAD A COMPLAINT, THAT WOULD BE

6  ROUTED TO MR. PALKOVIC'S ORGANIZATION?

7  **A.**  YES, SIR.

8  **Q.**  YOU WEREN'T RESPONSIBLE FOR OVERSEEING THE CALL CENTER

9  THAT DEALT WITH COMPLAINTS FROM EXISTING CUSTOMERS, WERE YOU?

10  **A.**  I WAS NOT.

11  **Q.**  IN THE SECOND PARAGRAPH YOU DESCRIBED THE ADVANCED WARNING

12  PROJECT AS ALERTING ALL CUSTOMERS WHEN PREMIUMS AND SPORTS

13  PACKAGES ARE ABOUT TO ROLL TO PAY.

14      DO YOU SEE THAT?

15  **A.**  YES, I DO.

16  **Q.**  AND FOR THE RECORD, WHAT DOES IT MEAN FOR A PACKAGE TO

17  ROLL TO PAY?

18  **A.**  IT MEANS THAT THE FREE PERIOD IS OVER, AND THE CUSTOMER IS

19  GOING TO BE -- START TO BE CHARGED FOR THE PACKAGE.

20  **Q.**  YOU THEN WROTE:  THINK OF IT AS A BIG HEADS-UP THAT A

21  PROMOTION IS ABOUT TO END SEVERAL MONTHS IN ADVANCE EACH AND

22  EVERY MONTH LEADING UP TO THE ROLL UP/ROLL OFF.

23      DO YOU SEE THAT?

24  **A.**  YES, I DO.

25  **Q.**  WHEN YOU SAY "ROLL UP," YOU ARE REFERRING TO ROLLING UP TO

1    RETAIL PRICING; IS THAT ACCURATE?

2    **A.**  YES, SIR.

3    **Q.**  SO FOR THE FREE PREMIUM CHANNEL OFFER, THE ROLL WOULD BE

4    ROLL TO PAY?  IT WOULD BE ROLL FROM FREE TO PAYING THE RETAIL

5    PRICE?

6    **A.**  YES, SIR.

7    **Q.**  AND ROLL UP REFERS TO THE POINT IN THE 24-MONTH CONTRACT

8    WHERE PROMOTIONAL PRICING EXPIRES AND A CUSTOMER IS ROLLED UP

9    TO THE RETAIL PRICE FOR THEIR PROGRAMMING PACKAGE?

10   **A.**  YES, SIR.

11   **Q.**  NOW, LOOKING AT THE THIRD PARAGRAPH YOU WROTE:  PRIOR TO

12   THIS PAST WEDNESDAY, MY TEAM AND I WERE UNDER THE IMPRESSION

13   THAT ADVANCED WARNING WAS OFF THE TABLE FOR NOW GIVEN THE

14   NEGATIVE IMPACT IT MAY HAVE ON REVENUE AND CHURN, AS WELL AS

15   MANY OTHER PRESSING CX ISSUES.  WITH LITTLE DOWNSIDE IMPACT,

16   IT COULD EASILY BE EXECUTED BEFOREHAND.

17       DO YOU SEE THAT?

18   **A.**  I DO.

19   **Q.**  SO LET'S PUT THIS IN CONTEXT.  IN DIRECTV'S ADVERTISING,

20   YOU WANTED NOTICE FOR THE PREMIUM-CHANNEL NEGATIVE OPTION TO

21   BE BURIED IN THE FINE PRINT AT THE BOTTOM OF PRINT ADS; IS

22   THAT ACCURATE?

23   **A.**  I DON'T THINK THIS IS TALKING ABOUT ADVERTISING.

24   **Q.**  I WANT TO PUT IT IN THE CONTEXT OF ADVERTISING.  THIS IS

25   AN ADVERTISING CASE.

GUYARDO – DIRECT / EDMONDSON

1    **A.**  WHAT WE ARE TALKING ABOUT HERE IS NOT ADVERTISING.

2    **Q.**  LET'S STEP BACK TO THE ADS THAT WE LOOKED AT A FEW MINUTES

3    AGO.

4    **A.**  SURE.  OKAY.

5    **Q.**  WE ESTABLISHED THAT YOU DIDN'T WANT ANY MESSAGES UP NEAR

6    THE CALL TO ACTION OR THE PROMOTIONAL PRICING THAT WOULD

7    DISTRACT CUSTOMERS FROM -- PROSPECTIVE CUSTOMERS FROM THOSE

8    IMPORTANT MESSAGES; ISN'T THAT ACCURATE?

9    **A.**  THAT'S NOT TRUE.

10   **Q.**  YOU WANTED DISTRACTING MESSAGES PUT DOWN IN THE LEGAL

11   TEXT, THAT IS WHAT WE ESTABLISHED?

12   **A.**  THAT'S NOT TRUE.  YOU KEEP USING THE WORD "DISTRACTING."

13            **THE COURT:**  YOU'RE ARGUING, MR. EDMONDSON.  YOU'RE

14   TRYING TO GET HIM TO AGREE TO A CHARACTERIZATION.  LET'S JUST

15   ASK QUESTIONS AND HAVE ANSWERS.

16   **BY MR. EDMONDSON:**

17   **Q.**  IN YOUR DEPOSITION YOU TESTIFIED YOU DIDN'T WANT

18   DISTRACTING MESSAGES UP IN THE -- YOU DIDN'T WANT ANYTHING UP

19   IN THE BODY OF THE AD THAT WOULD DISTRACT PROSPECTIVE

20   CUSTOMERS FROM THE MESSAGES THAT DIRECTV WANTED TO CONVEY;

21   ISN'T THAT ACCURATE?

22   **A.**  SIR, YOU ASKED ME A SPECIFIC QUESTION ABOUT WHAT I CALL

23   THE CIGARETTE WARNING LABEL BOXES, AND, YES, I DID CLEARLY

24   STATE IN THAT EMAIL THAT I WOULD PREFER IF THAT PARTICULAR

25   MESSAGE THAT WE WERE TALKING ABOUT BE CENTRALIZED IN THE COPY

GUYARDO – DIRECT / EDMONDSON

1    BLOCK AT THE BOTTOM.

2    **Q.**  AND THE REASON THAT YOU WANTED THAT MESSAGE CENTRALIZED IN

3    THE COPY BLOCK AT THE BOTTOM IS, YOU DIDN'T WANT THAT MESSAGE

4    DISTRACTING PROSPECTIVE CUSTOMERS FROM THE CORE MESSAGE OF THE

5    AD; ISN'T THAT ACCURATE?

6    **A.**  I WOULD SAY THAT FOR THIS POINT IN THE NEW CUSTOMER

7    JOURNEY, THE FOCUS NEEDED TO BE PRIMARILY ON THE PROMOTIONAL

8    PRICE.  THAT'S WHAT NEEDED TO BE CONVEYED IN THAT SECTION OF

9    THE AD.

10   **Q.**  AND IN THIS EMAIL, WHICH IS EXHIBIT 988, YOU OBJECTED TO

11   GIVING DIRECTV CUSTOMERS WARNING THAT THE PREMIUM CHANNELS

12   WERE ABOUT TO ROLL TO PAY; ISN'T THAT ACCURATE?

13   **A.**  FOR THIS PARTICULAR TEST THAT WE WERE TALKING ABOUT, THAT

14   IS CORRECT.

15   **Q.**  LOOKING AT THE FOURTH PARAGRAPH YOU WROTE:

16       MY CONCERN, WHICH I EXPRESSED TO PAT AND MIKE P., IS THAT

17   THE CX TEAM IS MOVING FULL SPEED AHEAD ON A PROJECT THAT WILL

18   LIKELY FIX ONE PROBLEM, CALL VOLUME, WHILE CREATING TWO

19   OTHERS, LOWER REVENUE AND HIGHER CHURN.

20       SO ISN'T IT ACCURATE THAT YOU WERE SAYING THAT ADVANCED

21   NOTIFICATION WOULD FIX A PROBLEM FOR MR. PALKOVIC WITH HAVING

22   LOTS OF COMPLAINTS COMING IN, THE CALL VOLUME, FROM EXISTING

23   CUSTOMERS; IS THAT ACCURATE?

24   **A.**  NO, THAT'S NOT ACCURATE.

25   **Q.**  WHAT WERE YOU SAYING?

1    **A.**  POTENTIALLY CALL VOLUME, WHICH IS WHAT I SAID, CALL VOLUME

2    IS NOT NECESSARILY A COMPLAINT.  PEOPLE CALL FOR VERY MANY,

3    MANY OTHER REASONS OTHER THAN A COMPLAINT.

4    **Q.**  THEY CALL TO ASK A QUESTION?

5    **A.**  THAT'S CORRECT.

6    **Q.**  WHY DID MY BILL GO UP $47 A MONTH?

7    **A.**  THAT'S ABSOLUTELY ONE OF THE REASONS WHY THEY COULD CALL,

8    YES.

9    **Q.**  SO IF A CUSTOMER CALLED DIRECTV TO ASK, WHY DID MY BILL GO

10   UP $47 A MONTH, THAT'S NOT A COMPLAINT, IN YOUR OPINION?

11   **A.**  THAT'S A QUESTION.

12   **Q.**  THAT'S A QUESTION.

13       YOU ALSO EXPRESSED A CONCERN THAT THE ADVANCED

14   NOTIFICATION SYSTEM WOULD CREATE TWO OTHER PROBLEMS, LOWER

15   REVENUE AND HIGHER CHURN?

16   **A.**  POTENTIALLY IT COULD, YES.

17   **Q.**  HOW WOULD IT CREATE LOWER REVENUE?

18   **A.**  IT COULD CAUSE LOWER REVENUE BECAUSE THE CUSTOMER MAY

19   DISCONNECT THEIR -- OR DISCONTINUE THEIR PAID PREMIUM.

20   **Q.**  THEY WOULD GET NOTICE THAT THEIR FREE PREMIUMS WOULD THEN

21   GO UP TO $47 A MONTH, AND THEY WOULD CALL AND CANCEL AT THAT

22   POINT?

23   **A.**  THAT IS A POSSIBILITY.

24   **Q.**  OKAY.  AND YOU WERE CONCERNED ENOUGH ABOUT THAT

25   POSSIBILITY THAT YOU EXPRESSED YOUR OPINION TO THE CEO OF

1    DIRECTV; IS THAT RIGHT?

2    **A.**  YES.

3    **Q.**  TAKE A LOOK AT TRIAL EXHIBIT 995.  THIS IS AN EMAIL FROM

4    VINCENT TORRES -- ACTUALLY, YEAH, VINCENT TORRES TO YOU DATED

5    OCTOBER 21ST, 2014.  DID YOU FIND THAT?

6    **A.**  YES, SIR.

7    **Q.**  AND YOU RECOGNIZE THIS DOCUMENT?

8    **A.**  YES, SIR.

9         **MR. EDMONDSON:**  YOUR HONOR, I WOULD LIKE TO MOVE

10    EXHIBIT 995 INTO EVIDENCE AT THIS TIME.

11         **MR. HUMMEL:**  NO OBJECTION.

12         **THE COURT:**  ADMITTED.

13         (TRIAL EXHIBIT 995 RECEIVED IN EVIDENCE)

14              (DISPLAYED ON SCREEN.)

15         **MR. EDMONDSON:**  I WOULD LIKE YOU TO TAKE A LOOK AT

16    PAGE 11 OF THIS DOCUMENT, WHICH HAS THE BATES STAMP AT THE

17    BOTTOM 480.

18              (DISPLAYED ON SCREEN.)

19         **THE WITNESS:**  YOU SAID PAGE 11 BUT THIS IS PAGE 10,

20    RIGHT?

21    **BY MR. EDMONDSON:**

22    **Q.**  I'LL JUST BE CLEAR, PAGE 10 OF THE POWERPOINT DECK.  THE

23    DOCUMENT NUMBERING STARTS WITH THE EMAIL COVER SHEET.

24    **A.**  GOT IT.  OKAY.  THANK YOU.

25    **Q.**  SO IT'S -- DOCUMENT PAGE 11 IS DISPLAYED ON THE SCREEN

```
 1    THERE TO YOUR LEFT.  THIS IS A POWERPOINT SLIDE THAT WE ARE

 2    LOOKING AT TITLED:  HIGHEST PRESSURE FROM EARLY TENURE STICKER

 3    SHOCKS.

 4        DO YOU SEE THAT?

 5    A.  YES, SIR.

 6    Q.  IT HAS THE SUBTITLE QUARTER 3 VOLUNTARY CHURN VERSUS LY OR

 7    TENURE.

 8        WHAT DOES LY STAND FOR?

 9    A.  LAST YEAR.

10    Q.  I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE BAR BENEATH

11    THE CIRCLE A WHICH HAS THE TITLE, PROMO ROLL-OFF, BELOW IT.

12    DO YOU SEE THAT?

13    A.  YES, SIR.

14    Q.  WHAT DOES PROMO ROLL-OFF MEAN IN THIS CONTEXT?

15    A.  IT WOULD MEAN WHEN THE PROMOTIONAL DISCOUNT IS ROLLING OFF

16    AND THE PRICE MOVES TO THE REGULAR RETAIL PRICE.

17    Q.  SO DOES THIS CHART DOCUMENT A SPIKE IN VOLUNTARY CHURN

18    THAT CORRELATES TO THE ROLL-OFF OF THE PROMOTIONAL PRICING AT

19    THE END OF THE FIRST 12 MONTHS?

20    A.  YES, IT DOES.

21    Q.  AND THEN WITH REGARD TO THE BAR BENEATH CIRCLE B, IT SHOWS

22    THAT AT THE END OF THE TWO-YEAR COMMITMENT THERE IS ANOTHER

23    SPIKE IN VOLUNTARY CHURN; IS THAT ACCURATE?

24    A.  YES, SIR, IT'S A COMBINATION.

25    Q.  WHEN YOU SAY "A COMBINATION," A COMBINATION OF WHAT?
```

GUYARDO – DIRECT / EDMONDSON

1   **A.**  I THINK IT'S THE FIRST COMMITMENT ROLL-OFF AND THEN

2   TRIPLE -- TRO STANDS FOR TRIPLE ROLL-OFF AND DOUBLE ROLL-OFF.

3   **Q.**  WHAT DOES TRIPLE ROLL-OFF REFER TO?

4   **A.**  CUSTOMERS THAT WOULD HAVE BEEN ROLLING OFF OF THREE

5   PROMOTIONAL DISCOUNTS.

6   **Q.**  WHAT DOES THE TERM "DOUBLE ROLL-OFF" REFER TO?

7   **A.**  CUSTOMERS THAT ARE ROLLING OFF OF TWO PROMOTIONAL

8   DISCOUNTS.

9   **Q.**  CAN YOU GIVE US AN EXAMPLE OF A SITUATION WHERE A CUSTOMER

10  MIGHT HAVE THREE PROMOTIONAL DISCOUNTS?

11  **A.**  YES, SIR.

12      ONE OF THE PROMOTIONAL DISCOUNTS WOULD BE A DISCOUNT ON

13  THE BASE PACKAGE.  A SECOND REASON IS, THERE WERE TIMES WHEN

14  TO TRY TO INCENT CUSTOMERS TO GIVE US THEIR EMAIL ADDRESS, WE

15  WOULD APPLY A SECOND DISCOUNT.  AND THEN WE ALSO ENCOURAGED

16  CUSTOMERS TO SIGN UP FOR AUTO BILL PAY, AND WE WOULD APPLY A

17  THIRD PROMOTIONAL DISCOUNT IN THAT CASE.  SO THERE WERE WAYS

18  IN WHICH WE WOULD DISCOUNT THE BILL FOR THINGS OTHER THAN JUST

19  DISCOUNTING THE BASE PACKAGE PRICE.

20  **Q.**  THANK YOU.

21      NOW I WOULD LIKE YOU TO TAKE A LOOK AT THE SLIDE PAGE

22  BATES NUMBERED 482.

23                    (DISPLAYED ON SCREEN.)

24      THIS SLIDE IS TITLED:  SEGMENTED APPROACH TO PRICE/VALUE

25  SENSITIVITY.

1          DO YOU SEE THAT?

2     **A.**   YES, SIR.

3     **Q.**   IF WE LOOK AT THE RIGHT-HAND COLUMN TITLED, STICKER SHOCK.

4               **MR. EDMONDSON:**  CAN WE CALL THAT OUT, MR. DUNKIN.

5     THANK YOU.

6     **BY MR. EDMONDSON:**

7     **Q.**   NOW, BELOW THE HEADER, STICKER SHOCK, THERE'S THE PHRASE

8     WILLINGNESS TO PAY ANCHORED TO PROMO PRICE.

9          DO YOU KNOW WHAT THAT MEANS?

10    **A.**   A CUSTOMER'S WILLINGNESS TO PAY BASED ON THE PROMO PRICE

11    THAT THEY SIGNED UP FOR.

12    **Q.**   AND THERE'S AN A IN A RED BUBBLE.  JUST BELOW THAT IS THE

13    PHRASE "FIRST PROMO ROLL-OFF".

14         DO YOU KNOW WHAT THAT REFERS TO?

15    **A.**   YES, SIR.

16    **Q.**   WHAT DOES THAT REFER TO?

17    **A.**   IT WOULD BE THE PROMOTIONAL ROLL-OFF PROBABLY AROUND

18    12 MONTH ASSOCIATED WITH THE DISCOUNT THAT WAS APPLIED TO THE

19    BASE PACKAGE.

20    **Q.**   OKAY.  SO THIS IS A REFERRING TO ROLL UP, NOT A ROLL TO

21    PAY, BUT A ROLL UP?

22    **A.**   YOU COULD SAY ROLL UP.  SURE.

23    **Q.**   JUST --

24    **A.**   I SAID ROLL-OFF.  BUT ROLL UP, SAME THING.

25              **MR. EDMONDSON:**  AND NOW I WOULD LIKE TO TAKE A LOOK

```
1    AT EXHIBIT 587, PLEASE.
2                     (DISPLAYED ON SCREEN.)
3    BY MR. EDMONDSON:
4    Q.  THIS IS AN EMAIL FROM MIKE WHITE TO YOU DATED MARCH 24TH,
5    2013.  I'M LOOKING AT PAGE 3 OF THIS EXHIBIT.  DO YOU
6    RECOGNIZE THAT EMAIL?
7    A.  YES, SIR.
8            MR. EDMONDSON:  I WOULD LIKE TO MOVE EXHIBIT 587 INTO
9    EVIDENCE, YOUR HONOR.
10           MR. HUMMEL:  NO OBJECTION.
11           THE COURT:  ADMITTED.
12             (TRIAL EXHIBIT 587 RECEIVED IN EVIDENCE)
13                     (DISPLAYED ON SCREEN.)
14   BY MR. EDMONDSON:
15   Q.  LOOKING AT THE FIRST FULL PARAGRAPH OF THE EMAIL,
16   MR. WHITE WROTE:
17       I STILL HAVE A SENSE OUR SERVICE AND SALES PROCESSES ARE
18   FAR TOO COMPLEX AND NOT TRANSPARENT ENOUGH ON BILL
19   EXPECTATIONS, BUT I KNOW WE ARE CURRENTLY IMPLEMENTING
20   NUMEROUS CHANGES TO IMPROVE ON THIS.  WE KNOW THAT COMPLEXITY
21   CAN HELP WITH GROSS ADDS, BUT IT ALSO ADDS COST.
22       DO YOU HAVE AN UNDERSTANDING OF WHAT MR. WHITE MEANT WHEN
23   HE WROTE THAT HE KNOWS COMPLEXITY CAN HELP WITH GROSS ADDS?
24   A.  YES, SIR.
25   Q.  AND WHAT IS YOUR UNDERSTANDING?
```

1    **A.**  THAT COMPLEXITY, HIS WORD, COULD HELP ATTRACT NEW

2    CUSTOMERS.

3    **Q.**  AND WHAT DID MR. WHITE MEAN BY COMPLEXITY?

4    **A.**  HE WAS REFERRING TO PROMOTIONAL PRICING ROLLING OFF OR

5    ROLLING UP TO REGULAR PRICING VERSUS EDLP, EVERYDAY LOW

6    PRICING.

7    **Q.**  DOWN AT THE BOTTOM OF THE PAGE, PARAGRAPH 5, MR. WHITE

8    WROTE:

9        DO WE HAVE ANY OTHER IDEAS ON HOW TO BETTER MANAGE THE

10   BILLING FRUSTRATION OUR CUSTOMERS HAVE?

11   **A.**  YES, I SEE IT, SIR.

12   **Q.**  ONE WAY THAT DIRECTV COULD HAVE ADDRESSED THE COMPLEXITY

13   PROBLEM AND THE CONFUSION CAUSED BY THE PROMOTIONAL PRICING

14   WHICH APPEARS THROUGHOUT DIRECTV'S ADVERTISING WOULD HAVE BEEN

15   TO OFFER A FIXED PRICE FOR THE FULL TERM OF THE CONTRACT;

16   ISN'T THAT ACCURATE?

17   **A.**  THAT'S ONE WAY.

18   **Q.**  BUT DIRECTV DIDN'T DO THAT WHILE YOU WERE AT DIRECTV, DID

19   IT?

20   **A.**  A FIXED PRICE DURING THE ENTIRE TERM OF THE CONTRACT?

21   **Q.**  AS A PROMOTION, YES.

22   **A.**  NOT TO MY RECOLLECTION.

23           **MR. EDMONDSON:**  NO FURTHER QUESTIONS, YOUR HONOR -- I

24   MEANT DIRECTV'S WITNESS.

25           **THE COURT:**  ALL RIGHT.  CROSS-EXAMINATION?

1          **MR. HUMMEL:**  YES, YOUR HONOR.  THANK YOU.

2                          **CROSS-EXAMINATION**

3     BY MR. HUMMEL:

4     **Q.**  GOOD MORNING, MR. GUYARDO.

5     **A.**  GOOD MORNING.

6     **Q.**  LET'S START WHERE MR. EDMONDSON LEFT OFF WITH EXHIBIT 587,

7     PAGE 3.  AND AS THAT IS BEING BROUGHT OUT, MR. GUYARDO, DID

8     YOU RECALL, AS HE WAS ASKING YOU THOSE QUESTIONS, IF THIS

9     EMAIL WAS A PART OF WHAT WAS KNOWN AS THE CX OR CUSTOMER

10    EXPERIENCE PROJECT AT DIRECTV?

11    **A.**  YES, IT WAS.

12    **Q.**  CAN YOU DESCRIBE, FROM YOUR PROSPECTIVE AS THE HEAD OF

13    SALES AND MARKETING AND REVENUE, WHAT THE CX PROJECT WAS

14    DESIGNED TO DO.

15    **A.**  IT WAS DESIGNED TO IMPROVE ALL ASPECTS OF THE CUSTOMER

16    EXPERIENCE.

17          **MR. HUMMEL:**  IF YOU COULD CALL UP PARAGRAPH 5 OF THAT

18    LAST EMAIL.

19                     (DISPLAYED ON SCREEN.)

20    BY MR. HUMMEL:

21    **Q.**  CX UNEARTHED A NUMBER OF PAIN POINTS.  DO YOU RECALL THAT?

22    **A.**  YES, SIR.

23    **Q.**  CAN YOU DESCRIBE FOR THE COURT WHAT A PAIN POINT IS.

24    **A.**  A PAIN POINT MIGHT BE WHEN THE BILL GOES UP.  A PAIN POINT

25    MIGHT BE THE COMPLEXITY OF THE BILL.  A PAIN POINT MIGHT BE A

1    MAIL-IN REBATE.

2    **Q.**  WAS IT THE GOAL OF THE CX PROJECT TO IDENTIFY PAIN POINTS

3    AND THEN IN A CORPORATE WAY ADDRESS THEM TO MAKE THE CUSTOMER

4    EXPERIENCE BETTER?

5    **A.**  YES.

6    **Q.**  AND WITH RESPECT TO THE COUPLE OF PAIN POINTS THAT YOU

7    JUST MENTIONED, THE BILL, AND THAT IS WHAT IS REFERENCED IN

8    PARAGRAPH 5, CORRECT?

9    **A.**  YES.

10   **Q.**  AND THE INSTANT REBATE, OR THE PRIOR PROGRAM OF A REBATE,

11   DID DIRECTV, TO YOUR KNOWLEDGE, TAKE ACTIONS TO REMEDY THOSE

12   ISSUES THAT IT HAD UNEARTHED IN ITS OWN SELF-EXAMINATION?

13   **A.**  WE DID.

14   **Q.**  CAN YOU DESCRIBE WHAT YOU DID WITH THE BILL, GENERALLY

15   SPEAKING?

16   **A.**  IT WAS A PROJECT CALLED SIMPLIFIED BILL.  IT ESSENTIALLY

17   TRIED TO SIMPLIFY, MAKE IT MUCH EASIER FOR OUR CUSTOMERS TO

18   UNDERSTAND WHAT THEY WERE BEING CHARGED, WHAT EACH CHARGE WAS

19   ASSOCIATED WITH.

20   **Q.**  SO IN CONNECTION WITH REBATE, CAN YOU DESCRIBE THE PROGRAM

21   THAT EXISTED UP UNTIL THE CX PROGRAM TOOK A LOOK AT THIS

22   POSSIBLE CUSTOMER PAIN POINT?

23   **A.**  YES.

24        INITIALLY WHEN WE INTRODUCED MAIL-IN REBATE, IT WAS

25   EXACTLY AS THE NAME IMPLIED.  IT WAS A REBATE THAT REQUIRED

1    CUSTOMERS TO TAKE ACTION, TO MAIL SOMETHING IN.  IN RETURN,

2    THEY WOULD THEN RECEIVE THEIR PROMOTIONAL DISCOUNT.

3    **Q.**  SO UP UNTIL CX, A CUSTOMER HAD TO TAKE AN AFFIRMATIVE

4    ACTION IN ORDER TO OBTAIN A PROMOTIONAL PRICE?

5    **A.**  YES.

6    **Q.**  ALL RIGHT.  AND HOW DID CX ADDRESS THAT ISSUE?

7    **A.**  WELL, WE WENT FROM MAIL-IN REBATE TO INSTANT REBATE, WHICH

8    MEANT THAT THE CUSTOMER DIDN'T HAVE TO DO ANYTHING TO GET THE

9    REBATE ON THEIR FIRST BILL.

10   **Q.**  LET'S MOVE TO EXHIBIT 988, WHICH I BELIEVE MR. EDMONDSON

11   SHOWED YOU AS WELL.

12                   (DISPLAYED ON SCREEN.)

13       THIS WAS THE EMAIL THAT YOU WROTE TO MIKE WHITE IN 2012.

14       DO YOU HAVE THAT IN FRONT OF YOU, SIR?

15   **A.**  YES, SIR.

16   **Q.**  WAS THIS EMAIL, TOO, WRITTEN IN THE CONTEXT OF THE CX

17   INITIATIVE?

18   **A.**  YES, IT WAS.

19   **Q.**  CAN YOU DESCRIBE THE CONTEXT IN WHICH THIS EMAIL WAS

20   WRITTEN?

21   **A.**  WHEN YOU SAY "CONTEXT", WHAT DO YOU MEAN?

22   **Q.**  WHY DID YOU WRITE THE EMAIL, IF YOU RECALL?

