Jeff Tillotson, SBN 139372
jtillotson@TillotsonLaw.com
Tillotson Law
750 North Saint Paul, Suite 600
Dallas, TX 75201
Telephone: (214) 382-3040

Pete Marketos, *Pro Hac Vice*
pete.marketos@rgmfirm.com
Reese Gordon Marketos LLP
750 North Saint Paul, Suite 600
Dallas, TX 75201
Telephone: (214) 382-9810

Chad S. Hummel, SBN 139055
chummel@sidley.com
Bridget S. Johnsen, SBN 210778
bjohnsen@sidley.com
Ryan M. Sandrock, SBN 251781
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 722-1200

Attorneys for Defendants
DIRECTV and DIRECTV, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 4:15-cv-01129 HSG |
| Plaintiff, | Assigned to the Hon. Haywood S. Gilliam, Jr. |
| vs. | **DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED. R. CIV. P. 52(c)** |
| DIRECTV, a corporation and DIRECTV, LLC a limited liability company, | [Proposed Findings of Fact and Conclusions of Law filed concurrently] |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ............................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

LEGAL STANDARD .............................................................................. 4

ARGUMENT ....................................................................................... 4

I.    The FTC Has Not Met Its Burden Under Section 5 Of The FTC Act ............................. 4

    A.    A Facial Review Of DIRECTV's Advertising Cannot Prove Likely Deception ................................................................................. 5

    B.    The FTC's Survey Evidence Failed To Prove That DIRECTV's Advertising Is Likely To Mislead Reasonable Consumers ...................................... 7

        1.    Dr. Erdem's Studies Do Not Test Net Impression Or Deception ............. 8

        2.    Dr. Erdem's Studies Were Fundamentally Flawed In Both Design And Execution, Rendering The Results Unreliable................................. 8

        3.    Dr. Erdem's Two Surveys Do Not Apply To The Overwhelming Majority Of Advertising At Issue ............................................10

    C.    The FTC's Other Expert Testimony Does Not Prove That Consumers Are Likely To Be Deceived ......................................................................12

    D.    DIRECTV's Internal Documents Do Not Support A Section 5 Violation............13

    E.    The FTC Introduced No Evidence Of Other Traditional Indicia Of Deceptive Advertising ........................................................................15

II.    The FTC Has Not Met Its Burden Under ROSCA ............................................16

    A.    The FTC's ROSCA Case Is Based On A Flawed Legal Theory ........................16

    B.    The FTC Did Not Prove That Consumers Are Unlikely To See Or Understand The Negative Option Disclosures And Provide Proper Consent .......17

III.    The FTC Has Not Met Its Burden On Its Claim For Monetary Relief ............................19

    A.    The Amount The FTC Seeks Does Not "Reasonably Approximate" DIRECTV's "Unjust Gains"....................................................................19

        1.    The Presumption Of Reliance Does Not Apply .....................................21

        2.    The Presumption Of Reliance Is Not A Presumption Of Expectation ......21

        3.    Without The Benefit Of "Presumptions," The FTC Has Not Met Its Burden At Step One Of *Commerce Planet* ................................................22

B.     Dr. Rascher Failed For Additional Reasons To Satisfy The FTC's Burden For Monetary Relief Related To The Premium Channel Negative Option, Early Cancellation Fees, And ROSCA..................................................24

C.     A "Benefit of the Bargain" Remedy Is Legal Damages, Not Restitution .............24

IV.    The FTC Has Not Met Its Burden As To A Permanent Injunction ..................................25

**Cases**

*ALLTEL Info. Servs., Inc. v. F.D.I.C.*,
  194 F.3d 1036 (9th Cir. 1999) ............................................................................. 25

*Barrer v. Chase Bank USA, N.A*,
  566 F.3d 883 (9th Cir. 2009) ............................................................................... 17

*In re Bassett*,
  285 F.3d 882 (9th Cir. 2002) ............................................................................... 17

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ......................................................................................... 22

*Cordas v. Uber*,
  228 F. Supp. 3d 985 (N.D. Cal. 2017) ................................................................. 19

*FTC v. Bronson Partners*,
  654 F.3d 359 (2d Cir. 2011) ................................................................................. 21

*FTC v. Commerce Planet*,
  815 F.3d 593 (9th Cir. 2016) ........................................................................ *passim*

*FTC v. Commerce Planet*,
  878 F. Supp. 2d 1048 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593
  (9th Cir. 2016) .......................................................................................5, 11, 15, 21

*FTC v. Cyberspace.Com LLC*,
  453 F.3d 1196 (9th Cir. 2006) ........................................................................... 4, 5

*FTC v. Dinamica Financiera LLC*,
  2010 WL 9488821 (C.D. Cal. Aug. 19, 2010) ...................................................... 5

*FTC v. Gill*,
  265 F.3d 944 (9th Cir. 2001) ................................................................................. 4

*FTC v. H.N. Singer, Inc.*,
  668 F.2d 1107 (9th Cir. 1982) ............................................................................. 25

*FTC v. Inc21.com Corp.*,
  745 F. Supp.2d 975 (N.D. Cal. 2010) .................................................................. 15

*FTC v. John Beck Amazing Profits*,
  LLC, 865 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................................................... 5

*FTC v. Johnson*,
    96 F. Supp. 3d 1100 (D. Nev. 2015) ......................................................... 5, 7

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008) ............................................................ 6

*FTC v. QT*,
    448 F. Supp. 2d 908 (N.D. Ill. 2006) ............................................................. 6

*FTC v. Security Rare Coin & Bullion Corp.*,
    931 F.2d 1312 (8th Cir. 1991) ..................................................................... 25

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ......................................................................... 5

*FTC v. Verity Intern., Ltd.*,
    443 F.3d 48 (2nd Cir. 2006) ........................................................................ 23

*McGlinchy v. Shell Chemical Co.*,
    845 F.2d 802 (9th Cir. 1988) ...................................................................... 20

*Meyer v. Uber Tech., Inc.*
    2017 WL 3526682 (2d Cir. Aug. 17, 2017) ........................................... 17, 19

*Pinterest, Inc. v. Pintrips, Inc.*,
    140 F. Supp. 3d 997 (N.D. Cal. 2015) ........................................................... 9

*POM Wonderful, LLC v. FTC*,
    777 F.3d 478 (D.C. Cir. 2015) .................................................................... 10

*Ritchie v. United States*,
    451 F.3d 1019 (9th Cir. 2006) ....................................................................... 4

*Telebrands Corp.*,
    140 F.T.C. 278 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006) ......................... 5

*United States v. Bayer Corp.*,
    2015 WL 5822595 (D.N.J. Sept. 24, 2015) ................................................... 6

*In re Wellbutrin XL Antitrust Litigation*,
    308 F.R.D. 134 (E.D. Pa. 2015) .................................................................. 20

**Statutes**

15 U.S.C. §45(a) ........................................................................................ *passim*

15 U.S.C. § 53 ................................................................................................ 25

15 U.S.C. § 8401 ............................................................................................ 16

15 U.S.C. §8403 ................................................................................ *passim*

15 U.S.C. § 8404 .......................................................................................... 24

Fed. R. Civ. P. 52(c) ............................................................................... 1, 4

**Other Authorities**

Charles A. Wright & Arthur Miller, 9C Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2008) ............................................................................................................ 4

Dobbs, 3 Law of Remedies § 12.2(1) (1993) ................................................. 25

1 J. Story, *Commentaries on Equity Jurisprudence in England and America,* § 191 (12th ed. 1877) ..................................................................................... 22

Restatement (Third) of Restitution and Unjust Enrichment § 13 (2011) ........................................ 25

# NOTICE OF MOTION

Defendants DIRECTV and DIRECTV, LLC (collectively "DIRECTV") hereby move for judgment pursuant to Rule 52(c), on each count in the Complaint and on the prayer for equitable relief, following the close of the Federal Trade Commission's ("FTC") case-in-chief.

