Jeff Tillotson, SBN 139372
jtillotson@TillotsonLaw.com
Tillotson Law
750 North Saint Paul, Suite 600
Dallas, TX 75201
Telephone: (214) 382-3040

Pete Marketos, *Pro Hac Vice*
pete.marketos@rgmfirm.com
Reese Gordon Marketos LLP
750 North Saint Paul, Suite 600
Dallas, TX 75201
Telephone: (214) 382-9810

Chad S. Hummel, SBN 139055
chummel@sidley.com
Bridget S. Johnsen, SBN 210778
bjohnsen@sidley.com
Ryan M. Sandrock, SBN 251781
rsandrock@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 722-1200

Attorneys for Defendants
DIRECTV and DIRECTV, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 4:15-cv-01129 HSG |
| Plaintiff, | Assigned to the Hon. Haywood S. Gilliam, Jr. |
| vs. | **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED R. CIV. P. 52(c)** |
| DIRECTV, a corporation and DIRECTV, LLC a limited liability company, | |
| Defendants. | [Motion and Proposed Order filed concurrently] |

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

# TABLE OF CONTENTS

                                                                              **Page**

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW .........................................1

I.      Parties...............................................................................................................1

II.     Procedural History And The FTC'S Allegations.............................................1

III.    Legal standardS..............................................................................................2

        A.      Jurisdiction...........................................................................................2

        B.      Standard Of Review.............................................................................3

        C.      Legal Standard Under Section 5 Of The FTC Act.............................3

        D.      Legal Standard Under ROSCA............................................................4

IV.     DIRECTV offers Subscription Satellite TELEVISION ServiceS ....................4

V.      DIRECTV's Subscription Satellite TELEVISION Services Are marketed Directly by
        DIRECTV and Indirectly by Third Parties Through Multiple Sales Channels ..................5

VI.     DIRECTV's Direct Marketing of its Subscription Satellite Services Has Varied
        Extensively since 2007 ......................................................................................6

        A.      DIRECTV Advertises Its Services In Multiple Media Using Numerous
                Different Tactics With Varying Sales Conversion Rates .........................6

                1.      Television.......................................................................7

                2.      Print Advertising.............................................................7

                        a.      Sunday Circulars...................................................7

                        b.      Alternative Media.................................................8

                        c.      Solo Mail...............................................................9

                3.      directv.com.....................................................................9

                4.      Banner Ads...................................................................10

                5.      Affinity Program...........................................................10

                6.      1-800-DIRECTV............................................................10

        B.      The Creative Focus Of DIRECTV's Advertisements Has Varied Based On
                Many Factors .............................................................................................10

        C.      DIRECTV's Offers Have Changed Over Time In Response To Competition......14

i

ACTIVE 224875332

VII.    THE CONSUMERS' JOURNEY TO SUBSCRIBE TO DIRECTV SERVICES INCLUDES NUMEROUS TOUCH POINTS FROM WHICH CONSUMERS CAN LEARN ABOUT ALL THE FEATURES OF the SUBSCRIPTION, INCLUDING THE Terms OF PURCHASE AT ISSUE ................................................................18

    A.    DIRECTV Is A High Involvement Purchase; Consumers Spend Substantial Time On The Journey To Subscription ..................................................18

    B.    The Terms of Purchase At Issue Are Repeatedly Communicated To Consumers In Advertising And In The Subscription Process .............................19

        1.    The Advertisements Include Disclosures Of The Terms Of Purchase. ......19

        2.    The Terms Of Purchase Are Provided And Explained During The Call To Customers Who Subscribe Over The Phone ........................................21

        3.    The Terms Of Purchase Are Disclosed Several Times In The Subscription Web Flow.................................................................21

    C.    After Subscribing On The Phone Or Web, Customers Receive Confirming Communications And Agreements ........................................37

VIII.    Retention of Its Customers has been the "Lifeblood" of DIRECTV's Business................38

    A.    DIRECTV's Profits Depend On Ensuring That Consumers Stay On The Platform As Long As Possible.................................................................38

    B.    DIRECTV Implemented An Extensive Program To Improve The Customer Experience From Multiple Perspectives ....................................39

        1.    Policies, Procedures, And Initiatives Implemented By The CX Committee.................................................................40

            a.    Instant Rebate.................................................................40

            b.    Simplified Bill.................................................................41

            c.    Electronic Confirmation Letters ..................................................41

            d.    Premium Refusal At Point Of Sale/Future Date Cancellation.......41

            e.    Sales CRM ..................................................42

            f.    Website ..................................................42

        2.    Results Arising From CX Initiatives.................................................42

IX.    The Evidence The FTC Presented At Trial Does Not support a finding of LIABILITY under section 5 of the FTC Act.................................................................43

    A.    A Facial Review Of DIRECTV's Advertising Cannot Prove Likely Deception...43

    B.    The FTC's Survey Evidence Does Not Show That Consumers Are Likely To Be Deceived By DIRECTV's Advertising ............................................46

ii

ACTIVE 224875332

|  |  | 1. | Dr. Erdem's Studies Do Not Test Net Impression Or Deception ............46 |
|  |  | 2. | Dr. Erdem's Surveys Are Fundamentally Flawed In Both Design And Execution, Rendering The Results Unreliable ...........................47 |
|  |  | 3. | Dr. Erdem's Two Surveys Do Not Even Apply To The Overwhelming Majority Of Advertising At Issue. ..............................52 |
|  | C. | The FTC's Other Expert Testimony Does Not Establish That Consumers Are Likely To Be Deceived ......................................................55 |
|  |  | 1. | Dr. Pratkanis Did Not Offer Opinions Of The Consumers' Net Impression .............................................55 |
|  |  | 2. | Dr. Mandel Did Not Offer Opinions Of The Consumers' Net Impression .............................................58 |
|  | D. | DIRECTV's Empirical Data Demonstrate That Its Customers Are Not Deceived .........................................................60 |
|  | E. | DIRECTV's Internal Documents Do Not Support A Section 5 Or ROSCA Violation ........................................................62 |
|  |  | 1. | Eye Tracking And Click Testing Studies Do Not Measure Consumer Comprehension Of Advertisements ...........................62 |
|  |  | 2. | McKinsey's Presentation Concerned Consumer Sentiment Regarding the Mail-In Rebate ....................................63 |
|  |  | 3. | The Website Usability Studies Are Not Projectable ...............................64 |
|  | F. | The FTC Introduced No Evidence Of Traditional Indicia Of Deceptive Advertising...........................................................66 |
| X. | The FTC Did Not Meet Its Burden Of Proof On Its ROSCA Claims ............................68 |
|  | A. | ROSCA Does Not Prohibit Disclosures In Hyperlinks And Info Hovers ............68 |
|  | B. | The FTC Contends That "Clear and Conspicuous" Is A Performance Standard ..69 |
|  | C. | The FTC Failed To Prove That Consumers Are Unlikely To See and Understand Premium Channel Terms And Provide Proper Consent.....................70 |
| XI. | The FTC IS NOT ENTITLED TO MONETARY RELIEF ..............................................73 |
|  | C. | Dr. Rascher's "Presumption Of Expectation" Is Not A Presumption of Reliance............................................................76 |
|  | D. | The FTC Did Not Carry Its Burden Of Reasonably Approximating DIRECTV's Unjust Gains .................................................78 |
|  | E. | Dr. Rascher Failed For Additional Reasons To Satisfy The FTC's Burden For Monetary Relief Related To The Premium Channel Negative Option, Early Cancellation Fees, And ROSCA.............................................80 |

iii

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

1    F.    A "Benefit of the Bargain" Remedy Is Legal Damages, Not Restitution..............81

2    XII.    The FTC Has Not Met Its Burden As To A Permanent Injunction ...................82

iv

ACTIVE 224875332

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALLTEL Information Services, Inc. v. F.D.I.C.*,
194 F.3d 1036 (9th Cir. 1999) ............................................................................ 82

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F. 3d 51 (2d Cir. 2016) ................................................................................ 44

*Barrer v. Chase Bank USA, N.A.*,
566 F.3d 883 (9th Cir. 2009) .............................................................................. 69

*In re Bassett*,
285 F. 3d 882 (9th Cir. 2002) ............................................................................. 69

*In re Cliffdale Assoc.*,
103 F.T.C. 110 (1984) ......................................................................................... 57

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2011) ........................................................................................ 78

*Cordas v. Uber*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ........................................................... 72, 73

*FTC v. Bronson Partners*,
654 F.3d 359 (2d Cir. 2011) ............................................................................... 76

*FTC v. Commerce Planet, Inc.*,
878 F. Supp. 2d 1048 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th
Cir. 2016) ...................................................................................................... *passim*

*FTC v. Cyberspace.Com LLC*,
453 F.3d 1196 (9th Cir. 2006) .............................................................................. 3

*FTC v. Gill*,
265 F.3d 944 (9th Cir. 2001) ................................................................................ 3

*FTC v. H.N. Singer, Inc.*,
668 F.2d 1107 (9th Cir. 1982) ............................................................................ 82

*FTC v. Inc21.com Corp.*,
745 F. Supp.2d 975 (N.D. Cal. 2010) ................................................................. 67

*FTC v. Johnson*,
96 F. Supp. 3d 1110 (D. Nev. 2015) .............................................................. 45, 52

v

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

*FTC v. Medlab, Inc.*,
    615 F. Supp. 2d 1068 (N.D. Cal. 2009) ........................................................... 45

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008) ........................................................... 43

*FTC v. QT*,
    448 F. Supp. 2d 908 (N.D. Ill. 2006) ........................................................... 44

*FTC v. Security Rare Coin & Bullion Corp.*,
    931 F.2d 1312 (8th Cir. 1991) ........................................................... 82

*FTC v. Verity Intern.*,
    443 F.3d 48 (2nd Cir. 2006) ........................................................... 78

*FTC v. World Travel Vacation Brokers*,
    861 F.2d 1020 (7th Cir. 1988) ........................................................... 82

*Legal Zoom.com Inc. v. Rocket Lawyer Inc.*,
    No. 12-9942, 2013 WL 12121303 (C.D. Cal. October 17, 2013) ........................ 44

*McGlinchy v. Shell Chemical Co.*,
    845 F.2d 802 (9th Cir. 1988) ........................................................... 74

*Meyer v. Uber Tech., Inc.*
    Nos. 16-2750-cv, 16-2752-cv, 2017 WL 3526682 (2d Cir. Aug. 17, 2017) ......... 69, 72, 73

*Pinterest, Inc. v. Pintrips, Inc.*,
    140 F. Supp. 3d 997 (N.D. Cal. 2015) ........................................... 48, 50, 51

*POM Wonderful, LLC v. FTC*,
    777 F.3d 478 (D.C. Cir. 2015) ........................................................... 52

*Ritchie v. United States*,
    451 F.3d 1019 (9th Cir. 2006) ........................................................... 3

*U.S. v. F/V Repulse*,
    688 F.2d 1283 (9th Cir. 1982) ........................................................... 3

*United States v. Bayer Corp.*,
    2015 WL 5822595 (D.N.J. Sept. 24, 2015) ........................................... 43

*Verisign Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ........................................................... 44

*In re Wellbutrin XL Antitrust Litigation*,
    308 F.R.D. 134 (E.D. Pa. 2015) ........................................................... 74

*William H. Morris Co. v. Group W, Inc.*,
    66 F.3d 255 (9th Cir. 1995) ........................................................... 44

**Statutes**

15 U.S.C. §§ 41 ............................................................................................................. 1

15 U.S.C. § 45 ....................................................................................................... 1, 2, 3

15 U.S.C. § 53 ............................................................................................................ 81

15 U.S.C. § 53 ..................................................................................................... 1, 3, 82

15 U.S.C. §§ 8401 ................................................................................................ *passim*

15 U.S.C. § 8403 ................................................................................................ 1, 4, 68

15 U.S.C. § 8404 ........................................................................................................ 81

28 U.S.C. § 1331 ......................................................................................................... 2

28 U.S.C. § 1337 ......................................................................................................... 2

28 U.S.C. § 1345 ......................................................................................................... 2

28 U.S.C. § 1391 ......................................................................................................... 3

**Other Authorities**

16 C.F.R. § 310.2(w) ................................................................................................... 4

Charles A. Wright & Arthur Miller, 9C Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2008) ..................................................................................................................... 3

Dobbs, 3 Law of Remedies § 12.2(1) pp. 22-23 (1993) ........................................... 82

FRCP 52(c) ........................................................................................................ 1, 2, 3

FTC Policy Statement on Deception at 3-4 (1983) .................................................... 57

1 J. Story, *Commentaries on Equity Jurisprudence in England and America,* § 191 (12th ed. 1877) ...................................................................................................... 78

Restatement (Third) of Restitution and Unjust Enrichment § 13 ............................... 81

ACTIVE 224875332

Concurrently with Defendants' Motion for Judgment on Partial Findings Pursuant to FRCP 52(c) ("Motion"), Defendants DIRECTV and DIRECTV, LLC (collectively "DIRECTV") hereby submit the following proposed Findings of Fact and Conclusions of Law ("FOF") based on admitted evidence and testimony provided at trial,[1] and on controlling or persuasive legal precedent.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. PARTIES

1. The Federal Trade Commission ("FTC") is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Restore Online Shopper's Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.*, which prohibits certain methods of negative option marketing on the Internet. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, and to seek injunctive relief for violations of the FTC Act and ROSCA. 15 U.S.C. § 53(b).

2. DIRECTV is a provider of subscription satellite television services.

3. DIRECTV was acquired by AT&T Inc. on July 24, 2015.

### II. PROCEDURAL HISTORY AND THE FTC'S ALLEGATIONS

4. The FTC commenced its investigation of DIRECTV in April 2010 when it served a civil investigative demand ("CID").

5. On March 11, 2015, the FTC filed its Complaint, alleging violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with the advertising, marketing, and sale of DIRECTV's subscription satellite television service. In the Complaint, the FTC sought equitable relief, including a permanent injunction and equitable monetary relief.

---

[1] References herein to "Tr." refer to the trial transcript, and references to "Ex." refer to the trial exhibits admitted in the above-captioned matter. Pincites to document exhibits refer to the PDF page in the electronic form of the exhibit, while pincites to video exhibits refer to the time in the exhibit.

6. With respect to the FTC's Section 5 claims, the FTC has alleged that DIRECTV failed to adequately disclose in its advertising certain terms of purchase for its satellite television service. The terms of purchase at issue are: (i) the introductory discount price lasts 12 months, and the customer is charged the then-prevailing rate at the end of the promotional period, (ii) the consumer is subject to a 24-month commitment period; (iii) cancelling before the end of the commitment period triggers the assessment of an early cancellation fee of $20 per month for the remaining months in the commitment period; and (iv) the premium channel (e.g., HBO and Showtime) package negative option.

7. The FTC does not allege that DIRECTV made any false statements or that it failed to provide any of the services that it advertises. Nor does the FTC allege that DIRECTV does not actually make the disclosures at issue—only that DIRECTV's disclosures in its advertising (on TV, in print, on the web, and in phone sales) are inadequate.

8. With respect to ROSCA, the FTC alleges that DIRECTV does not clearly and conspicuously disclose the premium channel negative option on its website and that it failed to obtain the consumer's express informed consent before charging consumers.

9. This case proceeded to a bench trial before this Court on August 14, 2017.

10. After two weeks of testimony, on August 25, 2017, the FTC concluded its case-in-chief and rested.

11. After the close of the FTC's case-in-chief, DIRECTV moved orally for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). The Court suspended the trial before DIRECTV presented its defense case-in-chief to allow DIRECTV to file its Motion and ordered the parties to file proposed findings of fact and conclusions of law in connection with the Motion.

III. **LEGAL STANDARDS**

A. **Jurisdiction**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b).

13. Venue is proper in this district under 28 U.S.C. § 1391(b), (c)(2), and (d), and 15 U.S.C. § 53(b).

**B.    Standard Of Review**

14. Federal Rule of Civil Procedure 52(c) authorizes the Court to enter judgment during a bench trial on partial findings. Once "a party has been fully heard on an issue during a nonjury trial and the Court finds against the party on that issue, the Court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c).

15. Because the Court sits as adjudicator of both law and fact during a bench trial, when considering a Rule 52(c) motion, it may weigh the evidence and "resolve disputed issues of fact." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

16. The Court "is not required to draw any inferences in favor of the non-moving party; rather, [it] may make findings in accordance with its own view of the evidence," including its own assessment of a witness's credibility. *Id.* In other words, the Court may "decide for itself in which party's favor the preponderance of the evidence lies." Charles A. Wright & Arthur Miller, 9C Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2008).

17. The Federal Trade Commission as Plaintiff bears the burden of proof and must prove each element of its case by a preponderance of the evidence. *U.S. v. F/V Repulse*, 688 F.2d 1283, 1284 (9th Cir. 1982).

**C.    Legal Standard Under Section 5 Of The FTC Act**

18. Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

19. To prove a deceptive act or practice in violation of Section 5, the FTC must establish three elements: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006).

20.     A failure adequately to disclose material terms—as alleged in this case—can constitute a deceptive practice under Section 5 if the inadequate disclosure makes the advertisement "likely to mislead" a significant minority of consumers.  To meet this standard, the FTC must first prove the "net impression" from the advertising and then prove that the net impression is false.  *See, e.g., FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063 (C.D. Cal. 2012), *aff'd in relevant part*, 815 F.3d 593 (9th Cir. 2016).

21.     As discussed *infra,* none of the FTC's evidence—taken individually or together—meets this legal standard or its burden of proof.

**D.      <u>Legal Standard Under ROSCA</u>**

22.     ROSCA requires merchants selling goods or services over the Internet through a "negative option feature" to (1) "provide[] text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information"; and (2) "obtain[] a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account . . ." 15 U.S.C. §§ 8403 (1)-(2).[2]

23.     As discussed *infra,* none of the FTC's evidence—taken individually or together—proves, by a preponderance of the evidence, that DIRECTV failed to satisfy these requirements.

**IV.     DIRECTV OFFERS SUBSCRIPTION SATELLITE TELEVISION SERVICES**

24.     DIRECTV had approximately 33.5 million unique subscribers to its satellite television service during the time period relevant to this dispute.  Tr. 1562:22-1563:2 (Rascher).

25.     DIRECTV's entry into the market provided the first meaningful competition to "incumbent" cable monopolies.  Tr. Tr. 332:3-4 (Bentley); Tr. 647:17-22 (Guyardo).  DIRECTV offers advanced technology including digital recording, mobile device technology, hundreds of high-definition channels, premium channels like HBO, Starz, Cinemax, and Showtime, Ex. 1046 at 7

---

[2] ROSCA incorporates the definition of "negative option feature" in the FTC's Telemarketing Sales Rule, *see* 15 U.S.C. § 8403, which "means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

(package features); Tr. 1051:15-18 (Patel), and is the exclusive provider of NFL Sunday Ticket—which provides every out-of-market Sunday NFL football game, Tr. 647:11-25 (Guyardo).

26. Throughout the period covered by the Complaint (2007 to the present), DIRECTV advertised its subscription television service through a number of different media using a multitude of advertising tactics. DIRECTV aired numerous television commercials, *see*, *e.g.*, Ex. 472, disseminated tens of thousands of different print ads, Tr. 933:20-21 (Erdem) (40,000 ads), published over 150 different Internet banner ads, Ex. 1161, and utilized multiple iterations of its website (directv.com), Tr. 1448:12-20 (describing multiple major redesigns), 1487:13-20 (Leever) ("It was a constant iteration."), and engaged with its consumers in numerous different phone scripts and required call components, *see* Tr. 266:10-16, 371:2-10 (Bentley); Ex. 544.

27. The fundamental purpose of DIRECTV's advertising "was to create some interest and start a dialogue with prospects", Tr. 266:4-9 (Bentley), in order to get them "to call or go online so that [DIRECTV] could begin the process of signing them up to become a DIRECTV customer", Tr. 641:15-19 (Guyardo); *see also* Tr. 666:20-667:10 (Guyardo) (the journey starts with the advertising and leads the prospective customer to pick up the phone and call an agent, or go to DIRECTV's website, or interact with one of DIRECTV's authorized dealers); Tr. 846:6-10 (Gieselman) ("There were two main objectives that the advertising communicate; [1] the high benefit, what differentiated us and made us better, and [2] to prompt people to call or go to the website to learn more."). The signup process "is a multistep journey", Tr. 642:5-21 (Guyardo), that DIRECTV deliberately adopted to engage the public at multiple touchpoints. *See* Tr. 643:4-16 (Guyardo) (testifying that DIRECTV did not mean to convey all information in one ad "because purchasing DIRECTV is a high involvement purchase" and "a complex purchase" "so that's why we have a multistep process that I felt continually got better over the years where there would be other opportunities in this new customer sign-up journey to fully disclose everything to the consumer.").

## V. DIRECTV'S SUBSCRIPTION SATELLITE TELEVISION SERVICES ARE MARKETED DIRECTLY BY DIRECTV AND INDIRECTLY BY THIRD PARTIES THROUGH MULTIPLE SALES CHANNELS

28. DIRECTV acquires subscribers using multiple sales channels that are broadly categorized as either "Direct Sales" or "Indirect Sales." Tr. 667:3-668:9 (Guyardo); Ex. 9 at 44.

29.     Direct Sales involves customers who subscribe either by phone through one of DIRECTV's toll free numbers or on the DIRECTV website, directv.com.  Tr. 298:19-25 (Bentley).

30.     The vast majority of Direct Sales subscribers complete their sign up over the phone and only a small percentage subscribe on the web.  Tr. 1441:23-1442:15 (Leever).

31.     Indirect Sales are made through a number of third-party channels.  Ex. 9 at 44.  These include Consumer Electronics or "CE" (consumer electronic and other big box stores like Walmart or Best Buy that sell DIRECTV in their stores, Tr. 299:10-23 (Bentley)); Telco (partnerships with telephone companies that sell DIRECTV services on their networks in addition to phone and internet services, Tr. 299:2-5 (Bentley)); National Strategic Partners or "NSP" (national third-party dealers, Tr. 300:3-7 (Bentley)); Local Strategic Partners or "LSP" (local third-party dealers, Tr. 300:9-14 (Bentley)); and Multi-Dwelling Units or "MDUs" (multi-unit buildings that contract with DIRECTV to make the service available to residences).  Ex. 9 at 44.

32.     Many third-party providers, including Telco, used their own advertising tactics.  *See* Tr. 225:21-226:20, 300:15-301:1 (Bentley); Tr. 1328:20-23 (Pratkanis) (referring to Costco tactic). Third-party providers also had offers that were different from Direct Sales offers.  Tr. 299:6-9 (Bentley).  For example, Telco partners offered bundles with their telephone and Internet services and DIRECTV's television services, and the Telco partners would offer such services, including those of DIRECTV, using their own sales network, by cross selling to their existing callers.  Tr. 300:15-301:1 (Bentley).  Likewise, there were over two thousand NSPs that would create and place their own advertising for DIRECTV.  Tr. 225:21-226:20 (Bentley).

