Eric D. Edmondson, D.C. Bar No. 450294
Erika Wodinsky, Cal. Bar No. 091700
Boris Yankilovich, Cal. Bar No. 257887
Jacob A. Snow, Cal. Bar No. 270988
901 Market Street, Suite 570, San Francisco, CA  94103
(415) 848-5100/(415) 848-5184 (fax)
*eedmondson@ftc.gov*; *ewodinsky@ftc.gov*;
*byankilovich@ftc.gov*; *jsnow@ftc.gov*

Raymond E. McKown, Cal. Bar No. 150975
Stacy Procter, Cal. Bar No. 221078
Kenneth H. Abbe, Cal. Bar No. 172416
10877 Wilshire Blvd., Suite 700, Los Angeles, CA 90024
(310) 824-4343/(310) 824-4380 (fax)
*rmckown@ftc.gov; sprocter@ftc.gov; kabbe@ftc.gov*

Attorneys for Plaintiff
Federal Trade Commission

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV, a corporation, and<br><br>DIRECTV, LLC, a limited liability company,<br><br>Defendants. | Case No. 15-cv-01129-HSG<br><br>**FEDERAL TRADE COMMISSION'S OPPOSITION TO DIRECTV'S MOTION FOR PARTIAL FINDINGS** |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   LEGAL STANDARD..................................................................................... 2

III.  ARGUMENT ................................................................................................. 2

    A.     Deception by Omission Violates the FTC Act. ................................... 2

    B.     DIRECTV's Advertisements Are Likely to Mislead Consumers about the Terms and Cost of Programming (Counts 1 and 2). ......................................... 5

          1.    DIRECTV's Ads Are Misleading on Their Face........................................ 5

              a.    The Print Ads Bury Material Terms in Fine Print. ........................ 6

              b.    The Websites Hide Material Terms in Links and Hovers.............. 6

              c.    The TV Ads Briefly Display a Misleading Low Price. ................. 7

              d.    DIRECTV's Ads Consistently Omit or Hide Key Disclosures. ..... 7

          2.    Internal DIRECTV Evidence Corroborates the Facial Analysis. ............... 8

              a.    Internal Testing Shows That Consumers Did Not Read the Fine Print.............................................................................................. 9

              b.    Behavioral Data Confirms That Consumers Did Not Understand the Relevant Terms. ....................................................................... 9

          3.    Dr. Erdem's Surveys Show That the Ads Fail to Adequately Disclose the Material Terms........................................................................................ 12

          4.    DIRECTV's Attacks on Dr. Erdem's Surveys Are Meritless.................... 13

          5.    Social Influence Analysis Reinforces the Facial Analysis. ...................... 16

          6.    Website Usability Problems Further Obscured Relevant Terms. ............. 16

    C.     DIRECTV Has Violated ROSCA (Counts 3 and 4). ........................................... 17

          1.    DIRECTV's Premium Channel Offer Is a Negative Option. ................... 17

          2.    DIRECTV Has Failed to Clearly and Conspicuously Disclose Material Terms of the Premium Channel Negative Option..................................... 18

          3.    Consumers Never Gave Their Express Informed Consent. ...................... 20

          4.    Dr. Erdem's Findings Confirm DIRECTV's ROSCA Violations. ........... 20

5.     The Negative Option Created Dissatisfied Customers. ........................... 21

D.     The Court Should Issue a Permanent Injunction. ................................... 22

E.     The FTC Is Entitled to Monetary Relief. ............................................... 22

F.     The FTC Has Offered a Reasonable Calculation of Monetary Relief. ................. 24

IV.     CONCLUSION ................................................................................... 25

**Cases**

*Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883 (9th Cir. 2009) ................................................... 19

*Carter Products v. FTC*, 186 F.2d 821 (7th Cir. 1951) .............................................................. 13

*Commerce Planet*, 815 F.3d 593 (9th Cir. 2016)...................................................................... 26

*Fanning v. FTC*, 821 F.3d 164 (1st Cir. 2016) ......................................................................... 10

*Feil v. FTC*, 285 F.2d 879 (9th Cir. 1960)............................................................................... 6

*FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338 (D. Nev. 2014) ...................................... 4, 9, 15, 26

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1984).............................. 5, 10

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ........................... 4, 5, 26

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................... 4, 5, 15

*FTC v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012)................................................................ 5

*FTC v. EMA Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) ....................................................... 6

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ......................................................... 24

*FTC v. Gill*, 265 F.3d 944 (2001) .......................................................................................... 3

*FTC v. Grant Connect*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ................................................. 21

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ......................................................... 24

*FTC v. Health Formulas, LLC*, 2015 WL 2130504 (D. Nev. May 6, 2015). ............................... 21

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015) .......................................................... 5, 7

*FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) ................................................................. 24

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998) .......................................... 9, 24

*FTC v. Natural Solutions, Inc.*, 2007 WL 8315533 (C.D. Cal. Aug. 7, 2007) ............................ 24

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)............................................................ 24

*FTC v. Publishers Bus. Servs., Inc.*, 2017 WL 451953 (D. Nev. Feb. 1, 2017) .................... 24, 25

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991)............................... 25

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)..................................................................... 4

*FTC v. Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449 ...................................... 4

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988)............................... 6

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)...................................................................... 5

*McGregor v. Chierco*, 206 F.3d 1378 (11th Cir. 2000) ........................................................ 24

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) ....................................................... 22

*P. Lorillard Co. v. FTC*, 186 F.2d 52 (4th Cir. 1950) ............................................................ 3

*Pinterest, Inc. v. Pintrips, Inc.,* 140 F. Supp. 3d 997 (N.D. Cal 2015) ........................................ 16

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) ................................................. 6

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ............................................... 5

*Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975) ...................................... 6, 13

*Wendt v. Host Int'l, Inc.*, 125 F.3d 806 (9th Cir. 1997) ........................................................ 14

**Statutes**

15 U.S.C. § 8403 ....................................................................................................................... 18

**Rules**

Fed. R. Civ. P. 52(c) .................................................................................................................. 2

**Federal Trade Commission Opinions**

*Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 175 n.4 (1984) ........................................................... 3

*In re Kraft, Inc.*, 114 F.T.C. 40, 121 (1991) .................................................................... 4, 10

*FTC v. Int'l Harvester Co.*, 104 F.T.C. 949, 1057 (1984) ...................................................... 3

*FTC Policy Statement on Deception*, appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 175 n.4

   (1984) ....................................................................................................................................... 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

The witness testimony, documents, data, and expert analysis introduced at trial show that DIRECTV's advertisements violate Section 5 of the Federal Trade Commission Act and the Restore Online Shoppers' Confidence Act ("ROSCA").  The Court should deny DIRECTV's motion under Federal Rule of Civil Procedure 52(c) and set a date to finish the trial.

The FTC Act prohibits representations, *omissions*, or practices that are likely to mislead consumers with respect to a material fact.  Deceptive omission cases include instances where a seller advertises a truthful claim about its product while omitting or hiding information necessary to prevent the ad from creating a misleading impression.  Under the FTC Act, consumers are entitled to ads that tell the whole truth.  Not just the half-truth that increases sales.

Over the course of trial, the FTC has introduced hundreds of ads and dozens of web flows that convey half-truths about the cost and terms of commitment of DIRECTV's subscription agreements and "free" premium channel negative option while omitting or burying pricing and contract terms in fine print or behind hyperlinks.  These advertisements, standing alone, are sufficient evidence for the Court to find that DIRECTV has violated the FTC Act and ROSCA, and award relief.