23   **A.**  I WROTE THE EMAIL BECAUSE I WAS CONCERNED ABOUT SEVERAL

24   ISSUES.

25   **Q.**  ONE OF THE ISSUES WAS THE POSSIBILITY, WAS IT NOT, OF

1    GOING TO AN ADVANCED WARNING FOR THE PREMIUM ROLL-OFFS, IS

2    THAT ACCURATE?

3    **A.**  YES -- WELL, MY CONCERN WAS THAT WE WERE GOING TO MOVE

4    FORWARD WITH THAT PARTICULAR INITIATIVE WITHOUT THE PROPER

5    TESTING TO UNDERSTAND THE PROS AND CONS, THE BENEFITS AND

6    DISADVANTAGES OF MOVING FORWARD WITH THAT INITIATIVE.

7    **Q.**  IF YOU COULD LOOK AT THE VERY LAST PARAGRAPH, LAST

8    SENTENCE, WHICH WAS NOT HIGHLIGHTED IN THE PRIOR EXAMINATION,

9    WHERE IT SAYS:  MOREOVER, THERE IS NO WELL DEFINED TESTING

10   OBJECTIVES AND METHODOLOGY IN PLACE TO TRULY UNDERSTAND THE

11   POTENTIAL IMPACTS.

12   **A.**  THAT IS MY POINT EXACTLY.

13   **Q.**  ALL RIGHT.  SO YOU WERE NOT NECESSARILY OPPOSED TO

14   ADVANCED WARNING, CORRECT?

15   **A.**  THAT'S CORRECT.

16   **Q.**  YOU WANTED TO DO WHAT?

17   **A.**  I WANTED TO TEST IT BEFORE WE JUST ROLLED IT OUT

18   NATIONALLY.

19   **Q.**  AND JUST SO WE ARE CLEAR, THE TOP OF THAT PARAGRAPH SAYS:

20      WHILE THE LACK OF TRANSPARENCY IS AN ISSUE THAT NEEDS TO

21   BE ADDRESSED, IT'S NOT MY BIGGEST CONCERN.

22      TRANSPARENCY THERE IS REFERRING TO WHAT?

23   **A.**  I WAS REFERRING TO THE FACT THAT IN MY OPINION, MY

24   COLLEAGUES, SPECIFICALLY MR. PALKOVIC AND MR. DOYLE WERE NOT

25   BEING TRANSPARENT WITH ME ABOUT THEIR DECISION TO MOVE FORWARD

1  WITH THIS WITHOUT THE PROPER TESTING IN PLACE.

2  **Q.**  HAD YOU HEARD ABOUT THAT THE NIGHT BEFORE?

3  **A.**  YES, SIR.

4  **Q.**  COULD YOU BRING UP, PLEASE, EXHIBIT -- WELL, EXHIBIT

5  NO. 987.  I THINK IT IS IN YOUR BINDER, MR. GUYARDO.

6      IS TRIAL EXHIBIT NO. 987, AN EMAIL THAT YOU RECEIVED ON

7  AUGUST 23, 2012?

8  **A.**  YOU SAID 980?

9  **Q.**  987.

10  **A.**  I JUST HAVE 984 AND IT JUMPS TO 988.

11  **Q.**  PERHAPS YOU CAN LOOK AT THE SCREEN THEN.

12  **A.**  SURE.

13  **Q.**  DO YOU RECOGNIZE EXHIBIT 987 AS AN EMAIL YOU RECEIVED ON

14  AUGUST 23, 2012?

15  **A.**  YES.

16      **MR. HUMMEL:**  YOUR HONOR, WE WOULD MOVE EXHIBIT 987.

17      **MR. EDMONDSON:**  NO OBJECTION.

18      **THE COURT:**  ADMITTED.

19      (TRIAL EXHIBIT 987 RECEIVED IN EVIDENCE)

20  **BY MR. HUMMEL:**

21  **Q.**  THIS EMAIL IS WRITTEN BY A MAX GOPALAN?

22  **A.**  YES.

23  **Q.**  WHO'S MAX GOPALAN?

24  **A.**  HE'S A YOUNG MAN THAT WORKED IN BRAD'S GROUP, I BELIEVE.

25  **Q.**  HE WROTE TO YOU IN THE FIRST PARAGRAPH OF THIS EMAIL:

1        JUST WANTED TO PROVIDE A HEADS UP ON THE TWO THINGS

2    RELATED TO PAY PREMIUM ROLL-OFF YOU CAN EXPECT TO SEE IN THE

3    CUSTOMER EXPERIENCE STEERING COMMITTEE MEETING ON TUESDAY.

4        DO YOU SEE THAT?

5    **A.**  YES.

6    **Q.**  HE WRITES:

7        I JUST DISCOVERED THAT ADVANCED WARNING HAS RESURFACED

8    UNDER THE SIMPLIFIED BILLING INITIATIVE.

9        DO YOU SEE THAT?

10   **A.**  YES.

11   **Q.**  IS THIS THE EMAIL THAT PROMPTED YOU TO WRITE 988?

12   **A.**  YES.

13   **Q.**  THE ISSUE THERE WAS, AS HE SAYS:

14       I'M UPSET BY THE LACK OF COLLABORATION AND TRANSPARENCY

15   WITHIN THE CX TEAM.

16       RIGHT?

17   **A.**  YES, SIR.

18   **Q.**  SO THIS WASN'T ANY CONCERN ABOUT NOT BEING TRANSPARENT

19   WITH CONSUMERS, WAS IT?

20   **A.**  IT HAD NOTHING TO DO WITH TRANSPARENCY TO CONSUMERS.

21   **Q.**  ALL RIGHT.  AND IN CONNECTION WITH THE SIMPLIFIED BILLING

22   INITIATIVE, WAS ADVANCED WARNING ACTUALLY IMPLEMENTED?

23   **A.**  YES.  YES, IT WAS.

24   **Q.**  CAN YOU DESCRIBE HOW THAT WORKED?

25   **A.**  IT WAS, TO THE BEST OF MY RECOLLECTION, EVERY MONTH WE

GUYARDO – CROSS / HUMMEL

1    WOULD ALERT CUSTOMERS THAT THEY, IF IT WAS A PROMOTIONAL

2    PERIOD OVER 12 MONTHS, WE WOULD LET THEM KNOW THAT THEY HAD 10

3    OF 12 PROMOTIONAL CREDITS LEFT.  AND THEN THE NEXT MONTH IT

4    WOULD BE 9 OF 12, AND THEN 8 OF 12.  SO IT WAS A BIT OF A

5    COUNTDOWN TO LET THEM KNOW WHAT PROMOTIONAL PERIOD THEY HAD

6    LEFT.

7    **Q.**  AND IN CONNECTION WITH EXHIBIT 988, WHICH I THINK

8    MR. EDMONDSON CHARACTERIZED AS YOUR RESISTANCE TO THE -- THIS

9    ADVANCED WARNING, NOTWITHSTANDING THAT EMAIL, IN FACT, DIRECTV

10   PROCEEDED WITH A SIMPLIFIED BILLING PROJECT THAT HAD ADVANCED

11   WARNING, CORRECT?

12   **A.**  CORRECT.

13   **Q.**  NOW LET'S MOVE, PLEASE, TO EXHIBIT 983.

14                    (DISPLAYED ON SCREEN.)

15       MR. EDMONDSON SHOWED YOU THIS EMAIL FROM EVELYN KO WHO

16   WORKED IN YOUR ORGANIZATION, CORRECT?

17   **A.**  YES, SIR.

18   **Q.**  I'M SORRY, IT IS FROM YOU TO EVELYN KO?

19   **A.**  YES, SIR.

20   **Q.**  RIGHT?  IN IT, YOU WRITE:

21       EVELYN, I LIKE THAT WE'RE IN THE CLIPPER.

22       SEE THAT?

23   **A.**  YES, SIR.

24   **Q.**  AND THE CLIPPER NOW HAS BEEN MARKED AS EXHIBIT 2013A.

25       DO YOU HAVE THAT MAGAZINE IN FRONT OF YOU?

1    **A.**  I DON'T KNOW WHAT I DID WITH THE CLIPPER.

2         I HAVE IT.

3    **Q.**  YOU HAVE IT?

4    **A.**  UH-HUH.

5    **Q.**  OKAY.

6         SO MR. EDMONDSON ASKED YOU ABOUT 2093, WHICH IS THE

7    ISOLATED DIRECTV AD WITHIN THIS ENTIRE MAGAZINE.  DO YOU

8    RECALL THAT?

9    **A.**  YES, SIR.

10   **Q.**  AFTER YOU WRITE, I LIKE THAT WE'RE IN THE CLIPPER, YOU

11   WRITE:  OUR AD FITS VERY NICELY WITH THE OTHER ADS IN THE

12   MAGAZINE.

13        DO YOU SEE THAT?

14   **A.**  YES, SIR.

15   **Q.**  COULD YOU OPEN THE MAGAZINE TO THE PAGE WHERE THE DIRECTV

16   AD APPEARS JUST BY WAY OF DEMONSTRATING?

17        DO YOU HAVE THAT, SIR?

18   **A.**  YES.

19   **Q.**  COULD YOU LOOK AT THE PAGE IMMEDIATELY NEXT TO THE DIRECTV

20   AD?  THERE'S AN AD FOR SEARS.

21   **A.**  YES.

22   **Q.**  I WANT TO MAKE SURE THE COURT HAS THAT OPEN.

23                  (PAUSE IN THE PROCEEDINGS.)

24        SO THE SEARS AD ALSO HAS A RED BUBBLE, HAS LEGAL TYPE, HAS

25   A CALL TO ACTION PHONE NUMBER, HAS ADVERTISED SAVINGS AND

1   ALLOWED TERMS AND CONDITIONS.

2       DO YOU SEE THAT?

3   **A.**  YES.

4   **Q.**  IS THAT, SIR, WHAT YOU MEANT WHEN YOU WROTE, OUR AD FITS

5   VERY NICELY WITH THE OTHER ADS IN THE MAGAZINE?

6   **A.**  NOT NECESSARILY.

7   **Q.**  OKAY.  WHAT DID YOU MEAN BY THAT SENTENCE?

8   **A.**  I LIKE THE FACT THAT -- I LIKED ITS PLACEMENT.  I LIKED --

9   IT'S CERTAINLY ONE OF THE THINGS I COULD HAVE BEEN MENTIONING.

10  I DON'T REALLY REMEMBER.

11  **Q.**  DO YOU RECALL AT SOME POINT LOOKING AT THE CLIPPER

12  MAGAZINE AND UNDERSTANDING THE CONTEXT IN WHICH THE DIRECTV

13  ADVERTISEMENT WOULD BE DISPLAYED?

14  **A.**  YES.

15  **Q.**  AND WHAT WAS THE PURPOSE, FROM YOUR PERSPECTIVE, OF HAVING

16  ADS LIKE EXHIBIT 2013 DISSEMINATED?

17  **A.**  TO GET PROSPECTIVE NEW CUSTOMERS TO CALL OR GO ONLINE SO

18  THAT WE COULD BEGIN THE PROCESS OF SIGNING THEM UP TO BECOME A

19  DIRECTV CUSTOMER.

20  **Q.**  DID YOU INTEND FOR PRINT ADS OR CLIPPER ADS OF THE TYPE IN

21  2013 TO PROMINENTLY DISCLOSE ALL OF THE TERMS AND CONDITIONS

22  RELATING TO AN OFFER?

23  **A.**  I FEEL LIKE WE DID ADEQUATELY DISCLOSE.

24  **Q.**  YEAH.

25  **A.**  IN ALL OF OUR ADS.

1    **Q.**  I UNDERSTAND.

2        WAS THE FOCUS OF THIS AD, THOUGH, TO DESCRIBE IN GREAT

3    DETAIL ALL OF THE TERMS AND CONDITIONS OF THE OFFER?

4    **A.**  NO, IT WAS NOT.

5    **Q.**  HOW DID YOU INTEND, AGAIN, AS THE HEAD OF MARKETING, TO

6    HAVE THOSE TERMS CONVEYED TO A CONSUMER?

7    **A.**  WELL, WE START, WHILE NOT PROMINENTLY, WE DO PROVIDE ALL

8    OF THE NECESSARY DISCLOSURES IN THE AD ITSELF, BUT THEN THIS

9    IS A MULTISTEP JOURNEY.

10       ONCE THE CUSTOMER WOULD CALL OR GO ONLINE, AN AVERAGE CALL

11   WAS OVER 20, 30 MINUTES IN LENGTH.  AND SO THERE WAS AN

12   OPPORTUNITY, AGAIN, AT THIS SECOND POINT TO EXPLAIN TO THE

13   CUSTOMER ALL OF THE DISCLOSURES, AS YOU CALL THEM.  SO

14   OBVIOUSLY THE CALL WAS THE SECOND OPPORTUNITY.

15       WE THEN IMPLEMENTED A CONFIRMATION EMAIL WHERE THERE WAS A

16   THIRD OPPORTUNITY TO PROVIDE THE DISCLOSURES AND OFFER THE

17   CONSUMER TO REVIEW THE DISCLOSURES.  AND THEN THERE WAS

18   ACTUALLY A FACE-TO-FACE INTERACTION WITH ONE OF OUR

19   PROFESSIONAL TECHS THAT WOULD COME OUT TO THE HOME, AND THE

20   CUSTOMER WOULD HAVE THE OPPORTUNITY TO SPEAK DIRECTLY WITH

21   THAT MAN OR WOMAN BEFORE SIGNING THE AGREEMENT.

22   **Q.**  LET'S LOOK AT EXHIBIT 990, WHICH WAS SHOWN TO YOU.

23                    (DISPLAYED ON SCREEN.)

24   **A.**  YES, SIR.

25   **Q.**  THESE, I THINK, YOU TESTIFIED WERE -- ONE WAS AN ACTUAL

1   END CARD AT THE END OF A TELEVISION AD AND ONE WAS A PROPOSED

2   ALTERNATIVE END CARD FROM JON GIESELMAN TO YOU; IS THAT RIGHT?

3   **A.**  YES, SIR.

4   **Q.**  AND, AGAIN, WITH RESPECT TO THIS END CARD IN A TELEVISION

5   AD, WAS IT THE INTENT OF DIRECTV TO CONVEY ALL OF THE NUMEROUS

6   TERMS AND CONDITIONS WITH RESPECT TO ANY PARTICULAR OFFER AT

7   THAT POINT IN TIME?

8   **A.**  NO.

9   **Q.**  WHY?

10  **A.**  AGAIN, BECAUSE PURCHASING DIRECTV IS A HIGH INVOLVEMENT

11  PURCHASE.  IT'S A COMPLEX PURCHASE.  IT'S NOT AS EASY AS

12  WALKING INTO STARBUCKS AND BUYING A CUP OF COFFEE.

13      AND SO THAT'S WHY WE HAVE A MULTISTEP PROCESS THAT I FELT

14  CONTINUALLY GOT BETTER OVER THE YEARS WHERE THERE WOULD BE

15  OTHER OPPORTUNITIES IN THIS NEW CUSTOMER SIGN-UP JOURNEY TO

16  FULLY DISCLOSE EVERYTHING TO THE CONSUMER.

17          **MR. HUMMEL:**  IF YOU CAN BLOW UP THE TOP END CARD ON

18  THIS EXHIBIT, PLEASE?

19                  (DISPLAYED ON SCREEN.)

20  **BY MR. HUMMEL:**

21  **Q.**  WHAT THAT SAYS FOR A COUPLE OF SECONDS AT THE END OF A

22  LONG TV AD, AND WE HAVE HAD ONE DISPLAYED AT THE TRIAL SO FAR,

23  IS PACKAGE OFFERS STARTING AT 24.99 PER MONTH.

24      DO YOU SEE THAT?

25  **A.**  YES, SIR.

1    **Q.**  WAS THAT TRUE?

2    **A.**  YES.

3    **Q.**  SO YOU HAD A PACKAGE THAT WAS AVAILABLE AT, I THINK WHAT

4    YOU CALLED, AN INTRODUCTORY OR PROMOTIONAL PRICE AT 24.99?

5    **A.**  PERHAPS IT WAS AN INTRODUCTORY PRICE OR PERHAPS IT WAS

6    JUST A BASE-PRICED PACKAGE.

7    **Q.**  IN ANY EVENT, WHAT WERE YOU INTENDING TO CONVEY BY THE

8    ENTIRETY OF THAT END CARD TO CONSUMERS?

9    **A.**  I WANTED THEM TO SEE THE ATTRACTIVE PROMOTIONAL PRICING.

10   I WANTED THEM TO KNOW THAT IT WAS A LIMITED TIME TO INCENT

11   THEM TO ULTIMATELY EITHER CALL 1-800 DIRECTV OR GO TO

12   DIRECTV.COM.

13   **Q.**  WAS THE GOAL OF THIS END CARD TO DRIVE CONSUMERS TO THE

14   PHONE OR TO THE WEBSITE TO FIND ADDITIONAL INFORMATION?

15   **A.**  ABSOLUTELY.

16   **Q.**  SO NOW LET'S LOOK AT EXHIBIT 991.

17       EXHIBIT 991 IS AN EMAIL FROM PETE MARTIN TO YOU DATED

18   APRIL 6, 2014.

19                     (DISPLAYED ON SCREEN.)

20       DO YOU SEE THAT EMAIL?

21   **A.**  YES, SIR.

22   **Q.**  AND IT ATTACHES A POWER POINT DECK ENTITLED REVENUE AND

23   MARKETING, PAUL GUYARDO EXECUTIVE VICE PRESIDENT.

24       DO YOU RECOGNIZE THIS EMAIL AND THIS DOCUMENT?

25   **A.**  YES, SIR.

1   **Q.**  IS THIS A POWER POINT THAT YOU PREPARED IN THE ORDINARY

2   COURSE OF BUSINESS AT DIRECTV?

3   **A.**  YES, IT WAS.

4   **Q.**  WHO WAS THE INTENDED AUDIENCE OF THIS POWER POINT, IF YOU

5   RECALL?

6   **A.**  I DON'T SPECIFICALLY RECALL WHO I GAVE THIS PARTICULAR

7   PRESENTATION TO.

8   **Q.**  WOULD IT HAVE BEEN WITHIN THE COMPANY?

9   **A.**  IT PROBABLY WOULD, OR IT WOULD HAVE BEEN SOMETHING THAT I

10  MIGHT HAVE SHARED WITH AN INCOMING NEW BOARD MEMBER TO GIVE

11  THEM AN UNDERSTANDING OF WHAT THE REVENUE AND MARKETING

12  DEPARTMENT WAS.

13  **Q.**  AND DID THE POWER POINT, TO THE BEST OF YOUR RECOLLECTION,

14  CONTAIN ACCURATE INFORMATION AND DATA?

15  **A.**  YES, SIR.

16          **MR. HUMMEL:**  YOUR HONOR, MOVE EXHIBIT 991.

17          **THE COURT:**  IS THERE ANY OBJECTION?

18  **BY MR. HUMMEL:**

19  **Q.**  IF YOU COULD TURN TO --

20          **THE CLERK:**  I'M SORRY.

21          **THE COURT:**  HOLD ON.

22      ADMITTED.  THANKS.

23          (TRIAL EXHIBIT 991 RECEIVED IN EVIDENCE)

24          **MR. HUMMEL:**  I'M SORRY, YOUR HONOR.  APOLOGIZE.

25

1    **BY MR. HUMMEL:**

2    **Q.**  FIRST PAGE OF THE POWER POINT SAYS, REVENUE AND MARKETING,

3    PAUL GUYARDO, EXECUTIVE VICE PRESIDENT.

4        THIS INDICATES THAT THIS IS A DECK THAT YOU DRAFTED, WERE

5    RESPONSIBLE FOR, AND PRESENTED, CORRECT?

6    **A.**  YES.

7             **MR. HUMMEL:**  AND GO TO THE SECOND PAGE OF THE POWER

8    POINT, PLEASE.

9                        (DISPLAYED ON SCREEN.)

10   **BY MR. HUMMEL:**

11   **Q.**  AS OF 2014 IN APRIL, THIS WAS A -- PUTTING THE HANDWRITING

12   ASIDE FOR A MINUTE, I DON'T KNOW WHAT THAT IS --

13   **A.**  IT IS MY HANDWRITING.

14   **Q.**  IT'S YOUR HANDWRITING?

15       DOES THIS ACCURATELY SHOW BASICALLY YOUR ORGANIZATION?

16   **A.**  YES, IT DOES.

17   **Q.**  AND SO WE'VE GOT JON GIESELMAN, WHO WE TALKED ABOUT,

18   SHANNON CAMPAIN, WHO WE'LL HEAR FROM, KAREN LEEVER, WHO WE'LL

19   HEAR FROM, AND BRAD BENTLEY.

20       DO YOU SEE THAT?

21   **A.**  YES, SIR.

22   **Q.**  THERE WAS A GENTLEMAN NAMED GILES LUNDBERG, WHO WAS THEN

23   THE HEAD OF THE RESEARCH DEPARTMENT, RIGHT?

24   **A.**  YES.

25   **Q.**  WHAT WAS THE FUNCTION OF THE RESEARCH DEPARTMENT?

GUYARDO – CROSS / HUMMEL

1    **A.**  NO PERFORM CONSUMER RESEARCH, EITHER QUALITATIVE OR

2    QUANTITATIVE, THAT GAVE US AN UNDERSTANDING OF A WIDE VARIETY

3    OF ISSUES.

4    **Q.**  IF YOU CAN LOOK AT THE NEXT PAGE OF THE POWER POINT,

5    PLEASE.

6                        (DISPLAYED ON SCREEN.)

7        DOES THIS SHOW YOUR STRATEGIES AND OBJECTIVES AS OF 2014?

8    **A.**  YES, SIR.

9    **Q.**  I WOULD LIKE TO ASK YOU ABOUT THE FIRST THREE BULLETS.

10   BUILD A WORLD-CLASS BRAND.  DID YOU CONSIDER THAT YOUR

11   OBJECTIVE?

12   **A.**  NO.  I CONSIDERED IT A STRATEGY.

13   **Q.**  FAIR ENOUGH.  IT'S UNDER THE LABEL STRATEGIES.

14       SO WHAT DOES IT MEAN?

15   **A.**  IT MEANS TO CREATE A BRAND THAT CONSUMERS ARE PROUD TO BE

16   ASSOCIATED WITH, A REPUTABLE BRAND, A BRAND THAT

17   DIFFERENTIATES ITSELF FROM ITS COMPETITORS AS BEING SIMPLY

18   BETTER.

19   **Q.**  CAN YOU BRIEFLY DESCRIBE, DURING THE TIME THAT YOU WERE AT

20   DIRECTV, HOW YOU DIRECTED YOUR MARKETING GROUP TO

21   DIFFERENTIATE DIRECTV FROM THE COMPETITION?

22   **A.**  YES.  WE DIFFERENTIATED ON SEVERAL FRONTS.  THERE WERE

23   ADVERTISEMENTS THAT SOMETIMES DIFFERENTIATED ON OUR EXCLUSIVE

24   CONTENT, LIKE NFL SUNDAY TICKET THAT WAS CONTENT THAT YOU

25   COULD ONLY GET IF YOU HAD DIRECTV.

GUYARDO − CROSS / HUMMEL

1    THERE WERE OTHER TIMES THAT WE DIFFERENTIATED ON OUR

2    TECHNOLOGY.  WHEN I SAY "TECHNOLOGY", I'M TALKING ABOUT OUR

3    SUPERIOR PICTURE QUALITY OR HD CHANNELS.

4    AND THEN WE WERE VERY PROUD OF OUR CUSTOMER SERVICE, AND

5    THAT WAS A POINT OF DIFFERENTIATION AS WELL.

6  **Q.**  MR. EDMONDSON FOCUSED ON THE RED BUBBLE PROMOTIONAL

7    PRICING AND ASKED YOU ABOUT A CALL TO ACTION.

8    FROM YOUR PERSPECTIVE, WHAT WAS THE PURPOSE OF HAVING

9    PRICING DISPLAYED LIKE THAT IN ADVERTISING?

10  **A.**  TO COMMUNICATE TO CONSUMERS THAT SIGNING UP FOR DIRECTV --

11   TO ENCOURAGE THEM TO SIGN UP FOR DIRECTV, TO LET THEM KNOW

12   THAT IT WAS AN ATTRACTIVE PRICE.

13  **Q.**  DID YOU HAVE THE COMPETITION IN MIND AT ALL IN DECIDING TO

14   ADVERTISE IN THAT WAY?

15  **A.**  ABSOLUTELY.

16  **Q.**  HOW SO?

17  **A.**  WELL, WHEN I STARTED AT DIRECTV, OUR PRIMARY COMPETITOR

18   WAS CABLE.  AND CABLE WAS OUT THERE VERY AGGRESSIVELY

19   PROMOTING THEIR 29.99 VIDEO PACKAGES.

20   AND OVER THE COURSE OF THE TEN YEARS THAT I WAS AT

21   DIRECTV, THE COMPETITIVE ENVIRONMENT BECAME EVEN MORE FIERCE

22   WITH MORE COMPETITIVE ENTRIES.

23  **Q.**  LOOK AT THE SECOND BULLET, PLEASE.

24   IT SAYS, ATTRACT AND RETAIN HIGH-VALUE CUSTOMERS.

25   WHAT DOES HIGH-VALUE CUSTOMERS MEAN IN THAT CONTEXT?

GUYARDO – CROSS / HUMMEL

1    **A.**  A HIGH-VALUE CUSTOMER IS A CUSTOMER WHO IS GOING TO SIGN

2    UP AND STAY ON THE DIRECTV PLATFORM FOR A VERY LONG TIME AND

3    DELIVER WHAT'S CALLED A HIGH LTV OR LIFETIME VALUE.

4    **Q.**  WHAT DOES LTV MEAN?

5    **A.**  LIFETIME VALUE.

6    **Q.**  CAN YOU DESCRIBE IT A LITTLE BIT, WHAT -- WHY WAS IT

7    IMPORTANT TO YOU?

8    **A.**  LTV IS A MEASUREMENT OR METRIC THAT IS COMMONLY USED IN A

9    SUBSCRIPTION BUSINESS.  BECAUSE IT'S NOT A SIMPLE TRANSACTION.

10       THIS IS A HOPEFULLY LONG-TERM RELATIONSHIP WITH A

11   CONSUMER.  AND WHAT THE LTV CALCULATION BASICALLY IS, IS THE

12   AMOUNT OF REVENUE AND PROFITS THAT ARE GENERATED FROM THAT

13   CUSTOMER AFTER ALL EXPENSES ARE DEDUCTED.

14   **Q.**  WERE YOU ABLE TO DRIVE, DURING YOUR TIME AT DIRECTV,

15   CUSTOMERS TO STAY ON THE PLATFORM IN A LONGER -- FOR A LONGER

16   PERIOD OF TIME?

17   **A.**  YES.

18   **Q.**  CAN YOU DESCRIBE THAT?

19   **A.**  THE --

20   **Q.**  LENGTH OF TIME ON THE PLATFORM.