The FTC has been fully heard on its claims under Section 5(a) of the FTC Act (15 U.S.C. §45(a)) (Complaint Counts I and II) and the Restore Online Shoppers Confidence Act ("ROSCA") (15 U.S.C. §8403) (Complaint Counts III and IV), and on its prayer for equitable relief. The FTC failed to meet its burden of proof on the following essential elements:

1. For Counts I and II under Section 5, that DIRECTV's advertising was likely to mislead consumers acting reasonably under the circumstances regarding material terms of their DIRECTV subscriptions.

2. For Counts III and IV under ROSCA, that DIRECTV (i) did not clearly and conspicuously disclose the material terms of its premium channel offer on its website before obtaining consumers' billing information; or (ii) did not obtain consumers' express informed consent before charging their credit card.

3. For its prayer for equitable monetary relief, that the FTC's $4 billion demand reasonably approximates DIRECTV's unjust gains or constitutes equitable restitution.

4. For its prayer for permanent injunctive relief, that DIRECTV's advertising violated Section 5 of the FTC Act or ROSCA.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The FTC's case against DIRECTV represents a significant departure from decades of practice and precedent. Its claims implicate all of DIRECTV's diverse advertising dating back ten years, across every sales channel, in multiple forms and media. The FTC does not claim that DIRECTV's services are a sham and concedes they are legitimate satellite television services that deliver substantial value to consumers. Nor does the FTC allege that DIRECTV made global and uniform misrepresentations about its core product or service. It instead claims that certain offer terms were not adequately disclosed in select advertisements. On this foundation, the FTC seeks $4 billion in restitution and a permanent injunction. DIRECTV believes that the FTC's failure of proof

1

at trial—including as to deception, "clear and conspicuous" disclosure, reliance, and restitution—is the natural result of its overreach.

First, the FTC stated in opening and throughout its case-in-chief that this is "an advertising case." It is, however, a *deceptive* advertising case. Binding precedent requires that deception be established by first determining the "net impression" consumers take away from advertising. Yet the FTC never articulated the net impression that DIRECTV's advertising supposedly conveys or how that impression is false. In fact, the FTC did not use the words "net impression" or "false impression" in opening or at any time during its presentation of evidence. No FTC witness testified to any false impression conveyed by a DIRECTV advertisement. No survey or other empirical data was offered to prove a false impression conveyed by any single advertisement—let alone all of them. The FTC introduced no false statements by DIRECTV, no consumer testimony, and no evidence that customers signed up for DIRECTV as a result of misleading advertising.

Instead, it was evident upon the close of the FTC's case-in-chief that it claims deception and seeks $4 billion in restitution because, in its view, certain offer terms were not featured prominently enough in select examples of DIRECTV's advertising. But the FTC's subjective assessment is not a legally sufficient substitute for evidence that consumers are likely to be misled by advertising—that is, that they take away false impressions from the ads about material terms—or that consumers are unlikely to see and understand the terms of the premium channel offer on DIRECTV's website.

And while DIRECTV did not have the burden of proof, the evidence introduced during the FTC's case-in-chief proved the opposite: A DIRECTV subscription is a complex and high-involvement purchase. DIRECTV communicates the material terms of a subscriber's customized order many times and in multiple forms prior to activation. DIRECTV's entire business model depends on customer loyalty and retention, and extensive empirical data demonstrates that consumers notice and understand the terms of their deal.

In the face of that evidence, the FTC turned to surveys proffered by Dr. Tülin Erdem, who tested only one print ad and one outdated web flow. She did not review the overwhelming majority of advertisements that the FTC has challenged in this case. With respect to the materials she did review, Dr. Erdem conceded that she did not test for "deception." No portion of Dr. Erdem's

testimony identified a "net impression" that consumers took away from the print ad and web flow she surveyed—let alone a false impression. Instead, Dr. Erdem's surveys showed only the unremarkable proposition that making disclosures more prominent can improve a reader's immediate recall of those specific disclosures. And even that aspect of her surveys was fatally flawed in execution because certain disclosures in her test were not legible or accessible.

The FTC also proffered two experts on web usability and "social influence" theory who did not even claim to have tested DIRECTV's advertising for a false impression. They performed no empirical studies and could thus only speculate about what consumers may have seen or how they may have reacted to DIRECTV's advertising. This *ipse dixit* testimony is of no use to the Court in assessing deception or what reasonable consumers saw and understood on the DIRECTV website.

Nor did the FTC provide any reasonable basis for its claim for $4 billion in monetary relief. Most fundamentally, the FTC failed to meet its "burden of proving" that the amount it seeks "reasonably approximates" "unjust gains," as required by the Ninth Circuit's decision in *FTC v. Commerce Planet,* 815 F.3d 593, 603 (9th Cir. 2016). The FTC's expert, Dr. Daniel Rascher, testified that he was simply instructed to assume that all DIRECTV subscribers were deceived by DIRECTV's advertising in exactly the same way and therefore (1) expected to pay the discounted, 12-month promotional price for the duration of their subscriptions, and (2) did not expect to pay for premium channels after the free period. Based on that unsupported assumption about consumer expectations—which the FTC never attempted to prove—Dr. Rascher then calculated "benefit of the bargain" damages without any causal connection to the alleged wrongful conduct.

Moreover, Dr. Rascher purported to calculate additional restitution based on early cancellation fees assessed by DIRECTV, as opposed to revenues actually collected, and an additional amount for premium channel fees based solely on the FTC's instruction (without any economic basis) that all premium channel fees collected from customers who canceled between months 4 and 9 were unjust gains. Dr. Rascher and the FTC submitted no separate restitution theory or monetary demand for any ROSCA violation whatsoever. Thus, as with its liability theory, the FTC failed to meet its burden of proof with respect to monetary relief.

Finally, because the FTC failed to prove a violation of Section 5 or ROSCA, it is not entitled to a permanent injunction. Judgment in DIRECTV's favor is warranted.

## LEGAL STANDARD

Federal Rule of Civil Procedure 52(c) authorizes the Court to enter judgment during a bench trial on partial findings. Once a party "has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c).

Because the Court sits as adjudicator of both law and fact during a bench trial, in considering a Rule 52(c) motion, it may weigh the evidence and "resolve disputed issues of fact." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006). The Court "is not required to draw any inferences in favor of the non-moving party; rather, [it] may make findings in accordance with its own view of the evidence," including its own assessment of a witness's credibility. *Id.* In other words, the Court may "decide for itself in which party's favor the preponderance of the evidence lies," Charles A. Wright & Arthur Miller, 9C Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2008).

## ARGUMENT

### I. The FTC Has Not Met Its Burden Under Section 5 Of The FTC Act

"Section 5 of the Federal Trade Commission Act prohibits 'deceptive acts or practices in or affecting commerce.'" *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006) (quoting 15 U.S.C. § 45(a)). To prove a Section 5 violation, the FTC must meet its burden of proof on three essential elements: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).

In this case, the FTC claims that DIRECTV "fail[ed] to adequately disclose . . . material terms." Dkt. 337 at 2. However, mere "inadequate disclosure of terms" does not itself constitute a violation of Section 5; the government must show likely *deception*. In order to determine whether an alleged failure to adequately disclose terms "is likely to mislead" reasonable consumers, courts therefore first identify the "net impression" of the ad and then determine

4

whether that net impression is false. *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016).