VI.     **DIRECTV'S DIRECT MARKETING OF ITS SUBSCRIPTION SATELLITE SERVICES HAS VARIED EXTENSIVELY SINCE 2007**

A.     **DIRECTV Advertises Its Services In Multiple Media Using Numerous Different Tactics With Varying Sales Conversion Rates**

33.     DIRECTV has advertised its television subscription service on TV, in print (by newspaper, magazine, email, or direct mail), on the web (on both the directv.com website, and with digital banner ads on the Internet), through Affinity partners, and in numerous other media, including those as varied as a display on a wall in a ballpark or a simple listing in the Yellow Pages. Tr. 302:10-13, 303:13-20 (Bentley); Ex. 9 at 33-81.  All consumer-facing advertising disseminated

by DIRECTV was designed to cause consumers to subscribe through DIRECTV's Direct Sales channels (phone or web), which represented approximately half of DIRECTV's subscribers. Tr. 298:19-25 (Bentley). The remaining customers subscribed through indirect channels—Telcos, CE, NSP, LSP, and MDUs. Ex. 9 at 44.

34.     In the relevant time period, there were numerous television ads, Ex. 472, over 150 banner ads, Ex. 1161, over 40,000 print ads, Tr. 933:20-21 (Erdem), and multiple iterations of the website, Tr. 1448:12-20 (describing multiple major redesigns); Tr. 1487:13-20 ("It was a constant iteration.") (Leever).

35.     DIRECTV uses thousands of 1-800 numbers, also known as toll free numbers or "TFNs," to track calls, subscriber subscriptions, and activations, among other data points, arising from each individual direct marketing tactic disseminated, including those arising from directv.com. Tr. 303:21-306:15, 312:15-25 (Bentley).

### 1.     Television

36.     DIRECTV advertised on television in nationally broadcast 30-second television, as well as in longer one to two minute ads about DIRECTV called "direct response television." All television ads prompt consumers to call 1-800-DIRECTV and/or visit directv.com. Tr. 220:8-11 (Bentley).

### 2.     Print Advertising

37.     DIRECTV's print advertising has taken numerous forms, known as "tactics," and has generally included three broad categories: freestanding newspaper inserts disseminated with Sunday papers (also known as Sunday Circulars), Alternative Media, and Solo Mail.

### a.     Sunday Circulars

38.     Sunday Circulars are multi-page advertisements inserted into the Sunday paper. Tr. 312:7-9 (Bentley); Ex. 9 at p. 60. DIRECTV has circulated approximately 200-300 different types of freestanding newspaper inserts per month. Tr. 231:7-10 (Bentley); *see, e.g.*, Exs. 203, 2707.

39.     The number of consumers who called DIRECTV in response to a Sunday Circular is "extremely small." Tr. 883:6-17 (Gieselman). By way of example, in response to a Sunday Circular distributed to 7 million consumers in or around August 2013, only three one hundredths of a percent

(.03%) of the people who received the Sunday Circular called DIRECTV, and only 32% of the people who called ultimately subscribed to DIRECTV during the call.  Tr. 879:21-883:17 (Gieselman); Ex. 384 at 7.

### b.  Alternative Media

40.    Alternative Media includes "hundreds of different tactics" that generally are provided to consumers with material or advertisements from other (and often many other) companies.  Tr. 223:22-224:2, 224:9-13, 313:22-314:10, 315:17-316:17 (Bentley); Ex. 9 at p. 59.  Alternative Media advertisements are comprised of newspaper-delivered inserts, shared mail or co-op mailings, mail inserts, or directories.  Tr. 223:22-224:13 (Bentley); Ex. 9 at p. 59.  Specific examples of Alternative Media include Shop Wise, Penny Saver, Valassis and Red Plum, which are magazines or booklets containing ads for numerous different companies distributed with newspapers or in the mail; Val-pak and Money Mailer envelopes, which are co-op mailings, meaning that the DIRECTV ad is "one of many ads" from different companies included in the mailing; bill inserts, which are DIRECTV ads that are included with a bill from a credit card company or other third party; address change move kits from the United States Postal Service, which include a DIRECTV ad among several other ads from other companies provided to consumers who recently changed their address with the U.S. Postal Service; and the Yellow Pages.  Tr. 224:9-13, 224:21-24, 249:3-10, 311:23-312:9, 313:22-314:10, 315:17-316:14 (Bentley); Ex. 9 at p. 59; *see, e.g.*, Exs. 185, 209, 210, 212, 139/2013A, 281/2022A (examples of Alternative Media pieces).

41.    The sizes of the Alternative Media tactics vary significantly from a roughly standard sized page included in a Red Plum booklet (8.4" x 10.8") to an envelope sized "buck slip" included in a Val-pak envelope or as a bill insert (8.25" x 3.5").  Tr. 313:1-21 (Bentley); *Compare*, Exs. 244/2026A (Red Plum), *with* 281/2022A (Val-pak buck slip).

42.    DIRECTV sent out "anywhere from 2[00] to 300 hundred [Alternative Media] tactics every month", Tr. 312:5-6, 321:6-10 (Bentley) ("there may be 300 different creative versions of [Alternative Media] in a single month . . ."); Ex. 9 at 59, in multiple channels of distribution, Tr. 321:6-10 (Bentley).  Alternative Media tactics were described as "the ones you typically get in the mail and you never open, you just toss."  Tr. 837:2-7 (Gieselman).  As a result, it is high-volume,

8

ACTIVE 224875332

low return marketing that targets the same households week after week.  Tr. 320:21-321:10

(Bentley).  For instance, for a Red Plum Alternative Media advertisement (e.g., Ex. 244/2026A), out

of a 10 million piece dissemination, DIRECTV may get around 1200 calls, and about half of those

fail credit and/or don't otherwise convert to subscriptions, leaving approximately 300 subscriptions,

out of which only 75% activate.  Tr. 322:18-323:16 (Bentley).

### c.  Solo Mail

43.  Solo Mail is a multipage letter sent in a #10 envelope (4 1/8 x 9 1/2 inches holding

standard 8 1/2 x 11 inch paper, folded) to targeted, credit pre-approved households.  Tr. 311:23-

312:9, 315:9-16, 321:2-10 (Bentley); Ex. 9 at 58; Ex. 172 (example of Solo Mail letter).  DIRECTV

would use predictive models to determine which households to target.  Tr. 321:11-19 (Bentley).

DIRECTV generally sent 15 to 18 million Solo Mail letters per month.  Tr. 320:12-16 (Bentley).

### 3.  directv.com

44.  Consumers may subscribe to DIRECTV's satellite television services through

directv.com.  Few consumers who enter DIRECTV's web flow complete the purchase on the

website.  For example, from August 2014 to May 2016, the conversion rate (rate of subscription) for

prospects who entered the website and placed a package in their cart ranged between 6.5 to 8.9%.

Tr. 794:13-18 (Chen); Ex. 1146 at 1. The conversion rate for all prospects who enter the web flow

(not just those that select a package) is even lower.  For example, from January 2016 to March 2016,

the conversion rate for prospects that continued from the landing page to the zip code page ranged

between 1.2 to 1.4%.  Tr. 799:5-10 (Chen); Ex. 1146 at 2.  The biggest drop off occurs at the

package selection page.  Ex. 1146 at 2; Tr. 798:4-11 (Chen) (only 25% of people progressed from

the package selection page to the next step in the web flow in March 2016).  Those that did make a

purchase typically "had multiple visits to be able to go through different parts of the website and

learn and educate themselves" before making a purchase because it is a "big purchase" and a

"complex product" that requires "a lot of decision points."  Tr. 1439:1-24 (Leever).

45.  Using individual TFNs and data available regarding visits to directv.com, out of all

subscriptions arising from a customer who visited directv.com, approximately 70% of those

consumers called an individual TFN and completed their subscription with a telephone customer service representative.  Tr. 305:14-25 (Bentley).

### 4. Banner Ads

46.     Banner ads are animated images that appear on third-party websites.  Tr. 801:3-6 (Chen); Ex. 1169 (example of banner ad).  When a consumer clicks on the banner ad, they are routed to directv.com.  In 2016, only 0.6 percent to 0.9 percent of customers who clicked on a banner ad subscribed to DIRECTV as a result.  Ex. 1146 at 3.  There is no evidence regarding the percent of those subscribing customers who activated the service.

### 5. Affinity Program

47.     The Affinity program constituted special offers made to the subscriber base of third-party partners.  Examples of such partners include American Airlines and AAA.  Tr. 312:10-14 (Bentley).  The FTC presented no evidence of the form of advertisements or offers made in connection with the Affinity Program.

### 6. 1-800-DIRECTV

48.     DIRECTV tracks calls to the general 1-800-DIRECTV number (also referenced as a "vanity" number), but such calls cannot be traced to a particular piece of marketing material, so it is not known what, if any, DIRECTV advertising a consumer may have seen prior to calling the general number.  Tr. 273:11-25, 302:3-7 (Bentley).  For example, customers calling the general toll-free number may be responding to a television commercial, Yellow Pages ad, or even a billboard in the outfield of a baseball stadium.  Tr. 273:11-25, 301:1-17, 313:5-7 (Bentley).  In the latter two instances, among others, the customer calling may not have seen a single advertisement.  Tr. 302:1-17, 313:5-7 (Bentley).

### B. The Creative Focus Of DIRECTV's Advertisements Has Varied Based On Many Factors

49.     The creative focus of DIRECTV's advertising has varied and changed frequently, including weekly, for certain tactics.

10

ACTIVE 224875332

50.     DIRECTV's advertisements generally included a "big idea" or "big theme" that would change three to four times per year as DIRECTV rolled out new creative advertising campaigns. Tr. 228:12-17 (Bentley); 826:21-827:11 (Gieselman).

51.     The focus on the "big idea" or "big theme" is called "brand advertising," and the "main intent . . . was to shape peoples' perception of the brand, that DIRECTV was better than cable, better than the competition." Tr. 873:11-23 (Gieselman). To shape the brand, DIRECTV would "communicate a message about the brand to differentiate [DIRECTV] from cable to help people understand what made DIRECTV better and different." Tr. 841:24-842:7 (Gieselman).

52.     DIRECTV differentiated its "brand" by emphasizing "technology superiority, programming superiority, [and] customer service superiority", which DIRECTV called its "proof points." Tr. 873:11-23 (Gieselman). Examples of specific features DIRECTV included in its ads are:  available programming packages, DVRs, advanced equipment, and HD capabilities. Tr. 826:21-827:7, 832:23-833:5, 872:24-873:2 (Gieselman); *see, e.g.*, Ex. 172 (Solo Mail letter emphasizing multiple reasons "Why someone switches to DIRECTV every 10 seconds"); Ex. 187 (Alternative Media piece emphasizing "FREE equipment upgrades and NFL SUNDAY TICKET included!"); Ex. 212 (Alternative Media piece emphasizing "NOW GET OVER 150 CHANNELS").

53.     In its advertisements, DIRECTV also would "prompt people to call or go to the website to learn more", Tr. 846:4-15 (Gieselman), known as the "call to action", Tr. 846:24-847:2 (Gieselman).

54.     Notwithstanding the priority given to and inclusion of these general themes in DIRECTV's advertising, there was substantial creative variation between the tens of thousands of DIRECTV ads disseminated since 2007, which variation resulted from a number of factors. Principally, the available space in a particular medium—the "real estate"—controlled the number and content of messages DIRECTV could include in any particular ad. Tr. 313:1-18, 316:24-317:5 (Bentley). In addition, the cost of the advertisement, the conversion rate for consumers, the projected value and demographics of consumers targeted by the ad, and projected attention consumers would give to the ad all impacted the content of and number of messages included. FoF, *supra*, ¶¶ 55-57. DIRECTV used "hierarchy in marketing" to determine the messages to be included

in its advertisements, including as a first priority its "main message." Tr. 886:2-20 (Gieselman). What other messages were included, the number of messages included, and the manner in which the messages were included varied greatly among the multiple advertising tactics. FoF, *supra*, ¶¶ 55-57.

55.     For example, typical television commercials are only 30 seconds long.  Therefore, in the first 25 seconds, DIRECTV would prioritize its main message, and the last five seconds would be used for the call to action, sometimes with a reference to a price point for the consumers' comparison purposes.  Exhibit 444 is a 2011 television commercial where price is not mentioned or displayed.  Exhibit 447 is a 2012 television commercial titled "Funeral" that DIRECTV played during its opening, Tr. 35:2-6, in which the benefit over cable humorously emphasized is DIRECTV's customer service: you won't have to wait a long time for the cable guy if you "get rid of cable and upgrade to DIRECTV."  Exhibit 455, called "Carrots Rev" and played by the FTC at trial, is a 2015 advertisement featuring Hannah and her horse.  It similarly focuses on customer service with Hannah stating, "Did you know that DIRECTV rated higher than cable in customer satisfaction for the fourteenth year in a row?", followed by humorous banter from the horse, and the announcer stating in the last four seconds, "get rid of cable and upgrade to DIRECTV.  Call 1-800-DIRECTV."  Exhibit 442, titled "Chicken and the Egg REV VO HD" from 2011, focuses on DIRECTV's superior video on demand programming, stating that "only DIRECTV gets you the latest box office hits first, months before Netflix," and in the last six seconds, displays an end card that states "Packages starting at 29.99" with a call to action directing the consumer to go on directv.com or call 1-800-DIRECTV.  Finally, Exhibit 453, a 2014 ad titled "Lemonade Rev," is an example of an ad focused on DIRECTV's technological superiority.  After humorously demonstrating the benefit of having no wires with a flat-screen TV, the announcer states, "now you don't need to see cable wires and boxes in every room.  Call 1-800-DIRECTV," while the end card states "Package offers starting at $24.99 for 12 months.  24-Mo. Agmt Req'd" and directs the consumer to call 1-800-DIRECTV or go to directv.com.

56.     Similar to television commercials focusing on a main theme that changed with each ad campaign, the website landing page likewise changed with every ad campaign, Tr. 228:9-17 (Bentley), and sometimes even more often to highlight a benefit of DIRECTV's service, including

the NFL Sunday Ticket programming at the end of every summer. *Compare*, *e.g.*, Ex. 1010 at 1

(2/13/14 capture), *with* Ex. 1012 at 1 (3/6/14 capture), *with* Ex. 1021 at 1 (4/17/14 capture), *with* Ex.

1027 (7/1/14 capture), *with* Ex. 1029 (7/18/14 capture) (showing five different landing pages in a

five-month period).

57.     With respect to the print ads, there is a high degree of variation both among the

different categories of print tactics, within the same categories of tactics distributed in different

areas, and compared to other media like the website or television advertisements. For instance,

because the "real estate" available varies widely on each print tactic, the messages advertised also

varies. A four page Sunday Circular allows for the inclusion of a lot more information on the

advertisement than a one page ad in a Penny Saver magazine or an even smaller Val-pak buck slip.

Each tactic also receives varying degrees of attention by consumers. A targeted letter to a

homeowner creates immediate interest and greater interest than a multi-insert Val-pak envelope that

includes one DIRECTV ad among 30 others that "you are opening [] over the trash." Tr. 313:11-15

(Bentley). With a shared mail tactic, the advertisement also needs to stand out as a consumer

quickly fans through the multiple included ads, affecting the elements included. Tr. 313:1-18,

313:22-314:10 (Bentley). The lead time for the printing of different tactics also varies. For instance,

a Solo Mail piece is printed only two weeks in advance, but an Alternative Media piece may be

printed four to five months in advance. Tr. 314:11-315:6 (Bentley). As a result, the Solo Mail piece

can be more timely and specifically targeted, whereas the focus of the Alternative Media piece tends

to include more evergreen offers (i.e., offers that will be in place for longer) that are more general

(e.g., "prices starting as low as 29.99"). Tr. 314:11-315:6 (Bentley). The nature or quality (or value)

of the consumer targeted by a particular tactic also resulted in varied messages. Tr. 319:1-13

(Bentley). For example, consumers targeted by Alternative Media tactics tend to be bargain hunters

who are managing a month-to-month budget and are more focused on lower end packages.

Therefore, DIRECTV would make "savings" messages "pop a bit more" in those tactics. Tr.

317:12-318:1, 318:11-319:18 (Bentley). For Solo Mail or Sunday Circulars, on the other hand,

DIRECTV talked more about the "premium nature of [its] offer." Tr. 304:8-17, 317:12-318:1

(Bentley); Ex. 9 at 56, 60. Those customers engaged in a more "considered purchase" and were "not

13

ACTIVE 224875332

1    looking at just the savings but looking at getting a premium subscription." Tr. 318:11-319:18

2    (Bentley).

3         **C.    DIRECTV's Offers Have Changed Over Time In Response To Competition**

4         58.    DIRECTV has competed against incumbent cable companies that had a majority

5    market share and a local presence, all of which conferred a substantial competitive advantage over

6    DIRECTV when it entered the market.  Tr. 331:25-332:11 (Bentley). Throughout the relevant time

7    period, cable competitors were also able to compete "aggressively with triple plays"—directly

8    offering bundled television, internet, and phone services to consumers.  Until the summer of 2015

9    when it merged with AT&T, DIRECTV was a "pure play" only television service (unless it

10   partnered with an independent Telco).  Tr. 245:3-14, 331:12-332:11 (Bentley).

11        59.    DIRECTV was also at an initial competitive disadvantage to cable providers because

12   of the relatively high costs of installation of a satellite television system in consumers' homes.

13   These costs were initially passed through to DIRECTV customers.  Tr. 245:3-14, 331:12-332:18

14   (Bentley).

15        60.    DIRECTV's offers changed over time and had a number of different components.  Tr.

16   337:7-10 (Bentley); Ex. 617.  DIRECTV offered multiple programming packages at different price

17   points, starting with a base package.  Packages included different programming options (i.e., the

18   number of and specific channels included, as well as local channels and HD availability).  *See* Ex.

19   1021 at 5 (4/17/14 web capture comparing package features).

20        61.    Generally, DIRECTV offered introductory discounted programming package prices

21   for 12 months.  This was done to "giv[e] the consumer an incentive to switch to a new provider" and

22   overcome the competitive challenges presented by the television-only pricing offered by cable

23   providers.  Tr. 244:22-246:2 (Bentley); *see* Exs. 172, 187, 281/2022A, 2707.  Most of the pay

24   television industry also offered 12-month introductory discounted pricing to new customers.  Tr.

25   344:12-15 (Bentley).

26        62.    Not all DIRECTV offers included discounted pricing.  For example, in Exhibit 84, a

27   2007 ad, the offer advertised "everyday packages starting as low as 29.99."  This was the

28   undiscounted cost of the base package and offered "everyday low pricing" that did not change (but

14

for the annual inflationary price increase). Tr. 345:10-346:7 (Bentley); Ex. 84; *see also* Exs. 78, 95, 139, 2014 as examples of ads that included everyday pricing, not promotional pricing.

63.     Until 2012, in order to obtain an introductory discounted price, the customers had to take affirmative steps to claim a rebate either through the mail or online.  If the customer did not affirmatively redeem the rebate, the customer would be billed the regular package price with no discount.  As part of the Customer Experience ("CX") initiative, in October 2012, DIRECTV made this rebate "instant" such that the customer automatically received the discount. Tr. 291:15-292:21, 293:19-294:11 (Bentley); FoF, *infra*, Section VIII.B.

64.     In its advertising and during the subscription processes, DIRECTV disclosed the regular prices for its programming packages that would be charged to consumers if they kept the same package.  The regular package prices were subject to change due to an annual inflationary price increase ranging  from 3 to 5% (resulting from increasing content acquisition costs).  Tr. 382:19-383:2 (Bentley).  Therefore, in its communications with consumers, DIRECTV estimated the monthly costs of programming throughout the commitment period (if applicable), using the then-prevailing rates, in, for example, the phone scripts and the "view monthly costs" tab on the web flow.

65.     Many other paid television services also had yearly inflationary price increases, so consumers expected these price increases.  Tr. 333:11-23 (Bentley).

66.     Although DIRECTV experienced, on average, between 8 to 10 percent annual increases in the amount it had to pay the content providers (such as Disney and Fox), DIRECTV passed on, on average, only 3 to 5% increases to its subscribers to limit potential churn and customer dissatisfaction.  As a result, DIRECTV experienced continually compressed margins.  Tr. 330:18-331:14; 332:20-333:10 (Bentley).

67.     While on the DIRECTV platform, customers could upgrade or downgrade programming packages.  Thus, they were not locked into the same package for any portion of an applicable commitment period.  Tr. 1565:14-17 (Rascher).  If there was an applicable commitment—for example, the 24-month agreement in effect since the spring of 2009—consumers were required

15

ACTIVE 224875332

to maintain a minimum level of service throughout the commitment period or be subject to an early cancellation fee.

68.     At certain times during the relevant time period, additional discounts would be available to a consumer who provided their email address or agreed to auto bill pay.  Tr. 373:7-13 (Bentley).

69.     Additional programing options available from DIRECTV at an extra cost included NFL Sunday Ticket, which provides the consumer with all out of market NFL games, and premium channels such as HBO, Showtime, Starz, or Cinemax.

70.      With certain packages, and as part of an introductory programming offer, certain premium channels would be offered for "free for 3 months."  If consumers did not call DIRECTV to change or cancel their premium channels prior to the end of the three-month promotional period, the premium channels would continue, and customers would be charged the then-prevailing rates.  Tr. 238:16-22 (Bentley).  This structure is referred to as a "negative option."

71.     The premium channel negative option was a "standard offering across cable, Dish Network, and Telco's," Tr. 389:14-17 (Bentley), and the "roll to pay" component was required by the premium channel providers in exchange for a waiver of the fees to DIRECTV for providing such programming.  Tr. 389:18-390:4 (Bentley) (noting that, without a waiver (which required roll-to-pay), DIRECTV could not offer the premium channels for three free months due to the prohibitive cost).

72.     The physical equipment available or required to provide in-home satellite television services (for example, a satellite dish, receiver, or DVR), whether such equipment was leased, and whether the cost of such equipment was passed onto consumers, varied significantly.  In certain circumstances, consumers also could upgrade from the base equipment required for certain packages, and in doing so, consumers may have to pay additional fees (like an Advanced Receiver Fee or "ARS") or commit to longer leases or contract lengths.  Tr. 410:10-411:6 (Poling-Hiraldo).  Examples of the varying equipment available over time include HD receivers, DVRs (and later DVRs that could record multiple shows or play recorded content in multiple rooms), and wireless

ACTIVE 224875332

receivers. Many advertisements also reference DIRECTV's advanced "Genie" receiver. *See*, *e.g.*, Exs. 209, 210, 212.

73. The cost to install DIRECTV service and of the related equipment early on in the existence of DIRECTV was incurred by consumers and ranged from $500-$700. Tr. 245:15:-246:2 (Bentley).

74. As DIRECTV attained economies of scale, in order to compete with the less expensive cable option at the point of entry, DIRECTV began to bear some or all of the installation and equipment in exchange for a minimum subscription length commitment. Initially, the minimum commitment length was 12 months, which was increased to 18 months in October 2007, Tr. 340:16-18 (Bentley); Ex. 617 at 2, and to 24-months in March 2009, Tr. 342:5-18 (Bentley); Ex. 617 at 3. At times, if the consumer paid for the receiver, there would be no commitment period. Tr. 242:5-16, 245:15-246:10 (Bentley). Also, when the minimum commitment period was less than 24 months for a standard receiver, the minimum commitment period could be longer if the consumer selected an advanced receiver. Tr. 242:5-16, 245:15-246:10 (Bentley). For example, in a 2008 ad (Exhibit 92) that the FTC displayed during its case in chief, there was an 18-month commitment with the standard receiver but a 24-month commitment with the advanced receiver. Tr. 242:5-16 (Bentley); Ex. 92.