Extrinsic evidence corroborates a finding of liability.  DIRECTV's own executives' testimony and internal records show that consumers are drawn to the low introductory pricing featured prominently in DIRECTV's ads.  This evidence also supports the conclusion that consumers are unlikely to see or understand the qualifying information—*e.g.*, contract length, "regular" price of advertised programming, and early cancellation fee—necessary to prevent them from being misled about the total cost and terms of commitment of a subscription to DIRECTV.  The analyses of Dr. Tulin Erdem, Dr. Anthony Pratkanis, and Dr. Theo Mandel also confirm that the terms at issue were unlikely to be seen and understood by consumers interacting with DIRECTV's ads and web signup flow.

In addition to making the showing necessary for broad injunctive relief, the FTC has also presented a reasonable calculation of monetary relief in this case, which would return to consumers charges that DIRECTV's ads did not adequately disclose.  This calculation is a

fraction of DIRECTV's net revenue and is the appropriate baseline for DIRECTV to present offsetting evidence in its defense case.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 52(c) permits the Court to rule against a party on a claim or defense when that party has been "fully heard" on the issue.  Fed. R. Civ. P. 52(c).  The rule also specifies that "the court may, however, decline to render any judgment until the close of the evidence."[1]  *Id.*

## III.    ARGUMENT

### A.     Deception by Omission Violates the FTC Act.

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."  *FTC v. Gill*, 265 F.3d 944, 950 (2001) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)).  Omissions violate the law even "where the representations made are not literally misleading, if those representations create a reasonable expectation or belief among consumers which is misleading, absent the omitted disclosure."  *FTC Policy Statement on Deception*, appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 175 n.4 (1984); *see also P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950) ("To tell less than the whole truth is a well[-]known method of deception.").  In deceptive omission cases, such as this one, the focus is not on whether the ads at issue convey false claims, but on whether the advertiser has "fail[ed] to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression."  *FTC v. Int'l Harvester Co.*, 104 F.T.C. 949, 1057 (1984).  Recent cases make clear that prominently advertising a half-truth while omitting or hiding qualifying material information renders the *net impression* of the advertisement misleading.[2]

---

[1] The FTC's Proposed Findings of Fact and Conclusions of Law ("FOF" and "COL", respectively) have been filed concurrently with this opposition.
[2] *See, e.g.*, *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1351 (D. Nev. 2014) ("This structure gives the *impression* that a $300.00 loan from the Lending Defendants will only cost borrowers

1   Under Section 5, the Court first must determine whether the challenged advertisements

2   convey the representations alleged by the FTC in its Complaint, *i.e.*, "that programming

3   materials can be purchased by paying the advertised prices," and that consumers "could obtain

4   certain premium channels for free for a specified time period" without an obligation to cancel or

5   be charged.  (Complaint Counts I and II).  The Court can base its determination on the fact that

6   "the representation has been explicitly stated . . . or [that] the defendant's advertising, when

7   viewed from the perspective of the reasonable consumer, gives the 'net impression' that such a

8   claim has been made*." FTC v. Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449,

9   at \*38–39 (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).  "The primary evidence

10  of what claims an advertisement can convey to reasonable consumers consists of the

11  advertisement itself." *In re Kraft, Inc.*, 114 F.T.C. 40, 121 (1991); *see also FTC v. Commerce*

12  *Planet, Inc.*, 878 F. Supp. 2d 1048, 1064 (C.D. Cal. 2012) ("The most compelling evidence that

13  the website marketing of OnlineSupplier was misleading are the sign-up pages themselves.").

14  Next, the Court, in this deceptive omissions case, must assess whether those

15  representations are likely to mislead consumers in the absence of qualifying information.  *FTC*

16  *Policy Statement on Deception*, 103 F.T.C. at 174.  Even if the advertisement includes some

17  qualifying disclosures, the advertisement will still be likely to mislead if the disclosure is not

18  adequate to prevent the likelihood of deception.  *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196,

19  1200 (9th Cir. 2006).  Put another way, "[d]isclaimers or qualifications in any particular ad are

20  not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change

21  the apparent meaning of the claims and to leave an accurate impression." *Removatron Int'l*

22  *Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989).  "Anything less is only likely to cause

23  confusion." *Id.*; *see also FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (disclosure

24

25  $90.00, when in fact, unless borrowers read the fine print and take the necessary steps to opt out
    of the renewal plan, such a loan will incur $675.00 in fees.") (emphasis added);  *FTC v.*

26  *Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (2006) ("[T]he receipt of a check, the perusal of
    which would reveal no obvious mention of an offer for services, no product information, and no

27  indication that a contract is in the offing, coupled with an invoice that has no advertising or
    solicitation purpose, creates an *overall impression* that the check resolves some small,

28  outstanding debt.") (emphasis added).

1   inadequate when consumers would have to look at small footnote buried in middle of other dense

2   footnote); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42–43 (D.C. Cir. 1984)

3   (fine print disclosure placed in inconspicuous corner of the ad was inadequate); *FTC v. Johnson*,

4   96 F. Supp. 3d 1110, 1139–40 (D. Nev. 2015) (disclosures made in small print at very top of

5   webpage or under the submit button were inadequate).

6          In the final step of the deception analysis, the Court must determine whether the omitted

7   information is material.  Under the FTC Act, a term is material if it "involves information that is

8   important to consumers and, hence, likely to affect their choice of or conduct regarding, a

9   product or service."  *Cyberspace*, 453 F.3d at 1201.  Information about cost is "undoubtedly"

10  material.  *Commerce Planet*, 878 F. Supp. 2d at 1068 (*citing Cyberspace.com*, 453 F.3d at 1200);

11  *see also FTC Policy Statement on Deception*, 103 F.T.C. at 182.

12         Decades of FTC case law establish the governing principles of ad analysis under Section

13  5.  First, to find DIRECTV liable, the Court need look no further than the advertisement itself

14  when the message is clear on the face of the ad.  *Kraft, Inc. v. FTC*, 970 F.2d 311, 318–19 (7th

15  Cir. 1992).  The Court does not need a consumer survey or other extrinsic evidence to support a

16  finding that an advertisement violates Section 5 of the FTC Act; a facial analysis is sufficient.

17  *Id*; *see also Commerce Planet*, 878 F. Supp. 2d at 1068 (citing *Kraft*).

18         Second, an ad is deceptive even if it is only likely to mislead a "significant minority of

19  reasonable consumers."  *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).

20  Third, the FTC need not prove actual deception; likelihood of deception is the standard.  *Resort*

21  *Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975).  Fourth, intent to deceive is not

22  required.  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *Feil*

23  *v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960).  Finally, "[e]ach advertisement must stand on its own

24  merits; even if other advertisements contain accurate, non-deceptive claims, a violation may

25  recur with respect to the deceptive advertisements."  *FTC v. EMA Nationwide, Inc.*, 767 F.3d

26  611, 632 (6th Cir. 2014) (quoting *Removatron*, 884 F.2d at 1496–97).

27         Defendants suggest a new rule—that ads cannot be evaluated on their own, and that

28  deceptive advertising can be cured by later communications.  This argument is contrary to the

law and the record, which establishes that defendants, throughout their advertising across various media, consistently advertised low prices but failed to make clear and conspicuous disclosures about the costs and obligations of a DIRECTV contract.

**B.      DIRECTV's Advertisements Are Likely to Mislead Consumers about the Terms and Cost of Programming (Counts 1 and 2).**

Over many years, DIRECTV's print ads, TV ads, and websites expressly represented that consumers can subscribe to DIRECTV for the advertised monthly prices—typically a discounted price for twelve months.  Many of these ads also expressly represented that consumers could access premium channels for "free" for three months.  But the advertised monthly price for the television package was contingent on consumers being enrolled in a two-year contract with a significantly higher monthly price in the second year.  And subscribers who cancelled their subscription before the end of 24 months were subject to an early cancellation fee.  The free premium channels also came with strings attached:  Consumers were automatically enrolled in a negative option plan that rolled to pay after the first three months unless they called to cancel. This additional qualifying information is material to consumers.[3]

**1.      DIRECTV's Ads Are Misleading on Their Face.**

As described below, a facial analysis of the ads in evidence shows that DIRECTV failed to adequately disclose material terms of its service to consumers.  Specifically, DIRECTV failed to adequately disclose the substantially higher "regular price" that consumers "roll up" to after twelve months; that consumers who cancelled prior to 24 months of service faced up to $480 in early termination fees; and that consumers would be charged upward of $40 a month for "free" premium channels if they did not cancel in the first three months.  As marketing expert Dr. Erdem explained, this practice of "shrouding" terms can effectively hide them from consumers. (FOF 178–184).