21   **A.**  LENGTH OF TIME ON THE PLATFORM OR CHURN, AS I WILL

22   TYPICALLY REFER TO IT, IS CRITICALLY IMPORTANT.  IT'S THE MOST

23   IMPORTANT METRIC IN LIFETIME VALUE.

24       AND I THINK IF YOU LOOK AT ANOTHER PAGE --

25   **Q.**  LET'S LOOK AT THE NEXT PAGE OF THE SLIDE.

```
 1              (DISPLAYED ON SCREEN.)

 2         MR. HUMMEL:  NOT THAT ONE, THE PREVIOUS ONE, THE

 3   PREVIOUS PAGE.

 4              (DISPLAYED ON SCREEN.)

 5      THERE WE GO.

 6         THE WITNESS:  SECOND ROW.

 7   BY MR. HUMMEL:

 8   Q.   OKAY.  SECOND ROW IS LABELED CHURN RATE?

 9   A.   UH-HUH.

10   Q.   WHAT DOES THAT MEAN?

11   A.   THAT IS -- THAT'S MONTHLY NUMBER.  AND IT IS THE

12   PERCENTAGE OF -- THE NUMBER OF CUSTOMERS WHO HAVE DISCONNECTED

13   IN A PARTICULAR MONTH AS A PERCENTAGE OF THE TOTAL SUBBASE.

14      SO IN A PARTICULAR -- OR IN THIS CASE, THIS IS AN ANNUAL

15   NUMBER THAT I WAS SHARING.  AND SO BASICALLY IT SAID THAT

16   1.56 PERCENT OF ALL OF THE CONSUMERS HAD CHURNED IN THAT

17   PARTICULAR YEAR.

18   Q.   IN 2011?

19   A.   CORRECT.

20   Q.   AND IN -- ROUGHLY SPEAKING, THIS CHURN RATE PERCENTAGE

21   STAYS AROUND 1.5 PERCENT CONSTANT FROM 2007 TO 2013, AND

22   THAT'S IS A MONTHLY CHURN?

23   A.   YES.  AND THE ONLY REASON IT POPPED UP IN 2011 WAS BECAUSE

24   WE HAD A MAJOR PROGRAMMING DISPUTE WITH VIACOM.  SO IF YOU

25   TAKE THAT OUT, YOU CAN SEE THAT DESPITE AN INCREASINGLY
```

GUYARDO – CROSS / HUMMEL

1    COMPETITIVE ENVIRONMENT -- BECAUSE OVER THAT TIME, IN ADDITION
2    TO TRADITIONAL CABLE, YOU HAD THE INTRODUCTION OF VERIZON
3    FIOS, YOU HAD AT INTRODUCTION OF AT&T U-VERSE, AND THEN YOU
4    HAD THE NONTRADITIONAL NETFLIX, HULU'S THAT WERE ALL STARTING
5    TO MAKE HEADWAY.
6        AND DESPITE ALL OF THAT INCREASED COMPETITION, WE WERE
7    ABLE TO KEEP CHURN ESSENTIALLY FLAT FOR ALL OF THOSE YEARS.
8    **Q.**  WHAT DOES THE LINE ARPU MEAN?
9    **A.**  AVERAGE REVENUE PER UNIT.
10   **Q.**  THAT IS PER CUSTOMER?
11   **A.**  YES.  UNIT IS -- IT'S JUST AN OLD TELCO TERM.  IT APPLIES
12   TO AVERAGE REVENUE PER CONSUMER OR CUSTOMER.
13   **Q.**  THAT'S INCREASING ALMOST ANNUALLY FROM 2007 TO 2013?
14   **A.**  YES, IT IS.
15   **Q.**  WHAT DOES THAT INDICATE TO YOU IN TERMS OF LIFETIME
16   TENURE?
17   **A.**  IT TELLS ME THAT WE ARE DOING A VERY GOOD JOB OF
18   DELIVERING STRATEGY NUMBER TWO, ATTRACTING AND RETAINING
19   HIGH-VALUE CUSTOMERS.  CUSTOMERS WERE STAYING ON THE PLATFORM.
20   THEY LIKED THE SERVICE AND WERE WILLING TO PAY MORE FOR IT
21   EVERY SINGLE YEAR.
22   **Q.**  IF YOU LOOK AT THE NEXT SLIDE, PLEASE.
23                  (DISPLAYED ON SCREEN.)
24       WHAT DOES THIS SLIDE INDICATE TO YOU, SIR?
25   **A.**  WHAT THIS SHOWS IS NET ADS, AND THAT'S VERY IMPORTANT

```
1   BECAUSE NET ADS IS NEW CUSTOMERS AND THEN YOU SUBTRACT THE

2   CHURN, AND SO THEN YOU ARE LEFT WITH NET ADS.

3       SO -- AND IT SHOWS THAT THE DIRECTV SUBSCRIBER BASE GREW

4   BY 3.5 MILLION SUBSCRIBERS FROM 2008 TO 2013 WHILE ALL OF OUR

5   OTHER COMPETITORS COMBINED ONLY GREW BY 400,000.

6   Q.  NOW CAN WE LOOK AT TRIAL EXHIBIT NO. 19.

7                   (DISPLAYED ON SCREEN.)

8   A.  I DON'T HAVE THAT IN MY -- I CAN LOOK AT THE SCREEN.

9   Q.  IT IS LEGIBLE --

10          THE COURT:  I THINK THIS IS THE BINDER SWITCH ISSUE.

11          MR. HUMMEL:  PROBABLY.

12          THE COURT:  IT WASN'T IN THE GOVERNMENT'S BINDER.

13          MR. HUMMEL:  IT'S IN THE BLACK BINDER, MR. GUYARDO,

14  IF YOU HAVE ONE THERE.

15          THE WITNESS:  I HAVE POLING-HIRALDO --

16          MR. HUMMEL:  IT'S THE WRONG ONE.

17          THE CLERK:  YOU HAVE SOME BINDERS -- THOSE ARE YOURS.

18                   (PAUSE IN THE PROCEEDINGS.)

19  BY MR. HUMMEL:

20  Q.  LET ME KNOW WHEN YOU HAVE IT IN FRONT OF YOU.

21  A.  GOT IT.

22  Q.  ALL RIGHT.

23      SO TRIAL EXHIBIT 19 IS A DOCUMENT THAT -- DO YOU RECOGNIZE

24  IT?

25  A.  YES, I DO.
```

1    **Q.**  WHAT IS IT?

2    **A.**  2011 SALES AND MARKETING OBJECTIVES YEAR-END REVIEW.

3    **Q.**  WERE YOU RESPONSIBLE FOR PREPARING THIS DOCUMENT?

4    **A.**  YES, I WAS.

5          **MR. HUMMEL:**  MOVE EXHIBIT 19, YOUR HONOR.

6          **MR. EDMONDSON:**  NO OBJECTION.

7          **THE COURT:**  19 IS ADMITTED.

8             (TRIAL EXHIBIT 19 RECEIVED IN EVIDENCE)

9    **BY MR. HUMMEL:**

10   **Q.**  LOOK AT PAGE 2 OF THE DOCUMENT.  I AM GOING TO ASK YOU

11   SOME QUESTIONS ABOUT SOME SELECTIVE SECTIONS HERE.

12       C SAYS:  FURTHER STRENGTHEN DIRECTV BRAND BY DELIVERING

13   THE BEST ADVERTISING AND MARKETING IN THE INDUSTRY.

14       DO YOU SEE THAT?

15   **A.**  YES.

16   **Q.**  HOW DID YOU INTEND TO DO THAT?

17   **A.**  HOW DID I DO THAT?

18   **Q.**  YES.

19   **A.**  WE -- WELL, FIRST OF ALL, IT WAS VERY MUCH A TEAM EFFORT.

20   I DON'T WANT TO TAKE INDIVIDUAL CREDIT FOR ANYTHING.

21       GIESELMAN AND HIS TEAM AND OUR AGENCY PARTNERS DEVELOPED

22   PHENOMENAL CREATIVE, AND I THINK THAT IS DEMONSTRATED BY BOTH

23   THE QUANTITATIVE METRIC THAT'S ON THE PAGE WHICH WAS WHATEVER

24   SALES GOALS THAT WE HAD TARGETED FOR THE 1-800 NUMBER --

25          **THE CLERK:**  KEEP GOING.  IGNORE ME.  KEEP GOING.

1              **THE WITNESS:**  THE QUANTITATIVE METRICS, AND THEN YOU

2   CAN SEE A WHOLE HOST OF CRITICAL ACCLAIM.  THOSE AWARDS ARE

3   ANALOGOUS TO AN OSCAR IN FILMS, A TONY IN THEATER, AN EMMY IN

4   TELEVISION.  THESE ARE THE KIND OF AWARDS THAT ARE HANDED OUT

5   IN THE ADVERTISING BUSINESS.

6   **Q.**  SO BOTH QUANTITATIVE AND QUALITATIVE METRICS?

7   **A.**  YES.

8   **Q.**  ALL RIGHT.

9       NOW, IF YOU CAN TURN TO PAGE 5 OF THIS DOCUMENT, AND ASK

10  YOU TO FOCUS ON THE BOTTOM OF PAGE 5.

11      AS ONE OF THE STATED OBJECTIVES FOR THE YEAR, YOU WROTE:

12      H, REDUCE CHURN AND INCREASE CUSTOMER LOYALTY.

13      AND THE FIRST BULLET POINT -- BY THE WAY, IS THIS A

14  DOCUMENT THAT APPEARS PUBLICLY OR IS THIS A PRIVATE DOCUMENT

15  WITHIN DIRECTV?

16  **A.**  THIS IS A PRIVATE DOCUMENT.

17  **Q.**  YOU WRITE:

18      DEVELOP AND IMPLEMENT PLAN TO IMPROVE THE SETTING OF

19  CUSTOMER EXPECTATIONS AT POINT OF SALE RIGHT-FITTING

20  PROGRAMMING/HARDWARE, CLEARLY EXPLAINING COSTS, TERMS AND

21  CONDITIONS.

22      DO YOU SEE THAT?

23  **A.**  YES, SIR.

24  **Q.**  WAS THAT YOUR OBJECTIVE?  AND THEN I AM GOING TO ASK YOU

25  SOME SPECIFIC QUESTIONS.

1    **A.**  IT CERTAINLY WAS ONE OF THEM.

2    **Q.**  WHY WAS IT IMPORTANT TO IMPROVE CUSTOMER EXPECTATIONS AT

3    THE POINT OF SALE?

4    **A.**  AT THE END OF THE DAY, IT WAS SO IMPORTANT BECAUSE WE WANT

5    A CUSTOMER TO BE HIGHLY SATISFIED AND STAY ON THE DIRECTV

6    PLATFORM FOR A VERY, VERY LONG TIME.  THAT IS THE ONLY WAY

7    THAT WE COULD ACHIEVE THE OBJECTIVE, WHICH YOU POINTED OUT,

8    WHICH IS TO DRIVE, YOU KNOW, REVENUE AND PROFIT GROWTH.  IT

9    ALL HINGES ON SATISFIED CUSTOMERS WHO STAY ON THE PLATFORM ON

10   AVERAGE OF FIVE YEARS.

11   **Q.**  LET'S LOOK AT THE NEXT PAGE, PLEASE, YEAR-END RESULT.

12                    (DISPLAYED ON SCREEN.)

13           **MR. HUMMEL:**  AND IF YOU CAN BRING UP THAT WHOLE

14   PARAGRAPH UNDERNEATH.

15   **BY MR. HUMMEL:**

16   **Q.**  IT SAYS IN THE FIRST BULLET:

17       FOCUS ON BETTER EXECUTION OF REQUIRED CALL COMPONENTS.

18       DO YOU KNOW WHAT THOSE ARE?

19   **A.**  YES.

20   **Q.**  WHAT ARE THEY?

21   **A.**  THEY WERE THE VARIOUS DISCLOSURES SPECIFIC TO WHEN THE

22   PROMOTIONAL PERIOD ENDED AND THE PRICE ROLLED UP TO THE

23   REGULAR PRICE.

24       IT WOULD HAVE PERTAINED TO THE FREE PAY PREMIUMS AND WHEN

25   THAT OCCURRED.  IT WOULD HAVE BEEN TALKED ABOUT OUR EARLY

GUYARDO – CROSS / HUMMEL

1    CANCELLATION FEE AND IT WOULD HAVE TALKED ABOUT THE TWO-YEAR

2    AGREEMENT.

3    **Q.**   AND REQUIRED CALL COMPONENTS, THIS HAS NOTHING TO DO WITH

4    THE WEBSITE.  THIS IS WHEN A CUSTOMER CALLS TO SIGN UP, RIGHT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   THESE ARE DISCLOSURES THAT A CALL AGENT IS REQUIRED TO

7    READ?

8    **A.**   THAT'S CORRECT.

9    **Q.**   AND IF THEY DON'T READ THEM, THERE'S SOMETHING CALLED AN

10   AUTO-FAIL.  DO YOU SEE THAT IN YOUR PARAGRAPH THERE?

11   **A.**   YES, SIR.

12   **Q.**   (READING)

13       RESULTING IN A 20 PERCENT DECREASE IN AUTO-FAIL OFFENSES

14   BY OUR DIRECT SALES AGENTS.

15       DO YOU SEE THAT?

16   **A.**   YES.

17   **Q.**   ALL RIGHT.  DOES THAT MEAN THAT YOU HAD IMPROVED ON

18   COMPLIANCE WITH THE REQUIRED CALL COMPONENTS?

19   **A.**   ABSOLUTELY.

20   **Q.**   NOW, IF YOU COULD LOOK, PLEASE, AT THE NEAR, LIKE THE

21   THIRD OF THE WAY TO THE BOTTOM, IT SAYS IN 2011.  AND THE

22   CONTEXT HERE IS 2011, WHICH IS BEFORE THE CX PROJECT REALLY

23   STARTED, CORRECT?

24   **A.**   YES.  IT REALLY STARTED IN 2012.

25   **Q.**   SO NOTWITHSTANDING THAT A PAIN POINT HAD BEEN IDENTIFIED

1    RELATING TO THE REBATE PROGRAM WHERE A CUSTOMER HAD TO MAIL

2    SOMETHING IN OR DO IT ON THE WEB, IN 2011 YOU WRITE:

3        SAW THE HIGHEST REBATE REDEMPTION RATES EVER AT 83 PERCENT

4    WITH OVER HALF OF AL REDEEMERS GETTING THE CREDITS ON THEIR

5    FIRST BILL BY REDEEMING PRIOR TO ACTIVATION.

6        DO YOU SEE THAT?

7    **A.**   YES.

8    **Q.**   WHAT DOES THAT MEAN?

9    **A.**   THAT MEANT THAT ALL OF THE CONSUMERS THAT WE EXTENDED THE

10   MAIL-IN REBATE TO, 83 PERCENT ACTUALLY REDEEMED.

11   **Q.**   MEANING THEY GOT THE REBATE AND IT APPEARED ON THEIR FIRST

12   BILL?

13   **A.**   CORRECT.

14   **Q.**   BUT FOR SOME AMOUNT NUMBER OF CUSTOMERS THAT WAS STILL A

15   PAIN POINT THAT YOU BELIEVED MERITED ADDRESSING?

16   **A.**   YEAH.  IN THIS CASE 17 PERCENT.

17   **Q.**   LET'S LOOK AT EXHIBIT 986, PLEASE.

18       **THE COURT:**  SORRY, I HAVE ONE QUESTION ABOUT THAT

19   ONE.

20       HOW WERE AUTO-FAIL OFFENSES DETECTED?  WAS THERE AUDITING

21   OR HOW DID THAT HAPPEN?

22       **THE WITNESS:**  YES.  WE RECORDED ALL OF OUR CALLS, AND

23   SO THEY WERE REVIEWED BY A MANAGER OR SUPERVISOR.

24       **THE COURT:**  I SEE.

25

GUYARDO – CROSS / HUMMEL

1    **BY MR. HUMMEL:**

2    **Q.**  JUST TO FOLLOW UP ON HIS HONOR'S QUESTION.

3        THERE WAS A QUALITY CONTROL COMPLIANCE COMPONENT WITH

4    RESPECT TO THE SALES AGENTS THAT WERE MAKING CALLS?

5    **A.**  YES.  AND --

6    **Q.**  SORRY, I DIDN'T MEAN TO INTERRUPT YOU.

7    **A.**  GO AHEAD.

8    **Q.**  WHO, WITHIN YOUR ORGANIZATION, WAS RESPONSIBLE FOR THE

9    CALL CENTERS AND THAT AVENUE OF SALES AND THE QC?

10   **A.**  SHANNON CAMPAIN.

11   **Q.**  OKAY.

12       NOW LET'S TURN TO EXHIBIT 986, PLEASE.

13                          (DISPLAYED ON SCREEN.)

14       THIS IS A DOCUMENT, MR. GUYARDO, FROM THE MID-YEAR OF

15   2012.  IT'S DATED JULY 10, 2012?

16   **A.**  I'M SORRY.

17   **Q.**  EXHIBIT 986.  APPARENTLY --

18   **A.**  GOT IT.

19   **Q.**  DO YOU HAVE IT?

20   **A.**  YES.

21   **Q.**  IS THAT A DOCUMENT THAT YOU WERE RESPONSIBLE FOR

22   PREPARING?

23   **A.**  YES.

24           **MR. HUMMEL:**  YOUR HONOR, MOVE EXHIBIT 986, PLEASE.

25           **MR. EDMONDSON:**  NO OBJECTION.

1              **THE COURT:**  IT'S ADMITTED.

2              (TRIAL EXHIBIT 986 RECEIVED IN EVIDENCE)

3   **BY MR. HUMMEL:**

4   **Q.**  MR. GUYARDO, THE PURPOSE OF THIS DOCUMENT AT THIS TIME WAS

5   WHAT?

6   **A.**  THIS WAS A MID-YEAR REVIEW.  SO I WAS IN THE MIDDLE OF THE

7   YEAR GIVING MY SUPERVISOR, MIKE WHITE, OUR UNDERSTANDING OF

8   HOW I WAS TRACKING AGAINST THE GOALS AND OBJECTIVES THAT HE

9   AND I AGREED TO AT THE BEGINNING OF THE YEAR.

10  **Q.**  AND IF YOU LOOK AT THE KEY ACCOMPLISHMENTS AT THE BOTTOM

11  OF THE PAGE, IF YOU LOOK AT THE LAST ONE.  THIS LISTS A NUMBER

12  OF EFFORTS YOU HAD TO IMPROVE PERFORMANCE OF THE SALES AND

13  MARKETING GROUP.  IT SAYS:

14      THE SUM OF THE ABOVE EFFORTS HAVE YIELDED THE HIGHEST

15  LTV --

16      DOES THAT MEAN LIFETIME VALUE?

17  **A.**  YES.

18  **Q.**  -- IN OVER TWO YEARS AT $1232 UP $246 VERSUS LAST YEAR.

19      DO YOU SEE THAT?

20  **A.**  WHICH --

21  **Q.**  IT'S NOT A NUMBER.  IT'S RIGHT BELOW F AT THE VERY BOTTOM

22  OF THE PAGE.

23  **A.**  YES.  GOT IT.

24  **Q.**  COULD YOU HAVE ACHIEVED AN INCREASE IN LTV DURING THAT

25  TIME IF CUSTOMERS WERE CHURNING AT A HIGH RATE?

GUYARDO – CROSS / HUMMEL

1    **A.**  NO.

2    **Q.**  CAN YOU EXPLAIN WHY?

3    **A.**  CHURN IS ONE OF, IF NOT, PERHAPS, THE MOST IMPORTANT

4    METRIC THAT DRIVES LTV UP OR DRIVES LTV DOWN.

5    **Q.**  IF YOU CAN LOOK PLEASE AT PAGE 5 -- I'M SORRY,

6    MR. GUYARDO.

7    **A.**  I THINK TO ILLUSTRATE THE POINT, IF YOU LOOK AT THE TOP OF

8    THE DOCUMENT.

9    **Q.**  YES, SIR.

10                    (DISPLAYED ON SCREEN.)

11   **A.**  I THINK WHAT THIS ILLUSTRATES IS IF YOU LOOK AT THE CHURN

12   RATE, WE HAD SET A PLAN OF 150.

13       TO THE BEST OF MY RECOLLECTION, 1H MEANT THAT WAS THE

14   ACTUAL OF WHAT WE HAD ACHIEVED, A 148 VERSUS AN LY OF 154.  IN

15   THE CHURN BUSINESS YOU WANT THAT NUMBER TO GO DOWN.  LESS IS

16   BETTER.

17       SO THAT WOULD INDICATE THE IMPROVEMENT YEAR OVER YEAR

18   RELATIVE TO LY AND RELATIVE TO PLAN, AND THAT WOULD HAVE

19   PROBABLY BEEN ONE OF THE KEY DRIVERS FOR THE IMPROVED LTV.

20   **Q.**  NOW CAN YOU LOOK AT PAGE 5, PLEASE?

21   **A.**  SURE.

22       I FEEL BAD ABOUT ONE THING THAT I JUST WANTED TO ADDRESS.

23   **Q.**  OKAY.

24   **A.**  WHEN I ASK -- WHEN I ANSWERED YOUR QUESTION, SIR, I SAID

25   WE RECORDED ALL OF OUR CALLS.  I DON'T KNOW FOR A FACT IF WE

1    RECORDED ALL OF OUR CALLS, BUT WE RECORDED MANY OF OUR CALLS.

2    AND THAT WAS THE BASIS.

3            **THE COURT:**  ALL RIGHT.  THANK YOU FOR CLARIFYING

4    THAT.

5    **BY MR. HUMMEL:**

6    **Q.**  NOW IF YOU CAN LOOK, PLEASE, MR. GUYARDO, AT THE MIDDLE OF

7    PAGE 5.  IT SAYS:  SUPPORTING THE CUSTOMER EXPERIENCE.

8        AGAIN, THIS WAS YOUR REPORTING ON ACHIEVEMENTS OF THE

9    SALES AND MARKETING GROUP.  AND CUSTOMER EXPERIENCE AT THIS

10   POINT WAS THE NEW INITIATIVE BY MR. WHITE WHO IS THE CEO OF

11   THE COMPANY, CORRECT?

12   **A.**  YES.

13   **Q.**  AND THEN IF YOU COULD LOOK AT THE SENTENCE THAT SAYS:

14       SERVICE EXPERIENCE, AND THEN LAUNCHED SIMPLIFIED SELLING

15   AND ON-BOARDING EFFORTS AS FOLLOWS.

16       NO. 1 IS CREATED BUSINESS CASE TO DISCONTINUE

17   REDEMPTION-BASED NATIONAL ACQUISITION OFFERS.

18       DOES THAT MEAN GETTING RID OF THE REBATE?

19   **A.**  YES.

20   **Q.**  AND THEN IF YOU COULD LOOK PLEASE AT NO. 2.

21       ROLLED OUT SALES CRM APPLICATION TO ALL DIRECT SALES

22   AGENTS COMPLETE BY AUGUST.

23       WHAT IS THAT REFERRING TO?

24   **A.**  THAT WOULD HAVE BEEN ONE OF THE APPLICATIONS ON THE

25   DESKTOP THAT A SALES REPRESENTATIVE WOULD INTERFACE WITH TO

1   MAKE HIS OR HER JOB IN THE CALL CENTER, IN THE SALES CENTER

2   EASIER.

3   **Q.**  AND THIS WAS, AGAIN, THE RESPONSIBILITY OF MS. CAMPAIN?

4   **A.**  SHE OVERSAW THAT, YES.

5   **Q.**  I WOULD LIKE TO JUST -- THIS WAS AN UPDATED, MORE

6   THOROUGH, MORE COMPLETE TOOL THAT WAS AVAILABLE TO PHONE

7   AGENTS TO UTILIZE WHEN THEY WERE DISCUSSING DIRECTV WITH A

8   POTENTIAL CUSTOMER?

9   **A.**  THAT'S RIGHT.  IT WAS -- IT CREATED AN AUTOMATED PROCESS

10  THAT WAS SIMPLER FOR THE AGENT, BUT IT ALSO IMPROVED THE

11  LIKELIHOOD THAT ALL OF THE DISCLOSURES WERE GOING TO BE MADE

12  ON THAT CALL.

13  **Q.**  IF YOU COULD LOOK AT 2E.  IN FACT, I THINK IT SAYS JUST

14  WHAT YOU INDICATED.

15      AUTOMATED DISPLAY OF APPLICABLE DISCLOSURES.

16  **A.**  RIGHT.

17  **Q.**  THIS WAS DESIGNED TO DO WHAT, SIR?

18  **A.**  IT WAS DESIGNED SO THAT THE AGENT WOULD CLEARLY

19  COMMUNICATE THE APPLICABLE DISCLOSURES ON EVERY CALL.

20  **Q.**  ONE FINAL SET OF QUESTIONS, SIR.

21      DO YOU RECALL IN 2010, THAT DIRECTV ENTERED INTO AN

22  AGREEMENT WITH ALL 50 STATES AND THE DISTRICT OF COLUMBIA?

23  **A.**  YES.

24  **Q.**  DO YOU RECALL MAKING CHANGES TO THE DISCLOSURE REGIME IN

25  ADVERTISING AS A RESULT OF THAT MULTISTATE AGREEMENT?

1    **A.**  YES.

2    **Q.**  DID YOU DIRECT YOUR TEAM TO MAKE THOSE DISCLOSURES AS

3    REQUIRED BY ALL 50 STATES WITH RESPECT TO THE SECOND-YEAR

4    PRICE DISCLOSURE, THE EARLY CANCELLATION FEE, AND THE PREMIUM

5    CHANNEL ISSUE?

6    **A.**  OF COURSE.

7          **MR. HUMMEL:**  I DON'T HAVE ANYTHING FURTHER AT THIS

8    TIME, YOUR HONOR.

9          **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

10               **REDIRECT EXAMINATION**

11   **BY MR. EDMONDSON:**

12   **Q.**  WHY DON'T YOU TAKE A LOOK AT EXHIBIT 1212.

13         **MR. EDMONDSON:**  IF I COULD HAVE THAT PULLED UP ON THE

14   SCREEN.  THIS WAS PREVIOUSLY ADMITTED.

15               (DISPLAYED ON SCREEN.)

16   **BY MR. EDMONDSON:**

17   **Q.**  YOU JUST TESTIFIED, MR. GUYARDO, THAT YOU DIRECTED YOUR

18   TEAM TO MAKE CHANGES TO DIRECTV ADVERTISEMENT --

19   ADVERTISEMENTS TO BRING IT INTO COMPLIANCE WITH THE MULTISTATE

20   AGREEMENT, OR MSA, THAT DIRECTV ENTERED INTO IN LATE 2010; IS

21   THAT ACCURATE?

22   **A.**  I SAID THAT, YES.

23   **Q.**  OKAY.

24       THIS IS A COPY OF THAT AGREEMENT WITH THE STATE OF

25   WASHINGTON.  THERE WERE 51 AGREEMENTS, 50 INDIVIDUAL

1    AGREEMENTS THAT FOLLOWED A STANDARD FORM.

2        YOU UNDERSTAND THAT?

3    **A.**  NOT AS WELL AS YOU, BUT, YES, I UNDERSTAND IT.  I THINK I

4    DO.

5    **Q.**  WELL, IN THAT AGREEMENT DIRECTV AGREED TO CLEARLY AND

6    CONSPICUOUSLY DISCLOSE MATERIAL TERMS IN ITS ADVERTISEMENTS.

7    **A.**  I UNDERSTAND THAT.

8    **Q.**  I WOULD LIKE YOU TO TAKE A LOOK AT PARAGRAPH 3.3 ON

9    PAGE 5.

10        **MR. EDMONDSON:**  CALL THAT OUT, PLEASE.

11   **BY MR. EDMONDSON:**

12   **Q.**  THIS IS THE DEFINITION OF CLEAR AND CONSPICUOUS DIRECTV

13   AGREED TO.  AND THE FIRST SENTENCE STATES:

14        WHEN REFERRING TO A STATEMENT OR DISCLOSURE, CLEARLY AND

15   CONSPICUOUSLY SHALL MEAN SUCH STATEMENT OR DISCLOSER IS

16   DISCLOSED IN SUCH SIZE, COLOR, CONTRAST, LOCATION, DURATION,

17   AND AUDIBILITY, THAT IT IS READILY NOTICEABLE, READABLE, AND

18   UNDERSTANDABLE.

19        DO YOU SEE THAT?

20   **A.**  YES, SIR.