The Ninth Circuit has uniformly held that the "net impression" test applies to FTC deception cases. *Cyberspace*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates."); *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) ("Deception may be found based on the 'net impression' created by a representation."). District courts in this Circuit regularly apply this "net impression" test as well. *See, e.g.*, *Commerce Planet*, 878 F. Supp. 2d at 1063; *FTC v. John Beck Amazing Profits*, LLC, 865 F. Supp. 2d 1052, 1066 (C.D. Cal. 2012); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1119 (D. Nev. 2015); *FTC v. Dinamica Financiera LLC*, 2010 WL 9488821, at *6 (C.D. Cal. Aug. 19, 2010). The FTC itself maintains that a "net impression" drawn by a reasonable consumer is the controlling test for determining whether advertising is deceptive. *See* FTC Policy Statement on Deception at 2 and n. 32.

Once the FTC establishes the "net impression," it must then show that reasonable consumers are likely to be deceived or misled by that net impression. *In re Telebrands Corp.*, 140 F.T.C. 278, 291 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006). But in this case, the FTC did not even attempt to prove a false net impression from a single DIRECTV ad—much less a uniform false impression across tens of thousands of different ads and media used by DIRECTV over the past decade.

For the reasons discussed below, the FTC's evidence at trial fell far short of the controlling legal standard.

## A.     A Facial Review Of DIRECTV's Advertising Cannot Prove Likely Deception

In its opening statement, the FTC repeatedly suggested that the Court could find DIRECTV's advertisements deceptive merely by looking at them. In its very first example, the FTC highlighted an advertisement from 2007 and asked, "Where does it say what the higher second year price will be?" Tr. 11:12-14 (displaying Ex. 84).[1] The offer the ad was promoting, the Court later learned, did not even require a two-year commitment, and it contained standard pricing, not promotional pricing.

---

[1] References herein to "Tr." refer to the trial transcript, and references to "Ex." refer to the trial exhibits. Pin cites to document exhibits refer to the PDF page in the electronic form of the exhibit.

Tr. 345:3-346:11 (Mr. Bentley comparing Ex. 84 to Ex. 617 (timeline of offers)). The FTC's error is more than a mere mistake in application—it underscores a fundamental problem with its entire case.

As discussed above, this case is not the typical Section 5 case where the FTC alleges a static, uniform misrepresentation regarding a product's or service's core characteristics throughout all of a company's advertising (*e.g.* a product causes weight loss, or has added calcium, or is FDA-approved). Instead, the FTC alleges inadequate disclosure of several varying terms in tens of thousands of diverse ads across multiple media for almost a decade. The FTC offered no explanation as to how the Court, through facial review, could divine the net impression a reasonable consumer would draw from each and every ad, or determine that the impressions are uniform, or that they are false. And the FTC certainly did not articulate how the Court is to conduct a facial review of tens of thousands of ads that were not even offered into evidence.

Regardless, courts have consistently held that, where it is not "reasonably clear from the face of the advertisement" that reasonable consumers take away the alleged implied false message, extrinsic evidence is required to prove deception. *United States v. Bayer Corp.*, 2015 WL 5822595, at *11 (D.N.J. Sept. 24, 2015); *id.* at *13 (rejecting FTC's deception claim because the FTC "offered no consumer survey data, no consumer testimony, no expert opinion on consumer understanding of the [defendant's] ads, no marketing data, and no copy tests of any [] advertisement"); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1193 (N.D. Ga. 2008) ("[T]he court will not presume, without extrinsic evidence, that a recipient of these advertisements would infer that [the product] is clinically proven to treat obesity from the clinical weight loss claims."); *compare FTC v. QT*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006) (recognizing that "conspicuous" implied claims do not require extrinsic evidence).

Such is the case here. There are no express false statements in any advertisement and no claim that they are "false" by necessary implication. Nor are any false net impressions involving price terms "reasonably clear from the face of the advertisement." The ads are multi-dimensional, thematically varied, humorous in the case of TV ads, and focus on the benefits of DIRECTV, such as customer service, expansive programming options, and superior technology. *See* Concurrently Filed Findings of Fact & Conclusions of Law ("FoF") ¶¶ 49-79. The advertisements also included

different promotions during this time period—some had a two-year contract, one-year promotional price, and three months free premium channels, while others did not. *See, e.g.*, Tr. 339:4-340:10. A finding that any particular DIRECTV advertisement is "deceptive" in the way the FTC claims here, therefore, cannot be made solely on the basis of a facial review.

The insufficiency of such a review is especially clear on *this* record: as already noted, although the FTC's claims involve more than 40,000 unique print advertisements, hundreds of Internet banner ads, dozens of television advertisements, and many different iterations of the website that changed throughout a 10-year period, many thousands of those materials were not even introduced into evidence, and the FTC did no categorization or content analysis to show that any conclusions as to one advertisement would apply to any others. *See FTC v. Johnson*, 96 F. Supp. 3d 1100, 1121 (D. Nev. 2015) (refusing to "adopt the FTC's approach of using selected examples of [advertising] claims picked from across the entire universe . . . seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites").

### B. The FTC's Survey Evidence Failed To Prove That DIRECTV's Advertising Is Likely To Mislead Reasonable Consumers

The FTC's only proffered testing of DIRECTV's advertising itself—Dr. Erdem's surveys—suffers from three independently fatal flaws that deprive them of any probative value. First, the surveys do not even *test* the net impression of the single DIRECTV print ad and web flow Dr. Erdem selected, and they neither ask nor answer the question of whether those ads were likely to mislead consumers. Dr. Erdem instead tested only the very different (and legally irrelevant) proposition that she can increase recall of certain terms by highlighting them. Second, apart from the fact that they address the wrong question, her studies are characterized by fundamental flaws in design and execution that render them unreliable even as to whether certain terms are clear and conspicuous— which she admitted was the extent of her assignment. Third, Dr. Erdem's survey data applies to less than .01% of the advertising that the FTC placed at issue in this case, and the FTC presented no basis for extrapolating her results to any of the other advertising content or media that she neither tested nor reviewed.

### 1. Dr. Erdem's Studies Do Not Test Net Impression Or Deception

Dr. Erdem's studies did not test the net impression of DIRECTV's ads. Tr. 962:10-965:11. Nor did they "determine or ask consumers [] if they took away [] a false impression," Tr. 963:2-16, or "test whether or not DIRECTV's advertisements or websites were likely to mislead consumers." Tr. 963:17-964:2; 964:19-965:1. Although Dr. Erdem recognized that the leading litigation guide on surveys—which she cited—explains how to do "deception studies," Tr. 965:2-6, she conducted "a different test." Tr. 965:7-11.

Instead of testing deception, Dr. Erdem only tested "whether or not adding specific disclosures would increase someone's understanding of those specific disclosures," Tr. 965:7-11. In this way, her test proved nothing relevant to this case: it is always possible to make any disclosure more prominent and thereby increase a reader's contemporaneous recall of its contents. That truism—and these studies—say nothing about what impressions consumers took away from the tested ad or website, and thus cannot be used to measure likely deception as required by Section 5.