75. The length of the minimum commitment period was based on an estimated break-even point for DIRECTV—i.e., the time when the amount DIRECTV collected from consumers roughly equaled the Subscriber Acquisition Cost ("SAC"), Tr. 344:4-15 (Bentley); 881:25-882:1 (Gieselman), which amount eventually reached $1,000.00 per customer, Tr. 381:9-11 (Bentley).

76. The concepts of introductory pricing in the first 12 months and a 24-month commitment were conceptually distinct and "completely unrelated." Tr. 344:4-15 (Bentley). DIRECTV was offering 12-month introductory pricing in 2007, as a customer incentive to switch to DIRECTV, long before it required a 24-month commitment. Ex. 617 at 2. It only extended its commitment period to 18 months and, ultimately, to 24 months (in the spring of 2009) as DIRECTV's free installation, added rooms, and advanced equipment costs significantly increased its "break even" point. Ex. 617 at 2-3; Tr. 340:11-15; 340:21-341:7; 342:19-344:19 (Bentley).

17

ACTIVE 224875332

77.     The average break-even point for customers for the last several years ranged between 28 and 30 months, meaning that the commitment period actually is shorter than the break-even point. Tr. 346:21-347:7 (Bentley).

78.     If a consumer canceled service before the end of the initial commitment period, that consumer would be charged a prorated "early cancellation fee" or "ECF" of, at most, $480, which was prorated by $20 for each month the consumer stayed on the platform.  Tr. 380:12-16 (Bentley).

79.     ECFs were implemented to defray a portion of the SAC and provide customers with the option of leaving the platform without having to pay the entirety of their commitment.  Tr. 381:9-14 (Bentley).

## VII.   THE CONSUMERS' JOURNEY TO SUBSCRIBE TO DIRECTV SERVICES INCLUDES NUMEROUS TOUCH POINTS FROM WHICH CONSUMERS CAN LEARN ABOUT ALL THE FEATURES OF THE SUBSCRIPTION, INCLUDING THE TERMS OF PURCHASE AT ISSUE

### A.   <u>DIRECTV Is A High Involvement Purchase; Consumers Spend Substantial Time On The Journey To Subscription</u>

80.     DIRECTV is a "considered purchase" such that consumers "go through anywhere between [a] 45- to 90-day process."  The complexities of purchase were due to the "sheer number of different tradeoffs and decisions that need to be made" regarding the packages, "advanced receiver, size of the hard drive, movies to save," number of rooms, and whether you need advanced receivers in each room.  Tr. 294:19-295:1, 308:16-309:4 (Bentley); 643:10-11 (Guyardo) (DIRECTV is a "high involvement" and "complex" purchase).

81.     Given the complex nature of the purchase process and the time and consideration involved, the purpose of DIRECTV's advertisements was to "create some interest and start a dialogue by motivating the consumers to pick up the phone and call DIRECTV or to go on the DIRECTV website," Tr. 266:4:16 (Bentley), which is colloquially known as the "call to action" in DIRECTV's advertising, Tr. 260:13-18 (Bentley).

82.     Consumers cannot subscribe (or purchase) DIRECTV having merely reviewed a DIRECTV television commercial, Internet banner, or print ad.  Instead, if they are in the Direct Sales channels, they must proceed through a lengthy and detailed subscription process, either on the phone

18

ACTIVE 224875332

with a DIRECTV representative or on the web. As described below, all of the relevant terms of purchase are repeatedly disclosed to consumers throughout their journey to subscription.

**B. The Terms of Purchase At Issue Are Repeatedly Communicated To Consumers In Advertising And In The Subscription Process**

**1. The Advertisements Include Disclosures Of The Terms Of Purchase.**

83. There is no evidence in this case that DIRECTV ever made a false statement or claim in any ad or that any DIRECTV ad is false by necessary implication. Neither did the FTC present any empirical evidence that consumers take away false net impressions from DIRECTV's television commercials, Internet banners, or print ads about the relevant terms of purchase. For these reasons, this case does not present a "deceptive door opener" scenario in which an advertiser entices a consumer to purchase based on a false initial advertisement.

84. Rather, the ads in evidence reveal that DIRECTV repeatedly disclosed the relevant terms of purchase in a variety of ways throughout the relevant time period. *See*, *e.g.*, Ex. 78 (a 2007 single, full page Alternative Media piece advertising a "12-month price guarantee" with "Everyday packages starting as low as $39.99"—before 24-month contracts were required—and no premium channel offer mentioned); Ex. 84 (a 2007 one-page Alternative Media with "Everyday packages starting as low as $29.99," which is the everyday, not promotional price; a promotion for three free months of premium channels ("Ask How!"); and no 24-month agreement required); Ex. 92/2009 (Two-page Alternative Media with $34.99 for 12 months and displaying Reg. $52.99/month right under promo price in red circle with "price reflected includes an $18 bill credit per month for 12 consecutive months after mail-in redemption" immediately underneath); Ex. 113 ($34.99 for 12 months with slashed out regular price of $55.99 and "Save $21 a month and lock in your price for one year!"); Ex. 124 (50% off for one year"); Ex. 172 (Solo Mail letter disclosing: promotional price is "FOR 12 MONTHS" with "2-yr agreement" under each price; specific "1st year" and "2nd year" savings in second paragraph and under package prices thereafter; value of free premium channels; and regular package prices, negative option, and cancellation fee in legal boxes); Ex. 2014 (advertising the Family package, which is not a promotional price); Ex. 175 at p. 336 (on front cover: $29.99 FOR 12 MONTHS, on back cover: "$29.99 FOR 12 MONTHS after rebate"; "24-

19

ACTIVE 224875332

month DIRECTV agreement"; "Save $35/mo. in 1st year!"; and "$20/mo. in 2nd year!"); Ex. 203 (example of bundled offer "$66.94/month for 12 months After instate rebate, bill credits, 24-month DIRECTV agreement** and 1-year AT&T term.^"; at bottom of package: "Lock in Your Savings for 2 Years! SAVE $25/mo. in 1st year AND $10/mo. in 2nd year"; at bottom of page: "All offers require 24-month DIRECTV agreement** and 1-year AT&T term.^");  Ex. 209 (disclosing that promotional prices are "FOR 12 MONTHS" 12 times on front and back covers; 24-month agreement multiple times, proximate to packages and call to action; specific "1st year" and "2nd year" savings below packages on back; value of free premiums on inside; and regular package prices, negative option, and cancellation fee in legal box); Ex. 212 (disclosing that promotional prices are "FOR 12 MONTHS" on front and back in bubbles; specific "1st year" and "2nd year" savings below front bubble and packages on back; 24-month agreement multiple times on front and back, proximate to packages and call to action; value of free premium channels on inside; and regular package prices, negative option, and cancellation fee in legal box); Ex. 281/2022A (Val-pak slip disclosing promotional price is "FOR 12 MONTHS" with "24-mo. agreement" in red bubble; 24-month agreement and value of free premium channels on back; and regular package prices, negative option, and cancellation fee in legal boxes); Ex. 2707 (Sunday Circular disclosing promotional price is "FOR 12 MONTHS" with "2-year agreement" under prices; specific "1st year" and "2nd year" savings in large font on left inside page and, in red, on back cover; and regular package prices, negative option, and cancellation fee in legal box).

85.    In situations where the exact details of each and every term of an offer are not highlighted in a given ad, the ad would prompt consumers to call or go online where they could explore all the terms relevant to offers of interest. *See* Tr. 641:15-642:21 (Guyardo); *see also, e.g.*, Ex. 139 (advertising "PACKAGES START AT $29.99/mo. Everyday Low Price" and value of DIRECTV service without promoting any specific package or the premium channels, and prompting consumers to call or go online).

86.    It was not DIRECTV's intent, nor was it practical, to disclose all permutations of each and every term of purchase in each and every ad (such as the cost of each additional receiver or the cost of every various package). However, the terms at issue in this case are disclosed to

consumers in the advertising and then repeated in the sign-up processes on the web and in phone sales calls. *See* Tr. 641:15-642:21 (Guyardo).

### 2. The Terms Of Purchase Are Provided And Explained During The Call To Customers Who Subscribe Over The Phone

87.     All calls to 1-800-DIRECTV and its thousands of unique TFNs are handled by customer service representatives.  The customer service representatives use a computerized program called the Sales CRM during calls with consumers, which provides scripts regarding DIRECTV's service, information regarding the available packages and options, and guides the customer service representative through the call.  Tr. 661:20-662:19 (Guyardo); Tr. 1064:21-1065:3 (Patel); Ex. 544. In addition, using DIRECTV's unique TFNs, the customer service representative could cater the call and information disclosed on the exact tactic that prompted the call.  Tr. 304:18-305:13 (Bentley).

88.     On the phone, a customer service representative would "walk the customer through all the details through the flow and then repeat it in what we call the required call components, which is about a two-minute verbatim read of all the additional terms, that are very consistent with what is in the [advertisements]" and "validate[] all the moving pieces of the offer."  Tr. 266:10-16, 371:2-10 (Bentley).  The Required Call Components ("RCCs") were provided verbatim in the Sales CRM, which prompted the customer sales representative to recite them to the consumer.  Ex. 544. To ensure that the RCCs are provided sufficiently and accurately, DIRECTV has "pretty tight auditing processes," Tr. 273:11-25 (Bentley), that it utilizes to monitor the over 1 million calls it receives every month, Tr. 268:6-7 (Bentley).

89.     Given the number of options and the amount of information to be conveyed, calls with customer service representatives averaged 30-45 minutes.  Tr. 388:24-389:7 (Bentley).

### 3. The Terms Of Purchase Are Disclosed Several Times In The Subscription Web Flow

90.     To complete a purchase online, the consumer must proceed through a landing page, programming package selection page, receiver selection page, a shopping cart page, a checkout page, and an order confirmation page, among other pages (the subscription "web flow"), and may review additional information in hyperlinks, info hovers, and tool tips to learn more about

21

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

DIRECTV and its services. *See*, *e.g.*, Ex. 1081. An "info hover" is a method DIRECTV used to disclose additional information on the same webpage when the consumer hovered her mouse over a prompt or icon signaling there was additional information (e.g., a blue question mark). Tr. 515:21-24 (Poling-Hiraldo). A "tooltip" is a method DIRECTV used to disclose additional information on the same webpage when the consumer clicked on a prompt or icon signaling there was additional information (e.g., a blue "i" enclosed in a circle). Tr. 515:24-25, 516:7-11 (Poling-Hiraldo).

91.     On the web, the average time a consumer takes to complete DIRECTV's web flow when making an online purchase of DIRECTV is about 45 minutes. Tr. 792:18-21 (Chen); *accord* Tr. 1442:12-15 (Leever) ("I recall it being anywhere from 35 to 45 minutes. It was a lengthy kind of session of them.").

92.     During the relevant period, in order to improve the "experience for the consumer" and "make it easier for the consumer to understand what they were buying" on its website, DIRECTV had "constant iteration" over time, as web technology and "[]new ways of presenting information" evolved in the industry, as "the product continued to evolve" (e.g. new receivers and technology), and as DIRECTV's offers changed. Tr. 1446:25-1447:9, 1487:13-22 (Leever).

93.     DIRECTV's web flow underwent two major redesigns during the relevant time period. The design that existed until late 2009 was referred to as the "Wizard Flow." In late 2009, a design referred to as the "Old Flow" replaced the Wizard Flow, and the "New Flow" completely replaced the Old Flow in 2014. Tr. 683:17-684:4 (Poling-Hiraldo); 1448:12-20 (Leever). The New Flow was publically split-tested with the Old Flow from January to July of 2014. During that period, some percent of consumers were directed to the Old Flow and some percent of consumers were directed to the New Flow. Tr. 1493:7-1494:2 (Leever). After more than a year of development, the New Flow took over 100% of prospect traffic in July 2014. Tr. 1486:21-1487:5 (Leever); Demonstrative 1.

94.     The Wizard Flow, Old Flow, and New Flow differ significantly with respect to, among other things: the design and layout of information (e.g., whether the packages were presented vertically or horizontally); the number and placement of hyperlinks, tool tips, or info hovers that DIRECTV used to disclose additional information about its offers and product; and the icons and

prompts signaling those hyperlinks, tool tips, or info hovers. *Compare, e.g.*, Ex. 1000 (9/4/09 Wizard Flow), *with* Ex. 2033 (8/13 Old Flow), *with* Ex. 1065 (9/17/15 New Flow); *see also* Tr. 1448:22-1451:21 (Leever). DIRECTV's web flow designs also differed with respect to the flow of webpages. For example, in the New Flow, between the package selection step and the receiver selection step, the consumer was directed to a "Choose add-on packages" step that was not in the Old Flow. At the top of this step, DIRECTV provided additional information and disclosures regarding the free premium channels offer. *See, e.g.*, Ex. 1065 at 10:58-11:14 (9/17/15 capture).



95. In addition to these major redesigns of the complete web flow, DIRECTV also made iterative design and layout changes to individual pages and features as it continuously updated the website throughout the relevant period. For example, in the New Flow, the layout of the package selection step underwent multiple design iterations as DIRECTV evolved and improved the display of information. *Compare, e.g.*, Ex. 1033 at 6-8 (10/30/14 capture), *with* Ex. 1046 at 5 (5/19/15 capture). Likewise, the layout of the Cart page in the New Flow underwent multiple design iterations, including the relocation of a link displaying the costs over 24 months from the bottom to the top of the cart, and the layout of that view. *Compare, e.g.*, Ex. 1033 at 131-33, 149 (10/30/14 capture), *with* Ex. 1046 at 192-93, 205 (5/19/15 capture), *with* Ex. 1072 at 23:28-23:36, 25:01-25:12 (11/25/15 capture); *see also* Tr. at 707:19-709:3 (Poling-Hiraldo) ("View Monthly Cost" link

"moved several times").  DIRECTV changed the icons signaling tooltips from a gray arrow icon to a blue "i" enclosed in a circle.  Tr. 1492:3-14, 1496:1-3, 1505:15-20 (Leever); *compare*, *e.g.*, Ex. 1033 at 141 (10/30/14 capture), *with* Ex. 1046 at 196 (5/19/15 capture).  In October 2014, DIRECTV added the ability for the consumer to opt out of the free three month premium channels offer across all packages online.  The consumer could do so by clicking a blue "Remove" button next to the free premium channels offer at (a) the "Add-on packages" step or (b) in the Cart.  Tr. 1455:4-12, 1462:10-13, 1498:17-24 (Leever); Ex. 1033 at 77, 92 (10/30/2014 capture).

96.     The FTC entered into evidence three materially incomplete videos showing only portions of the Wizard Flow from June and September 2009, which, among other things, fail to open numerous links containing disclosures, do not navigate to all webpages in the flow, do not scroll completely to the bottom of webpages, and do not complete the checkout process.  Tr. 208:7-11, 211:5-212:17, 214:15-21 (Hartsock); Exs. 998-1000.  The Washington state investigator that captured them, Rebecca Hartsock, admitted that the videos do "not [reflect] a typical consumer['s]" journey through the website, Tr. 211:20-25 (Hartsock); that she "d[id]n't know how another person would do it", Tr. 215:3-7 (Hartsock); that she was "not offering any view about how any other person understood any of the disclosures on the acquisition flow", Tr. 215:12-15 (Hartsock); and that she was "offering no opinion whatsoever about whether the website in 2009 … was in any way deceptive", Tr. 215:16-19 (Hartsock).

97.     The FTC offered no evidence of a reasonable consumer's net impression of DIRECTV's terms of purchase from any iteration of the Wizard Flow and no evidence that any consumer was deceived by it.

98.     The FTC entered into evidence a number of videos and screenshots of various iterations of the Old and New Flow, captured between February 2014 and March 2016, through its investigator, David Gonzalez, but he admitted that he "didn't investigate whether it was difficult in any way for reasonable consumers to find" disclosures on the website, Tr. 166:23-167:1 (Gonzalez), and that he was "not offering any testimony that it was difficult for consumers to understand" or "read the disclosures that were on the website", Tr. 167:2-14 (Gonzalez).

24

ACTIVE 224875332

99.    The FTC entered into evidence a number of videos of the New Flow, captured between August 2015 and April 2016, through its investigator, Ann Stahl, but she admitted that the videos "do not capture the entirety of the information that is contained or available to consumers on the website", Tr. 82:7-14 (Stahl); that she was offering no opinion as to whether the videos replicate a reasonable consumer's journey through the flow, Tr. 81:9-17 (Stahl); that she "do[es] not have a basis on which to comment on what other consumers might experience" or understand, Tr. 82:1-6, 86:16-19 (Stahl); and that she was not offering any view about how frequently consumers click on icons or hyperlinks containing disclosures or whether the website was deceptive, Tr. 86:20-87:6, 88:3-6, 91:6-11 (Stahl).  The FTC did not offer captures of the website for much of the period at issue.

100.    The FTC introduced no evidence of a reasonable consumer's net impression of DIRECTV's terms of purchase from any iteration of the Old or New Flow, nor did it offer any evidence that consumers were deceived by any web flow.

101.    The evidence shows that DIRECTV repeatedly disclosed each of the terms of purchase throughout the web flows, and continually made improvements over time.

102.    In the Old Flow:

    a.    On the landing page, proximate to the introductory discounted price, DIRECTV disclosed that the discounted price was for 12 months and required a 24-month agreement, *see*, *e.g.*, Ex. 2033 at 1; Tr. 510:7-10 (Poling-Hiraldo); *see also*, *e.g.*, Ex. 1021 at 1 ("for 12 months with 24-mo agreement" in red price circle);

    b.    On the landing page, DIRECTV disclosed in a blue "Offer Details" info hover, proximate to the orange "View All Packages" button that the consumer would click to proceed to the package selection page, that all offers require a 24-month agreement, the amount of the discount for the first 12 months, and the $20/month early cancellation fee, *see*, *e.g.*, Ex. 2033 at 3; Tr. 510:14-511:16 (Poling-Hiraldo);

ACTIVE 224875332



ALL DIRECTV OFFERS REQUIRE 24-MONTH AGREEMENT.** Prices exclude premiums and additional and advanced receiver fees. Price(s) include the following instant bill credits for 12 months: $30 for ENTERTAINMENT Package ($35 for CHOICE Package, $36 for XTRA Package, $36 for ULTIMATE Package and above).
Offers end 10/2/13. New customers only on approved credit; credit card required (except in MA & PA). If you fail to maintain your programming agreement, you agree that DIRECTV may charge you a prorated fee of up to $480 ($20 per month remaining).
If you cease to be our customer you must contact DIRECTV within 7 days to arrange for an equipment return kit.
If we haven't received your equipment within 21 days or if the returned equipment is in damaged condition an Equipment Non-Return fee will apply. Applicable use tax adjustment may apply on the retail value of the installation.
Programming, pricing and offers are subject to change and may vary in certain markets.

Offer Details

       c.      On the package selection page, proximate to the introductory discounted price,

DIRECTV disclosed that the discounted price was for 12 months with a 24-month agreement, and

the regular ("Reg.") package price, *see*, *e.g.*, Ex. 2033 at 5;

**ENTERTAINMENT**

140+ digital channels

$29.99/mo · ONLY $24.99/MO FOR 12 MONTHS

FOR 12 MONTHS AFTER INSTANT
SAVINGS WITH 24-MO. AGREEMENT

**Select**

**INCLUDES**
**Value-packed package**
Includes all the top entertainment
and news channels.
(Reg. $54.99/mo)

       d.      On the bottom of each of the package selection page, receiver selection page,

and cart page, DIRECTV disclosed that all offers require a 24-Month Agreement, proximate to a

blue "Additional Offer Details" hyperlink, *see*, *e.g.*, Ex. 2033 at 8, 49, 93; Tr. 511:17-512:11

(Poling-Hiraldo);

ALL OFFERS REQUIRE 24-MONTH AGREEMENT. Offers end 10/2/13 and are based on approved credit; credit card required, except in MA & PA. New customers only (lease required). Applicable use tax adjustment may apply to the retail value of the installation. Programming, pricing and offers are subject to change and may vary in certain markets. Customers activating the CHOICE Package or above or the MAS ULTRA Package will be automatically enrolled in the 2013 season of NFL SUNDAY TICKET at no additional cost and will receive a free upgrade to NFL SUNDAY TICKET MAX for the 2013 season.
Additional Offer Details

       e.      From that blue Additional Offer Details link on the package selection page,

receiver selection page, and cart page, DIRECTV disclosed in a light box (i.e., a textbox overlay that

26

appeared on the same page and dimmed the background, Tr. 84:10-14 (Stahl); 451:10-15 (Mandel))

all the offer details, including: that the customer had to call to change or cancel the premium

channels after three free months or be charged the then-prevailing rate; the regular cost of the

premium channels for three months; the regular package prices; the 24-month agreement; and the

$20/month early cancellation fee, *see*, *e.g.*, Ex. 2033 at 24-25; Tr. 512:12-513:25 (Poling-Hiraldo);

**Additional Information**

*BILL CREDIT/PROGRAMMING OFFER: IF BY THE END OF PROMOTIONAL PRICE PERIOD(S) CUSTOMER DOES NOT
CONTACT DIRECTV TO CHANGE SERVICE THEN ALL SERVICES WILL AUTOMATICALLY CONTINUE AT THE THEN-
PREVAILING RATES. Free HBO, STARZ, SHOWTIME and Cinemax for three months, a value of $141. LIMIT ONE
PROGRAMMING OFFER PER ACCOUNT. Featured package/service names and current prices: ENTERTAINMENT
$54.99/mo.; CHOICE $64.99/mo.; XTRA $70.99/mo. ULTIMATE $77.99/mo., PREMIER $124.99/mo. Advanced Receiver

**24-MONTH AGREEMENT: EARLY CANCELLATION WILL RESULT IN A FEE OF $20/MONTH FOR EACH REMAINING
MONTH. Must maintain 24 consecutive months of any DIRECTV base programming package ($29.99/mo. or above) or any

      f.    At the top of the cart page, DIRECTV disclosed the regular package price in

black, and the first year discount immediately underneath it, in green, as a bill credit clearly labeled

for "Months 1-12," *see*, e.*g.*, Ex. 2033 at 50;

      g.    On the cart page, immediately next to the package, DIRECTV disclosed the

24-month agreement in a tool tip signaled by a blue "What is my agreement?" prompt, *see*, *e.g.*, Ex.