---

[3] All of the terms at issue in this case relate to the total price that consumers will pay for the DIRECTV service and are therefore material.  *See, e.g.*, *Johnson*, 96 F. Supp. 3d at 1121 ("Generally speaking, information is material where it 'concerns the purpose, safety, efficacy, or cost, of the product or service.'") (internal citation omitted).

### a.     The Print Ads Bury Material Terms in Fine Print.

DIRECTV's print ads omit or fail to adequately disclose material terms.  DIRECTV's ads consistently display the first-year price prominently in the body of the ad.  (FOF 16, 82, 100).  This consistency is explained by DIRECTV's awareness that pricing claims create powerful, even "indelible," impressions in consumers' minds that can be difficult to reverse.  (FOF 26).  In fact, 95% of the print ads in evidence prominently display the promotional price, including through the use of bubbles, boxes, crescendos, or similar treatments.  (FOF 100).  That prominence stands in stark contrast to the *94%* of the print ads in evidence that contain no reference whatsoever to the regular (non-discounted) price in the body of the ad.  (FOF 101).  Similarly, not a single print ad in evidence discloses in the body of the ad *both* that the consumer is required to purchase television services from DIRECTV for 24 months *and* the regular, non-discounted price of DIRECTV services.  (FOF 105).  And no DIRECTV print ad in evidence stated the actual price a consumer would pay during the second year of the 24-month contract because the regular price is subject to change.  (FOF 103).[4]

The print ads consistently fail to disclose the terms of the "free" premium channel offer.  No single print ad in evidence contains any information in the body of the ad explaining the material terms of the negative option plan, including: 1) that consumers would be automatically enrolled in a negative option; 2) that consumers were required to affirmatively call and cancel before the end of the "free" trial to avoid being charged; or 3) the price consumers would have to pay if they did not call to cancel.  (FOF 107).  If DIRECTV disclosed any of the material terms associated with the "free" premium channel gift, it was in the fine print.  (FOF 107).

### b.     The Websites Hide Material Terms in Links and Hovers.

Like DIRECTV's print ads, the website also consistently and prominently displays the low introductory price (FOF 125, 132, 134 (old flow); 148 (new flow)) and the "free" premium

---

[4] Likewise, prior to October 2015, none of the print ads in evidence inform consumers in the body of the ad that they would be charged a steep early-cancellation fee if they attempted to cancel their 24-month agreement early.  (FOF 106).  To the extent such information was not included in the ad, it was again buried in the fine print.  (FOF 106).

1   channel offer (FOF 130 (old flow); 153, 142, 160 (new flow)), while consistently failing to

2   clearly and conspicuously disclose material terms of those offers.

3         For example, DIRECTV's website consistently fails to conspicuously state the price

4   consumers would pay in the second year.  (FOF 126, 141 (old flow); 149, 150, 166, 167 (new

5   flow)).  With few exceptions, the website provides no information about the required two-year

6   contract, except in inconspicuous small print, behind hyperlinks, or at the bottom of a long

7   webpage, which required scrolling to see.  (FOF 128, 134, 137, 140 (old flow); 151, 155, 158,

8   159, 162 (new flow)).  Similarly, the website provides information about the ECF and the terms

9   of the "free" premium channel only behind hyperlinks, info-hovers, and light boxes.  (FOF 130

10  (ECF, old flow); FOF 129–131, 143 (premium channel offer, old flow); FOF 152 (ECF, new

11  flow); FOF 154 (premium channel offer, new flow)).  A consumer could navigate the purchase

12  flow without clicking or viewing any material terms in those page elements.  (FOF 146).[5]

### c.         The TV Ads Briefly Display a Misleading Low Price.

14        For similar reasons, DIRECTV's television ads are consistently misleading.  The vast

15  majority of DIRECTV's television ads included an end card with a "call to action" that displayed

16  the promotional pricing information.  (FOF 111).  DIRECTV's television advertisements did not

17  clearly and conspicuously disclose the price consumers would pay during the second year of

18  their DIRECTV service.  (FOF 112).  In fact, until sometime after June 2011, DIRECTV's

19  television ads never mentioned the mandatory 24-month contract.  (FOF 113).  And in 2012 and

20  2013, television ads that aired more than 5,800 times did not contain any reference to the 24-

21  month contract.  (FOF 113).

### d.         DIRECTV's Ads Consistently Omit or Hide Key Disclosures.

24        DIRECTV asserts that the FTC introduced at trial only a small percentage of the

25  approximately 40,000 print ads that (according to DIRECTV) vary significantly from one

26  another.  (*See* Motion at 2, 5–7, 10–12, 21).  But the evidence tells a different story.

---

[5] DIRECTV's Wizard Flow website likewise failed to clearly and conspicuously disclose the 24-month agreement and the amount of any ECF.  (FOF 117–123).

The record shows that the vast majority of DIRECTV's ads between 2007 and 2015 had the misleading characteristics that form the basis of the FTC's complaint. (*See generally* FOF 100–175). The ads in evidence include many examples from each year and each type of advertisement. (FOF 28–76). The hundreds of ads in the record consistently fail to adequately disclose the material terms at issue. (FOF 100–175). For the ads that are not in evidence, the record shows that DIRECTV prioritized consistency across its campaigns and disseminated detailed instructions to vendors and partners to enforce that consistency. (FOF 82–91, 98–99). Defendants' ads achieved this consistency; testimony from witnesses with extensive knowledge of the various ads and advertising campaigns confirm that the ads were consistent with respect to the exact characteristics relevant to this case. (FOF 82–91).

In any event, the FTC need not show that every ad (or even a majority of ads) is deceptive to justify injunctive and monetary relief. *See FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998) ("proper cases" for an injunction include any violation of the FTC Act); *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1343 n.5 (D. Nev. 2014) (finding liability for defendants' website advertising even though the various websites differ in appearance because "all of them provide the same information to borrowers in the same language," which renders them "essentially 'identical'"); *Kraft*, 114 F.T.C. at 52 & n.9 (finding liability for a multi-year national advertising campaign even though each print and television execution "was somewhat different, and most were disseminated with a number of variations"). Advertisers cannot escape liability by disseminating so many ads that a facial review would be infeasible.

### 2. Internal DIRECTV Evidence Corroborates the Facial Analysis.

Because the ads alone establish DIRECTV's liability, no extrinsic evidence is needed. However, when it exists (as it does in this case), "such proof is *highly probative* to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *E.M.A. Nationwide*, 767 F.3d at 633 (emphasis added). Relevant extrinsic evidence can include usability studies, consumer behavior, and survey evidence. *See, e.g.*, *Fanning v. FTC*, 821 F.3d 164, 172 (1st Cir. 2016), *cert. denied*, 137 S. Ct. (2017) (consumer complaints); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40–42 (D.C. Cir. 1985) (consumer survey is not the

only form of extrinsic evidence; district court was not clearly erroneous in relying on consumer behavior expert).  Here, all of these types of extrinsic evidence buttress the facial analysis.