21   **Q.**  AND WHO MADE THE DETERMINATION THAT DISCLOSURES MET THAT

22   TEST?

23   **A.**  THE ULTIMATE DETERMINATION, EVERYTHING WE DID WE PUT

24   THROUGH OUR LEGAL DEPARTMENT.  AND SO TO ENSURE THAT WE

25   DELIVERED AGAINST THIS DOCUMENT, THAT WOULD HAVE BEEN OUR

GUYARDO - REDIRECT / EDMONDSON

1    LEGAL DEPARTMENT THAT WOULD HAVE MADE THE FINAL CALL.

2    **Q.**  SO IS IT YOUR TESTIMONY HERE TODAY THAT TO THE EXTENT YOU

3    BELIEVE DIRECTV'S DISCLOSURES WERE CLEAR AND CONSPICUOUS, IT

4    IS BECAUSE YOU RELIED ON DIRECTV'S LEGAL DEPARTMENT'S REVIEW?

5    **A.**  IT WAS A COMBINATION OF WHAT WE DID WITHIN THE SALES AND

6    MARKETING DEPARTMENT, AND THEN, YES, IN AN ATTEMPT TO ENSURE

7    THAT WE DID CLEAR AND CONSPICUOUS DISCLOSURES, AND THEN

8    REVIEWING EVERY DOCUMENT WITH LEGAL TO ENSURE THAT, IN FACT,

9    WE WERE COMPLYING.

10   **Q.**  DO YOU RECALL WHO IN THE LEGAL TEAM WAS PRINCIPALLY

11   RESPONSIBLE FOR ENSURING THAT DIRECTV'S ADVERTISING

12   DISCLOSURES COMPLIED WITH DMSA AND OTHER CONSUMER PROTECTION

13   LAWS, INCLUDING THE FTC ACT?

14   **A.**  WE PARTNERED WITH A VARIETY OF ATTORNEYS WITHIN -- LARRY

15   HUNTER, HE WAS OUR GENERAL COUNSEL, WITHIN HIS GROUP.

16   **Q.**  DO YOU REMEMBER AT YOUR DEPOSITION YOU SPECIFICALLY

17   MENTIONED TED SUZUKI?

18   **A.**  YES, I DO REMEMBER.

19   **Q.**  YOU TALKED IN YOUR TESTIMONY IN RESPONSE TO MR. HUMMEL'S

20   QUESTIONS ABOUT THE CX COMMITTEE AND WHAT THE CX COMMITTEE

21   FOCUSED ON, DO YOU RECALL THAT?

22   **A.**  ARE WE TALKING ABOUT TODAY?

23   **Q.**  TODAY'S TESTIMONY.

24   **A.**  YES.

25   **Q.**  BUT ISN'T IT TRUE THAT THE CX COMMITTEE DID NOT MAKE

1    CHANGES TO DIRECTV'S ADVERTISING DISCLOSURES, THAT WAS NOT THE

2    POINT OF THE CX COMMITTEE'S WORK?

3    **A.**  THE CX COMMITTEE'S PRIMARY FOCUS WAS ALL ASPECTS OF THE --

4    CX STANDS FOR CUSTOMER EXPERIENCE.  TO THE DEGREE TO WHICH

5    THERE WAS A PAIN POINT IN THE ADVERTISING, IT WOULD NOT HAVE

6    BEEN UNCOMMON FOR RASESH PATEL TO HAVE DISCUSSED THAT WITH OUR

7    CEO AND TO BRING IT UP.

8        AND SO WHILE IT WAS CERTAINLY MAYBE NOT THE FOCUS OF IT,

9    IT WAS CERTAINLY SOMETHING THAT THEY WOULD HAVE HAD THE

10   OPPORTUNITY TO DISCUSS WITH THE CEO OR WITH THE COMMITTEE IF

11   THEY WANTED TO.

12   **Q.**  SO IT WAS -- THE CX COMMITTEE WAS RUN BY RASESH PATEL?

13   **A.**  HE LED THE COMMITTEE, YES.

14   **Q.**  RASESH PATEL IS THE ULTIMATE EXPERT ON WORK OF THE CX

15   COMMITTEE?

16   **A.**  I THINK HE WAS, YES.

17   **Q.**  SO IF MR. PATEL SAYS THE CX COMMITTEE DIDN'T HAVE ANYTHING

18   TO DO WITH ADVERTISING, THAT IS THE FINAL WORD?

19   **A.**  I WOULD DEFER TO HIM.

20   **Q.**  FINALLY, YOU TALKED ABOUT DIRECTV SALES -- DIRECTV'S

21   PRODUCT BEING A HIGH INVOLVEMENT PRODUCT.

22   **A.**  YES, SIR.

23   **Q.**  AND I THINK YOU TESTIFIED AT YOUR DEPOSITION THAT THE

24   SALES PROCESS IS A JOURNEY; WAS THAT THE PHRASE YOU USED?

25   **A.**  YES.

GUYARDO - REDIRECT / EDMONDSON

1    **Q.**  AND THE JOURNEY STARTS WITH THE ADVERTISING?

2    **A.**  YES.

3    **Q.**  AND THEN IT COULD LEAD, IF THE ADVERTISING IS EFFECTIVE,

4    IT WOULD LEAD A PROSPECTIVE CUSTOMER TO PICK UP THE PHONE AND

5    CALL AN AGENT OR --

6    **A.**  YES, SIR.

7    **Q.**  -- OR MAYBE GO ONLINE TO DIRECTV'S WEBSITE?

8    **A.**  YES, SIR.

9    **Q.**  AND --

10   **A.**  OR INTERACT WITH ONE OF OUR AUTHORIZED DEALERS.

11   **Q.**  EXACTLY.  AND WHAT -- WHEN YOU REFER TO AUTHORIZED

12   DEALERS, YOU ARE TALKING ABOUT -- IS THAT THE INDIRECT SALES

13   CHANNEL?

14   **A.**  YES, SIR.

15   **Q.**  DESCRIBE FOR THE COURT WHAT WAS INVOLVED -- YOU KNOW, WHAT

16   PERCENTAGE OF DIRECTV SALES ARE COMPRISED OF OR CAME OUT OF

17   THE INDIRECT SALES CHANNEL?

18   **A.**  50 PERCENT.

19   **Q.**  50 PERCENT.  AND A LARGE PORTION OF THAT 50 PERCENT WERE

20   TELEPHONE SALES; IS THAT RIGHT?

21   **A.**  CAN YOU TELL ME WHAT YOU MEAN WHEN YOU SAY "A LARGE

22   PORTION"?

23   **Q.**  AT YOUR DEPOSITION YOU SPOKE ABOUT, I THINK A COMPANY

24   CALLED RED VENTURES OPERATING SEVERAL PHONE BANKS, RIGHT?

25   **A.**  YES.

GUYARDO – REDIRECT / EDMONDSON

1    **Q.**  I THINK THE FIGURE I RECALL WAS SOMETHING LIKE EIGHT TO

2    10 PERCENT OF TOTAL DIRECTV SALES CAME FROM RED VENTURES.

3    **A.**  YES, 5 TO 10 PERCENT.  RIGHT.

4    **Q.**  AND OTHER AUTHORIZED DEALERS, IT COULD BE MOM-AND-POP

5    STORES?

6    **A.**  YES, I SAID THAT.

7    **Q.**  AND YOU SAID IT CAN EVEN BE SOMETHING AS SIMPLE AS A

8    MOM-AND-POP STORE WITH A TELEPHONE.  IS THAT ACCURATE?

9    **A.**  YES.

10   **Q.**  SO IF A MOM-AND-POP STORE WITH A TELEPHONE GOT ONE OF THE

11   DIRECTV ADS TO PUBLISH, THEY PUT THEIR PHONE NUMBER ON THE

12   ADVERTISEMENT, AND DISSEMINATE IT IN THEIR COMMUNITY WITH

13   THEIR PHONE NUMBER AND A PERSPECTIVE CUSTOMER COULD CALL THAT

14   STORE; IS THAT ACCURATE?

15   **A.**  IT IS ACCURATE.  THERE WERE CERTAIN PROCESSES, THOUGH, IN

16   PLACE TO ENSURE THAT ALL OF OUR AUTHORIZED DEALERS WERE IN

17   COMPLIANCE AS WELL.

18   **Q.**  WERE IN COMPLIANCE WITH THE USE OF THE ADVERTISING, RIGHT?

19   **A.**  IN COMPLIANCE WITH THE USE OF THE ADVERTISING, YES.

20   **Q.**  YES.

21       SO ONE THING WE DISCUSSED AT YOUR DEPOSITION WAS HOW THESE

22   AUTHORIZED DEALERS ARE COMPENSATED FOR THEIR SALES.  DO YOU

23   RECALL THAT?

24   **A.**  I DO.

25   **Q.**  DO YOU RECALL HOW YOU DESCRIBED THEIR COMPENSATION?

GUYARDO – REDIRECT / EDMONDSON

1    **A.**  YES.

2        THEY RECEIVED A PPC UP FRONT, WHICH STANDS FOR PREPAID

3    COMMISSION, AND THEN THEY RECEIVED AN ONGOING -- I MAY HAVE

4    REFERRED TO IT AS AN ANNUITY, ONGOING RESIDUAL PAYMENT.

5    **Q.**  I THINK YOU ACTUALLY USED A DIFFERENT TERM.  I WONDER IF

6    WE CAN QUEUE UP THE TAPE AT PAGE -- THE DEPOSITION AT PAGE 33,

7    LINE 13 THROUGH LINE 20.

8            **THE COURT:**  IS HE BEING IMPEACHED?  WE DON'T NEED TO

9    EXAMINE HIM ABOUT WHAT HE SAID AT THE DEPOSITION.  LET'S JUST

10   ASK HIM A QUESTION, AND THEN IF YOU NEED TO IMPEACH HIM, YOU

11   CAN.

12   **BY MR. EDMONDSON:**

13   **Q.**  YOU USED A DIFFERENT TERM BEFORE SPEAKING WITH COUNSEL,

14   DIDN'T YOU?

15   **A.**  WHAT WAS THE TERM I USED, SIR?

16   **Q.**  WELL, LET'S LISTEN TO THE TAPE.

17       (DEPOSITION VIDEO PLAYED AS FOLLOWS:)

18           "QUESTION:  HOW WERE AUTHORIZED DEALERS COMPENSATED

19           FOR THE SALES?  DID THEY GET A PERCENTAGE OF EACH

20           SALE?

21           "ANSWER:  THEY TYPICALLY GOT A, A BOUNTY, A ONE-TIME

22           BOUNTY IN OR AROUND TWO TO $300 WHEN THEY ACQUIRED A

23           NEW CUSTOMER.  AND THEN IN SOME CASES THEY ALSO

24           RECEIVED AN ONGOING RESIDUAL PAYMENT.

25           "QUESTION:  SO YOU SAID THERE WAS A BOUNTY FOR EACH

GUYARDO − RECROSS / HUMMEL

```
 1              SIGN-UP?
 2              "ANSWER:  YES."
 3         THE COURT:  OKAY.  SO THE WAY FOR THAT TO WORK WOULD
 4   BE:  QUESTION:  THEY GOT A BOUNTY.  ANSWER:  THEY NOT DID.
 5   OR, NO, THEY DIDN'T, AND THEN YOU WOULD IMPEACH.
 6         MR. EDMONDSON:  OKAY.
 7   BY MR. EDMONDSON:
 8   Q.  YOU AGREE THAT YOU USED THE TERM "BOUNTY" TO REFER TO THE
 9   PPC?
10   A.  I DID.  I ALSO MADE OTHER STATEMENTS LATER IN THAT
11   DEPOSITION.
12   Q.  THOSE WERE STATEMENTS YOU MADE AFTER CONFERRING WITH
13   COUNSEL; IS THAT ACCURATE?
14   A.  YES.  HE POINTED OUT TO ME THAT I WAS USING A COLLOQUIAL
15   TERM "BOUNTY".
16   Q.  SO THE BOTTOM LINE IS, FOR THESE AUTHORIZED DEALERS TO GET
17   THAT BOUNTY OF TWO TO $300 PLUS A POTENTIAL RESIDUAL, THEY
18   NEED TO CLOSE THE SALE; IS THAT ACCURATE?
19   A.  YES.
20         MR. EDMONDSON:  NO FURTHER QUESTIONS.
21         THE COURT:  ANYTHING FURTHER FOR MR. GUYARDO?
22         MR. HUMMEL:  YES, YOUR HONOR.
23                    RECROSS-EXAMINATION
24   BY MR. HUMMEL:
25   Q.  MR. GUYARDO, MR. EDMONDSON JUST ASKED YOU IF ANY DIRECTV'S
```

GUYARDO – RECROSS / HUMMEL

1    ADVERTISING CHANGED AS A RESULT OF THE CX PROJECT, CUSTOMER

2    EXPERIENCE PROJECT.

3        I JUST WANTED TO SEE IF YOU REMEMBER WHETHER THE

4    ADVERTISING RELATING TO A REBATE THAT REQUIRED A CUSTOMER'S

5    AFFIRMATIVE ACTION CHANGED AFTER THE REBATE WAS TAKEN AWAY?

6    **A.**  YES, I BELIEVE WE DISCUSSED THAT.  IT WENT FROM A MAIL-IN

7    REBATE TO AN INSTANT REBATE.

8    **Q.**  AND PRIOR TO THE TIME THAT THAT CHANGE WAS MADE AS A

9    RESULT OF CX, DIRECTV ADVERTISED THAT IT WAS A REBATE, RIGHT?

10   **A.**  YES.

11   **Q.**  AND AFTER THAT REBATE WENT AWAY, WHAT HAPPENED?

12   **A.**  IT WAS AN INSTANT REBATE.  THERE WAS NO AFFIRMATIVE ACTION

13   REQUIRED.

14          **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

15          **THE COURT:**  ALL RIGHT.  THANK YOU, MR. GUYARDO.  YOU

16   ARE EXCUSED.

17          **THE WITNESS:**  THANK YOU VERY MUCH, SIR.

18          **THE COURT:**  IT'S ALMOST TEN TILL.  WHY DON'T WE GO

19   AHEAD AND TAKE OUR BREAK AND WE WILL RESUME WITH

20   POLING-HIRALDO.

21          **MR. HUMMEL:**  YES, YOUR HONOR.

22          **THE COURT:**  WE WILL BE BACK AT 12:05.

23      (RECESS TAKEN AT 11:50 A.M.; RESUMED AT 12:05 P.M.)

24          **THE CLERK:**  REMAIN SEATED AND COME TO ORDER.  THIS

25   COURT IS BACK IN SESSION.

1          **THE COURT:**  ALL RIGHT.  SO WILL WE BE PUTTING

2    MS. POLING-HIRALDO BACK ON THE STAND AT THIS TIME?

3          **MR. TILLOTSON:**  WE WILL, YOUR HONOR.

4          **THE COURT:**  MS. POLING-HIRALDO, I WILL REMIND YOU

5    THAT YOU ARE STILL UNDER OATH.

6          **THE WITNESS:**  YES.

7          **MR. HUMMEL:**  MAY I, YOUR HONOR?

8          **THE COURT:**  YES.

9          **MR. HUMMEL:**  THANK YOU.

10                    **CROSS-EXAMINATION**

11   BY MR. HUMMEL:

12   **Q.**  IT IS AFTERNOON.

13        GOOD AFTERNOON, MS. POLING-HIRALDO.

14   **A.**  GOOD AFTERNOON.

15   **Q.**  DURING THE EXAMINATION OF YOU BY MR. SNOW THIS MORNING, HE

16   PLAYED A DEPOSITION CLIP WHICH READ AS FOLLOWS, AND I'LL JUST

17   READ IT.  IT WAS:

18             "DID SUCH INFORMATION" -- REFERRING TO USABILITY

19             STUDIES -- "EVER WAS SUCH INFORMATION BASED ON

20             USABILITY TESTING EVER USED BY DIRECTV, TO YOUR

21             KNOWLEDGE, TO IMPROVE OR CHANGE DISCLOSURES?"

22        AND YOU ANSWERED:  "NO."

23        DO YOU RECALL THAT?

24   **A.**  YES, I DO.

25          **MR. HUMMEL:**  YOUR HONOR, I CAN EITHER, UNDER RULE

1    32(A)(6) READ THE ENTIRE CONTEXT OF THAT QUESTIONING INTO THE

2    RECORD OR I CAN ASK MS. POLING-HIRALDO.  I PREFER TO READ THE

3    DEPOSITION TO -- UNDER THAT RULE TO PROVE THE CONTEXT.

4              **THE COURT:**  IS IT THE RULE OF COMPLETENESS?

5              **MR. HUMMEL:**  YES, YOUR HONOR.

6              **THE COURT:**  IS THERE AN OBJECTION TO THAT?

7              **MR. SNOW:**  NO OBJECTION.

8              **THE COURT:**  WHY DON'T YOU GO AHEAD AND READ IT IN.

9              **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

10             "QUESTION:  MS. POLING-HIRALDO, YOU TESTIFIED THIS

11                  AFTERNOON EXTENSIVELY ABOUT USABILITY TESTING."

12        AND I'M READING FROM PAGE 192 FROM MAY 11, 2016

13   DEPOSITION.

14                  "WHAT WAS THE PURPOSE OF USABILITY TESTING

15                  INVARIABLY?

16                  "ANSWER:  THE PURPOSES WAS TO SEE IF THE USERS COULD

17                  COMPLETE THE TASK.  SO, WHETHER OR NOT THEY

18                  UNDERSTOOD WHAT IT TOOK TO SELECT A PACKAGE AND ADD

19                  IT TO THEIR CHART AND CHECKOUT.

20                  "Q.  WAS THE PURPOSE OF USABILITY TESTING THAT YOU

21                  DESCRIBED TODAY EVER TO TEST THE ADEQUACY OF

22                  DISCLOSURES?

23                  "ANSWER:  NO.

24                  "QUESTION:  WAS IT EVER TO TEST CONSUMER'S PERCEPTION

25                  OF DISCLOSURES?

 1              "ANSWER:  NO.

 2              "WAS IT EVER TO TEST WHETHER CONSUMERS UNDERSTOOD THE

 3              TERMS AND CONDITIONS OF PARTICULAR OFFERS?

 4              "ANSWER:  NO."

 5         AND HERE'S THE QUESTION MR. SNOW READ.

 6              "DID SUCH INFORMATION EVER -- WAS SUCH INFORMATION

 7              BASED ON USABILITY TESTING EVER USED BY DIRECTV TO

 8              YOUR KNOWLEDGE TO IMPROVE OR CHANGE DISCLOSURES?

 9              "ANSWER:  NO.

10              "WERE THERE -- WAS THERE EVER AN EFFORT ON YOUR PART

11              AND DIRECTV TO BURY, HIDE, OR MAKE DISCLOSURES LESS

12              PROMINENT SO THAT USERS WOULD BE CONFUSED ABOUT THE

13              TERMS OF OFFERS?

14              "ANSWER:  NOT AT ALL.

15              "QUESTION:  WAS IT -- HOW WOULD YOU DESCRIBE YOUR

16              ATTITUDE OR THE COMPANY'S ATTITUDE TOWARD DISCLOSING

17              THE TERMS OF OFFERS?

18              "ANSWER:  TRANSPARENCY.  WE WANT TO DISCLOSE -- WE

19              WANT TO DISCLOSE WHAT WE NEED TO DISCLOSE.

20              "QUESTION:  AND IS IT CORRECT THAT WITH RESPECT TO

21              DISCLOSURES ABOUT THE TERMS OF OFFERS, THOSE WERE

22              INVARIABLY APPROVED BY THE LEGAL GROUP?

23              "ANSWER:  YES, THEY WERE.

24              "QUESTION:  AND WERE THEY INVARIABLY, TO YOUR

25              KNOWLEDGE, APPROVED BY THE LEGAL GROUP WITH A MIND

POLING-HIRALDO – CROSS / HUMMEL

```
1              TOWARD AND IN VIEW OF THE REQUIREMENTS OF THE
2              MULTISTATE AGREEMENT WITH THE STATE'S ATTORNEY'S
3              GENERAL?
4              "ANSWER:  YES."
5         DID YOU GIVE THAT TESTIMONY ON MAY 11, 2016?
6    A.  YES, I DID.
7    Q.  IN YOUR MIND, WHEN THE QUESTION WAS ASKED, WAS USABILITY
8    TESTING USED TO IMPROVE OR CHANGE DISCLOSURES, WHAT WERE YOU
9    REFERRING TO?
10   A.  WHEN I WAS ASKED, I WAS SAYING THAT WE DO NOT CHANGE THE
11   LEGAL CONTENT BECAUSE THE LEGAL CONTENT DID NOT COME FROM US.
12   Q.  YOU DIDN'T CHANGE THE TEXT.
13   A.  RIGHT, THE TEXT.
14   Q.  BUT IN TERMS OF THE USABILITY TESTING THAT WAS DONE BY
15   DIRECTV, YOU DID USE THAT, DID YOU NOT, TO MAKE IMPROVEMENTS
16   TO THE USABILITY OF THE WEBSITE?
17   A.  YES, WE DID.
18   Q.  ALL RIGHT.  NOW LET'S LOOK AT A LITTLE BIT OF THAT
19   USABILITY TESTING, IF I MIGHT PLEASE.
20        AND LET'S START WITH EXHIBIT 770.
21            MR. HUMMEL:  IF WE CAN BRING UP 770.  I BELIEVE IT IS
22   IN EVIDENCE.
23                      (PAUSE IN THE PROCEEDINGS.)
24        DO WE HAVE 770?
25                      (PAUSE IN THE PROCEEDINGS.)
```

1          (DISPLAYED ON SCREEN.)

2          **MR. HUMMEL:**  LET'S GO TO PDF PAGE 1.

3  **BY MR. HUMMEL:**

4  **Q.**  THIS IS IN AN EMAIL.  IT'S NOT THE PDF.  AS LONG AS IT IS

5  UP, I WILL TALK ABOUT IT.

6          THE KEY FINDING FROM THIS USABILITY TEST WHICH WAS DONE IN

7  OCTOBER OF 2009 SAYS:

8          THE ACQUISITION FLOW PROTOTYPE DELIVERS ON THE GOALS OF

9  CREATING GREATER TRANSPARENCY OF COSTS AND COMPARISON OF

10  AVAILABLE OPTIONS.  HOWEVER, THE VOLUME OF INFORMATION AS IT

11  IS CURRENTLY PRESENTED ON THE PACKAGES PAGE AND CART PAGE

12  CREATES CONFUSION AND SUBSTANTIALLY SLOWS, IF NOT STOPS.

13          DO YOU SEE THAT?

14  **A.**  YES, I DO.

15  **Q.**  WERE YOU TESTING AN ACTUAL LIVE WEBSITE?

16  **A.**  NO.  IT WAS A PROTOTYPE.  IT WAS A SAMPLE FLOW.

17  **Q.**  AND IN 2009, WERE YOU ENGAGED IN A REDESIGN OF THE DIRECTV

18  WEBSITE?

19  **A.**  YES, WE WERE.

20  **Q.**  SO YOU HIRED AN OUTSIDE FIRM TO DO A TESTING ON THE

21  PROTOTYPE WEBSITE?

22  **A.**  THE PROTOTYPE OF THE NEW DESIGN, CORRECT.

23  **Q.**  AND THE PURPOSE OF THAT AGAIN WAS WHAT?

24  **A.**  IT'S TO VALIDATE THAT, YOU KNOW, WE'RE ACCOMPLISHING OUR

25  GOALS; THAT USERS CAN, YOU KNOW, COMPLETE THE TASK AND GET

1   THROUGH THE FLOW WITHOUT HINDERANCE.

2   **Q.**  CAN WE GO TO PAGE 6 OF THAT PARTICULAR PDF?  IT'S SLIDE 2

3   OF THE POWER POINT.

4                    (PAUSE IN THE PROCEEDINGS.)

5      DO YOU HAVE EXHIBIT 770 IN FRONT OF YOU?

6   **A.**  I'LL FIND IT.  I GOT IT.

7      WHICH PAGE?

8   **Q.**  YOU HAVE IT IN FRONT OF YOU?

9   **A.**  YES, I DO.

10  **Q.**  LOOK AT PDF PAGE 6 SLIDE 2 OF THE POWER POINT.

11  **A.**  RESEARCH OBJECTIVES AND DESIGN?

12  **Q.**  YES.

13                   (DISPLAYED ON SCREEN.)

14  **Q.**  SO IS THIS A -- THIS WAS A USABILITY TEST CONDUCTED WITH

15  HOW MANY PARTICIPANTS?

16  **A.**  TWENTY-FOUR.

17  **Q.**  AND IF YOU COULD READ THE SECOND-TO-LAST BULLET INTO THE

18  RECORD, PLEASE?

19  **A.**  (READING)

20     IT IS IMPORTANT TO NOTE THAT THIS WAS A QUALITATIVE

21  RESEARCH PROJECT, AND AS SUCH, THE FINDINGS MAY NOT BE

22  PROJECTABLE TO THE ENTIRE UNIVERSE OF PROSPECTIVE USERS.

23  **Q.**  WHAT DOES THAT MEAN TO YOU?

24  **A.**  IT MEANS THAT IT'S DIRECTIONAL.  SO WHAT WE ARE LOOKING

25  FOR ARE REALLY BIG, LIKE GOTCHAS.  PEOPLE, YOU KNOW, DON'T

1    UNDERSTAND WHAT THE SELECT BUTTON MEANS OR THAT THEY CAN'T --

2    YOU KNOW, THAT THEY CAN'T ADD SOMETHING TO THE CART.  WE ARE

3    TRYING TO SEE THE ROADBLOCKS IN THE FUNCTIONALITY SO WE CAN

4    MAKE IMPROVEMENTS ON THEM.

5        ONE PERSON'S FEEDBACK MAY NOT NECESSARILY REFLECT ALL THE

6    USERS.  AGAIN, WE TAKE ALL OF THE FEEDBACK, WE AGGREGATE IT,

7    WE WEIGHED IT, AND WE TAKE A LOOK TO SEE WHAT'S ACTIONABLE AND

8    WHAT'S KIND OF A RECOMMENDATION.

9    **Q.**  UNDERSTOOD.

10       AND IN TERMS OF THE USABILITY OF THE WEBSITE AS YOU

11   DEFINED IT, WAS THE PURPOSE OF THIS IN A DIRECTIONAL WAY TO

12   IMPROVE THE USABILITY BEFORE IT LAUNCHED?

13   **A.**  DEFINITELY WAS.

14   **Q.**  DID YOU MAKE CHANGES AND IMPROVEMENTS BASED ON THIS

15   FEEDBACK?

16   **A.**  WE MADE SOME CHANGES, YES.

17   **Q.**  IF YOU CAN LOOK AT THE LAST BULLET OF THE RESEARCH

18   OBJECTIVES.

19   **A.**  (READING)

20       INSTEAD, THIS TYPE OF RESEARCH WAS DESIGNED TO EXPLORE THE

21   RANGE AND TYPES OF ATTITUDES, OPINIONS, AND BEHAVIORS THAT

22   EXIST AMONG A GIVEN CONSTITUENCY.

23   **Q.**  UNDERSTOOD.

24       SO IF THE FTC WERE TO ARGUE IN THIS CASE THAT THIS

25   RESEARCH AND REPORT WOULD SHOW THAT SOMEHOW CONSUMERS WERE

POLING-HIRALDO - CROSS / HUMMEL

1    UNABLE TO ACCESS PARTICULAR DISCLOSURES, WOULD THAT BE AN

2    APPROPRIATE USE OF THIS STUDY, IN YOUR VIEW?

3    **A.**  NO, IT WOULD NOT BE.

4    **Q.**  WHY?

5    **A.**  BECAUSE WE WEREN'T TESTING FOR THAT.

6    **Q.**  UNDERSTOOD.

7        NOW LET'S LOOK AT SLIDE 9, PDF PAGE 13.

8                    (DISPLAYED ON SCREEN.)