### 2. Dr. Erdem's Studies Were Fundamentally Flawed In Both Design And Execution, Rendering The Results Unreliable

Moreover, Dr. Erdem's surveys did not even fairly test the proposition that she sought to test. The actual "alt media" print ad that Dr. Erdem sought to test contained some of the disclosures at issue at the bottom of the page in what was referred to as the "legal box." When she displayed the print ad in her online study, however, the disclosures in that box were rendered blurry and unreadable on the computer screens used by respondents taking her survey. *Compare* Ex. 2026A (ad DIRECTV disseminated), *with* Ex. 2371 (Dr. Erdem's survey URLs); Tr. 974:5-977:14. Dr. Erdem conceded that "if [i]t were true" that the disclosures in her stimulus were blurry, then her survey "would not be a fair comparison." Tr. 977:15-978:3. As the Court could judge for itself during the demonstration of her live survey at trial, the disclosure box in her stimulus purporting to be the original print ad was blurry, while the disclosures in the modified ad were perfectly legible. Her test was therefore biased and unreliable. *See* Ex. 2371.

Dr. Erdem's web stimulus was similarly flawed because the FTC disabled numerous links on the test website. Tr. 484:1-19.[2]  Although some of the "links that disclosed information at issue here [were] active," Tr. 997:11-998:18, as Dr. Mandel testified, survey respondents "may learn from the first page . . . that links are disabled" and therefore stop clicking on the active links later in the flow that had disclosures. Tr. 484:11-22. This biased Dr. Erdem's survey because, on the actual DIRECTV website, all the links are active and users would not be conditioned to ignore them.  This may partly explain why Dr. Erdem's survey respondents were able to complete the website flow in a fraction of the time actual subscribers spend on DIRECTV's website. *Compare* Tr. 981:21-24 (10-15 minute average to complete Erdem survey), *with* Tr. 792:18-21 (45 minute average for actual customers).

But Dr. Erdem's web survey was doubly flawed because the "thumbnails" used as reference for participants when they were answering the survey questions likewise had hyperlinks and info hovers that were not active, including those that contained the pertinent disclosures. Tr. 998:19-999:7; Ex. 2371. In other words, the disclosures were present in the "thumbnails" for the participants who navigated the altered webflow, because Dr. Erdem had moved them out of hyperlinks, while the disclosures were not visible at all from the "thumbnails" for the participants who navigated the "original."  In sum, Dr. Erdem materially obscured the disclosures from the unaltered, original DIRECTV material in both surveys, and therefore, the Court cannot draw conclusions about the appropriateness of DIRECTV's disclosures from these tests.

Dr. Erdem also inaccurately reported the survey results. She included respondents who did not "recall" or "remember" a term within the pool of respondents she classified as showing that the term was not clear and conspicuous. Tr. 966:22-967:15. This makes no sense. A respondent who could recall seeing a disclosure but not recite the specific information disclosed does not establish a lack of clarity in the information disclosed (much less deception). Dr. Erdem conceded

---

[2]The creator of the UX website stimulus, Dr. Good, admitted that "many of the links that would have typically been on the actual directv.com website were not active on the website stimuli," including the entire gray header bar, each of the six blue "Learn More" links on the first page, more than 25 links in the footer of every page, the "Need Help" chat button, and the channel selection scroll bar on the packages page. Tr. 121:5- 123:25; Ex. 1052.

9

that she had no way now of separating out those respondents from her aggregated data. Tr. 967:16-968:11 ("I don't know – when they say, I don't know…I don't have the subcategories."); Tr. 970:4-16 ("I don't have the breakdown of don't knows."). This Court has found "meaningless" a survey suffering from a similar inability to "disaggregate" those who were confused from those who were not, and should find the same here. *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1015-16 (N.D. Cal. 2015).

### 3. Dr. Erdem's Two Surveys Do Not Apply To The Overwhelming Majority Of Advertising At Issue

Even if the Court were to give some probative value to Dr. Erdem's studies, they are still insufficient to meet the FTC's burden of proof: they address less than .01% of the ads at issue in the FTC's case. The FTC sued DIRECTV over every one of its advertisements for nearly a decade. Its claims implicate more than 40,000 unique print ads, hundreds of banner ads, dozens of TV commercials, and many different iterations of DIRECTV's continually evolving website. Tr. 10:1-5 (FTC asserting in opening that the case involves "78 billion print ads" and all "33 million consumers" who subscribed). Yet the FTC purported to test only one print ad from 2013 and one August 2013 iteration of the "old flow" website that had been replaced more than a year before the FTC filed suit. The FTC offered no basis to extrapolate these limited empirical tests to DIRECTV's broader advertising.

As noted above, Dr. Erdem's study examined just one DIRECTV print ad out of the over 40,000 ads disseminated since 2007. Tr. 989:12-25. That single print ad resulted in just 300 subscriptions. Tr. 323:13-16. Dr. Erdem conceded that it "wouldn't be scientific research" if she "cherrypick[ed]" the ad, Tr. 935:23-936:7. She then admitted, however, that she picked her test ad by looking at only 116 print ads provided to her by her support staff, Tr. 989:16-17, and without conducting any copy testing or content analysis of the ads to determine whether the one she selected was representative of the 116—let alone of the tens of thousands she never viewed. Tr. 989:18-25, 990:13-22, 996:14-20.

Although the absence of any evidence of uniformity would be a critical evidentiary failure in any case, it is particularly so here. There is substantial variation in the 40,000 print advertisements at

issue with respect to media, page count, "real estate," promotional content, whether or not a promotional price is advertised, and the frequency, placement, and manner of disclosures. FoF ¶¶ 49-57. There is also substantial variation in the offers promoted by the ads. FoF ¶¶ 58-79. This precludes any claim that Dr. Erdem's survey results can be extrapolated beyond the single advertisement she tested. *See, e.g., POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (deferring to the FTC's administrative interpretation of the ads because "[t]he Commission set forth the basis for those findings in considerable detail in an appendix to its opinion, *with a separate explanation for each ad*.") (emphasis added).

The FTC's only other study, Dr. Erdem's survey of a partially functioning simulation of an outdated version of DIRECTV's web flow, suffers from the same flaw. Tr. 121:5-123:25; 986:1-5. Even though Dr. Erdem recognized that DIRECTV made numerous "changes" to its web flow over time, Tr. 986:7-13, including redesigns from a "vertical" to "horizontal" layout, Tr. 1001:23-1002:1, "different mouse-overs in different places, or hyperlinks," Tr. 1002:2-6, and the addition of more disclosures on unavoidable webpages, Tr. 1002:7-1003:15, Dr. Erdem failed to offer any evidence that the results of her survey of one website design can be extrapolated to any other of the many iterations of the website. Nor did Dr. Erdem have any evidence on the "new flow" website that was rolled out in 2014. Dr. Erdem simply stated that she "can expect, *it's not assumed*, but I can expect" that her results would be similar if she tested another website. Tr. 1003:16-23 (emphasis added). She did not explain how her "expectation" differs from an "assumption," and in any event her bald and unexplained assertion cannot fill the evidentiary gap. *See Commerce Planet*, 878 F. Supp. 2d at 1063 (making separate factual findings for each version of the website).

The FTC offered no other study on any other DIRECTV materials—including television commercials, phone scripts, web ads, and most types of print media. Without that evidence, there is no basis for judgment as to the vast majority of DIRECTV's advertising that the FTC alleges violated Section 5 and ROSCA.

### C. The FTC's Other Expert Testimony Does Not Prove That Consumers Are Likely To Be Deceived

With no competent empirical surveys, the FTC was left with the *ipse dixit* of Drs. Mandel and Pratkanis. Their limited testimony could not save the government's case. *See* Tr. 22-23 (FTC contending in opening that Pratkanis and Mandel only purport to provide the "why" to Dr. Erdem's testimony regarding "what" consumers take away from the ads).