2033 at 50; Tr. 514:23-515:12, 516:15-21 (Poling-Hiraldo);



      h.    At the top of the Cart, proximate to the "Package & Programming" header,

DIRECTV provided a "View Monthly Cost" tab that opened a detailed chart showing all costs for

each of the 24 months in six month blocks, including that the regular price of the premium channels

would be billed starting in month four, and that the regular package price would be billed starting in

month 13, *see*, *e.g.*, 2033 at 78-79; Tr. 514:1-22, 518:17-519:4 (Poling-Hiraldo);

i. In the Cart, under a "Premium Channels" header, DIRECTV disclosed the regular price of the premium channels in black, and immediately underneath them, in green, a bill credit clearly labeled: "Free for 3 months: HBO, SHOWTIME, STARZ, and Cinemax", *see*, *e.g.*, Ex. 2033 at 59;

j. In the Cart, DIRECTV disclosed, in an info hover immediately next to the premium channels bill credit, that the customer must call to cancel the premium channels after three free months or be charged the then-prevailing rate, *see*, *e.g.*, Ex. 2033 at 59; Tr. 517:10-20 (Poling-Hiraldo).



k. On the final checkout pages, DIRECTV disclosed in a Terms & Conditions light box that opened from a blue hyperlink labeled, "By clicking 'Submit Order' I agree to these Terms & Conditions", placed immediately next to the orange "I Accept. Submit My Order" button, the 24-month agreement and the $20/month early cancellation fee, *see*, *e.g.* Ex. 1021 at 124-25; Tr. 519:5-15 (Poling-Hiraldo);

103. In the Old Flow, before the consumer could place an order and transmit financial information to DIRECTV, the consumer was required to affirmatively click the orange button affirming: "I Accept. Submit My Order."

104. There is no reliable evidence that reasonable consumers did not see or understand these repeated disclosures in any iteration of the Old Flow, including with respect to the negative option feature of the free premium channel offer. To the contrary, the credible evidence proved that

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

reasonable consumers would likely notice and understand the terms of DIRECTV's offer on the Old Flow.

105. Specifically, DIRECTV's standard and consistent use of icons and hyperlinks to disclose additional information on the same webpage (a so-called "pattern library"), and its consistent use of the color green to mark the amount and duration of discounts off the regular prices in the Cart, allowed DIRECTV to reduce clutter and gave "the consumer [] a clear pattern of navigating through content." Tr. 681:11-682:1 (Poling-Hiraldo); 1444:20-1446:10, 1476:23-1480:20 (Leever); *see also* Tr. 1479:14-20 (Leever) ("When you look at how many information icons are there, it's a very obvious and very clear method of telling consumers where there's more information. It's a pattern that we established."); Tr. 681:11-682:10 (Poling-Hiraldo); 1517:4-17 (Leever) ("The question was what happens if you just put all of the information on the page, and I testified that it would be very confusing to a consumer.").

106. DIRECTV placed the disclosures, including in tool tips, info hovers, and hyperlinks, such that a reasonable consumer was likely to see them. Tr. 1523:20-1524:4 (Leever). Indeed, consumers in usability studies commissioned by DIRECTV on a prototype of the Old Flow commented "that they found the tool tips very helpful, they noticed them, and they appreciated the way that [DIRECTV was] presenting the information," Tr. 1469:14-1470:13 (Leever); Ex. 770 at 27, and that they generally understood the premium channel negative option. Tr. 680:10-681:8, 682:11-683:7 (Poling-Hiraldo). Furthermore, DIRECTV data shows that customers who subscribed online were "tech savvy" and "were informed and educated, and they stayed on the service [the] longest." Tr. 1443:12-22 (Leever). Although it would have been technically possible for a consumer to navigate her way through the web flow without seeing information disclosed in info hovers, tool tips, and hyperlinks, a consumer would have needed to have "the intent … to navigate around and not roll over any icon or roll over any additional information[.]" Tr. 1482:22-1483:3 (Leever).

107. Additionally, DIRECTV provided a "Need Help" chat button that was "always available" and "followed you up and down each webpage," Tr. 693:12-694:1 (Poling-Hiraldo). Consumers could and did use this chat function to obtain clarification if they had any questions

29

ACTIVE 224875332

regarding any of the terms of purchase, including the regular package price or the negative option feature of the free premium offer. Tr. 689:8-691:2 (Poling-Hiraldo).

108.     There is no evidence that DIRECTV failed to obtain express informed consent to the negative option feature of the free premium channel offer before DIRECTV charged the consumer in the fourth month of their subscription. To the contrary, consumers were repeatedly informed about the terms of the premium channel roll-to-pay offer on the web flows in a manner that a reasonable consumer was likely to notice and understand. Before the consumer affirmatively clicked the orange "I Accept.  Submit My Order." button, the web flow repeatedly disclosed, including on the cart page, that the premium channels were included with some packages, were free for three months, and that the consumer would be charged the then-prevailing regular price in month four unless the consumer called to cancel.  FoF, *supra*, ¶¶ 102(e, h-k), 103-107.

109.     Additionally, after placing an order, the consumer was directed to an order confirmation page that again disclosed the regular price of the package and premium channels, the duration and amount of the promotional bill credits for each item shown in the Cart, and the links to, among other things, an FAQ page. *See*, *e.g.*, Ex. 2033 at 121-24. All of this took place before a consumer's credit card was charged in the fourth month for premium channels.

110.     Further, in the New Flow, the following disclosures were made:

         a.     On the landing page, proximate to the introductory discounted price, DIRECTV disclosed that the discounted price was for 12 months and required a 24-month agreement, *see*, *e.g.*, Ex. 1080 at 1 (3/11/16 capture); *see also* Tr. 529:3-530:7 (Poling-Hiraldo); Ex. 2034 at 3 (8/2015 capture);

         b.     On the landing page, DIRECTV disclosed in a blue "Offer Details" info hover, proximate to the orange "View All Packages" button, that all offers require a 24-month agreement and the $20/month early cancellation fee, *see*, *e.g.*, Ex. 1080 at 8; *see also* Tr. 530:11-531:4 (Poling-Hiraldo); Ex. 2034 at 3;

ACTIVE 224875332

1    c.    On the package selection page, proximate to the introductory discounted price,

2  DIRECTV disclosed that the discounted price was for 12 months with a 24-month agreement, and

3  the regular ("Reg.") package price, *e.g.*, Ex. 1080 at 18;



11    d.    On the package selection page, in a tooltip located proximate to the free

12  premium channel offer for each package, DIRECTV disclosed that the customer had to call to cancel

13  the premium channels after three free months or be charged the then-prevailing rate, *see*, *e.g.*, Ex.

14  1080 at 25;



24    e.    On the package selection page, in the blue "Learn More" link for each

25  package, DIRECTV again disclosed that the discounted price was for 12 months with a 24-month

26  agreement, the regular package price, and, in a tooltip located proximate to the free premium channel

27

28

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

offer feature, DIRECTV disclosed that the customer had to call to cancel after three free months or be charged the then-prevailing rate, *see*, *e.g.*, Ex. 1080 at 32;

      f.    On the package selection page, in the channel lineup link, DIRECTV disclosed, in tool tips proximate to each and every premium channel, that the customer had to call to cancel after three free months or be charged the then-prevailing rate, *see*, *e.g.*, Ex. 1080 at 37-40;



      g.    At the bottom of the package selection page and each step of the web flow thereafter, DIRECTV disclosed that all offers require a 24-month agreement, proximate to blue "Additional Offer Details" and "Terms & Conditions" links, *see*, *e.g.*, Ex. 1080 at 24;

ALL DIRECTV OFFERS REQUIRE 24-MONTH AGREEMENT. ADD'L FEES APPLY. All offers valid through 4/13/16. New residential DIRECTV customers only (equipment lease req'd). Credit approval req'd. Credit card req'd (except MA & PA). Pro-rated ETF fee (up to $480) and Equipment Non-Return fees apply. Programming, pricing and offers are subject to change and may vary in certain markets. Some offers may not be available through all channels and in select areas. Customers activating the CHOICE™ Package or above or the MAS ULTRA™ Package or above will be automatically enrolled in the 2016 season of NFL SUNDAY TICKET at no additional cost and will receive a free upgrade to NFL SUNDAY TICKET MAX for the 2016 season.

©2016 DIRECTV, LLC.  |  Additional Offer Details  Privacy policy  Terms & conditions

      h.    On the package selection page and each step in the flow thereafter, DIRECTV disclosed in a light box that opened from the blue Additional Offer Details link in the footer (and from additional blue "Additional Details" links at the bottom of the landing page and Cart page), the offer details, including: that the customer had to call to cancel the premium channels after three free months or be charged the then-prevailing rate, the regular price of the premium channels for three

32

ACTIVE 224875332

months, and the regular package prices, *compare*, *e.g.*, Ex. 1080 at 7, 10-11, *with* Ex. 2034 at 67-68

(also disclosing the 24-month agreement and early cancellation fee);

        i.      On the package selection page and each step in the flow thereafter, DIRECTV

disclosed in a light box that opened from the blue Terms & Conditions link (which, discussed *infra*,

was also provided on the final checkout page immediately above the orange "Place My Order"

button and next to a mandatory checkbox stating "I agree to the Terms and Conditions"), the 24-

month agreement, the $20/month early cancellation fee, and that the customer had to call to cancel

the premium channels after three free months or be charged the then-prevailing rate, *see*, *e.g.,* Ex.

1080 at 46-47;

        j.      At the "Add-on packages" step, which the consumer was directed to after

selecting a package, DIRECTV disclosed the regular price of the premium channels next to the

words "FREE for 3 months," and in a tooltip proximate to the offer, that the customer had to call to

cancel after three free months or be charged the then-prevailing rate, *see*, *e.g.,* Ex. 1080 at 56; *see*

*also* Tr. 531:5-14, 532:23-533:4 (Poling-Hiraldo); 1431:6-10 (Leever); Ex. 2034 at 31;



        k.      At the top of the cart page, DIRECTV disclosed the regular package price in

black font and the first year discount immediately underneath it, in green, as a bill credit clearly

labeled for "Months 1-12," *see*, *e.g.*, Ex. 1080 at 91; Tr. 1501:4-13 (Leever) ("It was clear in the

green language that [the discount] was months 1 through 12.");

        l.      In the Cart, immediately proximate to the package, DIRECTV disclosed the

24-month agreement in a blue "What is my agreement" or "See Commitment Agreement" tool tip,

*compare*, *e.g.*, Ex. 1046 at 194 (5/19/15 capture), *with* Ex. 1080 at 97 (3/11/16 capture);

33

ACTIVE 224875332

m. In the Cart, next to the premium channels, DIRECTV disclosed the regular price in black font and immediately underneath that, in green, a bill credit clearly labeled: "Free for 3 months: HBO, SHOWTIME, STARZ, and Cinemax", *see, e.g., id.*;

n. In the Cart, DIRECTV disclosed, in a tooltip immediately next to the premium channels bill credit, that the customer must call to cancel the premium channels after three free months or be charged the then-prevailing rate, *see, e.g.,* Ex. 1080 at 96; *see also* Tr. 1432:9-18 (Leever) ("So they would have seen HBO, SHOWTIME, STARZ 59.96, and then a minus 59.96. And then they would have read on the left side, free for three months, so they would have known that 59.96 was free for three months. And then when they clicked on the i, they would have gotten the additional information that they would have to call to cancel.")

o. At the bottom of the cart page, proximate to an orange "Continue to Checkout" button, DIRECTV disclosed that all offers require a 24-month agreement and another Additional Offer Details blue link; *see, e.g.,* Ex. 1080 at 93; *see also* Tr. 533:5-24 (Poling-Hiraldo); Ex. 2034 at 49;

p. In the Cart, proximate to the 1st month total cost, DIRECTV provided a "View Monthly Cost" blue link, that showed all costs for each of the 24-months of the agreement, including that the regular price of the premium channels would be billed starting in month four, and that the regular package price would be billed starting in month 13, *see, e.g.,* Ex. 1046 at 192, 210-217 (5/19/15 capture);

q. In later iterations of the Cart, the 24-month billing link was relocated to the top of the cart and redesigned to "show you months 4 to 12 all in one column or months 13 to 24 all in one column" "so the consumer could easily see the changes" in price as the promotions rolled to pay, Tr. 1506:2-1507:1 (Leever), and DIRECTV again disclosed, in a blue "What Changed?" tooltip at the top of the column for months 4-12, that the customer must call to cancel the premium channels after three free months or be charged the then-prevailing rate; *see, e.g.,* Ex. 1080 at 91, 98-101;

| 📅 Estimated Monthly Bill | MONTHS 1-3 | MONTHS 4-12 | MONTHS 13-24 |
|---|---|---|---|
| | **$68.92** | **$122.91** | **$169.91** |
| | | What changed? | What changed? |

Base Package

XTRA    See Commitment Agreement
Regional Sports Fee ⓘ

HBO®, SHOWTIME®, Cinemax®, and STARZ® are no longer free after 3 months. Starting in month 4, you will be billed $50.99/mo. unless you call to cancel.

111.    There is no evidence that reasonable consumers did not see or understand these repeated disclosures in any iteration of the New Flow, including with respect to the negative option feature of the free premium channel offer.  There is no evidence that consumers were deceived in any way by the New Flow. The FTC did not test any aspect of the New Flow or otherwise introduce evidence that reasonable consumers would be unlikely to see and understand the terms of DIRECTV's offer—including the premium channel offer. To the contrary, the credible evidence proved that reasonable consumers would likely notice and understand the terms of DIRECTV's offer on the New Flow.

112.    Participants in usability studies commissioned by DIRECTV on a prototype of the New Flow noted that consumers understood clicking on the tooltips would provide them with additional information, and this was "very consistent" with other information DIRECTV had acquired over the years with respect to its tool tips and info hovers.  Tr. 1492:7-24 (Leever); *see also* Tr. 1433:17-1434:10 (Leever) ("It's a sequential flow that the customer goes through as they customize it, and at each of those points [] information was commonly shown with a standard i for more information.")

113.    The placement of the Additional Offer Details and Terms and Conditions links in the footer of each page also comports with standard web navigation practices and is common.  Tr. 1411:10-13 (Leever) ("There is always an offer detail link in the footer."); Tr. 1415:20-1416:16 (Leever) (explaining "that this is one instance of many instances in the flow where we gave disclaimer information clear[ly] and conspicuous[ly]" and "this is a standard navigation best of

35

ACTIVE 224875332

practice throughout many websites where it is very common for this type of information to be included in the footer of a website");

114.    At the final checkout step of the New Flow, before the consumer could place an order and transmit financial information to DIRECTV, the consumer was required affirmatively to check a box next to the words: "I agree to the Terms and Conditions", which was located immediately above the orange "Place My Order" button. The words "Terms and Conditions" were clearly marked in blue to signal that it was a hyperlink. When clicked, it opened the Terms and Conditions light box disclosing again the 24-month agreement, the $20/month early cancellation fee, and terms of the premium channel negative option offer. If the consumer clicked the Place My Order button without checking the box, a red error message appeared stating: "You must agree to the Terms & Conditions before continuing." *See*, *e.g*,. Ex. 1065 at 30:08-30:42 (9/17/15 video capture); Tr. 1502:13-1503:18 (Leever).



115.    There is no evidence that DIRECTV failed to obtain express informed consent to the negative option feature of the free premium channel offer before DIRECTV charged the consumer in the fourth month of their subscription. To the contrary, consumers were repeatedly informed about the terms of the premium channel roll-to-pay offer on the web flow in a manner that a reasonable consumer was likely to notice and understand. The Terms and Conditions and web flow repeatedly disclosed that the consumer would be charged the regular price in month four unless she called to cancel and, after October 2014, the consumer additionally had the option to remove the free premium channel offer multiple times in the flow. *See* Tr. 1437:2-24 (Leever) ("It's clear and

ACTIVE 224875332

conspicuous. If I don't check the box, I then get a red warning that says that you have to confirm that you agree to the terms and conditions. And that is standard in many, many services . . . .").
FoF, *supra*, ¶¶ 110(d-f, h-j, m-q), 111-114.

116. Additionally, after placing an order, the consumer was directed to an order confirmation page that again disclosed the regular price of the package and premium channels, the duration and amount of the promotional bill credits for each item shown in the Cart, and the links to numerous informational pages. *See*, *e.g.*, Ex. 2604 at 116-117.

### C. After Subscribing On The Phone Or Web, Customers Receive Confirming Communications And Agreements

117. After a prospective customer signed up for DIRECTV's services by phone or on the web, a DIRECTV customer received either a confirmation letter or email, which "gives all the conditions of the offer, what [the consumer] would be paying, as well as their installation date and time . . . ." Tr. 371:2-24 (Bentley); Ex. 2573. The confirmation email separately stated the 24-month agreement and early cancellation fee terms, Tr. 376:20-377:13 (Bentley), and it also included links to the customer agreement and equipment lease agreement, which the consumer could review prior to installation and contained additional disclosures. *See, e.g.,* Ex. 2573. Upon receiving the confirmation e-mail, if the customer did not agree to the 24-month commitment, an early cancellation fee, or any other term or condition, a 1-800 number was provided and the customer could cancel their order immediately. Tr. 377:23-378:5 (Bentley).

118. At installation, the consumer would receive a welcome packet that included the Customer Agreement and a one-page Equipment Lease Agreement. Tr. 378:17-379:15 (Bentley); Exs. 2388; 2389. The 24-month commitment and pro-rated, early cancellation fee of $20/month were prominently disclosed in the Equipment Lease Agreement that a customer had to sign in order to activate. Tr. 379:16-380:16 (Bentley). The consumer was not obligated to the minimum commitment or subject to an ECF until, at the earliest, they activated their equipment and DIRECTV service at the time of installation. Tr. 371:2-372:22 (Bentley).

119. Finally, if a customer, after receiving their first month's bill, disputed the amount being charged, DIRECTV would review the recorded sales call and release the customer from any

37

ACTIVE 224875332

contractual obligations (without penalty) if the terms had not been properly disclosed.  Tr. 1066:22-1067:8 (Patel).

## VIII.  RETENTION OF ITS CUSTOMERS HAS BEEN THE "LIFEBLOOD" OF DIRECTV'S BUSINESS

### A.  DIRECTV's Profits Depend On Ensuring That Consumers Stay On The Platform As Long As Possible.

120.    DIRECTV's subscriber acquisition cost ("SAC") over the relevant time period approached $1,000.00 per subscriber.  Tr. 330:3-6 (Bentley); 881:25-882:2 (Gieselman).  SAC includes three general components: (1) advertising costs; (2) installation costs; and (3) hardware costs (e.g., the satellite dish and receivers).  Tr. 881:19-24 (Gieselman).

121.    In light of this significant up-front investment, DIRECTV does not break-even until, on average, customers remain on the platform for 28-30 months.  Tr. 346:21-347:7 (Bentley).

122.    Consequently, DIRECTV's business model depends on keeping customers satisfied and ensuring that they remain customers for a very long period of time.  Tr. 330:12-13 (Bentley) ("at the end of the day, retention is the single most important driver of what makes this business successful"); Tr. 655:4-10 (Guyardo) (keeping "highly satisfied" customers on the platform for a "very, very long time" is the only way to "drive . . . revenue and profit growth"); Tr. 894:12 (entering into the record deposition of S. Hause at 137:02-03 ("retention and keeping customers on the platform is our life blood")) (Tr. Vol. 5).

123.    Because DIRECTV's business model relies on customer retention, DIRECTV has every incentive to ensure that customers are informed about the terms of their DIRECTV subscription from the beginning.  If customers are unhappy or feel they have been misled, during the sign-up, onboarding, or activation processes, it would be reflected in the rates at which prospective customers complete the subscription process ("close rates") and activate their subscription ("activation rates") and the rate at which customers leave the platform ("churn").  Tr. 404:18-405:3 (Bentley); 1047:3-1048:23 (Patel).  DIRECTV has continually made customer retention one of its main business objectives.  Over time, this initiative has included developing and implementing policies and plans to "improve the setting of customer expectations at point of sale[,] right fitting

38

ACTIVE 224875332

1  programming/hardware, and clearly explaining costs, terms, and conditions." Tr. 654:18-23

2  (Guyardo); Ex. 19 at 5-6.

3      124.    The average length of customer tenure on the DIRECTV platform has improved to

4  more than 60 months.  Tr. 347:8-13 (Bentley); 655:1-10 (Guyardo).

5      **B.    DIRECTV Implemented An Extensive Program To Improve The Customer**
       **Experience From Multiple Perspectives**

6

7      125.    In connection with its efforts to retain customers, in 2012, DIRECTV CEO Mike

8  White chartered the Customer Experience Steering Committee ("CX Committee") in order to "raise

9  visibility and opportunities to improve the customer experience."  Tr. 283:13-21 (Bentley); 1020:15

10 (Patel).

11     126.    The CX Committee was a cross-functional group of DIRECTV executives led by

12 Rasesh Patel.  Tr. 274:16-20 (Bentley); 1020:4-6 (Patel).  The CX Committee also included Brad

13 Bentley (Senior Vice President of Marketing), Shannon Campain (Senior Vice President of Sales

14 Operations), Pat Doyle (Chief Financial Officer), Ellen Filipiak (Senior Vice President of Customer

15 Care), Karen Leever (Senior Vice President of Digital Marketing), Paul Guyardo (Chief Marketing

16 Officer), and Dave Baker (Senior Vice President of Field/Installation Work Force).  Tr. 1020:15-24

17 (Patel).  The cross-functional nature of the group enabled DIRECTV "to look at an issue from

18 virtually every perspective."  Tr. 1028:19-22 (Patel).

19     127.    In creating the CX Committee, DIRECTV's CEO made it a "company-wide focus" to

20 "improve the customer experience."  Tr. 1025:4-7 (Patel).  DIRECTV viewed this initiative as

21 critically important to retaining customers in an increasingly competitive marketplace.  Tr. 1025:4-

22 11 (Patel).  This initiative focused on both current and prospective DIRECTV customers.  Tr.

23 1027:16-18 (Patel).

24     128.    A large part of the CX Committee's work was to undertake "rigorous analyses" of

25 customer research and satisfaction data as well as operational data.  Tr. 1029:19-1030:2 (Patel).  This

26 effort included working with front-line agents who interface with DIRECTV subscribers; reviewing

27 customer communications from the Office of the President; reviewing customer comments and

28 verbatims; conducting market research; surveying and interviewing DIRECTV subscribers; listening

39

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

ACTIVE 224875332

to recorded calls; and tracking social media responses to DIRECTV.  Tr. 1030:5-6, 1031:14-1032:12, 1032:20-1033:18, 1038:3-23, 1040:2-6 (Patel); Ex. 589 at 5.  The CX Committee also created the "Learning Lab," which was a market in San Diego wherein the CX Committee observed day-to-day direct sales operations, identified customer issues on the frontlines, and tested potential changes to examine their impact before rolling the changes out across the company.  Tr. 1029:25-1030:5, 1035:9-20 (Patel); Ex. 589 at 5.  In undertaking each of these analyses, the CX Committee's goal was to "identify customer pain points . . . and then really prioritize the ones that were most meaningful in terms of impact."  Tr. 1030:7-9 (Patel).  The CX Initiative was "very self-critical" and "discerning" in identifying "every opportunity . . . to improve the customer experience."  Tr. 1052:18-24 (Patel).

129.    By 2013, the CX Committee had identified numerous customer "pain points" which it categorized and prioritized in a "Customer Pain Points – Review and Prioritization" discussion document dated May 7, 2013.  Tr. 1031:8-22 (Patel); Ex. 589.  The CX Committee identified a number of these as "top recommended pain points" based on the "degree of impact" a particular pain point might have on metrics such as customer satisfaction, call volume, and numerous other dimensions.  Tr. 1043:10-18 (Patel); Ex. 589 at 7.