### a.   Internal Testing Shows That Consumers Did Not Read the Fine Print.

DIRECTV-funded research confirms the truth about fine print:  consumers do not read it. An eye-tracking study commissioned by DIRECTV shows that consumers focused on the price and spent little or no time looking at small-print disclosures in the legal box.  (FOF 263–266, 271–272, 277).  DIRECTV made clear in that study that it desired low consumer attention to the fine print in the ad.  (FOF 270–272).  Click-testing research produced the same results, showing that people paid attention to the offers and deals in the ads but not the fine-print disclosures. (FOF 354).  DIRECTV's head of marketing understood that consumers did not focus on information in the legal box, and instructed his employees to move disclosures that he did not want prominently displayed in DIRECTV's ads to the "legal text at the bottom" of the ad.  (FOF 462).[6]  Despite evidence that information in the legal box could go unnoticed, DIRECTV never moved its qualifying disclosures out of the legal box.  *See* Section III.B.1.b *supra*.[7]

Website usability studies conducted by DIRECTV show that consumers "[f]elt it was difficult to track when price increases were happening and why" and felt that the purchase flow included examples of "bait and switch tactics."  (FOF 398–399).  In one example, three separate usability tests, conducted in 2009, 2011, and 2013, *all reported* that consumers did not notice the link to view the price of DIRECTV service through the 24th month.  (FOF 393, 395, 398–399).

### b.   Behavioral Data Confirms That Consumers Did Not Understand the Relevant Terms.

DIRECTV witnesses testified that if its ads were misleading consumers, that fact would have been apparent in the company's behavioral data.  (Bentley Trial Tr. Vol. 3, 397:20–

---

[6] This understanding was not limited to DIRECTV executives.  One of DIRECTV's retail partners, Costco, also wanted to improve DIRECTV's disclosures in its ads by moving the regular price out of the legal box and displaying it more prominently in the ad.  (FOF 458–459).
[7] Despite constantly testing the efficacy of its ads, DIRECTV avoided ever conducting any non-privileged research or testing of whether consumers could see or understand its offers or the material disclosures in its ads.  (FOF 405–410; *see also* FOF 419).

398:12).[8]  In fact, it was apparent.  DIRECTV's behavioral data—from complaints to consumer-satisfaction surveys to usability studies—confirm that consumers were misled.

**Research and customer complaints showed that consumers were misled.**

DIRECTV's internal research revealed that customers felt misled.  For example, DIRECTV research related to the onboarding process showed that customers had "considerable confusion" about the length of the introductory period, and some subscribers believed the introductory price applied for the entire two-year commitment.  (FOF 433).  One noted subscriber sentiment was: "It was advertised for $39.95.  I thought it would be that for the whole time."  (FOF 433). Likewise, DIRECTV's research relating to customer churn revealed that the main reason customers canceled DIRECTV in the first 30 days of signing up is that they "felt misled about DIRECTV."  (FOF 431).  The top category of misinformation indicated by 49% of respondents related to pricing, including monthly fees increasing after the initial promotion.  (FOF 433; *see also* FOF 450 (Q2 2010 Churn/Customer Migration Study showing "Most Important" reasons customers canceled included "Price/Value" and "Misled")).

DIRECTV's own internal database (RIO), which indicated the reasons customers contacted the company (including sources of confusion and anger) (FOF 415–416), likewise establishes that many consumers did not know about the 24-month commitment, second-year price, and premium pay roll-off.  In 2008, "Agreement" was the top "Customer Issue" by escalation volume, and that category included customers who did not realize they had a two-year contract.  (FOF 417).  Similarly, a weekly tracking report of customer call escalations from December 2010 shows that a top driver of calls was "non-disclosure" and specifically "Not told about agreement" and "Agreement length not as agreed."  (FOF 418).  These issues persisted in 2014 and 2015, as reflected by customer complaint escalations, including escalations reflecting that customers believed the contract price was locked in for two years.  (FOF 441–446).[9]

---

[8] Mr. Bentley's testimony going to the central issue in the case is self-serving, unsubstantiated, and inadmissible opinion testimony under FRE 701.  It should be given no weight.

[9] Premium channel roll-to-pay was another customer pain point reflecting consumer confusion. (FOF 419).  DIRECTV knew that some customers thought the premium services would simply roll-off their bill.  (FOF 422, 423, 425; *see also* Section III.C.5 *infra*).

DIRECTV's data also reflected that customer dissatisfaction spiked during the 4th and 13th month of a consumer's contract—immediately following the premium channel roll-to-pay and the introductory price roll-off—further showing consumer confusion regarding terms of the contract.  (FOF 361; FOF 449 (voluntary churn spiked after the introductory price rolled off)).  Similarly, DIRECTV's net promoter score ("NPS")—a measurement of customer satisfaction— drops in the fourth month following the premium channel roll-to-pay and again in the 13th month after the introductory rate expires.  (FOF 356, 427; *see also* FOF 491).

Quantitative analysis of records from DIRECTV's RIO customer service database reached a similar result.  Dr. Anthony Pratkanis analyzed these records and determined that from 2014 to 2016, the number of customer calls that suggest surprise, confusion, or dislike *increased by over 60%* from the 3rd to the 4th month, and *more than doubled* from the 12th to the 13th month.  (FOF 357–361; TX795a at 1).  These spikes occurred exactly when the inadequately disclosed charges kicked in.

**DIRECTV executives understood that greater transparency could hurt revenue and cause customers to cancel.**  Despite all of DIRECTV's behavioral data establishing that consumers were misled, DIRECTV did not improve its advertising disclosures.  *See* Section III.B.1, *supra*.[10]  DIRECTV knew that improving disclosure of price increases would result in increased cancellations (churn) and decreased revenue.  (FOF 430, 467–468).  For these reasons, Paul Guyardo, DIRECTV's former Chief Marketing Officer and Chief Revenue Officer, did not want to tell customers in advance when the introductory rates and premium channel offer would end.  (FOF 467–468).[11]  Similarly, in response to proposals from the Customer Care team to

---

[10] While DIRECTV contends that it made changes to its post-sales disclosures as a result of the behavioral data in its possession and the work of the CX committee, none of those modifications directly related to DIRECTV's advertising or pre-sales disclosures.  (FOF 478, 481, 483–487).  They are therefore irrelevant under the FTC Act.  *See Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("[T]he public is not under any duty to make reasonable inquiry into the truth of advertising."); *see also Carter Products v. FTC*, 186 F.2d 821, 824 (7th Cir. 1951) ("The law is violated if the first contact or interview is secured by deception, even though the true facts are made known to the buyer before he enters into the contract of purchase.").

[11] The roll-to-pay feature of DIRECTV's premium channel promotion was a primary driver of revenue growth for the company.  (FOF 424).  In the second quarter of 2012 alone, DIRECTV took in $620 million in revenues from customers who had not cancelled the premium channels after the "free" promotion expired.  (FOF 424).

1    provide greater transparency for those annual inflationary price increases, Jon Gieselman wrote

2    that DIRECTV must balance customer "awareness with churn," pointing out that "those that

3    were more aware[ ] churned at a much higher rate."  (FOF 430).

### 3. Dr. Erdem's Surveys Show That the Ads Fail to Adequately Disclose the Material Terms.

6        Dr. Erdem, a leading expert in marketing research and consumer decision-making (FOF

7    176), opined that DIRECTV did not clearly and conspicuously disclose the terms of the

8    DIRECTV subscription agreement and the terms of the negative option offer.  (FOF 215–223,

9    239–242).  Dr. Erdem's studies demonstrate that DIRECTV's ads did not convey these terms to

10    consumers and, in fact, left consumers with a low level of understanding.

11        Dr. Erdem conducted two scientific studies to evaluate the effectiveness of DIRECTV's

12    print ads and websites in conveying the terms at issue.  When evaluating surveys, courts examine

13    whether the survey is relevant and conducted according to accepted principles.  *Wendt v. Host*

14    *Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  As described below, Dr. Erdem's surveys

15    evaluated a key issue in this case: whether DIRECTV clearly and conspicuously disclosed the

16    terms at issue.  Moreover, these studies were conducted according to accepted guidelines set

17    forth in the Shari Diamond litigation guide on surveys.  (FOF 190).