9        IF YOU COULD LOOK AT THE THIRD DASH.  AND THIS IS A

10   USABILITY STUDY WHERE YOU'RE LOOKING AT THE PACKAGES PAGE?

11   **A.**  YES.

12   **Q.**  THIS SAYS:

13       SEVERAL NOTE" -- SEVERAL OF THE RESPONDENTS IN THIS

14   LIMITED STUDY -- "NOTE AN APPRECIATION THAT PACKAGE PRICING IS

15   SO CLEARLY LAID OUT ON THIS PAGE, PARTICULARLY THOSE WHO

16   ANTICIPATED THAT THIS INFORMATION WOULD RESIDE MUCH DEEPER IN

17   THE SITE, OR ACCESSED ONLY AFTER COMPLETING THE REGISTRATION

18   PROCESS.

19       WHAT DID THIS MEAN TO YOU?

20   **A.**  THAT PEOPLE COULD SEE THE PRICING; THAT THEY WERE LOOKING

21   AT THE PACKAGES, THEY COULD VISUALLY DIFFERENTIATE THEM, AND

22   CLEARLY SEE PRICING ASSOCIATED WITH THEM.

23   **Q.**  DO YOU KNOW THE PHRASE "PROGRESSIVE DISCLOSURES"?

24   **A.**  I AM SORT OF FAMILIAR WITH IT.

25   **Q.**  IN THE CONTEXT OF A WEB DESIGN, WHAT DOES THE CONCEPT OF

1    PROGRESSIVE DISCLOSURES MEAN TO YOU?

2    **A.**  TO ME IT WOULD MEAN THAT WE DISCLOSE THINGS, YOU KNOW, AS

3    THEY RELATE TO THE SUBJECT MATTER AT HAND, THAT IT'S NOT, YOU

4    KNOW -- THIS IS MY INTERPRETATION, THAT IT WOULD NOT BE ALL UP

5    FRONT.  LIKE YOU'RE NOT BLASTING SOMEONE WITH EVERY TERM AND

6    CONDITION UP FRONT, THAT WE ARE DENOTING THINGS IN THE

7    PROXIMITY WHICH THEY NEED TO BE DISCLOSED IN.

8        SO IF A PRICE HAS A CERTAIN DISCLOSURE WITH IT, THEN WE

9    DISCLOSE IT APPROPRIATELY NEAR THAT PRICE.

10   **Q.**  NOW ON YOUR EXAMINATION, I THINK IT WAS YESTERDAY, BUT

11   MAYBE TODAY BY MR. SNOW, HE REFERENCED HYPERLINKS, INFO

12   HOVERS, AND TOOL TIPS.

13   **A.**  YES.

14   **Q.**  AND IN CONNECTION WITH HIS EXAMINATION, I THINK HE SAID

15   THE PREMIUM CHANNEL OFFERS WERE LOCATED OFF TIMES IN TOOL

16   TIPS?

17   **A.**  THE -- YES, THE DISCLOSURES.

18   **Q.**  THE DISCLOSURES RELATING TO THE PREMIUM CHANNEL OFFER?

19   **A.**  THAT'S CORRECT.

20   **Q.**  CAN WE GO TO SLIDE 23, PDF PAGE 27.  AND LET'S LOOK AT THE

21   BOTTOM BULLET.  IT READS:

22       IT IS WORTH NOTING, HOWEVER, THAT THE TOOL TIPS, USED

23   THROUGHOUT THE SITE, ARE EXTREMELY HELPFUL, NOTICED, AND

24   WELL-APPRECIATED.

25       WAS THAT FEEDBACK YOU RECEIVED FROM -- IN THIS TEST FROM

POLING-HIRALDO – CROSS / HUMMEL

1    CONSUMERS ABOUT THE USE OF TOOL TIPS?

2    **A.**  YES.

3    **Q.**  DID YOU EMPLOY TOOL TIPS THEN IN YOUR WEB DESIGNS IN A WAY

4    THAT WOULD ALLOW CONSUMERS TO SEE THEM AND ACCESS INFORMATION

5    USING THEM?

6    **A.**  YES.  AND THEY WERE USED THROUGHOUT THE ENTIRE SITE, NOT

7    JUST IN THE ACQUISITION FLOW BUT ALSO IN THE CUSTOMER SITE OF

8    THE ACCOUNT MANAGEMENT.

9    **Q.**  LET'S GO TO PAGE 30, SLIDE 26.

10                       (DISPLAYED ON SCREEN.)

11        BEFORE WE GO TO THIS, THOUGH, HAVE YOU HEARD THE PHRASE

12   "PATTERN LIBRARY"?

13   **A.**  YES.

14   **Q.**  WHAT IS A PATTERN LIBRARY?

15   **A.**  SO A PATTERN LIBRARY IS A COLLECTION OF PARTICULAR UI

16   ELEMENTS.  SO I WILL REFER TO ONE AS LIKE SAY A LIGHT BOX.

17        SO A LIGHT BOX IS A WAY OF, YOU KNOW, ENCASING

18   INFORMATION.  SO WE WOULD HAVE A PATTERN AROUND IF YOU --

19   LET'S SAY, I'M GOING TO SAY CLICK AN I FOR THE USE OF THE

20   EXAMPLE.  IF YOU CLICK AN I, YOU EXPECT A LIGHT BOX TO SHOW

21   UP.

22        ANOTHER PATTERN IS BLUE LINKS.  RIGHT?  SOME SITES USE

23   UNDERLINES IN THEIR LINKS, SOME SITES DON'T.  SO YOU GET USED

24   TO WHAT THAT PATTERN IS.  SO IF YOU SEE SOMETHING BLUE, YOU

25   MIGHT THINK, HEY, THAT'S CLICKABLE.  I SHOULD TOUCH THAT OR

1    MOUSE OVER THAT.

2    **Q.**  AND IS THE EFFORT TO, AS A CONSUMER WORKS THEIR WAY

3    THROUGH THE WEBSITE, TO HAVE A CONSISTENCY OF APPROACH IN

4    TERMS OF THE INFORMATION THAT'S BEING PROVIDED?

5    **A.**  YES, IT IS.

6    **Q.**  OKAY.

7         AND DID DIRECTV EMPLOY SUCH PATTERN LIBRARIES IN

8    CONNECTION WITH HOW IT CONSTRUCTED ITS WEBSITES?

9    **A.**  YES.  OUR CREATIVE DIRECTOR WAS VERY INSTRUMENTAL IN

10   DEVELOPING A NEW ONE FOR US.

11   **Q.**  OKAY.

12        NOW LET'S LOOK AT PAGE 30, SLIDE 26.

13                   (DISPLAYED ON SCREEN.)

14   **A.**  OKAY.

15   **Q.**  AGAIN, THIS IS A FINDING BASED ON THE REVIEW OF THE

16   PROTOTYPE WEBSITE.

17        CART:  RESPONDENT GENERALLY UNDERSTAND THE PREMIUM

18   SECTION, ALTHOUGH AT THIS POINT SEVERAL VOICE THEIR DISDAIN

19   FOR THE COMMON PRACTICE OF BEING AUTOMATICALLY CHARGED FOR THE

20   CHANNELS AFTER THE FREE PERIOD EXPIRED.

21        DO YOU SEE THAT?

22   **A.**  YES, I DO.

23   **Q.**  DOES THAT INDICATE TO YOU THAT WHETHER OR NOT CONSUMERS

24   LIKE THE PRACTICE, AT LEAST THEY'RE INFORMED OF IT THROUGH THE

25   WEBSITE?

POLING-HIRALDO – CROSS / HUMMEL

1    **A.**  YES.  THEY CAN TELL THAT IT IS FREE FOR THREE MONTHS.

2    **Q.**  AND THEN?

3    **A.**  AND THEN THAT IT IS GOING TO ROLL TO PAY.

4    **Q.**  CONSUMERS ON THIS WEBSITE IN THIS STUDY NOTICED THE

5    NEGATIVE OPTION FEATURE REGARDLESS OF WHETHER THEY LIKED IT OR

6    NOT?

7    **A.**  CORRECT.

8    **Q.**  OKAY.  SO NOW IF YOU WOULDN'T MIND GO TO EXHIBIT NO. 767,

9    WHICH IS IN EVIDENCE, AND IT'S ANOTHER USABILITY STUDY.

10                      (DISPLAYED ON SCREEN.)

11   **A.**  I SEE IT.

12   **Q.**  THIS IS DATED 2013.

13       SO WITH THAT DATE IN MIND, CAN YOU TELL US WAS THIS

14   USABILITY STUDY DONE AS AN —— IN AN EFFORT TO STUDY USERS'

15   USAGE FOR YET ANOTHER MAJOR REDESIGN OF THE DIRECTV WEBSITE?

16   **A.**  YES, IT WAS.

17   **Q.**  SO MAYBE I SHOULD PUT THIS IN CONTEXT.

18       DURING YOUR TENURE AT DIRECTV, THERE WERE HOW MANY MAJOR

19   REDESIGNS OF THE WEBSITE?

20   **A.**  FOR ACQUISITION ——

21   **Q.**  YES.

22   **A.**  —— DURING MY TENURE, THERE WERE TWO MAJOR REDESIGNS.

23   THERE WERE ENHANCEMENTS THROUGHOUT, BUT SPECIFIC TO

24   ACQUISITION THERE WERE TWO.

25   **Q.**  AND WITH RESPECT TO THOSE TWO REDESIGNS, ONE WAS FROM A

1    FLOW CALLED WIZARD?

2    **A.**   CORRECT.

3    **Q.**   TO WHAT WE NOW REFER TO AS THE OLD FLOW, RIGHT?

4    **A.**   YES.

5    **Q.**   AND THIS EXHIBIT RELATES TO TESTING A PROTOTYPE OF THE NEW

6    FLOW; IS THAT TRUE?

7    **A.**   CORRECT.

8    **Q.**   OKAY.  SO LET'S LOOK AT PDF PAGE 6, SLIDE 3.

9                        (DISPLAYED ON SCREEN.)

10       THIS BULLET REFERENCES THAT EFFORT TO IMPROVE THE USER

11   EXPERIENCE, DIRECTV IS REDESIGNING THE ONLINE PURCHASE FLOW

12   FOR POTENTIAL CUSTOMERS.

13       DO YOU SEE THAT?

14   **A.**   I DO.

15   **Q.**   AND THEN IT SAYS, AGAIN, IN THE THIRD BULLET:

16       IT IS IMPORTANT TO NOTE THAT THIS WAS QUALITATIVE

17   RESEARCH, AND AS SUCH, THE FINDINGS ARE NOT NECESSARILY

18   PROJECTABLE TO THE ENTIRE UNIVERSE OF PROSPECTIVE DIRECTV

19   CUSTOMERS.

20       AND, AGAIN, THAT MEANS TO YOU WHAT?

21   **A.**   THAT, YOU KNOW, WITH HOWEVER MANY USERS WE HAD, YOU'RE NOT

22   GOING TO HIT EVERY SINGLE NUANCE THAT AN INDIVIDUAL PROSPECT

23   MIGHT FIND.  SO WE ARE USING -- WE ARE USING THE FEEDBACK

24   DIRECTIONALLY TO HELP GUIDE US MAKE THE RIGHT DECISIONS IN

25   TERMS OF GETTING TO A BETTER FLOW.

1        AND PART OF THE DEVELOPMENT PROCESS THAT WE ALSO PUT INTO

2   PLACE WAS TO CONSTANTLY ITERATE TO IMPROVE POST THIS.  SO WE

3   WANT TO MAKE SURE THAT WE ARE TAKING THAT CUSTOMER FEEDBACK

4   AND PUTTING IT INTO THE HOW PEOPLE ARE TRYING TO INTERACT

5   WITH, AND SELECT, AND COMPLETE THEIR TASK.

6   **Q.**  LET'S LOOK, IF YOU WOULD, AT SLIDE 7, PAGE 10 OF THE PDF,

7   PLEASE.

8                    (DISPLAYED ON SCREEN.)

9        THIS IS ONE I THINK MR. SNOW ASKED YOU ABOUT.

10  **A.**  YES, HE DID.

11  **Q.**  AND IT'S EXECUTIVE SUMMARY.  IT SAYS:

12       QUESTIONS REGARDING COST, PACKAGES, CONTRACTS, PROMPT ALL

13  USERS TO SAY THEY WOULD CONTACT CUSTOMER SERVICE FOR

14  CLARIFICATION AND/OR REASSURANCE AT LEAST ONCE DURING THE

15  PURCHASE FLOW.

16       DO YOU SEE THAT?

17  **A.**  YES, I DO.

18  **Q.**  MS. POLING-HIRALDO, LET ME USE THAT AS A SPRINGBOARD TO

19  ASK YOU A COUPLE OF QUESTIONS.

20       WAS IT YOUR JOB TO TRY TO MAXIMIZE THE CONVERSION RATE,

21  MEANING THE NUMBER OF CONSUMERS WHO CLOSED ON THE WEBSITE AND

22  DIDN'T GO TO THE PHONE?

23  **A.**  NO, IT WASN'T.

24  **Q.**  WHAT WAS YOUR JOB?

25  **A.**  MY JOB SPECIFICALLY WAS TO MAKE SURE THAT WE WERE

1   DEVELOPING A SOLID ACQUISITION FLOW AND THAT WE UNDERSTOOD

2   THAT THERE WOULD BE A NUMBER OF CUSTOMERS WHO WOULD NOT FINISH

3   THEIR TRANSACTION, BUT AT THE VERY LEAST THEY COULD COME IN,

4   LEARN, GET SOME INFORMATION, LOOK AT THEIR OPTIONS.  AND FOR

5   SOME REASON FOR SOME PEOPLE THEY ARE MORE COMFORTABLE

6   TRANSACTING ON THE PHONE.

7   **Q.**  DID IT OCCUR THAT CONSUMERS WOULD START THEIR

8   INVESTIGATION OF DIRECTV ON THE WEB AND THEN GO TO THE PHONE?

9   **A.**  YES.  IN FACT, I THINK THAT ABOUT, I WANT TO SAY IT'S

10  SOMETHING LIKE 70/30, 70 PERCENT -- OUT OF THE HUNDRED PERCENT

11  OF CUSTOMERS THAT CAME TO WEB 70 CLOSED ON THE PHONE.

12  **Q.**  NOW WHAT ABOUT -- DO YOU HAVE ANY KNOWLEDGE ABOUT WHETHER

13  CONSUMERS CONVERT ON THEIR FIRST TIME ON THE WEBSITE?

14  **A.**  THEY DO NOT.  THEY MAKE REPEAT VISITS BECAUSE WHAT USUALLY

15  HAPPENS IS, IT'S AGAIN, AS MR. GUYARDO TESTIFIED, IT'S A

16  COMPLICATED PROCESS.  YOU WANT TO TAKE A LOOK AT WHAT YOUR

17  OTHER OPTIONS ARE, YOU WANT TO SEE LIKE MAYBE THERE'S A TRIPLE

18  PLAY IN YOUR AREA, SO YOU ARE GOING TO DO SOME RESEARCH.

19      SO A LOT OF THE TIME PEOPLE USE WEB TO DO THEIR RESEARCH.

20  THEY'LL START OFF ON THE SITE AND THEY'LL SAY, OKAY, I'VE

21  TAKEN A LOOK HERE, LET ME SEE WHAT FILES HAS TO OFFER ME.  DO

22  THEY OFFER ME A BETTER PRICE.

23  **Q.**  NOW, IF YOU LOOK AT WHAT MR. SNOW HIGHLIGHTED, IT SAYS:

24      USERS REPORT HAVING ENCOUNTERED BAIT AND SWITCH TACTICS IN

25  THE PAST.

POLING-HIRALDO – CROSS / HUMMEL

1    DO YOU SEE THAT?

2    **A.**  YES, I DO.

3    **Q.**  DID YOU TAKE THAT TO MEAN THAT THE WEBSITE, AS YOU WERE

4    TESTING IT FOR THE NEW FLOW, HAD A BAIT AND SWITCH TACTIC IN

5    PLACE?

6    **A.**  NO, I DID NOT.  I TOOK THAT TO MEAN THAT CUSTOMERS ARE

7    USED TO GOING AND SIGNING UP FOR SERVICE AND THEN HAVING, YOU

8    KNOW, IN OTHER -- WITH OTHER PROVIDERS AND DOING THAT KIND OF

9    SHOPPING.

10   **Q.**  AND, IN FACT, THE SECOND BULLET SAYS:

11   EXAMPLES INCLUDE THE FINE PRINT STATING THAT THE DISCOUNT

12   PACKAGE PRICE IS GOOD FOR 12 MONTHS BUT THAT NEW CUSTOMERS

13   MUST SIGN UP -- MUST SIGN A 24-MONTH AGREEMENT AS WELL AS

14   HIDDEN MONTHLY RECEIVER FEES.

15   DOES THIS BULLET INDICATE TO YOU THAT CUSTOMERS ARE

16   READING THE QUOTE FINE PRINT?

17   **A.**  YES, IT WOULD SUGGEST THAT.

18   **Q.**  SO NOTWITHSTANDING THE SIZE OF THE FONT, THE ALLEGATIONS

19   ABOUT PLACEMENT THAT ARE BEING MADE, THIS USABILITY STUDY

20   INDICATES THAT CONSUMERS ARE FINDING THE INFORMATION, WHETHER

21   THEY LIKE IT OR NOT, AND PERCEIVING IT AND UNDERSTANDING IT?

22   **A.**  YES, I WOULD SAY SO.

23   **Q.**  NOW LET'S GO TO PDF PAGE 14, SLIDE 11.

24               (DISPLAYED ON SCREEN.)

25   SO NOW IF YOU GO TO THE LAST BULLET.  THERE IT SAYS --

1    WITH RESPECT TO THE CART PAGE, DO YOU SEE THAT?

2    **A.**  YES.

3    **Q.**  THIS IS AGAIN WITH RESPECT TO THE NEW FLOW.

4        CONSIDERATION SHOULD BE GIVEN TO RELOCATING THE 24 MONTHS

5    COST LINK TOWARDS THE TOP OF THE SCREEN.

6        DO YOU SEE THAT?

7    **A.**  I DO.

8    **Q.**  DID DIRECTV IMPLEMENT THAT CHANGE?

9    **A.**  NOT AT LAUNCH, BUT EVENTUALLY WE DID.

10   **Q.**  EVENTUALLY YOU DID MOVE THAT 24 MONTHS COST LINK TO THE

11   TOP OF THE PAGE?

12   **A.**  CORRECT.

13   **Q.**  CONSISTENT WITH AT LEAST THE FEEDBACK FROM THIS ONE

14   USABILITY STUDY?

15   **A.**  YES.

16   **Q.**  LET ME TURN TO -- THERE ARE A NUMBER OF OTHER USABILITY

17   STUDIES THAT HE ASKED YOU ABOUT.

18       WAS THERE ANY EXCEPTION OF THOSE STUDIES IN CONNECTION

19   WITH... YOU USE THEM FOR DIRECTIONAL PURPOSES ONLY?

20   **A.**  THAT IS CORRECT.

21   **Q.**  AND THE RESULTS OF THEM SHOULDN'T BE PROJECTED TO AN

22   ENTIRE POPULATION OF USERS WHO ACTUALLY USED AND SIGNED UP ON

23   THE DIRECTV WEBSITE?

24   **A.**  THAT'S CORRECT.

25   **Q.**  LET'S GO TO EXHIBIT 1117, PLEASE.

```
1              (DISPLAYED ON SCREEN.)
2         NOW, THIS IS A DOCUMENT DATED OCTOBER 2012.  AND I THINK
3    YOU TESTIFIED THAT YOU BELIEVE THIS WAS PART OF THE CX PROJECT
4    WE'VE HEARD ABOUT?
5    A.   I WASN'T A HUNDRED PERCENT SURE.  I GOT A REQUEST FROM
6    KAREN TO HELP FIND THIS INFORMATION, AND THAT'S KIND OF ONE OF
7    THE AREAS THAT IT COULD HAVE BEEN FOR.
8    Q.   SO IN CONNECTION WITH EXHIBIT 1117, YOU WERE ASKED TO
9    EXAMINE A LIST FROM TOUCHCOMMERCE.  I JUST WANT TO BE VERY
10   CLEAR WHAT THIS IS.
11        WHAT'S TOUCHCOMMERCE?
12   A.   IT'S OUR SALES CHAT VENDOR.  SO IT'S A THIRD-PARTY VENDOR.
13   Q.   THAT --
14   A.   THEY USE --
15   Q.   SORRY.
16        THAT DOES WHAT?
17   A.   THEY HANDLE OUR SALES CHATS.
18   Q.   WHAT IS A SALES CHAT ON A WEBSITE?
19   A.   AT ANY POINT IN TIME A USER CAN GET STUCK OR HAVE A
20   QUESTION OR WANT CLARIFICATION, THEY CAN CLICK ON A CHAT
21   BUTTON ON THE SIDE THAT WILL PULL UP AN ONLINE AGENT THAT CAN
22   WALK THEM THROUGH THEIR QUESTIONS.  AND SOMETIMES, YOU KNOW,
23   IF THEY WERE SPENDING A LOT OF TIME ON A PAGE, WE INFER THAT
24   THROUGH BUSINESS RULES, WE TRY AND MAKE SENSE OF IT, AND SAY
25   LIKE, HEY, MAYBE THEY ARE CONFUSED HERE, LET'S POP UP A CHAT
```

1    SO THAT WE CAN HELP THEM OUT.

2    **Q.**  AND IF A CONSUMER HAD A QUESTION ABOUT HOW THE PRICING

3    WORKED OR PACKAGE PRICING OR THE PREMIUM CHANNEL OFFER, THEY

4    COULD HAVE REALTIME INTERACTION WITH A SALES AGENT TO GET

5    THOSE QUESTIONS ANSWERED, CORRECT?

6    **A.**  CORRECT.

7    **Q.**  AND THE NUMBER ONE QUESTION POSED IN THE SALES CHAT

8    FUNCTION WHICH WAS AVAILABLE ON THE DIRECTV WEBSITE AS OF THIS

9    TIME PERIOD WAS HOW MUCH DOES THE BLANK PACKAGE COST, RIGHT?

10   **A.**  CORRECT.

11   **Q.**  SO WHAT THIS IS INDICATING IS THE CONSUMERS WHO ARE

12   NAVIGATING THROUGH THE WEBSITE ASK, MORE THAN ANYTHING ELSE,

13   WHAT DOES THIS COST?

14   **A.**  CORRECT.

15   **Q.**  OKAY.

16       THE OTHER QUESTION THAT IS ASKED VERY FREQUENTLY OF

17   CONSUMERS IS... LOOK AT NO. 5.  THIS IS 7 PERCENT OF PEOPLE.

18       CAN I REMOVE THE PREMIUM CHANNELS AFTER THE THREE—MONTH

19   TRIAL PERIOD?

20       DO YOU SEE THAT?

21   **A.**  I DO.

22   **Q.**  AND, AGAIN, IN CONNECTION WITH THIS CHAT FUNCTION THAT WAS

23   AVAILABLE ON THE WEBSITE, CONSUMERS WERE FREQUENTLY ASKING

24   THIS QUESTION AND GETTING ANSWERS TO THAT QUESTION.

25   **A.**  YES.

POLING-HIRALDO – CROSS / HUMMEL

1   **Q.**  AS THEY NAVIGATED THROUGH THE WEBSITE.

2   **A.**  YES, THEY WERE.

3   **Q.**  LET'S GO TO EXHIBIT 1045, PLEASE.

4                    (DISPLAYED ON SCREEN.)

5       THIS IS WHAT HAS BEEN REFERRED TO IN THIS CASE, I BELIEVE,

6   AS THE UX SITE.  IT'S ONE THAT WAS CREATED BY THE FEDERAL

7   TRADE COMMISSION AND USED IN A, I GUESS, A SURVEY OF

8   CONSUMERS.

9       WHERE CAN A CONSUMER ACCESS -- LET'S CLICK ON THE WHY

10  DIRECTV LINK THERE AT THE TOP.

11      NOTHING HAPPENS.  ON THE REAL DIRECTV WEBSITE, IS THERE

12  INFORMATION PROVIDED THERE?

13  **A.**  YES.  THERE'S A NAVIGATION DROPDOWN THAT HAS INFORMATION

14  ABOUT DIRECTV AND GENERALIZED SERVICE AND SOME INFORMATION

15  ABOUT OUR COMPETITION AND HOW WE COMPARE TO THE COMPETITION.

16  **Q.**  WAS THE CHAT FUNCTION AVAILABLE IN CONNECTION WITH THE OLD

17  FLOW?

18  **A.**  YES.

19  **Q.**  NOW, IF YOU CAN LOOK AT THE PACKAGES LINK AT THE TOP.  IS

20  THAT -- NOT THE VIEW ALL PACKAGES, THE PACKAGES LINK.

21      IS THAT ACTIVE?  IT DOESN'T LOOK LIKE IT'S BEING CLICKED.

22      IS THERE INFORMATION AVAILABLE ABOUT PACKAGES THERE?

23  **A.**  YES, THERE IS.

24          **MR. SNOW:**  OBJECTION.

25          **THE COURT:**  WHAT'S THE OBJECTION?

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

1      **MR. SNOW:**  THERE'S A LOT OF TESTIFYING BY COUNSEL AND

2   LEADING QUESTIONS.  I KNOW WE ARE BEING FLEXIBLE ON THAT

3   SUBJECT HERE, BUT I THINK IT'S CROSSING THE LINE.

4      **THE COURT:**  IT'S IS A FAIR POINT.  I THINK YOU CAN DO

5   IT WITHOUT IT.

6      **MR. HUMMEL:**  I'LL BE MORE MINDFUL, YOUR HONOR.

7   **BY MR. HUMMEL:**

8   **Q.**  CAN YOU CLICK ON VIEW ALL PACKAGES PAGE?

9      AND THEN IT DIRECTS YOU TO ENTER A ZIP CODE.

10                    (DISPLAYED ON SCREEN.)

11      NOW, THE QUESTION I HAVE ABOUT THIS IS THE LAYOUT OF THIS

12   PAGE.  CAN YOU DESCRIBE HOW THE INFORMATION IS DISPLAYED WITH

13   RESPECT TO EACH OF THE PACKAGES?

14   **A.**  SO FOR EACH PACKAGE WE HAVE NAME OF THE PACKAGE, THE

15   PRICE, THE REG PRICE, AND THEN WHAT WE USED TO CALL THE

16   INCLUDE SECTION, SO IT'S EVERYTHING THAT COMES WITH THE

17   PACKAGE.  SO ADDITIONAL BENEFITS, LET'S SAY, LIKE THE FREE

18   GENIE UPGRADE OR THE PROFESSIONAL INSTALLATION, ET CETERA.

19      SO WE'RE PUTTING PROMINENCE ON WHAT, YOU KNOW, THE PRICING

20   UP ON TOP, RIGHT, BECAUSE THAT'S WHAT PEOPLE ARE LOOKING FOR

21   AND GIVING THEM LINKS TO ACCESS THE CHANNEL GUIDE SO THEY CAN

22   SEE WHAT CHANNELS ARE ACTUALLY IN THE PACKAGE, WHICH IS THE

23   SECOND MOST IMPORTANT THING THAT USERS ARE COMING FOR, THEY

24   WANT TO KNOW THAT THEY CAN GET ESPN WITH THAT PACKAGE, LET'S

25   SAY.

POLING-HIRALDO – CROSS / HUMMEL

1    **Q.** YOU SAID THAT THERE WAS A CONSISTENCY IN TERMS OF COLORING

2    AND WHAT AN ICON MIGHT DO.  IS THAT REFLECTED ON THIS PAGE?

3    **A.** YES, IT IS.

4    **Q.** HOW SO?  CAN YOU DESCRIBE THAT?