First, Dr. Pratkanis provided no opinion about the net impression conveyed by any DIRECTV advertising. Tr. 1311-1313; 1302:1-5. Though he conceded that a net impression is required in order to determine deception, Dr. Pratkanis did no such analysis. Tr. 1297:10-13. Instead, he performed a "social influence analysis" on a handful of DIRECTV print ads and sales calls. From this, he claimed that DIRECTV's marketing employs two "social influence" techniques—the "lowball" and "free gift." This purported analysis has no bearing on the FTC's claims that DIRECTV's advertising would likely mislead reasonable consumers about material terms.

Second, the premise of Dr. Pratkanis' opinion contradicts the theory of the FTC's case. The point of his "lowball" theory is that consumers are so taken with the initial offer (or the offeror) that they cannot resist accepting a higher price when conveyed. Under this theory, a consumer knows the terms of the higher offer before she purchases. Tr. 1320:12-17. That theory, of course, contradicts the FTC's claim that consumers do not understand the price that they will pay until the promotional, discounted price expires in the second year. If consumers instead know the terms of the offer before they make the purchase, they have not been deceived and certainly have not been harmed. *See* FTC Policy Statement on Deception at 3-4 ("the Commission will evaluate the entire advertisement, transaction, or course of dealing in determining how reasonable consumers are likely to respond").

Third, even if one were to accept that a witness's "social influence analysis" can divine how tens of millions of consumers reacted to DIRECTV's marketing, Dr. Pratkanis did not even contend that the two "social influence" techniques he claims DIRECTV employs are inherently "misleading," "deceptive," or "problematic." Tr. 1243:20-1244:7. The literature that Dr. Pratkanis

relied on does not maintain that these tactics are deceptive, merely that they "increase persuasion and influence." Tr. 1244:10-11. Some might call it "selling."

Fourth, at bottom, Dr. Pratkanis claimed only that "a consumer would be more likely to purchase" because of DIRECTV's "social influence techniques." Tr. 1312:12-18; 1312:19 ("The likelihood that they are going to purchase and engage in certain behaviors is increased based on principles of social influence."). Dr. Pratkanis could not testify, however, what the "base rate" of purchase is or "how much it would increase as a result of" the social influence tactics. Tr. 1312:23-1313:16. Regardless, the goal of advertising is to increase purchases. There is nothing deceptive or unlawful about that—and Dr. Pratkanis could not testify that any consumers were deceived by DIRECTV's ads.

Nor was Dr. Mandel's testimony probative of likely deception. Dr. Mandel was proffered as "an expert in the field of website design and usability." Tr. 422:2-4. He reviewed a prototype of DIRECTV's old website and "collect[ed] usability issues and [identified] areas of improvement." Tr. 423:17. "Usability" and "design" concepts do not equate to deception, and Dr. Mandel expressly stated that he was "not offering [an] opinion that any particular customer was misled" or "deceived." Tr. 476:3-13. Throughout his testimony, Dr. Mandel opined only that a consumer "may be" unlikely to see certain information, info hovers, or tool tips on DIRECTV's old flow website—which is not even probative of whether consumers *are* or *are not* likely to see DIRECTV's disclosures. As to guidelines, Dr. Mandel did not even opine that DIRECTV violated the FTC's own "DOT Com Disclosure guidelines." 478:24-479:4. And the HHS guidelines that he claims DIRECTV "violated" state that "they are not rigid standards that can form the basis of a contract or a lawsuit." Tr. 491:8-14. At bottom, the subjective view of one web designer regarding possible website improvements cannot support a Section 5 violation.

### D. DIRECTV's Internal Documents Do Not Support A Section 5 Violation

The FTC's reliance on a handful of DIRECTV's internal documents is entirely misplaced. Far from showing deception, the documents and related testimony prove that DIRECTV has been committed to improving its customers' experiences, to keeping satisfied customers on its platform for the long term (the "lifeblood" of the company), and to delivering a highly-valued and

competitively priced television service to tens of millions of customers. Tr. 894:12 (Depo. S. Hause at 136:12-137:03; FoF ¶¶ 207-232.

The FTC appeared to rely most heavily on a single "eye-tracking" study of a few DIRECTV print ads. Jon Gieselman, DIRECTV's head of marketing during the relevant time, testified, however, that this type of study was never used by the company and was not considered in its marketing decisions. Tr. 889:25-890:18. The document shows only that a person's eyes are at first glance attracted to bright colors and pictures, rather than written details. Even the FTC's own expert, Dr. Pratkanis, conceded that this obvious finding says nothing about deception. Tr. 1339:18-1340:5.

The FTC also touched on one document referencing that 33% of DIRECTV customers reported feeling misled by the telephone sales agent during the sign up process. Ex. 573. As the actual evidence showed, however, this study surveyed some customers in their first 90 days with DIRECTV, which has nothing to do with the issues in this case. Tr. 291:2-293:10. Those customers reported feeling misled in the one survey because they "had to redeem [their] rebate" in order to obtain the introductory price, Tr. 291:21-292:5, and "oftentimes consumers wouldn't redeem [the rebate] quick enough for it to be reflected on the first month bill." Tr. 291:21-293:14. This led some customers in that survey to feel "misled initially" before their promotional price took effect. *Id.* To ease this "pain point," however, DIRECTV first made it easier for customers to redeem the rebate online and later made the rebate "instant" so that "the customer has to take no action whatsoever." Tr. 293:11-21. The rebate now shows up automatically on each customer's bill. Most importantly, this survey had nothing to do with a two-year commitment, second year pricing, ECFs, or premium channels rolling to pay. Tr. 288:15-289:14.

The final set of documents relied on by the FTC were a few web usability studies. These were small, qualitative studies that typically tested prototypes of DIRECTV websites, Tr. 1466:1-25; Tr. 1489:7-11, and were not necessarily projectable to any larger user base. While the web usability tests never analyzed deception or confusion, DIRECTV took the directional recommendations into account in order to make the website more user friendly and to make it easier for customers to identify information. *See, e.g.* Tr. 1475; 1486; 1487; 1491 (Ms. Leever

testified about DIRECTV's "goal to make it easier for the consumer to understand what they were buying" online and the many "changes" DIRECTV "ma[de] to its [website] design elements as a result of [usability studies] and other feedback"). These studies show that, contrary to the FTC's allegations, DIRECTV was focused on improving customer experience and increasing the usability and clarity of its website.

### E.  The FTC Introduced No Evidence Of Other Traditional Indicia Of Deceptive Advertising

If DIRECTV's advertising since 2007 had really been a massive and prolonged campaign that deceived 33 million new subscribers, the FTC would have introduced ample traditional evidence of deception. In other Section 5 cases, actual customer testimony, consumer complaints or negative social media discussions, refund requests, high churn, lower sales with enhanced disclosures, and decreasing market share over time have been introduced and accorded considerable weight by courts. *See, e.g., Commerce Planet, Inc.*, 878 F. Supp. 2d at 1073-76; *FTC v. Inc21.com Corp.*, 745 F. Supp.2d 975, 992-99 (N.D. Cal. 2010) ("staggering" amount of unauthorized charges, consumer complaints, refunds, and customer testimony considered as additional indicia of deception). The FTC offered no such evidence here.