### 1.    Policies, Procedures, And Initiatives Implemented By The CX Committee

130.    In connection with its findings on customer pain points, the CX Committee implemented a number of new policies, procedures, and initiatives in order to resolve these pain points and to improve the customer experience.  Tr. 1030:7-9 (Patel).

### a.    Instant Rebate

131.    In October 2012, DIRECTV moved from an offer requiring customers to redeem a rebate via mail or online to an "instant" rebate.  Ex. 617 at 5.  This policy ensured that every customer would receive the discounted price starting with the first month's bill.

132.    While this initiative cost DIRECTV an additional $80 million in annual expenses, it did so in order to provide "a meaningful impact to improve the customer experience."  Tr. 294:3-11 (Bentley).

### b. Simplified Bill

133. Around the same time, DIRECTV adopted a "Simplified Bill" that incorporated a number of customer-friendly changes with the goal of making the bill easier to understand. Ex. 569. In particular, the DIRECTV bill was simplified by:

      a.    incorporating "consumer friendly language" and "doing the math for customers" so that they could clearly identify the "net discounted price." Tr. 1069:5-10 (Patel); Ex. 569 at 37.

      b.    indicating on each month's bill the number of months remaining until promotional credits expired. Tr. 1069:21-1070:18 (Patel); Ex. 569 at 37; Ex. 2413 at 3.

134. As part of the simplified bill initiative, the CX Committee provided consumers with several potential bill statements and "actually let our customers select the invoice that was most transparent and most clear to them." Tr. 1066:15-18 (Patel).

135. The simplified bill initiatives represented numerous "systemic changes" for which DIRECTV "invested tens of millions of dollars." Tr. 1066:13-20 (Patel).

### c. Electronic Confirmation Letters

136. In connection with the simplified bill, DIRECTV also began providing customers with confirmation letters via email so that they would receive a copy of their terms of service immediately upon completion of the subscription process. Tr. 1065:23-1066:9 (Patel).

### d. Premium Refusal At Point Of Sale/Future Date Cancellation

137. Another pain point that the CX Committee identified was that customers were unable to refuse the premium channel promotional offer at the point of sale or request a future cancellation date for premium channels. Ex. 589 at 7. In response to this pain point, DIRECTV implemented changes to its premium offer policies and processes so that:

      a.    Customers were able to decline the premium channel offer at the point of sale. Tr. 1053:1-4 (Patel).

      b.    Customers were able to contact DIRECTV at any time during the free trial period to future date a cancellation one or all of the premium channels (so the customer could take

41

ACTIVE 224875332

advantage of the full term of the free period but not have to remember to call to cancel on the last day of the trial period).  Tr. 1053:5-11 (Patel).

c.  Customers who forgot to cancel the premium channels in months four or five (the first two months beyond the trial period) could request a full refund through DIRECTV's "hassle-free grace period."  Tr. 1053:12-19, 1076:2-19 (Patel).

### e.  Sales CRM

138.  The CX Committee improved the customer experience relating to phone sales by streamlining the required call components (RCCs) and by implementing a new tool called a "Sales CRM" that enabled call agents to more easily identify the appropriate RCCs during the sales call flow.  Tr. 1064:17-1065:3 (Patel).

### f.  Website

139.  The CX Committee also recommended a number of improvements to the website, including the ability to opt out of the free premium channels at the point of sale and adding an initial disclosure of the regular price of the premium channels to the add-on packages step before the customer reaches the cart.  Tr. 1065:10-16 (Patel); 1454:17-1455:12, 1498:3-24 (Leever).

### 2.  Results Arising From CX Initiatives

140.  In response to its initiatives, DIRECTV identified a number of indicia to show that its efforts to improve the customer experience had been successful.

141.  First, DIRECTV reduced the customer contact rate in the first 120 days by 40%, or 24 million calls annually.  Tr. 1077:3-15 (Patel).

142.  Second, DIRECTV's Net Promoter Score improved from 16 to 34, and DIRECTV "went from second best in the industry to best in class in the industry."  Tr. 1077:16-20 (Patel).

143.  The CX Committee's efforts also drove a ten-basis point reduction in churn during the period of 2012-2015.  This metric is particularly significant in light of the increasingly competitive environment DIRECTV was a part of.  Tr. 1077:23-1078:5 (Patel).

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL
FINDINGS PURSUANT TO FED. R. CIV. P. 52(C)
4:15-CV-01129-HSG

## IX. THE EVIDENCE THE FTC PRESENTED AT TRIAL DOES NOT SUPPORT A FINDING OF LIABILITY UNDER SECTION 5 OF THE FTC ACT.

### A.  A Facial Review Of DIRECTV's Advertising Cannot Prove Likely Deception

144.   In its opening statement, the FTC suggested that the Court could find DIRECTV's advertisements deceptive merely by looking at them.  In its first example, the FTC highlighted an advertisement from 2007 and asked, "Where does it say what the higher second-year price will be?" Tr. 11:12-14 (displaying Ex. 84).  The offer the ad was promoting, the Court later learned, did not even require a two-year commitment, and it contained everyday pricing, not promotional pricing. Tr. 345:3-346:11 (Bentley) (comparing Ex. 84 to Ex. 617 (timeline of offers)).

145.   But this case is not the typical Section 5 case where the FTC alleges a static, uniform misrepresentation regarding a product or service's core characteristics throughout all of a company's advertising. Instead, the FTC alleges inadequate disclosure of numerous and varying terms in tens of thousands of diverse ads across multiple media for almost a decade.

146.   The FTC offered no explanation as to how the Court, through facial review, could divine the net impression a reasonable consumer would draw from each and every ad, or how the impressions are uniform, or how they are false. The FTC did not explain how the Court is to conduct a facial review of tens of thousands of ads that were not even offered into evidence. A brief review of the select ads displayed at trial shows that the material terms of DIRECTV's offer were contained in the ads and that many of the ads varied as to where and how that information was conveyed to the consumer.

147.   Regardless, courts have consistently held that, where it is not "reasonably clear from the face of the advertisement" whether reasonable consumers take away the alleged implied false messages, extrinsic evidence is required to prove the deception claims. *United States v. Bayer Corp.*, 2015 WL 5822595, at *11 (D.N.J. Sept. 24, 2015); *id.* at *13 (rejecting FTC's deception claim because the FTC "offered no consumer survey data, no consumer testimony, no expert opinion on consumer understanding of the [defendant's] ads, no marketing data, and no copy tests of any [] advertisement"); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1193 (N.D. Ga. 2008) ("[T]he court will not presume, without extrinsic evidence, that a recipient of these advertisements

43

ACTIVE 224875332

would infer that [the product] is clinically proven to treat obesity from the clinical weigh loss claims."); *compare FTC v. QT*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006) (recognizing that "conspicuous" implied claims do not require extrinsic evidence).[3]

148.    Such is the case here. There are no express false statements in any advertisement and no claim that they are "false" by necessary implication. Nor are any false net impressions involving price terms "reasonably clear from the face of the advertisement."

149.    Instead, DIRECTV ads are multi-dimensional, thematically varied, humorous in the case of television ads, varied in size, creative focus, and intended audience, and highlight numerous distinct benefits of DIRECTV's service, including top customer service, expansive programming options, and superior technology. FoF, *supra*, ¶ 55 (discussion of television commercials). The advertisements also promoted different offers during the relevant time period—some had a two-year contract, one-year promotional price, and three months free premium channels, while others did not *See, e.g.,* Tr. 339:4-340:10.

150.    In different forms and depending on the specific offer at the time, *see* Ex. 617 (timeline of offers), the ads contain everyday low pricing or promote introductory pricing for 12 months; require no commitment or state that a 24-month agreement is required; have no premium channel offer or offered premium channels free for 3 months; explain rebate credits (when rebates were in effect) or, later, the instant rebate prices; and disclose additional terms about equipment

---

[3] Courts apply the same standard under the deception prong of the Lanham Act. *See*, *e.g.*, *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) ("Where a statement is not literally false and is only misleading in context, however, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical.") (collecting cases); *Verisign Inc. v. XYZ.COM LLC*, 848 F.3d 292, 304 (4th Cir. 2017) ("it is incumbent on the plaintiff to present 'extrinsic evidence of consumer confusion, generally in the form of consumer survey evidence" to prove an implied claim is misleading) (internal quotation marks omitted); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F. 3d 51, 63 (2d Cir. 2016) ("a district court *must* rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message") (emphasis and brackets in original); *Legal Zoom.com Inc. v. Rocket Lawyer Inc.*, No. 12-9942, 2013 WL 12121303, at *5-6 (C.D. Cal. October 17, 2013) (requiring proof of "actual deception by using reliable consumer surveys or market research" for analogous allegations that advertisements and website failed to adequately disclose terms of negative option).

pricing, packages, and cancellation in other areas and the legal block. *See, e.g.*, Exs. 78, 84, 85 (2007); Exs. 92, 95 (2008); Ex. 113 (2009); Exs. 124, 139 (2010); Exs. 172, 2014 (2011); Exs. 175, 178/2707, 185 (2012); Exs. 203, 209, 212, 217 (2013); Ex. 281 (2014); FoF, *supra*, Section VI.A.2 & ¶ 84. These print ads are just an example of advertising that is multi-faceted, conveys different messages and offers, and presents varying terms in multiple different formats. A finding that any particular DIRECTV advertisement is "deceptive" in the way the FTC claims here cannot be made solely on the basis of a facial review.

151.     What individual consumers take away about price, and other terms and conditions, is dependent upon a number of variables including consumers' experience with pay-television providers and their motivations for purchase. An individual's net impression cannot be divined merely by looking at DIRECTV's advertisements.

152.     And the insufficiency of facial review is especially clear here: as already noted, although the FTC's claims involve more than 40,000 unique print advertisements, dozens of television advertisements, and many different iterations of the website that changed throughout a 10-year period, many thousands of those materials were not even introduced into evidence, and the FTC provided no categorization or content analysis to show that any conclusions as to one advertisement would apply to any others. *See FTC v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (refusing to "adopt the FTC's approach of using selected examples of [advertising] claims picked from across the entire universe . . . seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites").

153.     While courts have conducted a facial review on a few advertisements at issue, no court has ever conducted a facial review of thousands of different ads, particularly to determine the net impression from alleged inadequate disclosures. *See Commerce Planet, Inc.*, 878 F. Supp. 2d at 1063 (conducting a facial review on two versions of website); *FTC v. Medlab, Inc*., 615 F. Supp. 2d 1068, 1076-77 (N.D. Cal. 2009) (reviewing twenty-seven advertisements submitted by FTC and only making conclusions about those 27 advertisements).

ACTIVE 224875332

154.    Therefore, in this case, the Court cannot conduct a facial review to determine the "net impression" of all DIRECTV advertisements, or that the net impression is false such that the advertising is likely to mislead reasonable consumers about material terms.

## B.    The FTC's Survey Evidence Does Not Show That Consumers Are Likely To Be Deceived By DIRECTV's Advertising

155.    The FTC's only proffered testing of DIRECTV's advertising itself—Dr. Erdem's surveys—suffers from three independently fatal flaws that deprive them of any probative value. First, the surveys do not even *test* the net impression of the single DIRECTV Alternative Media print ad and web flow Dr. Erdem selected, and they neither ask nor answer the question of whether those ads were likely to mislead consumers. Dr. Erdem instead tested only the very different (and legally irrelevant) proposition that she can increase recall of certain terms by highlighting them. Second, apart from the fact that they address the wrong question, her studies are characterized by fundamental flaws in design and execution that render them unreliable even as to whether certain terms are clear and conspicuous—which she admitted was the extent of her assignment. Third, Dr. Erdem's survey data applies to less than .01% of the advertising that the FTC placed at issue in this case, and the FTC presented no basis for extrapolating her results to any of the other advertising content or media that she neither tested nor reviewed.

### 1.    Dr. Erdem's Studies Do Not Test Net Impression Or Deception

156.    Dr. Erdem's studies did not test the net impression of DIRECTV's ads. Tr. 962:10-964:2 (Erdem); *see also* Tr. 969:13-18 (Erdem) (did not test "net deception"). Nor did they "determine or ask consumers [] if they took away [] a false impression," Tr. 963:2-16 (Erdem), or "test whether or not DIRECTV's advertisements or websites were likely to mislead consumers." Tr 963:17-964:2, 964:19-965:1 (Erdem). Although Dr. Erdem recognized that the leading litigation guide on surveys—which she cited—explains how to do "deception studies," Tr. 965:2-6 (Erdem), she conducted "a different test," Tr. at 965:7-11 (Erdem).

157.    Instead of testing deception, Dr. Erdem only tested "whether or not adding specific disclosures would increase someone's understanding of those specific disclosures." Tr. 965:7-11 (Erdem). In this way, her test proved nothing relevant to this case: it is always possible to make any

46

ACTIVE 224875332

disclosure more prominent and thereby increase a reader's nearly contemporaneous recall of its contents. That truism—and these studies—say nothing about what impressions consumers took away from the tested ad or website, and thus cannot be used to measure deception as required by Section 5.

### 2. Dr. Erdem's Surveys Are Fundamentally Flawed In Both Design And Execution, Rendering The Results Unreliable

158. Dr. Erdem's surveys did not even fairly test the proposition that she purported to test, and thus, Dr. Erdem's findings resulted from a survey methodology that was flawed in multiple respects.

159. First, Dr. Erdem's stimuli were not presented to survey participants in a manner that could lead to reliable results. Some of the disclosures that Dr. Erdem tested in the print ad were contained exclusively in a legal block at the bottom of the print ad. Tr. 971:21-24 (Erdem). However, the print ad stimulus was displayed online in a manner that forced survey respondents to scroll down in order to see the legal block. This biased her survey because DIRECTV's actual consumers would have been able to see the entire ad, including the disclosures at the bottom, at once if they were holding the physical print ad that DIRECTV had disseminated. Tr. 973:9-974:4 (Erdem).

160. More importantly, if a consumer did scroll to see the legal box, the disclosures there were blurry and illegible on the computer screens used by respondents taking the survey. *Compare* Ex. 2026A (ad DIRECTV disseminated), *with* Ex. 2371 (Dr. Erdem's survey URLs); Tr. 974:5-977:9 (Erdem). This biased her survey because the text in DIRECTV's actual, physical print ad was not blurry. Moreover, in Dr. Erdem's "treatment" print ad stimulus, she lifted disclosures that she was testing "from the legal block and brought [them] up and put them in the main text of the ad" so that they were not in the same blurry text. Tr. 971:6-24, 977:15-20 (Erdem). Dr. Erdem's comparison of her survey results between the original and treatment groups, therefore, is not a fair comparison, as conceded by Dr. Erdem "if [it] were true" that the disclosures in the legal box were blurry. Tr. 977:21-978:3 (Erdem).

161.    There is no evidence that Dr. Erdem's pretests, conducted by a third party, would have identified this flaw because "no notes were taken" and "people weren't asked the specific question if they could read the legal disclosures or the fine print[.]" Tr. 1014:16-1015:17 (Erdem). The FTC has no evidence regarding the content or adequacy of the pretests.

162.    Dr. Erdem also provided no zoom function in her survey that could have improved the clarity of Dr. Erdem's blurry online presentation of her print ad stimulus or assisted participants when they reviewed the stimulus. Tr. 977:10-14 (Erdem).

163.    Because Dr. Erdem conducted no follow up questioning of respondents to determine why they responded that they "don't know" or were "unsure" about an answer to a survey question, Tr. 967:16-968:11 (Erdem), Tr. 970:10-16 (Erdem), she also cannot disaggregate those respondents who did not see or understand a disclosure because it was blurry in Dr. Erdem's online presentation, from those that did not see or understand a disclosure because it was not clear and conspicuous. The inability to "disaggregate" this data means the results are meaningless and renders this study unhelpful to the trier of fact. *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1015-16 (N.D. Cal. 2015).

164.    Based on all the foregoing, Dr. Erdem's print ad surveys are biased, unreliable, and the results are meaningless.

165.    With respect to Dr. Erdem's website stimuli, Dr. Nathan Good, the FTC expert who created the stimuli, admitted that "many of the links that would have typically been on the actual directv.com website were not active on the website stimuli." Tr. 121:5-16 (Good). Those disabled links and buttons include, for example: the entire gray header bar at the top of the landing page that contains the drop down menus for "Why DIRECTV?", "Packages", and "Equipment & Features", Tr. 121:17-20 (Good); Ex. 1052, "virtually all of the links on the landing page", including six blue "Learn More" links, notwithstanding that "the hand comes up suggesting you can click on them", Tr. 121:21-122:3 (Good); Ex. 1052, over 25 links in the footer bar of every page in the stimuli, Tr. 122:4-8 (Good); Ex. 1052, four of the five package selection buttons on the package selection page, Tr. 122:24-123:4, 125:2-13 (Good); Ex. 1052, the "Need Help" chat button that appeared on

ACTIVE 224875332

many pages of the stimuli, Tr. 124:12-20, 998:8-12 (Good), and the channel lineup scroll bar on the package selection page, Tr. 123:21-25 (Good); Ex. 1052.

166. On the other hand, select "links that disclosed information at issue here were active." Tr. 998:13-18 (Erdem).

167. Dr. Erdem also provided instructions at the top of the stimuli webpages that were not on DIRECTV's actual website, which told respondents what to click in order to advance through the stimuli. Tr. 122:9-23 (Good); Ex. 1052. Those instructions did not inform respondents that select info hovers and links containing DIRECTV's disclosures were active although many other links were disabled.

168. Dr. Erdem did not track whether respondents accessed disclosures in info hovers or hyperlinks in her stimuli. Tr. 1000:25-1001:2 (Erdem).

169. As conceded by the FTC's web usability expert, Dr. Theo Mandel, Dr. Erdem's survey respondents "may [have] learn[ed] from the first page and thereafter that links are disabled" and therefore stopped clicking on the active links later in the stimuli that had disclosures. Tr. 484:11-22 (Mandel). This biased Dr. Erdem's website survey because, on the actual DIRECTV website, all of the links are active and users would not have been conditioned to ignore them.

170. Indeed, respondents spent on average 10 to 15 minutes, from start to finish, on Dr. Erdem's website surveys, Tr. 981:21-24 (Erdem), which is a fraction of the 45 minutes the average DIRECTV subscriber spent subscribing to DIRECTV online. *Compare* Tr. 792:18-21 (Chen). Thus, whether or not respondents were habituated to ignore the information in info hovers and links or Dr. Erdem's instructions guided them through the website artificially, her survey stimuli failed to replicate consumers' experiences on DIRECTV's website and therefore are unreliable.

171. Furthermore, because Dr. Erdem conducted no follow-up questioning of respondents to determine why they responded that they "don't know" or were "unsure" about a question, Tr. 967:16-968:11, 970:10-16 (Erdem), she also cannot disaggregate those respondents who did not see or understand a disclosure because they were habituated to ignore links in Dr. Erdem's stimuli, from those that did not see or understand a disclosure because it was not clear and conspicuous. The

49

ACTIVE 224875332

inability to "disaggregate" this data means the results are meaningless and renders this study unhelpful to the trier of fact. *Pinterest*, 140 F. Supp. 3d at 1015-16.

172.    In her treatment stimuli, Dr. Erdem lifted disclosures at issue out of hyperlinks and info hovers and placed them on the web page. *See* Ex. 2371. Thus, any habituation in connection with the inactive hyperlinks and info hovers on the UX site would not have impacted whether the treatment group saw the disclosures at issue. On the other hand, any habituation related to numerous inactive hyperlinks and info hovers on the UX website would have directly impacted the original group, who could have been habituated to ignore all hyperlinks and info hovers, including those containing the relevant disclosures. As a result of this flaw, it is unfair to compare the survey results between her original and treatment groups.

173.    The website survey was doubly flawed because Dr. Erdem provided static thumbnail images of the interactive website stimuli as a reference in the questionnaire portion at the end of her website surveys; however, all links and info hovers were disabled in those thumbnail images, including those that contained the pertinent disclosures. Tr. 998:20-24, 999:4-7 (Erdem) ("In still versions of thumbnails if they wanted to go back, then those things were not active.").

174.    As a result, respondents could not reference any disclosures about the early cancellation fee when answering her questions because those were disclosed in links that were not available in the static thumbnail images. Tr. 999:8-16 (Erdem).

175.    This is necessarily also true regarding "the information that you would be charged the price after the three months unless you called to cancel" the premium channels because "that was contained in [an] info hover." Tr. 1480:18-21 (Leever).

176.    Similarly, if a respondent remembered seeing another disclosure solely in a hyperlink or info hover, regardless of whether it also was made outside of the link or info hover, then that respondent would not have been able to reference the same disclosure when answering Dr. Erdem's survey questions.

177.    There is also no evidence that any respondents even used the thumbnail images Dr. Erdem provided as a reference because Dr. Erdem did not track that. Tr. 981:18-20, 998:25-999:3 (Erdem).

ACTIVE 224875332

178.     Because participants could not re-access many of DIRECTV's disclosures when answering the survey questions on the untreated stimulus, Dr. Erdem's website survey tested respondents' recall of DIRECTV's disclosures, not their perception. *See* Tr. 981:10-16 (Erdem) ("I would agree with you [that respondents were being asked to remember the terms] if the[re] were not thumbnails available because they can always go back."); Tr. 1000:1-8 (Erdem) (conceding her survey was a memory test for the early cancellation fee for this reason).

179.     And as the FTC's usability expert, Dr. Mandel, testified, because "people aren't very good at remembering information even from web page to web page," Tr. 489:6-8 (Mandel), it is no surprise that Dr. Erdem's results show low levels of consumer recall about specific terms based on a cursory 10-15 minute review of a mocked-up and incomplete website and completion of a multi-question survey. Tr. 489:18-22 (Mandel) (Dr. Mandel conceding that people "probably also have trouble remembering information from the website once they click off it").

180.     Based on all the foregoing, Dr. Erdem's website surveys are biased and unreliable, and the results are not probative of any issue before the Court.

181.     Further, Dr. Erdem inaccurately reported the survey's results. She treated people that did not "recall" or "remember" a term and responded that they "don't know" or were "unsure" to her questions as if they were "confused", and included them within the pool of respondents that she classified as showing that a term was not clear and conspicuous. Tr. 966:22-969:1, 970:4-9 (Erdem). A respondent who could recall seeing a disclosure but who could not recite the specific information disclosed is not evidence of a lack of clarity in the information disclosed (much less deception). Because Dr. Erdem conducted no follow-up questioning of such respondents to determine why they responded "don't know" or "unsure", she cannot disaggregate those respondents that saw but did not recall a specific term, from those that did not see or understand a disclosure. Tr. 967:16-968:11 (Erdem) ("I don't know – when they say, I don't know . . . . I don't have the subcategories . . . ."); Tr. 970:10-16 (Erdem) ("I don't have the breakdown of don't knows."). The additional inability to "disaggregate" those who were confused from those who were not provides additional reason why Dr. Erdem's results are meaningless and unhelpful to the trier of fact. *Pinterest*, 140 F. Supp. 3d at 1015-16.