18        As part of her first study, Dr. Erdem conducted two surveys whose results demonstrate

19    that DIRECTV's print ads and websites did not clearly and conspicuously disclose the second-

20    year price.  (FOF 222–223, 239).  Her surveys show that only *1%* of survey respondents who

21    viewed the original DIRECTV website understood that the monthly price would dramatically

22    increase in the second year; *0%* of respondents who viewed the original DIRECTV print ad

23    understood that fact.  (FOF 239).  Dr. Erdem confirmed that DIRECTV's insufficient disclosures

24    caused this very low understanding by testing treatment versions of the website and the print ad

25    with minor improvements to the second-price disclosures.  (FOF 227, 270).  Her studies showed

26    that improved disclosures substantially increased the originally low consumer understanding of

27    the conditions associated with the DIRECTV subscription agreement.  (FOF 228, 241).

28

1    Dr. Erdem's second study included two surveys that examined DIRECTV's premium

2    channel offer.  (FOF 215–217, 242).  Dr. Erdem concluded that DIRECTV's print ads and

3    websites did not clearly and conspicuously disclose the terms of that offer.  (FOF 242).  Only

4    18% of respondents who viewed the original DIRECTV print ad understood this negative option,

5    while only 20% of respondents who viewed the original DIRECTV website understood it.  (FOF

6    243).  Respondents who viewed Dr. Erdem's treatments, which included minor improvements to

7    the negative option disclosure, demonstrated statistically higher understanding of the premium

8    channel offer, including the monthly fee charged in the fourth month.  (FOF 244).

9    Dr. Erdem's studies also show that the disclosures in the original print ad and website

10   regarding the price for the premium channels after three months and the second-year monthly

11   price were inadequate to give consumers accurate impressions.  (FOF 245).  Around 30% of

12   respondents who viewed the original website (and who thought that they knew the second-year

13   price) believed, incorrectly, that the second-year price would not change; around 53% of those

14   respondents who viewed the original print ad had the same incorrect belief.  (FOF 246).

15   Likewise, the majority of respondents who viewed the original website reported an incorrect

16   premium channel price after the initial three-month period.  Incorrect answers also outnumbered

17   the correct answers among respondents who viewed the original print ad (and who answered that

18   they knew the premium channels price).  (FOF 247).

19            **4.    DIRECTV's Attacks on Dr. Erdem's Surveys Are Meritless.**

20   DIRECTV has three criticisms of Dr. Erdem's surveys.  *First*, DIRECTV claims that Dr.

21   Erdem should have tested respondents' "net impression" and whether they took away a "false

22   impression" from DIRECTV's advertising.  (Motion at 8).  No such analysis is required.  In this

23   case, the relevant question is whether the ads adequately disclosed terms qualifying the first-year

24   price (*e.g.*, $24.99/mo.) and "free" premium channels.  The question to be surveyed is whether

25   the conditions on those terms (*e.g.*, early termination fees, higher second-year price, charges for

26   premium channels after three months) "were *sufficiently conspicuous* to draw the survey

27

28

1    subjects' attention."  *Cyberspace.com*, 453 F.3d at 1201 (emphasis added).  Dr. Erdem tested

2    exactly what the Ninth Circuit in *Cyberspace* directed.[12]  (FOF 189–192).

3        DIRECTV also criticizes Dr. Erdem's inclusion of respondents who indicated lack of

4    knowledge about the material terms at issue.  (Motion at 9–10).  Dr. Erdem's approach is the

5    right one for a deceptive-omission case, where consumers are misled in part *as a result* of their

6    lack of knowledge.  Consumers in *Cyberspace* did not know that they were being enrolled in a

7    continuity plan; in *AMG Services*, consumers did not know that they would be charged certain

8    fees associated with their loan.[13]  The ads in those cases were misleading precisely because

9    customers did not know particular material terms.  DIRECTV's ads are no different.  Dr.

10   Erdem's results show that 48% of web-survey respondents said they did not know or were

11   unsure of the price of the premium channels, compared to just 16% of respondents who viewed

12   the treatment website.  (FOF 215).  It is highly probative that the "don't knows" decreased with

13   better disclosures, which shows that respondents who answered "don't know" did not find the

14   disclosures to be understandable.[14]  (FOF 229, 248–249); *see Cyberspace*, 453 F.3d at 1201.

15       *Second*, DIRECTV argues (incorrectly) that Dr. Erdem's study had methodological

16   flaws.  With regard to the print ads, DIRECTV argues that Dr. Erdem's surveys are "biased and

17

18   _____

18   [12] It is not correct, as DIRECTV asserts, that Dr. Erdem should have run a "deception study" or
     tested "net impression."  (*See* Motion at 8).  Her survey and her results address a core fact in this

19   case: whether material qualifying disclosures are clear and conspicuous to consumers.  Dr.
     Erdem found generally that respondents who were exposed to the original print ad and website

20   stimuli demonstrated low understanding of the tested disclosures.  (FOF 235).  Ignoring the
     results from the original stimuli, DIRECTV claims that the much higher understanding rates

21   from Dr. Erdem's adjusted treatment print ad and website merely represent a "truism" that "it is
     always possible to make any disclosure more prominent and thereby increase a reader's

22   contemporaneous recall of its contents."  (Motion at 8).  What DIRECTV calls a truism, Dr.
     Erdem calls "causal research," a survey that involves control and test stimuli to establish cause

23   and effect.  (FOF 236).  Using this basic scientific technique, Dr. Erdem was able to test the
     modifications she made to the treatment stimuli.  (FOF 237).

24   [13] *Cyberspace*, 453 F.3d at 1198–201; *AMG Servs.*, 29 F. Supp. 3d at 1251.

24   [14] Dr. Erdem's studies do not share the defect that was of concern to the Court in *Pinterest, Inc.
     v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1015 (N.D. Cal 2015).  In that trademark case, this Court

25   found a survey to be unreliable because it asked the wrong question.  Rather than testing the
     correct question of whether respondents were confused only by an infringing mark, plaintiff's

26   expert had asked respondents both about the infringing mark and a web "button" functionality
     that the court had ruled could not be the basis for a trademark infringement.  Here, Dr. Erdem

27   asked exactly the right question—testing respondents' understanding of key price terms in the
     advertisements—to determine whether DIRECTV's disclosures were clear and conspicuous.

28

unreliable" because the fine print in the "legal box" appeared blurry on a computer screen when shown by defense counsel.  (Motion at 8).  However, as Dr. Erdem testified, the ad was not blurry or otherwise illegible in the actual test.  (FOF 253).  Attachment B to the FTC's Proposed Findings of Fact and Conclusions of Law includes print-outs of the two print ad stimuli that were shown to respondents, along with a magnified version of the legal box in each ad.  (FOF 250, 252)  It demonstrates that the fine-print text in the survey was in fact legible.[15]  Indeed, Dr. Erdem confirmed the legibility by pre-testing her surveys before deploying them in the field, and the pre-test reported no problems with legibility.  (FOF 255–256).  Moreover, survey participants could use the zoom function to increase the size of the text.  (FOF 254).

For the website test, DIRECTV complains that some hyperlinks in the tested website were not functional.  (Motion at 9)  In the tested website, all hyperlinks and info-hovers that DIRECTV has identified as containing relevant disclosures were functional.  (*See* DIRECTV Opp'n to MSJ (Dkt. 188-04) at 5–6; TX2033; TX2034; FOF 193–207).  In fact, the tested website closely simulated DIRECTV's August 2013 website.[16]  (FOF 193).  The original and treatment groups saw identical functionality in website hyperlinks.[17]  (FOF 258).