5    **A.** SO IF WE LOOK AT THE ENTERTAINMENT PACKAGE AND WE LOOK AT

6    THE 140 PLUS DIGITAL CHANNELS, THAT LINK IS INCONSISTENCY WITH

7    THE LINKS ON THE REST OF THE SITE.

8        IF WE LOOK AT THE TOOL TIPS WHICH IN THIS CASE ARE THE

9    BRACKET AND THE QUESTION MARK -- I'M SORRY THAT'S AN INFO

10   HOVER.  IT'S CONSISTENT.  SO THAT PATTERN EXISTS THROUGHOUT

11   THE SITE.

12   **Q.** NOW, WE TALKED ABOUT THE CHAT FUNCTION.  WHERE COULD YOU

13   GET THAT ON THIS PAGE?

14   **A.** SO ON THE LEFT-HAND SIDE THERE IS A NEED HELP TAB.  THAT

15   TAB WOULD, YOU KNOW, BASICALLY FLY OUT AND LAUNCH A CHAT BOX.

16       THAT MAY NOT HAVE BEEN THE PRESENTATION THROUGHOUT ALL OF

17   THE TIME, BUT THAT'S, YOU KNOW, IT WAS ALWAYS AVAILABLE.  SO

18   THERE WAS ALWAYS A CHAT BUTTON SOMEWHERE.

19   **Q.** IS THERE ANYTHING THAT INDICATES THAT -- IN TERMS OF THE

20   COLOR IN THAT NEED HELP BOX THAT WOULD PROMPT A USER TO CLICK

21   ON IT IF THEY WANTED HELP?

22   **A.** YEAH.  THERE'S A BLUE QUESTION -- BLUE SPEECH BUBBLE.

23   AND, AGAIN, THAT WAS PERSISTENT.  THAT FOLLOWED YOU UP AND

24   DOWN THE PAGE.  IT WAS ALWAYS AVAILABLE TO YOU.  IT WASN'T

25   THAT IT STAYED UP AT THE TOP.  YOU COULD ACCESS THAT CHAT FROM

1    ANYWHERE IN THE SITE.

2    **Q.**  IF YOU COULD JUST LOOK, PLEASE, I AM GOING TO CHOOSE THE

3    CHOICE PACKAGE HERE.

4         IN TERMS OF THE -- I'M NOT GOING TO CHOOSE IT, I AM

5    ACTUALLY GOING TO LOOK AT IT.  SORRY.

6         THIS PACKAGE THAT BEATS CABLE, AND THEN IT INCLUDES ALL OF

7    THOSE THINGS THAT ARE LISTED, DID DIRECTV LIST THOSE THINGS

8    BECAUSE THEY -- EACH ONE OF THEM MIGHT BE IMPORTANT TO SOME

9    CONSUMER LOOKING AT THE PACKAGE FOR SOME OTHER REASON?

10   **A.**  WELL, IT'S INFORMATION ABOUT THE PACKAGE.  SOME OF IT IS,

11   YOU KNOW, HERE'S THE EXTRA BELLS AND WHISTLES THAT YOU ARE

12   GOING TO GET.  SO THE ABILITY TO WATCH AND STREAM MOVIES ON

13   YOUR DEVICE IS IMPORTANT TO SOME PEOPLE.  IT'S KIND OF A

14   LITTLE BIT PROMOTIONAL.

15   **Q.**  ALL RIGHT.  NOW LET'S LOOK AT -- THIS IS THE OLD FLOW AND

16   IT IS UX AS PROFFERED BY THE FTC IN THIS CASE.

17        LET'S LOOK AT EXHIBIT 1065, WHICH IS THE VIDEO CAPTURE,

18   YOUR HONOR, FOR REFERENCE, DATED SEPTEMBER 17, 2015, PROFFERED

19   BY THE FTC.  AND IT IS OF THE NEW FLOW WEBSITE.

20        I'M GOING TO ASK YOU IF YOU RECOGNIZE IT AS SUCH.

21                      (DISPLAYED ON SCREEN.)

22        LET'S GO TO TIME OF 2:52.  IS THAT IT?  OKAY.

23        SO, HERE IS THE NEWLY-DESIGNED PACKAGES PAGE, CORRECT?

24   **A.**  CORRECT.

25   **Q.**  HOW DID THE LAYOUT CHANGE OF THE PACKAGES PAGE FOR THE

1    PACKAGE DESCRIPTIONS?

2    **A.**  SO WHAT WE DID WAS, BECAUSE THERE WAS A LOT OF INFORMATION

3    ON THE PAGE WHEN WE HAD THEM ALL SIDE BY SIDE, AND DUE TO THE

4    COMPLEXITY OF ADDING MORE PACKAGES, IT LIMITED -- WE WERE

5    LIMITED BY TECHNOLOGY AND WE WERE LIMITED BY JUST THE CODING

6    OF THE SITE INTO HOW WIDE THOSE COLUMNS COULD BE.  SO IF WE

7    HAD SIX PACKAGES, YOU BARELY COULD READ ANYTHING.  THE PAGE

8    TURNED INTO THIS LONG-SCROLLING PAGE.

9        WE WERE BETTER SERVED BY MOVING TO A DIFFERENT LAYOUT TO

10   MAKE IT EASIER FOR CONSUMERS TO LOOK AT THE INFORMATION, TO BE

11   ABLE TO SELECT THEIR PACKAGES, AND, YOU KNOW, TO GIVE THEM,

12   YOU KNOW, MORE ROOM LET'S SAY, YOU KNOW.

13   **Q.**  ON THIS PARTICULAR PAGE, LOOKING AT THE SELECT PACKAGE BUT

14   IT IS FOR ALL THE PACKAGES, THERE IS A BLUE I IN CONNECTION

15   WITH THE PREMIUM CHANNEL OFFER.

16       DO YOU SEE THAT?

17   **A.**  YES, I DO.

18   **Q.**  WHY DID DIRECTV UTILIZE THE I IN THIS MANNER ON THIS PAGE?

19   **A.**  BECAUSE THAT'S INFORMATIONAL -- THAT'S INFORMATION THAT

20   USERS MAY WANT TO SEE.  AND SO WE PUT THAT THERE SO TO MAKE IT

21   ACCESSIBLE TO THEM, TO USERS.

22   **Q.**  THIS IS A TOOL TIP?

23   **A.**  THAT IS A TOOL TIP, YES.

24   **Q.**  LIKE THE ONE THAT WAS DISCUSSED IN THE USABILITY STUDY?

25   **A.**  YES.  WE TALKED ABOUT INFO HOVERS AND TOOL TIPS.  SO I

1    WANT TO MAKE SURE WE HAVE THEM STRAIGHT.  A TOOL TIP REQUIRES

2    A CLICK, AN INFO HOVER IS JUST THE HOVER.

3    **Q.**  UNDERSTOOD.

4         WHERE IN THIS NEW FLOW DID DIRECTV PUT THE PACKAGE

5    FEATURES THAT WE SAW IN THE COLUMNS ON EXHIBIT 1045?

6    **A.**  WE PUT THOSE IN THE LEARN MORE.

7    **Q.**  CAN WE PROCEED THROUGH THE LEARN MORE HYPERLINK?

8                         (DISPLAYED ON SCREEN.)

9         SO THE USERS, IN ORDER TO GAIN ALL THE PROMOTIONAL

10   INFORMATION, HAD TO TAKE AN AFFIRMATIVE STEP IN THE NEW FLOW

11   TO GET ACCESS TO ALL OF THIS INFORMATION, CORRECT?

12   **A.**  CORRECT.

13   **Q.**  ALL RIGHT.

14        WAS THERE ANY REASON WHY DIRECTV PUT ALL OF THIS

15   PROMOTIONAL INFORMATION RELATING TO THE PACKAGES IN SOMETHING

16   THAT REQUIRED AN AFFIRMATIVE STEP BY THE USER?

17   **A.**  WE WERE TRYING JUST TO STREAMLINE THE FLOW TO GIVE PEOPLE

18   THE CHOICES, RIGHT?  SO PEOPLE NEED TO BE ABLE TO TAKE A LOOK

19   TOO SEE WHAT'S AVAILABLE TO THEM, MAKE A SELECTION.  AND THEN

20   IF THEY WANT TO LEARN MORE, THAT INFORMATION IS AVAILABLE TO

21   THEM.  RIGHT?  THEY CAN TAKE THAT CLICK.  BUT THEY HAVE TO BE

22   ABLE TO EASILY, YOU KNOW, KIND OF TAKE A LOOK AT WHAT'S BEING

23   OFFERED TO THEM IN TERMS OF CHOICE.

24        SO WE HAVE DIFFERENT PACKAGES.  HOW MANY DO WE HAVE?  HOW

25   DO I SELECT IT?  OH, OKAY, I WANT TO LEARN A LITTLE BIT MORE

1    ABOUT THIS.

2    **Q.**  IN CONNECTION WITH EVEN PROVIDING EVEN MORE INFORMATION

3    ABOUT THESE PROMOTIONAL FEATURES, THERE ARE TOOL TIPS

4    INDICATED BY THE LITTLE I FOR EACH AND EVERY ONE OF THESE

5    ISSUES, RIGHT?

6    **A.**  PRETTY MUCH.  THE LAST TO THE BOTTOM TWO DON'T HAVE IT,

7    BUT PRETTY MUCH FOR ALL OF THEM.

8    **Q.**  THAT'S THE PROBLEM WITH A LEADING QUESTION.  SOMETIMES

9    YOU'RE WRONG.

10        THERE ARE TWO THAT DON'T HAVE THE INFO HOVER, RIGHT?

11   **A.**  CORRECT.

12   **Q.**  SO -- BUT IN TERMS OF HOW YOU DESIGN THE FLOW, THE IDEA OF

13   USING THE I'S CONSISTENTLY ON A PAGE IS WHAT?

14   **A.**  A DESIGN PATTERN.

15   **Q.**  ENABLING WHAT?

16   **A.**  ENABLING USERS TO GET ADDITIONAL INFORMATION IF THEY

17   NEEDED IT.

18            **MR. HUMMEL:**  NOW LET'S GO, IF WE COULD, TO A

19   DEMONSTRATIVE EXHIBIT THAT WE PREPARED, YOUR HONOR.  IT'S BEEN

20   PREMARKED AS EXHIBIT 2701.  I'VE SHOWN IT TO FTC COUNSEL AND

21   HE HAS NO OBJECTION TO DISPLAYING IT FOR PURPOSES OF THIS

22   CROSS-EXAMINATION.

23            **THE CLERK:**  I NEED THE NUMBER ONE MORE TIME.  I'M

24   SORRY.

25            **MR. HUMMEL:**  NO PROBLEM.  2701.

1          **THE COURT:**  THIS IS ONLY FOR IDENTIFICATION FOR NOW?

2          **MR. HUMMEL:**  THAT'S CORRECT.  AND IT'S A

3    DEMONSTRATIVE.

4          (TRIAL EXHIBIT 2701 MARKED FOR IDENTIFICATION.)

5    **BY MR. HUMMEL:**

6    **Q.**  SO WERE YOU AWARE, MS. POLING-HIRALDO, THAT DURING 2015 AT

7    THE DIRECTION OF COUNSEL, DIRECTV LAUNCHED A LIVE WEB TEST?

8    **A.**  YES, I'M AWARE.

9    **Q.**  OKAY.  AND, AGAIN, AT THE DIRECTION OF COUNSEL, DIRECTV

10   INSTRUCTED YOU TO POST LIVE CERTAIN SPECIFIC CHANGES TO THE

11   WEBSITE.

12   **A.**  IT WASN'T ME, BUT IT WAS THE DIGITAL MEDIA GROUP.  SO YES.

13   **Q.**  I UNDERSTAND.  BUT YOU ARE KNOWLEDGEABLE ABOUT WHAT THE

14   CHANGES WERE, CORRECT?

15   **A.**  CORRECT.

16   **Q.**  SO THERE'S SOMETHING HERE ON THIS DEMONSTRATIVE CALLED A

17   BAU.

18        DO YOU KNOW WHAT THAT REFERS TO?

19   **A.**  YES.  THAT'S BUSINESS AS USUAL.

20   **Q.**  SO THE BAU FLOW, AND YOU WON'T KNOW THIS -- FOR THE RECORD

21   WAS MARKED AS TRIAL EXHIBIT 1059 AND THOSE ARE THE TIMES

22   INDICATED, YOUR HONOR, WHERE THESE DISPLAYS APPEAR.

23        SO FOR THIS NEW FLOW EXHIBIT, THE DISCLOSURE ABOUT THE

24   PRICE WAS IN THE RED BUBBLE AND THEN IN THE SAME FLOW, THE

25   SIGN-UP PAGE HAD WHAT'S INDICATED ON THE RIGHT AT THE TOP.

1      THAT WAS THE BUSINESS AS USUAL FLOW, CORRECT?

2    **A.**   CORRECT, BUT I BELIEVE YOU MISSTATED IT BECAUSE THE

3    DISCLOSURE IS UNDER THE 29.99 NOT IN THE RED BUBBLE.

4    **Q.**   FAIR ENOUGH.

5      SO THE WEB TEAM DEVELOPED AND PUBLISHED A REVISED WEB

6    FLOW, WHICH IS REFLECTED IN TRIAL EXHIBIT 1050, AND YOU'RE

7    FAMILIAR THAT THAT WAS PUBLISHED DURING 2015 BY THE DIRECTV

8    WEB TEAM?

9    **A.**   YES.

10   **Q.**   AND THAT CONSUMERS SIGNED UP ON BOTH OF THESE FLOWS,

11   CORRECT?

12   **A.**   YES, THEY DID.

13   **Q.**   WHAT WAS THE CHANGE WITH RESPECT TO THE LANDING PAGE PRICE

14   DISCLOSURE ON TRIAL EXHIBIT 1050, WHICH IS THE REVISED FLOW?

15   **A.**   IN 1050, THE DISCLOSURES GOT MOVED INTO THE RED BUBBLE.

16   **Q.**   AND THE DISCLOSURE THERE, FOR THE RECORD, READS:  SELECT

17   PACKAGE FOR 12 MONTHS WITH TWO-YEAR AGREEMENT, MONTHS 13

18   THROUGH 24, AND THERE IS A PRICE THAT I CAN'T READ BECAUSE MY

19   EYESIGHT IS BAD.

20     BUT THE THEN EXISTING REGULAR PRICE IS DISPLAYED, CORRECT?

21   **A.**   YES.

22   **Q.**   AND THEN AT THE END OF THE FLOW BEFORE THE CHECKOUT PAGE,

23   WHAT CHANGE WAS MADE?

24   **A.**   SO THEY TOOK THE TERMS AND CONDITIONS OUT OF THE LINK AND

25   THEY PUT IT WITHIN THE PAGE.  SO IT'S IN A, BASICALLY IN AN

POLING-HIRALDO – REDIRECT / SNOW

1    UNAVOIDABLE SCROLLING LIGHT BOX.

2    **Q.**  SO --

3    **A.**  NOT A LIGHT BOX, I'M SORRY.  IT'S NOT A LIGHT BOX.  IT'S A

4    DIV, WHICH IS A TECHNICAL TERM, BUT IT'S A PLACEMENT WITHIN

5    THE PAGE.

6    **Q.**  BOTH OF THESE FLOWS WERE LIVE AT THE SAME TIME ON THE

7    DIRECTV WEBSITE, CORRECT?

8    **A.**  CORRECT.

9    **Q.**  SOME CONSUMERS SAW THE TOP, SOME CONSUMERS SAW AND WENT

10   THROUGH THE BOTTOM FLOW, CORRECT?

11   **A.**  CORRECT.

12         **MR. HUMMEL:**  ONE MOMENT, YOUR HONOR.

13              (PAUSE IN THE PROCEEDINGS.)

14      NOTHING FURTHER AT THIS TIME.

15         **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

16         **MR. SNOW:**  YES, YOUR HONOR.

17                 **REDIRECT EXAMINATION**

18   **BY MR. SNOW:**

19   **Q.**  MS. POLING-HIRALDO, DO YOU RECALL MR. HUMMEL ASKING YOU

20   SOME QUESTIONS ABOUT THIS ISSUE OF WHETHER DISCLOSURES WERE

21   IMPROVED OR CHANGED AS A RESULT OF THE RESULTS OF USABILITY

22   TESTS?

23   **A.**  YEAH, YOU JUST QUOTED IT.

24   **Q.**  HE JUST DID IT AND I JUST QUOTED IT, SO PRESUMABLY YOU

25   REMEMBER?

1    **A.** YES.

2    **Q.** OKAY.

3       AND YOU ALSO RECALL TESTIFYING EARLIER THIS MORNING ABOUT

4    INDIVIDUAL EXAMPLES OF USABILITY TESTS AND REPORTS IN THOSE

5    USABILITY TESTS, RIGHT?

6    **A.** YES.

7    **Q.** AND WAS YOUR TESTIMONY THIS MORNING ACCURATE WITH RESPECT

8    TO WHETHER INDIVIDUAL RESULTS OF USABILITY TESTS THAT WE

9    LOOKED AT TOGETHER WERE EVENTUALLY -- EVENTUALLY RESULTED IN

10   CHANGES TO THE DIRECTV WEBSITE?

11   **A.** YES.

12   **Q.** SO YOU'RE TESTIMONY THIS MORNING ON THOSE SUBJECTS WAS

13   ACCURATE?

14   **A.** SO, IF I CAN CLARIFY.

15      IN TERMS OF CHANGES TO THE WEBSITE, THERE WERE -- SO WHEN

16   WE WERE DOING -- I BELIEVE ONE OF THE QUESTIONS YOU ASKED WAS,

17   YOU KNOW, DID YOU, YOU KNOW, MOVE THE LINK OR CHANGE THIS.

18   AND MY ANSWER TO THAT AT THE TIME WOULD HAVE BEEN, WE DID A

19   COMPLETE REDESIGN AND THE VIEW 24-MONTHS AT THE TOP WAS AN

20   OUTDATED PATTERN.  SO WE DEVELOPED A NEW DESIGN PATTERN FOR

21   IT.

22      SO IN TERMS OF DID CHANGES RESULT, WE MADE CHANGES, BUT

23   NOT NECESSARILY AS A DIRECT RESULT OF THAT FEEDBACK.  RIGHT?

24   SO THERE WERE DESIGN PATTERN CHANGES.  THERE WERE LAYOUT

25   CHANGES.  AND SOME OF THAT -- SOME OF THOSE CHANGES WERE

1    DIRECTIONALLY INFLUENCED BY IT, BUT I WOULDN'T SAY THEY WERE A

2    DIRECT RESULT.  IT WAS KIND OF, AGAIN, NOT, YOU KNOW, FOR THE

3    DISCLOSURES, THE DISCLOSURES THEMSELVES, WE DIDN'T CHANGE THE

4    DISCLOSURES BECAUSE THE DISCLOSURES CAME FROM LEGAL, YOU KNOW.

5         DOES THAT ANSWER THE QUESTION?

6    **Q.**  I THINK IT DOES.

7         WITH RESPECT TO THE PARTICULAR EXAMPLES THAT WE LOOKED AT,

8    YOUR TESTIMONY THIS MORNING WAS ACCURATE THOUGH, CORRECT?

9              **MR. HUMMEL:**  OBJECTION.  THAT'S ARGUMENTATIVE, YOUR

10   HONOR, ASKING HER TO CHARACTERIZE HER TESTIMONY.

11             **THE COURT:**  OVERRULED.

12             **THE WITNESS:**  I'M SORRY, REPEAT THE QUESTION.

13   **BY MR. SNOW:**

14   **Q.**  MY QUESTION WAS, WITH RESPECT TO THE PARTICULAR EXAMPLES

15   THAT WE LOOKED AT THIS MORNING, YOUR TESTIMONY WAS ACCURATE;

16   IS THAT CORRECT?

17   **A.**  YES.

18             **MR. SNOW:**  CAN WE BRING UP TRIAL EXHIBIT 770, PAGE 6,

19   PDF PAGE 6 NO. 2 AT THE BOTTOM OF THE PAGE.

20                  (DISPLAYED ON SCREEN.)

21   **BY MR. SNOW:**

22   **Q.**  SO, YOU JUST LOOKED AT THE FOURTH BULLET DOWN ON THIS

23   SLIDE.  DO YOU RECALL THAT?

24   **A.**  YES, I DO.

25   **Q.**  AND YOU MENTIONED THAT THIS IS A QUALITATIVE RESEARCH

POLING-HIRALDO – REDIRECT / SNOW

1    PROJECT AND THE FINDINGS MAY NOT BE PROJECTABLE TO THE ENTIRE

2    UNIVERSE OF PROSPECTIVE USERS, RIGHT?

3    **A.**   CORRECT.

4    **Q.**   DESPITE THAT, YOU STILL ARE A BIG ADVOCATE FOR USING

5    USABILITY STUDIES INSIDE THE DIRECTV ORGANIZATION, CORRECT?

6    **A.**   YES, WE ARE.

7    **Q.**   AND YOU STILL FIND THEM VERY USEFUL FOR GUIDING DESIGN OF

8    THE WEBSITE, DON'T YOU?

9    **A.**   WE FIND THEM USEFUL TO GUIDE HOW USERS -- TO LEARN HOW

10   USERS INTERACT AND HOW THE FUNCTIONALITY NEEDS TO BE BUILT OUT

11   TO ACCOMMODATE THEM.

12   **Q.**   SO IT'S USEFUL TO UNDERSTAND HOW USERS INTERACT WITH THE

13   WEBSITE TO PERFORM AN ALBEIT QUALITATIVE STUDY?

14   **A.**   YES.

15   **Q.**   I THINK YOU ALSO MENTIONED THAT A USABILITY STUDY IS

16   USEFUL TO IDENTIFY GOTCHAS OR ROAD BLOCKS IN A WEBSITE THAT

17   PARTICIPANTS ARE LOOKING AT; IS THAT CORRECT?

18   **A.**   YES.  IN A FLOW, YES.

19   **Q.**   IF A CONSUMER DOESN'T UNDERSTAND OR A PARTICIPANT IN THE

20   STUDY DOESN'T UNDERSTAND SOMETHING ABOUT THE TERMS AND

21   CONDITIONS OF THE OFFER, WOULD YOU CONSIDER THAT A GOTCHA?

22   **A.**   WE WERE NOT TESTING FOR THAT AND THAT WOULD BE A CONTENT

23   ISSUE.  IT WOULD NOT BE A GOTCHA.

24   **Q.**   WOULD IT BE A ROAD BLOCK EITHER?

25   **A.**   IF THEY HAVE ACCESS TO THE INFORMATION AND WE CAN SEE THEY

1    CAN CLEARLY ACCESS IT, THEN NO.

2    **Q.**  SO AS LONG AS THEY CAN ACCESS IS, THAT'S ALL THAT IS

3    REQUIRED FROM A USABILITY PERSPECTIVE?

4    **A.**  YES.

5    **Q.**  I'D LIKE TO MOVE TO PDF PAGE 13, SLIDE NO. 9 OF

6    EXHIBIT 770.

7                        (DISPLAYED ON SCREEN.)

8       I THINK YOU TESTIFIED ABOUT THIS SLIDE THAT THIS INDICATES

9    TO YOU THAT PEOPLE SEE THE PRICING; IS THAT CORRECT?

10   **A.**  YES.

11   **Q.**  AND YOU ARE ABLE TO MAKE THAT INFERENCE DESPITE THE FACT

12   THAT IT'S A QUALITATIVE STUDY?

13   **A.**  THE STATEMENT SAYS:  SEVERAL NOTES AN APPRECIATION THAT

14   PACKAGE PRICING IS SO CLEARLY LAID OUT ON THE PAGE.

15      SO BEING A QUALITATIVE STUDY, WE GOT THAT FEEDBACK, RIGHT?

16   **Q.**  SO YOU CAN READ THIS FROM A QUALITATIVE STUDY AND YOU CAN

17   INFER THAT THE PARTICIPANTS COULD SEE THE PRICING ON THIS

18   PAGE?

19   **A.**  I CONFERRED THAT THE LAYOUT OF THE PAGE WAS CONDUCIVE TO

20   USERS' UNDERSTANDING WHAT WAS IN -- WHAT OUR PACKAGE MODULE

21   LOOKED LIKE AND WHAT THE ELEMENTS OF THAT PACKAGE MODULE

22   LOOKED LIKE, AND PRICING HAPPENS TO BE ONE OF IT, JUST LIKE

23   THE ADD TO CART BUTTON IS ANOTHER PART OF IT.

24   **Q.**  TAKE A LOOK AT PAGE 47 OF THIS EXHIBIT.

25                        (DISPLAYED ON SCREEN.)

1          **MR. SNOW:**  THREE SLIDES FORWARD.

2                         (DISPLAYED ON SCREEN.)

3          **MR. SNOW:**  LET'S DO ONE MORE FORWARD.

4                         (DISPLAYED ON SCREEN.)

5      THIS IS THE ONE.  THANK YOU.

6  **BY MR. SNOW:**

7  **Q.**  YOU SEE IN THE RECOMMENDATIONS UNDER THE FOURTH BULLET?

8  IT SAYS:  THE LINK TO VIEW SIX MONTHS AT A GLANCE NEEDS TO BE

9  MORE PROMINENT?

10  **A.**  YES, I DO.

11  **Q.**  AND CAN YOU ALSO INFER FROM THIS, JUST LIKE YOU DID FROM

12  THE PREVIOUS SLIDE WE LOOKED AT, THAT THE VIEW SIX MONTHS AT A

13  GLANCE IS NOT NOTICED BY USERS AND THAT IT SHOULD BE MORE

14  PROMINENT ON THE SITE?

15  **A.**  SO, AGAIN, THIS IS -- A CERTAIN NUMBER OF USERS SAID IT.

16  I DON'T KNOW FROM THIS HOW MANY USERS SAID IT.  SO

17  DIRECTIONALLY, WE WOULD TAKE A LOOK AT HOW MANY USERS ACTUALLY

18  MADE THAT COMMENT AND WE MAY OR MAY NOT MAKE CHANGES OFF OF

19  IT.

20  **Q.**  MS. POLING-HIRALDO, YOU TESTIFIED THAT YOU COULD SEE THAT

21  USERS WERE SEEING THE PRICE BASED ON A QUALITATIVE STUDY WHEN

22  WE ARE LOOKING BACK AT PDF PAGE 13 OF THIS EXHIBIT, AND YET

23  WHEN THIS INDICATION IS THAT CONSUMERS OR USERS CAN'T SEE VIEW

24  SIX MONTHS AT A GLANCE, YOU SAY THAT YOU CAN'T INFER THAT

25  THAT'S NOT SOMETHING THEY CAN SEE.

1      WHY IS THAT?

2   **A.**  I DID NOT SAY THAT.  I SAID THAT, YES, PEOPLE MADE THAT

3   OBSERVATION.  THE NUMBER OF PEOPLE WHO MADE THE OBSERVATION

4   WOULD HAVE IMPACTED HOW WE TOOK THE FEEDBACK.

5      AND I CAN'T TELL FROM THIS STATEMENT HERE HOW MANY PEOPLE

6   MADE THAT STATEMENT.

7   **Q.**  COULD YOU TELL FROM THE STATEMENT ABOUT PRICE HOW MANY

8   PEOPLE MADE THAT STATEMENT?

9   **A.**  NO, I COULD NOT.

10  **Q.**  LET'S TAKE A LOOK AT EXHIBIT 767, PAGE 3.

11                  (DISPLAYED ON SCREEN.)

12         **MR. SNOW:**  PAGE 7 OF THE PDF.

13                  (PAUSE IN THE PROCEEDINGS.)

14     LET'S LOOK AT SLIDE NO. 7.  THERE'S A THREE-PAGE OFFSET,

15  AND...

16     NUMBERED 7.  OKAY.

17                  (DISPLAYED ON SCREEN.)