In this case, not a single consumer testified at trial that she was misled into subscribing to DIRECTV or that she wrongly expected that the introductory discount price would continue past 12 months. In *Commerce Planet,* "[t]wo fairly sophisticated consumers . . . testified that they were misled by OnlineSupplier's webpages," and it was noted that such consumer testimony of actual deception is highly "probative" of a Section 5 violation. *Id.* at 1073. Despite the express allegation in the Complaint in this case that "tens of thousands of consumers complain[ed]" about DIRECTV's marketing practices, Dkt. 1 at 4, the FTC introduced no evidence to support that contention. Instead, its "social influence" expert testified that consumer complaints are a poor indicator of deception. Tr. 1338:6-13. In contrast, in *Commerce Planet*, the FTC introduced "ample evidence that Commerce Planet . . . received thousands of telephone complaints." 878 F. Supp. 2d at 1075. There was also no evidence in this case that customers requested refunds or sought credit card chargebacks. *Compare id.* ("FTC presented additional evidence of excessive

15

1 | chargeback rates").  Finally, the FTC introduced no evidence that DIRECTV had a shrinking
2 | market share or high churn rates, or that enhanced disclosures led to reduced sales. Indeed, the
3 | evidence was to the contrary: consistently low churn (1.5% monthly) and increased market share
4 | in the face of heavy competition. Tr. 650-651; 1307:4-8.

**II.     The FTC Has Not Met Its Burden Under ROSCA**

The Court should also grant DIRECTV judgment on Counts III and IV because the FTC has not met its burden of proof under ROSCA. First, the FTC's case is based on a flawed legal theory. Second, the evidence demonstrated that customers see and understand the premium channel offer disclosures and provide express informed consent, and the FTC did not prove otherwise.

**A.     The FTC's ROSCA Case Is Based On A Flawed Legal Theory**

The FTC's entire ROSCA case is premised on the agency's insinuation throughout this case that disclosures made in info hovers and hyperlinks are *per se* unclear and inconspicuous. The FTC's pre-trial statement claimed that DIRECTV's website "does not disclose material terms of its 'free' premium channel negative option clearly and conspicuously" because "the company hid those terms behind generically labeled hyperlinks and [info hover] symbols."  Dkt. 337 at 5.

There is no legal or factual basis for the FTC's assertion. ROSCA does not prohibit hyperlinks or info hovers for the required disclosures. 15 U.S.C. § 8401 *et seq.*  Nor has the FTC promulgated any rules or regulations prohibiting them. Indeed, the FTC's own ".com Guidance" permits companies to make disclosures through hyperlinks. *See* FTC, .com Disclosures: How to Make Effective Disclosures in Digital Advertising p. 7 (Mar. 2013) ("Hyperlinks can provide a useful means to access disclosures"). This is because there is "no set formula for a clear and conspicuous disclosure," and "[h]yperlinked disclosures may be particularly useful if the disclosure is lengthy or if it needs to be repeated." *Id.* at 5, 7, 10. No court has ever interpreted ROSCA or any similar statutory language to mean that hyperlinks and info hovers fail to provide clear and conspicuous disclosures as a matter of law.

**B.    The FTC Did Not Prove That Consumers Are Unlikely To See Or Understand The Negative Option Disclosures And Provide Proper Consent**

Instead of a categorical rule, the FTC promulgated in its Guidelines what it calls a "performance" standard for determining whether disclosures are clear and conspicuous— "that is, how consumers actually perceive and understand the disclosure within the context of the entire ad." Federal Trade Commission, .com Disclosures: How to Make Effective Disclosures in Digital Advertising p. 6. As this standard reflects, ROSCA itself neither prescribes nor prohibits any manner of online disclosure, only that the terms of the negative option be clearly and conspicuously disclosed. The Ninth Circuit has interpreted a "clear and conspicuous" disclosure requirement in other federal statutes to require that disclosure be made in a manner that reasonable consumers ought to notice and understand.[3]  This means that "[n]o particular kind of formatting is magical," and the Court of Appeals has therefore found no need to "promulgate . . . a code of conspicuousness."  *Barrer v. Chase Bank USA, N.A*, 566 F.3d 883, 892 (9th Cir. 2009) (interpreting "clear and conspicuous" in Truth in Lending Act).

Furthermore, courts assume that "reasonably prudent" consumers who purchase goods or services online "know[] that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer v. Uber Tech., Inc.* 2017 WL 3526682 at *7 (2d Cir. Aug. 17, 2017) (enforcing arbitration clause in Terms of Service contained in a hyperlink below the "REGISTER" button on the payment screen). *Reasonable* consumers transacting on the Internet are readily familiar with hyperlinks, info hovers, and terms and conditions boxes.

Although DIRECTV bears no burden, the evidence introduced as part of the FTC's own case showed that DIRECTV's premium channel disclosures have been clear and conspicuous under this standard, and that customers who signed up for the service therefore gave their informed consent. All of the web flows repeatedly disclosed the details of the negative option.

---

[3] *See In re Bassett*, 285 F.3d 882, 885 (9th Cir. 2002) (Bankruptcy Code provision requiring a "clear and conspicuous" statement of the debtor's right to rescind an agreement means the statement must be written in a way that "a reasonable person against whom it is to operate ought to have noticed it") (quoting U.S.C. § 1-201(10)).

Tr. 1416:9-11 (testifying to "one instance of many instances in the flow where [DIRECTV] gave disclaimer information [that was] clear and conspicuous"). These disclosures were made in close proximity to the premium channel offer, and also on the cart checkout page, in both the old and new flow. *See, e.g.* Ex. 2033 at 25, 33, 59; Ex. 1080 at 25, 32, 37-40, 96, 100, 102, 104, 132, 138; Tr. 1432:9-18. Although in the old flow it was possible that a consumer could intentionally avoid all disclosures, the "disclosures and information" were "place[d]" so "that a reasonable consumer was likely to see them," Tr. 1523-1524, and a consumer could only avoid this information if it was her "intent to . . . navigate around and not roll over any icon or roll over for additional information." Tr. 1482:22-1483:3.

The trial evidence showed that consumers did not have this "intent" to avoid the disclosures, but rather reasonable consumers—for both the old and new flow—saw and understood DIRECTV's premium channel disclosures. First, most customers canceled the premium channels in the first three months, before the charges began. Tr. 387:22-388:4; 393:19-394:6; 405:9-24. This fact demonstrates that customers saw and understood the disclosures.

Second, DIRECTV's usability studies showed that customers uniformly saw, used, and appreciated the info hovers and tool tips on DIRECTV's web flow. Tr. 680:10-683:7; 1469:13-1470:8; 1492:3-24. This finding was no surprise to Karen Leever, who has 20 years of experience in designing web sites, because presenting information in this manner is "a common standard [] used across multiple websites" and "multiple industries" and is an "established method." Tr. 1470:9-13.

Third, DIRECTV's customer satisfaction, net promoter, and churn data all confirm that consumers understood these disclosures. If DIRECTV's premium channel negative option disclosures were not clear and conspicuous when the channels rolled-to-pay, it "would have [made] an impact in [DIRECTV] customer" data. Tr. 1457:8-1458:3. For example, it would have decreased "customer satisfaction scores" and "NPS [net promoter scores]," as well as increased "churn." Tr. 1457:20-1458:10. The company would also have received many complaints at its call centers when the option rolled-to-pay, and customers who started the buying process online but then moved to the phone would have complained to phone sales agents as well. Tr. 1457-58.

18

There is *no* evidence of any of this occurring in the actual data. In fact, the data demonstrate just the opposite: customer satisfaction scores, NPS, and churn all show that DIRECTV had satisfied and stable customers. Tr. 284:7-15; 347:8-23; 397:20-398:12; 894:12;136:12-137:03; 1048:11-23; 1077:16-20; 1456:13-16, 1457:8-1458:21. Subscribers who came through DIRECTV's website had some of the highest customer satisfaction scores in the organization. Tr. 1458:22-25.