51

ACTIVE 224875332

182. Dr. Erdem's survey results are therefore not credible or reliable, and lack any significant evidentiary weight.

### 3. Dr. Erdem's Two Surveys Do Not Even Apply To The Overwhelming Majority Of Advertising At Issue.

183. Even if the Court were to give some probative value to Dr. Erdem's studies, they are still insufficient to meet the FTC's burden of proof: they address less than .01% of the ads at issue in the FTC's case. The FTC sued DIRECTV over every one of its advertisements for nearly a decade. Its claims implicate more than 40,000 unique print ads, hundreds of banner ads, dozens of television commercials, and many different iterations of DIRECTV's continually evolving website. Tr. 10:1-5 (FTC asserting in opening that the case involves "78 billion print ads" and all "33 million consumers" who subscribed). Yet the FTC purported to test only one print ad from 2013 and the "old flow" website that had been replaced many months before the FTC filed suit. The FTC offered no basis to extrapolate these limited empirical tests to DIRECTV's broader advertising.

184. To establish liability on each of these advertisements, the Court would need to either make an individual factual finding of deception for each advertisement, or would need to group the advertisements together in some coherent and evidence-based manner and make factual findings by group. *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (deferred to the FTC's administrative interpretation of the ads because "[t]he Commission set forth the basis for those findings in considerable detail in an appendix to its opinion, *with a separate explanation for each ad*.") (emphasis added); *Commerce Planet, Inc.*, 878 F. Supp. 2d at 1063 (analyzing and making separate factual findings for each version of the website at issue); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015).

185. The FTC offered no empirical evidence for overwhelming majority of DIRECTV's advertisements, as Dr. Erdem tested only one print advertisement and one iteration of the Old Flow website. Nor did Dr. Erdem undertake any analysis—facial or otherwise—to ensure that the data derived from testing a single print ad and one web flow could be extrapolated to other advertising.

186. To select her test ad, Dr. Erdem looked at just 116 print ads provided to her by her support staff out of approximately 40,000 print ads produced to the FTC. Tr. 934:22-935:2, 989:12-

52

ACTIVE 224875332

25, 996:14-20 (Erdem); *see also* Tr. 933:17-25 (Erdem) (Dr. Erdem had access to "about 40,000 different DIRECTV print ads from 2007 to 2015").  That single print ad would have resulted in only about 300 subscriptions, and even fewer activations. Tr. 323:13-16 (Bentley).  Dr. Erdem conceded that it "wouldn't be scientific research" if she "cherrypick[ed]" the ad to be tested, Tr. 935:23-936:7 (Erdem), which is exactly what she did.

187.  Dr. Erdem admitted that she selected her ad without conducting any copy or content testing of the ads to determine whether the one she selected was empirically generalizable to the 116 print ads provided to her, let alone the tens of thousands of ads she never viewed.  Tr. 989:18-25, 990:13-22, 996:14-20 (Erdem).  Dr. Erdem was unable to explain how her ad was "representative" of all DIRECTV print ads beyond testifying that DIRECTV's ads generally contain some "fine print" and "a promotional price." Tr. 996:6-13 (Erdem).

188.  Dr. Erdem conceded that she was aware that in some years DIRECTV print ads "had [a] fixed price" rather than a promotional price.  This alone precludes generalizing Dr. Erdem's survey results to numerous of DIRECTV's print ads.  Tr. 995:23-996:4 (Erdem).

189.  Additionally, there is substantial variation in DIRECTV's print advertising with respect to, among other things, tactic, page count, content, and the frequency, placement, and manner of disclosures in the 116 ads Dr. Erdem reviewed.  *Compare*, *e.g.*, Ex. 2026A (single page ad used in Erdem study in the form DIRECTV disseminated to consumers, with FOR 12 MONTHS with "ALL DIRECTV OFFERS REQUIRE 24-MONTH AGREEMENT" in bold font under the packages as well as above the call to action), *with* Ex. 2707 (original four-page Sunday Circular of Ex. 178 with no slashed out pricing; disclosing "FOR 12 MONTHS" and "2-year" agreement immediately under each price point; and disclosing precise first and second-year savings in large font on inside left page and again, in red, on back cover), *with* Ex. 124 (prominently advertising "50% OFF FOR ONE YEAR!" at top and side; disclosing promotional price is "FOR 12 MONTHS" in red bubble), *with* Ex. 92 (two-sided buck slip disclosing promotional price is "FOR 12 MONTHS" with the "Reg." package price in red bubbles on front and back), *with* Ex. 172 (four page direct mail letter disclosing "FOR 12 MONTHS" and "2-yr agreement" immediately under each price point; disclosing precise first and second-year savings in second paragraph of first page, and

53

under each promotional price on pages thereafter; disclosing value of premium channels next to premium channel copy), *with* Ex. 209 (four page ad disclosing promotional price is "FOR 12 MONTHS" 12 times on front and back covers; disclosing precise first and second-year savings under each package on back cover; disclosing value of free premium channels next to premium channel copy on inside right page), *with* Ex. 113/2011A (slashing out regular package price rather than prior promotional price), *with* Ex. 139/2013A (advertising "PACKAGES START AT $29.99 Everyday Low Price" without promoting any specific package or premium channels).  Such variation among DIRECTV's ads precludes generalizing Dr. Erdem's survey results to the 116 print ads she reviewed, let alone to the over 40,000 she did not view.

190.    Similarly, Dr. Erdem did not provide "any empirical data like a survey or other analysis for anything beyond [the] August 2013" iteration of the web flow, Tr. 986:6-9, 986:14-17 (Erdem), although she admitted that she was aware that "there were some changes" to the web flow over time, including redesigns from a "vertical" to "horizontal" layout, Tr. 1001:23-1002:1 (Erdem), "different mouse-overs in different places, or hyperlinks," Tr. 1002:2-6 (Erdem), and the addition of more disclosures on new, unavoidable webpages, Tr. 1002:7-1003:15 (Erdem).  Dr. Erdem offered no evidence that the results of one iteration of the Old Flow from August 2013 could be extrapolated to any iteration New Flow or any other iteration of the website during the period at issue.  Dr. Erdem simply stated that she "can expect, *it's not assumed*, but I can expect" that her results would be similar if she tested another website.  Tr. 1003:16-23 (Erdem) (emphasis added).  She did not explain how her "expectation" differs from an "assumption," and in any event her bald and unexplained assertion cannot fill this evidentiary gap.  This testimony is not credible and not credited.

191.    Nor did the FTC provide any other evidentiary basis—empirical or otherwise—to extrapolate the data on these two pieces of marketing material to the tens of thousands of other material at issue in this case, including the various media channels Dr. Erdem did not even test (e.g. banner ads, television commercials, phone scripts).  The FTC also conducted no grouping or categorization of the many advertisements at issue in the case to allow the Court to make factual findings on groups or tranches of advertisements.

ACTIVE 224875332

192.    Thus, even if Dr. Erdem's survey had tested the right issue, and was not fundamentally flawed in design and execution, there is no evidentiary basis for extrapolating Dr. Erdem's survey results beyond the single ad and single iteration of the web flow that she tested.

**C.    The FTC's Other Expert Testimony Does Not Establish That Consumers Are Likely To Be Deceived**

193.    The FTC explained in opening that its other experts, Drs. Pratkanis and Mandel, only purport to provide the "why" to Dr. Erdem's testimony regarding "what" consumers take away from the ads. Tr. 21:14-22:19. Because the FTC failed to prove in the first instance the "what" with Dr. Erdem, the testimony of Drs. Pratkanis and Mandel regarding the "why" is entirely unhelpful to the trier of fact.

**1.    Dr. Pratkanis Did Not Offer Opinions Of The Consumers' Net Impression**

194.    Dr. Pratkanis provided no opinion of the net impression of DIRECTV's advertising or that reasonable consumers were likely to be misled by DIRECTV's advertising. Tr. 1311:6-1314:1, 1302:1-5 (Pratkanis). Although Dr. Pratkanis conceded that "in order to measure deception, you have to determine the net impression that consumers take away from an ad and compare that to the truth," Dr. Pratkanis performed no independent empirical analyses to determine what net impression consumers take away from DIRECTV advertising. Tr. 1297:10-13, 1300:6-10 (Pratkanis). In fact, Dr. Pratkanis performed no independent empirical analysis in this case whatsoever. For instance:

a.    Dr. Pratkanis did not perform any empirical testing—including copy or perception testing—on DIRECTV advertisements. Tr. 1291:23-25, 1301:4-17 (Pratkanis). Nor did Dr. Pratkanis perform a content analysis on any of the advertisements to determine whether they are similar with respect to font size or disclosures. Tr. 1305:8-1306:4 (Pratkanis).

b.    Dr. Pratkanis did not interview or survey any prospective or actual DIRECTV consumers. Tr. 1301:17-22, 1302:6-8 (Pratkanis).

ACTIVE 224875332

c. Dr. Pratkanis did not perform any test to measure consumers' immediate reactions to DIRECTV advertising, nor did he measure whether consumers were convinced, informed, or persuaded by DIRECTV advertising. Tr. 1293:9-12 (Pratkanis).

d. Dr. Pratkanis did not survey any DIRECTV subscribers to determine whether they knew and understood the terms of purchase or whether they felt deceived by DIRECTV's advertising. Tr. 1302:1-5 (Pratkanis).

e. Dr. Pratkanis did not perform any test to determine whether consumers read the disclosures contained in DIRECTV's advertising. Tr. 1300:11-15 (Pratkanis).

f. Dr. Pratkanis did not perform any analysis to determine whether consumers find the disclosures in DIRECTV advertising to be difficult or confusing to read. Tr. 1310:13-18 (Pratkanis).

g. Dr. Pratkanis performed no empirical study to ascertain whether consumers who use DIRECTV's website see and understand the terms of purchase. Tr. 1307:24-1308:6 (Pratkanis).

h. Dr. Pratkanis performed no empirical study to ascertain what percentage of consumers believe that that (1) there is no two-year commitment; or (2) that the introductory price lasts for two years. Tr. 1311:20-25, 1313:4-7, 1313:17-1314:1 (Pratkanis).

195. Having failed to perform any type of independent empirical analysis to determine what message, if any, consumers take away from DIRECTV advertising, Dr. Pratkanis could not opine on whether consumers take away a false net impression from DIRECTV advertising.

196. Rather than conduct any empirical analysis, Dr. Pratkanis instead performed a "social influence analysis" on certain DIRECTV advertisements and sales calls to form his opinions in this case. Tr. 1241:3-7, 1271:11-12, 1291:13-25, 1305:8-10 (Pratkanis). But Dr. Pratkanis could not meaningfully describe how he applied a "social influence analysis" to the facts of this case. Tr. 1317:5-15 (Pratkanis) ("that's what people do when they process and try to understand. And this is a – just like a science of gravity has given us rules for how gravity flows"). Rather, he testified only that he applied the "principles of Grice," a philosopher on communication, who Pratkanis conceded

56

"never talked about advertising."  Tr. 1316:4-6, 1316:22-23 (Pratkanis).  Nor could he explain how the social analysis literature he cited in his report could possibly support his conclusions in this case. For instance, Dr. Pratkanis cited four studies in support of his conclusions regarding the use of the social influence tactic of a "lowball offer" in DIRECTV advertising.  Tr. 1321:14-22 (Pratkanis). But he conceded that none of these studies had anything to do with consumer advertising.  Tr. 1321:14-1322:7 (Pratkanis).

197.    From this "social influence analysis," Dr. Pratkanis concluded that DIRECTV employs two social influence "tactics": "throwing the lowball" (by advertising an introductory price) and the "free gift" (premium channel negative option).  Tr. 1258:24-1259:4, 1318:7-11 (Pratkanis). But these conclusions do not advance a finding of deception in this case.

198.    First, Dr. Pratkanis conceded that neither of these social influence tactics are inherently "misleading" or "deceptive."  Tr. 1243:20-1244:7 (Pratkanis).  Instead, Dr. Pratkanis testified that these social influence tactics are also used in "democracy and capitalism . . . as a part of [] decision-making where we argue, debate, discuss, and reach conclusions."  Tr. 1243:24-1244:2 (Pratkanis).

199.    Second, the entire premise of Dr. Pratkanis's opinion contradicts the FTC's case.  The whole point of his "lowball" theory is that consumers are so taken with the initial offer (or the offeror) that they cannot resist accepting a higher price when conveyed.  Under this theory, a consumer must know the terms of the higher offer before they purchase. Tr. 1320:12-17 (Pratkanis). That theory directly contradicts a fundamental aspect of the FTC's claim—namely, that consumers do not understand the price that they will pay until the promotional price rolls off in the second year. If customers instead know the terms of the offer before they make the purchase, they have not been deceived and certainly have not been harmed.  *See* FTC Policy Statement on Deception at 3-4 (1983), appended to *In re Cliffdale Assoc.*, 103 F.T.C. 110, 180, 182 n. 32 (1984) ("the Commission will evaluate the entire advertisement, transaction, or course of dealing in determining how reasonable consumers are likely to respond").

200.    Third, all Dr. Pratkanis was ultimately able to conclude from his "social influence analysis" is that "a consumer would be more likely to purchase" DIRECTV's service because

57

ACTIVE 224875332

DIRECTV employed social influence "tactics." Tr. 1312:12-20 (Pratkanis) ("The likelihood that they are going to purchase and engage in certain behaviors is increased based on principles of social influence."). But Dr. Pratkanis did not conduct any analysis to determine the "base rate" of purchase or "how much it would increase as a result of" the social influence tactics. Tr. 1312:23-1313:16 (Pratkanis). Dr. Pratkanis's "conclusions" therefore suggest only that DIRECTV engages in advertising, just like every other company selling a product or service. This proposition is undisputed. DIRECTV clearly engages in persuasive advertising, as evidenced by the over 40,000 advertisements at issue in this case. Tr. 933:20-21 (Erdem). However, Dr. Pratkanis has provided no evidence to show that that persuasive advertising is deceptive.

### 2. Dr. Mandel Did Not Offer Opinions Of The Consumers' Net Impression

201. Dr. Theo Mandel was proffered as "an expert in the field of website design and usability." Tr. 422:2-4 (Mandel).

202. Dr. Mandel testified that he conducted an "expert review," which he describes as "an assessment of a website and collecting usability issues and areas of improvement." Tr. 423:16-21, 426:20-23 (Mandel). To do so, he reviewed the UX Site and "identified design elements that had usability issues." Tr. 428:18-24 (Mandel); 986:1-5 (Erem); Ex. 1045. Dr. Mandel does not list on his website an "expert review" as one of the services he provides clients. Tr. 471:18-22 (Mandel). Moreover, Dr. Mandel has never provided expert testimony regarding an "Expert Review" of the usability of a website. Tr. 491:15-18 (Mandel). No weight should be given to Dr. Mandel's opinions.

203. Dr. Mandel's opinions also are not probative of whether a consumer likely was deceived by the directv.com website. Dr. Mandel conceded that he is offering no opinion of what consumers may see or understand on directv.com. Tr. 490:9-12 (Mandel). Dr. Mandel expressly stated that he was "not offering [an] opinion that any particular customer was misled" or "deceived." Tr. 476:3-13 (Mandel).

204. Further, Dr. Mandel's subjective view of what a consumer may or may not be likely to see on DIRECTV's Old Flow website is not probative of any issue in this case. Dr. Mandel has proffered no empirical data regarding what users of the directv.com do on website, Tr. 490:1-8

58

ACTIVE 224875332

(Mandel), and in fact did not conduct an empirical study or analysis at all in connection with his testimony. Tr. 476:14-17, 477:17-20 (Mandel). Moreover, he admits he "would be speculating to answer [a] questions about what a consumer might think" or "might likely do." Tr. 467:6-21 (Mandel). In fact, Dr. Mandel's testimony was limited to pure speculation about what a user "may or may not see or understand" Tr. 490:13-15 (Mandel), "may . . . pay attention to" Tr. 432:14-20 (Mandel), "may not be likely to see" Tr. 442:10-11 (Mandel), and "may be unlikely to read or find . . . information" Tr. 442:13-18 (Mandel), as well as what "may not be a particularly familiar type of navigation" Tr. 446:15-17 (Mandel)—none of which is probative of deception or what a reasonable consumer is likely to see or understand after their use and review of the website.

205.   Dr. Mandel's use of the Health and Human Services Guidelines ("HHS Guidelines") is misguided. He ignored other relevant guidelines and failed to apply any sort of methodology in his consideration of the HHS Guidelines, noting some, while ignoring other relevant and applicable HHS Guidelines. Surprisingly, Dr. Mandel offered no opinion regarding whether DIRECTV's website violated the FTC's .com Disclosure Guidelines. Tr. 478:6-479:4 (Mandel); Ex. 1119. He also did not consider guidelines that apply only to eCommerce sites and instead considered the HHS Guidelines that apply to informational sites. Tr. 479:5-15 (Mandel). Indeed, the HHS Guidelines specifically state that they cannot be relied upon in these circumstances because "they are not rigid standards that can form the basis of a contract or a lawsuit. Guidelines are not a comprehensive academic theory that has strong predictive value, rather they should be prescriptive, in the sense that they prescribe practice with useful sets of DOs and DON'Ts." Ex. 901 at 4; Tr. 491:8-18 (Mandel). Moreover, and contrary to the HHS Guidelines, Dr. Mandel made assumptions regarding the users of directv.com without considering DIRECTV data, including demographic information regarding or the age and characteristics of the users of directv.com. Tr. 472:6-17 (Mandel). The HHS Guidelines state that a web developer should consider the user and "[p]rovide content that is engaging, relevant, and appropriate to the audience", "[u]se all available resources to better understand users' requirements", and "ensure that the Web site format meets user expectations." Ex. 901 at 24-26.

206.     Finally, the "core" of Dr. Mandel's work involved a review of only the August 2013 UX site.  Tr. 474:4-11 (Mandel).  Indeed, Dr. Mandel did not identify or analyze in his report a screen capture from any other iteration of DIRECTV's web flows.  Likewise, during his testimony, Dr. Mandel provided opinions only related to the UX Site.  Tr. 474:23-25 (Mandel).  While Dr. Mandel states that he reviewed screenshots of other iterations of directv.com, he provides no testimony or conclusions regarding any other iteration of directv.com, nor did he conduct any sort of content analysis such that his analysis of a prototype of the August 2013 iteration of the website could be applied to any other iteration of directv.com.

**D.     DIRECTV's Empirical Data Demonstrate That Its Customers Are Not Deceived**

207.     As part of its regular business practices, DIRECTV constantly monitors numerous metrics in order to track DIRECTV's business and sales performance and to ensure that it is meeting its business objectives.  Tr. 334:14-335:5 (Bentley) ("There's hundreds of different variables that we have within our internal database that are predictors of churn and predictive of value. And so we use that data to make informed business decisions.");  Tr. 399:4-14 (Bentley).  If there had been a widespread issue with consumers not knowing or understanding or being confused about the conditions of their service, such an issue would have been revealed in the metrics and data tracked by DIRECTV.  *See generally* Lundberg Depo. 150:10-155:1 (submitted Aug. 28, 2017).

208.     One of the most important metrics that DIRECTV measures is churn.  "Churn" is a measurement of the rate at which customers leave the platform.  Tr. 1389:25-1390:1 (Leever).  DIRECTV also monitors a related metric—the average length of time that a subscriber *stays* with DIRECTV (commonly referred to as average time on platform).  Tr. 649:14-23 (Guyardo).

209.     A third valuable metric monitored by DIRECTV is market share.  Ex. 991 at 6.  "Market share" measures the number of net additions ("adds") (new customers minus customers who churn) for DIRECTV and compares it to the net adds for the rest of the satellite and cable services industry.  Tr. 651:25-652:2 (Guyardo).

210.     Another important metric is "Net Promoter Score," or "NPS."  Net Promoter Score is a calculation of promoters (consumers who are satisfied or would recommend a service) minus

detractors (consumers who are dissatisfied or would not recommend a service), the sum of which measures customer satisfaction.  Tr. 363:12-364:11 (Bentley); Ex. 571 at 2.  NPS is not a unique metric for DIRECTV; rather, it is a "self-critical" standardized metric that can be compared within and across industries.  Tr. 364:6-11 (Bentley).

211.    If consumers felt deceived by DIRECTV advertising, that sentiment would be reflected in these various metrics referenced above.  Close rates and activation rates would have gone down, and, in particular, DIRECTV's churn rate would have risen and average time on the platform (necessarily) would have plummeted.  *See, e.g.*, Tr. 1047:3-1048:18 (Patel). DIRECTV's NPS would have also have decreased (and would have been low in comparison with its competitors). And finally, DIRECTV would have lost market share to any one of a number of the emerging competitors to the market—including Netflix and other streaming services.  Tr. 1457:20-1458:4 (Leever) (explaining that if consumers had felt deceived about the premium roll off, there would have been an impact in customer satisfaction scores, NPS scores, and churn rates); Tr. 397:24-398:12 (Bentley) (explaining that if DIRECTV advertising was deceptive, it would have been evident in the close rates, call volume, and churn rate).

212.    Moreover, the Customer Experience Initiative undertook a three-year project to identify and address customer "pain points."  Drawing from multiple, extensive sources of empirical and supplemental data—including customer comments, market research, in-depth interviews, sales calls, escalations, "learning lab" field insights, supplemental NPS surveys, transactional data, and social media—the CX Committee identified a complete list of approximately 120 identified customer pain points.  Tr. 1025:2-1043:23 (Patel); Ex. 589 at 5; FoF, *supra*, Section VIII.B.  If DIRECTV customers had been deceived by its advertising in the manner in which the FTC alleges here, that deception would have been reflected in the findings of the CX Committee and in DIRECTV's data collected on pain points, consumer research, sales calls, closing rates, activation rates, and churn.  Tr. 1047:3-1048:23 (Patel).

213.    But no such evidence exists in these metrics.  To the contrary, DIRECTV's churn rate stayed constant at approximately 1.5% from 2007 to 2013, "despite an increasingly competitive environment."  Tr. 650:20-651:7 (Guyardo); Ex. 991 at 5.  And DIRECTV improved its market

61

ACTIVE 224875332

share from 2008 to 2013, when "the DIRECTV subscriber base grew by 3.5 million subscribers . . . while all of [DIRECTV's] other competitors combined only grew by 400,000." Tr. 651:22-652:5 (Guyardo); Ex. 991 at 6.

214. Similarly, a subscriber's average time on the platform has also steadily increased over time. The average customer now stays with DIRECTV for "close[] to seven years"—years after the initial 24-month commitment period. Tr. 347:8-18 (Bentley).

215. Finally, as a result (in part) of the CX initiative, DIRECTV's NPS score increased over time from 16 to 34 and from "second best in the industry to best in class in the industry." Tr. 1077:16-20 (Patel).

**E. DIRECTV's Internal Documents Do Not Support A Section 5 Or ROSCA Violation**

216. The FTC's reliance on a handful of DIRECTV's internal documents to support its deceptive advertising claims is entirely misplaced. Far from showing deception, the documents and related testimony prove that DIRECTV has been committed to improving its customers' experiences, to keeping satisfied customers on its platform for the long term (the "lifeblood" of the company), and to delivering a highly-valued and competitively priced television service to tens of millions of customers. Tr. 894:12 (Depo. S. Hause at 136:12-137:03) (Tr. Vol. 5); FoF, *supra*, Section VIII. The McKinsey presentation on consumer sentiment, usability studies, eye tracking and click tracking studies, are not probative of deception, and the FTC's reliance on these documents should be rejected.