*Third*, DIRECTV argues that Dr. Erdem's print and website surveys cannot be projected to the entire universe of DIRECTV ads since 2007.  (Motion at 10–11).  This is a reprise of defendants' implication that the FTC must introduce all 40,000 ads to prevail, and it fails for the same reason.  The parties agree that DIRECTV consistently and prominently featured the first-year price and the "free" premium channels and that DIRECTV consistently put qualifying information in legal blocks and behind hover links and info-hovers.  The question is the

---

[15] If there is any doubt, the Court can proceed through Dr. Erdem's survey and review the stimulus itself.  (*See* TX2371).

[16] One element that could not be replicated was the "help button."  (Erdem Tr. Vol. 6, 997:22-998:12).  This function would have required a person to interact with each respondent.  There was no way to ensure that all respondents would have had the same experience.  In any event, disclosures that require customers to utilize a help button are not clear and conspicuous.

[17] DIRECTV similarly challenges the website studies because Dr. Erdem provided non-interactive thumbnail images of the webpages in the purchase flow during the questionnaire part of the survey.  The thumbnail images are a secondary reference for respondents who had already reviewed the full interactive website before proceeding to the questionnaire.  (FOF 257).  Both the original and treatment group respondents had the same interactivity and functionality when proceeding through the website, and later, answering the questionnaire.  (FOF 258).

1  sufficiency of those disclosures.  A plain reading of the ads shows their inadequacy, and Dr.

2  Erdem's findings from her consumer surveys reinforce that conclusion.

### 5.    Social Influence Analysis Reinforces the Facial Analysis.

4      The failures of DIRECTV ads to clearly and conspicuously disclose material terms are

5  further supported by the social influence analysis that Dr. Pratkanis performed.  His analysis

6  concluded that DIRECTV's ads de-emphasize or omit the 24-month commitment and the price

7  of service after the first year, and therefore the offer that is likely communicated to consumers is

8  that they can subscribe to DIRECTV for the discounted monthly price.  (FOF 324–338).

9  Similarly, Dr. Pratkanis concluded that, with respect to DIRECTV's premium channels offer,

10  consumers are likely to think they are receiving a truly free gift, without strings attached, rather

11  than entering into a negative option, which imposes additional risk and cost.  (FOF 339–342).

12  Qualifying information included in DIRECTV's ads is not likely to counter the effects of the

13  "low-ball" package pricing or the free gift.  (FOF 343–347).  Dr. Pratkanis also conducted a

14  social influence analysis of DIRECTV's sales call process, showing that the call process was not

15  likely to cure consumers' misleading impressions.  (FOF 348–352).  Limited disclaiming

16  information comes at the end of the call—after the customer has agreed to purchase the

17  service—and it is read quickly and may be hard to understand.  (*Id.*)

### 6.    Website Usability Problems Further Obscured Relevant Terms.

19      Consumers cannot understand language that they do not see or cannot read.  Dr. Theo

20  Mandel, an expert in website design and usability, testified that the DIRECTV's website[18]

21  suffered from numerous usability problems, each of which made it harder for consumers to see

22  information related to second-year terms and the premium channel negative option.  (FOF 280–

23  322).  For example, the information (a) was hidden behind obscure links and hovers, (b)

24  appeared in tiny fonts, (c) was surrounded by distracting visual elements, (d) required significant

25  scrolling, (e) was not proximate to related information, and had a host of other usability

---

[18] Because DIRECTV did not produce an interactive capture of its own website, Dr. Mandel
focused his analysis on the UX Site.  (FOF 283).  Dr. Mandel also reviewed 45 non-interactive
versions of the website's purchase flow captured in screenshots or video between 2008 and 2016,
and found that his conclusions applied to every version he reviewed.  (FOF 282–283).

1   problems.  (FOF 287–322).  The issues Dr. Mandel identified were not subtle—they are very

2   basic problems with an otherwise sophisticated website.  (FOF 323).  Dr. Mandel's analysis,

3   based on objective facts (*e.g.*, small fonts are hard to read) and supported by well-researched and

4   authoritative guidelines, shows that DIRECTV's website design consistently failed to disclose

5   second-year price terms and negative option information so consumers can find and read them.

6                    **C.      DIRECTV Has Violated ROSCA (Counts 3 and 4).**

7            ROSCA prohibits charging consumers in Internet transactions sold through a negative

8   option feature, unless the seller "provides text that clearly and conspicuously discloses all

9   material terms of the transaction before obtaining the consumer's billing information."  15

10  U.S.C. § 8403(1).  ROSCA also prohibits charging consumers for such transactions without first

11  obtaining "a consumer's express informed consent."  15 U.S.C. § 8403(2).  Unlike the FTC Act,

12  ROSCA does not require that conduct be deceptive to violate the law.  (*See* COL 606).  ROSCA

13  does not require proof that anything about an ad is misleading.  Failure to disclose the material

14  terms of the deal clearly and conspicuously, and failure to obtain express informed consent to

15  those terms, are the violations.  (*See* COL 599-601, 606).

16                    **1.      DIRECTV's Premium Channel Offer Is a Negative Option.**

17          Since ROSCA became law in December 2010, DIRECTV's website has sold television

18  service plans that contained a promotion for "free" premium channels for three months. (FOF

19  499).  Until at least August 2014, DIRECTV did not allow customers to remove the "free"

20  premium channels from their online shopping cart.  (FOF 498).  DIRECTV's premium channel

21  promotion is a negative option.  (FOF 421, 497; COL 601).  Upon the conclusion of the initial

22  three-month period, DIRECTV automatically subscribed customers to the premium channels (at

23  between approximately $40 and $50 per month).  (FOF 19, 421, 497).  Until the end of 2014,

24  consumers could stop the charges only by calling DIRECTV and speaking with a sales agent

25  (who would try to sell them premium channels).  (FOF 24).

26

27

28

1

2. **DIRECTV Has Failed to Clearly and Conspicuously Disclose**

2

**Material Terms of the Premium Channel Negative Option.**

3   The material terms of DIRECTV's premium channel negative option that are at issue in

4   this case are: (1) that DIRECTV automatically charges consumers for the premium channels

5   immediately after the "free" initial three-month period unless consumers call to cancel; and (2)

6   the price that DIRECTV charges. *See* FTC Complaint (Dkt. No. 1) ¶ 19.  These terms relate to

7   cost and are material to consumers.  (FOF 364, 503; COL 576).  DIRECTV has not disclosed

8   these terms clearly and conspicuously in its website purchase process.

9   "Clear and conspicuous" disclosures are those that a reasonable consumer "would notice

10   and understand." *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009); *see also*

11   *Cole v. U.S. Capital*, 389 F.3d 719, 730 (7th Cir. 2004) ("Clear and conspicuous" means "so

12   written, displayed, or presented that a reasonable person against which it is to operate ought to

13   have noticed it").  (COL 607–612).  The Court may make this determination based on a facial

14   analysis, considering the following objective factors: prominence, presentation, and placement of

15   the disclosures, and their proximity to the prominent promotional claim.  *See Barrer*, 566 F.3d at

16   892; (COL 607–610).  A disclosure is not clear when it fails to tell consumers in a clear and

17   cogent manner the actual cost of a negative option plan.  (COL 611–612).

18   In both versions of DIRECTV's website since ROSCA became law—the Old Flow

19   (online from 2009 until July 2014) and the New Flow (online since 2014)—the disclosures about

20   the negative option, where they were present at all, have not been prominent, have not been

21   proximate to the prominent "free" premium channel promotional claims, and have been

22   completely avoidable to consumers as they proceeded through the purchase flow.  (FOF 499,

23   501–513).[19]  Where they appear at all, the material terms are consistently hidden behind three

24   interface elements, described below.