18  **BY MR. SNOW:**

19  **Q.**  DO YOU RECALL MR. HUMMEL'S TESTIMONY -- QUESTIONING,

20  PARTIAL TESTIMONY ALSO QUESTIONING TO YOU ABOUT USERS HAVING

21  ENCOUNTERED BAIT AND SWITCH TACTICS IN THE PAST, IN THE FIRST

22  BULLET?

23  **A.**  YES.

24  **Q.**  I THINK THE SUGGESTION WAS THAT THAT BAIT AND SWITCH

25  TACTICS REFERRED TO THE PAST, AND IT WASN'T NECESSARILY

1    REFERRING TO THIS ACQUISITION FLOW; IS THAT RIGHT?

2    **A.**  I WOULD SAY YES.

3    **Q.**  BUT WHEN YOU LOOK AT THIS SENTENCE, IT SAYS:  NEGATIVITY

4    TO WHAT THEY PERCEIVE AS EXAMPLES OF THIS THROUGHOUT THE

5    ACQUISITION FLOW.

6        DO YOU SEE THAT?

7    **A.**  YES, I DO.

8    **Q.**  DOESN'T "THIS" REFER TO BAIT AND SWITCH TACTICS THAT THEY

9    ENCOUNTERED IN THE PAST?

10   **A.**  IT IS A PERCEPTION OF WHAT THEY HAVE ENCOUNTERED IN THE

11   PAST.  RIGHT?  SO IF YOU WANT TO SAY THAT...  YES.

12   **Q.**  TAKE A LOOK AT SLIDE NO. 11.

13                      (DISPLAYED ON SCREEN.)

14       **MR. SNOW:**  TRY THREE PAGES FORWARD.  I THINK THAT IS

15   WHERE THIS IS.

16                      (DISPLAYED ON SCREEN.)

17       LET'S TRY THREE PAGES BACK.

18   **BY MR. SNOW:**

19   **Q.**  WHAT I AM LOOKING FOR IS THE SLIDE WHICH REFLECTS THAT

20   USERS OR PARTICIPANTS IN THE STUDY SUGGESTED THAT THE VIEW

21   MONTHLY COST LINK BE MOVED TO THE TOP OF THE PAGE.

22   **A.**  RIGHT.

23   **Q.**  DO YOU RECALL THAT?

24   **A.**  I DO RECALL.

25   **Q.**  I THINK YOUR TESTIMONY WAS THAT IT WAS, IN FACT, MOVED TO

1    THE TOP OF THE PAGE?

2    **A.**   EVENTUALLY, YES.

3    **Q.**   WHEN WAS IT MOVED TO THE TOP OF THE PAGE?

4    **A.**   I DON'T RECALL EXACTLY, BUT I KNOW IT WAS AFTER LAUNCH.

5         AND WHEN WE LAUNCHED, THE FIRST TIME THAT YOU PUT

6    SOMETHING IN YOUR CART, YOUR CART DROPPED DOWN AND YOU WOULD

7    SEE YOUR COSTS FOR THE PROGRAMMING THAT YOU JUST ADDED.  AND

8    THE LINK WAS CLEARLY VISIBLE THERE.  SO YOU HADN'T FINISHED

9    COMPLETING YOUR PACKAGE YET, SO -- BUT IT WAS THERE SO PEOPLE

10   COULD SEE IT AND GET FAMILIAR WITH -- AGAIN, THE LAYOUT OF THE

11   PAGE AND THE INFORMATION THAT WAS BEING PRESENTED IN TERMS OF

12   LIKE THIS CHUNK HERE IS FOR PRICING, THIS CHUNK HERE IS FOR

13   RECEIVER, ET CETERA.

14   **Q.**   LET'S LOOK AT EXHIBIT 2034, PAGE 44.

15                    (DISPLAYED ON SCREEN.)

16        IT KEEPS SHOWING UP FOR A SECOND.  HOLD ON.

17                    (PAUSE IN THE PROCEEDINGS.)

18   **BY MR. SNOW:**

19   **Q.**   YOU RECOGNIZE THIS PAGE AS PART OF THE DIRECTV WEB FLOW?

20   **A.**   YES.

21   **Q.**   AND WHEN YOU REFER TO THE VIEW MONTHLY COST INFORMATION

22   BEING AT THE TOP OF THE PAGE, ARE YOU REFERRING TO THIS

23   PORTION (INDICATING) OF THE PAGE?  THAT IS THE VIEW MONTHLY

24   COST LANGUAGE UNDER THE EXTRAS HEADING?

25   **A.**   YES.

1    **Q.**   THAT'S THE DISCLOSURE YOU ARE REFERRING TO WHEN YOU SAID

2    THAT IT WAS MOVED EVENTUALLY TO THE TOP OF THE PAGE?

3    **A.**   IT HAS ACTUALLY MOVED SEVERAL TIMES.

4    **Q.**   OKAY.

5        IS IT ACCURATE TO SAY THAT THAT LINK IN THIS PAGE WAS AT

6    THE TOP?

7    **A.**   NOT IN THIS PARTICULAR VIEW OF THE FLOW.  THE FLOW HAS

8    EVOLVED OVER TIME.  SO YOU'RE TAKING A MOMENT IN TIME.

9    **Q.**   LET'S LOOK AT EXHIBIT 1117.

10       DO YOU RECALL THE DISCUSSION ABOUT TOUCHCOMMERCE?

11                   (DISPLAYED ON SCREEN.)

12   **A.**   YES, I DO.

13   **Q.**   DO YOU KNOW WHAT PERCENTAGE OF THE USERS ON THE WEBSITE

14   TRIGGER AN INTERACTION WITH THE TOUCHCOMMERCE SYSTEM?

15   **A.**   I AM SORRY, I ACTUALLY DON'T.

16   **Q.**   DO YOU KNOW HOW MANY USERS MIGHT HAVE THE QUESTION OF HOW

17   MUCH THE PACKAGE COSTS AND THEN NOT TRIGGER A CHAT WITH

18   TOUCHCOMMERCE?

19   **A.**   I DO NOT HAVE THAT INFORMATION.

20   **Q.**   WHAT ABOUT THE NUMBER OF USERS WHO MIGHT HAVE A QUESTION

21   ABOUT WHETHER THEY CAN CANCEL, REMOVE PREMIUM CHANNELS AFTER

22   THE THREE-MONTH TRIAL PERIOD BUT THEN NOT TRIGGER A CHAT WITH

23   TOUCHCOMMERCE?

24   **A.**   I DON'T HAVE THAT INFORMATION EITHER, BUT I DO KNOW THAT

25   PEOPLE -- AGAIN, GOING BACK TO OUR 70/30 NUMBER, 70 PERCENT OF

1    THE PEOPLE WHO START ON THE WEB CALL.

2    **Q.**  LET'S TAKE A LOOK AT EXHIBIT 1045.

3                    (DISPLAYED ON SCREEN.)

4        DO YOU RECALL THE QUESTIONING ABOUT THE ACTIVE OR INACTIVE

5    LINKS IN THIS EXHIBIT, MS. POLING-HIRALDO?

6    **A.**  YES.

7    **Q.**  I THINK YOU TESTIFIED THE WHY DIRECTV LINK ON THIS PAGE IS

8    NOT ACTIVE?

9    **A.**  I DIDN'T TESTIFY.  I JUST SAID WHAT WAS UNDER IT.

10   **Q.**  THAT'S TRUE, MR. HUMMEL TESTIFIED.  YOU CAN SEE THAT IT IS

11   NOT ACTIVE IN THIS SITE?

12   **A.**  RIGHT.

13   **Q.**  AND THE PACKAGES LINK IS ALSO NOT ACTIVE AS YOU CAN SEE?

14   **A.**  YES.

15   **Q.**  IF A USER CLICKED WHY DIRECTV, WHAT INFORMATION WOULD BE

16   DISPLAYED TO THEM?

17   **A.**  AS I TESTIFIED EARLIER, THE INFORMATION ABOUT, YOU KNOW,

18   GENERAL INFORMATION ABOUT THE SERVICE, MORE OF A PROMOTIONAL

19   MARKETING PAGE, PLUS A COMPARISON PAGE ABOUT COMPARING US TO

20   CABLE VERSUS OTHER PROVIDERS.

21   **Q.**  WAS THERE A PRICING INFORMATION IN THE WHY DIRECTV PAGE?

22   **A.**  THERE WERE LINKS TO PACKAGES, AND IF MY MEMORY SERVES ME

23   CORRECTLY, THERE WOULD HAVE BEEN SOME PROMOTIONAL OFFER

24   COMPONENT ON THOSE PAGES ALONG WITH ALL THE NECESSARY LEGAL

25   DISCLOSURES.

1    **Q.**  WHAT ABOUT PACKAGES?  WHAT WAS DISPLAYED IF THE USER

2    CLICKED THE PACKAGES BUTTON IN THE HEADER?

3    **A.**  YOU GOT A LISTING OF... BASICALLY THERE WERE THREE

4    SECTIONS.  ONE WHICH WAS THE PACKAGES THEMSELVES, SPANISH

5    VERSUS ENGLISH.  THE OTHER SECTION WAS RELATED TO ALL OF THE

6    PREMIUM/ADD-ON CHANNELS THAT DIRECTV HAD TO OFFER, AND THE

7    THIRD SECTION WAS RELATED TO ALL THE SPORTS PROGRAMMING THAT

8    WE HAD AVAILABLE.

9    **Q.**  WAS THERE PRICING INFORMATION IN THE PACKAGES PAGE?

10   **A.**  THE PACKAGES PAGE, THE GENERAL -- THE LANDING PAGE FOR

11   PACKAGES, SO WHAT WE CALL THE PACKAGES INDEX AGAIN HAD A

12   PROMOTIONAL ELEMENT THAT TALKED ABOUT THE PACKAGES WITH THE

13   PRICING AND THE LEGAL DISCLOSURES AND THEN THE LINK TO THE

14   ENGLISH PACKAGES PAGE TOOK YOU INTO THE FLOW.

15          **MR. SNOW:**  CAN WE BRING UP TRIAL EXHIBIT 2033,

16   PLEASE?

17                   (DISPLAYED ON SCREEN.)

18      GO TO THE FIRST PAGE.  ZOOM IN ON THE FIRST PAGE OF THAT

19   DOCUMENT.

20   **BY MR. SNOW:**

21   **Q.**  MS. POLING-HIRALDO, DO YOU RECOGNIZE THIS AS A SCREENSHOT

22   OF THE DIRECTV WEBSITE?

23   **A.**  YES, I DO.

24   **Q.**  CAN YOU CLICK ON ANY LINK IN THIS DOCUMENT?

25   **A.**  IT'S A SCREENSHOT.

1   **Q.**   THAT'S RIGHT.  AND CAN YOU CLICK ON ANYTHING IN A

2   SCREENSHOT IN ORDER TO SEE MORE INFORMATION BEHIND THAT LINK?

3   **A.**   IT DEPENDS ON HOW THE DOCUMENT WAS SAVED.  IF IT WAS SAVED

4   WITH A PDF WITH CLICKABLE LINKS, YES.  SO THAT DUB DUB DUB

5   DIRECTV.COM UP THERE CAN BE CLICKED, BUT GENERALLY SPEAKING

6   NO.

7   **Q.**   AND YOU CAN'T REVEAL ANY INFO HOVERS BY MOVING YOUR MOUSE

8   OVER A LINK IN A SCREENSHOT LIKE THIS, CAN YOU?

9   **A.**   NO, YOU CAN'T.

10   **Q.**   YOU CAN'T REVEAL A TOOL TIP BY CLICKING ON A LINK THAT

11   MIGHT REVEAL A TOOL TIP IN AN INTERACTIVE SITE, CAN YOU?

12   **A.**   NOT IN A SCREENSHOT.

13   **Q.**   AND OBVIOUSLY YOU CAN'T CLICK WHY DIRECTV IN A SCREENSHOT?

14   **A.**   NO, YOU CAN'T.

15   **Q.**   YOU CAN'T CLICK PACKAGES IN A SCREENSHOT?

16   **A.**   NO, YOU CAN'T.

17   **Q.**   HAVE YOU SEEN AN INTERACTIVE CAPTURE, WHAT YOU MIGHT CALL

18   A HIGH FIDELITY PROTOTYPE, PREPARED IN CONNECTION WITH THIS

19   CASE BY ANYONE WITH THE FTC?

20   **A.**   I DON'T -- MAYBE.  I'M NOT SURE.

21   **Q.**   UNDER WHAT CIRCUMSTANCES MIGHT YOU HAVE SEEN IT?

22   **A.**   I GUESS IN A VIDEO OR SOMETHING.

23       AGAIN, I HAVE NOT LIKE SAT DOWN AND CLICKED ON A DOCUMENT

24   OR RECEIVED A DOCUMENT TO CLICK.  I HAVE GOTTEN PRINTOUTS AND

25   SEEN VIDEOS.

1    **Q.**  SO YOU'RE NOT SURE ONE WAY OR ANOTHER WHETHER --

2    **A.**  RIGHT.  YES.

3    **Q.**  YOU ARE NOT SURE ONE WAY OR ANOTHER WHETHER YOU HAVE SEEN

4    AN INTERACTIVE HIGH FIDELITY PROTOTYPE PREPARED BY, FOR

5    EXAMPLE, DIRECTV IN THIS CASE?

6    **A.**  I'M NOT SURE.

7            **MR. SNOW:**  LET'S LOOK AT THE DEMONSTRATIVE MR. HUMMEL

8    PUT UP.  IT IS MARKED 2701.  WE MIGHT HAVE TO SWITCH OVER TO

9    PLAY THAT.

10                     (DISPLAYED ON SCREEN.)

11   **BY MR. SNOW:**

12   **Q.**  MS. POLING-HIRALDO, THE WAY THAT THIS WORKED, AS I

13   UNDERSTAND IT, I WANT TO SEE IF THIS MATCHES YOUR

14   UNDERSTANDING, IS THAT SOME POPULATION OF CUSTOMERS ON THE

15   DIRECTV WEBSITE WOULD HAVE SEEN ONE OF THESE TWO AND SOME

16   OTHER POPULATION WOULD HAVE SEEN THE OTHER; IS THAT RIGHT?

17   **A.**  YEAH.  THE WAY AN A/B TEST WORKS IS THAT WE SEGMENT A

18   POPULATION, AND WE WILL SEND TO EITHER THE BAU FLOW OR THE

19   REVISED FLOW.

20   **Q.**  AND WAS THIS RUN, TO YOUR KNOWLEDGE, THROUGH THE STANDARD

21   A/B TESTING WORK FLOW AT DIRECTV?

22   **A.**  MY UNDERSTANDING IS YES.  I DO NOT RUN THE TEST.

23   **Q.**  WOULD THAT BE USING THE MONETATE TOOL?

24   **A.**  YEAH.  WE'VE HAD A COUPLE OF TOOLS, BUT I BELIEVE THE

25   MONETATE -- I'M NOT A HUNDRED PERCENT SURE.  I DIDN'T RUN THIS

1    TEST.

2    **Q.**   COULD IT HAVE BEEN THE ADOBE TEST AND TARGET TOOL?

3    **A.**   YEAH.  I WOULD LEAN TOWARD TEST AND TARGET.  BUT, AGAIN, I

4    DIDN'T RUN THE TEST SO I DON'T WANT TO SPEAK TO WHICH DEVICE

5    WAS USED.

6    **Q.**   AND WHICHEVER ONE IT IS, THE DATA RESULTING THIS WOULD

7    HAVE BEEN GATHERED USING THAT TOOL THAT DIRECTV USES FOR A/B

8    TESTING IN THE ORDINARY COURSE OF BUSINESS, CORRECT?

9    **A.**   CORRECT.

10            **MR. SNOW:**  NO FURTHER QUESTIONS.  THANK YOU.

11            **THE COURT:**  ANYTHING FURTHER FOR MS. POLING...

12            **MR. SNOW:**  HIRALDO.

13            **THE COURT:**  I'M SORRY.  MS. POLING --

14            **THE WITNESS:**  THAT'S OKAY.

15            **MR. SNOW:**  HIRALDO.

16            **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

17            **THE COURT:**  THANK YOU, MA'AM.  YOU ARE EXCUSED.

18            **THE WITNESS:**  THANK YOU.

19            **THE COURT:**  SO HOW ABOUT THIS.  IS MS. STAHL'S

20    TESTIMONY SHORT?

21            **MR. EDMONDSON:**  I BELIEVE SO, YOUR HONOR, BUT

22    MS. WODINSKY, WHO WILL BE HANDLING MS. STAHL'S TESTIMONY, IS

23    NOT IN THE COURTROOM AT PRESENT.

24            **THE COURT:**  WHERE IS SHE?

25            **MR. SNOW:**  I'LL SEE IF I CAN FIND HER.

1            **THE COURT:**  THAT WAY WE CAN GET THAT FINISHED TODAY.

2    AND OBVIOUSLY MS. CHEN IS GOING TO HAVE TO COME BACK SO LET'S

3    SEQUENCE IT THAT WAY.

4            **MR. EDMONDSON:**  THANK YOU, YOUR HONOR.

5                    (PAUSE IN THE PROCEEDINGS.)

6            **MR. EDMONDSON:**  MS. WODINSKY HAS BEEN CONTACTED AND

7    SHE IS COMING OVER TO THE COURTROOM.  SHE WILL BE HERE

8    MOMENTARILY, YOUR HONOR.

9            **THE COURT:**  IS SHE IN THE BUILDING?

10           **MR. EDMONDSON:**  NEXT DOOR.

11           **THE COURT:**  IF WE START AT 1:15 CAN MS. STAHL BE

12   COMPLETED BY 1:30?

13           **MR. HUMMEL:**  YES, YOUR HONOR.

14           **THE COURT:**  ALL RIGHT.

15           **MR. HUMMEL:**  I CAN'T REPRESENT HOW LONG IT'S GOING TO

16   TAKE THEM.  AS FOR ME, YES.

17           **THE COURT:**  LET'S JUST BREAK, AND MY DEPUTY CLERK CAN

18   GET ME WHEN MS. WODINSKY IS HERE AND THEN WE WILL FINISH UP

19   MS. STAHL.

20           **MR. EDMONDSON:**  THANK YOU, YOUR HONOR.

21           **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

22      (RECESS TAKEN AT 1:09 P.M.; RESUMED AT 1:17 P.M.)

23           **THE CLERK:**  REMAIN SEATED.  COME TO ORDER.  THIS

24   COURT IS BACK IN SESSION.

25           **THE COURT:**  READY TO PROCEED?

1     **MS. WODINSKY:**  YOUR HONOR, WE WOULD LIKE TO CALL OUR

2  NEXT WITNESS ANN STAHL BACK TO PROVIDE SOME FOUNDATIONAL

3  TESTIMONY ON SOME SUMMARIES.

4     **THE COURT:**  ALL RIGHT.

5                    **DIRECT EXAMINATION**

6  BY MS. WODINSKY:

7  **Q.**  YOU HAVE BEEN ON THE STAND AND TAKEN THE OATH AND PROVIDED

8  YOUR NAME, SO WE WILL SKIP THROUGH ALL OF THAT.  YOU HAVE

9  PROVIDED YOUR BACKGROUND AND I DON'T THINK WE NEED TO REPEAT

10  THAT.

11     YOU ARE STILL AN INVESTIGATOR WITH THE FEDERAL TRADE

12  COMMISSION, CORRECT?

13  **A.**  YES.

14  **Q.**  WE'LL START OFF WITH THE FIRST SUMMARY, WHICH IS

15  EXHIBIT 76.

16     **MS. WODINSKY:**  MR. DUNKIN, IF YOU CAN BRING UP

17  EXHIBIT 76.

18               (DISPLAYED ON SCREEN.)

19  BY MS. WODINSKY:

20  **Q.**  MS. STAHL, ARE YOU FAMILIAR WITH THIS DOCUMENT?

21  **A.**  YES.

22  **Q.**  WHAT IS IT?

23  **A.**  THIS IS A SUMMARY OF PRICES FOR VARIOUS DIRECTV PACKAGES

24  THAT WERE OFFERED AT DIFFERENT PERIODS OF TIME.

25  **Q.**  DID YOU PREPARE THIS CHART?

1    **A.**  I PREPARED IT BASED ON INFORMATION THAT WAS PROVIDED TO ME

2    ALSO IN CHART FORM, AND I WAS ASKED TO GO BACK TO THE ORIGINAL

3    SOURCE DOCUMENTS AND CONFIRM ALL OF THE INFORMATION AND

4    CORRECT ANY CALCULATIONS THAT NEEDED TO BE CORRECTED OR ANY

5    INFORMATION THAT WAS INCORRECT.

6    **Q.**  SO JUST TO RUN THROUGH, IF YOU CAN DESCRIBE FOR US WHAT

7    ARE THE HEADINGS AND WHAT DOES THAT MEAN FOR EACH OF THE

8    HEADINGS IN EACH OF THE COLUMNS?

9    **A.**  YES.

10       THE TIME PERIOD OR EFFECTIVE DATE AND SOURCE IS THE, AS

11   IT'S INDICATED IN THE SALES BELOW THERE, DERIVED FROM

12   RESIDENTIAL NATIONAL OFFER SALES GUIDES, IN THE CASE OF THE

13   FIRST ONE, EXHIBIT 52.

14       THE SALES GUIDES WENT BY SLIGHTLY DIFFERENT NAMES, I

15   UNDERSTAND, BUT THESE WERE PRODUCED BY DIRECTV TO THE FEDERAL

16   TRADE COMMISSION, AND THEY EACH COVERED VARIOUS TIME PERIODS.

17       AND THE TRIAL EXHIBIT IS THE EXHIBIT NUMBER FOR THOSE

18   SALES GUIDES.  AND THE SALE GUIDES CONTAIN THE FIRST YEAR

19   MONTHLY PRICE AND THEN THE REGULAR MONTHLY PRICE AS WELL.  AND

20   THEN I CALCULATED THE DIFFERENCE BETWEEN THE TWO, AND THEN THE

21   PRICE DIFFERENCE AS A PERCENTAGE OF THE FIRST YEAR PRICE.

22   **Q.**  ALL RIGHT.  LET'S TAKE A QUICK LOOK AT ONE OF THE

23   UNDERLYING DOCUMENTS.

24           **MS. WODINSKY:**  MR. DUNKIN, IF YOU CAN BRING UP

25   EXHIBIT 58, PLEASE.

```
 1                    (DISPLAYED ON SCREEN.)

 2   BY MS. WODINSKY:

 3   Q.  NOW, MS. STAHL, LOOKING AT EXHIBIT 58, CAN YOU DESCRIBE

 4   WHAT YOU UNDERSTAND THIS TO BE?

 5   A.  YES.  THIS IS THE RESIDENTIAL NATIONAL OFFER SALES GUIDE

 6   FOR THE PERIOD APRIL 1ST, 2015 THROUGH MAY 27TH, 2015.

 7   Q.  AND IS THIS ONE OF THE DOCUMENTS YOU RELIED ON IN

 8   PREPARING EXHIBIT 76?

 9   A.  YES, IT IS.

10   Q.  DID YOU FIND THE INFORMATION THAT YOU PUT INTO EXHIBIT 76

11   IN THIS DOCUMENT?

12   A.  YES, I DID.

13   Q.  COULD YOU TELL US WHERE YOU FOUND THAT AND DESCRIBE WHAT

14   IT IS?

15   A.  YES.  IN THIS PARTICULAR CASE, I BELIEVE, IF YOU'LL TURN

16   TO PAGE 3, ON PAGE 3 IS WHERE I FOUND THE PRICE INFORMATION

17   FOR THE VARIOUS PACKAGES.

18       SO YOU'LL SEE THE TABS ALONG THE TOP FOR THE PACKAGES

19   OFFERED DURING THAT TIME PERIOD, THE SELECT, ENTERTAINMENT,

20   CHOICE, XTRA, ULTIMATE, AND PREMIER.

21       AND THEN DOWN BELOW IN THE LARGE LETTERS YOU'LL SEE FOR

22   EACH ONE, FOR EXAMPLE, THE SELECT 19.99 PER MONTH, AND THEN

23   ABOVE IT, RIGHT UNDER THE SELECT RED TAB, YOU'LL SEE WHAT'S

24   DESIGNATED AS THE REGULAR PRICE 49.99 PER MONTH.

25       SO THIS INFORMATION IS WHAT I TOOK THEN AND MADE SURE WAS
```

1   CORRECT IN THE CHART.

2   **Q.**  DID YOU USE THE SAME PROCESS IN GATHERING THE INFORMATION

3   FOR THE OTHER ENTRIES IN THE CHART?

4   **A.**  I DID.  THERE WERE IN SOME CASES WHERE NOT -- THAT THE

5   INFORMATION WAS ON DIFFERENT PAGES, BUT I FOUND IT SOMEWHERE

6   IN EACH OF THESE GUIDES.

7       AND THERE WERE ALSO, AS I MENTIONED, A DIFFERENCE IN THE

8   PACKAGES THAT WERE OFFERED IN ANY GIVEN TIME.  SO THERE ARE

9   SOME YEARS, FOR EXAMPLE, THE CHARTS GO BY YEAR AND -- I MEAN

10  BY PACKAGE RATHER.  YOU'LL SEE THAT SOME OF THEM HAVE FEWER

11  ENTRIES THAN OTHERS BECAUSE THAT PACKAGE WAS ONLY OFFERED IN A

12  CERTAIN NUMBER OF TIME PERIODS.

13          **MS. WODINSKY:**  MR. DUNKIN, CAN YOU GO BACK TO

14  EXHIBIT 76.

15                  (DISPLAYED ON SCREEN.)

16  **BY MS. WODINSKY:**

17  **Q.**  AND JUST TO GIVE US AN EXAMPLE, IF WE GO DOWN THIS

18  PARTICULAR PAGE COVERS THE SELECT PACKAGE.  IF WE -- IS THAT

19  CORRECT, MS. STAHL?

20  **A.**  YES.

21  **Q.**  IF WE CAN GO DOWN TO PAGE 2, WHAT --

22  **A.**  THIS PACKAGE COVERS THE ENTERTAINMENT PACKAGE, AND IT

23  SHOWS THE VARIOUS TIME PERIODS THAT WERE COVERED BY THOSE

24  SALES GUIDES.  AND THEN, AGAIN, ALL OF THE ELEMENTS THAT I'VE

25  DISCUSSED.

1          AND THEN ON THE NEXT PAGE, PAGE 3, IS THE SELECT -- I MEAN

2     CHOICE PACKAGE RATHER, AND SO THE CHART -- THIS IS HOW THE

3     CHART IS LAID OUT, SO PAGE BY PAGE COVERING DIFFERENT

4     DIRECTV'S PACKAGES.

5     **Q.**   MS. STAHL, CAN YOU ESTIMATE HOW LONG IT TOOK YOU TO

6     PREPARE THIS CHART?

7     **A.**   APPROXIMATELY 18 HOURS.

8     **Q.**   AND DO YOU KNOW IF THE SALES GUIDES WERE SEEN BY

9     CONSUMERS?

10    **A.**   I DON'T KNOW PERSONALLY, BUT I DID NOTICE THAT ON THE

11    SALES GUIDES THERE IS A -- MANY OF THEM, AND THIS ONE, FOR

12    EXAMPLE, ON THE RIGHT-HAND SIDE IN THE RED SAYS, FOR SALES

13    ASSOCIATES ONLY NOT FOR CUSTOMERS.  BUT I DON'T KNOW OTHER

14    THAN THAT.  BUT I DID SEE THAT NOTATION ON A NUMBER OF THE

15    SALES GUIDES.

16    **Q.**   SO WHEN YOU WERE TO "ON THIS", WERE YOU REFERRING BACK TO

17    EXHIBIT 58?

18    **A.**   58, YES.