Finally, the company performed a comprehensive, data- and survey-driven review of all conceivable "pain points" customers had with DIRECTV. Through this company-wide review, DIRECTV identified more than 100 "pain points," but not a single one was that customers felt uninformed or deceived about the negative option. Tr. 1456:13-16.[4]

## III. The FTC Has Not Met Its Burden On Its Claim For Monetary Relief

Even if the FTC had offered evidence sufficient to proceed on liability, it still failed to show any entitlement to equitable monetary relief. The FTC contends that Dr. Daniel Rascher's calculation of $3.95 billion represents "a reasonable estimate (under *Commerce Planet*) of the unjust gains DIRECTV collected from consumers." Dkt. 337 at 11. In its only request for monetary relief, the FTC "seeks to have DIRECTV return that amount." *Id.* But the FTC has not met its burden, under controlling Ninth Circuit law, of proving a reasonable approximation of DIRECTV's unjust gains from the allegedly deceptive advertising, and it has offered no estimate at all of any gains attributable to the claimed ROSCA violations.

### A. The Amount The FTC Seeks Does Not "Reasonably Approximate" DIRECTV's "Unjust Gains"

The FTC failed to meet its "burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Commerce Planet*, 815 F.3d at 603. Dr. Rascher testified that he calculated DIRECTV's "unjust gains" based on the assumption that "*all* DIRECTV subscribers . . . thought they would pay the same amount in the second year as they paid

---

[4] Further, in the "new flow," which was rolled out in 2014, DIRECTV disclosed the negative option in the "terms and conditions" of the purchase and required customers to click a box confirming that they viewed and agreed to these hyperlinked terms and conditions prior to purchase. Tr. 1502:13-1503:20. Courts have held that a disclosure made in a hyperlinked "terms and conditions" page, coupled with a mandatory check box, constitutes a proper and sufficient disclosure as a matter of law. *Cordas v. Uber*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017); *Meyer v. Uber Technologies, Inc.* 2017 WL 3526682 at *7-8 (2d Cir. Aug. 17, 2017).

in the first," Tr. 1630:15-20 (emphasis added), and that he applied "that same kind of presumption" with respect to unjust gains for the premium channel offer, Tr. 1681:11-25. He thus presumed that all DIRECTV subscribers in his approximation of unjust gains were misled, and that they were all misled in the same way. That is how he generated a demand at the magnitude of nearly $4 billion.

Dr. Rascher admitted, however, that (1) he had no opinion as to "what consumers thought or expected" after viewing any of DIRECTV's advertising, Tr. 1621:22-25; (2) he conducted no empirical studies himself (experimental, behavioral, survey, content analysis, or otherwise); and (3) he did not rely on any studies conducted by others in forming his opinions, Tr. 1625:10-21, 1626:14-24, 1638:7-9. He explained that he had been instructed that the FTC would prove what DIRECTV customers "thought" or "believed" their deal with DIRECTV to be and thus supply the core predicate for his analysis. Tr. 1616:13-18; 1618:08-25.

Apparently unknown to Dr. Rascher, the FTC did not even attempt to prove that predicate. It presented no evidence that customers were misled, let alone that all customers were misled in the specific way Dr. Rascher assumed for his calculations. None of the FTC's experts concluded that DIRECTV's customers were deceived as to the second-year price, the premium channel offer, or any other aspect of the service. Indeed, not a single expert testified about the expectations DIRECTV customers developed from advertising. The central presumption underlying Dr. Rascher's calculations has no basis in the record. *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988) (affirming trial court's exclusion of expert testimony that had no basis in the record and rested on "unsupported assumptions"); *see also In re Wellbutrin XL Antitrust Litigation*, 308 F.R.D. 134, 146 (E.D. Pa. 2015) ("instruction from counsel is not a sound basis on which to draw an economic conclusion").

Dr. Rascher further testified that the FTC had advised him that he could "presume reliance," which he said he then "operationalized" as a presumption that all subscribers purchased DIRECTV service with the "expectation" that the second-year price would be the same as the first-year price (and he adopted similar presumptions as to the other terms at issue). Tr. 1554:5-1556:6. He explained that he had been told that, once he took that step, the burden would fall on DIRECTV to affirmatively disprove his analysis. Tr. 1553:18-23. The sole basis the FTC has cited for this

20

evidentiary shortcut is the Ninth Circuit's decision in *Commerce Planet*. But *Commerce Planet* provides no support for Dr. Rascher's approach.

### 1. The Presumption Of Reliance Does Not Apply

The presumption of reliance does not apply here. In *Commerce Planet*, the FTC proved that every customer who signed up for the service did so through a website that conveyed a false net impression, and the court therefore presumed that all customers relied on the false claim on the website. *See* 878 F. Supp. 2d at 1064-68 (finding both versions of the company's website conveyed the misleading impression that the service was free). The FTC made no comparable showing in this case. Dr. Rascher's calculations were based on purchases made by approximately 33 million subscribers over a 10-year period who may have seen none, one, or more of over 40,000 different advertisements and who signed up through a variety of channels. The FTC has presented no evidence on most of these advertisements and marketing materials: many thousands are not even *in* evidence, and of the ones that are, only a handful were the subject of testimony or expert review. *Commerce Planet* does not permit the FTC to presume that the millions of customers who may have viewed marketing materials that are not in evidence relied on deceptive statements in deciding to subscribe.

### 2. The Presumption Of Reliance Is Not A Presumption Of Expectation

In any event, Dr. Rascher did not actually apply a presumption of reliance; he instead based his calculations on a presumed set of customer "expectations." Those are two different things. A "presumption of reliance" presumes that customers "*purchased*" a service "in reliance on the misrepresentations." *Commerce Planet*, 815 F.3d at 604 (emphasis added). It has thus been applied in cases where, for example, the product was a sham or the deception misled consumers about the product's core function such that there was reason to believe that, had a customer not been deceived, she would have been unlikely to have made the purchase at all. *See, e.g., id.* at 597 (consumers signed up for a "free" auction kit and were enrolled in a different service for which they faced recurring charges); *FTC* v. *Bronson Partners*, 654 F.3d 359, 364 (2d Cir. 2011) ("no evidence that any of Bronson's gains were 'just' gains because the Chinese Diet Tea and the Bio–Slim Patch in no instance worked as advertised").

Dr. Rascher, by contrast, specifically testified that he was *not* presuming "a reliance injury" focused on "the customers who wouldn't have purchased the product." Tr. 1556:11-1557:1; *see also* Tr. 1595:23-1596:1 ("I specifically don't assume that at all. In fact, through the expectation injury methodology that I use, I assume that the customers would have continued to purchase the product."). Instead, what he presumed was a very specific set of hypothesized customer expectations about the terms that were offered. There is no legal precedent for, and no logic behind, *that* kind of presumption.

Nor would such a blanket presumption of hypothesized customer expectations be appropriate on the facts of this case. Even if the FTC had proved that the ads convey a false net impression (which, as shown *supra*, it did not), the FTC did not even attempt to prove that the net impression of DIRECTV's ads conveyed a single and specific false price for DIRECTV service. The FTC took pains to avoid reference to "net impression" entirely, let alone a false impression that premium channels would always be free or the promotional price for 12 months would continue in the second year. Therefore, Dr. Rascher could not simply presume, for example, that customers expected to pay the promotional price in their second year as a result of advertising.