**1. Eye Tracking And Click Testing Studies Do Not Measure Consumer Comprehension Of Advertisements**

217. Third-party Real Eyes North America ("Real Eyes") conducted one "eye tracking market research study" for DIRECTV in 2010. Tr. 1221:8 (entering into the record Depo. J Hellstrom at 9:14-18, 130:25:131:08) (Tr. Vol. 7); Ex. 718.

218. During this study, participants were shown a DIRECTV print advertisement on a large computer screen. Tr. 1221:8 (Depo. J. Hellstrom at 25:25-26:07) (Tr. Vol. 7); Ex. 718 at 16. Real Eyes then tracked participants' "eye gaze data" for 30 to 90 seconds, aggregated that data, and

62

ACTIVE 224875332

1  created a "heat map" to show where participants focused their "visual attention" on DIRECTV's

2  advertisement.  Tr. 1221:8 (Depo. J. Hellstrom at 62:16-63:12) (Tr. Vol. 7); Ex. 718 at 16; Ex. 720 at

3  3.

4      219.    DIRECTV's former marketing executive Jon Gieselman testified that the results of

5  this study were never used or relied upon by DIRECTV in connection with the creation or

6  preparation of DIRECTV advertisements.  Tr. 890:4-18 (Gieselman).

7      220.    Additionally, the FTC has provided no evidence to show that this eye tracking study

8  was intended to replicate the experience that a consumer undertakes when reviewing DIRECTV

9  advertisements at home or before the purchase process.  Tr. 1221:8 (Depo. J. Hellstrom at 25:25-

10  26:07, 121:20-23) (explaining that the typical survey would be conducted at "mall intercepts or at

11  other high-traffic locations such as cafes or fitness centers.") (Tr. Vol. 7).

12      221.    Furthermore, the FTC conceded that these and similar studies do not measure what, if

13  any, net impression a consumer is taking away from an advertisement.  Tr. 1339:8-23 (Pratkanis).

14  Nor do these types of studies measure consumer sentiment, persuasion, or understanding of an

15  advertisement.  Tr. 1339:24-1340:5 (Leever).  Instead, all this document shows is that a person's

16  eyes are attracted to bright colors and pictures, rather than written details.

17      **2.    McKinsey's Presentation Concerned Consumer Sentiment Regarding the
         Mail-In Rebate**

18

19      222.    In connection with its Customer Experience initiative, DIRECTV partnered with

20  third-party consulting company McKinsey in order to take an "introspective look" at "areas of

21  opportunity" to improve the customer experience.  Tr. 286:15-287:1 (Bentley).

22      223.    As part of its engagement with DIRECTV, McKinsey surveyed a sample of

23  DIRECTV customers during their onboarding period, e.g., within the first 90 days of their tenure

24  with DIRECTV.  Tr. 287:23-288:3, 288:23-289:2 (Bentley).

25      224.    The FTC touched on one document referencing that 33% of DIRECTV customers

26  reported feeling misled by the telephone sales agent during the sign-up process.  Ex. 573.  As the

27  actual evidence showed, this study surveyed some customers in their first 90 days with DIRECTV,

28  which has nothing to do with the issues in this case.  Tr. 291:2-293:10 (Bentley).  Those customers

63

reported feeling misled in the one survey because, although they "had to redeem [their] rebate" in order to obtain the introductory price, "oftentimes consumers wouldn't redeem [the rebate] quick[ly] enough for it to be reflected on the first month bill." Tr. 291:21-292:5 (Bentley). This led some customers in that survey to feel "misled initially" before their promotional price took effect. *Id.* To ease this "pain point," DIRECTV first made it easier for customers to redeem the rebate online and later made the rebate "instant" so that "the customer has to take no action whatsoever." Tr. 293:11-21 (Bentley). The rebate now shows up automatically on each customer's bill. Most important, this survey had nothing to do with a two-year commitment, second-year pricing, ECFs, or premium channels rolling to pay. Tr. 288:15-289:14 (Bentley).

### 3. The Website Usability Studies Are Not Projectable

225. The web usability studies relied on by the FTC do not show any deception. To the contrary, DIRECTV's goal in commissioning such studies was to "delight the customer by doing usability where [the website] could be continuously improved so [it] could be easy to use and easy to understand." Tr. 1229:18-19 (entering into the record the deposition of S. Stinson at 195:11-196:6) (Tr. Vol. 8); *see also id.* 196:25-197:21 ("you don't hire independent objective third-party researchers to come into your company, time and again, to help improve websites if you have [the] intent [to deceive consumers about the prices of packages or the terms of their deals]"); *see also id.* 198:18-199:1, 205:19-22.

226. The usability studies the FTC relied on involved as few as four to 24 participants. *See*, *e.g.*, Tr. 1489:7-11 (Leever) (Ex. 1129 had four participants); Tr. 1491:7-24 (Leever) (Ex. 767 had 10 participants); Tr. 562:9-11 (Poling-Hiraldo) (usability studies had 10-20 participants on average). These studies expressly state that they are "qualitative … and as such, the findings may not be projectable to the entire universe of prospective users." Tr. 677:17-22 (Poling-Hiraldo); *accord* Tr. 688:16-24 (Poling-Hiraldo); 1229:18-19 (Deposition S. Stinson at 200:20-23 ("This is qualitative research; it's not quantitative research. It's not projectable to…the prospect audience that's out there.")) (Tr. Vol. 8).

227. The specific purpose of usability studies invariably was "to see if users could complete the task," that is, "whether or not they understood what it took to select a package and add

ACTIVE 224875332

it to their c[]art and checkout." Tr. 673:14-19 (Poling-Hiraldo); *accord* Tr. 1466:11-17 (Leever) ("Usability testing helped give us[,] the designers and the business digital folks an understanding of a feature or a functionality; does a consumer know how to whatever the task at hand is, purchase something, navigate through a flow.").

228.    The purpose was never to test the adequacy of disclosures, consumers' perception of disclosures, or whether consumers understood the terms and conditions of offers. Tr. 673:20-674:4, 678:24-679:5 (Poling-Hiraldo) ("[I]t would not be" appropriate to use these studies to "show that somehow consumers were unable to access particular disclosures" "because we weren't testing for that."); *accord* Tr. 1467:1-7 (Leever); 1229:18-19 (Depo. S. Stinson at 206:24-207:4, 219:22-220:2, 220:5-6, 220:8-11, 220:12-15, 221:10-14, 221:19-222:5, 222:8-222:18, 223:2-223:9, 223:11, 223:15-223:20, 229:10-17) (Tr. Vol. 8).

229.    DIRECTV used such usability studies directionally as a tool "to see the roadblocks in the functionality so [it could] make improvements on them"; however, "because one person's feedback may not necessarily reflect all the users," DIRECTV took "all of the feedback, [] aggregate[d] it, [] weighed it, and [took] a look to see what's actionable and what's kind of a recommendation." Tr. 677:23-678:16 (Poling-Hiraldo). Each study was just "a data point" because DIRECTV "had been working on th[e] website since 2005" and had "years and years of data points of how the consumer needs to see their information." Tr. 1487:24-1488:7 (Leever).

230.    Because of these studies' small sample size and qualitative nature, "many times it would be … half wanting it one way and the other half of the consumers tested wanting it another way." Tr. 1471:19-25 (Leever). DIRECTV could not simply "take the comments literally and start applying changes or [it] [wouldn't] have a kind of a consistent cohesive experience at the end." Tr. 1475:20-1476:6 (Leever). Instead, it had to "take into consideration the content and the context of what the user is saying", *id.*, and let its design experts take "overarching kind of themes" to determine how best to meet consumers' needs. Tr. 1472:2-9 (Leever); *accord* Tr. 1484:21-1485:7 (Leever).

231.    The usability studies also were not performed on final, live designs of the website, but rather on demos or clickable prototypes in connection with redesigns. Tr. 560:23-561:1

65

ACTIVE 224875332

(Poling-Hiraldo); *see also* Tr. 586:18-24 (Poling-Hiraldo) (Ex. 767 tested static screenshots); Tr. 1469:3-12 (Leever) (Ex. 770 tested prototype); Tr. 1489:17-20 (Ex. 1129 tested prototype). Thus, in these studies "a user wasn't really navigating through the website as they would as a consumer going through the purchase flow" because the "functionality was limited." Tr. 1229:18-19 (Depo. S. Stinson at 217:16-218:11) (Tr. Vol. 8).

232. The evidence shows DIRECTV used such testing to improve its website, Tr. 675:7-17, 678:10-16 (Poling-Hiraldo), and many of the purported issues identified by the FTC at trial with the prototypes or demos tested before launch were in fact improved in DIRECTV's actual live website. For example, Ms. Leever explained that DIRECTV made the View Monthly Cost tab in the live Old Flow "bolder and more prominent" and the text in the cart a "darker font" than in the prototype tested in Ex. 770. Tr. 1473:14-1475:18 (Leever). As another example, Ms. Poling-Hiraldo explained that in the New Flow, DIRECTV did a "complete redesign" of the View Monthly Cost link that the four participants in Ex. 1178 failed to notice because it "was an outdated pattern" and "it changed to a different link" in the cart. *See* Tr. 570:21-573:7, 701:7-702:4 (Poling-Hiraldo) (explaining "some of those changes were directionally influenced by" the study); *accord* Tr. 1487:9-1491:6 (Leever). DIRECTV later moved the redesigned View Monthly Cost link to the top of the Cart, consistent with feedback from another usability study. Tr. 688:3-15 (Poling-Hiraldo); *see also*, *e.g.*, Tr. 1494:8-1495:15 (Leever) (testifying that the "Learn More" link found by some to be difficult to read because "gray font against a gray background" in the prototype in Ex. 767 was changed to a "bright blue, which is an action color"); Tr. 1497:15-1498:24 (Leever) (testifying that the regular price of premium channels was added to the Add Premium Channels step in New Flow, consistent with feedback from Ex. 767); Tr. 1499:21-1500:16 (Leever) (testifying that the View Monthly Cost link was moved in the Cart so it was viewable without scrolling, consistent with feedback from Ex. 767).

F. **The FTC Introduced No Evidence Of Traditional Indicia Of Deceptive Advertising**

233. The FTC did not introduce any of the traditional types of evidence that have been historically used to support a Section 5 claim. Even though this evidence has featured prominently

ACTIVE 224875332

in other FTC deception cases, the FTC presented none of it here.  *See Commerce Planet, Inc.*, 878 F.

Supp. 2d at 1063.

234.    If DIRECTV's advertising since 2007 had really been a massive and prolonged

campaign that deceived 33.5 million subscribers, the FTC would have introduced ample traditional

evidence of deception. In other Section 5 cases, actual customer testimony, consumer complaints or

negative social media discussions, refund requests, high churn, lower sales with enhanced

disclosures, and decreasing market share over time have been introduced and heavily weighted by

courts. *See, e.g., Commerce Planet, Inc.*, 878 F. Supp. 2d at 1073-76, 1078; *FTC v. Inc21.com Corp.*,

745 F. Supp.2d 975, 992-99 (N.D. Cal. 2010) ("staggering" amount of unauthorized charges,

consumer complaints, refunds, and customer testimony considered as additional indicia of

deception).

235.    The FTC did not have a single consumer testify at trial.  There is no evidence that any

consumer has claimed to have been deceived by DIRECTV's advertising or in the sign-up process.

The FTC introduced no evidence that there were a significant number of customer complaints

regarding the terms of purchase at issue. Despite the express allegation in the FTC's Complaint that

"tens of thousands of  consumers complain[ed]" about DIRECTV's marketing practices, Dkt. 1 at 4,

the FTC introduced no evidence to support that contention. To the contrary, its "social influence"

expert testified that consumer complaints are a poor indicator of deception.  Tr. 1338:6-13

(Pratkanis).  *Compare Commerce Planet, Inc.*, 878 F. Supp. 2d at 1073 (the FTC introduced "ample

evidence that Commerce Planet . . . received thousands of telephone complaints").

236.    The FTC introduced no evidence that there was any significant negative feedback or

discussion regarding DIRECTV's terms of purchase on social media, which would have been

expected had DIRECTV's ads or signup process been deceptive.  *See* Tr. 398:13-16 (Bentley) ("you

would see a big spike" on social media if customers are feeling misled).

237.    The FTC introduced no evidence of a high volume of credit card chargebacks.

238.    The FTC introduced no evidence of high churn.

239.    The FTC introduced no evidence of decreasing market share over time.

ACTIVE 224875332

240.     This lack of evidence is telling and confirms that the FTC has not met its burden of proof under Section 5.

## X.     THE FTC DID NOT MEET ITS BURDEN OF PROOF ON ITS ROSCA CLAIMS

### A.     <u>ROSCA Does Not Prohibit Disclosures In Hyperlinks And Info Hovers</u>

241.     ROSCA took effect on December 29, 2010.  15 U.S.C. § 8403.

242.     Other than the requirement that certain material terms relating to an online negative option transaction be clearly and conspicuously disclosed, ROSCA does not prescribe or prohibit any particular type of disclosure or express informed consent mechanism.

243.     ROSCA does not prohibit the use of hyperlinks or info hovers as proper disclosure formats.  Nor has the FTC promulgated any rules or regulations prohibiting them.

244.     The FTC's ".com Guidance," while not binding on the Court, at least provides some notice to the public as to how the FTC will enforce its authority. That guidance does not prohibit disclosure through hyperlinks or info hovers and certainly does not claim that any such disclosure would be inconspicuous.  *See* Ex. 1119 at 15 ("Hyperlinks can provide a useful means to access disclosures").  According to the FTC, there is "no set formula for a clear and conspicuous disclosure," and "[h]yperlinked disclosures may be particularly useful if the disclosure is lengthy or if it needs to be repeated." *Id.* at 12, 15.  Likewise, no court has ever interpreted ROSCA or any similar statutory language to mean that hyperlinks or info hovers fail to provide clear and conspicuous disclosures as a matter of law.

245.     Moreover, if there had been a question or concern regarding whether consumers saw or understood the premium channel disclosures, the data and metrics tracked by DIRECTV would have revealed such an issue, consistent with the FTC's ".com Guidance" to monitor information about consumer use.  *See* Ex. 1119 at 18 (advertisers should "[p]ay attention to *indicia that hyperlinked disclosures are not effective*" but "are not required to" monitor "click-through rates") (emphasis added).

ACTIVE 224875332

**B.** **The FTC Contends That "Clear and Conspicuous" Is A Performance Standard**

246. Instead of a categorical rule, the FTC promulgated in its Guidelines what it calls a "performance" standard for determining whether disclosures are clear and conspicuous—"that is, how consumers actually perceive and understand the disclosure within the context of the entire ad." Ex. 1119 at 11. This is an appropriate standard to follow because ROSCA itself neither prescribes nor prohibits any manner of online disclosure, only that the terms of the negative option be clearly and conspicuously disclosed.

247. The Ninth Circuit has interpreted "clear and conspicuous" requirements in other federal statutes in similar ways. Those cases require that disclosures be made in a manner that reasonable consumers will notice and understand.[4] This means that "[n]o particular kind of formatting is magical," and the Court of Appeals has therefore found no need to "promulgate here a code of conspicuousness." *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (discussing clear and conspicuous disclosures under the Truth in Lending Act).

248. In determining whether a disclosure is likely to be noticed and understood, courts analyze the disclosure from the perspective of a reasonable consumer. "[R]easonably prudent" consumers who purchase goods or services online "know[] that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer v. Uber Tech., Inc*. Nos. 16-2750-cv, 16-2752-cv, 2017 WL 3526682 at *7-8 (2d Cir. Aug. 17, 2017) (enforcing arbitration clause in Terms of Service contained in a hyperlink below the "REGISTER" button on the payment screen). Reasonable consumers transacting on the Internet are readily familiar with hyperlinks, info hovers, and terms and conditions boxes.

---

[4] *See, e.g.*, *In re Bassett*, 285 F. 3d 882, 885 (9th Cir. 2002) (Bankruptcy Code provision requiring a "clear and conspicuous" statement of the debtor's right to rescind an agreement means the statement must be written in a way that "a reasonable person against whom it is to operate ought to have noticed it") (quoting U.S.C. § 1-201(10)).

**C.** **The FTC Failed To Prove That Consumers Are Unlikely To See and Understand Premium Channel Terms And Provide Proper Consent**

249.    Although DIRECTV bears no burden of proof in this case, the evidence introduced as part of the FTC's own case showed that DIRECTV's premium channel disclosures are clear and conspicuous and that customers who signed up for the service gave their informed consent.

250.    Since 2011, each of the web flows repeatedly disclosed the details of the negative option. FoF, *supra*, Section VII.B.3; *see also* Tr. 1416:9-11(Leever) (testifying to "one instance of many instances in the flow where [DIRECTV] gave disclaimer information [that was] clear and conspicuous"). These disclosures were made in close proximity to the premium channel offer, including immediately next to the premium channels in the cart, *see*, *e.g.*, Ex. 2033 (8/2013 capture) at 25, 33, 59; Ex. 1080 (3/11/16 capture) at 25, 32, 37-40, 96, 100, 102, 104, 132, 138; Tr. 1432:9-18 (Leever) ("So they would have seen HBO, SHOWTIME, STARZ 59.96, and then a minus 59.96. And then they would have read on the left side, free for three months, so they would have known that 59.96 was free for three months. And then when they clicked on the i, they would have gotten the additional information that they would have to call to cancel."). Customers expressly consented to purchase the entire DIRECTV package with clear and conspicuous disclosures as to the premium channel offer.

251.    Although in the Old Flow it was possible that a consumer could intentionally avoid all disclosures, the "disclosures and information" were "place[d]" so "that a reasonable consumer was likely to see them," Tr. 1523:20-1524:4 (Leever), and a consumer would only avoid this information if it was her "intent to . . . navigate around and not roll over any icon or roll over [for] any additional information." Tr. 1482:22-14833 (Leever).

252.    The trial evidence further shows that consumers did in fact navigate the web flow reasonably and did see, understood, and consent to DIRECTV's premium channel offer.

253.    First, the majority of customers canceled the premium channels in the first three months, before the charges began. Tr. 387:22-388:4, 393:19-394:6, 405:9-24 (Bentley).

254.    Second, DIRECTV usability studies showed that customers uniformly saw, used, and appreciated the hyperlinks, tooltips, and info hovers on DIRECTV's web flow, and that they

generally understood the premium channel negative option. Tr. 680:10-683:7 (Poling-Hiraldo); 1469:14-1470:13, 1492:3-24 (Leever); Ex. 770 at 27; Ex. 767 at 23. This finding was no surprise to Karen Leever, who has 20 years of experience in designing web sites, because presenting information in this manner is "a common standard [] used across multiple websites" and "multiple industries" and is an "established method." Tr. 1470:9-13.

255.     Third, DIRECTV's customer satisfaction, net promoter, and churn data all confirm that consumers understood these disclosures and were informed as to their terms. If DIRECTV's premium channel negative option disclosures were not clear and conspicuous, when the channels rolled-to-pay it "would have [made] an impact in [DIRECTV] customer" data. Tr. 1457:8-1458:4 (Leever). For example, it would have decreased "customer satisfaction scores" and "NPS [net promoter scores]," as well as increased "churn." Tr. 1457:20-1458:10 (Leever). The company would have received many complaints at its call centers when the option rolled-to-pay, and customers who started the buying process online but then moved to the phone would have complained to phone sales agents as well. Tr. 1458:5-6, 1459:18-1460:2 (Leever). There is no evidence of any of this negative data. In fact, the data demonstrate just the opposite: customer satisfaction scores, NPS, and churn all show that DIRECTV had satisfied and stable customers. Tr. 284:7-15, 347:8-23, 397:20-398:12 (Bentley); 894:12 (Depo. S. Hause at 136:12-137:03) (Tr. Vol. 5); 1048:11-23, 1077:16-1078:5 (Patel); 1456:13-16, 1457:8-1458:25 (Leever). Subscribers who came through DIRECTV's website had some of the highest customer satisfaction scores in the organization. Tr. 1458:22-25 (Leever).

256.     Finally, the company performed a comprehensive, data- and survey-driven review of all conceivable "pain points" customers had with DIRECTV. Through this company-wide review, DIRECTV identified more than 100 "pain points," but not a single one was that customers felt uninformed or deceived about the negative option. Tr. 1456:13-16 (Leever).[5]

---

[5] Further, in the "new flow," which was rolled out in 2014, DIRECTV further disclosed the negative option in the "terms and conditions" of the purchase and required customers to click a box confirming that they viewed and agreed to these hyperlinked terms and conditions prior to purchase. Tr. 1502:13-1503:20. Courts have held that a disclosure made in hyperlinked "terms and conditions" page, coupled with a mandatory check box, constitutes a proper and sufficient disclosure

257. In the face of this evidence, the FTC did not introduce competent evidence to show that consumers were unlikely to see and understand the premium channel negative option disclosure such that their express consent to purchase was not informed.

258. As explained, FoF, *supra*, Section IX.B.2, Dr. Erdem's study suffered from fundamental flaws in methodology and execution and have lacks any evidentiary weight. As relevant here, Dr. Erdem tested only a prototype of DIRECTV's website that had non-functioning hyperlinks, tool tips, and info hovers. The Court cannot draw any conclusions regarding the clarity and conspicuousness of disclosures that were made in hyperlinks, tooltips, info hovers from a study that may have conditioned respondents to ignore them and which disabled them in the static thumbnail images provided to respondents as the only reference in the questionnaire portion of the survey.

259. Furthermore, Dr. Erdem chose to not even test or track whether respondents clicked on the hyperlinks, tooltips and info hovers. Tr. 998:20-1001:3 (Erdem). Her testimony regarding whether customers tend to click on and read this information is mere speculation and not probative.

260. Dr. Mandel similarly provided no probative evidence on clarity and conspicuousness of DIRECTV disclosures. His testimony went to usability and design. He could not testify at all about the actual performance of DIRECTV's disclosures, and in fact conceded that he would be speculating as to whether consumers clicked on info hovers or hyperlinks, nor can he rebut the evidence showing that DIRECTV's disclosures are effective. *See, e.g.*, Tr. 432:16-20, 437:19-22, 485:19-21, 442:15-18, 453:2-5, 458:13-459:1, 493:10-19 (Mandel).