25   **(1) Behind *some* of the generically labeled hyperlinks.**  Both the Old Flow and New

26   Flow version of DIRECTV's website have small, generically labeled "Terms & Conditions,"

27

28

---

[19] For a short period of time in 2015, DIRECTV added to the face of the website a statement that referenced a charge after three months.  The statement disappeared in 2016.  (FOF 156).

1    "Additional Details," and "Additional Offer Details" hyperlinks typically displayed at the bottom

2    of lengthy, colorful webpages in the purchase process.  (FOF 503–508, 513).  These types

3    disclosures are not clear and conspicuous.  (*See* COL 609–610).

4            Extrinsic evidence validates this objective facial assessment.  DIRECTV's usability

5    studies from 2013 testing a variation of the Old Flow confirmed that most users "did not scroll

6    down to see more information on the Home page," and that "information was missed below the

7    fold."  (FOF 513).  Similarly, a 2013 usability study testing a New Flow variation stated that

8    "Links at the bottom of the Packages page frequently go unseen."  (FOF 513).  Dr. Mandel's

9    expert analysis also concludes that consumers are likely to miss the "Additional Offer Details"

10   hyperlink, and, even if located, would find the text underneath it hard to read.  (FOF 305, 306).

11           **(2) Behind *some* of the numerous generically labeled symbols.**  DIRECTV's website

12   had limited negative-option disclosures behind a handful of info-hover icons— [?]  (Old Flow)

13   and     (New Flow)—interspersed among scores of other identically labeled symbols that had

14   nothing to do with the premium channel negative option.  (FOF 502, 509).  Repetition of these

15   identical, generic symbols throughout the website diminishes the conspicuousness of information

16   hidden underneath.  *See AMG Servs.*, 29 F. Supp. 3d at 1353; (COL 609).  Dr. Mandel's expert

17   findings confirm that the "habituation" effect will likely lead the typical website user to stop

18   activating these icons early on in the purchase flow once the user realizes that the icons contain

19   promotional language.  (FOF 311, 312).

20           **(3) Behind a small "Monthly Cost Tab" that most users do not open.**  DIRECTV has

21   placed some information related to pricing behind a tab (or hyperlink) on the Cart page:

22   [← VIEW MONTHLY COST]  (Old Flow) and  [View Monthly Cost]  (New Flow).  (FOF 510, 511).  The information

23   behind the tab is concealed by default, and a user must click to reveal it.  (*Id.*).  The generic

24   "View Monthly Cost" label gives no indication of a relationship to that the "free" premium

25   channel promotion.  (*Id.*).  In both flows, the tab label is small and unlikely to be noticed.  (*Id.*).

26   In the Old Flow, the tab was labeled in small gray font against a gray background (FOF 510),

27   which DIRECTV knew makes "reading more difficult" (FOF 401).

28

### 3.   Consumers Never Gave Their Express Informed Consent.

"Express informed consent" requires obtaining consumers' affirmative and explicit consent provided with demonstrated understanding of the terms and consequences, after having received a careful explanation of them.  (COL 614–618).  This requires more than merely providing consumers an opportunity to review the terms.  *Id.*

DIRECTV has failed to obtain express informed consent to the negative option.  As an initial matter, because DIRECTV has not clearly and conspicuously disclosed the material terms at issue, DIRECTV has necessarily not obtained consumers' express informed consent.  *See FTC v. Grant Connect*, 827 F. Supp. 2d 1199, 1230 (D. Nev. 2011); *FTC v. Health Formulas, LLC*, No 2:14–cv–01649, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015).

Checking a checkbox near a "Terms & Conditions" link on the last Checkout page does not constitute express informed consent.  The evidence shows that the checkbox did not exist in the Old Flow.  (FOF 169).  The Terms and Conditions page did not even include any information about the negative option in the Old Flow, which was not replaced by the New Flow until mid-2014.  (FOF 515).  Moreover, the Terms and Conditions page itself remains unopened unless a consumer clicks the link.  (FOF 516).  DIRECTV has no evidence that any consumer has ever clicked on that link even after it added a checkbox.  (FOF 516).  Thus, as DIRECTV's head of digital marketing testified, the terms themselves are avoidable to consumers.  (*Id.*).  DIRECTV's argument to the contrary relies on cases involving binding consumers to arbitration clauses.  (Motion at 17, 19 n.4) (citing, *inter alia*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017)).  Those cases apply an "inquiry notice" standard, which is less demanding than ROSCA's "express informed consent" requirement.

### 4.   Dr. Erdem's Findings Confirm DIRECTV's ROSCA Violations.

Dr. Erdem's findings from her Premium Channel website survey confirm that the material terms of the negative option at issue are not clear and conspicuous, and failed to obtain express informed consent.  (FOF 215–217).[20]  Dr. Erdem's results show that only a small

---

[20] DIRECTV's legal attack that Dr. Erdem failed to test "net impression" or "false impression" is meritless with respect to the FTC's ROSCA claims.  ROSCA requires the presence of clear and

minority of respondents who completed the original (unmodified) version of the website purchase flow took away an understanding that they were providing consent to be automatically charged for the premium channels after the initial "free" period.  Only 19% indicated basic awareness of the premium channel promotion and that they were agreeing to be automatically charged.  (FOF 217).  Understanding increased to 42% among respondents who completed the modified purchase flow.  (FOF 217).

Dr. Erdem's results also show that only 28% of respondents who completed the original purchase flow understood that they would be charged between $40 and $50 per month for the premium channels after the "free" period (the charge was $47).  (FOF 215).  By contrast, 71% of respondents who completed the modified purchase flow understood this correct price range.  (*Id.*)  These results show that DIRECTV's website has failed to provide clear and conspicuous disclosures and obtain express informed consent.  (FOF 215, 217).

### 5.      The Negative Option Created Dissatisfied Customers.

DIRECTV attempts to overcome its violation of ROSCA by suggesting that there is an absence of customer dissatisfaction evidence.  (Motion at 18–19.)  In fact, there is a *mountain* of such evidence.  DIRECTV's Customer Care department reported the roll-to-pay feature of the premium channel promotion as a "pain point"—a recognized customer-unfriendly practice.  (FOF 419, 421, 422).  The fact that customers received no proactive notification "when premiums roll to pay" is a "top complaint" for the company, affecting half a million DIRECTV customers.  (FOF 425).  DIRECTV's Net Promoter Score, a measure of customer satisfaction, drops precipitously in the fourth month of the customer's service term—precisely when the customer begin to be automatically charged for the premium channels.  (FOF 427).  DIRECTV has attributed a third of that decline directly to its premium channel cancellation policy.  (*Id.*).  Dr. Pratkanis's RIO trend analysis also shows a volume spike in consumer calls regarding billing concerns between months three and four.  (FOF 361).

conspicuous disclosures, and that is precisely what Dr. Erdem tested.  (FOF 189, 235).

DIRECTV knows that half a million customers cancel the premiums *after* the roll-to-pay deadline.  (FOF 425).[21]  DIRECTV also knows that resolving the roll-to-pay "pain point" is highly feasible.  (*Id.*).  In fact, DIRECTV tested a side-by-side comparison of its roll-to-pay practice (the negative option) with a "roll-off" (where customers would stop getting the premium channels, but would also not be automatically charged).  (FOF 423).  It learned that customer sentiment "is more negative on roll to pay" because "some consider this a negative option." (*Id.*). Nevertheless, DIRECTV stayed with the negative option because of the massive revenues it generates: over half a *billion* dollars *per quarter* just from those customers who had not yet cancelled the premium channels after their "free" promotion expires.  (FOF 423, 424).  In DIRECTV's own words, proactively alerting customers that their premium channels will be rolling to pay is "a significant revenue risk."  (FOF 425; TX591 at DTVFTCII-0433074).