19            **MS. WODINSKY:**   YOUR HONOR THE PARTIES HAVE AGREED

20    THAT SOME OF THE SALES GUIDES CAN GO IN.  I WOULD LIKE TO READ

21    INTO THE RECORD AND SEE IF WE THEIR CONCURRENCE ON THE SALES

22    GUIDES THAT ARE REFERENCED IN THE CHART.

23          THIS WOULD BE TRIAL EXHIBITS 1, 7, 14, 22, 36, 40, 52, 54,

24    58 AND 62.  AND WE WOULD REQUEST THAT THOSE BE MOVED INTO

25    EVIDENCE.

1          **MR. HUMMEL:**  NO OBJECTION.

2          **THE COURT:**  ALL RIGHT.  ADMITTED.

3       (TRIAL EXHIBITS 1, 7, 14, 22, 36, 40, 52, 54, 58 AND 62

4    RECEIVED IN EVIDENCE)

5          **MS. WODINSKY:**  YOUR HONOR, I WOULD ALSO NOW REQUEST

6    TRIAL EXHIBIT 76 BE ADMITTED INTO EVIDENCE.

7          **THE COURT:**  ANY OBJECTION?

8          **MR. HUMMEL:**  NO OBJECTION.

9          **THE COURT:**  ADMITTED.

10          (TRIAL EXHIBIT 76 RECEIVED IN EVIDENCE)

11    **BY MS. WODINSKY:**

12    **Q.**  TURNING NOW TO YOUR NEXT SUMMARY, WHICH IS TRIAL

13    EXHIBIT 472.

14          **MS. WODINSKY:**  MR. DUNKIN, IF YOU CAN BRING THAT UP.

15                  (DISPLAYED ON SCREEN.)

16       THANK YOU.

17          **MS. WODINSKY:**  WE'VE ALSO DISCUSSED THE ADMISSION OF

18    THIS.  SO I WOULD LIKE TO MOVE EXHIBIT 472 INTO EVIDENCE.

19          **THE COURT:**  IS THAT CORRECT, NO OBJECTION?

20          **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

21          **THE COURT:**  ADMITTED.

22          (TRIAL EXHIBIT 472 RECEIVED IN EVIDENCE)

23          **MS. WODINSKY:**  AND JUST TO PROVIDE JUST VERY BRIEF

24    CONTEXT.  WE APPRECIATE YOUR INDULGENCE ON THE TIME HERE.

25

1  **BY MS. WODINSKY:**

2  **Q.**  MS. STAHL, IF YOU CAN DESCRIBE VERY BRIEFLY WHAT IT IS

3  THAT YOU DID TO CREATE THIS SUMMARY.

4  **A.**  YES.  THIS IS A SUMMARY THAT SHOWS THE SEVERAL SELECTED

5  ADVERTISEMENTS THAT WERE PROVIDED TO THE FEDERAL TRADE

6  COMMISSION BY A COMPANY CALLED GREY GLOBAL.

7      SO WE SHOWED THE PARTICULAR ADS LISTED FOR EACH OF THE

8  YEARS COVERED, AND THEN THE DISSEMINATION DATES ARE -- THE

9  OTHER ELEMENT THAT MAKE UP THE IMPORTANT PARTS OF THIS CHART

10  SO THAT I GOT THE INFORMATION ABOUT THE AD TITLE FROM THE ADS

11  THAT WERE PROVIDED BY GREY GLOBAL, AND THOSE ADS CONTAINED AN

12  IDENTIFYING CODE THAT I THEN USED TO GET THE DISSEMINATION

13  INFORMATION FROM THE DOCUMENTS THAT ARE LISTED IN THE FAR

14  RIGHT COLUMN.  DEUTSCH IS A COMPANY THAT PROVIDED THE

15  DISSEMINATION SCHEDULES TO THE FEDERAL TRADE COMMISSION, AND

16  SO THEN I WAS ABLE USING THAT UNIQUE IDENTIFIER TO FIND THE AD

17  IN THE DISSEMINATION SCHEDULE, SORT FOR THE NUMBER OF TIMES

18  THAT IT AIRED AND THE NUMBER OF CHANNELS THAT IT AIRED ON FOR

19  EACH OF THE ADS LISTED.

20  **Q.**  AND THIS PARTICULAR CHART, WHICH IS THREE PAGES, OR TWO

21  AND A HALF PAGES, ARE THESE ALL OF THE TELEVISION ADS THAT YOU

22  REVIEWED IN PREPARING THE CHART?

23  **A.**  IN PREPARING THE CHART, YES.

24  **Q.**  WERE THERE, TO THE BEST OF YOUR KNOWLEDGE, WERE THERE

25  OTHER ADS THAT WE RECEIVED?

1    **A.**  YES.  THERE WERE NUMEROUS OTHER ADS THAT WE RECEIVED THAT

2    I HAVE VIEWED.

3            **MS. WODINSKY:**  YOUR HONOR, I WOULD LIKE TO MOVE INTO

4    EVIDENCE THE ADS THAT ARE LISTED ON THIS CHART.  AND THERE

5    ARE -- THERE MAY BE SOME ADDITIONAL TELEVISION ADS, BUT AT

6    THIS POINT WE WOULD JUST LIKE TO MOVE THOSE IN.  I BELIEVE THE

7    PARTIES HAVE AGREED TO THAT.  I WILL READ THOSE PARTICULAR

8    EXHIBIT NUMBERS?

9            **THE COURT:**  WHY DON'T WE DO THIS.  IF THERE IS NO

10   OBJECTION, THEN I AGREE WITH THEIR ADMISSION, AND JUST TRUE IT

11   UP WITH MY DEPUTY CLERK AFTER COURT.

12           **MR. HUMMEL:**  NO OBJECTION, YOUR HONOR.

13           **THE COURT:**  ALL RIGHT.

14           **MS. WODINSKY:**  THANK YOU.

15   **BY MS. WODINSKY:**

16   **Q.**  TURNING NOW TO --

17           **MS. WODINSKY:**  MR. DUNKIN, IF YOU CAN BRING UP

18   EXHIBIT 1184.

19                   (DISPLAYED ON SCREEN.)

20   **BY MR. EDMONDSON:**

21   **Q.**  MS. STAHL, DO YOU RECOGNIZE THIS DOCUMENT?

22   **A.**  YES, I DO.

23   **Q.**  WHAT IS THIS?

24   **A.**  THIS IS A SUMMARY OF SOME SELECTED DIRECTV DIGITAL ADS OR

25   BANNER ADS, AND THEY ARE DISSEMINATION INFORMATION THAT I

```
1    ALSO -- THAT I PREPARED.

2    Q.   WHAT DO YOU MEAN BY DIGITAL ADS?

3    A.   DIGITAL ADS ARE BANNER ADS.  IN THIS CASE THEY WERE

4    ANIMATED ADS THAT WERE CREATED USING THE FLASH ADOBE

5    TECHNOLOGY.  AND SO THAT THEY ARE ADS THAT ARE COMMONLY SEEN

6    ON WEBSITES BUT IN AN ANIMATED VERSION.

7    Q.   HOW DID YOU CREATE THIS CHART?

8    A.   I USED INFORMATION THAT WAS PROVIDED TO DIRECTV THAT

9    LISTED THE, ALL OF THE DIFFERENT BANNER ADS, AND THEN IT

10   PROVIDED THE DISSEMINATION DATES, AND IT ALSO HAD LINKS TO

11   WHERE THE ADS THEMSELVES COULD BE VIEWED.

12   Q.   MS. STAHL, I THOUGHT YOU SAID IT WAS INFORMATION PROVIDED

13   TO DIRECTV.  WAS THIS INFORMATION PROVIDED FROM DIRECTV?

14   A.   RIGHT.  NO, I MEANT TO SAY FROM DIRECTV.

15   Q.   I AM SORRY TO INTERRUPT.  DO YOU WANT TO CONTINUE

16   DESCRIBING THE LINKS AND HOW YOU WERE ABLE TO LOCATE THE

17   BANNER ADS?

18   A.   YES.

19       SO THE DOCUMENT THAT WAS PROVIDED, IT'S TRIAL

20   EXHIBIT 1161, LISTED EACH OF THE ADS AND THEN THE DATES THAT

21   IT RAN TYPICALLY EXPRESSED IN THE QUARTERS OF THE YEAR WITH

22   END DATES.  AND SO I TOOK THE INFORMATION FROM THERE IN TERMS

23   OF THE DISSEMINATION DATES AND THE NAMES OF THE ADS.

24           MS. WODINSKY:  I WILL ASK MR. DUNKIN IF YOU CAN NOW

25   BRING UP ONE OF THE ITEMS LISTED, I THINK ON PAGE 2 OR 3 OF
```

STAHL – DIRECT / WODINSKY

1    THIS.  IF YOU COULD FIRST GO FORWARD TO -- WE'RE LOOKING FOR

2    1108.

3                    (DISPLAYED ON SCREEN.)

4        THAT'S IT.  THANK YOU.

5    BY MS. WODINSKY:

6    Q.  SO TRIAL EXHIBIT 1180, IS A BANNER AD THAT YOU IDENTIFIED

7    AS CABLE CRUSHER?

8    A.  YES.

9            MS. WODINSKY:  PLEASE BRING UP EXHIBIT 1180.

10                   (DISPLAYED ON SCREEN.)

11       THAT IS 1080, I BELIEVE.

12                   (DISPLAYED ON SCREEN.)

13       THANK YOU.

14   BY MS. WODINSKY:

15   Q.  MS. STAHL, WITH THIS PARTICULAR EXHIBIT YOU'VE ALREADY

16   DESCRIBED AT SOME LENGTH HOW YOU CAPTURE WEBSITES.

17       DID YOU USE THE SAME PROCESS FOR CAPTURING THESE BANNER

18   ADS?

19   A.  I DID.  THE DOCUMENT I MENTIONED, TRIAL EXHIBIT 1161, HAD

20   WHAT ARE CALLED STAGING LINKS, WHICH WERE LINKS THAT WERE --

21   WENT TO A WEBSITE HOSTED BY THE COMPANY THAT'S NOTED AT THE

22   TOP THERE, ICROSSING, AND DIRECTV PROVIDED THE FEDERAL TRADE

23   COMMISSION WITH A PASSWORD IN ORDER TO BE ABLE TO GO TO THAT

24   SITE AND TO VIEW THE ADS AS THEY WOULD HAVE APPEARED ON A WEB

25   PAGE BUT WITHOUT THE OTHER WEB PAGE CONTENT.

1    AND SO I USED THE SAME TECHNOLOGY I DESCRIBED IN MY

2    EARLIER TESTIMONY EMPLOYING THE SNAGIT CAPTURE PROGRAM, AND I

3    WOULD CLICK ON EACH OF THE DIFFERENT SIZED DIMENSIONS AND THEN

4    MAKE A RECORDING OF THE ANIMATED BANNER AD.

5         MS. WODINSKY:  ASK MR. DUNKIN TURN BACK QUICKLY TO

6    1184 AGAIN.

7                    (DISPLAYED ON SCREEN.)

8    BY MS. WODINSKY:

9    Q.  DID YOU USE THE SAME PROCESS IN CAPTURING ALL OF THE ADS

10   LISTED IN THIS SUMMARY THAT YOU USED IN CAPTURING THE EXHIBIT

11   WE JUST LOOKED AT, 1180?

12   A.  YES.

13        MS. WODINSKY:  YOUR HONOR, I WOULD LIKE TO ASK THAT

14   WE ARE ABLE TO MOVE EXHIBITS 1169 THROUGH 1183 INTO EVIDENCE.

15        MR. HUMMEL:  NO OBJECTION.

16        THE COURT:  ADMITTED.

17     (TRIAL EXHIBIT 1169 THROUGH 1183 RECEIVED IN EVIDENCE)

18   BY MS. WODINSKY:

19   Q.  JUST FOR CLARIFICATION, IF ONE WANTED TO GET A SENSE OF

20   THE ROUGH TIME PERIOD THAT THESE PARTICULAR BANNER ADS WERE

21   AVAILABLE OR WERE SEEN ONLINE, THAT WOULD BE IN THE -- ON THE

22   RIGHT, THE LAST COLUMN QUARTER RUN AND END DATE?

23   A.  YES.  THAT'S RIGHT.

24        MS. WODINSKY:  YOUR HONOR, WE WOULD LIKE TO MOVE

25   EXHIBIT 1184 INTO EVIDENCE.

1              **MR. HUMMEL:**  NO OBJECTION.

2              **THE COURT:**  ADMITTED.

3                  (TRIAL EXHIBIT 1184 RECEIVED IN EVIDENCE)

4              **MS. WODINSKY:**  THAT'S ALL THE QUESTIONS I HAVE FOR

5    MS. STAHL.  OPPOSING COUNSEL MAY HAVE QUESTIONS FOR YOU AS

6    WELL.

7              **THE COURT:**  ANY CROSS-EXAMINATION?

8              **MR. HUMMEL:**  I HAVE SOME, YOUR HONOR.  HOW LONG WOULD

9    YOU LIKE TO TAKE?

10             **THE COURT:**  HOW LONG WILL YOU BE?

11             **MR. HUMMEL:**  TEN MINUTES?

12             **THE COURT:**  LET'S PROCEED.

13             **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

14                         **CROSS-EXAMINATION**

15   **BY MR. HUMMEL:**

16   **Q.**  HELLO AGAIN, MS. STAHL.

17   **A.**  HI.

18   **Q.**  THANK YOU FOR WAITING AROUND THE COURTHOUSE.

19   **A.**  CERTAINLY.

20             **MR. HUMMEL:**  LET'S PULL UP EXHIBIT 76 PLEASE.

21                       (DISPLAYED ON SCREEN.)

22   **BY MR. HUMMEL:**

23   **Q.**  THIS IS A SUMMARY THAT YOU CREATED THAT SHOWS PRICES, AND

24   WHAT YOU HAVE LISTED HERE IS THE FIRST YEAR MONTHLY PRICE AND

25   THE REGULAR MONTHLY PRICE, CORRECT?

1    **A.**  YES.

2    **Q.**  AND YOU GOT THAT INFORMATION FROM DIRECTV SALES GUIDES NOT

3    FROM ADS, CORRECT?

4    **A.**  YES, THAT'S CORRECT.

5    **Q.**  WITH RESPECT TO THE PRICING THAT'S LISTED ON THE MANY

6    PAGES OF THIS EXHIBIT, WHICH YOU SAID YOU TOOK 18 HOURS TO

7    PREPARE?

8    **A.**  RIGHT.  A ROUGH ESTIMATE.

9    **Q.**  HAD YOU EVER DONE, AS AN FTC INVESTIGATOR OR BEEN ASKED TO

10   PERFORM WHAT IS CALLED A CONTENT ANALYSIS ON THESE ADS?

11   **A.**  NO.

12   **Q.**  YOU KNOW WHAT A CONTENT ANALYSIS IS?

13   **A.**  NO.

14   **Q.**  HAVE YOU EVER BEEN ASKED TO EVALUATE WHETHER THE SIZE OF

15   THE DISCLOSURES THROUGHOUT ALL THESE ADS IS THE SAME OR

16   SIMILAR?

17   **A.**  NO.

18   **Q.**  HAVE YOU EVER BEEN ASKED TO EVALUATE WHETHER FONT USED IN

19   ANY OF THESE DISCLOSURES IS THE SAME?

20   **A.**  NO.

21   **Q.**  DO YOU KNOW IF ANYBODY FROM THE FTC HAS EVER DONE THAT?

22   **A.**  I DON'T KNOW.

23   **Q.**  HAVE YOU EVER BEEN ASKED TO DO A CONTENT ANALYSIS OF THE

24   LOCATION OR LANGUAGE OF ANY OF THE DISCLOSURES ON THESE ADS?

25   **A.**  NO.

STAHL – CROSS / HUMMEL

1    **Q.** HAVE YOU EVER BEEN ASKED TO DO A CONTACT ANALYSIS ON THE

2    RELATIVE CLARITY OF THE DISCLOSURES ON THESE ADS?

3    **A.** NO.

4    **Q.** HAVE YOU EVER BEEN ASKED TO ASSESS HOW THESE ADS CHANGED

5    OVER TIME?

6    **A.** NO.

7    **Q.** AND YOU HAVEN'T BEEN ASKED TO ANALYZE WHETHER SO MUCH AS A

8    SINGLE CONSUMER WAS EVER DECEIVED BY ANY OF THESE ADS, RIGHT?

9    **A.** NO, I HAVE NOT.

10   **Q.** OKAY.

11        AND YOU HAVEN'T BEEN ASKED TO EVALUATE, WITH RESPECT TO

12   ANY OF THE ADS THAT ARE REFLECTED IN THE SALES GUIDES, WHAT

13   CONSUMERS' NET IMPRESSIONS ARE OF THESE ADS; IS THAT RIGHT?

14   **A.** NO.

15   **Q.** SO THESE ARE MEANT TO DEPICT ONLY A DIFFERENCE IN PRICE;

16   IS THAT RIGHT?

17   **A.** MY ASSIGNMENT WAS TO PREPARE THIS CHART OR TO CONFIRM THE

18   INFORMATION IN THE CHART TO COVERING ALL OF THE ELEMENTS IN

19   THE CHART.  THAT WAS THE EXTENT OF IT.

20   **Q.** I UNDERSTAND.  I JUST WANTED TO KNOW WHAT YOU HAVEN'T DONE

21   AND TO YOUR KNOWLEDGE WHAT THE FTC HAS NOT DONE.  FAIR?

22   **A.** I UNDERSTAND.

23   **Q.** IF YOU CAN LOOK AT EXHIBIT 472.

24                    (DISPLAYED ON SCREEN.)

25        THIS IS A -- NOW THERE WERE HUNDREDS OF TELEVISION ADS

1   DONE, AND YOU SUMMARIZED HERE THE DISSEMINATION SCHEDULES --

2   THE DISSEMINATION DATES, RATHER, WHICH IS THE DATES ON WHICH

3   THESE PARTICULAR TV ADS AIRED BETWEEN 2010 AND 2015.

4       IS THAT FAIR?

5   **A.**  WELL, THE PURPOSE OF THE SUMMARY PRIMARILY WAS TO SHOW THE

6   DISSEMINATION OF IT.  SO THE TIMES AIRED AND THE NUMBER OF

7   CHANNELS WAS MY ASSIGNMENT BASICALLY TO COMPUTE THAT BASED ON

8   THE DOCUMENTS THAT I DESCRIBED.

9   **Q.**  AND, AGAIN, YOU WEREN'T ASKED TO PERFORM ANY SORT OF

10  CONTENT ANALYSIS ON THE TV ADS, CORRECT?

11  **A.**  THAT'S CORRECT.

12  **Q.**  YOU HAVEN'T ANALYZED HOW THE END CARDS CHANGED OVER TIME,

13  CORRECT?

14  **A.**  THAT'S RIGHT.

15  **Q.**  AND YOU HAVEN'T OFFERED ANY TESTIMONY THAT WITH RESPECT TO

16  THE TV ADS, THE -- HOW LONG THE END CARD WAS DISPLAYED ON EACH

17  OF THESE DISSEMINATED ADS, RIGHT?

18  **A.**  RIGHT.  NO, I HAVEN'T ANALYZED IT.  I HAVE VIEWED THESE

19  ADS AND MANY, MANY MORE, BUT I HAVEN'T BEEN ASKED TO DO AN

20  ANALYSIS.

21          **MR. HUMMEL:**  ONE MOMENT, YOUR HONOR.

22              (PAUSE IN THE PROCEEDINGS.)

23          **MR. HUMMEL:**  OKAY.  LET'S MOVE ON, IF WE COULD, TO

24  EXHIBIT 1184.

25              (DISPLAYED ON SCREEN.)

1    **BY MR. HUMMEL:**

2    **Q.**  AGAIN, THIS DIGITAL AD SUMMARY SHOWS THE DATES ON WHICH

3    DIGITAL ADS WERE RUN, CORRECT?

4    **A.**  YES.  WELL, THE DATES IN TERMS OF A DATE RANGE, THE

5    QUARTER RUN AND THE END DATE AS DERIVED FROM THE VARIOUS

6    SOURCES I MENTIONED.

7    **Q.**  AND THESE ADS APPEARED ON THE INTERNET?

8    **A.**  YES.

9    **Q.**  AND YOU DIDN'T -- AGAIN, YOU DID NO CONTENT ANALYSIS AND

10   TO YOUR KNOWLEDGE NO ONE FROM THE FTC DID A CONTENT ANALYSIS

11   TO ASSESS SIMILARITY OF THE SIZE, FONT, COLOR, LOCATION,

12   LANGUAGE, CLARITY OF THE DISCLOSURES ON THESE ADS, RIGHT?

13   **A.**  RIGHT.  I DID NO SUCH ANALYSIS AND I AM NOT AWARE OF

14   WHETHER OR NOT AN ANALYSIS WAS DONE.

15   **Q.**  AND YOU DID NO ANALYSIS, TO YOUR KNOWLEDGE, AND THE FTC

16   DID NO ANALYSIS OF HOW THESE BANNER ADS CHANGED OVER TIME,

17   RIGHT?

18   **A.**  I DID NO SUCH ANALYSIS AND I AM NOT AWARE OF WHETHER ANY

19   ANALYSIS WAS DONE.

20   **Q.**  WITH RESPECT TO EXHIBIT NO. 1180, IF WE CAN PULL THAT UP,

21   THAT WAS THE CABLE CRUSHER.

22                    (DISPLAYED ON SCREEN.)

23      LITTLE ANIMATED AD.

24      AND THE IDEA OF THIS AD, TO YOUR KNOWLEDGE, WAS THAT A

25   CONSUMER WOULD CLICK ON A LINK ON THIS AD AND BE TAKEN TO THE

1    DIRECTV LANDING PAGE; IS THAT RIGHT?

2    **A.**  I DO NOT KNOW ANYTHING MORE THAN JUST WHAT I WAS

3    PARTICULARLY ASSIGNED TO DO, WHICH WAS TO CAPTURE THESE ADS SO

4    I DIDN'T TAKE THAT STEP.  I COULDN'T SPEAK TO THAT.

5    **Q.**  SO YOU DON'T KNOW WHAT HAPPENS WHEN A CONSUMER CLICKS ON

6    DIRECTV; IS THAT ACCURATE?

7    **A.**  THAT'S RIGHT.  I DON'T.

8        **MR. HUMMEL:**  YOUR HONOR, IF I COULD HAVE ONE MOMENT,

9    PLEASE.

10                    (PAUSE IN THE PROCEEDINGS.)

11   **BY MR. HUMMEL:**

12   **Q.**  OKAY.  A COUPLE OF OTHER QUESTIONS WITH RESPECT TO

13   EXHIBIT NO. 76.

14       IF WE CAN PUT THAT UP AGAIN.

15                    (DISPLAYED ON SCREEN.)

16       I JUST WANT TO FOCUS, IF YOU COULD, ON THE NUMBER THAT IS

17   IN THE -- NUMBERS THAT ARE IN THE FAR RIGHT COLUMN, WHICH IS

18   THE PRICE -- THAT'S A DELTA, MEANING DIFFERENCE, RIGHT?

19   **A.**  YES.

20   **Q.**  PRICE DIFFERENCE AS A PERCENT OF THE FIRST YEAR PRICE.

21   **A.**  RIGHT.

22   **Q.**  COUPLE OF QUESTIONS ABOUT THAT.

23       THAT IS NOT A PERCENTAGE THAT APPEARS IN ANY OF THE

24   UNDERLYING DOCUMENTS, RIGHT?

25   **A.**  RIGHT.

1    **Q.**  YOU MADE THAT MATHEMATICAL CALCULATION, RIGHT?

2    **A.**  THAT'S RIGHT.

3            **MR. HUMMEL:**  IF YOU COULD ZOOM OUT.

4    **BY MR. HUMMEL:**

5    **Q.**  THAT'S EXPRESSED AS A DIFFERENCE BETWEEN A FIRST YEAR

6    MONTHLY PRICE AND THE REGULAR PRICE THAT'S FOUND ON THE SALES

7    GUIDE, RIGHT?

8    **A.**  RIGHT.

9    **Q.**  WITH RESPECT TO THE FIRST YEAR PRICE, YOU UNDERSTAND THAT

10   IS AN INTRODUCTORY DISCOUNT, RIGHT?

11   **A.**  I DON'T HAVE AN UNDERSTANDING OF IT OTHER THAN, YOU KNOW,

12   THE WAY IT WAS PRESENTED TO ME.  AND THIS ASSIGNMENT WAS TO

13   CALCULATE THE DIFFERENCE.

14   **Q.**  AND IN CONNECTION WITH THE REGULAR MONTHLY PRICE, THAT'S

15   WHAT A CONSUMER ON THE DIRECTV PLATFORM WOULD PAY FOR THAT

16   PACKAGE WHEN THE INTRODUCTORY DISCOUNT ENDS AND THROUGHOUT

17   THEIR TENURE ON THE PLATFORM WITH DIRECTV.

18       DO YOU UNDERSTAND THAT'S WHAT REGULAR PRICE MEANT?

19   **A.**  REGULAR PRICE WAS WHAT THE CONSUMER WOULD PAY ONCE THE

20   FIRST YEAR MONTHLY PRICE EXPIRED.

21   **Q.**  AND THAT ASSUMES THAT THEY KEPT THE SAME PACKAGE IN THAT

22   SECOND YEAR, RIGHT?

23           **MS. WODINSKY:**  YOUR HONOR, I MUST OBJECT.  THIS IS

24   BEYOND THE SCOPE OF DIRECT.  THIS WAS ABOUT A SUMMARY THIS IS

25   NOT ABOUT.

1      **THE COURT:**  SHE DOESN'T KNOW.

2          ANYTHING ELSE?

3          **MR. HUMMEL:**  NO, YOUR HONOR.

4          **THE COURT:**  OKAY.  MAY MS. STAHL BE EXCUSED?

5          **MR. HUMMEL:**  FROM OUR PERSPECTIVE, YES, YOUR HONOR.

6          **MS. WODINSKY:**  ONE QUESTION.

7                    **<u>REDIRECT EXAMINATION</u>**

8      **BY MS. WODINSKY:**

9      **Q.**  MY ONLY QUESTION IS, THE DIGITAL SUMMARIES THAT WE SAW ON

10     THE LARGE SCREEN, THEY WOULD NOT HAVE BEEN THAT SIZE, THEY

11     WOULD HAVE BEEN THE SIZE MORE SIMILAR TO WHAT YOU SEE ON A

12     COMPUTER SCREEN IN FRONT OF YOU; IS THAT CORRECT?

13     **A.**  YES.

14         **MS. WODINSKY:**  THAT'S ALL THE QUESTIONS I HAVE.

15         **THE COURT:**  THANK YOU, MS. STAHL.  YOU ARE EXCUSED.

16         SEE YOU TOMORROW.

17         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

18         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE COURT.)

19         **MS. WODINSKY:**  THE EXHIBITS ARE:  438, 442, 443, 444,

20     445, 446, 447, 448, 450, 451, 452, 453, 454, 455, AND 456.

21         (TRIAL EXHIBITS 438, 442, 443, 444, 445, 446, 447, 448,

22     450, 451, 452, 453, 454, 455, AND 456 RECEIVED IN EVIDENCE AS

23     NOTED BY THE COURT PREVIOUSLY)

24

25                 (PROCEEDINGS ADJOURNED AT 1:50 P.M.)

STAHL – REDIRECT / WODINSKY

**CERTIFICATE OF REPORTER**

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

THURSDAY, AUGUST 17, 2017