And that presumption would be particularly improper here because the evidence showed that customers received significant information from DIRECTV *after* viewing an advertisement. Unlike in *Commerce Planet*, where there were no additional interactions before the service was purchased, DIRECTV continued to convey information about the terms of service through confirmation letters, e-mails, customer agreements, and lease agreements after the advertisement—and prior to activation. FoF ¶¶ 117-119. No presumption of what customers expected at the time they activated service could fairly be made from the advertisements alone.

### 3. Without The Benefit Of "Presumptions," The FTC Has Not Met Its Burden At Step One Of *Commerce Planet*

The FTC's claim for equitable monetary relief is governed by the fundamental principle that no "Court in Equity" would ever "interfere to grant relief upon the ground of fraud" if the other party were "not misled" by the "misrepresentation." 1 J. Story, *Commentaries on Equity Jurisprudence in England and America,* § 191, p. 189, 217 (12th ed. 1877). To obtain relief, "the

party must have been misled to his prejudice or injury." *Id* § 203, p. 230; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) ("[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*") (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).

Accordingly, because no legal presumption permits Dr. Rascher's evidentiary shortcut, the FTC had the burden to prove with actual evidence that his estimate reasonably approximated unjust gains from customers who were misled by DIRECTV's conduct. It provided no such evidence, much less proof, and thus committed the same error as in *FTC v. Verity Intern., Ltd.*, 443 F.3d 48 (2nd Cir. 2006). In *Verity*, where, like here, no presumption of reliance applied, the FTC nonetheless proposed a monetary demand that was based on the assumption that every customer had been the victim of the alleged deceptive practice. *Id.* at 68. The Second Circuit held that, because some customers had authorized the adult content-charges in question and thus had not been deceived, "the amount of [defendants'] *unjust* gains is only a fraction of the overall gains from the billing system," and a reasonable approximation of unjust gains "must take this into account." *Id.* at 69. The FTC thus did not meet its "burden" of proving a "reasonable approximation" at the first step of the analysis because it did not account for that consideration, and the Second Circuit therefore held that the district court was "premature in shifting the burden of proof to the defendant-appellants." *Id.* Indeed, as the Second Circuit explained, "[t]he FTC's investigatory power gives it the capacity to estimate with some degree of precision how many" consumers were actually deceived and it must distinguish between "just" and "unjust" gains before the burden shifts to the defendant. *Id.*

Neither the FTC nor Dr. Rascher undertook any effort to do this. They made no effort to distinguish between customers who knew and understood the terms of their agreement with DIRECTV and those who may have been misled. Indeed, Dr. Rascher's approximation did not even consider that DIRECTV informed consumers of the terms of their customized subscription numerous times during the onboarding and activation process. Dr. Rascher, moreover, made no attempt to disaggregate his $3.95 billion estimate by sales channel, web, telephone, or direct marketing tactic over the last decade. Tr. 1634:16-25; 1635:11-14. He did not segregate alleged

23

unjust gains attributable to DIRECTV's current website, wizard flow, old flow, new flow, or "any other iteration of DIRECTV's website over the last ten years." Tr. 1635:19-1636:05; 1636:07-10. For all these reasons, Dr. Rascher's approximation of unjust gains was in no way reasonable.

**B.** **Dr. Rascher Failed For Additional Reasons To Satisfy The FTC's Burden For Monetary Relief Related To The Premium Channel Negative Option, Early Cancellation Fees, And ROSCA**

Dr. Rascher also failed to provide a reasonable approximation of unjust gains for Counts II, III, or IV for additional reasons.

First, Dr. Rascher's premium channel negative option calculation was not reasonable because it was based entirely on an instruction from FTC counsel, not any estimate of harm or unjust gains. Dr. Rascher simply calculated a 6-month period of premium channel payments (from months 4-9) after consumers' premium channels rolled to pay. He conceded that he had "no economic basis" for selecting this 6-month period, but simply relied on counsel's instruction, Tr. 1680:24-1681:10.

Second, Dr. Rascher's ECF calculation included money that DIRECTV never received. Even though Dr. Rascher had documentation showing that "60 to 65 percent of the ECFs go uncollected" by DIRECTV, Tr. 1583:15-25, Dr. Rascher included 100% of assessed ECFs in his calculation. Tr. 1672:23-1674:17, 1673:13-21. He also had real-world data showing that the vast majority of DIRECTV customers who canceled did so for reasons other than price (for example, they moved), Tr. 1675:1-25, 1676:2-1677:3, but nonetheless Dr. Rascher still presumed that all ECFs were paid because consumers were deceived by advertising.

Third, Dr. Rascher did not provide any approximation of unjust gains for ROSCA. ROSCA applies only to online sales from 2011 and thereafter, 15 U.S.C. § 8404, but Dr. Rascher did not testify as to any amount of alleged unjust gains exclusive to online sales from this time period. The FTC therefore did not carry its burden on equitable monetary relief under ROSCA.

**C.** **A "Benefit of the Bargain" Remedy Is Legal Damages, Not Restitution**

Although the Ninth Circuit has interpreted section 13(b) as conferring the "equitable power to order payment of restitution," it held that courts are "preclud[ed]" from "awarding damages." *Commerce Planet*, 815 F.3d at 599. In addition to its other deficiencies, Dr. Rascher's

24

"expectation interest" framework, Tr. 1556:07-10, is an award of money damages—not restitution—and therefore independently barred by section 13(b). [5]

"Restitution" is awarded when a "transfer induced by fraud or material misrepresentation is subject to rescission," and "restitution" is "necessary to avoid unjust enrichment." 1 Restatement (Third) of Restitution and Unjust Enrichment § 13, p.165. Here, however, the FTC is not seeking to rescind subscribers' contracts with DIRECTV. It is instead seeking to enforce a bargain it claims consumers expected due to DIRECTV's ads. This is why Dr. Rascher calculated monetary relief as the difference between the "actual price paid by the customers" and "the bargain that they would have received had DIRECTV done what" the FTC alleges the "ads claimed [it] would do." Tr. 1554:21-24. That is the quintessential example of "expectancy" damages that give a person the "benefit of the bargain he in fact made" by awarding a sum of money that puts him "in as good a position as he would have been in had the contract been performed." Dobbs, 3 Law of Remedies § 12.2(1) pp. 22-23 (1993); *ALLTEL Info. Servs., Inc. v. F.D.I.C.*, 194 F.3d 1036, 1039 n. 3 (9th Cir. 1999). No court in a Section 13(b) case has ever awarded the FTC "expectation" or "benefit-of-the-bargain" damages. This is because both are a form of "general damages," Dobbs at 22-23, and for that reason are barred by *Commerce Planet*.

## IV. The FTC Has Not Met Its Burden As To A Permanent Injunction

Section 13(b) of the Act provides that the Court may issue a permanent injunction to remedy past or likely future violations of the FTC Act. *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314 (8th Cir. 1991); *see also FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-11 (9th Cir. 1982). The FTC failed to prove that DIRECTV violated Section 5 or ROSCA or that it will violate those statutes in the future. The FTC, therefore, is not entitled to a permanent injunction.

---

[5] It is DIRECTV's position that the FTC is not entitled to any form of monetary relief because it brought this case under section 13(b), which authorizes only injunctive relief, 15 U.S.C. § 53. Because this Court is bound by the contrary construction of this provision adopted by the Ninth Circuit in *Commerce Planet*, we merely preserve this issue for appeal.

Date: September 11, 2017

By: /s/ Chad Hummel
DIRECTV and DIRECTV, LLC