261. Finally, as to New Flow, DIRECTV further disclosed the negative option in the "terms and conditions" of the purchase and required customers to click a box confirming that they viewed and agreed to these terms and conditions prior to purchase. Tr. 1437:2-24, 1502:13-1503:20 (Leever); *see also* 1437:2-24 (Leever) ("It's clear and conspicuous. If I don't check the box, I then get a red warning that says that you have to confirm that you agree to the terms and conditions. And that is standard in many, many services . . . ."). In similar contexts, courts have held that a

as a matter of law. *Cordas v. Uber*, 228 F. Supp. 3d 985, 991 (N.D. Cal. 2017); *Meyer v. Uber Tech., Inc*., Nos. 16-2750-cv, 16-2752-cv, 2017 WL 3526682 at *7 (2d Cir. Aug. 17, 2017).

disclosure made in a hyperlinked "terms and conditions" page, coupled with a mandatory check box, constitutes a proper and sufficient disclosure. *Cordas v. Uber*, 228 F. Supp. 3d 985 (N.D. Cal. 2017) (finding no genuine dispute regarding whether Uber user was on notice that he was subject to arbitration because creating an account requires user to click "DONE" on a screen stating that "By Creating an Uber account, you agree to the Terms & Conditions and Privacy Policy," which contains an arbitration provision); *Meyer v. Uber Tech., Inc.*, Nos. 16–2750–cv, 16–2752–cv, 2017 WL 3526682, at *7-8 (2d Cir. Aug. 17, 2017) (finding a "reasonably prudent smartphone user would have constructive notice of the terms" of their Uber agreement where: (1) the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" appeared directly below the buttons for registration, and (2) the hyperlinked "TERMS OF SERVICE & PRIVACY POLICY" text was "reasonably conspicuous").

## XI. THE FTC IS NOT ENTITLED TO MONETARY RELIEF

262. Even if the FTC had offered evidence sufficient to proceed on liability, it failed to carry its burden as to equitable monetary relief with respect to both the claims under Section 5 and ROSCA. The Court should grant judgment in DIRECTV's favor on the FTC's claims for equitable relief.

### A. Dr. Rascher's Flawed Application Of The *Commerce Planet* Framework

263. Under the Ninth Circuit's *Commerce Planet* decision, the FTC first "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains" before the burden shifts to the defendant to disprove that amount. *Commerce Planet, Inc.,* 815 F.3d at 603. The FTC has not met its burden.

264. Dr. Daniel Rascher testified in support of the FTC's claim that $3.95 billion represents "a reasonable estimate (under *Commerce Planet*) of the unjust gains DIRECTV collected from consumers." Dkt. 337 at 11. To calculate this amount, Dr. Rascher examined customer billing data for certain types of programming packages identified by the FTC. Tr. 1552:5-10; 1554:11-17. He then calculated an estimate of unjust gains related to second year pricing, Tr. 1599:09-1600:07 (Rascher) ($3.68 billion); Ex. 1321, and the premium channel offer, Tr. 1605:12-16 (Rascher) ($268 million); Ex. 1322.

73

265. Dr. Rascher testified that he calculated DIRECTV's "unjust gains" based on the assumption that "*all* DIRECTV subscribers . . . thought they would pay the same amount in the second year as they paid in the first," Tr. 1630:15-20 (emphasis added), and that he applied "that same kind of presumption" with respect to unjust gains for the premium channel offer, Tr. 1681:11-25. He thus presumed that all DIRECTV subscribers in his approximation of unjust gains were misled, and that they were all misled in the same way.

266. Dr. Rascher testified that did not determine or opine on the percentage of customers allegedly misled by DIRECTV's advertising. Tr. 1683:01-05 (Rascher).

267. Indeed, Dr. Rascher testified that (1) he had no opinion as to "what consumers thought or expected" after viewing any of DIRECTV's advertising, Tr. 1621:22-1622:03; 1643:06-10; 1644:04-10 (Rascher); (2) he conducted no empirical studies himself (experimental, behavioral, survey, content analysis, or otherwise) Tr. 1625:10-21; and (3) he did not rely on any studies conducted by others in forming his opinions, 1626:14-24, 1638:07-09 (Rascher).

268. Rather, he explained that he had been instructed that the FTC would prove what DIRECTV customers "thought" or "believed" their deal with DIRECTV to be and thus supply the core predicate for his analysis. Tr. 1616:13-18; 1618:08-25 (Rascher). However, the FTC did not even attempt to prove that predicate, FOF, *supra*, Section IX.B.1, and therefore, the central presumption underlying Dr. Rascher's calculations has no basis in the record. *See McGlinchy v. Shell Chemical Co*., 845 F.2d 802, 806-07 (9th Cir. 1988) (affirming trial court's exclusion of expert testimony that had no basis in the record and rested on "unsupported assumptions"); *see also In re Wellbutrin XL Antitrust Litigation*, 308 F.R.D. 134, 146 (E.D. Pa. 2015) ("instruction from counsel is not a sound basis on which to draw an economic conclusion").

269. Instead, as Dr. Rascher explained, the FTC advised him that he could "presume reliance," which he said he then "operationalized" as a presumption that all subscribers purchased DIRECTV service with the "expectation" that the second-year price would be the same as the first-year price (and he adopted similar presumptions as to the other terms at issue). Tr. 1554:5-1556:6. He explained that he was instructed that, once he took that step, the burden would fall on DIRECTV to affirmatively disprove his analysis. Tr. 1553:18-23.

1

**B.**     **The Presumption Of Reliance Does Not Apply**

270.     In *Commerce Planet*, the FTC proved that every customer that signed up for the service did so through two versions of a website that conveyed a false net impression, and the court therefore presumed that all customers relied on the false claim on the website. *See* 878 F. Supp. 2d at 1064-68 (finding both versions of the company's website conveyed the misleading impression that the service was free).

271.     The FTC made no comparable showing in this case for the entirety of the advertising at issue and for every manner in which a customer subscribes to DIRECTV for the following reasons:

    a.     Dr. Rascher's calculations were based on purchases made by approximately 33 million subscribers over a 10-year period who may have seen none, one, or more of the over 40,000 different advertisements at issue and who signed up through a variety of channels and subscription processes within each channel. FOF, *supra*, ¶ 26 & Sections V-VI. The FTC has presented no evidence on most of these advertisements and marketing materials; many thousands are not even *in* evidence, and of the ones that are, only a handful were the subject of testimony or expert review. *Commerce Planet* does not permit the FTC to presume that the millions of customers who may have viewed marketing materials that are not in evidence relied on deceptive statements in deciding to subscribe.

    b.     The evidence has established that there were 40,000 unique print ads, hundreds of banner ads, dozens of television commercials, and many different iterations of DIRECTV's website. There is no evidence supporting a presumption that any customer viewed or relied on any one advertisement or that consumers' took away the same net impression from each of the advertisements at issue, particularly when the ads vary substantially in message, content, and offer.

    c.     Consumers subscribe to DIRECTV in different ways. Specifically, in order to subscribe to DIRECTV, a consumer has to either go online or call a telephone sales agent. Tr. 641:15-19, 642:5-21, 643-4:16 (Guardo). On the web, the average time a consumer takes to complete DIRECTV's web flow when making an online purchase of DIRECTV is about 45 minutes.

ACTIVE 224875332

Tr. 792:18-21 (Chen); Tr. 1442:12-15 (Leever). Those that did make a purchase typically "had multiple visits to be able to go through different parts of the website and learn and educate themselves" before making a purchase because it's a big purchase and a complex product that requires "a lot of decision points[.]" Tr. 1439:1-24 (Leever). The vast majority of direct sales customers, however, call DIRECTV to subscribe (even those who may initially start on directv.com), Tr. 1441:23-1442:15 (Leever), and the calls with customer service representatives averaged 30-45 minutes. Tr. 388:24-389:7 (Bentley). There is no evidence that consumers' subscribing to DIRECTV in the various ways to do so has the same net impression about the terms of purchase.

272. Moreover, DIRECTV data rebuts the presumption of reliance. Specifically, DIRECTV presented evidence of low customer churn (Tr. 1077:21-1078:5 (Patel)), an average customer lifespan of over six years, Tr. 347:8-13 (Bentley), and a high customer satisfaction rating for the industry, Tr. 284:7-15 (Bentley); Tr. 1077:16-20 (Patel). This evidence, along with the evidence regarding DIRECTV's sales process, is sufficient to rebut any presumption of reliance on the advertising, even if the FTC has proffered evidence and established that the ads had conveyed a uniform false impression about DIRECTV's core product or service, which the FTC did not do.

**C.** **Dr. Rascher's "Presumption Of Expectation" Is Not A Presumption of Reliance**

273. A presumption of reliance is not a presumption of expectation. A "presumption of reliance" presumes that customers "*purchased*" a service "in reliance on the misrepresentations." *Commerce Planet*, 815 F.3d at 604 (emphasis added). It has thus been applied in cases where, for example, the product was a sham or the deception misled consumers about the product's core function such that there was reason to believe that, had a customer not been deceived, she would have been unlikely to have made the purchase at all. *See, e.g., id.* at 602 (consumers signed up for a "free" auction kit and were enrolled in a different service for which they faced recurring charges); *FTC* v. *Bronson Partners*, 654 F.3d 359 (2d Cir. 2011) ("no evidence that any of Bronson's gains were 'just' gains because the Chinese Diet Tea and the Bio–Slim Patch in no instance worked as advertised").

ACTIVE 224875332

274. Here, the FTC instructed its damages expert to calculate restitution through an "'expectation' injury framework" measuring consumers' total losses. Tr. 1556:7-10; 1611:21-1612:12 (Rascher).

275. Dr. Rascher testified that he was *not* presuming "a reliance injury" focused on "the customers who wouldn't have purchased the product." Tr. 1556:11 -1557:1 (Rascher); *see also* Tr. 1595:23-1596:1 (Rascher).

276. Instead, Dr. Rascher testified that he compared the actual price paid by the customers to what would have happened if DIRECTV had performed as its ads indicated it would. Tr. 1554:18-1555:16 (Rascher).

277. Dr. Rascher further testified that, to determine the price that a customer would pay in the but-for world, he simply used the price the customer had paid in the first year based on the billing data. Tr. 1555:08-16 (Rascher). Dr. Rascher offered no analysis or explanation as to what the ads indicated the terms of the subscription actually would be. Instead, he simply presumed that customers had an expectation that they would pay the same introductory price for two years, based only on an instruction from the FTC. 1618:08-25; 1667:02-09 (Rascher).

278. Even if the Court could presume reliance on the ads, the Court cannot presume expectation. *See e.g.*, Tr. 1643:23-1644:10 (Rascher). The FTC did not even attempt to prove that the net impression of DIRECTV's ads conveyed a single and specific false price for DIRECTV service. The FTC took pains in its case-in-chief to avoid reference to "net impression" entirely, let alone a false net impression that premium channels would always be free or the promotional price for 12 months would continue in the second year. Therefore, Dr. Rascher could not simply presume that customers expected to pay the promotional price in their second year as a result of advertising.

279. Any such presumption would be particularly improper here because the evidence showed that customers received significant information from DIRECTV after viewing an advertisement. Unlike in *Commerce Planet*, where there were no additional interactions before the service was purchased, DIRECTV continued to convey information about the terms of service through confirmation letters, e-mails, customer agreements, and lease agreements after the advertisement—and prior to activation. FOF, *supra*, ¶¶ 27, 80-82, 87-119, 133-36. There is no

ACTIVE 224875332

evidence of what customers expected based on the advertisements or what customers expected by the time they signed up for DIRECTV, which is when Dr. Rascher attempted to calculate an estimate of unjust gains.  Tr. 1645:13-17 (Rascher). Therefore, Dr. Rascher could not simply presume—as he did—that there was a precise amount customers expected to pay as a result of any advertisement they may or may not have viewed.

### D. The FTC Did Not Carry Its Burden Of Reasonably Approximating DIRECTV's *Unjust* Gains

280.    As the Second Circuit explained in *Verity*, in a case like this one, *before* shifting the burden to the defendant, the FTC must establish that its reasonable approximation takes into account those consumers who received what they paid for. *FTC v. Verity Intern.*, 443 F.3d 48, 69 (2nd Cir. 2006).  In *Verity*, where, like here, no presumption of reliance applied, the FTC nonetheless proposed a monetary demand that was based on the assumption that every customer had been the victim of the alleged deceptive practice. The Second Circuit held that, because some customers had authorized the adult services in question and had *not* been deceived, "a reasonable approximation of the defendant-appellants' *unjust* gains must take this into account."  *Id.* at 69. The FTC thus did not meet its "burden" of proving a "reasonable approximation" at the first step of the analysis because it did not account for that consideration, and the Second Circuit therefore held that the district court was "premature in shifting the burden of proof to the defendant-appellants." *Id.* Indeed, as the Second Circuit explained, "[t]he FTC's investigatory power gives it the capacity to estimate with some degree of precision how many" consumers were actually deceived and it must distinguish between "just" and "unjust" gains before the burden shifts to the defendant. *Id.*[6]

281.    The FTC did not carry its burden to reasonably approximate DIRECTV's unjust gains, and therefore, the burden never shifted to DIRECTV under *Commerce Planet*'s two-step

---

[6] The FTC's claim for equitable monetary relief is governed by the fundamental principle that no "Court in Equity" would ever "interfere to grant relief upon the ground of fraud" if the other party were "not misled" by the "misrepresentation."  1 J. Story, *Commentaries on Equity Jurisprudence in England and America,* § 191, p. 217 (12th ed. 1877). To obtain relief, "the party must have been misled to his prejudice or injury." *Id* § 203, p. 230; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2011) ("[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*") (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)) (emphasis in original).

burden shifting framework.  Because Dr. Rascher presumes customers' expectation, neither the FTC nor Dr. Rascher distinguished between customers who were deceived by DIRECTV's advertising and those who were not.

282.  Dr. Rascher's approximation did not take into consideration that DIRECTV informed consumers of the terms of the deal multiple times during the sign-up, onboarding, and activation process—*e.g.* by phone or on the website, by confirmation email or letter, by the sales technician at the time of the activation, and by the terms of the lease agreement and consumer agreement.  Tr. 1646:02-08; 1646:9-1647:01 (Rascher).

283.  Dr. Rascher conceded that if a consumer knows the terms of the agreement with DIRECTV before activation, a measure of unjust gains should not include those consumers. Tr. 1653:08-1654:3 (Rascher). Yet Dr. Rascher made no attempt to exclude from his calculation of unjust gains those customers who expected to pay a higher price in the second year. Tr. 1627:19-1628:02; 1628:21-1629:10; 1669:25-1670:19 (Rascher).

284.  Dr. Rascher also did not consider numerous distinguishing factors that would affect the assessment of possible deception for the 33 million customers at issue:

    a.  Dr. Rascher agreed that the allegedly offending ads were not the same, changed over time, and presented different offers in different ways.  Tr. 1636:11-1637:1 (Rascher).

    b.  Dr. Rascher made no attempt to disaggregate his $3.95 billion estimate by sales channel, web, telephone, or direct marketing tactic over the last decade.  Tr. 1631:19-1632:05; 1634:6-11; 1634:16-25, 1635:11-14 (Rascher).

    c.  If a customer signed up for DIRECTV via the website, Dr. Rascher did not segregate alleged unjust gains attributable to DIRECTV's current website, wizard flow, old flow, new flow, or "any other iteration of DIRECTV's website over the last ten years."  Tr. 1635:19-1636:05, 1636:07-10 (Rascher).

    d.  Dr. Rascher instead calculated the total dollars assessed by DIRECTV to customers who signed up for certain programming packages without regard to what those customers understood or expected, without regard to what ads, if any, the customers viewed, and without regard to how the customer signed up.

79

ACTIVE 224875332

285. Dr. Rascher's estimate of unjust gains was further based on what customers were charged, not based on what DIRECTV collected as revenue. Tr. 1564:01-04 (Rascher).

286. The FTC did not provide a reasonable approximation of unjust gains related to the alleged second year pricing claim.

**E.  Dr. Rascher Failed For Additional Reasons To Satisfy The FTC's Burden For Monetary Relief Related To The Premium Channel Negative Option, Early Cancellation Fees, And ROSCA**

287. Dr. Rascher also calculated the total amount of early cancellation fees assessed by DIRECTV for all customers who signed up for the programming packages identified by the FTC.

288. The FTC produced no evidence that these customers cancelled because they were unaware of the terms of the DIRECTV subscription. Instead, Dr. Rascher presumed that every customer who cancelled during the relevant time period did so because they were misled into purchasing the subscription.

289. Dr. Rascher also ignored evidence presented by DIRECTV that the vast majority of DIRECTV customers who canceled did so for reasons other than price (for example, they moved). Tr. 1675:1-25, 1676:2-1677:3; 1678:03-05 (Rascher).

290. Dr. Rascher's ECF calculation also included money that DIRECTV never obtained and that consumers never paid. DIRECTV offered evidence that "60 to 65 percent of the ECFs go uncollected" by DIRECTV. Tr. 1583:15-25(Rascher). Nevertheless, Dr. Rascher included 100% of assessed ECFs in his calculation. Tr. 1672:23-1674:17, 1673:13-21 (Rascher).

291. The FTC did not provide a reasonable approximation of unjust gains related to any early cancellation fees collected by DIRECTV.

292. Dr. Rascher's premium channel offer calculation was not reasonable because it was based entirely on an instruction from the FTC, not any estimate of harm or unjust gains. Dr. Rascher calculated a 6-month period of premium channel payments (from months 4-9) after consumers' premium channels rolled to pay, which he admitted he had "no economic basis" to do. Tr. 1680:24-1681:10.

293.    Dr. Rascher then presumed that any customer who cancelled in months 4-9 did so because they had been misled about the premium channel offer. Tr. 1681:11-1681:17; 1681:20-22 (Rascher).

294.    However, Dr. Rascher did not conduct any analysis as to why customers canceled their premium channels at any point in time. Tr. 1681:11-1681:17; 1681:23-25 (Rascher).

295.    The FTC did not provide a reasonable approximation of unjust gains related to the premium channel offer.

296.    Finally, Dr. Rascher did not provide any calculation of unjust gains for ROSCA. ROSCA applies only to online sales from 2011 and thereafter, 15 U.S.C. § 8404, but Dr. Rascher did not testify as to any specific amount of alleged unjust gains exclusive to online sales from this time period.  The FTC therefore did not carry its burden on equitable monetary relief under ROSCA.

## F.    A "Benefit of the Bargain" Remedy Is Legal Damages, Not Restitution

297.    Although the Ninth Circuit has interpreted section 13(b) as conferring the "equitable power to order payment of restitution," it held that courts are "preclud[ed]" from "awarding damages." *Commerce Planet, Inc.*, 815 F.3d at 599.  In addition to its other deficiencies, Dr. Rascher's "expectation interest" framework, Tr. 1556:07-10, is an award of money damages—not restitution—and therefore independently barred by section 13(b). [7]

298.    "Restitution" is awarded when a "transfer induced by fraud or material misrepresentation is subject to rescission," and "restitution" is "necessary to avoid unjust enrichment." 1 Restatement (Third) of Restitution and Unjust Enrichment § 13, p.165.  Yet, the FTC is not seeking to rescind subscribers' contracts for DIRECTV service and require DIRECTV to return the money it unjustly earned from the contracts.  The remedy is accordingly not restitution.

299.    Instead, the FTC is seeking to enforce the contractual bargain the FTC claims was offered by the DIRECTV ads. This is why Dr. Rascher calculated monetary relief as the difference between the "actual price paid by the customers" and "the bargain that they would have received had

---

[7] It is DIRECTV's position that the FTC is not entitled to any form of monetary relief because it brought this case under section 13(b), which authorizes only injunctive relief, 15 U.S.C. § 53. Because this Court is bound by the contrary construction of this provision adopted by the Ninth Circuit in *Commerce Planet*, we merely preserve this issue for appeal.

ACTIVE 224875332

DIRECTV done what" the FTC alleges the "ads claimed [it] would do." Tr. 1554:21-24. That is the quintessential example of "expectancy" damages that give a person the "benefit of the bargain he in fact made" by awarding a sum of money that puts him "in as good a position as he would have been in had the contract been performed." Dobbs, 3 Law of Remedies § 12.2(1) pp. 22-23 (1993); *see also ALLTEL Information Services, Inc. v. F.D.I.C.*, 194 F.3d 1036, 1039 n. 3 (9th Cir. 1999).

300. No court in a Section 13(b) case has ever awarded the FTC "expectation" or "benefit-of-the-bargain" damages. This is because both are a form of "general damages," Dobbs at pp. 22-23, and for that reason are barred by *Commerce Planet.*

## XII. THE FTC HAS NOT MET ITS BURDEN AS TO A PERMANENT INJUNCTION

301. Section 13(b) of the Act provides that the Court may issue a permanent injunction to *remedy past or likely future violations* of the FTC Act. *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314 (8th Cir. 1991); *see also FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110-11 (9th Cir. 1982). The FTC failed to prove that DIRECTV violated Section 5 or ROSCA or that it will violate those statutes in the future. The FTC, therefore, is not entitled to a permanent injunction.

302. Further, in order to be entitled to a permanent injunction, the FTC must establish, on balance of the equities, that a permanent injunction would be in the "public interest." 15 § U.S.C. 53(b); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1028-29 (7th Cir. 1988) ("We believe that the legislative history of section 13(b) makes it quite clear that the 'public interest' test is the correct approach.") (citing *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir.1984) (per curiam)).

303. In this case in particular, the FTC's permanent injunction is inequitable and does not favor the public interest. As the evidence at trial established, in December 2010, DIRECTV entered into a Multistate Settlement Agreement that was agreed to by all 50 states and the District of Columbia. Ex. 1212; Tr. 254:9-18 (Bentley). DIRECTV, the 50 states, and the District of Columbia have stipulated, with specificity, as to how DIRECTV's nation-wide advertising is to disclose certain qualifying terms of its offer. That included a definition of "clear and conspicuous" and the appearance and placement of disclosures in print advertisements. Tr. 256:9-257:5 (Bentley).

304.     In the seven years since the MSA was executed, no jurisdiction has commenced an enforcement action under the MSA.  Tr. 1201:25-1202:2 (Friedman).  The FTC offered into evidence only one instance in which Texas and Tennessee inquired about a specific DIRECTV advertisement. DIRECTV responded that the advertisement included with the inquiry from the Attorney General for the State of Tennessee was materially incomplete because it did not include all the disclosures in the ad, and pointed the Executive Committee over the MSA to the appropriate disclosures. No enforcement action was taken by any jurisdiction at any time then or since.  Tr. 1217:18-1219:4 Ex. 1241 (Friedman).

305.     During that same seven-year period, DIRECTV has made changes to its advertising and to its website in reliance on the MSA.  Tr. 1202:3-9 (Friedman).

306.     There can be no "public interest" in a permanent injunction sought by the FTC where DIRECTV and the entirety of the "public"—through the enforcement agencies of every jurisdiction in the United States—have already agreed to a consent judgment governing DIRECTV's advertising. On balance, DIRECTV's ability to advertise in accordance with a prior agreement and consent judgment covering every jurisdiction must be accorded great weight. The public further has an interest in the decisions of their officials, borne out in negotiated agreements and consent decrees, being respected and enforced. There is no public interest in countenancing, almost 7 years later, the far more narrow and restrictive permanent injunction sought by the FTC that would subrogate, potentially conflict with, and render the MSA superfluous.

307.     Moreover, the evidence at trial established that DIRECTV has the highest customer satisfaction ratings in the paid television industry and that it counts more than 20 million subscribers. The general public has an interest in receiving advertising for a highly valued product, in accordance with terms negotiated by their enforcement agencies, without hindering those communications with an additional layer of an onerous federal injunction.

308.     For these reasons, the FTC has failed to carry its burden of establishing that it is entitled to permanent injunctive relief.

ACTIVE 224875332

Date:    September 11, 2017

By:    /s/ Chad Hummel
       DIRECTV and DIRECTV, LLC

ACTIVE 224875332