### D.      The Court Should Issue a Permanent Injunction.

Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  Under this provision, this Court may grant permanent injunctive relief for violations of any provision of law enforced by the FTC, and has broad equitable authority "to grant any ancillary relief necessary to accomplish complete justice."  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).  Because DIRECTV has violated the FTC Act, this is a "proper case" for injunctive relief.  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086–87 (9th Cir. 1985) ("proper case" is any violation of a provision of law enforced by the FTC); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998) ("proper cases" includes any violation of the FTC Act).

### E.      The FTC Is Entitled to Monetary Relief.

To obtain restitution for consumers under Section 13(b) of the FTC Act, the FTC must establish that the defendants "engaged in misrepresentations or omissions of a kind usually relied

---

[21] DIRECTV's assertion that "most customers canceled the premium channels in the first three months" (Motion at 18) is false.  DIRECTV's records show the opposite: the vast majority of customers (around 80%) keep all the premium channels through month three, but that figure drops by more than half *in month four*.  (TX660 (filed as Dkt. No. 177-50) at 57).

on by reasonably prudent persons and that consumer injury resulted." *Pantron I*, 33 F.3d at

1102. "To demonstrate reliance and resulting consumer injury, [the FTC] must prove that [the]

'defendant made material representations, that they were widely disseminated, and that

consumers purchased the defendant's product.'" *FTC v. Natural Solutions, Inc.*, 2007 WL

8315533, at *6 (C.D. Cal. Aug. 7, 2007) (quoting *Figgie*, 994 F.2d at 605–06). If the FTC

makes this showing, "the burden shifts to the defendant to prove the absence of reliance." *FTC

v. Publishers Bus. Servs., Inc.*, 2017 WL 451953, at *3 (D. Nev. Feb. 1, 2017) (quoting *Figgie*,

994 F.2d at 605–06). Because the FTC has proved that DIRECTV widely disseminated ads (*see,

e.g.*, FOF 32–33, 40, 42, 45, 47, 49, 51, 57, 60–61, 66) that misled consumers by failing to

adequately disclose material price terms, and that consumers purchased DIRECTV's services

(FOF 12), the presumption of reliance applies, and it is therefore DIRECTV's burden to show

the absence of reliance.

Contrary to DIRECTV's arguments, courts have consistently applied this presumption of

reliance regardless of whether the underlying product is fraudulent, because "[w]hile it may be

true that the defrauded [customers] received a useful product, and though less likely, they may

have even received the product at a competitive price, the central issue here is whether the

seller's misrepresentations tainted the customer's purchasing decisions." *McGregor v. Chierco*,

206 F.3d 1378, 1388 (11th Cir. 2000). In *FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004),

defendant's sales of genuine magazine subscriptions failed to disclose the "true cost, duration

and cancellation policies." *Id.* at 757; *see also Publishers Bus. Servs., Inc.*, 2017 WL 451953, at

*5 (holding similarly that "consumers are entitled to a full refund, with no discount for the value

of the magazines"). The panel, explicitly applying section 13(b) redress principles in the context

of civil contempt, imposed the presumption of reliance, noting that "[t]o the extent the large

number of consumers affected . . . creates a risk of uncertainty, the defendants must bear that

risk." 371 F.3d at 765. Similarly, in *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312

(8th Cir. 1991), which involved sales of genuine coins at inflated prices, the Eighth Circuit

applied the presumption of reliance for the same public policy reasons present here:

> It would be virtually impossible for the FTC to offer such proof,
> and to require it would thwart and frustrate the public purposes of

> FTC action.  This is not a private fraud action, but a government
> action brought to deter unfair and deceptive trade practices and
> obtain restitution . . . .

*Id.* at 1316.  Indeed, the consequences of failing to apply the presumption of reliance are

particularly acute in a case like this, where the scale of the operation renders an individual

determination of reliance virtually impossible.

### F.    The FTC Has Offered a Reasonable Calculation of Monetary Relief.

While the Court's equitable authority to award relief is broad, the measure of that relief is

governed by a two-step burden-shifting framework.  *Commerce Planet*,, 815 F.3d 593, 603 (9th

Cir. 2016).  The first step is for the FTC to show that the amount it seeks in restitution

reasonably approximates the defendant's unjust gains, which are measured by net revenues (the

amount consumers paid for the product or service minus refunds and chargebacks).  *Id.*  Here,

Dr. Daniel Rascher calculated DIRECTV's net programming revenue for 2007 to 2015 (limited

to the first 27 months of new customers' subscriptions) as $30.4 billion.  (FOF 538).

The FTC at this point had met its burden and could have allowed DIRECTV to introduce

mitigating evidence in the second step.  Instead, the FTC provided (through Dr. Rascher) a

drastically smaller estimate of unjust gains, recognizing that DIRECTV consumers received the

service they paid for and that the service functioned as advertised, but that consumers were

misled as to the price.  The "benefit of the bargain" methodology aims to return consumers to the

position they would have been if DIRECTV had performed as its advertisements indicated.

(FOF 534).  This resulting figure is approximately 13% of net revenues,[22] and it is within the

Court's equitable authority to use this reduced amount as the baseline for DIRECTV to offset

with further reductions under the second step.  (COL 628–636).  Courts can and do make such

reductions in fashioning equitable relief.  *See, e.g.*, *Commerce Planet*, 878 F. Supp. 2d at 1092.

Indeed, the FTC already has presented evidence that could be helpful to the Court in

considering any appropriate reductions.  In this case, if the Court finds that DIRECTV has

rebutted the presumption of reliance for certain categories of ads, time periods, or customers, or

with respect to the overall likelihood that the ads are misleading, then Dr. Rascher's results can

---

[22] $3.95 billion / $30.5 billion = 13%.

accommodate modifications to take those conclusions into account. Attachment C to the FTC's Proposed Findings of Fact and Conclusions of Law provide tables showing examples of modified calculations. (Att. C; FOF 554–556). If the Court concludes, for example, that customers purchasing through indirect sales were not injured, that would reduce the monetary injury figure by approximately half. (*Id.*).

DIRECTV's various criticisms of the FTC's relief analysis lack merit. Neither the FTC nor Dr. Rascher are under any obligation to do an investigation or empirical study to determine whether consumers relied on the ads' misrepresentations or what consumers expected. Courts have specifically rejected such obligations. (COL 638–643).

DIRECTV also argues that Dr. Rascher's methodology constitutes legal damages rather than equitable relief. This assertion is inconsistent with the broad scope of the Court's equitable authority in FTC cases. *See Commerce Planet*, 815 F.3d at 598; (COL 629). No "necessary and inescapable inference" limits the Court's equitable authority here. (COL 629).

DIRECTV is also wrong that "no court in a Section 13(b) case has ever awarded the FTC 'expectation' or 'benefit of the bargain' damages." (*See* Motion at 25). *Commerce Planet* and *AMG Services* also return undisclosed fees to consumers, which is equivalent to an "expectation" or "benefit of the bargain" measure. (*See* COL 634–635). Next, DIRECTV incorrectly suggests that the relief framework is limited to cases of fraud or businesses with the sole goal of scamming consumers. (*See* Motion at 21). Again, DIRECTV is incorrect: Many of the cases underlying the law of monetary relief under the FTC Act—including *Figgie* and *Commerce Planet*—were not frauds or pure scams. Rather, they were instances of misleading advertising for legitimate products that some customers valued. (*See* COL 640–643).

## IV.    CONCLUSION

For the reasons stated above, DIRECTV's motion for partial findings should be denied. The Court should order that the parties conclude the trial.

Respectfully Submitted,

Dated:      September 25, 2017           __/s/ Eric D. Edmondson__
                                        Eric D. Edmondson
                                        Raymond E. McKown
                                        Erika Wodinsky
                                        Jacob A. Snow
                                        Stacy Procter
                                        Boris Yankilovich
                                        Kenneth H. Abbe

                                        Attorneys for Plaintiff
\                                       Federal Trade Commission